NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 26-5193

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

DSCC, *ET AL.*,

*Plaintiffs-Appellants*,

v.

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, *ET AL.*,

*Defendants-Appellees*.

On Appeal from the
United States District Court for the District of Columbia
Case No. 1:26-cv-01114
Hon. Carl J. Nichols

## BRIEF FOR PLAINTIFFS-APPELLANTS

Tyler L. Bishop
**ELIAS LAW GROUP LLP**
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0177

Marc E. Elias
Lalitha D. Madduri
Jacob D. Shelly
Christina Ford
Max Accardi
Kevin R. Kowalewski
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
Telephone: (202) 948-1135

*Counsel for Plaintiffs-Appellants DSCC, DCCC, Democratic National Committee, Democratic Governors Association, Senate Minority Leader Schumer, and House Minority Leader Jeffries*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

As required by Circuit Rules 27(a)(4) and 28(a)(1), undersigned counsel for Plaintiffs-Appellants hereby provides the following information:

**I.      Parties and Amici Appearing Below**

**<u>Plaintiffs-Appellants</u>**:

- Democratic Senatorial Campaign Committee (DSCC)

- Democratic Congressional Campaign Committee (DCCC)

- Democratic National Committee (DNC)

- Democratic Governors Association (DGA)

- Senate Minority Leader Charles E. Schumer

- House Minority Leader Hakeem S. Jeffries

No parent company or publicly held company holds a 10% or greater ownership interest in any Plaintiff-Appellant.

**<u>Defendants-Appellees</u>**:

- Donald J. Trump, in his official capacity as President of the United States

- Executive Office of the President

- United States Department of Justice

- United States Postal Service

- United States Department of Homeland Security

- United States Citizenship and Immigration Services

- Social Security Administration

- United States Department of Commerce

- Todd Blanche, in his official capacity as Acting United States Attorney General

- David Steiner, in his official capacity as United States Postmaster General

- Markwayne Mullin, in his official capacity as Secretary of Homeland Security

- Joseph B. Edlow, in his official capacity as Director of the United States Citizenship and Immigration Services

- Frank J. Bisignano, in his official capacity as Commissioner of the Social Security Administration

- Howard Lutnick, in his official capacity as Secretary of the Department of Commerce

**Intervenor-Defendants**:

- State of Missouri
- State of Alabama
- State of Florida
- State of Indiana
- State of Kansas
- State of Louisiana

- State of Montana
- State of Nebraska
- State of Oklahoma
- State of South Carolina
- State of South Dakota
- State of Texas

**Additional Plaintiffs Below**:

- League of United Latin American Citizens

- Secure Families Initiative

- Arizona Students' Association

- National Association for the Advancement of Colored People (NAACP)

- Common Cause

- Common Cause Education Fund

- Black Voters Matter Fund, Inc.

- BVM Capacity Building Institute, Inc.

**<u>Additional Defendants Below:</u>**

- Amber F. McReynolds, in her official capacity as Chair of the Board of Governors of the United States Postal Service

- Board Of Governors of the United States Postal Service

- Daniel M. Tangherlini, in his official capacity as Member of the Board of Governors of the United States Postal Service

- Derek Kan, in his official capacity as Vice Chairman of the Board of Governors of the United States Postal Service

- Ronald A. Stroman, in his official capacity as Member of the Board of Governors of the United States Postal Service

**<u>Amici</u>:**

- Society for the Rule of Law
- Wisconsin Democracy Campaign
- Expo of Wisconsin, Inc.
- Jaleyce Oraedu
- Jasmine Oraedu
- Aharon Shelef
- America's Future

- Citizens United
- Federation for American Immigration Reform

## II.    Ruling Under Review

The ruling under review in this case is the May 28, 2026 order of United States District Court Judge Carl J. Nichols denying Plaintiffs-Appellants' motion to preliminary enjoin Defendants from implementing Sections 2(a) and 3(b) of Executive Order 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 FR 17125 (Mar. 31, 2026).

## III.    Related Cases

This case has not previously been before this Court or any other court. Counsel is aware of the following cases qualifying as related under Circuit Rule 28(a)(1)(C), both of which were consolidated with Plaintiffs-Appellants' case below: *League of United Latin American Citizens, et al. v. Executive Office of the President, et al.*, No. 26-cv-01132-CJN (D.D.C.), and *National Association for the Advancement of Colored People, et al. v. Trump, et al.*, No. 26-cv-01151-CJN (D.D.C.).

*/s/ Lalitha D. Madduri*
Lalitha D. Madduri

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

STATEMENT OF JURISDICTION.......................................................................2

ISSUES PRESENTED..............................................................................................2

PERTINENT STATUTES ........................................................................................3

STATEMENT OF THE CASE................................................................................3

I.      Legal Background................................................................................3

II.    Factual Background ...........................................................................4

        A.      Section 2(a) requires federal agencies to amass and distribute "Citizen-Resident Lists" shortly before each federal election. .............4

        B.      Section 3(b) orders USPS to prohibit the transmission of ballots for voters not "enrolled" with USPS........................................................6

        C.      Plaintiffs are in the midst of final preparations for the 2026 elections. ......................................................................................................7

III.   Procedural History ............................................................................8

SUMMARY OF THE ARGUMENT .....................................................................11

STANDARD OF REVIEW ...................................................................................15

ARGUMENT ..........................................................................................................15

I.      Plaintiffs' claims are justiciable. ...................................................15

        A.      Plaintiffs' challenges to Section 2(a) are justiciable...........................16

            1.  Section 2(a) inflicts several Article III injuries.............................16

            2.  Plaintiffs' challenge to Section 2(a) is prudentially ripe. .............25

        B.      Plaintiffs' challenges to Section 3(b) are justiciable...........................29

            1.  Section 3(b) inflicts several Article III injuries. ..........................29

2. Plaintiffs' challenge to Section 3(b) is prudentially ripe. .............39

C. The remaining standing elements are satisfied. .................................40

II. Plaintiffs are likely to succeed on the merits................................................40

A. The Executive Order is *ultra vires*. .......................................................40

B. Section 3(b) violates the separation of powers. ..................................44

C. Section 3(b) exceeds USPS's statutory authority. .............................45

D. Section 2(a) violates the Privacy Act. ...................................................46

1. The records required to build the E.O.'s Citizen-Resident Lists cannot lawfully be used for that purpose. .....................................47

2. The E.O.'s Citizen-Resident Lists cannot be created without illegal data matching. .......................................................................49

III. The remaining preliminary injunction factors are satisfied..........................51

A. Plaintiffs will be irreparably harmed if the E.O. is not enjoined quickly. ......................................................................................................51

B. The equities and public interest favor relief.......................................55

CONCLUSION ........................................................................................................56

**TABLE OF AUTHORITIES**

PAGE(S)

**CASES**

*AFGE v. HUD*,
118 F.3d 786 (D.C. Cir. 1997)...............................................................54

*AFGE v. Trump*,
139 F.4th 1020 (9th Cir. 2025)...............................................................27

*AFL-CIO v. DOL*,
No. 25-339 (JDB), 2026 WL 879518 (D.D.C. Mar. 31, 2026) ..........17, 18, 20, 29

*AFL-CIO v. SSA*,
172 F.4th 361 (4th Cir. 2026) ...............................................................20

*Am. Petroleum Inst. v. EPA*,
906 F.2d 729 (D.C. Cir. 1990)...............................................................38

*\*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013)............................................................... 3, 44, 45

*AT&T v. Cent. Off. Tel., Inc.*,
524 U.S. 214 (1998)...............................................................27

*Baker v. Carr*,
369 U.S. 186 (1962)...............................................................42

*Bennett v. Spear*,
520 U.S. 154 (1997)...............................................................29

*Bldg. & Constr. Trades Dep't, AFL-CIO, v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002)............................................... 28, 39

*\*Bost v. Ill. State Bd. of Elections*,
607 U.S. 71 (2026)....................................... 2, 11, 12, 16, 22, 23, 30, 40, 52, 53

*Bristol-Myers Co. v. FTC*,
424 F.2d 935 (D.C. Cir. 1970)...............................................................35

*Britt v. Naval Investigative Serv.*,
886 F.2d 544 (3d Cir. 1989) ...............................................................48

*California v. Trump*,
786 F.Supp.3d 359 (D. Mass. 2025)........................................................36

*\*Chamber of Com. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996)........................................ 41, 43, 55

*Chamber of Com. v. Reich*,
57 F.3d 1099 (D.C. Cir. 1995)........................................................26

*Chi. Women in Trades v. Trump*,
778 F.Supp.3d 959 (N.D. Ill. 2025)........................................36

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979)........................................................43

*Chung v. DOJ*,
333 F.3d 273 (D.C. Cir. 2003)........................................20

*City & Cnty. of S.F. v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ........................................ 27, 36

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)........................................................2

*Colo. Republican Fed. Campaign Comm. v. FEC*,
518 U.S. 604 (1996)........................................................22

*Common Cause/Ga. v. Billups*,
554 F.3d 1340 (11th Cir. 2009) ........................................33

*Crawford v. Marion Cnty. Election Bd.*,
472 F.3d 949 (7th Cir. 2007) ........................................32

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
710 F.2d 842 (D.C. Cir. 1983)........................................35

*Ctr. for Democracy & Tech. v. Trump*,
507 F.Supp.3d 213 (D.D.C. 2020)........................................37

*Ctr. for Taxpayer Rts. v. IRS*,
815 F.Supp.3d 1 (D.D.C. 2025)........................................ 21, 54

*Dart v. United States*,
848 F.2d 217 (D.C. Cir. 1988) ...................................................39

*Deer Park Indep. Sch. Dist. v. Harris Cnty. Appraisal Dist.*,
132 F.3d 1095 (5th Cir. 1998) ...................................................41

*Defs. of Wildlife v. Perciasepe*,
714 F.3d 1317, 1324 (D.C. Cir. 2013) ......................................35

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ......................................................... 24, 40

*\*Doe v. Stephens*,
851 F.2d 1457 (D.C. Cir. 1988) ........................................ 48, 50

*Eagle-Picher Indus., Inc. v. EPA*,
759 F.2d 905 (D.C. Cir. 1985) ..................................................35

*Ex parte Siebold*,
100 U.S. 371 (1879) ......................................................... 41, 44

*FAA v. Cooper*,
566 U.S. 284 (2012) ......................................................... 20, 54

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ......................................................24, 25, 31

*Fish v. Schwab*,
957 F.3d 1105 (10th Cir. 2020) .................................................33

*FTC v. PPG Indus., Inc.*,
798 F.2d 1500 (D.C. Cir. 1986) ................................................53

*Gadelhak v. AT&T Servs.*,
950 F.3d 458 (7th Cir. 2020) ....................................................17

*Geo Grp., Inc. v. Inslee*,
151 F.4th 1107 (9th Cir. 2025) .................................................35

*Georgia v. Meadows*,
88 F.4th 1331 (11th Cir. 2023) .............................................. 3, 41

*Georgia v. President of the United States*,
46 F.4th 1283 (11th Cir. 2022) ........................................................ 44, 45

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)........................................................ 31, 32

*HIAS, Inc. v. Trump*,
985 F.3d 309 (4th Cir. 2021) ........................................................28

*Huisha-Huisha v. Mayorkas*,
27 F.4th 718 (D.C. Cir. 2022)........................................................15

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)........................................................16

*Jeffries v. Volume Servs. Am., Inc.*,
928 F.3d 1059 (D.C. Cir. 2019)........................................................18

*Kendall v. U.S. ex rel. Stokes*,
37 U.S. 524 (1838)........................................................ 43

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986)........................................................45

*\*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)........................................ 2, 14–16, 51, 55, 56

*League of Women Voters v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) ........................................................ 52, 54

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)........................................................ 15, 40

*LULAC v. EOP*,
780 F.Supp.3d 135 (D.D.C. 2025)........................................ 8, 27, 28, 31, 36, 53

*LULAC v. EOP*,
808 F.Supp.3d 29 (D.D.C. 2025)........................................................ 8, 41

*LULAC v. EOP*,
818 F.Supp.3d 34 (D.D.C. 2026)........................................ 8, 24, 25, 27, 48

*Minnesota v. Mille Lacs Band of Chippewa Indians,*
526 U.S. 172 (1999) ................................................................41

*Molina v. DHS,*
811 F.Supp.3d 1 (D.D.C. 2025) ...........................................11

*N.Y. State Ophthalmological Soc'y v. Bowen,*
854 F.2d 1379 (D.C. Cir. 1988) ............................. 12, 26, 27

*Nat. L. Party of U.S. v. FEC,*
111 F.Supp.2d 33 (D.D.C. 2000) ..........................................30

*Nat'l Ass'n of Postal Supervisors v. USPS,*
26 F.4th 960 (D.C. Cir. 2022) ...............................................34

*Nat'l Urb. League v. Trump,*
783 F.Supp.3d 61 (D.D.C. 2025) ..........................................37

*New Jersey v. EPA,*
989 F.3d 1038 (D.C. Cir. 2021) ............................................39

*NFIB v. OSHA,*
595 U.S. 109, 117 (2022) ......................................................45

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,*
461 U.S. 190 (1983) ..............................................................32

*Pearson v. Dodd,*
410 F.2d 701 (D.C. Cir. 1969) ..............................................18

*\*Pileggi v. Wash. Newspaper Publ'g Co.,*
146 F.4th 1219 (D.C. Cir. 2025) .............. 11, 12, 17, 20, 25

*POET Biorefining v. EPA,*
970 F.3d 392 (D.C. Cir. 2020) ..............................................15

*Purcell v. Gonzalez,*
549 U.S. 1 (2006) ....................................................................9

*RNC v. N.C. State Bd. of Elections,*
120 F.4th 390 (4th Cir. 2024) ...............................................24

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) ................................................................................39

*Shays v. FEC*,
414 F.3d 76 (D.C. Cir. 2005) ..................................................................30

*Sidak v. ITC*,
174 F.4th 151 (D.C. Cir. 2026) ................................................... 16, 26, 39

*Sierra Club v. DOT*,
125 F.4th 1170 (D.C. Cir. 2025) ..................................................... 35, 38

*Spokeo v. Robins*,
578 U.S. 330 (2016) ................................................................................16

*Susman Godfrey LLP v. EOP*,
789 F.Supp.3d 15 (D.D.C. 2025) .............................................................36

*Tenn. NAACP v. Lee*,
139 F.4th 557 (6th Cir. 2025) ..................................................................32

*Thomas More L. Ctr. v. Obama*,
651 F.3d 529 (6th Cir. 2011) ...................................................................44

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ....................................................................... 11, 16

*Trump v. New York*,
592 U.S. 125 (2020) ................................................................................36

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) ................................................................................29

*\*Venetian Casino Resort v. EEOC*,
409 F.3d 359 (D.C. Cir. 2005) ........................................................ 12, 26

*\*Venetian Casino Resort v. EEOC*,
530 F.3d 925 (D.C. Cir. 2008) ................................................. 26, 29, 34

*Washington v. Trump*,
766 F.Supp.3d 1138 (W.D. Wash. 2025) ...............................................44

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ............................................................49

*Wilmer Cutler Pickering Hale & Dorr LLP v. EOP*,
   784 F.Supp.3d 127 (D.D.C. 2025) .....................................36

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ...............................................................51

*\*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ...........................................................41

**STATUTES**

5 U.S.C. § 552a ...................................................... 14, 19, 21, 46–51

5 U.S.C. § 704 .....................................................................................41

5 U.S.C. § 706(2) ......................................................................... 41, 46

28 U.S.C. § 1292(a) ..............................................................................2

28 U.S.C. § 1331 ...................................................................................2

28 U.S.C. § 1339 ...................................................................................2

39 U.S.C. § 101(a) ..............................................................................45

39 U.S.C. § 401(2) ..............................................................................45

39 U.S.C. § 403(c) ..............................................................................46

39 U.S.C. § 404(e)(2) ..........................................................................46

39 U.S.C. § 409 .....................................................................................2

39 U.S.C. § 3001 *et seq* .....................................................................46

42 U.S.C. § 1320b-7 ............................................................................49

52 U.S.C. § 20501 *et seq* .....................................................................3

52 U.S.C. § 20509 *et seq* .....................................................................3

52 U.S.C. § 20507(a) ...............................................................................42

52 U.S.C. § 21083(a) ...............................................................................42

Pub. L. No. 100-503, 102 Stat. 2507 (1988)...........................................19

Pub. L. No. 99-603, 100 Stat. 3359 (1986)..............................................49

**OTHER AUTHORITIES**

U.S. Const. art. I, § 4, cl. 1................................................................. 3, 45

Exec. Order No. 14399, *Ensuring Citizenship Verification and*
   *Integrity in Federal Elections*,
   91 FR 17125 (Mar. 31, 2026) ................... 4, 6, 8, 10, 13, 21, 24, 40-42, 47–50, 54

U.S. Department of Homeland Security, *Privacy Act of 1974;*
   *System of Records*, 90 FR 48948 (Oct. 31, 2025)..............................21, 22, 48, 50

Social Security Administration, *Privacy Act of 1974; System of Records*,
   90 FR 50879-03 (Nov. 12, 2025)........................................................ 21, 48, 50

U.S. Postal Service, *Ballot Mail for Federal Elections*,
   91 FR 32915-01 (June 2, 2026) ................................................................6

H.R. Rep. No. 100-802 (1988) ....................................................... 20, 22

Lisa Marshall Manheim, *Presidential Control of Elections*,
   74 Vand. L. Rev. 385 (2021) ...................................................................4

Restatement (Second) of Torts § 652B....................................................17

The Federalist No. 57 (James Madison) ..................................................41

The Federalist No. 59 (Alexander Hamilton) ..........................................41

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| DHS | Department of Homeland Security |
| DCCC | Democratic Congressional Campaign Committee |
| DGA | Democratic Governors Association |
| DNC | Democratic National Committee |
| DSCC | Democratic Senatorial Campaign Committee |
| EO | Executive Order |
| EOP | Executive Office of the President |
| HAVA | Help America Vote Act |
| JA | Joint Appendix |
| NVRA | National Voter Registration Act |
| NPRM | Notice of Proposed Rulemaking |
| SAVE | Systematic Alien Verification for Entitlements |
| SORN | System of Records Notice |
| SSA | Social Security Administration |
| SSN | Social Security Number |
| USCIS | U.S. Citizenship and Immigration Services |
| USPS | U.S. Postal Service |

## INTRODUCTION

No one really disagrees that President Trump's latest Executive Order purporting to regulate American elections—which requires agencies to create lists of adult citizens residing in every State to share with State election officials, and orders USPS not to transmit mail ballots of voters who are not properly "enrolled" with USPS—is flagrantly unlawful. Not Defendants, whose attorney said that he was "very hesitant to just sort of canvas the U.S. Code for how [] the Postal Service [could] do such a thing." JA644. And not the district court, which largely avoided addressing Plaintiffs' claims on the merits. JA695-720.

At bottom, the district court erred in treating this case as a run-of-the-mill rulemaking case, finding that Plaintiffs must wait until USPS issues a final rule transforming mail voting, and until DHS has finalized its citizen-resident lists—and prove that those lists have errors—before they can obtain relief. *See* JA697. But this is not a rulemaking case. It is a separation of powers case. And there is no serious question that the President lacks authority to order his subordinates to conduct the action the E.O. requires, or that the agencies themselves lack authority to take that action.

The only question is whether Plaintiffs—the Democratic Party's national organizations and congressional leaders—are entitled to a preliminary injunction now, or whether their injuries must continue to metastasize. In emphasizing that the

E.O.'s implementation is not yet *complete*, the district court ignored the several ways concrete harm has *already begun*. Already, the E.O. has damaged Plaintiffs' interests in "the integrity of the election[] and the democratic process." *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 82 (2026). Already, Plaintiffs are incurring "costs to 'mitigate or avoid' a 'substantial risk' of some independent harm." *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). Political parties and their candidates cannot meaningfully prepare for high-stakes elections with an unlawful E.O. commanding agency interference just before voting begins. As this Court has recognized, "Damocles's sword does not have to actually fall on [Plaintiffs] before the court will issue an injunction." *League of Women Voters v. Newby*, 838 F.3d 1, 8-9 (D.C. Cir. 2016). This Court should reverse.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1339, and 39 U.S.C. § 409. JA42-43. The district court denied Plaintiffs' motion for a preliminary injunction on May 28, 2026. JA721. Plaintiffs timely appealed. JA726. This Court has jurisdiction pursuant to 28 U.S.C. § 1292(a).

## ISSUES PRESENTED

1.    Whether Plaintiffs' claims are justiciable.

2.    Whether the President may order federal agencies to match and disclose Americans' personal records to States for use in elections.

3.	Whether the President may order USPS to impose new restrictions on mail voting.

4.	Whether the remaining preliminary injunction factors support the issuance of a preliminary injunction.

**PERTINENT STATUTES**

All pertinent statutes are contained in the Addendum.

**STATEMENT OF THE CASE**

## I.	Legal Background

The Elections Clause allocates power to regulate elections to States in the first instance, subject to certain oversight only by Congress. *See* U.S. Const. art. I, § 4, cl. 1. While Congress may regulate *how* federal elections are administered, it typically may not decide *who* is eligible to vote—that power is reserved for States. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8, 16 (2013) ("*ITCA*"). Congressional statutes that regulate voting, including the NVRA, 52 U.S.C. § 20501, *et seq.*, and HAVA, 52 U.S.C. § 20509, *et seq.*, confirm that primary responsibility for election administration rests with the States.

"[T]he Constitution does not spell out a role for the President in the operation of state voting procedures in federal elections[.]" *Georgia v. Meadows*, 88 F.4th 1331, 1346 (11th Cir. 2023). And "in the field of election administration, Congress appears to have granted the president vanishingly little power to exercise unilateral

3

control." Lisa Marshall Manheim, *Presidential Control of Elections*, 74 Vand. L. Rev. 385, 435 (2021).

## II. Factual Background

On March 31, 2026, President Trump issued E.O. 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections* (the "E.O." or "Order"), which attempts to transform American elections by executive fiat. *See* JA102-07. The E.O. requires the federal government to amass and distribute lists of adult citizen-residents to State election officials and orders USPS to impose new restrictions on voting by mail, forcing Plaintiffs to adapt to a new electoral playing field.

### A. Section 2(a) requires federal agencies to amass and distribute "Citizen-Resident Lists" shortly before each federal election.

Section 2(a) requires DHS to prepare "Citizen-Resident Lists" of every adult American citizen residing in each State and share those lists with State election officials. Section 2(a) specifies that the Lists "shall be derived from Federal citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases." E.O. § 2(a). The Lists must be "transmitted to State election officials no fewer than 60 days before each regularly scheduled Federal election," or upon request. *Id.* The E.O.'s purpose is to "assist in verifying identity and Federal election voter eligibility." *Id.* § 1.

Defendants did not dispute Plaintiffs' evidence demonstrating that the Lists

4

are sure to be defective. *First*, because the E.O. requires Defendants to provide the Lists to States "no fewer" than 60 days before each election, the Lists will omit or have inaccurate data for anyone who moves or attains citizenship after the Lists are transmitted. JA220; JA333-36; JA339-40. *Second*, the databases the E.O. requires Defendants to use have known deficiencies that ensure they cannot accurately reflect the adult-citizen residents of each State. SAVE and SSA databases are incomplete, out-of-date, and riddled with inaccurate citizenship data, as DHS and SSA have acknowledged. JA219-20; JA274-75; JA304-07.

When States attempt to use those databases for voter-eligibility purposes, citizens are frequently flagged as noncitizens, with error rates as high as 80%. JA220; JA309-26. Moreover, neither has current residential information for most Americans, JA220-21; JA327-31, nor do they have updated information on surname changes due to marriage or divorce, JA223. The idea that these databases could be used to create accurate lists of citizen-residents in each State is preposterous. Nonetheless, 12 States that intervened to defend the E.O. asserted intent to use them to "verify" and "modify" their own voter-registration lists. Doc. 77-1 at 10-12.

On June 5, 2026, DHS announced its policy "regarding implementation of [Section 2(a)], including the creation of State Citizenship Lists" in a "registry" that would be "operational by June 30, 2026" for States to access. JA728-30. Three days later, DHS rescinded that policy but confirmed its "current" plan "to facilitate direct

sharing of citizenship list information with states" derived from SAVE, SSA, and State Department data by June 30. JA731-33. "[C]itizen-facing portal capabilities" will be available only "later in 2026." JA732. Even as details have evolved, Defendants have continued to carry out Section 2(a) as written.

**B.** **Section 3(b) orders USPS to prohibit the transmission of ballots for voters not "enrolled" with USPS.**

Section 3(b) of the E.O. calls for a transformation of the vote-by-mail process. It "direct[s]" the Postmaster General to "initiate a proposed rulemaking" that "*shall* include, at minimum" the creation of "Mail-In and Absentee Participation Lists" of individuals "who are enrolled with the USPS" for "mail-in or absentee ballots" in each State. E.O. § 3(b)(iv) (emphasis added). Section 3(b)(iii) prohibits USPS from transmitting ballots for voters who are not on such lists. *See id.* § 3(b)(iii). On June 2, 2026, USPS issued that notice of proposed rulemaking. *See* Ballot Mail for Federal Elections, 91 FR 32915-01 (June 2, 2026) (the "NPRM"). "[C]onsistent with Section 3 of Executive Order 14399," the NPRM proposes amending U.S. Postal Standards "regarding the transmission of mail-in or absentee ballots for federal elections through the mail." *Id.* The NPRM includes every element Section 3(b) requires, including creation of "Mail-In and Absentee Participation Lists" for each State and the prohibition on transmitting ballots of individuals who are not "enrolled" with USPS. NPRM §§ 24.4.2, 24.5.1, 24.5.3. Such changes would radically remake mail voting; every State offers at least some form of mail voting,

and every State uses USPS to transmit ballots. *See* JA363-78; JA455-59.

**C.** **Plaintiffs are in the midst of final preparations for the 2026 elections.**

Plaintiffs—DSCC, DCCC, DNC, DGA, Leader Schumer, and Leader Jeffries—are dedicated to electing Democratic candidates nationwide, a mission that requires their members to successfully cast ballots. JA120; JA134; JA149; JA164; JA178-79; JA187-88. Collectively, Plaintiffs' membership includes Democratic candidates and Democratic voters in all 50 States. JA121; JA134; JA149-50; JA165-66. In addition, Leaders Schumer and Jeffries are themselves voters and candidates with individual interests in the electoral process and their privacy rights. JA178-79; JA187-89.

In advance of the 2026 elections, Plaintiffs developed mail-ballot programs, voter-turnout initiatives, and voter-information campaigns based on election rules as they existed before the E.O. JA123-25; JA137-40; JA152-54; JA167-69. Mail voting is particularly essential to Plaintiffs' programs, as Democratic voters currently vote by mail at higher rates than Republicans do. JA153; JA413. The E.O. fundamentally disrupts Plaintiffs' plans for the election and significantly alters the electoral playing field. Unless it is enjoined, Plaintiffs must develop new voter assistance and education programs at the expense of their voter persuasion and mobilization efforts. JA125-27; JA139-42; JA154-56; JA169-71. These programs cannot be created overnight, and because mail ballots will be sent to voters in early September,

7

Plaintiffs cannot wait to make programming changes. JA126; JA140; JA156.

This is not the first time the President has attempted to illegally transform American elections by fiat. Last year, Plaintiffs successfully challenged E.O. 14248, which (among other things) ordered agencies to share sensitive voter information, change mail-voting rules, and require documentary proof-of-citizenship to register. *LULAC v. EOP* ("*LULAC I*"), 780 F.Supp.3d 135 (D.D.C. 2025); *LULAC v. EOP* ("*LULAC II*"), 808 F.Supp.3d 29 (D.D.C. 2025); *LULAC v. EOP* ("*LULAC III*"), 818 F.Supp.3d 34 (D.D.C. 2026), *appeals consolidated*, No. 25-5476 (D.C. Cir. June 1, 2026).

## III. Procedural History

The day after E.O. 14399 was issued, Plaintiffs challenged its directives. *See* JA37-100.[1] Plaintiffs then moved for a preliminary injunction on their claims that the E.O. is *ultra vires*, violates the separation of powers and federalism, contrary to USPS's statutory powers, and irreconcilable with the Privacy Act. Docs. 34 & 55. Plaintiffs supported their motion with declarations from party leaders and members, detailing how the E.O.'s illegal changes would cause imminent harm and why prompt relief was necessary. JA119-213. Defendants, along with several Republican-led States that intervened to support the E.O., Doc. 77, largely declined

---

[1] Two other plaintiff groups, referred to below as the "LULAC" and "NAACP" Plaintiffs, also challenged the E.O. The cases were consolidated.

to defend the E.O.'s legality, *see* Docs. 105 & 117-1. Instead, they claimed it was too soon for the court to provide relief, even suggesting the E.O. might *never* be implemented. *See* Doc. 117-1 at 25, 39.

At the preliminary injunction hearing, the district court offered Defendants ample opportunities to defend the E.O. on the merits, asking, for example, how USPS might lawfully implement Section 3(b). Defendants had no response. JA644. The court also expressed concern that *Purcell v. Gonzalez*, 549 U.S. 1 (2006), which discourages courts from entering injunctions too close to an election, might soon bar relief. *See* JA641-42 (district court opining that waiting until the "end of July" to grant relief would put the case on "the cusp of election season, and we are starting to really bump up against *Purcell*"). Defendants declined to renounce making *Purcell*-related arguments in the future. JA641.

Nevertheless, the district court denied Plaintiffs' motion, finding Plaintiffs moved too soon.[2] *See* JA696-97. On their Section 2(a) challenge, the court held Plaintiffs lacked standing to challenge Defendants' unlawful disclosure of their private data and that their injuries were "speculative." *See* JA706-07. It suggested Plaintiffs could renew their motion once Plaintiffs showed those Lists "omit specific

---

[2] The district court did not make factual findings regarding the accuracy of SAVE and SSA data, nor findings on mail-voting rates (including partisan differences). All evidence presented by Plaintiffs was unrebutted.

individuals due to particularized flaws," JA697, effectively finding that Plaintiffs cannot be injured until the Lists are already in use and actively inflicting privacy harms. The district court's reasoning requires Plaintiffs to wait to seek relief to address this illegally structured environment—*after* expending critical resources to mitigate harms to their voters, and potentially even *after voting has begun*. *See* E.O. § 2(a) (requiring Lists be transmitted to States "no fewer than 60 days" before each federal election); JA732 (Defendants indicating a public, "citizen-facing portal" will not be available until "later in 2026"); JA126. That delay also exacerbates the risk that Defendants will argue *Purcell* bars relief. *See* JA641. Similarly, on Plaintiffs' Section 3(b) challenge, the court held that Plaintiffs must wait until USPS issues a final rule (after July 30) to renew their motion, before which Plaintiffs must prepare for the E.O. to take effect. JA713-14. By July 30, mail ballots will be just a month away from going out to voters across the country, JA126, and under the district court's reasoning, Defendants' *Purcell* arguments will have ripened. JA641.

The district court "briefly" assessed Plaintiffs' *ultra vires* claims (but no other claims) on the merits, finding Plaintiffs were unlikely to succeed based on the proposition that the President can "direct[] executive branch officials to take certain actions," even if those directives are patently unlawful. JA716-17.

After the district court's order, the White House confirmed that "[t]he entire Trump Administration … remains confident that the Executive Order will be

implemented by the November election, which was always the intent when it was signed."[3]

**SUMMARY OF THE ARGUMENT**

**I.** The district court had jurisdiction to resolve Plaintiffs' motion. In holding Plaintiffs were "unlikely" to show an Article III controversy, the court disregarded recent binding precedents that confirm Plaintiffs are not obliged to wait to obtain relief until Defendants have already invaded federal records to create the Citizen-Resident Lists and disseminated private voter information, as compelled by Section 2(a), or refused to transmit lawful mail ballots, as directed by Section 3(b). *See Pileggi v. Wash. Newspaper Publ'g Co.*, 146 F.4th 1219 (D.C. Cir. 2025) (applying *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)); *Bost*, 607 U.S. 71.

**A.** The district court erred in holding that Plaintiffs are unlikely to establish a concrete injury to challenge Section 2(a). Plaintiffs and their members have cognizable privacy interests in preventing unauthorized disclosures of records protected by the Privacy Act, both between federal agencies and to State officials. The holding below cannot be squared with the Act's express prohibitions and this Court's precedents, and it fails to heed this Court's admonition that congressional

---

[3] Tierney Sneed et al., *Postal Service Won't Deliver Mail Ballots for States That Don't Hand Over Voter Lists, Under Plan for Trump Directive*, CNN (June 10, 2026), https://www.cnn.com/2026/06/10/politics/postal-service-deliver-mail-in-ballots. This Court may take notice of "Executive Branch statements" to media. *E.g.*, *Molina v. DHS*, 811 F.Supp.3d 1, 46 n.41 (D.D.C. 2025).

judgments in federal privacy law must guide courts in determining concreteness. *Pileggi*, 146 F.4th at 1231-34.

The district court similarly erred in rejecting Plaintiffs' political "interest in a fair [election] process," *Bost*, 607 U.S. at 77, on the theory that Section 2(a) does not "alter the rules of any State election," JA711. That theory both misreads *Bost* and ignores the E.O.'s real-world impact on the elections process. Similarly, the district court erred in concluding that cognizable harm to Plaintiffs' organizational interests from the imminent disclosure of protected records is too speculative, particularly given the substantial, unrebutted evidence detailing those effects—which are consistent with fears Congress sought to avoid through the Privacy Act—are happening today.

Finally, Plaintiffs' claims against Section 2(a) are ripe because they present facial challenges to the Lists' compatibility with federal law that require no further details about implementation. Binding precedent holds that such challenges require the Court's attention immediately. *E.g.*, *Venetian Casino Resort v. EEOC* ("*Venetian I*"), 409 F.3d 359, 365-67 (D.C. Cir. 2005); *N.Y. State Ophthalmological Soc'y v. Bowen*, 854 F.2d 1379, 1385-88 (D.C. Cir. 1988).

**B.** Plaintiffs' claims against Section 3(b) are equally justiciable. Again, Plaintiffs' claims present a series of purely legal questions: Does the President have the power to declare that some voters' ballots cannot be mailed? Does the President

have the power to tell USPS to act beyond its statutory authority? So long as those questions remain unanswered and the E.O. remains in force, Plaintiffs must plan to compete in unlawfully structured elections. The corresponding fallout disrupts Plaintiffs' core electoral activities, forcing them to divert critical resources to respond, thereby harming their electoral prospects. The district court brushed aside these well-recognized Article III injuries based on a series of far-fetched contingencies, assuming the Order's plain commands may never be implemented. So long as the E.O. remains in force, however, Plaintiffs must plan to execute an election under it.

**II.** Although the district court did not meaningfully review the merits, it is largely undisputed that Sections 2(a) and 3(b) violate federal law.

**A.** Plaintiffs are likely to succeed on their *ultra vires* challenge to both provisions. No constitutional or statutory provision gives the President or any Defendant authority to create Citizen-Resident Lists to determine "Federal election voter eligibility," E.O. § 1, or for the President to order USPS to mandate new restrictions for mail voting.

**B.** Section 3(b) also violates the separation of powers and exceeds USPS's statutory authority. No party has suggested any legal basis for USPS to propose or enact a rule consistent with Section 3(b), and for good reason: such a rule infringes on both Congress's and the States' authority to regulate elections and is inconsistent

13

with USPS's governing statutes.

**C.** Section 2(a) also facially violates the Privacy Act, 5 U.S.C. § 552a, which prohibits record-sharing within and outside the federal government for reasons incompatible with the purpose for which the record was collected, and bans computer "matching programs" absent existing "legal authority," *id.* § 552a(a), (b), (o). There is no way to follow Section 2(a)'s commands without violating the Act.

**III.** The remaining preliminary injunction factors each favor relief.

**A.** The district court erred in its analysis of irreparable harm, which merely reiterated its conclusion that Plaintiffs likely lack standing, and appeared to improperly require that their injury be "certain" and presently occurring. Binding precedent does not require Plaintiffs to have *already* suffered injury to establish irreparable harm, which need only be "likely." *Newby*, 838 F.3d at 6. That said, if the E.O. is not enjoined, Plaintiffs *are* certain to experience several harms to their core electoral activities, each of which is quintessentially irreparable: as this Court's precedent recognizes, once an election occurs, "there can be no do over." *Id.* at 9. Further, Plaintiffs' members face imminent violations of their privacy rights, harm that is irreparable because it involves disclosure of data Congress deemed off-limits and cannot be adequately remedied through damages.

**B.** Finally, the equities and public interest overwhelmingly favor relief. Left unaddressed, nearly every adult citizen, including the individual Plaintiffs and

14

millions of the organizational Plaintiffs' members, will suffer privacy breaches, and Plaintiffs will have to compete on an unlawful electoral playing field. Defendants have failed to show they will be harmed by an injunction.

## STANDARD OF REVIEW

This Court reviews the district court's "decision to [deny] Plaintiffs' request for a preliminary injunction for abuse of discretion, its legal conclusions de novo, and its findings of fact for clear error." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 726 (D.C. Cir. 2022).

## ARGUMENT

The Court should reverse and order the district court to enjoin Defendants' impending implementation of Sections 2(a) and 3(b) of the Executive Order.[4]

### I.     Plaintiffs' claims are justiciable.

Plaintiffs established Article III standing and ripeness by showing a substantial likelihood that the E.O. is causing injuries-in-fact that are traceable to the Order and redressable by the Court. *Newby*, 838 F.3d at 9; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *see also POET Biorefining v. EPA*, 970 F.3d 392, 403 (D.C. Cir. 2020) (recognizing "[c]onstitutional ripeness is subsumed into the Article III requirement of standing" where plaintiffs seek prospective relief against

---

[4] Plaintiffs' request encompasses the related provisions of Sections 4(a) and 4(c), which direct implementation of the relevant portions of Sections 2(a) and 3(b).

executive action (quotation omitted)). Plaintiffs' claims are also "prudentially ripe"—to the extent the doctrine still exists—because the issues are fit for review and plaintiffs are threatened with hardships without review. *Sidak v. ITC*, 174 F.4th 151, 157 (D.C. Cir. 2026).

### A. Plaintiffs' challenges to Section 2(a) are justiciable.

#### 1. Section 2(a) inflicts several Article III injuries.

The record establishes that Plaintiffs are suffering cognizable harm from imminent implementation of Section 2(a). The organizational Plaintiffs have associational standing because their members' privacy rights will be infringed, those harms are germane to their missions, and individual participation is unnecessary. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Plaintiffs also have standing under *Bost* and organizational standing because the Order disrupts their core election programs by threatening impending, unlawful changes to the voting process. *See Bost*, 607 U.S. at 76-78; *Newby*, 838 F.3d at 9.

**a. Privacy Harm.** Plaintiffs and their members have common-law interests in preventing unauthorized disclosures of their records. Section 2(a), which will be implemented by June 30, poses an imminent threat to those interests. JA728-33.

Plaintiffs' injury satisfies Article III if it has "a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424 (quoting *Spokeo v. Robins*, 578 U.S. 330, 341 (2016)).

16

Such harms include "reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.* at 425. The common-law analogue need not be an exact match; Congress may elevate the status of injuries previously inadequate at law, and it may identify modern relatives. *Pileggi*, 146 F.4th at 1226-27; *see Gadelhak v. AT&T Servs.*, 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.). What matters is the harm has "a 'close relationship' in kind, not degree." *Gadelhak*, 950 F.3d at 462 (quoting *Spokeo*, 578 U.S. at 341).

As several courts have held, harms from inter-agency sharing of data in violation of the Privacy Act satisfy this standard. *AFL-CIO v. DOL*, No. 25-339 (JDB), 2026 WL 879518, at *10 (D.D.C. Mar. 31, 2026) (collecting cases). Congress—by enacting specific restrictions—"simply gave protection to a common law injury cloaked in more modern garb." *Pileggi*, 146 F.4th at 1229-30 (citing *TransUnion*, 594 U.S. at 423). Plaintiffs suffer a "concrete" injury when federal agencies share records in a manner that violates the Privacy Act. *Id.* at 1230.

Privacy Act injuries are analogous to at least two common-law torts: intrusion-upon-seclusion and breach-of-confidence. Intrusion-upon-seclusion forbids "intentionally intrud[ing], physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns" if "the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B. The tort is "founded upon the discomfort produced by [such] intrusions." *Id.* "[W]hat

17

produces the injury it recognizes is not targeting, as in malicious prosecution, but the knowledge that one's private space or affairs have been entered or exposed without consent." *AFL-CIO*, 2026 WL 879518, at *10 (citing *Pearson v. Dodd*, 410 F.2d 701, 704 (D.C. Cir. 1969)).

That is precisely what Section 2(a) does: it intrudes on the "sphere of privacy surrounding [Plaintiffs'] members' personal affairs" and mandates that federal agencies "access" their "private information" without authorization. *Id.* at *10 (holding unauthorized disclosures from officials in one agency to another sufficiently analogous to intrusion-upon-seclusion). The record "confirms" the injury: Plaintiffs and their members are suffering "deep unease," *id.*, at Defendants' threatened intrusions, JA128-29; JA143-44; JA157-58; JA172-73; JA181-84; JA191-93; JA202-03; JA206-08; JA210-12.

Breach-of-confidence supplies a second analogue. That tort "lies where a person offers private information to a third party in confidence and the third party reveals [it] to another." *Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019). It requires *only* that "plaintiff's trust in the breaching party is violated." *Id.* Here, Plaintiffs' members are suffering such harm: "their members entrusted [Defendants] with their private data, assured by the Privacy Act's protections that the Agencies would not disclose it to others." *AFL-CIO*, 2026 WL 879518, at *11-12; JA202-12. Yet that is just what the E.O. requires and what

Defendants have resolved to do. JA728-33.

The district court erred several times over. It erred by ignoring that the Order's plain text requires Defendants to share citizenship-related data outside the federal government to States, JA102-04, as DHS confirmed will happen on or around June 30, JA728-33. It erred by suggesting further information about Defendants' implementation was needed to adjudicate Plaintiffs' legal claims. And it erred by finding the most imminent disclosures—"between and among" federal agencies to "create[]" the Lists—are not "concrete" because they are "*intra-federal government*." JA708. This position, apparently premised on the notion that unauthorized federal-agency employees are never third-party recipients of illegally shared data, JA708-09, flouts the text of the Privacy Act.

The Act expressly prohibits federal agencies from sharing records with *other federal agencies* absent an exception, 5 U.S.C. § 552a(b), and forbids sharing records with *other federal agencies* for use in "matching programs" absent specific "legal authority," *id.* § 552a(o), (q). Congress went further and specified "[n]othing" in the Act "shall be construed" to permit "establishment or maintenance by any agency of a national data bank that combines, merges, or links information on individuals maintained" "by *other Federal agencies*." Pub. L. No. 100-503, § 9, 102 Stat. 2507, 2514 (1988) (codified at 5 U.S.C. § 552a note) (emphasis added). Thus, the provisions Plaintiffs seek to enforce were enacted for the express purpose of

curbing unauthorized disclosures, even those *within* the federal government. In fact, preventing the federal government from compiling the sort of centralized registry ordered by the E.O. motivated the provisions at issue. In enacting them, the authoring Committee considered that nearly 80% of Americans viewed "central data files" within the federal government as a threat. H.R. Rep. No. 100-802 ("CMPPA Rep."), at 4-8, 19-22 (1988).

In finding the harms alleged are not "highly offensive," the district court contradicted this Court's recent holding that courts have no prerogative to disrupt "policy judgments" reflected in federal privacy statutes. *Pileggi*, 146 F.4th at 1229. Its finding also sits on a lonely island. The only similar ruling Plaintiffs are aware of was reversed by the Fourth Circuit sitting en banc. *AFL-CIO v. SSA*, 172 F.4th 361, 369 (4th Cir. 2026). And "every court in this [C]ircuit" to address this issue concluded plaintiffs have standing to prevent impending *intra-government sharing* of their members' data. *AFL-CIO*, 2026 WL 879518, at \*10 (collecting cases).[5] Unsurprisingly, the court below cited no contrary authority. *See* JA707-09.

The district court also ignored the nature of the privacy harms by suggesting

---

[5] These holdings follow directly from precedents of this Court and the Supreme Court that recognize the Privacy Act was designed to track harms addressed by privacy torts. *Chung v. DOJ*, 333 F.3d 273, 277 (D.C. Cir. 2003) (holding Privacy Act "sufficiently similar" to justify application of analogous tolling principles); *FAA v. Cooper*, 566 U.S. 284, 295 (2012) (similar).

only "name, age, and residence information" will be disclosed. JA708. Even if true (it is not), residence information is protected by the Act, *see* 5 U.S.C. § 552a(a)(4) (defining "record" to include any item of information about an individual maintained by agencies), and Plaintiffs have a right to expect that such "records" will not be disclosed in violation of it, *Ctr. for Taxpayer Rts. v. IRS*, 815 F.Supp.3d 1, 40 (D.D.C. 2025) ("*CTR*") (holding unauthorized disclosures of "addresses" from IRS to DHS satisfied Article III).

The district court was also factually wrong—its finding is contradicted by the text of the Order, uncontested representations in Plaintiffs' filings, and agency documents in the record that govern the databases the E.O. requires Defendants to use. The Order, for example, mandates that Lists be "derived" from "SAVE data" and "SSA records," and states SSA must provide DHS with all necessary citizenship information. E.O. §§ 2(a), 4(c). The SORNs for SAVE and SSA records (as well as DHS's "Privacy Impact Assessment" for SAVE) confirm that "verifying" "citizenship status" requires cross-referencing sensitive identifying information— *e.g.*, SSNs, passport numbers, and dates of birth—against another agency's records. 90 FR 48948-50 (Oct. 31, 2025) ("SAVE SORN"); *see* 90 FR 50879-03 (Nov. 12, 2025) ("SSA SORN"); JA256-77. Those materials specify DHS cannot "verify" "citizenship status" without "matching" a name, date of birth, *and* either a SSN, driver's license number, or passport number—consistent with the E.O.'s mandate

that SSA hand over all "citizenship information" to DHS, 90 FR 48950; JA259-60, and with how data-verification works in agencies, CMPPA Rep. 4-22.

All this evidence was introduced below. JA88-89; JA253-77; JA535; JA542-44. Defendants disputed none of it.[6] Nor did the district court explain how Defendants could create the Lists without sharing this highly sensitive information. *See* JA708. Thus, to the extent the court's holding is based on a factual finding that the only information likely at imminent risk of unlawful sharing includes "name, age, and residence information," *id.*, the finding is clearly erroneous. The court's holding as to the privacy harms should be reversed.

**b. *Bost* Standing.** Plaintiffs—two individual candidates and organizations whose membership includes candidates in all 50 States—independently have standing under recent Supreme Court precedent to challenge rules governing the election process. *See Bost*, 607 U.S. at 77. *Bost* establishes that candidates "have an interest in a fair process," and "suffer [a cognizable harm] when the process departs from the law." *Id.* This harm exists whether the challenged procedures "help, hurt, or have no effect on a candidate's electoral prospects." *Id.*[7]

---

[6] Defendants recently *confirmed* information beyond name, age, and residence will be disclosed: Agencies will share "citizenship-related data" for "voter citizenship verification." JA728-33.

[7] Plaintiffs' candidate members have standing under *Bost*, as do DSCC, DCCC, DNC, and DGA as the national party organizations that support those candidates. *See Colo. Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 630 (1996)

The district court rejected this basis for standing under the theory that Section 2(a) "does not purport to alter the rules of any State election," and the E.O. does not require States to use the Lists. JA711. This approach reads *Bost* too narrowly and ignores the real-world effects of the E.O. Although *Bost* adjudicated a challenge to a state-election rule, the Court's opinion focused on candidates' interest in a fair elections *process*—it was not limited to state-election laws. *See* 607 U.S. at 77 (holding "candidates suffer when the process departs from the law"); *id.* (holding candidates "have an interest in a fair process"); *id.* at 82 (holding candidate's "interest extends to the integrity of the election" and "the democratic process" writ large).

*Bost* also rebuts the district court's conclusion that Plaintiffs must show the Lists wrongfully exclude voters before they can obtain relief. Were that the rule, Bost would not have been able to sue until the ballot-receipt deadline he challenged resulted in the tabulation of contested ballots after the election. The Supreme Court rejected that notion; candidates' interest in fair elections process arises *before* ballots are cast, to ensure that they are *competing* in an environment that is not illegally structured. *Id.* at 77.

_____

(Kennedy, J., concurring in part) (recognizing that "during an election," political parties and their candidates share "a practical identity of interests").

There is no dispute that the E.O. purports to regulate the election process. *See* E.O. § 1 (stating purpose of ensuring "only citizens receive and cast ballots"). There is no question Defendants are implementing "a mechanism for States to receive secure, state-focused citizenship-related information from each agency"—*i.e.*, private data held by the federal government—in just 13 days. JA732. There also is no question that States intend to use the Lists to modify their voter rolls. Doc. 77-1 at 11-12. That suffices for standing under *Bost*.

**c. Organizational Harm.** Plaintiffs separately have organizational standing to challenge Section 2(a). Plaintiffs' core business includes registering, persuading, and mobilizing voters to support Democratic Party candidates. JA120-31; JA134-47; JA149-60; JA164-75. Because the Lists pose an imminent threat to their core business, Plaintiffs must develop programs to ensure their members and other supporters are on the Lists and to attempt to add any who are erroneously omitted. JA131; JA146; JA159-60; JA174-75. The resources required come at the expense of Plaintiffs' persuasion and voter-mobilization programs. JA130-31; JA145-46; JA159-60; JA174-75. Plaintiffs' voter education and assistance programs cannot be created overnight; Plaintiffs must plan them now to be effective. JA131; JA146; JA160; JA174-75. These harms establish organizational standing. *LULAC III*, 818 F.Supp.3d at 111 (citing *Dep't of Com. v. New York*, 588 U.S. 752, 767-78 (2019)); *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024); *RNC v. N.C. State Bd.*

*of Elections*, 120 F.4th 390, 397 (4th Cir. 2024).

In concluding otherwise, the district court improperly analogized to *Alliance for Hippocratic Medicine*, *see* JA709-10, where the Supreme Court held that issue-advocacy organizations could not manufacture standing by spending resources to oppose disfavored policies, 602 U.S. at 394. But that is nothing like Plaintiffs' harms: the Citizen-Resident Lists, which Defendants will implement by June 30, directly threaten Plaintiffs' core business. The unrebutted record establishes that these Lists *cannot* accurately identify citizen-residents of each State, *supra* Background § II.A, yet 12 States have confirmed they plan to use them to "modify" their registration records, Doc. 77-1 at 11-12.[8] Plaintiffs' response to the Lists is therefore not out of opposition to a policy, as in *Alliance for Hippocratic Medicine*, but a necessary response to preserve their members' ability to vote.

### 2. Plaintiffs' challenge to Section 2(a) is prudentially ripe.

Plaintiffs' challenges to Section 2(a) are also prudentially ripe because (1)

---

[8] The district court also improperly assessed these harms as distinct from the privacy harm. Given that Congress already determined that violations of the Privacy Act have concrete effects on the American people, *Pileggi*, 146 F.4th at 1227, it is entirely "predictable" that requiring agencies to disclose information in violation of the Act for voter-eligibility determinations has a negative impact on engagement in "federal elections," as one district court recently held. *LULAC III*, 818 F.Supp.3d at 111 (discussing *Pileggi*). That reality triggers a *necessary* programmatic response by organizations whose "core business activities" include "registering, persuading, and mobilizing voters to support Democratic Party candidates." *Id.* (first quoting *All. for Hippocratic Med.*, 602 U.S. at 395). The uncontested record supports the same conclusion here.

25

they "raise[] legal questions," not factual questions, and (2) "delay of a judicial decision would impose hardships." *Sidak*, 174 F.4th at 157. In *Chamber of Commerce v. Reich*, 57 F.3d 1099, 1100 (D.C. Cir. 1995), this Court held plaintiffs' challenge to an Executive Order prudentially ripe, even though the government argued plaintiffs' injury might never transpire, because the "mere existence of the Order" altered the balance of power between employees and employers, much like this E.O. unlawfully alters the electoral playing field. Such "institutional considerations favor immediate review." *Id.* at 1101.

When evaluating claims that a policy facially violates federal privacy law in particular, this Court has consistently found the claims ripe *before* infringements occur. *E.g.*, *Venetian I*, 409 F.3d at 365-67; *Bowen*, 854 F.2d at 1385-88. This is because the "question whether [a disclosure] policy is lawful presents a live and focused dispute." *Venetian Casino Resort v. EEOC* ("*Venetian II*"), 530 F.3d 925, 929-31 (D.C. Cir. 2008) (holding APA claim asserting facial violation of privacy law ripe, even where "details" of policy remained "unclear" (citing *Venetian I*, 409 F.3d at 367)). A contrary approach would require plaintiffs to suffer the very harms they seek to avoid.

Here, whether a remedy is available turns on "clear-cut legal question[s]" suitable for resolution now, *id.* at 927, specifically: (1) whether any constitutional or statutory provision authorizes Defendants to create the Lists (no), (2) whether

disclosures of records to create and disseminate the Lists could ever be "compatible" with authorized purposes of the records (they could not), (3) whether Section 2(a) requires matching records covered by the Act (it does), and (4) whether there is legal authority for such a program (there is not). None of the answers turn on unknown "details" of Defendants' implementation, *id.* at 929, but on whether Defendants have authority to proceed "at the outset," *Bowen*, 854 F.2d at 1388. "[O]peration of [Section 2(a)] at all stages" violates Plaintiffs' rights. *Id.* at 1386.

Defendants' lack of legal authority also explains Section 2(a)'s "savings clause"—which directs Defendants to implement the EO "[t]o the extent feasible and consistent with applicable law"—cannot save it from liability. Executive orders cannot "destroy themselves through saving clauses" where, as here, their commands *cannot* be lawfully implemented. *LULAC III*, 818 F. Supp.3d at 87; *see also City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1239-40 (9th Cir. 2018) ("The Executive Order's savings clause does not and cannot override its meaning."); *cf. AT&T v. Cent. Off. Tel., Inc.*, 524 U.S. 214, 227-28 (1998) (a statute "cannot be held to destroy itself" via a savings clause (quotation omitted)). When "an executive order unambiguously commands action that a saving clause purports to negate," a reviewing court must "read the order's operative provision to mean what it says." *LULAC I*, 780 F.Supp.3d at 176 (citations and alterations omitted); *see also AFGE v. Trump*, 139 F.4th 1020, 1038 (9th Cir. 2025) ("Any language in the Executive

27

Order or Memorandum purporting to limit their directives to what is statutorily authorized is belied by other language in these documents."); *HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021) (refusing to rely on savings clause that would "nullify the clear and specific substantive provisions of the Order" (quotation omitted)).

In finding otherwise, the district court cited *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, which considered an executive order that directed agencies to change how they fulfilled their lawful duty of "administering federally funded projects," but only "to the extent permitted by law." 295 F.3d 28, 33 (D.C. Cir. 2002) (citation modified). This Court held the savings clause insulated the order from a "facial" challenge, and distinguished the order from a case like *Youngstown*, where the question was "whether the President had constitutional authority" for the order's directive to seize the mills, and not "whether he could direct Executive Branch officials in their implementation of statutory authority." *Id.* This case is like *Youngstown*: there is *no* lawful way for the Executive Branch to create and distribute Citizen-Resident Lists, because to do so is beyond the power of the Executive Branch and violates clear statutory commands. *See id.* (contemplating review of executive order that "is without any valid application"). Therefore, Section 2's savings clause provides no saving at all. *See, e.g.*, *LULAC I*, 780 F.Supp.3d at 176 (distinguishing *Allbaugh* on this basis).

This challenge also satisfies the APA's ripeness analogue, "final agency action." *Venetian II*, 530 F.3d at 931. Defendants "adopt[ed] a policy" requiring disclosure of records subject to nondisclosure under federal law, which this Court held in *Venetian II* is "surely a 'consummation of the agency's decisionmaking process,' and 'one by which [the information holder's] rights [and the agency's] obligations have been determined.'" *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)); *see also AFL-CIO*, 2026 WL 879518 (similar). And in any APA context, an agency head's "approv[al]" of a written "policy"—as Secretary Mullin has given here—is final action. JA731-33; *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597-600 (2016).

## B.    Plaintiffs' challenges to Section 3(b) are justiciable.

The district court erred in holding that Plaintiffs' claims against Section 3(b) of the E.O. are premature. Section 3(b) inflicts several concrete, imminent harms that demand redress now. And Plaintiffs' challenges are prudentially ripe—they present purely legal issues, and the district court's failure to resolve them threatens irreparable harm.

### 1.    Section 3(b) inflicts several Article III injuries.

Plaintiffs have standing at least three times over to challenge Section 3(b), which requires USPS not to transmit ballots for voters who are not enrolled with the agency.

**a. *Bost* Standing.** As with Section 2(a), Plaintiffs have standing to challenge

Section 3(b) under *Bost*. The district court did not evaluate this as a basis for standing

for Section 3(b), but the conclusion is straightforward. Under *Bost*, candidates have

an interest in a fair election process and have standing to challenge unlawful

departures from that process, whether or not they affect their electoral prospects. *See*

*Bost*, 607 U.S. at 79; *see also supra* Argument § I.A.1. The E.O.'s mandate to USPS

requires unlawful rules governing mail voting, harming the interests of electoral

participants like Plaintiffs. *See supra* Background § II.C.[9]

**b. Organizational Harm.** Plaintiffs also have organizational standing to

challenge Section 3(b). It is undisputed that Plaintiffs' core business activities

include ensuring their voters successfully cast their ballots. JA122-23; JA137-38;

JA152; JA167-68. Plaintiffs invested in vote-by-mail programs under the law as it

existed before the E.O.; those programs require significant planning and are

underway for the 2026 elections. *See* JA122-26; JA137-42; JA151-56; JA167-69.

Section 3(b) interferes with Plaintiffs' existing programs and investments, as well as

their ability to effectively plan for and thoughtfully allocate resources to compete in

---

[9] Beyond *Bost*, which requires no showing of competitive harm, Plaintiffs separately have standing because the E.O. will disadvantage Plaintiffs relative to their competitors because of Democratic voters' reliance on mail voting. *See Shays v. FEC*, 414 F.3d 76, 85-86 (D.C. Cir. 2005) (recognizing such harm for candidates); *Nat. L. Party of U.S. v. FEC*, 111 F.Supp.2d 33, 47 (D.D.C. 2000) (same for party committees).

the 2026 elections, undermining the efficacy of their "core" business activities. JA122-26; JA137-42; JA151-56; JA167-69; *see also All. for Hippocratic Med.*, 602 U.S. at 395 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982)). Section 3(b) also forces Plaintiffs to develop new programs to assist voters in ensuring they are "enrolled" in USPS's "Mail-In and Absentee Participation List" and help voters to successfully cast a ballot if they are not permitted to vote by mail. *See* JA126-27; JA140-42; JA154-56; JA169-71. These programs cannot be built overnight, and their significant costs come at the expense of other initiatives. *See* JA126-27; JA140-42; JA154-56; JA169-71. That is more than sufficient to establish injury-in-fact. *See All. for Hippocratic Med.*, 602 U.S. at 370, 394-95 (holding that while a party cannot "spend its way into standing simply by expending money to gather information and advocate against the [challenged] action," it *does* have standing where the challenged action "directly affect[s] and interfere[s] with [their] core business activities"); *see also LULAC I*, 780 F.Supp.3d at 207; *supra* Argument § I.A.1.

To be clear: *any* rule USPS promulgates as a result of the E.O. will require changes to Plaintiffs' voter assistance and mail ballot programs, JA122-27; JA137-42; JA152-56; JA167-71, thus, this Court need not wait to conclude Plaintiffs' operations will be impacted. Until Plaintiffs have certainty that the E.O.'s mandates will not be implemented, and that USPS has abandoned any plans to implement such

31

a rule—and USPS's NPRM confirms just the opposite—Plaintiffs must modify their voter programming and mail voting programs. JA126-27; JA140-42; JA154-56; JA169-71. That suffices for standing. *See Havens*, 455 U.S. at 380 (holding organization that "had to devote significant resources to identify and counteract" defendant's practices had standing to challenge them); *see also, e.g.*, *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201-02 (1983) (holding dispute ripe where forcing plaintiffs "to proceed without knowing whether the [law] is valid would impose a palpable and considerable hardship on the[m]"); *cf. Tenn. NAACP v. Lee*, 139 F.4th 557, 565 (6th Cir. 2025) (distinguishing *Clapper*, holding "organizations [may] have standing to challenge a government action that does not regulate them if the action causes them to suffer economic harms"). The district court erred in holding otherwise.

**c. Voter Harm.** Plaintiffs also have associational standing on behalf of their voter members to challenge Section 3(b), *whether or not* they are precluded from voting. A voter has standing to challenge a law that regulates the terms by which they may cast a ballot, even if they are ultimately able to overcome the restriction. *See, e.g.*, *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) (noting that standing requires only a "minimal showing of injury," and finding Democratic Party organizations had standing to challenge a law restricting voting on behalf of their members who would be affected), *aff'd*, 553 U.S. 181, 189 n.7 (2008);

*Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351-52 (11th Cir. 2009) (holding even if voters "possessed an acceptable form of photo identification, they would still have standing to challenge the statute that required them to produce" photo ID to cast a ballot); *Fish v. Schwab*, 957 F.3d 1105, 1119-20 (10th Cir. 2020) (holding even a voter who *could* comply with proof of citizenship law had standing to challenge it).

Section 3(b) conditions transmission of a mail ballot on whether a voter appears on USPS's eligible list for receiving one. As such, it plainly regulates the terms by which Plaintiffs' members will vote, causing them injury. In particular, their right to vote will be threatened, because even if they qualify for mail ballots under their respective States' election rules, the transmission of those ballots will be controlled by USPS's new gatekeeping authority. *See* JA127; JA140-42; JA153; JA168-70.

\* \* \*

The district court did not specifically address any of these harms. Instead, painting with a broad brush, it held that *all* harms inflicted by Section 3(b) were too speculative because any injury "depends on a series of contingencies: whether the Postal Service issues a notice of proposed rulemaking, what the proposed rule says, what changes occur through notice and comment, whether a final rule issues, and how that final rule affects voters, States, or Plaintiffs." JA713. To start, the court's

33

imposition of these additional hurdles before Plaintiffs can challenge Section 3(b) as candidates and political parties on the grounds that it illegally restructures the elections process runs headfirst into *Bost* and should be reversed for that reason alone. Nor can this reasoning properly apply to Plaintiffs' other organizational injuries; those injuries stem from the Order's very existence, which forces Plaintiffs to plan for new vote-by-mail rules to mitigate the injuries it threatens to its core business activities. Those injuries are present even while Defendants iron out the nuances of implementation—Plaintiffs must react and prepare *now* to be ready for elections just months away. Finally, half of the supposed "contingencies" the district court deemed unknowable have already actualized, just as the E.O. dictated by its plain terms: USPS issued a NPRM on the E.O.'s timeline, and the NPRM includes all of Section 3(b)'s mandates.

In short, the district court's ruling rested almost entirely on the principle that "the issuance of a notice of proposed rulemaking" does not create a controversy "ripe for review because the rule may or may not be adopted or enforced." JA714 (quotation omitted). But Plaintiffs' claims against Section 3(b) do not sound under the APA, so the "final agency action" requirement does not apply. *See Venetian II*, 530 F.3d at 927-31 (explaining that requirement).[10] Instead, the Court must assess

---

[10] Indeed, USPS is almost entirely exempt from APA review. *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 972-73 (D.C. Cir. 2022).

ripeness according to traditional Article III principles, determining whether Plaintiffs "likely will suffer an injury in fact" that is "direct and imminent," and attributable to the challenged action. *See Sierra Club v. DOT*, 125 F.4th 1170, 1181 (D.C. Cir. 2025).[11]

Plaintiffs easily satisfy that standard: Section 3(b) is likely to result in the implementation of the proposed rule, or a very similar rule, and that implementation is not only likely to cause the litany of injuries described above—it already is doing so. *See, e.g., Geo Grp., Inc. v. Inslee*, 151 F.4th 1107, 1115 (9th Cir. 2025) (finding plaintiff had alleged a ripe challenge to a statute even though the relevant agency "ha[d] not yet adopted rules implementing" the challenged provisions, because it was "clear that [the agency] intends to adopt such rules"). Challenges to proposed rulemaking may be unripe where the "court will benefit from deferring review until the agency's policies have crystallized." *Eagle-Picher Indus., Inc. v. EPA*, 759 F.2d 905, 915 (D.C. Cir. 1985). Here, however, there is no "agency policy" to "crystallize"—USPS is simply following the President's directives, and the legality

---

[11] Several of the cases cited by the district court also did not involve executive orders at all, and thus do not speak to ripeness of the distinct separation of powers violations and injuries at issue here. *See Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1324 (D.C. Cir. 2013); *Bristol-Myers Co. v. FTC*, 424 F.2d 935, 938 (D.C. Cir. 1970); *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 710 F.2d 842, 846-47 (D.C. Cir. 1983).

of those directives presents a "purely legal question" that is "suitab[le] for judicial determination." *Id*. (finding pre-enforcement challenge to agency policy was ripe).

This case thus resembles a host of other cases addressing pre-implementation challenges to unlawful executive action. *See, e.g.*, *LULAC I*, 780 F.Supp.3d at 175 (holding executive orders "dictat[ing] particular outcomes" are "subject to pre-enforcement review" (quotations omitted)); *Susman Godfrey LLP v. EOP*, 789 F.Supp.3d 15, 40-41 (D.D.C. 2025) (challenge to executive order directing agencies to provide guidance was ripe, although guidance had not yet issued and its "precise contours" had "not been set," because "the Order provides a clear preview of what [the guidance] will do"); *Wilmer Cutler Pickering Hale & Dorr LLP v. EOP*, 784 F.Supp.3d 127, 147 (D.D.C. 2025) (claims were ripe despite future action because plaintiffs' "claims turn on the constitutionality of the Order *as issued*"); *City & Cnty. of S.F.*, 897 F.3d at 1240 (claims were ripe against an executive order that "unambiguously commands action"); *Chi. Women in Trades v. Trump*, 778 F.Supp.3d 959, 978 (N.D. Ill. 2025); *California v. Trump*, 786 F.Supp.3d 359, 385 (D. Mass. 2025).

In fact, the district court relied on cases that illustrate why Plaintiffs' challenge here *is* ripe. In *Trump v. New York*, for example, the President issued a memorandum after the 2020 census directing the Secretary of Commerce to provide him with an alternate tabulation that excluded undocumented immigrants. 592 U.S. 125, 130

(2020). The plaintiffs challenging the memorandum did not allege that the contested tabulation *itself* violated their rights, or that the President or any executive agency had concrete plans to use the tabulation for any specific purpose. *Id*. at 132-33. In contrast, here, the E.O. commands USPS to interfere with States' mail-voting programs in ways that will irreparably harm Plaintiffs' electoral rights and interests.

Much of the same is true of the "intra-governmental mandate" cases that the district court relied on below. In each of those cases—unlike here—the court found the challenged order directed agency action that could conceivably have knock-on consequences, but was not itself unlawful or injurious. *See, e.g.*, *Nat'l Urb. League v. Trump*, 783 F.Supp.3d 61, 79 (D.D.C. 2025) (finding no standing to challenge order to create a "list" of fund recipients, which was not itself illegal, where there was no evidence of "what someone in the government might do based on [the] list"); *Ctr. for Democracy & Tech. v. Trump*, 507 F.Supp.3d 213, 223 (D.D.C. 2020) (finding no standing to challenge order that directed rulemaking that could result in lawful regulations).

The district court's contrary analysis was premised on the notion that two future "contingencies" might prevent Section 3(b) from harming Plaintiffs. *See* JA713. But neither "contingency" is remotely plausible. One would occur if USPS chooses to alter the NPRM so substantially that it ignores Section 3(b)'s dictates. But that is not a realistic possibility: the EO *requires* USPS's rulemaking to include

37

the provisions outlined in Section 3(b) and indeed, USPS's NPRM does just that. The other contingency would occur if USPS decided to simply not adopt the proposed rule at all. But that too is overwhelmingly unlikely and directly contrary to the record here. "Rather than disclaiming any intent to implement the [proposed rule] or conceding its invalidity, [USPS] continues to defend" and even implement it—strong evidence that it has no plans of abandoning it. *See Sierra Club*, 125 F.4th at 1180.

As this Court held just last year in *Sierra Club*, the executive cannot evade judicial review by manufacturing uncertainty about its rule-making process. In that case, a subdivision of the Department of Transportation promulgated a rule concerning the transportation of liquid-natural gas, but later "suspended the rule" and initiated a "new rulemaking process to modify it." 125 F.4th at 1180. This Court rejected the Department's argument that this rendered a challenge to the rule unripe. *Id*. An agency cannot "stave off judicial review" of a rule based on the mere possibility that future action "would amend the rule in a significant way," the Court observed, because "[i]f that were true, a savvy agency could perpetually dodge review." *Id*. (citations omitted). So too here: "If the possibility of unforeseen amendments were sufficient to render an otherwise fit challenge unripe, review could be deferred indefinitely." *Am. Petroleum Inst. v. EPA*, 906 F.2d 729 (D.C. Cir. 1990).

Finally, to the extent the district court relied on any "savings" clause in assessing Section 3(b)'s ripeness, *see* JA717, it manifestly erred, because Section 3(b) contains no language limiting it to "lawful" or "feasible" implementation. For the same reasons, to the extent it relied on *Allbaugh*, 295 F.3d at 33, in its ripeness analysis of Section 3(b), it erred; *Allbaugh* relied on a "savings clause" that is absent from Section 3(b) and is otherwise distinguishable, *supra* Argument § I.A.2.

In short, Section 3(b) is an unlawful exercise of executive power, one that "inflicts a here-and-now injury on affected third parties," *Seila Law LLC v. CFPB*, 591 U.S. 197, 212 (2020) (quotation omitted), for all the reasons explained. The district court should have "reestablish[ed] the limits on [executive] authority," *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988), and issued relief to remediate Plaintiffs' current injuries and protect them against the "substantial risk" of future injuries, the evidence of which was undisputed. *New Jersey v. EPA*, 989 F.3d 1038, 1047 (D.C. Cir. 2021).

### 2. Plaintiffs' challenge to Section 3(b) is prudentially ripe.

Plaintiffs' challenge to Section 3(b) easily satisfies both prudential ripeness considerations: the challenge to the scope of presidential power presents purely legal issues, and further delay in resolving these issues will inflict hardship on Plaintiffs. *See Sidak*, 174 F.4th at 157. Recent Supreme Court precedent further refutes the district court's conclusion that Plaintiffs must wait until they have incurred further

harm to challenge unlawful election rules. *See Bost*, 607 U.S. at 80 (cautioning against alternative approach to candidate standing that would "channel many election disputes to shortly before election day—or worse, after").

### C. The remaining standing elements are satisfied.

Plaintiffs' injuries are traceable to Defendants, whom the E.O. charges with enforcement. *See* E.O. §§ 2(a), 3, 4(a), 5; *Dep't of Com.*, 588 U.S. at 768. And there is no question declaratory and equitable relief would redress Plaintiffs' injuries by stopping them altogether. *See Lujan*, 504 U.S. at 560.

## II. Plaintiffs are likely to succeed on the merits.

The E.O. is an unlawful attempt by the President to impose his preferred election policies. The E.O. is *ultra vires*, contravenes the horizontal and vertical separation of powers, conflicts with USPS's statutory authority, and violates the Privacy Act.

### A. The Executive Order is *ultra vires.*

Plaintiffs are likely to succeed on the merits of their claim that the E.O. is an *ultra vires* exercise of executive power. The President has no authority to order— and other Defendants have no legal authority to implement—Section 2(a)'s mandate

to create and distribute Citizen-Resident Lists to States for elections or Section 3(b)'s directive to USPS to create new restrictions for mail voting.[12]

It is "black letter law" that the President's power to issue an edict like the Order "must stem either from an act of Congress or from the Constitution itself." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188–89 (1999) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). While the Constitution contains several provisions addressing voting and elections, none authorize the President or the executive branch to exercise any authority over election administration. Background § I; *see Meadows*, 88 F.4th at 1346; *LULAC II*, 808 F. Supp.3d at 73. The Constitution instead "submit[s] the regulation of elections for the federal government, in the first instance" to the States, The Federalist No. 59 (Alexander Hamilton), and only "action of Congress" "supersedes" that authority. *Ex parte Siebold*, 100 U.S. 371, 384 (1879).

The only purported constitutional authority the E.O. cites is the Guarantee Clause, *see* E.O. at Preamble, but that Clause requires only that States hold elections of some kind, *see* The Federalist No. 57 (James Madison); *cf. Deer Park Indep. Sch. Dist. v. Harris Cnty. Appraisal Dist.*, 132 F.3d 1095, 1099–1100 (5th Cir. 1998) (per

---

[12] Plaintiffs' *ultra vires* claim against Section 2(a) is available either as a freestanding constitutional claim or under the APA because final action occurred, *supra* Argument § I.A; 5 U.S.C. §§ 704, 706(2); *Chamber of Com. v. Reich*, 74 F.3d 1322, 1329–30 (D.C. Cir. 1996).

curiam) (noting that if a State tried to impose a "monarchy" or "military dictatorship," it might "offend the Guarantee Clause of the Constitution"). Nor does the President have authority to determine whether state elections are "republican"— that power "rests with Congress." *Baker v. Carr*, 369 U.S. 186, 220 (1962).

The E.O. also cites the NVRA and HAVA for its authority, but neither statute grants Defendants any power to regulate elections as the E.O. requires: both are exercises of *Congress*'s power to supervise elections and both require *States* to take actions related to voter-registration. *See* 52 U.S.C. §§ 20507(a), 21083(a). The E.O. nonetheless invokes those statutes to order Defendant-agencies to build and distribute lists of "eligible" voters in each State. E.O. §§ 2(a), 4(c); *see id.* § 1 (claiming SSA and SAVE data "can assist in verifying identity and Federal election voter eligibility"). But neither statute envisions any role for the Executive Branch to create such lists or regulate mail voting, and Defendants have never suggested otherwise.

The district court's only merits holding was a puzzling suggestion that Plaintiffs' *ultra vires* claims for both provisions were unlikely to succeed because the E.O. is "not self-executing," and instead only "directs executive branch officials to take certain actions," opining that was a lawful exercise of the President's authority to "supervise and direct the actions of executive branch agencies." JA716-17. That was legal error.

For 30 years, this Court has held that "[r]eview of the legality of Presidential action" is available "in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Chamber of Com.*, 74 F.3d at 1328 (citation omitted). This is true where the President's "action" is directing federal agents to take action. *See id.* at 1324 (reviewing the legality of an executive order that charged the Secretary of Labor "with implementing and enforcing the Order"); *see also Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 610 (1838) (holding judicial review was available against the President ordering the Postmaster General to violate the law). Even if there are some circumstances where the President can direct an agency to engage in rulemaking, he certainly cannot issue commands to an agency that it could not lawfully fulfill. If the President ordered the Bureau of Alcohol, Tobacco, Firearms, and Explosives to engage in rulemaking to confiscate every firearm in America, that would be illegal, not because the President ordered the Bureau to engage in rulemaking, but because he would be ordering the Bureau to violate the law.

The district court seemingly acknowledged that the President lacks authority to regulate elections in the way the E.O. describes, *see* JA716-17, but immediately thereafter held that the President has authority to command his subordinates to do so, *id*. Holding that the President cannot take an action, but that he can order executive branch agencies to do so, violates both black-letter law and common sense. *See, e.g., Chrysler Corp. v. Brown*, 441 U.S. 281, 305-06 (1979) (reviewing

executive order directing agency to adopt regulations to determine whether "any of the arguable statutory grants of authority" could support those regulations); *Georgia v. President of the United States*, 46 F.4th 1283, 1295 (11th Cir. 2022) (holding the President cannot "direct subordinate[s]" to "exceed[] the limitations imposed by" law); *Washington v. Trump*, 766 F.Supp.3d 1138, 1147, 1154 (W.D. Wash. 2025) (enjoining executive order as unlawful even though its provisions directed the President's subordinates to take action).

**B.      Section 3(b) violates the separation of powers.**

As described above, Section 3(b) violates the horizontal separation of powers between the executive and legislative branches. The States' constitutional authority to regulate federal elections may be displaced only by "the action of Congress." *Ex parte Siebold*, 100 U.S. at 384; *see also ITCA*, 570 U.S. at 8. Section 3(b) has no congressional or constitutional authorization. It nonetheless mandates that USPS create a system for enrolling voters, track ballot mailings sent to voters, and refuse to transmit ballots to "unenrolled" voters. That constitutes direct regulation of elections by the Executive Branch that Congress has not authorized.

Section 3(b) also violates the "vertical separation of powers between the National Government and the States." *Thomas More L. Ctr. v. Obama*, 651 F.3d 529, 564 (6th Cir. 2011) (Sutton, J., concurring in part). The Constitution delegates to the States the power to regulate the "Times, Places and Manner of holding [federal]

Elections," absent Congressional preemption. U.S. Const. art. I, § 4, cl. 1. And States alone set voter qualifications. *ITCA*, 570 U.S. at 16 (recognizing "the Elections Clause empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them"). States have exercised their authority by permitting mail ballots to be submitted by classes of voters that they select, and under circumstances of their choosing. Section 3(b) interferes with these prerogatives by requiring enrollment of mail voters with USPS, and by prohibiting USPS from transmitting ballots for voters who are not enrolled via this process.

**C.    Section 3(b) exceeds USPS's statutory authority.**

Section 3(b) is also unlawful because it commands USPS to exceed its statutory authority. Agencies like USPS "are creatures of statute" and "possess only the authority that Congress has provided." *NFIB v. OSHA*, 595 U.S. 109, 117 (2022) (per curiam). "[A]n agency literally has no power to act ... unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). The President may therefore only direct agencies to "carry out their own lawful statutory authority," not "exceed[] the limitations imposed" by their authorizing statutes. *Georgia*, 46 F.4th at 1295. The E.O. requires USPS to create a system for enrolling voters and to refuse to send ballots for unenrolled voters. Nothing in USPS's governing statute authorizes such acts. *See generally* 39 U.S.C. § 101(a) (defining Postal Service powers); *id*. § 401(2) (permitting USPS to make

regulations, but only to fulfill its statutory functions); *id*. § 404(e)(2) (restricting USPS's authority to offer "nonpostal services"). When pressed below to identify Section 3(b)'s legal authorization, Defendants' attorney floundered, stating only that he was "very hesitant to just sort of canvas the U.S. Code for how ... the Postal Service [could] do such a thing." JA644. In fact, the E.O. *violates* several of USPS's statutory obligations, including the exhaustive statutory definition of "nonmailable matter," which does not include ballot mail from unenrolled individuals, *see* 39 U.S.C. §§ 3001-18, and USPS's obligation not to make "any undue or unreasonable discrimination among users of the mails," *id.* § 403(c).

**D.     Section 2(a) violates the Privacy Act.**

Section 2(a)'s mandate to create and distribute the Citizen-Resident Lists runs headlong into the Privacy Act, and Defendants' actions to comply with the mandate violate the APA. 5 U.S.C. § 706(2).

Since 1974, the Privacy Act has prohibited federal officers from disclosing "any" record contained in "system[s] of records" by "any means of communication to any person, or to another agency" with few exceptions, none of which apply here. 5 U.S.C. § 552a(b). In 1988, recognizing the growing threat of technology-enabled data-collection programs, Congress extended these protections to expressly prohibit disclosing records, including to other agencies, for use in "computer matching program[s]," except under strictly defined conditions. *Id.* § 552a(o)(1). Congress

also made clear that "*[n]othing*" in the Act "shall be construed" to permit "establishment or maintenance by any agency of a national data bank that combines, merges, or links information on individuals maintained" by "other Federal agencies," or "computer matching of records not otherwise authorized by law." 102 Stat. at 2514 (codified at 5 U.S.C. § 552a note). These safeguards exist to protect Americans from precisely the kind of national registry Defendants are "implementing" on June 30. JA732.

Any implementation of Section 2(a) would violate the Act because (1) it requires Defendants to share records with each other and States for purposes not "compatible" with the records' original purposes, and (2) in a way that contravenes the Act's ban on disclosing data for computer "matching programs" without "legal authority." 5 U.S.C. § 552a(b), (o), (q); *see* 102 Stat. at 2514.

Defendants did not argue otherwise below. Their only defense was that Plaintiffs do not have a cause of action under the APA. Because those arguments fail under this Court's precedents, *see supra* Argument § I.A, and because the merits are clear, this Court should hold that Plaintiffs are likely to succeed.

### 1. The records required to build the E.O.'s Citizen-Resident Lists cannot lawfully be used for that purpose.

To start, there is no dispute that the databases from which the Lists will be derived—"citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases," E.O. § 2(a)—are "systems" with "records"

covered by the Act, 5 U.S.C. § 552a(a)(4), (7).[13] Before disclosing any record, Defendants must satisfy an "exception" to the Act's prohibition of disclosing records. *Id.* § 552a(b), (e)(4). Defendants have suggested they can do so by publishing a SORN relying on the "routine use" exception. JA653-54. Not so. *Doe v. Stephens*, 851 F.2d 1457, 1466 (D.C. Cir. 1988) ("It is by now well-established that agencies covered by the Privacy Act may not utilize the 'routine use' exception to circumvent the mandates of the Privacy Act.") (collecting cases).

The "routine use" provision permits agencies—after complying with a series of safeguards—to disclose a record outside the agency, but *only if* the purpose for that disclosure is compatible with the purpose for which the record was collected. *Id.* at 1465-67; *see also Britt v. Naval Investigative Serv.*, 886 F.2d 544, 549-50 (3d Cir. 1989) (holding "compatibility" requires a "concrete relationship or similarity" "between the disclosing agency's purpose in gathering the information and in its disclosure"). Defendants cannot make that showing here—nor have they even tried to. Nothing in federal law suggests the records Defendants are using to build the Citizen-Resident Lists are compatible with the purpose of building a national databank for States to use for voter-eligibility purposes. *See* E.O. §§ 1, 2(a); JA728-

---

[13] This is clear from two SORNs issued by DHS and SSA in response to Plaintiffs' successful claim in prior litigation. 90 FR 48948; 90 FR 50879-03; *see LULAC III*, 818 F.Supp.3d at 115-17 & n.54.

32. SSA's collection of SSNs and "related record[s]" to track work-related entitlements, for example, is not remotely compatible with the purpose of building a national databank to verify "Federal election voter eligibility." E.O. § 1. Nor was the SAVE database built for this purpose: Congress authorized SAVE to assist States in verifying immigration status of *non-citizens* for the purpose of determining entitlement to federal public benefits. *See Immigration Reform and Control Act of 1986* ("IRCA"), Pub. L. No. 99-603, tit. I, §121(c)(1), 100 Stat. 3359, 3391 (1986) (codified at 42 U.S.C. § 1320b-7). Under IRCA's plain text, it extends neither to citizens nor determinations related to eligibility for voting. *Id.* § 1320b-7(d)(2)(A), (d)(3). If Congress intended this statute—or any other—to be used for such a purpose, it would have said so. 102 Stat. at 2514; *see West Virginia v. EPA*, 597 U.S. 697, 724 (2022). But it has not.

A contrary conclusion would hollow out the "compatibility" requirement of the routine-use provision, 5 U.S.C. § 552a(a)(7), which Defendants cannot do, *see Stephens*, 851 F.2d at 1466-67.

### 2. The E.O.'s Citizen-Resident Lists cannot be created without illegal data matching.

Any implementation of Section 2(a) would also violate the Privacy Act's prohibition against disclosures "for use in a computer matching program" without "legal authority." 5 U.S.C. § 552a(o), (q).

A "matching program" is "any computerized comparison" of "two or more

automated systems of records or a system of records with non-Federal records for the purpose" of "establishing or verifying the eligibility" of "applicants for, recipients or beneficiaries of, participants in, or providers" of federal benefits. *Id.* § 552a(a)(8).[14] Here, the databases Defendants must use are "computerized" systems. SAVE SORN, 90 FR at 48954; SSA SORN, 90 FR at 50884. As explained *supra* Argument § I.A.1, to "verify" an individual's citizenship status, an individual's identifying number "must" be cross-referenced with another database, JA258-76.[15] Defendants' "policy" confirms this: DHS will "facilitate" a "mechanism" to share "state-focused" "citizenship list information" derived from SAVE, SSA, and State Department data, just as the E.O. directs. JA731-32. This cannot be done without prohibited computerized comparisons, and Defendants have not suggested otherwise.

Defendants also cannot lawfully disclose records contained in federal systems outside the government for *further* matching against *State* records. *See* 5 U.S.C. § 552a(o) ("[n]o record which is contained in a system of records may be disclosed

---

[14] "Federal benefit program" is "any program administered or funded by the Federal Government, or by any agent or State on behalf of the Federal Government, providing cash or in-kind assistance in the form of payments, grants, loans, or loan guarantees to individuals." 5 U.S.C. § 552a(12); *see also* SAVE SORN, 90 FR at 48952 (noting inclusion of "voter verification" in category of benefits-eligibility assessed by SAVE); *id.* at 48950 (citing the NVRA and HAVA).

[15] Additional matching will be necessary to estimate state residence. *See* E.O. § 2(a).

to a recipient agency or non-Federal agency for use in a computer matching program" absent legal authority and procedural compliance).[16] But Section 2(a) requires just that, and Defendants' adopted policy confirms the mandates will be implemented by June 30. JA732.

## III. The remaining preliminary injunction factors are satisfied.

### A. Plaintiffs will be irreparably harmed if the E.O. is not enjoined quickly.

The district court also erred in its irreparable harm analysis, which merely reiterated its conclusion that Plaintiffs did not have Article III standing, *see* JA719, and improperly implied that their injury must be both "certain," and presently occurring, JA718-20. But as Plaintiffs have shown, they *do* have Article III standing, *see supra* Argument § I, and irreparable injury need only be "likely," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Newby*, 838 F.3d at 8-9 (holding post-*Winter* that, because "a preliminary injunction requires only a likelihood of irreparable injury, Damocles's sword does not have to actually fall on all appellants before the court will issue an injunction").

Regardless, unless the E.O. is enjoined, Plaintiffs are *certain* to experience several harms, each of which is irreparable because once an election occurs, "there can be no do over and no redress." *Newby*, 838 F.3d at 9 (citation omitted). First,

---

[16] "[T]he term 'non-Federal agency' means any State or local government, or agency thereof." 5 U.S.C. § 552a(a)(10).

Plaintiffs will have to revamp their voter education and turnout programs at the expense of their persuasion and mobilization programs, making it more difficult to accomplish their fundamental purpose of turning out Democratic voters and electing Democrats—a quintessential irreparable harm. *See, e.g.*, *id.*; *League of Women Voters v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). These harms will begin well before Election Day. Voting starts in early September, and Plaintiffs are already executing their election strategies and programs based on the law as it existed before the E.O. *See* JA126; JA140; JA156. Because these programs and strategies take months to build and execute, if the E.O. is not swiftly enjoined, Plaintiffs must retool them. *See* JA126; JA140; JA156. Plaintiffs cannot wait to change their campaign strategy given the complexity required to operate congressional and statewide campaigns. *See Bost*, 607 U.S. at 80 (recognizing that "[o]nly [after election day] will many candidates be able to predict with any certainty that a rule will be outcome determinative"). Moreover, the whiplash induced by Defendants' rapidly changing implementation plans—procedures announced on a Friday were superseded the following Monday, JA728-33—illustrates how Plaintiffs must scramble to mitigate actions that are unlawful in *any* iteration.

Every moment and resource that Plaintiffs are forced to spend planning and implementing these programs cannot be recovered. *See* JA131-32; JA146-47; JA159-60; JA174-75. "[B]ecause each day presents an opportunity to recruit

candidates, persuade voters, and galvanize supporters that cannot be restored once lost, the [E.O.'s changes to the election process] irreparably harm the Democratic Party Plaintiffs' interests throughout the country." *LULAC I*, 780 F.Supp.3d at 201; *see also id.* at 201-02 (recognizing that the court "can neither postpone an election nor turn back the clock to give Plaintiffs additional time to pursue their campaigns").

This is especially harmful to Plaintiffs' candidate members, who have a special interest in ensuring a lawful electoral process. *Bost*, 607 U.S. at 77. Precisely because the E.O. will compromise Plaintiffs' existing programs and force them to reallocate planned investments, Plaintiffs will also suffer irreparable competitive harm to their electoral prospects. *See FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1508 (D.C. Cir. 1986) (recognizing prospect of competitive harm, even outside the elections context, as irreparable harm).

Each of those harms applies to Plaintiffs' challenges to both Sections 2 and 3 of the E.O. In addition, Section 2's irreparable harm to Plaintiffs' members' privacy rights is imminent. Development of the infrastructure to implement the Order is already underway—intra-government disclosures and matching are likely currently occurring, and disclosures *outside* of the federal government to State and local officials will commence *at the end of June*. JA732.

One court in this Circuit recently held impending disclosures of confidential "address information" from IRS to DHS in violation of federal privacy law

constituted irreparable harm. *CTR*, 815 F.Supp.3d at 61-68. This case is similar—except the disclosures here involve *more* sensitive information. *See id.* at 61. And, as in that case, Plaintiffs do not claim harm flows *only* from risk that data will be impermissibly "disseminated publicly," *id.* at 61 (quoting *AFGE v. HUD*, 118 F.3d 786, 793 (D.C. Cir. 1997)), but rather that it will be impermissibly disclosed for use against their interests—precisely as "the text of [E.O. 14399]" directs, *id.* at 63; *see also* E.O. §§ 2(a), 5 (directing investigations of purported non-citizens).[17] There is no other adequate remedy for such harms, given the Privacy Act's damages remedy is limited to retrospective recovery for "tangible economic loss." *Cooper*, 566 U.S. at 303.

It is further likely that Plaintiffs' members' voting rights will be irreparably harmed when they are erroneously omitted from the Citizen-Resident Lists or Mail-In and Absentee Voting List. *See* JA126-27; JA129-30. Courts "routinely deem" such injury to "voting rights irreparable injury." *League of Women Voters*, 769 F.3d at 247. Ultimately, given that Plaintiffs have millions of voter members nationwide, *see* JA150, it is inconceivable that they all emerge unscathed when the E.O. is implemented.

---

[17] In any event, Defendants' "current policy" confirms there *will* be "public disclosures" of citizenship-related information. JA732 (stating "citizen-facing portal capabilities" will be available this year).

**B.     The equities and public interest favor relief.**

The equities and public interest overwhelmingly favor the issuance of a preliminary injunction. The district court's abbreviated analysis—finding only that these factors did not "cut *significantly* in favor of injunctive relief," JA720 (emphasis added)—provides no reason to conclude otherwise.

*First*, Defendants face no harm at all from an order temporarily enjoining unlawful provisions while this litigation proceeds. *See Newby*, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful agency action."). *Second*, an injunction would not circumscribe the President's authority to hire, fire, and oversee Executive Branch appointees, *see* JA720; it merely prevents those appointees from following an unlawful order, *see Chamber of Com.*, 74 F.3d at 1328 ("[C]ourts have power to compel subordinate executive officials to disobey illegal Presidential commands."). And *third*, although there is a public interest in "preserving the integrity of [the] election process," *Newby*, 838 F.3d at 13 (citation omitted), the uncontested record demonstrates the E.O. does not further that interest. There is no evidence—whatsoever—of any material level of mail voter fraud, nor any credible evidence of material numbers of noncitizens voting in U.S. elections. JA225-26; *see* JA128; JA143; JA157; JA200; JA321-26; JA360; JA504.

On the other side of the scale, without a preliminary injunction, privacy breaches will affect nearly every adult U.S. citizen, and parties and candidates will

have to compete on an unlawful playing field. And even if the E.O. does not disenfranchise mass numbers of voters, it is very likely the E.O.'s changes to the voting process will nonetheless lead to widespread "[c]onfusion" that "create[s] a disincentive for citizens who would otherwise attempt" to vote. *Newby*, 838 F.3d at 13; JA216-26; *see* JA126-27; JA131-32; JA155; JA159; JA190; JA197-201.

Finally, the equities and public interest favor immediate action to settle election rules as far in advance as possible, including because Defendants refused to disclaim future *Purcell* arguments. JA641.

## CONCLUSION

This Court should reverse and remand with instructions to grant Plaintiffs' motion for preliminary injunction.

Dated: June 17, 2026

**ELIAS LAW GROUP LLP**

By: /s/ *Lalitha D. Madduri*

Marc E. Elias
Lalitha D. Madduri
Jacob D. Shelly
Christina Ford
Max Accardi
Kevin R. Kowalewski
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
Telephone: (202) 948-1135
eliasm@elias.law
lmadduri@elias.law
jshelly@elias.law

cford@elias.law
maccardi@elias.law
kkowalewski@elias.law


Tyler L. Bishop
**ELIAS LAW GROUP LLP**
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0177
tbishop@elias.law

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7) because it contains 12,991 words, excluding the parts of the brief exempted by Rule 32(f) and Circuit Rule 32(e)(1); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word and is set in 14-point Times New Roman typeface.

Dated: June 17, 2026                     /s/ *Lalitha D. Madduri*

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2026, I filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Lalitha D. Madduri*
Lalitha D. Madduri

# ADDENDUM

# TABLE OF CONTENTS

5 U.S.C. § 552a ....................................................................................Add. 1

39 U.S.C. § 101 ..................................................................................Add. 21

39 U.S.C. § 401 ..................................................................................Add. 23

39 U.S.C. § 403 ..................................................................................Add. 24

42 U.S.C. § 1320b-7 ...........................................................................Add. 25

**5 U.S.C. § 552a – Records maintained on individuals.**

**(a) Definitions.** — For purposes of this section —

(1) the term "agency" means agency as defined in section 552(e)(1) of this title;

(2) the term "individual" means a citizen of the United States or an alien lawfully admitted for permanent residence;

(3) the term "maintain" includes maintain, collect, use, or disseminate;

(4) the term "record" means any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph;

(5) the term "system of records" means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual;

(6) the term "statistical record" means a record in a system of records maintained for statistical research or reporting purposes only and not used in whole or in part in making any determination about an identifiable individual, except as provided by section 8 of title 13;

(7) the term "routine use" means, with respect to the disclosure of a record, the use of such record for a purpose which is compatible with the purpose for which it was collected;

(8) the term "matching program" —

   (A) means any computerized comparison of —

      (i) two or more automated systems of records or a system of records with non-Federal records for the purpose of —

         (I) establishing or verifying the eligibility of, or continuing compliance with statutory and regulatory requirements by, applicants for, recipients

or beneficiaries of, participants in, or providers of services with respect to, cash or in-kind assistance or payments under Federal benefit programs, or

(II) recouping payments or delinquent debts under such Federal benefit programs, or

(ii) two or more automated Federal personnel or payroll systems of records or a system of Federal personnel or payroll records with non-Federal records,

(B) but does not include —

(i) matches performed to produce aggregate statistical data without any personal identifiers;

(ii) matches performed to support any research or statistical project, the specific data of which may not be used to make decisions concerning the rights, benefits, or privileges of specific individuals;

(iii) matches performed, by an agency (or component thereof) which performs as its principal function any activity pertaining to the enforcement of criminal laws, subsequent to the initiation of a specific criminal or civil law enforcement investigation of a named person or persons for the purpose of gathering evidence against such person or persons;

(iv) matches of tax information (I) pursuant to section 6103(d) of the Internal Revenue Code of 1986, (II) for purposes of tax administration as defined in section 6103(b)(4) of such Code, (III) for the purpose of intercepting a tax refund due an individual under authority granted by section 404(e), 464, or 1137 of the Social Security Act; or (IV) for the purpose of intercepting a tax refund due an individual under any other tax refund intercept program authorized by statute which has been determined by the Director of the Office of Management and Budget to contain verification, notice, and hearing requirements that are substantially similar to the procedures in section 1137 of the Social Security Act;

(v) matches—

(I) using records predominantly relating to Federal personnel, that are performed for routine administrative purposes (subject to guidance provided by the Director of the Office of Management and Budget pursuant to subsection (v)); or

(II) conducted by an agency using only records from systems of records maintained by that agency;

if the purpose of the match is not to take any adverse financial, personnel, disciplinary, or other adverse action against Federal personnel;

(vi) matches performed for foreign counterintelligence purposes or to produce background checks for security clearances of Federal personnel or Federal contractor personnel;

(vii) matches performed incident to a levy described in section 6103(k)(8) of the Internal Revenue Code of 1986;

(viii) matches performed pursuant to section 202(x)(3) or 1611(e)(1) of the Social Security Act (42 U.S.C. 402(x)(3), 1382(e)(1));

(ix) matches performed by the Secretary of Health and Human Services or the Inspector General of the Department of Health and Human Services with respect to potential fraud, waste, and abuse, including matches of a system of records with non-Federal records; or

(x) matches performed pursuant to section 3(d)(4) of the Achieving a Better Life Experience Act of 2014; 1

(9) the term "recipient agency" means any agency, or contractor thereof, receiving records contained in a system of records from a source agency for use in a matching program;

(10) the term "non-Federal agency" means any State or local government, or agency thereof, which receives records contained in a system of records from a source agency for use in a matching program;

(11) the term "source agency" means any agency which discloses records contained in a system of records to be used in a matching program, or any

State or local government, or agency thereof, which discloses records to be used in a matching program;

(12) the term "Federal benefit program" means any program administered or funded by the Federal Government, or by any agent or State on behalf of the Federal Government, providing cash or in-kind assistance in the form of payments, grants, loans, or loan guarantees to individuals; and

(13) the term "Federal personnel" means officers and employees of the Government of the United States, members of the uniformed services (including members of the Reserve Components), individuals entitled to receive immediate or deferred retirement benefits under any retirement program of the Government of the United States (including survivor benefits).

**(b) Conditions of Disclosure.** — No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be—

(1) to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties;

(2) required under section 552 of this title;

(3) for a routine use as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section;

(4) to the Bureau of the Census for purposes of planning or carrying out a census or survey or related activity pursuant to the provisions of title 13;

(5) to a recipient who has provided the agency with advance adequate written assurance that the record will be used solely as a statistical research or reporting record, and the record is to be transferred in a form that is not individually identifiable;

(6) to the National Archives and Records Administration as a record which has sufficient historical or other value to warrant its continued preservation by the United States Government, or for evaluation by the Archivist of the United States or the designee of the Archivist to determine whether the record has such value;

(7) to another agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought;

(8) to a person pursuant to a showing of compelling circumstances affecting the health or safety of an individual if upon such disclosure notification is transmitted to the last known address of such individual;

(9) to either House of Congress, or, to the extent of matter within its jurisdiction, any committee or subcommittee thereof, any joint committee of Congress or subcommittee of any such joint committee;

(10) to the Comptroller General, or any of his authorized representatives, in the course of the performance of the duties of the Government Accountability Office;

(11) to the Director of the Congressional Budget Office, or any authorized representative of the Director, in the course of performance of the duties of the Congressional Budget Office;

(12) pursuant to the order of a court of competent jurisdiction; or

(13) to a consumer reporting agency in accordance with section 3711(e) of title 31.

**(c) Accounting of Certain Disclosures.** — Each agency, with respect to each system of records under its control, shall—

(1) except for disclosures made under subsections (b)(1) or (b)(2) of this section, keep an accurate accounting of—

(A) the date, nature, and purpose of each disclosure of a record to any person or to another agency made under subsection (b) of this section; and

(B) the name and address of the person or agency to whom the disclosure is made;

(2) retain the accounting made under paragraph (1) of this subsection for at least five years or the life of the record, whichever is longer, after the disclosure for which the accounting is made;

(3) except for disclosures made under subsection (b)(7) of this section, make the accounting made under paragraph (1) of this subsection available to the individual named in the record at his request; and

(4) inform any person or other agency about any correction or notation of dispute made by the agency in accordance with subsection (d) of this section of any record that has been disclosed to the person or agency if an accounting of the disclosure was made.

[ . . . ]

**(e) Agency Requirements.** — Each agency that maintains a system of rec-ords shall—

(1) maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President;

(2) collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs;

(3) inform each individual whom it asks to supply information, on the form which it uses to collect the information or on a separate form that can be retained by the individual—

(A) the authority (whether granted by statute, or by executive order of the President) which authorizes the solicitation of the information and whether disclosure of such information is mandatory or voluntary;

(B) the principal purpose or purposes for which the information is intended to be used;

(C) the routine uses which may be made of the information, as published pursuant to paragraph (4)(D) of this subsection; and

(D) the effects on him, if any, of not providing all or any part of the requested information;

(4) subject to the provisions of paragraph (11) of this subsection, publish in the Federal Register upon establishment or revision a notice of the existence and character of the system of rec-ords, which notice shall include—

(A) the name and location of the system;

(B) the categories of individuals on whom records are maintained in the system;

(C) the categories of records maintained in the system;

(D) each routine use of the records contained in the system, including the categories of users and the purpose of such use;

(E) the policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal of the records;

(F) the title and business address of the agency official who is responsible for the system of records;

(G) the agency procedures whereby an individual can be notified at his request if the system of records contains a record pertaining to him;

(H) the agency procedures whereby an individual can be notified at his request how he can gain access to any record pertaining to him contained in the system of records, and how he can contest its content; and

(I) the categories of sources of records in the system;

(5) maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination;

(6) prior to disseminating any record about an individual to any person other than an agency, unless the dissemination is made pursuant to subsection (b)(2) of this section, make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes;

(7) maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity;

(8) make reasonable efforts to serve notice on an individual when any record on such individual is made available to any person under compulsory legal process when such process becomes a matter of public record;

(9) establish rules of conduct for persons involved in the design, development, operation, or maintenance of any system of records, or in maintaining any record, and instruct each such person with respect to such rules and the requirements of this section, including any other rules and procedures adopted pursuant to this section and the penalties for noncompliance;

(10) establish appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained;

(11) at least 30 days prior to publication of information under paragraph (4)(D) of this subsection, publish in the Federal Register notice of any new use or intended use of the information in the system, and provide an opportunity for interested persons to submit written data, views, or arguments to the agency; and

(12) if such agency is a recipient agency or a source agency in a matching program with a non-Federal agency, with respect to any establishment or revision of a matching program, at least 30 days prior to conducting such program, publish in the Federal Register notice of such establishment or revision.

**(f) Agency Rules.** — In order to carry out the provisions of this section, each agency that maintains a system of records shall promulgate rules, in accordance with the requirements (including general notice) of section 553 of this title, which shall—

(1) establish procedures whereby an individual can be notified in response to his request if any system of records named by the individual contains a record pertaining to him;

(2) define reasonable times, places, and requirements for identifying an individual who requests his record or information pertaining to him before the agency shall make the record or information available to the individual;

(3) establish procedures for the disclosure to an individual upon his request of his record or information pertaining to him, including special procedure, if deemed necessary, for the disclosure to an individual of medical rec-ords, including psychological records, pertaining to him;

(4) establish procedures for reviewing a request from an individual concerning the amendment of any record or information pertaining to the individual, for making a determination on the request, for an appeal within the agency of an initial adverse agency determination, and for whatever additional means may be necessary for each individual to be able to exercise fully his rights under this section; and

(5) establish fees to be charged, if any, to any individual for making copies of his record, excluding the cost of any search for and review of the record.

The Office of the Federal Register shall biennially compile and publish the rules promulgated under this subsection and agency notices published under subsection (e)(4) of this section in a form available to the public at low cost.

**(g)(1) Civil Remedies.** — Whenever any agency

(A) makes a determination under subsection (d)(3) of this section not to amend an individual's record in accordance with his request, or fails to make such review in conformity with that subsection;

(B) refuses to comply with an individual request under subsection (d)(1) of this section;

(C) fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual; or

(D) fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual, the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.

(2)(A) In any suit brought under the provisions of subsection (g)(1)(A) of this section, the court may order the agency to amend the individual's record in accordance with his request or in such other way as the court may direct. In such a case the court shall determine the matter de novo.

(B) The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this paragraph in which the complainant has substantially prevailed.

(3)(A) In any suit brought under the provisions of subsection (g)(1)(B) of this section, the court may enjoin the agency from withholding the records and order the production to the complainant of any agency records improperly withheld from him. In such a case the court shall determine the matter de novo, and may examine the contents of any agency records in camera to determine whether the records or any portion thereof may be withheld under any of the exemptions set forth in subsection (k) of this section, and the burden is on the agency to sustain its action.

(B) The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this paragraph in which the complainant has substantially prevailed.

(4) In any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section in which the court determines that the agency acted in a manner which was intentional or willful, the United States shall be liable to the individual in an amount equal to the sum of —

(A) actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000; and

(B) the costs of the action together with reasonable attorney fees as determined by the court.

(5) An action to enforce any liability created under this section may be brought in the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, without regard to the amount in controversy, within two years from the date on which the cause of action arises, except that where an agency has materially and willfully misrepresented any information required under this section to be disclosed to an individual and the information so misrepresented is material to establishment of the liability of the agency to the individual under this section, the action may be brought at any time within two years after discovery by the individual of the misrepresentation. Nothing in this section shall be construed to authorize any civil action by reason of any injury sustained as the result of a disclosure of a record prior to September 27, 1975.

[ . . . ]

**(i) (1) Criminal Penalties.**— Any officer or employee of an agency, who by virtue of his employment or official position, has possession of, or access to, agency records which contain individually identifiable information the disclosure of which is prohibited by this section or by rules or regulations established thereunder, and who knowing that disclosure of the specific material is so prohibited, willfully discloses the material in any manner to any person or agency not entitled to receive it, shall be guilty of a misdemeanor and fined not more than $5,000.

(2) Any officer or employee of any agency who willfully maintains a system of records without meeting the notice requirements of subsection (e)(4) of this section shall be guilty of a misdemeanor and fined not more than $5,000.

(3) Any person who knowingly and willfully requests or obtains any record concerning an individual from an agency under false pretenses shall be guilty of a misdemeanor and fined not more than $5,000.

**(j) General Exemptions.** — The head of any agency may promulgate rules, in accordance with the requirements (including general notice) of sections 553(b)(1), (2), and (3), (c), and (e) of this title, to exempt any system of records within the

agency from any part of this section except subsections (b), (c)(1) and (2), (e)(4)(A) through (F), (e)(6), (7), (9), (10), and (11), and (i) if the system of records is—

(1) maintained by the Central Intelligence Agency; or

(2) maintained by an agency or component thereof which performs as its principal function any activity pertaining to the enforcement of criminal laws, including police efforts to prevent, control, or reduce crime or to apprehend criminals, and the activities of prosecutors, courts, correctional, probation, pardon, or parole authorities, and which consists of (A) information compiled for the purpose of identifying individual criminal offenders and alleged offenders and consisting only of identifying data and notations of arrests, the nature and disposition of criminal charges, sentencing, confinement, release, and parole and probation status; (B) information compiled for the purpose of a criminal investigation, including reports of informants and investigators, and associated with an identifiable individual; or (C) reports identifiable to an individual compiled at any stage of the process of enforcement of the criminal laws from arrest or indictment through release from supervision.

At the time rules are adopted under this subsection, the agency shall include in the statement required under section 553(c) of this title, the reasons why the system of records is to be exempted from a provision of this section.

**(k) Specific Exemptions.** — The head of any agency may promulgate rules, in accordance with the requirements (including general notice) of sections 553(b)(1), (2), and (3), (c), and (e) of this title, to exempt any system of records within the agency from subsections (c)(3), (d), (e)(1), (e)(4)(G), (H), and (I) and (f) of this section if the system of rec-ords is —

(1) subject to the provisions of section 552(b)(1) of this title;

(2) investigatory material compiled for law enforcement purposes, other than material within the scope of subsection (j)(2) of this section: Provided, however, That if any individual is denied any right, privilege, or benefit that he would otherwise be entitled by Federal law, or for which he would otherwise be eligible, as a result of the maintenance of such material, such material shall be provided to such individual, except to the extent that the disclosure of such material would reveal the identity of a source who furnished information to the Government

Add. 12

under an express promise that the identity of the source would be held in confidence, or, prior to the effective date of this section, under an implied promise that the identity of the source would be held in confidence;

(3) maintained in connection with providing protective services to the President of the United States or other individuals pursuant to section 3056 of title 18;

(4) required by statute to be maintained and used solely as statistical records;

(5) investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment, military service, Federal contracts, or access to classified information, but only to the extent that the disclosure of such material would reveal the identity of a source who furnished information to the Government under an express promise that the identity of the source would be held in confidence, or, prior to the effective date of this section, under an implied promise that the identity of the source would be held in confidence;

(6) testing or examination material used solely to determine individual qualifications for appointment or promotion in the Federal service the disclosure of which would compromise the objectivity or fairness of the testing or examination process; or

(7) evaluation material used to determine potential for promotion in the armed services, but only to the extent that the disclosure of such material would reveal the identity of a source who furnished information to the Government under an express promise that the identity of the source would be held in confidence, or, prior to the effective date of this section, under an implied promise that the identity of the source would be held in confidence.

At the time rules are adopted under this subsection, the agency shall include in the statement required under section 553(c) of this title, the reasons why the system of records is to be exempted from a provision of this section.

[ . . .]

**(o) Matching Agreements.** —

(1) No record which is contained in a system of records may be disclosed to a recipient agency or non-Federal agency for use in a computer matching program

except pursuant to a written agreement between the source agency and the recipient agency or non-Federal agency specifying—

(A) the purpose and legal authority for conducting the program;

(B) the justification for the program and the anticipated results, including a specific estimate of any savings;

(C) a description of the records that will be matched, including each data element that will be used, the approximate number of records that will be matched, and the projected starting and completion dates of the matching program;

(D) procedures for providing individualized notice at the time of application, and notice periodically thereafter as directed by the Data Integrity Board of such agency (subject to guidance provided by the Director of the Office of Management and Budget pursuant to subsection (v)), to —

(i) applicants for and recipients of financial assistance or payments under Federal benefit programs, and

(ii) applicants for and holders of positions as Federal personnel, that any information provided by such applicants, recipients, holders, and individuals may be subject to verification through matching programs;

(E) procedures for verifying information produced in such matching program as required by subsection (p);

(F) procedures for the retention and timely destruction of identifiable records created by a recipient agency or non-Federal agency in such matching program;

(G) procedures for ensuring the administrative, technical, and physical security of the records matched and the results of such programs;

(H) prohibitions on duplication and redisclosure of records provided by the source agency within or outside the recipient agency or the non-Federal agency, except where required by law or essential to the conduct of the matching program;

(I) procedures governing the use by a recipient agency or non-Federal agency of records provided in a matching program by a source agency, including procedures governing return of the records to the source agency or destruction of records used in such program;

(J) information on assessments that have been made on the accuracy of the records that will be used in such matching program; and

(K) that the Comptroller General may have access to all records of a recipient agency or a non-Federal agency that the Comptroller General deems necessary in order to monitor or verify compliance with the agreement.

(2)(A) A copy of each agreement entered into pursuant to paragraph (1) shall—

(i) be transmitted to the Committee on Governmental Affairs of the Senate and the Committee on Government Operations of the House of Representatives; and

(ii) be available upon request to the public.

(B) No such agreement shall be effective until 30 days after the date on which such a copy is transmitted pursuant to subparagraph (A)(i).

(C) Such an agreement shall remain in effect only for such period, not to exceed 18 months, as the Data Integrity Board of the agency determines is appropriate in light of the purposes, and length of time necessary for the conduct, of the matching program.

(D) Within 3 months prior to the expiration of such an agreement pursuant to subparagraph (C), the Data Integrity Board of the agency may, without additional review, renew the matching agreement for a current, ongoing matching program for not more than one additional year if —

(i) such program will be conducted without any change; and

(ii) each party to the agreement certifies to the Board in writing that the program has been conducted in compliance with the agreement.

**(p) Verification and Opportunity to Contest Findings.** —

(1) In order to protect any individual whose records are used in a matching program, no recipient agency, non-Federal agency, or source agency may suspend, terminate, reduce, or make a final denial of any financial assistance or payment under a Federal benefit program to such individual, or take other adverse action against such individual, as a result of information produced by such matching program, until —

(A)(i) the agency has independently verified the information; or

(ii) the Data Integrity Board of the agency, or in the case of a non-Federal agency the Data Integrity Board of the source agency, determines in accordance with guidance issued by the Director of the Office of Management and Budget that—

(I) the information is limited to identification and amount of benefits paid by the source agency under a Federal benefit program; and

(II) there is a high degree of confidence that the information provided to the recipient agency is accurate;

(B) the individual receives a notice from the agency containing a statement of its findings and informing the individual of the opportunity to contest such findings; and

(C) (i) the expiration of any time period established for the program by statute or regulation for the individual to respond to that notice; or

(ii) in the case of a program for which no such period is established, the end of the 30-day period beginning on the date on which notice under subparagraph (B) is mailed or otherwise provided to the individual.

(2) Independent verification referred to in paragraph (1) requires investigation and confirmation of specific information relating to an individual that is used as a basis for an adverse action against the individual, including where applicable investigation and confirmation of—

(A) the amount of any asset or income involved;

(B) whether such individual actually has or had access to such asset or income for such individual's own use; and

(C) the period or periods when the individual actually had such asset or income.

(3) Notwithstanding paragraph (1), an agency may take any appropriate action otherwise prohibited by such paragraph if the agency determines that the public health or public safety may be adversely affected or significantly threatened during any notice period required by such paragraph.

**(q) Sanctions.** —

(1) Notwithstanding any other provision of law, no source agency may disclose any record which is contained in a system of records to a recipient agency or non-Federal agency for a matching program if such source agency has reason to believe that the requirements of subsection (p), or any matching agreement entered into pursuant to subsection (o), or both, are not being met by such recipient agency.

(2) No source agency may renew a matching agreement unless —

(A) the recipient agency or non-Federal agency has certified that it has complied with the provisions of that agreement; and

(B) the source agency has no reason to believe that the certification is inaccurate.

**(r) Report on New Systems and Matching Programs.** — Each agency that proposes to establish or make a significant change in a system of records or a matching program shall provide adequate advance notice of any such proposal (in duplicate) to the Committee on Government Operations of the House of Representatives, the Committee on Governmental Affairs of the Senate, and the Office of Management and Budget in order to permit an evaluation of the probable or potential effect of such proposal on the privacy or other rights of individuals.

**[ . . . ]**

**(u) Data Integrity Boards.** —

(1) Every agency conducting or participating in a matching program shall establish a Data Integrity Board to oversee and coordinate among the various components of such agency the agency's implementation of this section.

(2) Each Data Integrity Board shall consist of senior officials designated by the head of the agency, and shall include any senior official designated by the head of the agency as responsible for implementation of this section, and the inspector general of the agency, if any. The inspector general shall not serve as chairman of the Data Integrity Board.

(3) Each Data Integrity Board—

(A) shall review, approve, and maintain all written agreements for receipt or disclosure of agency records for matching programs to ensure compliance with subsection (o), and all relevant statutes, regulations, and guidelines;

(B) shall review all matching programs in which the agency has participated during the year, either as a source agency or recipient agency, determine compliance with applicable laws, regulations, guidelines, and agency agreements, and assess the costs and benefits of such programs;

(C) shall review all recurring matching programs in which the agency has participated during the year, either as a source agency or recipient agency, for continued justification for such disclosures;

(D) shall compile an annual report, which shall be submitted to the head of the agency and the Office of Management and Budget and made available to the public on request, describing the matching activities of the agency, including—

(i) matching programs in which the agency has participated as a source agency or recipient agency;

(ii) matching agreements proposed under subsection (o) that were disapproved by the Board;

(iii) any changes in membership or structure of the Board in the preceding year;

(iv) the reasons for any waiver of the requirement in paragraph (4) of this section for completion and submission of a cost-benefit analysis prior to the approval of a matching program;

(v) any violations of matching agreements that have been alleged or identified and any corrective action taken; and

(vi) any other information required by the Director of the Office of Management and Budget to be included in such report;

(E) shall serve as a clearinghouse for receiving and providing information on the accuracy, completeness, and reliability of records used in matching programs;

(F) shall provide interpretation and guidance to agency components and personnel on the requirements of this section for matching programs;

(G) shall review agency recordkeeping and disposal policies and practices for matching programs to assure compliance with this section; and

(H) may review and report on any agency matching activities that are not matching programs.

(4) (A) Except as provided in subparagraphs (B) and (C), a Data Integrity Board shall not approve any written agreement for a matching program unless the agency has completed and submitted to such Board a cost-benefit analysis of the proposed program and such analysis demonstrates that the program is likely to be cost effective.

(B) The Board may waive the requirements of subparagraph (A) of this paragraph if it determines in writing, in accordance with guidelines prescribed by the Director of the Office of Management and Budget, that a cost-benefit analysis is not required.

(C) A cost-benefit analysis shall not be required under subparagraph (A) prior to the initial approval of a written agreement for a matching program that is specifically required by statute. Any subsequent written agreement for such a program shall not be approved by the Data Integrity Board unless the agency has submitted a cost-benefit analysis of the program as conducted under the preceding approval of such agreement.

(5) (A) If a matching agreement is disapproved by a Data Integrity Board, any party to such agreement may appeal the disapproval to the Director of the Office of Management and Budget. Timely notice of the filing of such an appeal shall be provided by the Director of the Office of Management and Budget to the Committee on Governmental Affairs of the Senate and the Committee on Government Operations of the House of Representatives.

(B) The Director of the Office of Management and Budget may approve a matching agreement notwithstanding the disapproval of a Data Integrity Board if the Director determines that — (i) the matching program will be consistent with all applicable legal, regulatory, and policy requirements; (ii) there is adequate evidence that the matching agreement will be cost-effective; and (iii)the matching program is in the public interest.

(C) The decision of the Director to approve a matching agreement shall not take effect until 30 days after it is reported to committees described in subparagraph (A).

(D) If the Data Integrity Board and the Director of the Office of Management and Budget disapprove a matching program proposed by the inspector general of an agency, the inspector general may report the disapproval to the head of the agency and to the Congress.

(6) In the reports required by paragraph (3)(D), agency matching activities that are not matching programs may be reported on an aggregate basis, if and to the extent necessary to protect ongoing law enforcement or counterintelligence investigations.

**(v) Office of Management and Budget Responsibilities.** — The Director of the Office of Management and Budget shall —

(1) develop and, after notice and opportunity for public comment, prescribe guidelines and regulations for the use of agencies in implementing the provisions of this section; and

(2) provide continuing assistance to and oversight of the implementation of this section by agencies.

[ . . . ]

**39 U.S.C. § 101 – Postal Policy.**

**(a)** The United States Postal Service shall be operated as a basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people. The Postal Service shall have as its basic function the obligation to provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people. It shall provide prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities. The costs of establishing and maintaining the Postal Service shall not be apportioned to impair the overall value of such service to the people.

**(b)** The Postal Service shall maintain an integrated network for the delivery of market-dominant and competitive products (as defined in chapter 36 of this title). Delivery shall occur at least six days a week, except during weeks that include a Federal holiday, in emergency situations, such as natural disasters, or in geographic areas where the Postal Service has established a policy of delivering mail fewer than six days a week as of the date of enactment of the Postal Service Reform Act of 2022. The Postal Service shall provide a maximum degree of effective and regular postal services to rural areas, communities, and small towns where post offices are not self-sustaining. No small post office shall be closed solely for operating at a deficit, it being the specific intent of the Congress that effective postal services be insured to residents of both urban and rural communities.

**(c)** As an employer, the Postal Service shall achieve and maintain compensation for its officers and employees comparable to the rates and types of compensation paid in the private sector of the economy of the United States. It shall place particular emphasis upon opportunities for career advancements of all officers and employees and the achievement of worthwhile and satisfying careers in the service of the United States.

**(d)** Postal rates shall be established to apportion the costs of all postal operations to all users of the mail on a fair and equitable basis.

**(e)** In determining all policies for postal services, the Postal Service shall give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail.

**(f)** In selecting modes of transportation, the Postal Service shall give highest consideration to the prompt, economical, consistent, and reliable delivery of all mail in a manner that increases operational efficiency and reduces complexity. Modern methods of transporting mail by containerization and programs designed to achieve cost-effective overnight transportation to the destination of important letter mail to all parts of the Nation shall also be a primary goal of postal operations.

**(g)** In planning and building new postal facilities, the Postal Service shall emphasize the need for facilities and equipment designed to create desirable working conditions for its officers and employees, a maximum degree of convenience for efficient postal services, proper access to existing and future air and surface transportation facilities, and control of costs to the Postal Service.

**39 U.S.C. § 401 – General powers of the Postal Service**

Subject to the provisions of section 404a, the Postal Service shall have the following general powers:

**(1)** to sue and be sued in its official name;

**(2)** to adopt, amend, and repeal such rules and regulations, not inconsistent with this title, as may be necessary in the execution of its functions under this title and such other functions as may be assigned to the Postal Service under any provisions of law outside of this title;

**(3)** to enter into and perform contracts, execute instruments, and determine the character of, and necessity for, its expenditures;

**(4)** to determine and keep its own system of accounts and the forms and contents of its contracts and other business documents, except as otherwise provided in this title;

**(5)** to acquire, in any lawful manner, such personal or real property, or any interest therein, as it deems necessary or convenient in the transaction of its business; to hold, maintain, sell, lease, or otherwise dispose of such property or any interest therein; and to provide services in connection therewith and charges therefor;

**(6)** to construct, operate, lease, and maintain buildings, facilities, equipment, and other improvements on any property owned or controlled by it, including, without limitation, any property or interest therein transferred to it under section 2002 of this title;

**(7)** to accept gifts or donations of services or property, real or personal, as it deems, necessary or convenient in the transaction of its business;

**(8)** to settle and compromise claims by or against it;

**(9)** to exercise, in the name of the United States, the right of eminent domain for the furtherance of its official purposes; and to have the priority of the United States with respect to the payment of debts out of bankrupt, insolvent, and decedents' estates; and

**(10)** to have all other powers incidental, necessary, or appropriate to the carrying on of its functions or the exercise of its specific powers.

**39 U.S.C. § 403 – General duties**

**(a)** The Postal Service shall plan, develop, promote, and provide adequate and efficient postal services at fair and reasonable rates and fees. The Postal Service shall receive, transmit, and deliver throughout the United States, its territories and possessions, and, pursuant to arrangements entered into under sections 406 and 411 of this title, throughout the world, written and printed matter, parcels, and like materials and provide such other services incidental thereto as it finds appropriate to its functions and in the public interest. The Postal Service shall serve as nearly as practicable the entire population of the United States.

**(b)** It shall be the responsibility of the Postal Service —

> **(1)** to maintain an efficient system of collection, sorting, and delivery of the mail nationwide;

> **(2)** to provide types of mail service to meet the needs of different categories of mail and mail users; and

> **(3)** to establish and maintain postal facilities of such character and in such locations, that postal patrons throughout the Nation will, consistent with reasonable economies of postal operations, have ready access to essential postal services.

**(c)** In providing services and in establishing classifications, rates, and fees under this title, the Postal Service shall not, except as specifically authorized in this title, make any undue or unreasonable discrimination among users of the mails, nor shall it grant any undue or unreasonable preferences to any such user.

**42 U.S.C. § 1320b-7 – Income and eligibility verification system**

**(b) Applicable programs.** The programs which must participate in the income and eligibility verification system are—

(1) any State program funded under part A of subchapter IV of this chapter;

(2) the medicaid program under subchapter XIX of this chapter;

(3) the unemployment compensation program under section 3304 of the Internal Revenue Code of 1986;

(4) the supplemental nutrition assistance program established under the Food and Nutrition Act of 2008 (7 U.S.C. 2011 et seq.); and

(5) any State program under a plan approved under subchapter I, X, XIV, or XVI of this chapter.

[ . . . ]

**(d) Citizenship or Immigration Status Requirements; Documentation; Verification by Immigration and Naturalization Service; Denial of Benefits; Hearing**

The requirements of this subsection, with respect to an income and eligibility verification system of a State, are as follows:

(1) (A) The State shall require, as a condition of an individual's eligibility for benefits under a program listed in subsection (b), a declaration in writing, under penalty of perjury—

(i) by the individual,

(ii) in the case in which eligibility for program benefits is determined on a family or household basis, by any adult member of such individual's family or household (as applicable), or

(iii) in the case of an individual born into a family or household receiving benefits under such program, by any adult member of such family or household no later than the next redetermination of eligibility of such family or household following the birth of such individual, stating whether the individual is a citizen or national of the United States, and, if that

individual is not a citizen or national of the United States, that the individual is in a satisfactory immigration status.

(B) In this subsection, in the case of the program described in subsection (b)(4)—

(i) any reference to the State shall be considered a reference to the State agency, and

(ii) any reference to an individual's eligibility for benefits under the program shall be considered a reference to the individual's eligibility to participate in the program as a member of a household, and

(iii) the term "satisfactory immigration status" means an immigration status which does not make the individual ineligible for benefits under the applicable program.

(2) If such an individual is not a citizen or national of the United States, there must be presented either —

(A) alien registration documentation or other proof of immigration registration from the Immigration and Naturalization Service that contains the individual's alien admission number or alien file number (or numbers if the individual has more than one number), or

(B) such other documents as the State determines constitutes reasonable evidence indicating a satisfactory immigration status.

(3) If the documentation described in paragraph (2)(A) is presented, the State shall utilize the individual's alien file or alien admission number to verify with the Immigration and Naturalization Service the individual's immigration status through an automated or other system (designated by the Service for use with States) that —

(A) utilizes the individual's name, file number, admission number, or other means permitting efficient verification, and

(B) protects the individual's privacy to the maximum degree possible.

(4) In the case of such an individual who is not a citizen or national of the United States, if, at the time of application for benefits, the statement described in

paragraph (1) is submitted but the documentation required under paragraph (2) is not presented or if the documentation required under paragraph (2)(A) is presented but such documentation is not verified under paragraph (3)—

(A) the State—

(i) shall provide a reasonable opportunity to submit to the State evidence indicating a satisfactory immigration status, and

(ii) may not delay, deny, reduce, or terminate the individual's eligibility for benefits under the program on the basis of the individual's immigration status until such a reasonable opportunity has been provided; and

(B) if there are submitted documents which the State determines constitutes reasonable evidence indicating such status—

(i) the State shall transmit to the Immigration and Naturalization Service either photostatic or other similar copies of such documents, or information from such documents, as specified by the Immigration and Naturalization Service, for official verification,

(ii) pending such verification, the State may not delay, deny, reduce, or terminate the individual's eligibility for benefits under the program on the basis of the individual's immigration status, and

(iii) the State shall not be liable for the consequences of any action, delay, or failure of the Service to conduct such verification.

(5) If the State determines, after complying with the requirements of paragraph (4), that such an individual is not in a satisfactory immigration status under the applicable program—

(A) the State shall deny or terminate the individual's eligibility for benefits under the program, and

(B) the applicable fair hearing process shall be made available with respect to the individual.

[ . . . ]