NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 26-5193

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

DSCC, *ET AL.*,

*Plaintiffs-Appellants,*

v.

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, *ET AL.*,

*Defendants-Appellees.*

On Appeal from the
United States District Court for the District of Columbia
Case No. 1:26-cv-01114
Hon. Carl J. Nichols

**JOINT APPENDIX**

Tyler L. Bishop
**ELIAS LAW GROUP LLP**
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0177

Marc E. Elias
Lalitha D. Madduri
Jacob D. Shelly
Christina Ford
Max Accardi
Kevin R. Kowalewski
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
Telephone: (202) 968-4652

*Counsel for Plaintiffs-Appellants DSCC, DCCC, Democratic National Committee, Democratic Governors Association, Senate Minority Leader Schumer, and House Minority Leader Jeffries*

# TABLE OF CONTENTS

Relevant Docket Entries ................................................................. JA1

Complaint (Dkt. 1) ....................................................................... JA37

Executive Order (Dkt. 1-1) ....................................................... JA101

Exhibits to Plaintiffs' Motion for Preliminary Injunction (Dkt. 55)................. JA108

Exhibits to Defendants' Opposition to Motion for Preliminary
    Injunction (Dkt. 107) ............................................................ JA520

Exhibits to Plaintiffs' Reply in Support of Motion for Preliminary
    Injunction (Dkt. 122) ............................................................ JA532

Plaintiffs' Supplemental Exhibit (Dkt. 131-1) .................................... JA546

Plaintiffs' Supplemental Exhibit (Dkt. 137-1) .................................... JA554

Defendants' Supplemental Exhibit (Dkt. 139-1) ................................. JA558

Transcript of Hearing on Motion for Preliminary Injunction (Dkt. 148) ......... JA562

Memorandum Opinion (Dkt. 143) ................................................. JA695

Order Denying Motion for Preliminary Injunction (Dkt. 144)................... JA721

Notice of Case Developments (Dkt. 145)........................................... JA723

Notice of Appeal (Dkt. 146)......................................................... JA726

Notice of Case Developments (Dkt. 149)........................................... JA728

Notice of Case Developments (Dkt. 150)........................................... JA731

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:26–cv–01114–CJN

DSCC et al v. TRUMP et al
Assigned to: Judge Carl J. Nichols
Related Cases:  1:26–cv–01132–CJN
                1:26–cv–01151–CJN
Case in other court:  USCA, 26–05193
Cause: 28:1331 Fed. Question

Date Filed: 04/01/2026
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**DSCC**                                represented by   **Christina Ford**
ELIAS LAW GROUP LLP
250 Massachusetts Avenue NW
Suite 400
Washington, DC 20001
202–968–4558
Email: cford@elias.law
*ATTORNEY TO BE NOTICED*

**Jacob D. Shelly**
ELIAS LAW GROUP LLP
250 Massachusetts Avenue NW
Suite 400
Washington, DC 20001
202–968–4496
Email: jshelly@elias.law
*ATTORNEY TO BE NOTICED*

**Kevin Ronald Kowalewski**
ELIAS LAW GROUP LLP
250 Massachusetts Avenue NW
Suite 400
Washington, DC 20001
202–985–3535
Email: kkowalewski@elias.law
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lalitha Madduri**
ELIAS LAW GROUP LLP
250 Massachusetts Avenue NW
Suite 400
Washington, DC 20001
202–968–4593
Email: lmadduri@elias.law
*ATTORNEY TO BE NOTICED*

**Tyler Bishop**
ELIAS LAW GROUP LLP
1700 Seventh Avenue
Suite 2100
Seattle, WA 98101–3099
202–985–0628
Email: tbishop@elias.law
*ATTORNEY TO BE NOTICED*

**Marc Erik Elias**
ELIAS LAW GROUP LLP
250 Massachusetts Avenue NW

JA1

Suite 400
Washington, DC 20001
202–968–4510
Email: eliasm@elias.law
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DCCC**                                           represented by  **Christina Ford**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Jacob D. Shelly**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Kevin Ronald Kowalewski**
                                                                  (See above for address)
                                                                  *PRO HAC VICE*
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Lalitha Madduri**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Tyler Bishop**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Marc Erik Elias**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**DEMOCRATIC NATIONAL**              represented by  **Christina Ford**
**COMMITTEE**                                       (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Jacob D. Shelly**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Kevin Ronald Kowalewski**
                                                                  (See above for address)
                                                                  *PRO HAC VICE*
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Lalitha Madduri**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Tyler Bishop**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Marc Erik Elias**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*

**Plaintiff**

**DEMOCRATIC GOVERNORS**             represented by  **Christina Ford**
**ASSOCIATION**                                     (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*

JA2

**Jacob D. Shelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin Ronald Kowalewski**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lalitha Madduri**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tyler Bishop**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc Erik Elias**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CHARLES E. SCHUMER**
*U.S. SENATE MINORITY LEADER*

represented by **Christina Ford**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jacob D. Shelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin Ronald Kowalewski**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lalitha Madduri**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tyler Bishop**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc Erik Elias**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**HAKEEM S. JEFFRIES**
*U.S. HOUSE OF REPRESENTATIVES*
*MINORITY LEADER*

represented by **Christina Ford**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jacob D. Shelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin Ronald Kowalewski**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lalitha Madduri**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tyler Bishop**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marc Erik Elias**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**LEAGUE OF UNITED LATIN AMERICAN CITIZENS**

represented by **Anna Marks Baldwin**
CAMPAIGN LEGAL CENTER
1101 14th St. NW
Suite 400
Washington, DC 20005
202–736–2200
Fax: 202–736–2222
Email: abaldwin@campaignlegalcenter.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aseem Mulji**
CAMPAIGN LEGAL CENTER
1101 14th Street NW
Suite 400
Washington, DC 20005
202–868–4777
Email: amulji@campaignlegal.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin Phillips**
CAMPAIGN LEGAL CENTER
1101 14th St. NW
Suite 400
Washington, DC 20005
202–683–4895
Email: bphillips@campaignlegalcenter.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Danielle M. Lang**
CAMPAIGN LEGAL CENTER
1101 14th Street, NW
Suite 400
Washington, DC 20005
(202) 736–2200
Fax: (202) 736–2222
Email: dlang@campaignlegalcenter.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Heather Szilagyi**
CAMPAIGN LEGAL CENTER
1101 14th St. NW
Suite 400
Washington, DC 20005
202–736–2200
Email: hszilagyi@campaignlegalcenter.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Renata O'Donnell**
CAMPAIGN LEGAL CENTER

JA4

1101 14th St. NW
Suite 400
Washington, DC 20005
202–746–2200
Email: rodonnell@campaignlegalcenter.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Brent Ferguson**
3465 Holmead Place NW
Washington, DC 20010
918–576–4318
Email: bferguson@campaignlegalcenter.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sejal Jhaveri**
CAMPAIGN LEGAL CENTER
1101 14th St. NW
Suite 400
Washington, DC 20005
202–736–2200
Email: sjhaveri@campaignlegalcenter.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Valencia Richardson**
CAMPAIGN LEGAL CENTER
1101 14th St. NW
Suite 400
Washington, DC 20005
318–573–8984
Email: vrichardson@campaignlegalcenter.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Norman Larry Eisen**
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave SE
Unit 15180
Washington, DC 20003
202–594–9958
Email: norman@democracydefenders.org
*ATTORNEY TO BE NOTICED*

**Pooja Chaudhuri**
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave SE
Unit 15180
Washington, DC 20003
202–594–9958
Email: pooja@statedemocracydefenders.org
*ATTORNEY TO BE NOTICED*

**Sofia Fernandez Gold**
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave SE
Unit 15180
Washington, DC 20003
202–594–9958
Email: Sofia@statedemocracydefenders.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

JA5

**SECURE FAMILIES INITIATIVE**       represented by  **Anna Marks Baldwin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aseem Mulji**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin Phillips**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Danielle M. Lang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Heather Szilagyi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Renata O'Donnell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Brent Ferguson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sejal Jhaveri**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Valencia Richardson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Norman Larry Eisen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Pooja Chaudhuri**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sofia Fernandez Gold**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ARIZONA STUDENTS'**
**ASSOCIATION**       represented by  **Anna Marks Baldwin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aseem Mulji**

JA6

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin Phillips**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Danielle M. Lang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Heather Szilagyi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Renata O'Donnell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Brent Ferguson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sejal Jhaveri**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Valencia Richardson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Norman Larry Eisen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Pooja Chaudhuri**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sofia Fernandez Gold**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE**

represented by **Catherine Meza**
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
1500 K Street NW
Suite 900
Washington, DC 20005
202–662–8323
Email: cmeza@lawyerscommittee.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Javon Davis**

JA7

LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street, NW
Suite 900
Washington, DC 20005
202–662–8353
Email: jdavis@lawyerscommittee.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Neil Weiner**
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street, NW
Suite 900
Washington, DC 20005
202–662–8600
Email: rweiner@lawyerscommittee.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elisabeth S. Theodore**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave. NW
Washington, DC 20001
(202) 942–5891
Fax: (202) 942–5999
Email: elisabeth.theodore@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Grace Thomas**
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street, NW
Suite 900
Washington, DC 20005
202–662–8365
Email: gthomas@lawyerscommittee.org
*ATTORNEY TO BE NOTICED*

**Jeffrey Blumberg**
LAWYERS COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K St., NW
Washington, DC 20005
202–747–4608
Email: jblumberg@lawyerscommittee.org
*ATTORNEY TO BE NOTICED*

**Jeremy Karpatkin**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave, NW
Washington, DC 20001
202–942–5564
Email: Jeremy.Karpatkin@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**John Arak Freedman**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave, NW
Washington, DC 20001
(202) 942–5316

JA8

Fax: (202) 942–5999
Email: john.freedman@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Marlin David Rollins–Boyd**
LAWYERS COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K St., NW
Washington, DC 20005
202–662–8351
Email: drollins–boyd@lawyerscommittee.org
*ATTORNEY TO BE NOTICED*

**Nicholas Anway**
ARNOLD & PORTER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
202–942–6076
Email: nicholas.casmier.anway@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Orion DE Nevers**
ARNOLD & PORTER
601 Massachusetts Ave, NW
Washington, DC 20001
202–942–5918
Email: orion.denevers@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **COMMON CAUSE** | represented by | **Catherine Meza** |

**Catherine Meza**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Javon Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Neil Weiner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elisabeth S. Theodore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Grace Thomas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeffrey Blumberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Karpatkin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Arak Freedman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marlin David Rollins–Boyd**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas Anway**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Orion DE Nevers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| COMMON CAUSE EDUCATION FUND | represented by | **Catherine Meza**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Javon Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Neil Weiner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elisabeth S. Theodore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Grace Thomas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeffrey Blumberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Karpatkin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Arak Freedman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marlin David Rollins–Boyd**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas Anway**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Orion DE Nevers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| BLACK VOTERS MATTER FUND, INC. | represented by | **Catherine Meza**<br>(See above for address) |

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Javon Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Neil Weiner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elisabeth S. Theodore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Grace Thomas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeffrey Blumberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Karpatkin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Arak Freedman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marlin David Rollins–Boyd**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas Anway**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Orion DE Nevers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BVM CAPACITY BUILDING INSTITUTE, INC.**  represented by **Catherine Meza**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Javon Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Neil Weiner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elisabeth S. Theodore**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA11

**Grace Thomas**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeffrey Blumberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Karpatkin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Arak Freedman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marlin David Rollins–Boyd**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas Anway**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Orion DE Nevers**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**DONALD J. TRUMP**
*in his official capacity as President of the*
*United States*

represented by **Esam Al–Shareffi**
DOJ–CIV
1100 L Street
Room 12520
Washington, DC 20005
845–536–4560
Email: esam.k.al–shareffi@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen M. Pezzi**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
(202) 305–8576
Fax: (202) 616–8470
Email: stephen.pezzi@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**EXECUTIVE OFFICE OF THE**
**PRESIDENT**

represented by **Esam Al–Shareffi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen M. Pezzi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA12

**Defendant**

| | | |
|---|---|---|
| **UNITED STATES DEPARTMENT OF JUSTICE** | represented by | **Esam Al–Shareffi**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Stephen M. Pezzi**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **UNITED STATES POSTAL SERVICE** | represented by | **Esam Al–Shareffi**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Stephen M. Pezzi**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **U.S. DEPARTMENT OF HOMELAND SECURITY** | represented by | **Esam Al–Shareffi**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Stephen M. Pezzi**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **U.S. CITIZENSHIP AND IMMIGRATION SERVICES** | represented by | **Esam Al–Shareffi**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Stephen M. Pezzi**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **SOCIAL SECURITY ADMINISTRATION** | represented by | **Esam Al–Shareffi**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Stephen M. Pezzi**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **U.S. DEPARTMENT OF COMMERCE** | represented by | **Esam Al–Shareffi**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

Stephen M. Pezzi  
(See above for address)  
*LEAD ATTORNEY*  
*ATTORNEY TO BE NOTICED*

**Defendant**

**PAMELA BONDI**  
*in her official capacity as U.S. Attorney General*

represented by **Esam Al–Shareffi**  
(See above for address)  
*LEAD ATTORNEY*  
*ATTORNEY TO BE NOTICED*

**Stephen M. Pezzi**  
(See above for address)  
*LEAD ATTORNEY*  
*ATTORNEY TO BE NOTICED*

**Defendant**

**DAVID STEINER**  
*in his official capacity as U.S. Postmaster General*

represented by **Esam Al–Shareffi**  
(See above for address)  
*LEAD ATTORNEY*  
*ATTORNEY TO BE NOTICED*

**Stephen M. Pezzi**  
(See above for address)  
*LEAD ATTORNEY*  
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARKWAYNE MULLIN**  
*in his official capacity as Secretary of Homeland Security*

represented by **Esam Al–Shareffi**  
(See above for address)  
*LEAD ATTORNEY*  
*ATTORNEY TO BE NOTICED*

**Stephen M. Pezzi**  
(See above for address)  
*LEAD ATTORNEY*  
*ATTORNEY TO BE NOTICED*

**Defendant**

**JOSEPH B. EDLOW**  
*in his official capacity as Director of the U.S. Citizenship and Immigration Services*

represented by **Esam Al–Shareffi**  
(See above for address)  
*LEAD ATTORNEY*  
*ATTORNEY TO BE NOTICED*

**Stephen M. Pezzi**  
(See above for address)  
*LEAD ATTORNEY*  
*ATTORNEY TO BE NOTICED*

**Defendant**

**FRANK J. BISIGNANO**  
*in his official capacity as Commissioner of the Social Security Administration*

represented by **Esam Al–Shareffi**  
(See above for address)  
*LEAD ATTORNEY*  
*ATTORNEY TO BE NOTICED*

**Stephen M. Pezzi**  
(See above for address)  
*LEAD ATTORNEY*  
*ATTORNEY TO BE NOTICED*

**Defendant**

**HOWARD LUTNICK**
*in his official capacity as Secretary of the Department of Commerce*

represented by **Esam Al–Shareffi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen M. Pezzi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**AMBER F. MCREYNOLDS**
*in her official capacity as Chair of the Board of Governors of the United States Postal Service*

represented by **Esam Al–Shareffi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen M. Pezzi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**BOARD OF GOVERNORS OF THE UNITED STATES POSTAL SERVICE**

represented by **Esam Al–Shareffi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen M. Pezzi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DANIEL M. TANGHERLINI**
*in his official capacity as Member of the Board of Governors of the United States Postal Service*

represented by **Esam Al–Shareffi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen M. Pezzi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEREK KAN**
*in his official capacity as Vice Chairman of the Board of Governors of the United States Postal Service*

represented by **Esam Al–Shareffi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen M. Pezzi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**RONALD A. STROMAN**
*in his official capacity as Member of the Board of Governors of the United States Postal Service*

represented by **Esam Al–Shareffi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen M. Pezzi**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Defendant**

**STATE OF MISSOURI**                represented by **John Michael Patton**
OFFICE OF THE MISSOURI
ATTORNEY GENERAL
615 E. 13th Street
Suite 401
Kansas City, MO 64106
816–889–2250
Email: michael.patton@ago.mo.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Louis Joseph Capozzi , III**
MISSOURI ATTORNEY GENERAL'S
OFFICE
Solicitor General
815 Olive Street
St Louis, Missouri 63101, Suite 200
St Louis, MO 63101
717–802–2077
Email: Louis.Capozzi@ago.mo.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**STATE OF ALABAMA**                represented by **Alexander Barrett Bowdre**
STATE OF ALABAMA
OFFICE OF THE ATTORNEY
GENERAL
501 Washington Ave.
PO Box 300152
Montgomery, AL 36130–0152
334–353–8892
Email: barrett.bowdre@alabamaag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Louis Joseph Capozzi , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**STATE OF FLORIDA**                represented by **Louis Joseph Capozzi , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**STATE OF INDIANA**                represented by **James Allen Barta**
OFFICE OF THE INDIANA ATTORNEY
GENERAL
302 West Washington Street
IGCS–5th Floor
Indianapolis, IN 46204
317–232–0709
Email: james.barta@atg.in.gov

JA16

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Louis Joseph Capozzi , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**STATE OF KANSAS**　represented by　**James Rodriguez**
KANSAS ATTORNEY GENERAL'S
OFFICE
120 SW 10th Ave, 2d Fl
Topeka, KS 66612
785−368−8197
Email: jay.rodriguez@ag.ks.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Louis Joseph Capozzi , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**STATE OF LOUISIANA**　represented by　**Louis Joseph Capozzi , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**STATE OF MONTANA**　represented by　**Louis Joseph Capozzi , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**STATE OF NEBRASKA**　represented by　**Cody S Barnett**
NEBRASKA ATTORNEY GENERAL'S
OFFICE
1445 K Street
Ste 2115
Lincoln, NE 68508
402−471−6933
Email: cody.barnett@nebraska.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Louis Joseph Capozzi , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**STATE OF OKLAHOMA**　represented by　**Louis Joseph Capozzi , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**STATE OF SOUTH CAROLINA**　represented by

JA17

**Joseph David Spate**
SOUTH CAROLINA ATTORNEY
GENERAL'S OFFICE
P.O. Box 11549
Columbia, SC 29211
803–734–3371
Email: josephspate@scag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Louis Joseph Capozzi , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

| | | |
|---|---|---|
| **STATE OF SOUTH DAKOTA** | represented by | **Grant Michael Flynn**<br>OFFICE OF THE ATTORNEY<br>GENERAL SOUTH DAKOTA<br>1302 East SD Highway 1889<br>Suite 1<br>Pierre, SD 57501–8501<br>605–773–3215<br>Fax: 605–773–4106<br>Email: grant.flynn@state.sd.us<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Louis Joseph Capozzi , III**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Intervenor Defendant**

| | | |
|---|---|---|
| **STATE OF TEXAS** | represented by | **Louis Joseph Capozzi , III**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Movant**

| | | |
|---|---|---|
| **STATE AND LOCAL ELECTION OFFICIALS AND ELECTION EXPERTS** | represented by | **Samantha P. Bateman**<br>WASHINGTON LITIGATION GROUP<br>1717 K St NW<br>Washington, DC 20006<br>202–521–8755<br>Email: sbateman@washingtonlitigationgroup.org<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Movant**

| | | |
|---|---|---|
| **EMANUEL MCCRAY**<br>*TERMINATED: 05/11/2026* | represented by | **EMANUEL MCCRAY**<br>400 W. McLoughlin Blvd.<br>Apt. 5<br>Vancouver, WA 98660<br>PRO SE |

**Amicus**

| | | |
|---|---|---|
| **SOCIETY FOR THE RULE OF LAW** | represented by | **Nancy A. Temple**<br>KATTEN & TEMPLE LLP<br>209 S. LaSalle Street<br>Suite 950<br>Chicago, IL 60604 |

JA18

312−663−0800
Email: ntemple@kattentemple.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard D. Bernstein**
1875 K Street N.W.
Washington, DC 20006
301−775−2064
Email: rbernsteinlaw@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **WISCONSIN DEMOCRACY CAMPAIGN, INC.** | represented by | **Douglas Maynard Poland** |

LAW FORWARD, INC.
222 West Washington Avenue
Suite 680
Madison, WI 53703
608−283−9822
Email: dpoland@lawforward.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey A. Mandell**
LAW FORWARD, INC.
222 West Washington Avenue
Suite 250
Madison, WI 53703
608−218−4155
Email: jmandell@lawforward.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachel Elizabeth Snyder**
LAW FORWARD
222 West Washington Ave
Suite 680
Madison, WI 53703
608−289−3896
Email: rsnyder@lawforward.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **EXPO OF WISCONSIN, INC.** | represented by | **Douglas Maynard Poland** |

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey A. Mandell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachel Elizabeth Snyder**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**JALEYCE ORAEDU**       represented by    **Douglas Maynard Poland**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey A. Mandell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachel Elizabeth Snyder**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**JASMINE ORAEDU**       represented by    **Douglas Maynard Poland**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey A. Mandell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachel Elizabeth Snyder**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**AHARON SHELEF**       represented by    **Douglas Maynard Poland**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey A. Mandell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachel Elizabeth Snyder**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**AMERICA'S FUTURE**       represented by    **William Jeffrey Olson**
WILLIAM J. OLSON, P.C.
370 Maple Avenue West
Suite 4
Vienna, VA 22180
(703) 356–5070
Fax: (703) 356–5085

Email: wjo@mindspring.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**CITIZENS UNITED**                     represented by   **William Jeffrey Olson**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Amicus**

**FEDERATION FOR AMERICAN**             represented by   **Christopher Joseph Hajec**
**IMMIGRATION REFORM**                                   FEDERATION FOR AMERICAN
                                                          IMMIGRATION REFORM
                                                          25 Massachusetts Ave., NW
                                                          Suite 335
                                                          Washington, DC 20001
                                                          202–232–5590
                                                          Email: chajec@fairus.org
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Matt A. Crapo**
                                                          FEDERATION FOR AMERICAN
                                                          IMMIGRATION REFORM
                                                          25 Massachusetts Ave., NW
                                                          Suite 330
                                                          Washington, DC 20001
                                                          571–435–3582
                                                          Fax: 202–387–3447
                                                          Email: mcrapo@fairus.org
                                                          *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/01/2026 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC–12335628) filed by DCCC, DSCC, HAKEEM S. JEFFRIES, DEMOCRATIC NATIONAL COMMITTEE, DEMOCRATIC GOVERNORS ASSOCIATION, CHARLES E. SCHUMER. (Attachments: # 1 Exhibit A – Executive Order, # 2 Civil Cover Sheet, # 3 Summons Donald J. Trump, # 4 Summons Executive Office of the President, # 5 Summons U.S. Department of Justice, # 6 Summons U.S. Postal Service, # 7 Summons U.S. Department of Homeland Security, # 8 Summons U.S. Citizenship and Immigration Services, # 9 Summons Social Security Administration, # 10 Summons U.S. Department of Commerce, # 11 Summons Pamela Bondi, # 12 Summons David Steiner, # 13 Summons Markwayne Mullin, # 14 Summons Joseph B. Edlow, # 15 Summons Frank J. Bisignano, # 16 Summons Howard Lutnick)(Elias, Marc) (Attachment 2 replaced on 4/2/2026) (zmtm). (Entered: 04/01/2026) |
| 04/01/2026 | 2 | NOTICE OF RELATED CASE by All Plaintiffs. Case related to Case No. 1:25–cv–946–CKK. (Elias, Marc) (Entered: 04/01/2026) |
| 04/01/2026 | 3 | NOTICE of Appearance by Marc Erik Elias on behalf of All Plaintiffs (Elias, Marc) (Entered: 04/01/2026) |
| 04/01/2026 | 4 | NOTICE of Appearance by Lalitha Madduri on behalf of All Plaintiffs (Madduri, Lalitha) (Entered: 04/01/2026) |
| 04/01/2026 | 5 | NOTICE of Appearance by Jacob D. Shelly on behalf of All Plaintiffs (Shelly, Jacob) (Entered: 04/01/2026) |
| 04/01/2026 | 6 | NOTICE of Appearance by Christina Ford on behalf of All Plaintiffs (Ford, Christina) (Entered: 04/01/2026) |

| 04/01/2026 | 7 | NOTICE of Appearance by Tyler Bishop on behalf of All Plaintiffs (Bishop, Tyler) (Entered: 04/01/2026) |
|---|---|---|
| 04/02/2026 | | Case Assigned to Judge Colleen Kollar–Kotelly. (zmtm) (Entered: 04/02/2026) |
| 04/02/2026 | 8 | SUMMONS (14) Issued Electronically as to All Defendants and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zmtm) (Entered: 04/02/2026) |
| 04/02/2026 | | NOTICE OF NEW CASE ERROR The following error(s) need correction: Missing summonses– U.S. Attorney. When naming a U.S. government agent or agency as a defendant, you must supply a summons for each defendant & two additional summonses for the U.S. Attorney & U.S. Attorney General. Please submit using the event Request for Summons to Issue. (zmtm) (Entered: 04/02/2026) |
| 04/02/2026 | 9 | REQUEST FOR SUMMONS TO ISSUE filed by DCCC, DSCC, HAKEEM S. JEFFRIES, DEMOCRATIC NATIONAL COMMITTEE, DEMOCRATIC GOVERNORS ASSOCIATION, CHARLES E. SCHUMER.(Elias, Marc) (Entered: 04/02/2026) |
| 04/02/2026 | 10 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by DEMOCRATIC NATIONAL COMMITTEE (Elias, Marc) (Entered: 04/02/2026) |
| 04/02/2026 | 11 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by DEMOCRATIC GOVERNORS ASSOCIATION (Elias, Marc) (Entered: 04/02/2026) |
| 04/02/2026 | 12 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by DCCC (Elias, Marc) (Entered: 04/02/2026) |
| 04/02/2026 | 13 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by DSCC (Elias, Marc) (Entered: 04/02/2026) |
| 04/02/2026 | 14 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by DCCC, DEMOCRATIC GOVERNORS ASSOCIATION, DEMOCRATIC NATIONAL COMMITTEE, DSCC, HAKEEM S. JEFFRIES, CHARLES E. SCHUMER (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit Sealed Notice)(Elias, Marc) (Entered: 04/02/2026) |
| 04/02/2026 | 15 | ORDER ESTABLISHING PROCEDURES FOR CIVIL CASES ASSIGNED TO JUDGE COLLEEN KOLLAR–KOTELLY. Signed by Judge Colleen Kollar–Kotelly on 04/02/2026. (lcckk1) (Entered: 04/02/2026) |
| 04/02/2026 | 19 | SEALED DOCUMENT – Notice filed by DCCC, DEMOCRATIC GOVERNORS ASSOCIATION, DEMOCRATIC NATIONAL COMMITTEE, DSCC, HAKEEM S. JEFFRIES, CHARLES E. SCHUMER. re 1 Complaint,,,,. (This document is SEALED and only available to authorized persons.)(zjm) (Entered: 04/06/2026) |
| 04/03/2026 | 16 | SUMMONS (1) Issued Electronically as to U.S. Attorney (Attachments: # 1 Notice and Consent)(zjm) (Entered: 04/03/2026) |
| 04/03/2026 | 17 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Kevin Kowalewski, Filing fee $ 100, receipt number ADCDC–12340799. Fee Status: Fee Paid. by DCCC, DEMOCRATIC GOVERNORS ASSOCIATION, DEMOCRATIC NATIONAL COMMITTEE, DSCC, HAKEEM S. JEFFRIES, CHARLES E. SCHUMER. (Attachments: # 1 Declaration of Kevin Kowalewski, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Madduri, Lalitha) (Entered: 04/03/2026) |
| 04/06/2026 | 18 | ORDER directing the parties in Case Nos. 26–1114 and 26–1132 to MEET AND CONFER to discuss whether the two cases should be consolidated, setting deadlines, and addressing other preliminary matters. See Order for further details. Signed by Judge Colleen Kollar–Kotelly on 04/06/2026. (lcckk1) (Entered: 04/06/2026) |
| 04/06/2026 | | MINUTE ORDER granting 17 Motion for Leave to Appear *Pro Hac Vice* with respect to Attorney Kevin Kowalewski, in order for him to appear as co–counsel for Plaintiffs, **CONTINGENT on said attorney filing a declaration certifying familiarity with this Court's Local Rules by no later than April 21, 2026. <span style="color:red">Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)</span> Click for instructions. Signed by Judge Colleen Kollar–Kotelly on 4/6/2026.** |

| | | |
|---|---|---|
| | | (lcckk3) (Entered: 04/06/2026) |
| 04/06/2026 | 20 | DECLARATION *of Kevin R. Kowalewski in Support of Motion for Admission Pro Hac Vice* by DCCC, DEMOCRATIC GOVERNORS ASSOCIATION, DEMOCRATIC NATIONAL COMMITTEE, DSCC, HAKEEM S. JEFFRIES, CHARLES E. SCHUMER re 17 MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Kevin Kowalewski, Filing fee $ 100, receipt number ADCDC–12340799. Fee Status: Fee Paid.. (Kowalewski, Kevin) (Entered: 04/06/2026) |
| 04/06/2026 | 21 | NOTICE of Appearance by Kevin Ronald Kowalewski on behalf of All Plaintiffs (Kowalewski, Kevin) (Entered: 04/06/2026) |
| 04/08/2026 | 22 | NOTICE of Appearance by Esam Al–Shareffi on behalf of All Defendants (Al–Shareffi, Esam) (Entered: 04/08/2026) |
| 04/08/2026 | 23 | MOTION to Reassign Case *Objection to Notice of Related Case* by FRANK J. BISIGNANO, PAMELA BONDI, JOSEPH B. EDLOW, EXECUTIVE OFFICE OF THE PRESIDENT, HOWARD LUTNICK, MARKWAYNE MULLIN, SOCIAL SECURITY ADMINISTRATION, DAVID STEINER, DONALD J. TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. DEPARTMENT OF COMMERCE, U.S. DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES POSTAL SERVICE. (Al–Shareffi, Esam) (Entered: 04/08/2026) |
| 04/08/2026 | 24 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 4/3/2026. Answer due for ALL FEDERAL DEFENDANTS by 6/2/2026. (Madduri, Lalitha) (Entered: 04/08/2026) |
| 04/08/2026 | 25 | RESPONSE TO ORDER OF THE COURT re 18 Order, filed by DCCC, DEMOCRATIC GOVERNORS ASSOCIATION, DEMOCRATIC NATIONAL COMMITTEE, DSCC, HAKEEM S. JEFFRIES, CHARLES E. SCHUMER. (Madduri, Lalitha) (Entered: 04/08/2026) |
| 04/08/2026 | 26 | ORDER granting (23) Motion to Reassign Case in case 1:26–cv–01114–CKK; granting (16) Motion to Reassign Case in case 1:26–cv–01132–CKK. Signed by Judge Colleen Kollar–Kotelly on 4/8/2026. (lcckk3) (Entered: 04/08/2026) |
| 04/09/2026 | | Case randomly reassigned to Judge Carl J. Nichols pursuant to 26 Order dated 4/8/2026. Judge Colleen Kollar–Kotelly is no longer assigned to the case. (ztnr) (Entered: 04/09/2026) |
| 04/09/2026 | 27 | ORDER CONSOLIDATING CASES. Signed by Judge Carl J. Nichols on 4/9/2026. (lccjn1) (Entered: 04/09/2026) |
| 04/09/2026 | 28 | NOTICE *of Filing Opposition to LULAC Plaintiffs' Motion for Expedited Discovery* by FRANK J. BISIGNANO, PAMELA BONDI, JOSEPH B. EDLOW, EXECUTIVE OFFICE OF THE PRESIDENT, HOWARD LUTNICK, MARKWAYNE MULLIN, SOCIAL SECURITY ADMINISTRATION, DAVID STEINER, DONALD J. TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. DEPARTMENT OF COMMERCE, U.S. DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES POSTAL SERVICE (Al–Shareffi, Esam) (Entered: 04/09/2026) |
| 04/10/2026 | 29 | MOTION for Preliminary Injunction by LEAGUE OF UNITED LATIN AMERICAN CITIZENS, SECURE FAMILIES INITIATIVE, ARIZONA STUDENTS' ASSOCIATION. (Lang, Danielle) (Entered: 04/10/2026) |
| 04/10/2026 | 30 | NOTICE of Appearance by Anna Marks Baldwin on behalf of ARIZONA STUDENTS' ASSOCIATION, LEAGUE OF UNITED LATIN AMERICAN CITIZENS, SECURE FAMILIES INITIATIVE (Baldwin, Anna) (Entered: 04/10/2026) |
| 04/10/2026 | 31 | NOTICE of Appearance by Robert Brent Ferguson on behalf of ARIZONA STUDENTS' ASSOCIATION, LEAGUE OF UNITED LATIN AMERICAN CITIZENS, SECURE FAMILIES INITIATIVE (Ferguson, Robert) (Entered: 04/10/2026) |

JA23

| 04/10/2026 | 32 | NOTICE of Appearance by Renata O'Donnell on behalf of ARIZONA STUDENTS' ASSOCIATION, LEAGUE OF UNITED LATIN AMERICAN CITIZENS, SECURE FAMILIES INITIATIVE (O'Donnell, Renata) (Entered: 04/10/2026) |
|---|---|---|
| 04/10/2026 | 33 | NOTICE of Appearance by Heather Szilagyi on behalf of ARIZONA STUDENTS' ASSOCIATION, LEAGUE OF UNITED LATIN AMERICAN CITIZENS, SECURE FAMILIES INITIATIVE (Szilagyi, Heather) (Entered: 04/10/2026) |
| 04/10/2026 | 34 | MOTION for Preliminary Injunction by DCCC, DEMOCRATIC GOVERNORS ASSOCIATION, DEMOCRATIC NATIONAL COMMITTEE, DSCC, HAKEEM S. JEFFRIES, CHARLES E. SCHUMER. (Madduri, Lalitha) (Entered: 04/10/2026) |
| 04/10/2026 | 35 | NOTICE of Appearance by Benjamin Phillips on behalf of ARIZONA STUDENTS' ASSOCIATION, LEAGUE OF UNITED LATIN AMERICAN CITIZENS, SECURE FAMILIES INITIATIVE (Phillips, Benjamin) (Entered: 04/10/2026) |
| 04/10/2026 | 36 | REPLY to opposition to motion re 17 Motion to Expedite filed by ARIZONA STUDENTS' ASSOCIATION, LEAGUE OF UNITED LATIN AMERICAN CITIZENS, SECURE FAMILIES INITIATIVE. . (Baldwin, Anna) Modified docket text on 4/13/2026, pursuant to Counsel (mg). (Entered: 04/10/2026) |
| 04/10/2026 | 37 | MOTION for Preliminary Injunction by NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, COMMON CAUSE, COMMON CAUSE EDUCATION FUND, BLACK VOTERS MATTER FUND, INC., BVM CAPACITY BUILDING INSTITUTE, INC.. (Freedman, John) (Entered: 04/10/2026) |
| 04/10/2026 | 38 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by BLACK VOTERS MATTER FUND, INC. (Freedman, John) (Entered: 04/10/2026) |
| 04/10/2026 | 39 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by BVM CAPACITY BUILDING INSTITUTE, INC. (Freedman, John) (Entered: 04/10/2026) |
| 04/10/2026 | 40 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by COMMON CAUSE (Freedman, John) (Entered: 04/10/2026) |
| 04/10/2026 | 41 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (Freedman, John) (Entered: 04/10/2026) |
| 04/10/2026 | 42 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by COMMON CAUSE EDUCATION FUND (Freedman, John) (Entered: 04/10/2026) |
| 04/12/2026 | | MINUTE ORDER. Upon consideration of the 36 Motion to Expedite Discovery, and the entire record herein, it is hereby ORDERED that the motion is DENIED WITHOUT PREJUDICE. In the event that the Court later determines that discovery would assist in resolving the motions for a preliminary injunction, the Court may order such discovery on an expedited basis. So ORDERED by Judge Carl J. Nichols on 4/12/2026. (lccjn1) (Entered: 04/12/2026) |
| 04/13/2026 | 43 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 4/13/2026. Answer due for ALL FEDERAL DEFENDANTS by 6/12/2026. (Lang, Danielle) (Entered: 04/13/2026) |
| 04/13/2026 | 44 | NOTICE of Appearance by Sofia Fernandez Gold on behalf of ARIZONA STUDENTS' ASSOCIATION, LEAGUE OF UNITED LATIN AMERICAN CITIZENS, SECURE FAMILIES INITIATIVE (Gold, Sofia) (Entered: 04/13/2026) |
| 04/13/2026 | 45 | NOTICE of Appearance by Pooja Chaudhuri on behalf of ARIZONA STUDENTS' ASSOCIATION, LEAGUE OF UNITED LATIN AMERICAN CITIZENS, SECURE FAMILIES INITIATIVE (Chaudhuri, Pooja) (Entered: 04/13/2026) |
| 04/13/2026 | 46 | NOTICE of Appearance by Stephen M. Pezzi on behalf of All Defendants (Pezzi, Stephen) (Entered: 04/13/2026) |

| | | |
|---|---|---|
| 04/14/2026 | | Cases Consolidated. The following cases have been consolidated with this case: 26cv1132, 26cv1151 pursuant to 27 Order filed 4/9/2026. From this date forward, all pleadings shall be filed ONLY in this case. Parties are advised NOT to elect the SPREAD TEXT option when filing in ECF, as this will result in repetitive docketing. (znmw) (Entered: 04/14/2026) |
| 04/14/2026 | 47 | NOTICE of Appearance by Norman Larry Eisen on behalf of ARIZONA STUDENTS' ASSOCIATION, LEAGUE OF UNITED LATIN AMERICAN CITIZENS, SECURE FAMILIES INITIATIVE (Eisen, Norman) (Entered: 04/14/2026) |
| 04/14/2026 | 48 | STANDING ORDER. Signed by Judge Carl J. Nichols on 4/14/2026. (lccjn1) (Entered: 04/14/2026) |
| 04/17/2026 | 49 | NOTICE of Appearance by Richard D. Bernstein on behalf of Society For The Rule of Law (Bernstein, Richard) (Entered: 04/17/2026) |
| 04/17/2026 | 50 | Unopposed MOTION for Leave to File Amicus Brief *as Amicus Curiae of The Society For the Rule of Law* by Society For The Rule of Law. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order)(Bernstein, Richard) (Entered: 04/17/2026) |
| 04/17/2026 | 51 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Nancy A. Temple, Filing fee $ 100, receipt number ADCDC–12367061. Fee Status: Fee Paid. by Society For The Rule of Law. (Attachments: # 1 Declaration of Nancy A. Temple, # 2 Text of Proposed Order)(Bernstein, Richard) (Entered: 04/17/2026) |
| 04/17/2026 | 52 | NOTICE of Proposed Order by Society For The Rule of Law re 50 Unopposed MOTION for Leave to File Amicus Brief *as Amicus Curiae of The Society For the Rule of Law* (Bernstein, Richard) (Entered: 04/17/2026) |
| 04/17/2026 | | MINUTE ORDER. The Court having considered the 51 Motion for Admission Pro Hac Vice of Nancy A. Temple, and it appearing to the Court that the attorney referenced therein meets the requirements for pro hac vice admission under Local Civil Rule 83.2(e), it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Nancy A. Temple is ADMITTED to practice before the Court pro hac vice. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. So ORDERED by Judge Carl J. Nichols on 4/17/2026. (lccjn1) (Entered: 04/17/2026) |
| 04/17/2026 | | MINUTE ORDER. It is hereby ORDERED that the Society for the Rule of Law's 50 Motion for Leave to File Amicus Brief is GRANTED. So ORDERED by Judge Carl J. Nichols on 4/17/2026. (lccjn1) (Entered: 04/17/2026) |
| 04/17/2026 | 53 | MEMORANDUM re 29 MOTION for Preliminary Injunction by ARIZONA STUDENTS' ASSOCIATION, LEAGUE OF UNITED LATIN AMERICAN CITIZENS, SECURE FAMILIES INITIATIVE. (Attachments: # 1 Index of Exhibits, # 2 Exhibit 1– Executive Order No. 14399, # 3 Exhibit 2– Federal Post Card Application, # 4 Exhibit 3– Executive Order No. 14248, # 5 Exhibit 4– Privacy Impact Assessment for the Systematic Alien Verification Entitlements Program, # 6 Exhibit 5– Post Election Audit Report: General Election 2016, # 7 Exhibit 6– Westat Report to DHS, # 8 Exhibit 7– Privacy Impact Assessment for the Systematic Alien Verification Entitlements Program, # 9 Exhibit 8– Hrg Tr., United States v. Bellows, # 10 Exhibit 9– Confidential Memorandum of Understanding executed with Texas, # 11 Exhibit 10– Confidential Memorandum of Understanding executed with Alaska, # 12 Exhibit 11– Declaration of Sarah Streyder, # 13 Exhibit 12– Declaration of Jessica Mendoza, # 14 Exhibit 13– Declaration of Janessa Zucchetto, # 15 Exhibit 14– Declaration of Kelsi Kiper, # 16 Exhibit 15– Declaration of Brittney Haddix, # 17 Exhibit 16– Declaration of Wyatt Perkins, # 18 Exhibit 17– Declaration of Evan Stasch, # 19 Exhibit 18– Declaration of Juan Proao, # 20 Exhibit 19– Declaration of Gustavo Rivera, # 21 Exhibit 20– Declaration of Gabriel Rosales, # 22 Exhibit 21– Declaration of Diego Jacob Sandoval, # 23 Exhibit 22– 2024 Post–Election Analysis Report)(Lang, Danielle) (Entered: 04/17/2026) |
| 04/17/2026 | 54 | MEMORANDUM re 37 MOTION for Preliminary Injunction by BLACK VOTERS MATTER FUND, INC., BVM CAPACITY BUILDING INSTITUTE, INC., COMMON CAUSE, COMMON CAUSE EDUCATION FUND, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE. (Attachments: # 1 Ex. 1. – DECLARATION OF TYLER STERLING, # 2 Ex. 2. – |

| | | |
|---|---|---|
| | | DECLARATION OF ALPHONSO BRAGGS, # 3 Ex. 3. – DECLARATION OF ELENA NUNEZ, # 4 Ex. 4. – DECLARATION OF KYLE GIDDINGS, # 5 Ex. 5. – DECLARATION OF ADRIAN JAMES LOMAX, # 6 Ex. 6. – DECLARATION OF JILL HOWARD, # 7 Ex. 7. – DECLARATION OF CATHERINE BALAN, # 8 Ex. 8. – DECLARATION OF BRIAN JAMES FREEMAN, # 9 Ex. 9. – DECLARATION OF CLIFFORD ALBRIGHT, # 10 Ex. 10. – DECLARATION OF MICHAEL P. MCDONALD, # 11 [Proposed] Order)(Freedman, John) (Entered: 04/17/2026) |
| 04/17/2026 | 55 | MEMORANDUM re 34 MOTION for Preliminary Injunction by DCCC, DEMOCRATIC GOVERNORS ASSOCIATION, DEMOCRATIC NATIONAL COMMITTEE, DSCC, HAKEEM S. JEFFRIES, CHARLES E. SCHUMER. (Attachments: # 1 Index of Exhibits, # 2 Madduri Declaration, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13, # 16 Exhibit 14, # 17 Exhibit 15, # 18 Exhibit 16, # 19 Exhibit 17, # 20 Exhibit 18, # 21 Exhibit 19, # 22 Exhibit 20, # 23 Exhibit 21, # 24 Exhibit 22, # 25 Exhibit 23, # 26 Exhibit 24, # 27 Exhibit 25, # 28 Exhibit 26, # 29 Exhibit 27, # 30 Exhibit 28, # 31 Exhibit 29, # 32 Exhibit 30, # 33 Exhibit 31, # 34 Exhibit 32, # 35 Exhibit 33, # 36 Exhibit 34, # 37 Exhibit 35, # 38 Exhibit 36, # 39 Exhibit 37, # 40 Text of Proposed Order)(Madduri, Lalitha) (Entered: 04/17/2026) |
| 04/20/2026 | 56 | AMICUS BRIEF by SOCIETY FOR THE RULE OF LAW. (Bernstein, Richard) (Entered: 04/20/2026) |
| 04/20/2026 | 57 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 04/13/2026. (Lang, Danielle) (Entered: 04/20/2026) |
| 04/20/2026 | 58 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. U.S. DEPARTMENT OF COMMERCE served on 4/10/2026 (Lang, Danielle) (Entered: 04/20/2026) |
| 04/20/2026 | 59 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DAVID STEINER served on 4/16/2026 (Lang, Danielle) (Entered: 04/20/2026) |
| 04/20/2026 | 60 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. U.S. DEPARTMENT OF HOMELAND SECURITY served on 4/16/2026 (Lang, Danielle) (Entered: 04/20/2026) |
| 04/20/2026 | 61 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNITED STATES DEPARTMENT OF JUSTICE served on 4/13/2026 (Lang, Danielle) (Entered: 04/20/2026) |
| 04/20/2026 | 62 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. FRANK J. BISIGNANO served on 4/10/2026 (Lang, Danielle) (Entered: 04/20/2026) |
| 04/20/2026 | 63 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. HOWARD LUTNICK served on 4/9/2026 (Lang, Danielle) (Entered: 04/20/2026) |
| 04/20/2026 | 64 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. JOSEPH B. EDLOW served on 4/10/2026 (Lang, Danielle) (Entered: 04/20/2026) |
| 04/20/2026 | 65 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. MARKWAYNE MULLIN served on 4/9/2026 (Lang, Danielle) (Entered: 04/20/2026) |
| 04/20/2026 | 66 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. PAMELA BONDI served on 4/10/2026 (Lang, Danielle) (Entered: 04/20/2026) |
| 04/20/2026 | 67 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. SOCIAL SECURITY ADMINISTRATION served on 4/16/2026 (Lang, Danielle) (Entered: 04/20/2026) |
| 04/20/2026 | 68 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. U.S. CITIZENSHIP AND IMMIGRATION SERVICES served on 4/10/2026 (Lang, Danielle) (Entered: 04/20/2026) |
| 04/20/2026 | 69 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNITED STATES POSTAL SERVICE served on 4/13/2026 (Lang, Danielle) (Entered: 04/20/2026) |

| 04/20/2026 | 70 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. AMBER F. MCREYNOLDS served on 4/13/2026 (Lang, Danielle) (Entered: 04/20/2026) |
|---|---|---|
| 04/20/2026 | 71 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. BOARD OF GOVERNORS OF THE UNITED STATES POSTAL SERVICE served on 4/13/2026 (Lang, Danielle) (Entered: 04/20/2026) |
| 04/20/2026 | 72 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DANIEL M. TANGHERLINI served on 4/16/2026 (Lang, Danielle) (Entered: 04/20/2026) |
| 04/20/2026 | 73 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DEREK KAN served on 4/13/2026 (Lang, Danielle) (Entered: 04/20/2026) |
| 04/20/2026 | 74 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. RONALD A. STROMAN served on 4/16/2026 (Lang, Danielle) (Entered: 04/20/2026) |
| 04/20/2026 | 75 | NOTICE of Appearance by Nancy A Temple on behalf of SOCIETY FOR THE RULE OF LAW (Temple, Nancy) (Entered: 04/20/2026) |
| 04/20/2026 | 76 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. FRANK J. BISIGNANO served on 4/6/2026; PAMELA BONDI served on 4/7/2026; JOSEPH B. EDLOW served on 4/6/2026; HOWARD LUTNICK served on 4/8/2026; MARKWAYNE MULLIN served on 4/13/2026; SOCIAL SECURITY ADMINISTRATION served on 4/6/2026; DAVID STEINER served on 4/9/2026; U.S. CITIZENSHIP AND IMMIGRATION SERVICES served on 4/6/2026; U.S. DEPARTMENT OF COMMERCE served on 4/8/2026; U.S. DEPARTMENT OF HOMELAND SECURITY served on 4/8/2026; UNITED STATES DEPARTMENT OF JUSTICE served on 4/9/2026; UNITED STATES POSTAL SERVICE served on 4/7/2026 (Madduri, Lalitha) (Entered: 04/20/2026) |
| 04/20/2026 | 77 | MOTION to Intervene by STATE OF MISSOURI, STATE OF ALABAMA, STATE OF FLORIDA, STATE OF INDIANA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, STATE OF TEXAS. (Attachments: # 1 Memorandum in Support of Motion to Intervene, # 2 Proposed Motion to Dismiss, # 3 Proposed Memorandum in Support of Motion to Dismiss)Associated Cases: 1:26–cv–01114–CJN, 1:26–cv–01132–CJN, 1:26–cv–01151–CJN(Capozzi, Louis) (Entered: 04/20/2026) |
| 04/21/2026 | 78 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. EXECUTIVE OFFICE OF THE PRESIDENT served on 4/21/2026 (Lang, Danielle) (Entered: 04/21/2026) |
| 04/21/2026 | 79 | NOTICE of Appearance by John Michael Patton on behalf of STATE OF MISSOURI (Patton, John) (Entered: 04/21/2026) |
| 04/21/2026 | 80 | NOTICE of Appearance by James Allen Barta on behalf of STATE OF INDIANA (Barta, James) (Entered: 04/21/2026) |
| 04/21/2026 | 81 | NOTICE of Appearance by Louis Joseph Capozzi, III on behalf of STATE OF MISSOURI (Capozzi, Louis) (Entered: 04/21/2026) |
| 04/21/2026 | 82 | NOTICE of Appearance by James Rodriguez on behalf of STATE OF KANSAS (Rodriguez, James) (Entered: 04/21/2026) |
| 04/21/2026 | | MINUTE ORDER. It is hereby ORDERED that Plaintiffs and the United States shall file responses to the States' 77 Motion to Intervene on or before April 24, 2026; the States shall file any reply on or before April 27, 2026. So ORDERED by Judge Carl J. Nichols on 4/21/2026. (lccjn1) (Entered: 04/21/2026) |
| 04/21/2026 | 83 | NOTICE of Appearance by Alexander Barrett Bowdre on behalf of STATE OF ALABAMA (Bowdre, Alexander) (Entered: 04/21/2026) |
| 04/22/2026 | 84 | NOTICE of Proposed Order by ARIZONA STUDENTS' ASSOCIATION, LEAGUE OF UNITED LATIN AMERICAN CITIZENS, SECURE FAMILIES INITIATIVE re 53 Memorandum,,,,,, (Lang, Danielle) (Entered: 04/22/2026) |

JA27

| | | |
|---|---|---|
| 04/22/2026 | 85 | NOTICE of Appearance by Cody S Barnett on behalf of STATE OF NEBRASKA (Barnett, Cody) (Entered: 04/22/2026) |
| 04/23/2026 | 86 | MOTION for Leave to File *One Combined Brief in Opposition to Plaintiffs' Motions for a Preliminary Injunction and in Support of Defendants' Motions to Dismiss* by FRANK J. BISIGNANO, BOARD OF GOVERNORS OF THE UNITED STATES POSTAL SERVICE, PAMELA BONDI, JOSEPH B. EDLOW, EXECUTIVE OFFICE OF THE PRESIDENT, DEREK KAN, HOWARD LUTNICK, AMBER F. MCREYNOLDS, MARKWAYNE MULLIN, SOCIAL SECURITY ADMINISTRATION, DAVID STEINER, RONALD A. STROMAN, DANIEL M. TANGHERLINI, DONALD J. TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. DEPARTMENT OF COMMERCE, U.S. DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES POSTAL SERVICE. (Attachments: # 1 Text of Proposed Order)(Pezzi, Stephen) (Entered: 04/23/2026) |
| 04/23/2026 | | MINUTE ORDER. Upon consideration of Defendants' 86 motion for leave to file one combined brief, the Court hereby ORDERS the NAACP Plaintiffs to file an opposition on or before April 24, 2026, at 10:00 AM. So ORDERED by Judge Carl J. Nichols on 4/23/2026. (lccjn1) (Entered: 04/23/2026) |
| 04/24/2026 | 87 | RESPONSE re 86 MOTION for Leave to File *One Combined Brief in Opposition to Plaintiffs' Motions for a Preliminary Injunction and in Support of Defendants' Motions to Dismiss* filed by BLACK VOTERS MATTER FUND, INC., BVM CAPACITY BUILDING INSTITUTE, INC., COMMON CAUSE, COMMON CAUSE EDUCATION FUND, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE. (Attachments: # 1 Exhibit A, # 2 [Proposed] Order)(Freedman, John) (Entered: 04/24/2026) |
| 04/24/2026 | 88 | RESPONSE re 77 MOTION to Intervene filed by FRANK J. BISIGNANO, BOARD OF GOVERNORS OF THE UNITED STATES POSTAL SERVICE, PAMELA BONDI, JOSEPH B. EDLOW, EXECUTIVE OFFICE OF THE PRESIDENT, DEREK KAN, HOWARD LUTNICK, AMBER F. MCREYNOLDS, MARKWAYNE MULLIN, SOCIAL SECURITY ADMINISTRATION, SOCIETY FOR THE RULE OF LAW, STATE OF ALABAMA, STATE OF FLORIDA, STATE OF INDIANA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MISSOURI, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, STATE OF TEXAS, DAVID STEINER, RONALD A. STROMAN, DANIEL M. TANGHERLINI, DONALD J. TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. DEPARTMENT OF COMMERCE, U.S. DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES POSTAL SERVICE. (Al–Shareffi, Esam) (Entered: 04/24/2026) |
| 04/24/2026 | 89 | RESPONSE re 77 MOTION to Intervene filed by ARIZONA STUDENTS' ASSOCIATION, LEAGUE OF UNITED LATIN AMERICAN CITIZENS, SECURE FAMILIES INITIATIVE. (Baldwin, Anna) (Entered: 04/24/2026) |
| 04/24/2026 | 90 | RESPONSE re 77 MOTION to Intervene filed by BLACK VOTERS MATTER FUND, INC., BVM CAPACITY BUILDING INSTITUTE, INC., COMMON CAUSE, COMMON CAUSE EDUCATION FUND, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE. (Freedman, John) (Entered: 04/24/2026) |
| 04/24/2026 | | MINUTE ORDER. Upon consideration of Defendants' 86 motion for leave to file one combined brief, and the entire record herein, it is hereby ORDERED that Defendants' motion is GRANTED; and it is further ORDERED that Defendants may file one combined brief, not to exceed 70 pages simultaneously (1) opposing Plaintiffs' three motions for a preliminary injunction and (2) supporting Defendants' (forthcoming) motions to dismiss. This Order does not change the previously agreed preliminary injunction schedule. Plaintiffs shall file their oppositions to Defendants' (forthcoming) motions to dismiss on or before May 15, 2026, and Defendants shall file any reply on or before May 22, 2026. So ORDERED by Judge Carl J. Nichols on 4/24/2026. (lccjn1) (Entered: 04/24/2026) |
| 04/24/2026 | 91 | NOTICE of Appearance by Jeffrey A. Mandell on behalf of Wisconsin Democracy Campaign, Inc., EXPO of Wisconsin, Inc., Jaleyce Oraedu, Jasmine Oraedu, Aharon |

JA28

| | | |
|---|---|---|
| | | Shelef (Mandell, Jeffrey) (Main Document 91 replaced on 4/27/2026) (znmw). (Entered: 04/24/2026) |
| 04/24/2026 | 92 | MOTION for Leave to File Amicus Brief by Wisconsin Democracy Campaign, Inc., EXPO of Wisconsin, Inc., Jaleyce Oraedu, Jasmine Oraedu, Aharon Shelef. (Attachments: # 1 Exhibit Brief of Proposed Amici Curiae WDC et al, # 2 Exhibit Ex. 1 to Brief of Proposed Amici Curiae WDC et al, # 3 Text of Proposed Order Proposed Order Granting Leave of Amici Curiae WDC et al to File Brief)(Mandell, Jeffrey) (Entered: 04/24/2026) |
| 04/24/2026 | 93 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Rachel E. Snyder, Filing fee $ 100, receipt number ADCDC–12381960. Fee Status: Fee Paid. by EXPO of Wisconsin, Inc., Jaleyce Oraedu, Jasmine Oraedu, Aharon Shelef, Wisconsin Democracy Campaign, Inc.. (Attachments: # 1 Declaration Declaration of Rachel E. Snyder, # 2 Text of Proposed Order Proposed Order Granting Rachel E. Snyder Leave to Appear Pro Hac Vice)(Mandell, Jeffrey) (Attachment 1 replaced on 4/27/2026) (znmw). (Entered: 04/24/2026) |
| 04/24/2026 | 94 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Douglas M. Poland, Filing fee $ 100, receipt number ADCDC–12381963. Fee Status: Fee Paid. by EXPO of Wisconsin, Inc., Jaleyce Oraedu, Jasmine Oraedu, Aharon Shelef, Wisconsin Democracy Campaign, Inc.. (Attachments: # 1 Declaration Declaration of Douglas M. Poland, # 2 Text of Proposed Order Proposed Order Granting Douglas M. Poland Leave to Appear Pro Hac Vice)(Mandell, Jeffrey) (Attachment 1 replaced on 4/27/2026) (znmw). (Entered: 04/24/2026) |
| 04/24/2026 | 95 | RESPONSE re 77 MOTION to Intervene filed by DCCC, DEMOCRATIC GOVERNORS ASSOCIATION, DEMOCRATIC NATIONAL COMMITTEE, DSCC, HAKEEM S. JEFFRIES, CHARLES E. SCHUMER. (Attachments: # 1 Text of Proposed Order)(Madduri, Lalitha) (Entered: 04/24/2026) |
| 04/26/2026 | 96 | MOTION for Leave to File Amicus Brief by EXPO of Wisconsin, Inc., Jaleyce Oraedu, Jasmine Oraedu, Aharon Shelef, Wisconsin Democracy Campaign, Inc.. (Attachments: # 1 Exhibit Corrected Brief of Proposed Amici Curiae WDC et al, # 2 Exhibit Ex. 1 to Corrected Brief of Amici Curiae WDC et al – Luedtke v. Yunker Opinion, # 3 Text of Proposed Order Proposed Order Granting Motion for Leave to File Corrected Brief of Amici Curiae WDC et al)(Mandell, Jeffrey) (Entered: 04/26/2026) |
| 04/27/2026 | 97 | MOTION for Leave to File Amicus Brief*in Support of Plaintiffs* by STATE AND LOCAL ELECTION OFFICIALS AND ELECTION EXPERTS. (Attachments: # 1 Proposed Amicus Brief, # 2 Text of Proposed Order)Associated Cases: 1:26–cv–01114–CJN, 1:26–cv–01132–CJN, 1:26–cv–01151–CJN(Bateman, Samantha) (Entered: 04/27/2026) |
| 04/27/2026 | 98 | REPLY to opposition to motion re 77 Motion to Intervene,, filed by STATE OF ALABAMA, STATE OF FLORIDA, STATE OF INDIANA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MISSOURI, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, STATE OF TEXAS. (Capozzi, Louis) (Entered: 04/27/2026) |
| 04/28/2026 | 99 | NOTICE of Appearance by Aseem Mulji on behalf of ARIZONA STUDENTS' ASSOCIATION, LEAGUE OF UNITED LATIN AMERICAN CITIZENS, SECURE FAMILIES INITIATIVE (Mulji, Aseem) (Entered: 04/28/2026) |
| 04/28/2026 | 100 | MOTION for Hearing re 34 MOTION for Preliminary Injunction , 55 Memorandum,,, by DCCC, DEMOCRATIC GOVERNORS ASSOCIATION, DEMOCRATIC NATIONAL COMMITTEE, DSCC, HAKEEM S. JEFFRIES, CHARLES E. SCHUMER. (Attachments: # 1 Text of Proposed Order)(Madduri, Lalitha) (Entered: 04/28/2026) |
| 04/29/2026 | 101 | NOTICE *of Joinder* by BLACK VOTERS MATTER FUND, INC., BVM CAPACITY BUILDING INSTITUTE, INC., COMMON CAUSE, COMMON CAUSE EDUCATION FUND, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE re 100 Motion for Hearing, (Freedman, John) (Entered: 04/29/2026) |

| | | |
|---|---|---|
| 04/29/2026 | 102 | NOTICE of Appearance by Joseph David Spate on behalf of STATE OF SOUTH CAROLINA (Spate, Joseph) (Entered: 04/29/2026) |
| 04/30/2026 | | MINUTE ORDER. Upon consideration of the States' 77 Motion to Intervene, it is hereby ORDERED that the motion is GRANTED IN PART AND DENIED IN PART. The Court concludes that the Movant States are not entitled to intervention as of right but grants permissive intervention pursuant to Federal Rule of Civil Procedure 24(b). Accordingly, the Movant States are permitted to intervene in this action and shall adhere to the same preliminary injunction briefing schedule as Defendants. It is further ORDERED that the 96 Motion for Leave to File Amicus Brief by Wisconsin Democracy Campaign, Inc., EXPO of Wisconsin, Inc., Jaleyce Oraedu, Jasmine Oraedu, and Aharon Shelef and the 97 Motion for Leave to File Amicus Brief by State and Local Election Officials and Election Experts are GRANTED. It is further ORDERED that the Democratic Party Plaintiffs' 100 Motion for Hearing is GRANTED. The Court will hold a hearing on the Plaintiffs' motions for preliminary injunction on May 14, 2026, at 2:00 PM in Courtroom 17. So ORDERED by Judge Carl J. Nichols on 4/30/2026. (lccjn1) (Entered: 04/30/2026) |
| 04/30/2026 | | MINUTE ORDER. The Court having considered the 93 Motion for Admission Pro Hac Vice of Rachel E. Snyder, and it appearing to the Court that the attorney referenced therein meets the requirements for pro hac vice admission under Local Civil Rule 83.2(e), it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Rachel E. Snyder is ADMITTED to practice before the Court pro hac vice. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. So ORDERED by Judge Carl J. Nichols on 4/30/2026. (lccjn1) (Entered: 04/30/2026) |
| 04/30/2026 | | MINUTE ORDER. The Court having considered the 94 Motion for Admission Pro Hac Vice of Douglas M. Poland, and it appearing to the Court that the attorney referenced therein meets the requirements for pro hac vice admission under Local Civil Rule 83.2(e), it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Douglas M. Poland is ADMITTED to practice before the Court pro hac vice. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. So ORDERED by Judge Carl J. Nichols on 4/30/2026. (lccjn1) (Entered: 04/30/2026) |
| 04/30/2026 | 141 | MOTION to Dismiss by STATE OF ALABAMA, STATE OF FLORIDA, STATE OF INDIANA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MISSOURI, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, STATE OF TEXAS. (Attachments: # 1 Memorandum in Support)(znmw) (Entered: 05/26/2026) |
| 04/30/2026 | 142 | AMICUS BRIEF by EXPO OF WISCONSIN, INC., JALEYCE ORAEDU, JASMINE ORAEDU, AHARON SHELEF, WISCONSIN DEMOCRACY CAMPAIGN, INC.. (Attachments: # 1 Exhibit)(znmw) (Entered: 05/26/2026) |
| 05/01/2026 | 103 | NOTICE of Appearance by Douglas Maynard Poland on behalf of EXPO OF WISCONSIN, INC., JALEYCE ORAEDU, JASMINE ORAEDU, AHARON SHELEF, WISCONSIN DEMOCRACY CAMPAIGN, INC. (Poland, Douglas) (Entered: 05/01/2026) |
| 05/01/2026 | 104 | MOTION for Leave to File Amicus Brief by AMERICA'S FUTURE, CITIZENS UNITED. (Attachments: # 1 Exhibit Proposed Amicus Brief)(Olson, William) (Entered: 05/01/2026) |
| 05/01/2026 | 105 | Memorandum in opposition to re 34 MOTION for Preliminary Injunction , 37 MOTION for Preliminary Injunction , 29 MOTION for Preliminary Injunction filed by STATE OF ALABAMA, STATE OF FLORIDA, STATE OF INDIANA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MISSOURI, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, STATE OF TEXAS. (Capozzi, Louis) (Entered: 05/01/2026) |
| 05/01/2026 | 106 | MOTION to Dismiss by FRANK J. BISIGNANO, BOARD OF GOVERNORS OF THE UNITED STATES POSTAL SERVICE, PAMELA BONDI, JOSEPH B. EDLOW, EXECUTIVE OFFICE OF THE PRESIDENT, DEREK KAN, HOWARD LUTNICK, AMBER F. MCREYNOLDS, MARKWAYNE MULLIN, SOCIAL |

| | | |
|---|---|---|
| | | SECURITY ADMINISTRATION, DAVID STEINER, RONALD A. STROMAN, DANIEL M. TANGHERLINI, DONALD J. TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. DEPARTMENT OF COMMERCE, U.S. DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES POSTAL SERVICE. (Attachments: # 1 Memorandum in Support, # 2 Ex. 1 – Decl. of M. Mayhew (USCIS), # 3 Ex. 2 – Decl. of J.B. MacBride (SSA), # 4 Ex. 3 – Decl. of S. Monteith (USPS), # 5 Text of Proposed Order)(Pezzi, Stephen) (Entered: 05/01/2026) |
| 05/01/2026 | 107 | Memorandum in opposition to re 34 MOTION for Preliminary Injunction , 37 MOTION for Preliminary Injunction , 29 MOTION for Preliminary Injunction filed by FRANK J. BISIGNANO, BOARD OF GOVERNORS OF THE UNITED STATES POSTAL SERVICE, PAMELA BONDI, JOSEPH B. EDLOW, EXECUTIVE OFFICE OF THE PRESIDENT, DEREK KAN, HOWARD LUTNICK, AMBER F. MCREYNOLDS, MARKWAYNE MULLIN, SOCIAL SECURITY ADMINISTRATION, DAVID STEINER, RONALD A. STROMAN, DANIEL M. TANGHERLINI, DONALD J. TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. DEPARTMENT OF COMMERCE, U.S. DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES POSTAL SERVICE. (Attachments: # 1 Ex. 1 – Decl. of M. Mayhew (USCIS), # 2 Ex. 2 – Decl. of J.B. MacBride (SSA), # 3 Ex. 3 – Decl. of S. Monteith (USPS))(Pezzi, Stephen) (Entered: 05/01/2026) |
| 05/01/2026 | 108 | MOTION to Intervene by EMANUEL MCCRAY. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Pro Se Consent to E–Noticing Form)(znmw) (Entered: 05/04/2026) |
| 05/04/2026 | | MINUTE ORDER. Upon review of Federal Defendants' 107 Memorandum in opposition to Plaintiffs' motions for preliminary injunction, it appears that the Memorandum is not double–spaced as required by Paragraph 8(b) of the Court's 48 Standing Order. Accordingly, it is hereby ORDERED that the Federal Defendants refile a memorandum that complies with the Court's Standing Order on or before May 5, 2026. So ORDERED by Judge Carl J. Nichols on 5/4/2026. (lccjn1) (Entered: 05/04/2026) |
| 05/04/2026 | 109 | NOTICE of Appearance by Valencia Richardson on behalf of ARIZONA STUDENTS' ASSOCIATION, LEAGUE OF UNITED LATIN AMERICAN CITIZENS, SECURE FAMILIES INITIATIVE (Richardson, Valencia) (Entered: 05/04/2026) |
| 05/05/2026 | 110 | NOTICE of Appearance by Sejal Jhaveri on behalf of ARIZONA STUDENTS' ASSOCIATION, LEAGUE OF UNITED LATIN AMERICAN CITIZENS, SECURE FAMILIES INITIATIVE (Jhaveri, Sejal) (Entered: 05/05/2026) |
| 05/05/2026 | 111 | NOTICE of Appearance by Rachel Elizabeth Snyder on behalf of EXPO OF WISCONSIN, INC., JALEYCE ORAEDU, JASMINE ORAEDU, AHARON SHELEF, WISCONSIN DEMOCRACY CAMPAIGN, INC. (Snyder, Rachel) (Main Document 111 replaced on 5/5/2026) (znmw). (Entered: 05/05/2026) |
| 05/05/2026 | 112 | NOTICE of Appearance by Elisabeth S. Theodore on behalf of BLACK VOTERS MATTER FUND, INC., BVM CAPACITY BUILDING INSTITUTE, INC., COMMON CAUSE, COMMON CAUSE EDUCATION FUND, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (Theodore, Elisabeth) (Entered: 05/05/2026) |
| 05/05/2026 | 113 | NOTICE of Appearance by Jeremy Karpatkin on behalf of BLACK VOTERS MATTER FUND, INC., BVM CAPACITY BUILDING INSTITUTE, INC., COMMON CAUSE, COMMON CAUSE EDUCATION FUND, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (Karpatkin, Jeremy) (Entered: 05/05/2026) |
| 05/05/2026 | 114 | NOTICE of Appearance by Orion DE Nevers on behalf of BLACK VOTERS MATTER FUND, INC., BVM CAPACITY BUILDING INSTITUTE, INC., COMMON CAUSE, COMMON CAUSE EDUCATION FUND, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (DE Nevers, Orion) (Entered: 05/05/2026) |

| | | |
|---|---|---|
| 05/05/2026 | 115 | NOTICE of Appearance by Nicholas Anway on behalf of BLACK VOTERS MATTER FUND, INC., BVM CAPACITY BUILDING INSTITUTE, INC., COMMON CAUSE, COMMON CAUSE EDUCATION FUND, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (Anway, Nicholas) (Entered: 05/05/2026) |
| 05/05/2026 | 116 | NOTICE of Appearance by Grant Michael Flynn on behalf of STATE OF SOUTH DAKOTA (Flynn, Grant) (Entered: 05/05/2026) |
| 05/05/2026 | 117 | NOTICE *of Filing of Revised Memorandum of Law in Response to the Court's Order of May 4, 2026* by FRANK J. BISIGNANO, BOARD OF GOVERNORS OF THE UNITED STATES POSTAL SERVICE, PAMELA BONDI, JOSEPH B. EDLOW, EXECUTIVE OFFICE OF THE PRESIDENT, DEREK KAN, HOWARD LUTNICK, AMBER F. MCREYNOLDS, MARKWAYNE MULLIN, SOCIAL SECURITY ADMINISTRATION, DAVID STEINER, RONALD A. STROMAN, DANIEL M. TANGHERLINI, DONALD J. TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. DEPARTMENT OF COMMERCE, U.S. DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES POSTAL SERVICE (Attachments: # 1 Memorandum in Support, # 2 Ex. 1 – Decl. of M. Mayhew (USCIS), # 3 Ex. 2 – Decl. of J.B. MacBride (SSA), # 4 Ex. 3 – Decl. of S. Monteith (USPS))(Pezzi, Stephen) (Entered: 05/05/2026) |
| 05/07/2026 | 118 | NOTICE of Appearance by Christopher Joseph Hajec on behalf of FEDERATION FOR AMERICAN IMMIGRATION REFORM Associated Cases: 1:26–cv–01114–CJN, 1:26–cv–01132–CJN, 1:26–cv–01151–CJN(Hajec, Christopher) (Entered: 05/07/2026) |
| 05/07/2026 | 119 | NOTICE of Appearance by Matt A. Crapo on behalf of FEDERATION FOR AMERICAN IMMIGRATION REFORM Associated Cases: 1:26–cv–01114–CJN, 1:26–cv–01132–CJN, 1:26–cv–01151–CJN(Crapo, Matt) (Entered: 05/07/2026) |
| 05/07/2026 | 120 | Unopposed MOTION for Leave to File Amicus Brief*in support of Defendants' Motion to Dismiss* by FEDERATION FOR AMERICAN IMMIGRATION REFORM. (Attachments: # 1 Amicus Brief, # 2 Proposed Order)Associated Cases: 1:26–cv–01114–CJN, 1:26–cv–01132–CJN, 1:26–cv–01151–CJN(Hajec, Christopher) (Entered: 05/07/2026) |
| 05/08/2026 | 121 | REPLY to opposition to motion re 29 Motion for Preliminary Injunction filed by ARIZONA STUDENTS' ASSOCIATION, LEAGUE OF UNITED LATIN AMERICAN CITIZENS, SECURE FAMILIES INITIATIVE. (Lang, Danielle) (Entered: 05/08/2026) |
| 05/08/2026 | 122 | REPLY to opposition to motion re 34 Motion for Preliminary Injunction filed by DCCC, DEMOCRATIC GOVERNORS ASSOCIATION, DEMOCRATIC NATIONAL COMMITTEE, DSCC, HAKEEM S. JEFFRIES, CHARLES E. SCHUMER. (Attachments: # 1 Declaration of Lalitha D. Madduri, # 2 Exhibit 38, # 3 Exhibit 39, # 4 Exhibit Supplemental Index of Exhibits)(Madduri, Lalitha) (Entered: 05/08/2026) |
| 05/08/2026 | 123 | REPLY to opposition to motion re 37 Motion for Preliminary Injunction filed by BLACK VOTERS MATTER FUND, INC., BVM CAPACITY BUILDING INSTITUTE, INC., COMMON CAUSE, COMMON CAUSE EDUCATION FUND, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE. (Freedman, John) (Entered: 05/08/2026) |
| 05/11/2026 | | MINUTE ORDER. It is hereby ORDERED that the 108 Motion to Intervene is DENIED. So ORDERED by Judge Carl J. Nichols on 5/11/2026. (lccjn1) (Entered: 05/11/2026) |
| 05/11/2026 | | MINUTE ORDER. It is hereby ORDERED that the 104 Motion for Leave to File Amicus Brief by America's Future, Citizens United is GRANTED; and it is further ORDERED that the 120 Motion for Leave to File Amicus Brief by Federation for American Immigration Reform is GRANTED. So ORDERED by Judge Carl J. Nichols on 5/11/2026. (lccjn1) (Entered: 05/11/2026) |
| 05/11/2026 | 124 | NOTICE of Appearance by Javon Davis on behalf of BLACK VOTERS MATTER FUND, INC., BVM CAPACITY BUILDING INSTITUTE, INC., COMMON CAUSE, COMMON CAUSE EDUCATION FUND, NATIONAL ASSOCIATION |

| | | |
|---|---|---|
| | | FOR THE ADVANCEMENT OF COLORED PEOPLE (Davis, Javon) (Entered: 05/11/2026) |
| 05/11/2026 | 125 | NOTICE of Appearance by Grace Thomas on behalf of BLACK VOTERS MATTER FUND, INC., BVM CAPACITY BUILDING INSTITUTE, INC., COMMON CAUSE, COMMON CAUSE EDUCATION FUND, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (Thomas, Grace) (Entered: 05/11/2026) |
| 05/11/2026 | 135 | AMICUS BRIEF by AMERICA'S FUTURE, CITIZENS UNITED. (znmw) (Entered: 05/18/2026) |
| 05/11/2026 | 136 | AMICUS BRIEF by FEDERATION FOR AMERICAN IMMIGRATION REFORM. (znmw) (Entered: 05/18/2026) |
| 05/12/2026 | 126 | NOTICE of Appearance by Marlin David Rollins–Boyd on behalf of BLACK VOTERS MATTER FUND, INC., BVM CAPACITY BUILDING INSTITUTE, INC., COMMON CAUSE, COMMON CAUSE EDUCATION FUND, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (Rollins–Boyd, Marlin) (Entered: 05/12/2026) |
| 05/12/2026 | 127 | NOTICE of Appearance by Jeffrey Blumberg on behalf of BLACK VOTERS MATTER FUND, INC., BVM CAPACITY BUILDING INSTITUTE, INC., COMMON CAUSE, COMMON CAUSE EDUCATION FUND, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (Blumberg, Jeffrey) (Entered: 05/12/2026) |
| 05/12/2026 | 128 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Andrew H. Warren, Filing fee $ 100, receipt number ADCDC–12416996. Fee Status: Fee Paid. by ARIZONA STUDENTS' ASSOCIATION, LEAGUE OF UNITED LATIN AMERICAN CITIZENS, SECURE FAMILIES INITIATIVE. (Attachments: # 1 Declaration Declaration for Pro Hac Vice Admission, # 2 Text of Proposed Order Proposed Order, # 3 Supplement Certificate of Good Standing)(Gold, Sofia) (Entered: 05/12/2026) |
| 05/12/2026 | 129 | NOTICE of Appearance by Robert Neil Weiner on behalf of BLACK VOTERS MATTER FUND, INC., BVM CAPACITY BUILDING INSTITUTE, INC., COMMON CAUSE, COMMON CAUSE EDUCATION FUND, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (Weiner, Robert) (Entered: 05/12/2026) |
| 05/12/2026 | 130 | NOTICE of Appearance by Catherine Meza on behalf of BLACK VOTERS MATTER FUND, INC., BVM CAPACITY BUILDING INSTITUTE, INC., COMMON CAUSE, COMMON CAUSE EDUCATION FUND, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (Meza, Catherine) (Entered: 05/12/2026) |
| 05/14/2026 | 131 | NOTICE of Filing of Supplemental Exhibit by DCCC, DEMOCRATIC GOVERNORS ASSOCIATION, DEMOCRATIC NATIONAL COMMITTEE, DSCC, HAKEEM S. JEFFRIES, CHARLES E. SCHUMER re 34 Motion for Preliminary Injunction (Attachments: # 1 Exhibit 40)(Madduri, Lalitha) (Entered: 05/14/2026) |
| 05/14/2026 | | MINUTE ORDER. The Court having considered the 128 Motion for Admission Pro Hac Vice of Andrew H. Warren, and it appearing to the Court that the attorney referenced therein meets the requirements for pro hac vice admission under Local Civil Rule 83.2(e), it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Andrew H. Warren is ADMITTED to practice before the Court pro hac vice **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. So ORDERED by Judge Carl J. Nichols on 5/14/2026. (lccjn1) (Entered: 05/14/2026) |
| 05/14/2026 | | Minute Entry for proceedings held before Judge Carl J. Nichols: Preliminary Injunction held on 5/14/2026. Motions Taken Under Advisement. Further Order and Opinion to be issued by the Court. Court Reporter: Lorraine Herman. (zcam) (Entered: 05/14/2026) |

| | | |
|---|---|---|
| 05/15/2026 | 132 | RESPONSE re 106 MOTION to Dismiss , 77 MOTION to Intervene *in Opposition to Motions to Dismiss* filed by DCCC, DEMOCRATIC GOVERNORS ASSOCIATION, DEMOCRATIC NATIONAL COMMITTEE, DSCC, HAKEEM S. JEFFRIES, CHARLES E. SCHUMER. (Attachments: # 1 Text of Proposed Order)(Madduri, Lalitha) (Entered: 05/15/2026) |
| 05/15/2026 | 133 | RESPONSE re 106 MOTION to Dismiss , 77 MOTION to Intervene *Motion to Dismiss* filed by ARIZONA STUDENTS' ASSOCIATION, LEAGUE OF UNITED LATIN AMERICAN CITIZENS, SECURE FAMILIES INITIATIVE. (Attachments: # 1 Exhibit 1– Memorandum of Understanding between Department of Homeland Security, United States Citizenship and Immigration Services, and Department of Justices Civil Rights Division, # 2 Text of Proposed Order)(Lang, Danielle) (Entered: 05/15/2026) |
| 05/15/2026 | 134 | RESPONSE re 106 MOTION to Dismiss , 77 MOTION to Intervene *Motion to Dismiss* filed by BLACK VOTERS MATTER FUND, INC., BVM CAPACITY BUILDING INSTITUTE, INC., COMMON CAUSE, COMMON CAUSE EDUCATION FUND, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE. (Attachments: # 1 Text of Proposed Order)(Freedman, John) (Entered: 05/15/2026) |
| 05/20/2026 | 137 | NOTICE OF SUPPLEMENTAL AUTHORITY by DCCC, DEMOCRATIC GOVERNORS ASSOCIATION, DEMOCRATIC NATIONAL COMMITTEE, DSCC, HAKEEM S. JEFFRIES, CHARLES E. SCHUMER (Attachments: # 1 Exhibit 41)(Madduri, Lalitha) (Entered: 05/20/2026) |
| 05/22/2026 | 138 | Unopposed MOTION for Leave to File Excess Pages by FRANK J. BISIGNANO, BOARD OF GOVERNORS OF THE UNITED STATES POSTAL SERVICE, PAMELA BONDI, JOSEPH B. EDLOW, EXECUTIVE OFFICE OF THE PRESIDENT, DEREK KAN, HOWARD LUTNICK, AMBER F. MCREYNOLDS, MARKWAYNE MULLIN, SOCIAL SECURITY ADMINISTRATION, DAVID STEINER, RONALD A. STROMAN, DANIEL M. TANGHERLINI, DONALD J. TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. DEPARTMENT OF COMMERCE, U.S. DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES POSTAL SERVICE. (Attachments: # 1 Text of Proposed Order)(Al–Shareffi, Esam) (Entered: 05/22/2026) |
| 05/22/2026 | 139 | REPLY to opposition to motion re 106 Motion to Dismiss,, filed by FRANK J. BISIGNANO, BOARD OF GOVERNORS OF THE UNITED STATES POSTAL SERVICE, PAMELA BONDI, JOSEPH B. EDLOW, EXECUTIVE OFFICE OF THE PRESIDENT, DEREK KAN, HOWARD LUTNICK, AMBER F. MCREYNOLDS, MARKWAYNE MULLIN, SOCIAL SECURITY ADMINISTRATION, DAVID STEINER, RONALD A. STROMAN, DANIEL M. TANGHERLINI, DONALD J. TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. DEPARTMENT OF COMMERCE, U.S. DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES POSTAL SERVICE. (Attachments: # 1 Ex. 1 to Defs.' MTD Reply – Supp. Mayhew Decl. (May 22, 2026))(Pezzi, Stephen) (Entered: 05/22/2026) |
| 05/22/2026 | 140 | REPLY to opposition to motion re 141 Motion to Intervene,, filed by STATE OF ALABAMA, STATE OF FLORIDA, STATE OF INDIANA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MISSOURI, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, STATE OF TEXAS. (Capozzi, Louis) Modified link on 5/26/2026 (znmw). (Entered: 05/22/2026) |
| 05/26/2026 | | MINUTE ORDER. It is hereby ORDERED that the 138 unopposed motion for leave to file one combined reply brief and for additional pages is GRANTED. Federal Defendants may file one combined reply brief, not to exceed 35 pages, in support of Defendants' motion to dismiss. So ORDERED by Judge Carl J. Nichols on 5/26/2026. (lccjn1) (Entered: 05/26/2026) |
| 05/28/2026 | 143 | MEMORANDUM OPINION. Signed by Judge Carl J. Nichols on 5/28/2026. (lccjn1) (Entered: 05/28/2026) |

| | | |
|---|---|---|
| 05/28/2026 | 144 | ORDER denying 29 Motion for Preliminary Injunction; denying 34 Motion for Preliminary Injunction; denying 37 Motion for Preliminary Injunction. Signed by Judge Carl J. Nichols on 5/28/2026. (lccjn1) (Entered: 05/28/2026) |
| 05/29/2026 | 145 | NOTICE *of Case Developments* by FRANK J. BISIGNANO, BOARD OF GOVERNORS OF THE UNITED STATES POSTAL SERVICE, PAMELA BONDI, JOSEPH B. EDLOW, EXECUTIVE OFFICE OF THE PRESIDENT, DEREK KAN, HOWARD LUTNICK, AMBER F. MCREYNOLDS, MARKWAYNE MULLIN, SOCIAL SECURITY ADMINISTRATION, DAVID STEINER, RONALD A. STROMAN, DANIEL M. TANGHERLINI, DONALD J. TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. DEPARTMENT OF COMMERCE, U.S. DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES POSTAL SERVICE (Al–Shareffi, Esam) (Entered: 05/29/2026) |
| 06/01/2026 | | ENTERED IN ERROR.....MINUTE ENTRY. In light of footnote 1 in the government's 145 Notice of Case Developments, the Court makes clear that while it expected the government to notify the Court of any material factual developments that were relevant to Plaintiffs' motions for preliminary injunction while those motions were under consideration, the Court continues to expect that the government will notify the Court of any material factual developments while this litigation remains pending. 6/1/2026. (lccjn1) Modified on 6/1/2026; incorrect entry docketed (zcam). (Entered: 06/01/2026) |
| 06/01/2026 | | NOTICE. In light of footnote 1 in the government's 145 Notice of Case Developments, the Court makes clear that while it expected the government to notify the Court of any material factual developments that were relevant to Plaintiffs' motions for preliminary injunction while those motions were under consideration, the Court continues to expect that the government will notify the Court of any material factual developments while this litigation remains pending. (lccjn1) Modified on 6/1/2026 to remove date (zcam). (Entered: 06/01/2026) |
| 06/01/2026 | | NOTICE OF ERROR: Minute Entry filed 6/1/2026 entered incorrectly. Will be filed as a NOTICE. (zcam) (Entered: 06/01/2026) |
| 06/01/2026 | 146 | NOTICE OF INTERLOCUTORY APPEAL TO DC CIRCUIT COURT as to 144 Order on Motion for Preliminary Injunction,, 143 Memorandum & Opinion by DCCC, DEMOCRATIC GOVERNORS ASSOCIATION, DEMOCRATIC NATIONAL COMMITTEE, DSCC, HAKEEM S. JEFFRIES, CHARLES E. SCHUMER. Filing fee $ 605, receipt number ADCDC–12457752. Fee Status: Fee Paid. (Madduri, Lalitha) Modified event on 6/2/2026 (znmw). (Entered: 06/01/2026) |
| 06/02/2026 | 147 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 146 Notice of Appeal to DC Circuit Court,. (znmw) (Entered: 06/02/2026) |
| 06/03/2026 | 148 | TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS before Judge Carl J. Nichols, held on May 14, 2026. Page Numbers: 1–133. Date of Issuance: June 3, 2026. Court Reporter: Lorraine Herman. Email: lorraine_herman@dcd.uscourts.gov. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 6/24/2026. Redacted Transcript Deadline set for 7/4/2026. Release of Transcript Restriction set for 9/1/2026.(Herman, Lorraine) (Entered: 06/03/2026) |

JA35

| 06/04/2026 | | USCA Case Number 26–5193 for 146 Notice of Appeal to DC Circuit Court, filed by DEMOCRATIC NATIONAL COMMITTEE, HAKEEM S. JEFFRIES, DSCC, DEMOCRATIC GOVERNORS ASSOCIATION, DCCC, CHARLES E. SCHUMER. (znmw) (Entered: 06/04/2026) |
|---|---|---|
| 06/05/2026 | 149 | NOTICE *of Case Developments* by FRANK J. BISIGNANO, BOARD OF GOVERNORS OF THE UNITED STATES POSTAL SERVICE, PAMELA BONDI, JOSEPH B. EDLOW, EXECUTIVE OFFICE OF THE PRESIDENT, DEREK KAN, HOWARD LUTNICK, AMBER F. MCREYNOLDS, MARKWAYNE MULLIN, SOCIAL SECURITY ADMINISTRATION, DAVID STEINER, RONALD A. STROMAN, DANIEL M. TANGHERLINI, DONALD J. TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. DEPARTMENT OF COMMERCE, U.S. DEPARTMENT OF HOMELAND SECURITY, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES POSTAL SERVICE (Al–Shareffi, Esam) (Entered: 06/05/2026) |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr>
<td>

DSCC,
120 Maryland Avenue NE
Washington, DC 20002;

DCCC,
430 South Capitol Street SE
Washington, DC 20003;

DEMOCRATIC NATIONAL COMMITTEE,
430 South Capitol Street SE
Washington, DC 20003;

DEMOCRATIC GOVERNORS ASSOCIATION,
1225 Eye Street NW, Suite 1100
Washington, DC 20005;

U.S. SENATE MINORITY LEADER CHARLES E.
SCHUMER,
Notice of address to be filed under seal pursuant to
LCvR 5.1(c);

*and*

U.S. HOUSE OF REPRESENTATIVES MINORITY
LEADER HAKEEM S. JEFFRIES,
Notice of address to be filed under seal pursuant to
LCvR 5.1(c);

               Plaintiffs,
     *v.*

DONALD J. TRUMP, in his official capacity as
President of the United States,
1600 Pennsylvania Avenue NW
Washington, DC 20500;

EXECUTIVE OFFICE OF THE PRESIDENT,
1600 Pennsylvania Avenue NW
Washington, DC 20500;

U.S. DEPARTMENT OF JUSTICE,
950 Pennsylvania Avenue NW
Washington, DC 20530;

</td>
<td>

Case No. 1:26-cv-01114

</td>
</tr>
</table>

JA37

U.S. POSTAL SERVICE,
475 L'Enfant Plaza SW
Washington, DC 20260;

U.S. DEPARTMENT OF HOMELAND SECURITY,
2707 Martin Luther King Jr. Avenue SE
Washington, DC 20528;

U.S. CITIZENSHIP AND IMMIGRATION
SERVICES, 5900 Capital Gateway Drive, Prince
George's County, Camp Springs, MD 20746;

SOCIAL SECURITY ADMINISTRATION,
6401 Security Boulevard
Baltimore, MD 21235;

U.S. DEPARTMENT OF COMMERCE
1401 Constitution Ave NW
Washington, DC 20230;

PAMELA BONDI, in her official capacity as U.S.
Attorney General,
950 Pennsylvania Avenue NW
Washington, DC 20530;

DAVID STEINER, in his official capacity as U.S.
Postmaster General,
475 L'Enfant Plaza SW
Washington, DC 20260;

MARKWAYNE MULLIN, in his official capacity as
Secretary of Homeland Security,
2707 Martin Luther King Jr. Avenue SE
Washington, DC 20528;

JOSEPH B. EDLOW, in his official capacity as
Director of the U.S. Citizenship and Immigration
Services, 5900 Capital Gateway Drive, Prince George's
County, Camp Springs, MD 20746;

FRANK J. BISIGNANO, in his official capacity as
Commissioner of the Social Security Administration,
6401 Security Boulevard
Baltimore, MD 21235;

*and*

JA38

HOWARD LUTNICK, in his official capacity as
Secretary of the Department of Commerce,
1401 Constitution Ave NW
Washington, DC 20230

Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      President Trump has tried again and again to rewrite election rules for his own perceived partisan advantage. If only he could ban mail voting—a favorite scapegoat for his 2020 electoral defeat—and impose other voting restrictions, he has proclaimed, Republicans will "never lose a race—for 50 years."

2.      Our Constitution's Framers anticipated this kind of desire for absolute power. They recognized the menace it would pose to ordered liberty and the ways in which it would corrode self-government like an acid. And so to preserve the People's own sovereignty, they crafted a system of government to resist that threat. They left most election authority with the States, permitted state regulations to be displaced only upon the agreement of both chambers of Congress, and established an independent judiciary to repel threats to individual rights.

3.      That careful division of authority has held fast against President Trump's attacks. Each State has customized its own rules and regulations for voting, including absentee and mail-in voting, that balance the twin needs of broad access to the franchise and secure elections. Congress has rebuffed the President's call to override state law in this area. And federal courts have repeatedly confirmed that this distribution of power may not be manipulated at the President's discretion. *See League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 226 (D.D.C. 2025) ("*LULAC I*"); *LULAC v. Exec. Off. of President*, No. 1:25-cv-0946, 2025 WL 3042704, at *38 (D.D.C. Oct. 31, 2025) ("*LULAC II*"); *LULAC v. Exec. Off. of the President*, No. 1:25-cv-0946, 2026 WL 252420, at *56–57 (D.D.C. Jan. 30, 2026) ("*LULAC III*"); *Washington v. Trump*, No. 2:25-cv-00602, 2026 WL 73866, at *38–39 (W.D. Wash. Jan. 9, 2026); *California v. Trump*, 786 F. Supp. 3d 359, 396–97 (D. Mass. 2025); *California v. Trump*, 805 F. Supp. 3d 387 (D. Mass. 2025).

1

JA40

4.      Undeterred by this consistent authority—and his own continued failures to convince Congress to adopt his self-aggrandizing election policies—President Trump has yet again taken matters into his own hands. Just days after it became clear Congress would fail to pass the President's SAVE America Act, he signed a new Executive Order titled "*Ensuring Citizenship Verification and Integrity in Federal Elections*." *See generally* Exhibit A (the "Executive Order," "Order," or "E.O."). This Executive Order seeks to impose radical changes to the manner and conditions under which citizens may cast absentee or mail-in ballots (collectively, "mail ballots")—changes that imminently threaten to disenfranchise lawful voters and plainly exceed the President's lawful authority.

5.      The Executive Order's provisions are convoluted and confusing. What is clear is that it dramatically restricts the ability of Americans to vote by mail, impinging on traditional state authority. It achieves this principally by directing the Postal Service to take actions unrelated to the agency's statutory mandate that run roughshod over established protections for voters who rely on the mail to exercise their fundamental right to vote. Because the Executive Order does not "stem either from an act of Congress or from the Constitution itself"—and further threatens to unjustifiably disenfranchise eligible voters across the country—it is an unlawful exercise of authority that must be declared invalid. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Order, in fact, runs headlong into myriad other guarantees provided by the Constitution, the States, and Congress—authorities that *do* regulate elections.

6.      Among them are the Administrative Procedure Act and the Privacy Act, which require agencies to comply with governing law and strictly prohibit use of federal records absent prior authorization under federal law. 5 U.S.C. §§ 552a, 706(2). The Order drops the veil on a months-long campaign to amass a national citizenship registry—now formally mandating that

2

JA41

Defendants create wholly unauthorized "State Citizenship Lists" and share those lists with States within 60 days of every federal election. Even as this Court recently expressed "grave concern" over disclosures related to the same databases the Order directs Defendants to use in amassing this "List," *LULAC III*, 2026 WL 252420, at *55 & n.54 (granting judgment requiring compliance with Privacy Act, noting "important risk" of "false, incomplete, outdated or otherwise unreliable information" and "threat of misuse"), yesterday's Order even more flagrantly directs violations of the Privacy Act and other federal laws.

7.      Plaintiffs—the Democratic Senatorial Campaign Committee (DSCC), the Democratic Congressional Campaign Committee (DCCC), the Democratic National Committee, the Democratic Governors Association, (collectively the "Party Plaintiffs"), and the Democratic leaders of the U.S. House and Senate—are again severely harmed by the President's unlawful attempts to upturn the electoral playing field in his own favor and against his political rivals. Tens of millions of Plaintiffs' members and supporters are likewise injured by the Order's directives that erect obstacles for casting ballots that will be counted, frustrate the fair administration of federal elections, and mandate unlawful disclosures of protected information.

8.      In view of the rapidly approaching—and in some cases already completed—federal elections and the short timeframes imposed by President Trump's Order, Plaintiffs respectfully request urgent equitable and declaratory relief as set forth in more detail below.

## JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs assert federal law claims, including but not limited to claims arising under the U.S. Constitution, the Administrative Procedure Act, 5 U.S.C. §§ 702–06, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02. The Court also has jurisdiction under 39 U.S.C.

3

JA42

§ 409(a) and 28 U.S.C. § 1339 because Plaintiffs assert claims against and related to the U.S. Postal Service.

10.     Venue is proper under 28 U.S.C. § 1391 because nearly all Defendants, including President Donald J. Trump, reside within this district and carry out their official duties within this district. Furthermore, a substantial part of the events giving rise to the claims occurred within this district, including the President's issuance of the Executive Order.

## PARTIES

11.     Plaintiff DSCC, also known as the Democratic Senatorial Campaign Committee, is the Democratic Party's national senatorial committee. Its mission is to elect candidates of the Democratic Party across the country to the U.S. Senate. Like its fellow federal Democratic Party committees, DSCC pursues its mission by working with Democratic Senate candidates to encourage and assist Democratic Party members and supporters in successfully casting ballots, including by preserving the legal rights of its members and voters. DSCC's members include Democratic members of the U.S. Senate, as well as Democratic candidates for U.S. Senate. DSCC currently has members in 46 States (every State except for Indiana, Missouri, Utah and North Dakota). Beyond its formal membership, DSCC's constituency also includes Democratic voters and supporters in all 50 States. Both DSCC itself and DSCC's members—including its members who are Democratic candidates for office—are directly impacted by the Order, which purports to alter the rules governing their elections. DSCC's members, who are voters themselves in their respective States, are also separately harmed by the Order, which purports to impose new requirements to cast mail ballots and infringes on their privacy rights. Kirsten Gillibrand, U.S. Senator from New York, serves as Chair of DSCC.

4

JA43

12.    Plaintiff DCCC, also known as the Democratic Congressional Campaign Committee, is the Democratic Party's national congressional committee. Its mission is to elect candidates of the Democratic Party from across the country to the U.S. House of Representatives. Like its fellow Democratic Party committees, DCCC pursues its mission by working with Democratic congressional candidates and their campaigns to encourage and assist supporters of the Democratic Party in successfully casting ballots and to preserve the legal rights of its members and voters. DCCC's members include Democratic members of the U.S. House, as well as Democratic candidates for U.S. House. DCCC currently has members in 49 States (every State except for Wyoming). Beyond its formal membership, DCCC's constituency also includes Democratic voters and supporters, whose voting rights it seeks to protect. Both DCCC itself and DCCC's members—including its members who are candidates for office—are directly impacted by the Order, which purports to alter the rules governing their elections. DCCC's members, who are voters themselves in their respective States, are also separately harmed by the Order, which purports to impose new requirements to cast mail ballots and infringes on their privacy rights. Suzan DelBene, U.S. Representative from Washington's First Congressional District, serves as Chair of DCCC.

13.    Plaintiff Democratic National Committee ("DNC") is the oldest continuing party committee in the United States and is the Democratic Party's national committee as defined by 52 U.S.C. § 30101(14). The DNC is dedicated to electing Democratic candidates in federal, state, and local elections across the country. In support of its mission, the DNC seeks to encourage and assist Democratic Party members and supporters in successfully casting ballots and to preserve the legal rights of its members and voters. The DNC has approximately 450 formal members nationwide, including State Party leaders, elected officials, and Democratic voters. These formal members

5

JA44

come from all 50 States, Washington D.C., and the five U.S. territories. In fact, 200 of DNC's formal members are elected from those jurisdictions across the country. The DNC also considers any registered Democrat to be a member of the DNC and the Democratic Party, because Democratic voters influence and ultimately determine the DNC's strategic and political direction by electing certain DNC members and Democratic candidates to local, state, and federal offices. Both the DNC itself and the DNC's members—including its members who are candidates for office—are directly impacted by the Order, which purports to alter the rules governing their elections. The DNC's voter members are also harmed by the Order, which purports to impose new requirements to cast mail ballots and infringes on their privacy rights. Ken Martin serves as Chair of the DNC.

14.     Plaintiff Democratic Governors Association ("DGA") is a political organization dedicated to supporting Democratic governors and electing Democratic gubernatorial candidates across the United States. The DGA works with Democratic gubernatorial candidates and campaigns and provides funding to educate and communicate with Democratic voters; to encourage and assist supporters of the Democratic Party in successfully casting ballots; and to preserve the legal voting rights of its voters. The DGA also supports Democratic incumbent governors by serving as a clearinghouse for best practices and policies, including for managing, administering, and budgeting for Federal, State, and local elections. All incumbent Democratic governors currently serve as members of the DGA, representing 24 States, the District of Columbia, Guam, and the U.S. Virgin Islands. At least 11 of these incumbent Democratic governors are candidates for office in their respective States in the 2026 general election. Both the DGA itself and the DGA's members—including its members who are candidates for office—are directly impacted by the Order, which purports to alter the rules governing their elections. The

6

JA45

DGA's members, who are voters themselves in their respective States, are also separately harmed by the Order, which purports to impose new requirements to cast mail ballots and infringes on their privacy rights. Kentucky Governor Andy Beshear serves as Chair of the DGA.

15.     Plaintiff Charles E. "Chuck" Schumer is the senior U.S. Senator from New York and the leader of the Senate Democratic Caucus, presently serving as Senate Minority Leader. Leader Schumer is responsible for helping to elect Democratic Party candidates in U.S. Senate elections across the country. This responsibility is critical to the success of the Senate Democratic Caucus, as the caucus's ability to pass and influence legislation depends in significant part upon the size of its membership. Increasing the size of the Senate Democratic Caucus, both by electing new Democratic senators and reelecting incumbent Democratic senators, is therefore an essential part of Leader Schumer's mission and duties. Leader Schumer is often directly involved in campaigns across the country to elect Democratic senators, including in competitive battleground States. Relatedly, Leader Schumer works closely with DSCC and its leadership to help elect Democratic Senate candidates. Leader Schumer has been elected to the U.S. Senate five times and to the U.S. House of Representatives nine times prior to that. He is a candidate for the U.S. Senate in 2028 and is directly impacted by the Order in his own capacity as a candidate for office. As a voter himself in New York State, Senator Schumer is eligible to vote by mail for any reason and is consequently separately harmed by the Order, which purports to impose new requirements to vote by mail. And as a voter himself, Senator Schumer is also harmed by the Order's infringement on his privacy rights.

16.     Plaintiff Hakeem S. Jeffries is a member of the U.S. House of Representatives from the Eighth Congressional District of New York. He is the leader of the House Democratic Caucus and presently serves as House Minority Leader. Leader Jeffries is responsible for helping to elect

7

JA46

Democratic Party candidates in congressional elections across the country. This responsibility is critical to Leader Jeffries' ability to serve as an effective leader of the House Democratic Caucus, as increasing the size of the Caucus is central to improving its ability to pass and influence legislation, and its ability to pursue the mission and platform of the Democratic Party. To that end, Leader Jeffries is directly involved in helping Democratic congressional candidates to campaign in races across the country, including in key battleground districts that often resolve which party controls the House of Representatives. He also works closely with DCCC and its leadership to help elect Democratic congressional candidates. Leader Jeffries has been elected seven times to the U.S. House of Representatives. He is up for reelection in the upcoming 2026 midterm elections and is therefore also directly impacted by the Order in his own capacity as a candidate for office. As a voter himself in New York State, Leader Jeffries is eligible to vote by mail for any reason and is consequently separately harmed by the Order, which purports to impose new requirements to vote by mail. And as a voter himself, Leader Jeffries is also harmed by the Order's infringement on his privacy rights.

17.    Defendant Donald J. Trump is the President of the United States and is sued in his official capacity. The President carries out many of his duties through Defendant Executive Office of the President ("EOP"), an agency headquartered in Washington, D.C. On March 31, 2026, President Trump issued the Executive Order, *Ensuring Citizenship Verification and Integrity in Federal Elections*, which requires the U.S. Postal Service to make changes to—and in some cases refuse altogether—transmission and delivery of election mail. *See id.* § 3.

18.    The U.S. Department of Justice ("DOJ") is a federal agency headquartered in Washington, D.C. Defendant Pamela Bondi is the U.S. Attorney General and is sued in her official capacity.

8

JA47

19.     The U.S. Postal Service ("USPS" or "Postal Service") is a federal "independent establishment" headquartered in Washington, D.C. *See* 39 U.S.C. § 201. Defendant David Steiner is the U.S. Postmaster General and is sued in his official capacity.

20.     The U.S. Department of Homeland Security ("DHS") is a federal agency headquartered in Washington, D.C. Defendant Markwayne Mullin is the Secretary of Homeland Security and is sued in his official capacity.

21.     U.S. Citizenship and Immigration Services ("USCIS") is a federal agency within DHS headquartered in Camp Springs, Maryland. Defendant Edlow is the Director of USCIS and is sued in his official capacity.

22.     The Social Security Administration ("SSA") is a federal agency headquartered in Baltimore, Maryland. Defendant Frank J. Bisignano is the Commissioner of SSA and is sued in his official capacity.

23.     The U.S. Department of Commerce is a federal agency headquartered in Washington, D.C. Defendant Howard Lutnick is the Secretary of Commerce and is sued in his official capacity.

## STATEMENT OF LAW AND FACTS

I.      **The Constitution vests the power to regulate elections in the States and in Congress, not the President.**

24.     The President's power to issue executive orders "must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585.

25.     But "[o]ur Constitution entrusts Congress and the States—not the President—with the authority to regulate federal elections." *LULAC I*, 780 F. Supp. 3d at 155. This delegation of authority is especially clear in two respects.

9

JA48

26.    First, "the Constitution empowers the States to decide who is qualified to vote in federal elections." *Id.* at 156 (first citing U.S. Const. art. I, § 2, cl. 1; then citing U.S. Const. amend. XII; and then citing U.S. Const. art. II, § 1, cl. 2). States' ability to impose voter qualifications are, of course, also limited by the Constitution itself, but the Executive Branch maintains no control over such qualifications. *See id.*[1]

27.    Second, "the Constitution grants the States broad regulatory authority over the conduct of federal elections but reserves final, supervisory authority to Congress." *Id.* at 157. Specifically, the Elections Clause states: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of choosing Senators." U.S. Const. art. I, § 4, cl. 1.

28.    Under the Clause's plain language, the broad discretion conferred on the States has just one narrow limitation: "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Ex parte Siebold*, 100 U.S. 371, 384 (1879).

29.    "The Constitution's allocation of authority over federal elections between Congress and the States . . . is no accident. Instead, this design was the product of carefully considered compromises among our Constitution's Framers." *LULAC I*, 780 F. Supp. 3d at 158. Under that

---

[1] For example, the Seventeenth Amendment requires that States hold elections for U.S. Senators, *see* U.S. Const. amend. XVII, and the Fifteenth, Nineteenth, Twenty-Fourth, and Twenty-Sixth Amendments prohibit abridging the right to vote based on race, sex, poll tax or age, *see id.*, amends. XV, XIX, XXIV, XXVI. Likewise, constitutional principles of free speech, free association, equal protection, and due process enshrined in the First and Fourteenth Amendments establish a federal constitutional right to vote free from excessive burdens. *See id.*, amends. I, XIV; *see also, e.g.*, *Anderson v. Celebrezze*, 460 U.S. 780, 793 (1983); *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).

10

JA49

framework, "[t]he States have initial authority to regulate elections," "Congress has supervisory authority over those regulations," and "[t]he President does not feature at all." *Id.* at 159. "In fact, Executive regulatory authority over federal elections does not appear to have crossed the Framers' minds." *Id.*

30.     Though the Constitution extends to the Executive certain enumerated powers, the regulation of elections is not one of them. The President lacks any "direct control" over "the individuals—members of Congress and state officials—who conduct federal elections," and he thus has "no authority" to "interfere[] with state election procedures based solely on the federal executive's own initiative." *State v. Meadows*, 88 F.4th 1331, 1347 (11th Cir. 2023). Because the Constitution places authority in the hands of the Legislature rather than the Executive, the President may not "seiz[e] the power of the Legislature" by enacting policy "that Congress has chosen not to enact itself." *Biden v. Nebraska*, 600 U.S. 477, 503 (2023).

31.     When the President "takes measures incompatible with the expressed or implied will of Congress," his authority is "at its lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). That includes when the President ignores congressionally established procedures and acts in "a different and inconsistent way of his own." *Id.* at 639.

32.     Ignoring these constraints, one year ago, in March 2025, President Trump signed Executive Order 14,248, entitled, "Preserving and Protecting the Integrity of American Elections." Courts across the country—including this one—soon invalidated much of that executive order and its purported attempt to regulate elections as a violation of the separation of powers. *See, e.g.*, *LULAC I*, 780 F. Supp. 3d at 154 (entering preliminary injunction against the attempt to order the U.S. Election Assistance Commission to amend the federal voter registration form to require documentary proof of U.S. citizenship and to require agencies to "assess" citizenship of individuals

11

JA50

who receive public assistance before providing them a registration form as violations of the separation of powers); *LULAC II*, 2025 WL 3042704, at *38 (entering a permanent injunction against the same); *LULAC III*, 2026 WL 252420, at *35 (issuing permanent injunction and declaratory relief against additional provisions of the executive order); *California*, 786 F. Supp. 3d at 396–97 (enjoining parts of executive order); *Washington*, 2026 WL 73866, at *38–39 (same).[2]

## II.    The States and Congress have exercised their constitutional authority to provide for absentee and mail voting that the Executive Order purports to displace.

33.    Voting by mail has a long and well-established pedigree in the United States, dating to before the nation's founding. During the Revolutionary War, some American colonies allowed voting away from usual polling places, often to ensure the military conflict did not disenfranchise eligible voters. *See* Olivia B. Waxman, *Voting by Mail Dates Back to America's Earliest Years. Here's How It's Changed Over the Years*, Time (updated Dec. 12, 2023), https://bit.ly/49WqDxZ.

34.    During the Civil War, States experimented with absentee voting on an even larger scale to ensure that soldiers away from home could still vote. *See id.* Following the Civil War, States began to expand absentee voting beyond members of the military. In 1896, "Vermont became the first State to accord absentee voting privileges to civilians," and States "have continued to provide for and expand absentee voting since." *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1175 (9th Cir. 2001).

35.    In the early 20th century, States adopted a variety of models of non-military absentee voting, consistent with the States' "constitutional duty to craft the rules governing federal

---

[2] The Trump Administration has appealed parts of these orders.

12

JA51

elections" wherever Congress has not acted to displace them. *Moore v. Harper*, 600 U.S. 1, 29 (2023).

36.    In 1978, "California became the first state to allow voters to apply for an absentee ballot without having to provide an excuse," and the majority of States have since followed suit. *See* Waxman, *supra*, ¶ 33. Today, 28 States offer absentee ballots to any voter who requests one, without having to provide an excuse, and another eight States (California, Colorado, Hawaii, Nevada, Oregon, Utah, Vermont and Washington) plus the District of Columbia automatically mail ballots to all registered voters. *See Table 1: States with No-Excuse Absentee Voting*, Nat'l Conf. of State Legs. (updated Mar. 10, 2026), https://www.ncsl.org/elections-and-campaigns/table-1-states-with-no-excuse-absentee-voting.

37.    Even in States that do not permit all voters to vote absentee, voters are able to do so if they have a qualifying "excuse." Permitted excuses can range widely, including being out of the jurisdiction during the election period, illness or disability, advanced age, work or school conflicts, religious beliefs or practices, jury duty, or being an election worker. *See Table 2: Excuses to Vote Absentee*, Nat'l Conf. of State Legs., (updated Aug. 26, 2025), https://www.ncsl.org/elections-and-campaigns/table-2-excuses-to-vote-absentee.

38.    As States have exercised their prerogative to expand mail voting options under their Elections Clause authority, the use of mail voting has expanded significantly in federal elections. In the 2020 general election, nearly 70 million voters cast their ballots by mail. The National Association of State Election Directors later declared that election "the most secure in American history." Press Release, *Joint Statement from Elections Infrastructure Government Coordinating Council and Sector Coordinating Council Executive Committees*, Nat'l Ass'n of State Election Directors (Nov. 12, 2020), https://www.nased.org/news/jointstatement111220. This conclusion

13

JA52

accords with reams of other studies about the absence of widespread voter fraud, including mail voter fraud. Researchers have confirmed that, "[a]s with all forms of voter fraud, documented instances of fraud related to [mail voting] are rare." M.I.T. Election Data & Sci. Lab, *Voting by mail and absentee voting* (last updated Feb. 28, 2024), https://electionlab.mit.edu/research/voting-mail-and-absentee-voting.[3]

39.    President Trump is among those who have relied on absentee ballots to cast his vote. Despite criticizing mail voting, President Trump acknowledged that he voted absentee by mail in New York in 2018 and in Florida in 2020. *See* Stephanie Saul & Reid J. Epstein, *Trump Is Pushing a False Argument on Vote-by-Mail Fraud. Here Are the Facts*, N.Y. Times (Sep. 28, 2020), https://www.nytimes.com/article/mail-in-voting-explained.html. And just last month President Trump again voted by mail in Palm Beach County. Erica L. Green, *Trump, Who Calls Mail-in Voting 'Cheating,' Just Voted by Mail*, N.Y. Times (Mar. 24, 2026), https://www.nytimes.com/2026/03/24/us/politics/trump-mail-in-voting-florida.html.

40.    Although the rate of absentee voting has decreased from its 2020 peak, in 2024, approximately 30 percent of all voters—roughly 47 million people—still cast ballots by mail. *See* U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* 35 (June 2025), https://www.eac.gov/sites/default/files/2025-07/2024_EAVS_Report_508.pdf (Overview Table 1: Mail Voting in the 2024 General Election). That year, mail ballots accounted for at least 75% of the votes cast in seven States—Arizona,

---

[3] *See also* Jonathan Auerbach & Steve Pierson, *Does voting by mail increase fraud? Estimating the change in reported voter fraud when states switch to elections by mail*, Am. Stat. Ass'n, Off. of Sci. Pol'y (Oct. 26, 2020), www.amstat.org/docs/default-source/amstat-documents/pol-vote-by-mail.pdf (comparing the number of voter fraud cases in vote by mail States to the number of cases in non-vote by mail States and finding "no evidence that voting by mail increases the risk of voter fraud overall").

14

JA53

California, Colorado, Hawaii, Oregon, Utah, and Washington—and in four of those states, mail ballots accounted for more than 90% of the votes. *Id*. at 34–35.

41. Congress has consistently permitted these States' practices. As courts have recognized, there is a "long history of congressional tolerance" of absentee balloting, and in modern times Congress has "required, not just allowed, states to provide for absentee voting in federal elections." *Keisling*, 259 F.3d at 1175; *see also Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 776–77 (5th Cir. 2000) (recognizing Congress "enacted at least three statutes authorizing absentee balloting," including the 1970 Amendments to the Voting Rights Act, the 1984 Voting Accessibility for the Elderly and Handicapped Act, and the Uniformed and Overseas Citizens Absentee Voting Act of 1986).

42. In the 1970 Amendments to the Voting Rights Act, Congress mandated that "each State *shall* provide by law for the casting of absentee ballots" in Presidential elections. 52 U.S.C. § 10502(d) (emphasis added). The congressional findings for the statute recognized that "the lack of sufficient opportunities for absentee registration and absentee balloting in presidential elections," deny citizens "equality of civil rights, . . . due process[,] and equal protection of the laws." *Id*. § 10502(a).

## III. The Postal Service is structured to operate independently of partisan politics.

43. Article I, Section 8, Clause 7 of the Constitution vests Congress with the power to "establish Post Offices and post Roads." Pursuant to that authority, Congress established the Post Office Department in 1792 and established the U.S. Postal Service (hereinafter, the "Postal Service" or "USPS"), as the successor entity to the Post Office Department in 1971. The Postal Service is "a basic and fundamental service provided to the people by the Government of the

15

JA54

United States, authorized by the Constitution, created by Act of Congress, and supported by the people." 39 U.S.C. § 101(a).

44. Congress created the Postal Service as an "independent establishment" meant to be isolated from partisan politics. *Id.* § 201. That independence is built into its structure. The Postal Service is directed by a Board of Governors, which comprises eleven members: the Postmaster General, Deputy Postmaster General, and nine other Governors, the latter of which are appointed by the President after bipartisan consultation with the Speaker of the House, the minority leader of the House, the majority leader of the Senate, and the minority leader of the Senate. *Id.* § 202(a)(1). No more than five Governors may be from the same political party, and they must be chosen "solely on the basis of their experience in the field of public service, law or accounting or on their demonstrated ability in managing organizations or corporations (in either the public or private sector) of substantial size." *Id.* Governors may be removed by the President only for cause. *Id.*

45. The Board of Governors, rather than the President, appoints and has the power to remove the Postmaster General. *Id.* § 202(c). The Postmaster General is the "chief executive officer" of the Postal Service. *Id.* § 203.

46. The Postal Regulatory Commission, another "independent establishment," sets rules and regulations governing the Postal Service. *Id.* §§ 501, 503. The Commission is composed of five members, appointed by the President with the advice and consent of the Senate. *Id.* § 502(a). "The Commissioners shall be chosen solely on the basis of their technical qualifications, professional standing, and demonstrated expertise in economics, accounting, law, or public administration, and may be removed by the President only for cause." *Id.*

16

JA55

47. The Postal Service is subject to both substantive and procedural statutory obligations.

48. The role of the Postal Service is defined by statute and limited to the function of providing postal service to all Americans. Congress has mandated that the Postal Service "provide prompt, reliable, and efficient services to patrons in all areas" and "render postal services to all communities." *Id.* § 101(a). It is also "the responsibility" of the Postal Service "to maintain an efficient system of collection, sorting, and delivery of the mail nationwide"; "to provide types of mail service to meet the needs of different categories of mail and mail users"; and "to establish and maintain postal facilities of such character and in such locations, that postal patrons throughout the Nation will, consistent with reasonable economies of postal operations, have ready access to essential postal services." *Id.* § 403(b). In fulfilling those responsibilities, the Postal Service may not "make any undue or unreasonable discrimination among users of the mails." *Id.* § 403(c). And in setting any policy, it must give "the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." *Id.* § 101(e).

49. To further the Postal Service's primary obligation to "develop and promote adequate and efficient postal services," Congress has also imposed several procedural requirements on the Postal Service. *Id.* § 3661(a). As relevant to this action, 39 U.S.C. § 3661(b) mandates that:

> When the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change.

Subsection (c) of the same provision further mandates that "[t]he Commission shall not issue its opinion on any proposal until an opportunity for hearing on the record under [the Administrative

17

JA56

Procedures Act] has been accorded to the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public."

50.     As a general matter, the Postal Service's authority to reject mailpieces is defined by statute. Congress has listed specific, defined categories of "nonmailable matter" that the Postal Service may "dispose[] of" rather than transmitting to its designated address. 39 U.S.C. §§ 3001 *et seq.* None of these provisions permit the categorical disposal of state-issued mail ballot envelopes.

51.     The Postal Service simply has no independent authority to regulate elections. "Although the Constitution allows *Congress* to override a State's authority regarding its elections, it does not extend the same authority to the Postal Service — an agency of the federal executive branch." *Colorado v. DeJoy*, No. 20-cv-2768, 2020 WL 5513567, at *2 (D. Colo. Sept. 14, 2020).

52.     The Postal Service is indispensable for voting by mail. According to its post-election report, in 2024 the Postal Service delivered over 222 million pieces of ballot mail, including nearly 100 million ballots for the November general election.[4] And more broadly, it delivered over 3 billion total pieces of political and election mail in 2024.[5] As it had in the past, the Postal Service took "extraordinary measures" for the 2024 general election to ensure the timely delivery of election mail, including extra deliveries and collections, special pick-ups, specialized

---

[4] U.S. Postal Serv., *2024 Post-Election Analysis Report* 3 (Dec. 12, 2024), https://about.usps.com/what/government-services/election-mail/pdf/usps-post-election-report-2024-12-02.pdf.

[5] The Postal Service defines "election mail" as any items sent to or from election officials that enable citizens to participate in the voting process, including balloting materials, voter registration cards, absentee applications, and polling place notifications. U.S. Postal Serv., *2024 Post-Election Analysis Report* 7 (Dec. 12, 2024), https://about.usps.com/what/government-services/election-mail/pdf/usps-post-election-report-2024-12-02.pdf.

18

JA57

sorting plans at processing facilities to expedite delivery and local handling and transportation of ballots.[6] Ultimately, the Postal Service determined that it had "ample capacity to handle the nation's Election Mail," which comprised only 0.72% of its total mail volume between January 1 and November 15, 2024.

**IV.    The Executive Order follows Congress's refusal to pass legislation that restricts mail voting despite President Trump's urging.**

53.    President Trump has peddled false claims about American elections for the better part of a decade. Those lies culminated in the "Big Lie," in 2020, in which President Trump falsely claimed that cheating and fraudulent ballots cost him the 2020 election. In particular, President Trump has said that in 2020, "Democrats attempted the most brazen and outrageous election theft" in American history through the "scam of mail-in ballots."[7] Hours after he made that statement, thousands of President Trump's supporters launched a violent attack on the U.S. Capitol Building, delaying certification of the 2020 presidential election. The Final Report of the U.S. House Select Committee to Investigate the January 6th Attack on the United States Capital subsequently detailed the "blizzard of lies" President Trump made to "delegitimiz[e] mail-in-voting in the middle of a deadly pandemic."[8]

---

[6] The Postal Service is also subject to a settlement agreement for the 2026 and 2028 election cycles under which it must, among other things, publicly post guidance documents reflecting the Postal Service's "good faith efforts to prioritize monitoring and timely delivery of Election Mail." *See* Stipulation of Settlement & Proposed Order, *N.A.A.C.P. v. U.S. Postal Serv.*, No. 1:20-cv-2295-EGS (D.D.C. Dec. 17, 2021), ECF No. 170.

[7] Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

[8] H.R. Rep. No. 117-663, at 201–02, 117th Cong, 2d Sess. (2022).

19

JA58

54.     Following his return to office in 2025, President Trump continued to repeat these false claims, as well as his call for radically reshaping American elections. In particular, President Trump has continued to falsely contend that non-citizens are "brought to our country to vote, and they vote illegally," urging the Republican Party to "take over" and "nationalize the voting."[9] At President Trump's urging, Congress has repeatedly considered bills to restrict voting, including the "SAVE America Act," which contains provisions that would make it significantly more difficult to register to vote and cast a ballot. Michael Gold, *Trump Leans on Congress to Address His False Claims of Voter Fraud*, N.Y. Times (Feb. 24, 2026), https://www.nytimes.com/2026/02/24/us/politics/trump-congress-voting-save-america-act.html. President Trump has openly admitted that the goal of adding these barriers to the voting process is to ensure that for the next "50 years," Republicans will "never lose a race." Maddie Ganon, *Trump stops in battleground Georgia to talk economy, voter ID ahead of midterms* (updated Feb. 19, 2026), Spectrum News https://spectrumlocalnews.com/us/snplus/politics/2026/02/19/trump-visit-georgia.

55.     President Trump has repeatedly maligned mail voting in particular and sought to convince Congress to pass voting legislation that meets his mandate of "NO MAIL-IN BALLOTS (EXCEPT FOR ILLNESS, DISABILITY, MILITARY, OR TRAVEL!)." *See, e.g.,* Donald J. Trump (@realDonaldTrump), TruthSocial (Mar. 6, 2026, at 4:12 PM), https://truthsocial.com/@realDonaldTrump/posts/116178624373752275.

---

[9] Miles Parks, *Trump says he wants Republicans to 'nationalize' elections,* NPR (Feb. 3, 2026), https://www.npr.org/2026/02/03/nx-s1-5698095/trump-says-he-wants-republicans-to-nationalize-elections

20

56.    But President Trump has been unable to pass his antidemocratic agenda through Congress. Just this past week, the SAVE America Act stalled in the Senate after failing to gain sufficient support, including from key Republican Senators. Unwilling to accept his failure in the legislature, President Trump issued the challenged Order yesterday, March 31. Entitled *Ensuring Citizenship Verification and Integrity in Federal Elections*, the Order seeks to accomplish many of the SAVE America Act's objectives by burdening and disenfranchising vulnerable voters. To this end, it dictates the creation of unprecedented lists of American citizens, purportedly for the purpose of identifying eligible voters. And it mandates sweeping changes to mail voting across the country, effectively shifting the determination of eligibility for voting from the State to an array of federal agencies, including the Postal Service, without any grant of constitutional or statutory authority. The Order has two main components to accomplish this scheme.

57.    *First*, Section 2(a) orders Defendants to amass state-specific lists of every American citizen over the age of 18 from federal records contained in certain specified databases and other unspecified databases. The Order also mandates that Defendants provide each State the list of its citizens 60 days ahead of federal elections, presumably in support of the Order's "Purpose" of "assist[ing] in verifying identity and Federal election voter eligibility." E.O. § 1.

58.    *Second*, Section 3(b) transforms the Postal Service into an election administration agency, purporting to grant the Postal Service unilateral authority to determine who is eligible to vote by mail based on the criteria specified in the Order. *Id.* § 3(b).

59.    Section 4(a), in turn, requires the Secretary of Homeland Security, the Commissioner of SSA, and the Postmaster General to coordinate with the Secretary of Commerce to effectuate "all relevant aspects of the implementation of this order."

21

JA60

60.     For months, President Trump threatened that he would issue an executive order purporting to restrict mail voting in the 2026 general elections. He made clear that he would do so by fiat if Congress would not act as he demanded, expressing his view that States "must do what the Federal Government, as represented by the President of the United States, tells them, FOR THE GOOD OF OUR COUNTRY, to do."[10] But President Trump possesses no such authority to order such a sweeping change to American elections.

### A.     The Executive Order unlawfully directs the creation of unprecedented lists of American citizens.

61.     Section 2(a) of the Order directs the Secretary of Homeland Security, "through the Director of United States Citizenship and Immigration Services and in coordination with the Commissioner of [Social Security Administration]," to compile for each State a list of every U.S. citizen above the age of 18 by an upcoming federal election who resides in that State. *See* E.O. § 2(a). This so-called "State Citizenship List" is to be derived from an array of disparate federal citizenship and naturalization records, including Social Security Administration records, the Department of Homeland Security's Systematic Alien Verification for Entitlements (SAVE) program, as well as unnamed "other relevant Federal databases." *Id.*

62.     Once compiled, the Order requires the Secretary of Homeland Security to transmit the lists to the chief election official of each State "no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election." *Id.* The Order explicitly disclaims that the lists will identify whether an individual is properly registered to vote. *Id.* It instead advises that an individual is only registered

---

[10] Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 18, 2025, at 7:17 AM), https://truthsocial.com/@realDonaldTrump/posts/115049485680941254

22

JA61

if she has followed the relevant state and federal procedures for voter registration. *Id.* The Order does not explicitly explain the intended use of the State Citizenship List, but the Order's stated purpose is to assist in verifying voter eligibility.

63.    While the Order contains boilerplate language purporting to require compliance with applicable law alongside its otherwise mandatory provisions, its plain language directs a breathtaking set of actions that implicate federal records that are heavily regulated by a "web" of post-Watergate restrictions meant to protect Americans from such intrusions, including the Privacy Act. *Whalen v. Roe*, 429 U.S. 589 (1977).

64.    The Privacy Act strictly prohibits the use of federal records absent specific authorization in federal law—including procedural requirements that dictate when and how an agency can use federal data, as well as substantive provisions that impose requirements on the kinds of data that may be used and disclosed by agencies for legally authorized and otherwise appropriate purposes. *See* 5 U.S.C. § 552a; *see also LULAC III*, 2026 WL 252420, at *12, 54.

65.    Indeed, in enacting amendments that tightened restrictions specifically on "computerized matching programs," Congress underscored that its purpose was to ensure that it would be "*legally impossible* for the Federal Government . . . to put together anything resembling a '1984' personal dossier on a citizen," and that "proper regard for privacy of the individual, confidentiality of data, and security of the system" would be respected. *Legislative History of the Privacy Act of 1974: Source Book on Privacy* 168, 217 (Sep. 1976) (hereinafter "Source Book on Privacy") (emphasis added) (compiled for the Senate and House Committees on Government Operations, 94th Cong., 2d Sess. (1976)).

66.    Yet the Order purports to direct Defendants to make good on President Trump's repeated claims that the federal government should take charge of who is "eligibl[e]" to vote, E.O.

23

JA62

§ 1, precisely by amassing such a database. And it does so by directing the use of databases that are already riddled with significant flaws that are guaranteed to harm eligible voters—databases that are already subject to litigation in this Court. *See generally League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. 1:25-cv-3501, 2025 WL 3198970 (D.D.C. Nov. 17, 2025); *see also LULAC III*, 2026 WL 252420, at \*12, 55 & n.54.

67.     Specifically, the Order directs each  State Citizenship List to be compiled from SAVE, SSA records, and other unspecified "databases," and in turn directs Defendants to transmit such lists of purportedly eligible voters to each State "no fewer than 60 days before each regularly scheduled Federal election." E.O. § 2(a).

68.     SAVE suffers from known, significant, and harmful errors and inaccuracies. A recent review found that the database was incorrect as to *35%* of individuals whose information was checked through the database in one county in Missouri—and substantial error rates have been reported in other locations. Indeed, reporting from earlier this year suggests that the SAVE database persistently flags eligible voters as potential noncitizens.[11] SSA's database, known as "Numident," also suffers from serious flaws. The SSA has itself represented that "SSA records . . . do not provide definitive information on U.S. citizenship."[12]

69.     Further still, the timing of the Order's mandate to provide the State Citizenship List to the States poses a significant problem in and of itself for at least two reasons. *First*, residence

---

[11] *See* Jen Fifield & Zach Despart, *A federal tool to check voter citizenship keeps making mistakes. It led to confusion in Texas*, The Tex. Trib. (Feb. 13, 2026), https://www.texastribune.org/2026/02/13/save-voter-citizenship-tool-mistakes-confusion/.

[12] *See* Letter from Nancy Morales Gonzalez, Assoc. Gen. Counsel for Soc. Sec. Admin., to Jon Sherman, Litig. Dir. & Senior Counsel for Fair Elections Ctr. (July 13, 2023), https://perma.cc/KS2N-U2US.

24

JA63

information for some voters will certainly be inaccurate, because the voters will have moved during the 60-day period between transmission of the list and the election. According to Census data, 8.2 million people move between States each year—averaging to about 680,000 per month, or 1.36 million during the 60-day period. *See* Mehreen S. Ismail, *Number and Percentage of State-to-State Movers Increased Between 2021 and 2022*, U.S. Census Bureau (Nov. 21, 2023), https://www.census.gov/library/stories/2023/11/state-to-state-migration.html. *Second*, citizenship information for some voters will certainly be inaccurate, because many people will become naturalized citizens during the 60-day period. According to the USCIS, about 800,000 people become naturalized citizens each year, or over 65,000 per month. *See* "Naturalization Statistics," USCIS, https://www.uscis.gov/citizenship-resource-center/naturalization-statistics (last visited Apr. 1, 2026).

**B.    The Executive Order gives the Postal Service unauthorized control over voter eligibility for mail voting.**

70.    Section 3(b) of the Order requires the Postmaster General to initiate a proposed rulemaking that defines the Postal Service as the nationwide arbiter of eligibility to vote by mail. E.O. § 3(b). It specifies that the USPS shall provide each State with a "Mail-In and Absentee Participation List" of individuals "who are enrolled with the USPS" for "mail-in or absentee ballots" in such State. *Id.* § 3(b)(iv). The Order further commands that the USPS "shall not transmit mail-in or absentee ballots from any individual" unless that individual appears on the USPS's "Mail-In and Absentee Participation List" sent to a State. *Id.* § 3(b)(iii). In other words, Subsections 3(b)(iii) and 3(b)(iv) of the Order transform USPS from an independent agency that simply delivers the mail into an election administration agency that must determine every single voter's eligibility to vote by mail—even though such determinations are solely the province of the

25

JA64

States under the Elections Clause's distribution of authority for voting administration and federal law.

71.    The Order does not explain how USPS will create the Mail-In and Absentee Participation List. Rather, Subsection 3(b)(iv) says that USPS will use "a process specified in the rulemaking directed by this subsection." *Id.* § 3(b)(iv). Nor does it explain how a voter becomes "enrolled" on the List. *Id.* The Order also does not clarify how the USPS's Mail-In and Absentee Participation List is connected to the State Citizenship List; presumably, the latter will be used to help develop the former, but the Order never says so, nor does the Order otherwise establish any legitimate criteria or process for the USPS to use in determining who is eligible to vote.

72.    Further, Section 3(b)(1) of the Order directs the Postal Service to issue rigid design specifications for envelopes for "all outbound ballot mail," including that every envelope must be "marked as Official Election Mail," be "automation-compatible and bear a unique Intelligent Mail barcode," and have "undergone a mail envelope design review by the USPS." *Id.* § 3(b)(i).

73.    The Order usurps the States' authority over voting by mail and voter eligibility and places these subjects firmly in the control of the USPS. The Order says that no fewer than 90 days before a federal election, a State "may choose to notify the USPS if it intends to allow for mail-in or absentee ballots to be transmitted by the USPS." *Id.* § 3(b)(ii). Alongside that notification, the State "should further indicate" whether it intends to submit to USPS, no fewer than 60 days before the election, a list of eligible voters to whom the State intends to send a mail-in ballot. *Id.* The Order does not, however, explain how that list will inform the USPS's Mail-in and Absentee Participation List, which purports to control who is *actually* eligible to vote by mail. Nor does it specify the consequences if a State declines to send the list, as the Order implicitly acknowledges is within a State's authority.

26

JA65

74.    Likewise, although the Order directs development of "procedures enabling each State to routinely supplement and provide suggested modifications or amendments to the State's Mail-In and Absentee Participation List," *id.* § 3(b)(iv), these procedures are undefined, and by their own terms, confine the States' role to offering "suggested" changes to a list that remains in USPS's unilateral control, *id.*

75.    In short, under the Order, even when a voter is eligible to vote by mail under state law, a State sends the voter a mail ballot, and the voter completes the ballot and attempts to mail it to the State's election officials, USPS must refuse to deliver the ballot unless the voter appears on USPS's own Mail-In and Absentee Participation List. As a result, the Order will unlawfully disenfranchise qualified voters.

**V.    The Executive Order fails to identify any legitimate source of authority for the President's dramatic and unilateral actions to control federal elections.**

76.    The Order identifies three purported sources of authority for the President's actions: the Help America Vote Act ("HAVA"), the National Voter Registration Act of 1993 ("NVRA"), and Article IV, § 4 of the U.S. Constitution, which requires the "United States [to] guarantee to every State in th[e] Union a Republican Form of Government" (the "Guarantee Clause"). *See* Order at Preamble. None of these sources provide the President with the sweeping authority that he has invoked, and each make clear that neither the Constitution nor federal law has conferred any power to the President to regulate federal elections.

77.    Congress enacted HAVA in the wake of the 2000 elections to "help improve the equipment used to cast votes, the way registration lists are maintained, and how polling operations are conducted." *Am. C.R. Union v. Phila. City Comm'rs*, 872 F.3d 175, 180 (3d Cir. 2017) (internal citation omitted). HAVA regulates how States maintain their voter rolls, but leaves the

27

JA66

maintenance of those rolls to the States themselves, requiring them to create a "computerized statewide voter registration list." 52 U.S.C. § 21083(a)(1)(A). It also requires States to "perform list maintenance" consistent with the NVRA. *Id.* § 21083(a)(2)(A). HAVA is clear that this list is to be "defined, maintained, and administered at the State level." *Id.* § 21083(a)(1)(A). Further, HAVA commands that the "specific choices on the methods of complying with" HAVA "shall be left to the discretion of the State." *Id.* § 21085.

78.    While HAVA contemplates that the executive branch may enforce its dictates, it confers no unilateral power to the President to regulate elections.

79.    Indeed, HAVA's legislative history stressed the importance of maintaining our decentralized electoral system to preserving liberty:

> Historically, elections in this country have been administered at the state and local level. *This system has many benefits that must be preserved. The dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome.* This leaves the power and responsibility for running elections where it should be, in the hands of the citizens of this country.

H.R. Rep. No. 107-329, pt. 1, at 31–32 (2001) (emphases added). Thus, HAVA in no way supports the President's unilateral power-grab—it is a Congressional act that imposes certain obligations on the States, but leaves election supervision in their hands.

80.    Congress enacted the NVRA in 1993 to serve "two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018); *see also* 52 U.S.C. § 20501(b). The NVRA charges States—not the federal government—with the "administration of voter registration for elections for Federal office," 52 U.S.C. § 20507(a), including maintaining voter lists, *id.*

28

JA67

§ 20507(c)–(g). It similarly makes States the custodians of voter lists. *See Husted*, 584 U.S. at 761. Like HAVA, the NVRA leaves election administration to the States—and does not authorize the unilateral exercise of presidential authority in this area.

81.    Thus, both HAVA and the NVRA provide a highly limited role for the federal government in state election administration—and no unilateral role for the President. Both statutes instead "reflect[] a careful allocation of regulatory power to a bipartisan panel [(i.e., the Election Assistance Commission)], accompanied by a requirement for consultation with the States." *LULAC I*, 808 F. Supp. 3d at 74. "This careful allocation implicitly forbids any individual member of the Executive Branch from unilaterally exercising the delegated power to regulate State voter registration programs"—much less unilaterally take sweeping and unrelated action regarding elections writ large. *Id*.

82.    The Order's reliance on the Guarantee Clause fares no better. The requirement that the federal government "guarantee" a "republican form of government" simply means that States must hold elections of some kind. *See* The Federalist No. 57 (James Madison) ("The elective mode of obtaining rulers is the characteristic policy of republican government."). Thus, while "a monarchy" or "military dictatorship" might "offend the Guarantee Clause of the Constitution," *Deer Park Indep. Sch. Dist. v. Harris Cnty. Appraisal Dist.*, 132 F.3d 1095, 1099–1100 (5th Cir. 1998), there is no suggestion that any State is refusing to hold elections or descending into autocracy, so the Guarantee Clause cannot justify the President's blatant overreach.

## VI.    The Executive Order severely harms Plaintiffs, their members, and the voters Plaintiffs represent.

83.    In view of its extraordinary breadth and unprecedented nature, the Executive Order harms Plaintiffs, the Party Plaintiffs' members and supporters, and the voters Plaintiffs represent.

29

JA68

Specifically, the Order harms each Plaintiff by altering the rules for the elections in which they and their members compete, undermining their ability to participate in lawful and fair elections, by burdening and likely disenfranchising Democratic voters, by harming Plaintiffs' electoral prospects, by forcing Plaintiffs to divert money and resources to ameliorate the Order's effects, and by threatening the privacy rights of Plaintiffs' members and voters.

84.    These injuries are not mere idle concerns for a future day—they come while the 2026 midterm elections are well underway, as well as with the 2028 general election impending, for which Plaintiffs will begin preparing shortly after the 2026 elections.

85.    Moreover, the Order threatens to disrupt and confuse ongoing election activities, including in the upcoming 2026 primary elections. On its face, the Order's provisions appear to apply immediately, thus changing the rules for mail-in voting during ongoing primary elections. Moreover, many of the Order's provisions are impossible to implement in view of state election administration responsibilities. Section 2(a), for example, calls for the distribution of the State Citizenship Lists "no fewer than 60 days" before any federal election—but many States are already fewer than 60 days from their federal primary elections. E.O. § 2(a). Section 3(b)(ii) asks States to "notify the USPS" if they intend to allow for mail-in voting, and submit to the USPS "no fewer than 60 days before the election" lists of eligible voters. E.O. § 3(b)(ii). Sections 3(b)(iii) and 3(b)(iv) require the USPS to compile a list of voters it believes are eligible for mail-in voting (based on completely unspecified criteria), provide that list to each State, and then refuse to transmit mail-in ballots.

86.    As the Supreme Court has repeatedly emphasized, a "bedrock tenet of election law" is that "[w]hen an election is close at hand, the rules of the road must be clear and settled." *Merrill v. Milligan*, 142 S. Ct. 879, 880–81 (2022) (Kavanaugh, J., concurring in the grant of a stay

30

JA69

pending appeal). This is because last-minute changes may "work[] a needlessly chaotic and disruptive effect upon the electoral process." *Benisek v. Lamone*, 585 U.S. 155, 161 (2018) (citation omitted). That is precisely the effect that the Order will have—it imposes novel and obligations on States and their election workers, to say nothing of its catastrophic effects on voters, in the midst of an active primary season.

**A.      The Order harms Plaintiffs by unlawfully altering the rules in the elections in which they compete.**

87.      The Order harms the Party Plaintiffs directly, including their members who are candidates in upcoming elections in all 50 States, as well as Leader Schumer and Leader Jeffries (who are candidates themselves)—by forcing them to compete in unlawfully structured elections.

88.      The Supreme Court has recognized that "candidates [] have an interest in a fair process," and "suffer [a cognizable harm] when the process departs from the law." *Bost v. Ill. State Bd. of Elections*, 146 S. Ct. 513, 519–20 (2026). Even candidates who ultimately prevail suffer a concrete injury when laws "erode[] public confidence that the election results reflect the people's will." *Id.* at 520.

89.      The Order unlawfully alters election rules in ways that "deprive the candidate[s] of a fair process and an accurate result." *Bost*, 146 S. Ct. at 520. That concrete injury is compounded by the damage to Plaintiffs' reputational interests, which depend on public confidence in election integrity.

**B.      The Order harms Plaintiffs by burdening the ability of Democratic voters to cast effective ballots.**

90.      The Order harms the Party Plaintiffs' members and supporters, which include registered Democrats and Democratic voters, by imposing new requirements to cast a mail ballot, thereby making it harder for them to vote and potentially disenfranchising them altogether. *See*

31

JA70

*Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) ("The Democratic Party also has standing to assert the rights of those of its members who will be prevented from voting by the [voter ID] law."), *aff'd*, 553 U.S. 181, 189 n.7 (2008) (agreeing that "Democrats have standing to challenge the validity" of voter ID law that makes it more difficult to vote).

91.   Democratic voters use mail ballots at higher rates than their Republican counterparts in many States.[13]

92.   Many of Plaintiffs' constituents, supporters, and members rely on voting by mail because they find voting in-person to be unduly burdensome for any number of reasons: many voters have work schedules which prevent them from reaching the polls on Election Day, or lack access to convenient and reliable transportation to their polling place, or have health conditions or disabilities which make it unsafe for them to vote in person.

93.   By purporting to impose new requirements to cast a mail ballot—including that the voter be "enrolled" with the USPS to be entitled to receive such a ballot—the Order will burden or even disenfranchise many of these disproportionately Democratic voters. And if there was any doubt as to the intended effect of the Order, President Trump has frequently and vocally attacked voting by mail because of his belief that it helps Democratic candidates win elections. *See supra* § IV.

94.   The harm is particularly acute for the Party Plaintiffs' members and voters in States where voting by mail is the norm. *See supra* § II. Indeed, voting by mail is the most common

---

[13] Pew Rsch. Ctr., *Voters' and Nonvoters' Experiences With the 2024 Election* (Dec. 4, 2024), https://perma.cc/BXR3-L2GJ (showing that in the 2024 general election 44 percent of Democratic candidates' voters voted by mail or absentee ballot compared to 26 percent of Republican candidates' voters).

32

JA71

means of voting in many States—and some States now automatically send mail ballots to *all* registered voters. *See, e.g.*, Nev. Rev. Stat. § 293.269911; Cal. Elec. Code § 3000.5.

95.   Even those Democratic voters who are able to vote in person can anticipate being burdened by the Order, which may require them to travel long distances or wait in substantial lines to vote in person.

96.   The Order's requirement that the federal government compile State Citizenship Lists also stands to burden and disenfranchise Democratic voters. As explained, such a list is likely to be incomplete and inaccurate, omitting newly naturalized citizens and failing to properly include other citizens. *See supra* § IV.A. Even if the Order gives voters the right to "update or correct" their records with DHS, voters may not know their information is inaccurate, or may not learn they have been omitted from the list until it is too late.

**C.      The Order harms Plaintiffs' electoral and competitive prospects.**

97.   The Order separately harms Plaintiffs because the risk of disenfranchising or burdening large numbers of Democratic-leaning voters injures Plaintiffs' electoral and competitive prospects. Courts have routinely held that any threat to the electoral prospects of a political party's candidates—or to an individual candidate—stemming from a change in election rules constitutes a concrete and particularized injury for purposes of Article III.[14] Plaintiffs thus have direct standing to challenge the Order on these grounds. *See Shays v. FEC*, 414 F.3d 76, 85–86 (D.C. Cir. 2005) (candidates had standing to challenge regulation that would "alter the environment in which rival

---

[14] *E.g.*, *Mecinas v. Hobbs*, 30 F.4th 890, 898 (9th Cir. 2022) (regulations that "make[] the competitive landscape worse for a candidate or that candidate's party than it would otherwise be if the regulation[s] were declared unlawful" inflict cognizable harm); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 & n.4 (5th Cir. 2006) (similar, collecting "[v]oluminous persuasive authority"); *Nelson v. Warner*, 472 F. Supp. 3d 297, 306–07 (S.D. W. Va. 2020) (collecting cases from "[s]everal circuits" finding individual candidate and party committee standing).

33

JA72

parties defend their concrete interests . . . in winning reelection") (cleaned up); *Nat. L. Party of U.S. v. F.E.C.*, 111 F. Supp. 2d 33, 47 (D.D.C. 2000) (holding the "party affiliate" of active candidates for political office may also have political competitor standing); *LULAC I,* 780 F. Supp. 3d at 192 (holding that active candidates and party affiliates had shown substantial likelihood of political competitor standing); *LULAC II*, 808 F. Supp. 3d at 61 (holding that active candidates and party affiliates had shown political competitor standing); *LULAC III*, 2026 WL 252420, at *30 (same as *LULAC II*).

98.     As explained, Democrats are more likely than Republican voters to vote by mail. *See supra* § VI.B. When fewer Democrats are able to vote, Plaintiffs' electoral prospects necessarily suffer, since Plaintiffs are all Democratic Party members or affiliated organizations. *See Crawford,* 472 F.3d at 951 (holding Democratic Party entities had standing to challenge voter ID law when impacted voters were "more likely to vote for Democratic than Republican candidates").

**D.     The Order harms the Party Plaintiffs by forcing them to divert resources to ameliorate the destructive effects of the Order's provisions.**

99.     The Order separately harms the Party Plaintiffs because it requires them to divert resources from other mission critical activities to attempting to offset the destructive effects of the Order. *See Crawford*, 472 F.3d at 951 (finding voter ID law "injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote"); *see also Lee v. Va. State Bd. of Elections*, 188 F. Supp. 3d 577, 584 (E.D. Va. 2016) (finding Democratic Party entity had standing to challenge Virginia voter ID law based on "diversion of time, talent, and resources to

34

JA73

educate their voters and implement the requirements" of the law), *aff'd*, 843 F.3d 592 (4th Cir. 2016).

100.    The Party Plaintiffs have invested heavily in encouraging their members and supporters to vote by mail. They have done so by providing funds to vendors for this purpose and by investing in their own education and outreach programs that promote mail voting. And they have developed increasingly comprehensive outreach, assistance, and ballot-cure programs to ensure their voters are able to cast mail ballots and have them counted. Plaintiffs have already begun to plan and execute similar programs in upcoming elections. These programs are, of course, built on the premise that those voters will be entitled to cast mail ballots and those mail ballots will be counted.

101.    The Order will force the Party Plaintiffs to divert resources to reformulate these programs and/or develop new programs to ensure that their voters, supporters, and constituents are able to cast ballots that will be counted. For example, Plaintiffs will need to develop new voter education programs, including but not limited to social media and direct outreach campaigns to assist voters in complying with the Order to be eligible to vote by mail for upcoming and future elections, and to assist voters to vote by other means if they are no longer able to vote by mail under the Order. These new and altered programs, which will need to be implemented across the country, come at significant economic cost. Because planning and campaigning for the 2026 election cycle is already well underway, Plaintiffs will therefore have to restructure longstanding mail-voter programs to account for the President's unlawful Order. Specifically, Plaintiffs will replace existing mail-voter assistance and outreach programs with programs aimed at ensuring that voters know how they can vote by mail under the Order, helping alleviate voter confusion in light

35

JA74

of the Order, and assisting those voters who can no longer vote by mail to vote in person on or before election day.

102.    The Order will also force the Party Plaintiffs to divert resources to ameliorate inevitable confusion from the Order's creation of State Citizenship lists, and attempt to educate and help voters who have been mistakenly omitted from such lists to update or correct their information with DHS. The Party Plaintiffs have no existing program to do this kind of work; it will need to be created entirely from scratch, with an election fast-approaching. This new program, which will need to be implemented across the country, will come at significant economic cost.

**E.    The Order harms the Party Plaintiffs' members and voters by violating their privacy rights.**

103.    By ordering the creation of State Citizenship Lists, the Order also harms the Plaintiffs' voters and members by threatening their privacy rights.

104.    A key goal of the Privacy Act was to prevent the government from creating de facto national data banks—precisely as the Order aims to do—by making it "legally impossible for the Federal Government in the future to put together anything resembling a '1984' personal dossier on a citizen," and to ensure "proper regard for privacy of the individual, confidentiality of data, and security of the system." Source Book on Privacy at 168, 217.

105.    The Privacy Act authorizes the compilation and sharing of information of American citizens only under strict circumstances that are not met here. The Executive Order thus violates the privacy rights of millions of Americans, including Plaintiffs' members and voters.

**CLAIMS FOR RELIEF**

**COUNT I: *ULTRA VIRES* PRESIDENTIAL ACTION**

**(All Defendants)**

106.    Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

36

JA75

107. "The Framers created a Federal Government of limited powers, and assigned to [federal courts] the duty of enforcing those limits." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 588 (2012) ("*NFIB*"). Accordingly, it is "black letter law" that the President's power to issue an edict like the Order "must stem either from an act of Congress or from the Constitution itself." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188–89 (1999) (quotation omitted); *see Youngstown*, 343 U.S. at 585. The President lacks *any* authority to act "unconstitutionally *or* beyond his statutory powers." *Dalton v. Specter*, 511 U.S. 462, 472 (1994) (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 691 n. 11 (1949)). And "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (collecting authority); *see also Am. Forest Res. Council v. United States*, 77 F.4th 787, 798 (D.C. Cir. 2023) (concluding claims of *ultra vires* action are reviewable), *cert. denied,* 144 S. Ct. 1110 (2024).

108. In the realm of elections for federal, state, and local office, the President's constitutional and statutory authority is purposefully limited. "Despite many constitutional provisions addressing elections, voting, or both, none authorize the President or the Executive Branch to exercise authority over the administration of federal elections." *Washington v. Trump*, 2026 WL 73866, at *25 n.57. Instead, the Constitution "invests the States with responsibility for the mechanics of congressional elections." *Foster*, 522 U.S. at 69 (citing U.S. Const. art. I, § 4, cl. 1); *see also* U.S. Const. art. 2, § 1, cl. 2. As Alexander Hamilton explained, the Constitution "submit[s] the regulation of elections for the federal government, in the first instance, to the local administrations." The Federalist No. 59 (Alexander Hamilton).

109. The Constitution makes clear that it only "empowers *Congress* to pre-empt state regulations governing" federal elections, not the President. *Arizona v. Inter Tribal Council of*

37

JA76

*Arizona, Inc.*, 570 U.S. 1, 8 (2013) ("*ITCA*") (emphasis added). It is only "the action of *Congress*," not the President, that may "supersede[]" contrary state law. *Ex parte Siebold*, 100 U.S. at 384 (emphasis added). Even then, Congress's authority goes only "so far as it is exercised, and no farther." *ITCA*, 570 U.S. at 9 (quoting *Ex parte Siebold*, 100 U.S. at 371).

110.    In contrast to Congress's express authority to regulate elections, the "Constitution does not spell out a role for the President in the operation of state voting procedures in federal elections." *Meadows*, 88 F.4th at 1346. "The Constitution empowers only the states and Congress to 'regulate the conduct of [federal] elections.'" *Id.* (alteration in original) (quoting *Roudebush*, 405 U.S. at 24). The President lacks any "direct control" over "the individuals—members of Congress and state officials—who conduct federal elections," and he thus has "no authority" to "interfere[] with state election procedures based solely on the federal executive's own initiative." *Id.* at 1347. Instead, the President and other executive officers may only act "in relation to another branch's constitutionally authorized act." *Id.* "Perhaps tellingly, in the field of election administration, Congress appears to have granted the president vanishingly little power to exercise unilateral control." Lisa Marshall Manheim, *Presidential Control of Elections*, 74 Vand. L. Rev. 385, 435 (2021).

111.    President Trump's Order dramatically exceeds his highly limited constitutional and statutory authority when it comes to regulating elections. No source of legal authority exists for the President to:

- Direct the Secretary of the Department of Homeland Security, the Director of the United States Citizenship and Immigration Services, and the Commissioner of the Social Security Administration, to "compile and transmit to the chief election official of each State a list of individuals confirmed to be [U.S.] Citizens" who are eligible to vote. E.O. § 2(a).

- Direct the Postmaster General of the USPS to make rules governing "all outbound ballot mail" in every State. E.O. § 3(b)(i).

38

JA77

- Direct the Postmaster General of the USPS to create a "list of individuals . . . who are enrolled with the USPS . . . for mail-in or absentee ballots provided by [each] State." E.O. § 3(b)(iv).

- Direct the Postmaster General to make rules stating that "the USPS shall not transmit mail-in or absentee ballots from any individual unless those individuals have been enrolled on a State-specific list." E.O. § 3(b)(iii); *see also* E.O. § 4(a) (directing agencies to implement this mandate).

- Direct the Secretary for the Department of Homeland Security to implement the other provisions of the order, including the "infrastructure necessary" for each "State Citizenship List." E.O. § 4(c).

112.    Each of these commands interferes with state election procedures by purporting to require the USPS to make arbitrary rules governing which mail-in ballots it will transmit, by purporting to direct the USPS to provide States with lists of voters whom the USPS believes are eligible to vote by mail, and by purporting to require USPS to refuse to deliver mail-in or absentee ballots from voters whom the USPS has not included on that list. E.O. §§ 2(a), 3(b).

113.    Further, each of these commands is *ultra vires* because the President lacks any constitutional or statutory authority to issue them. None of the sources of authority identified in the Order confer any of the powers the President has claimed for himself in the Order—indeed, as explained above, they reaffirm that election governance is an area of traditional state governance, subject only to review by Congress. *Supra* § V.

114.    Accordingly, this Court must "reestablish the limits on [the President's] authority," *Reich*, 74 F.3d at 1328 (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)), by issuing injunctive and declaratory relief against each provision of the Executive Order identified above, *see also Larson*, 337 U.S. at 689.

JA78

## COUNT II:  VIOLATION OF THE SEPARATION OF POWERS –
## UNLAWFUL INTRUSION UPON CONGRESSIONAL AUTHORITY

### (Defendants Trump, Steiner, EOP, USPS)

115.    Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

116.    The constitutional separation of powers is "intended, in part, to protect each branch of government from incursion by the others." *Bond v. United States*, 564 U.S. 211, 222 (2011). The "structural principles secured by the separation of powers protect the individual as well," including by preserving constitutionally mandated "checks and balances" between the federal branches of government. *Id.* at 222–23.

117.    "[U]nder our Constitution, the power to regulate federal election procedures rests exclusively with the States and with Congress." *LULAC III*, 2026 WL 252420, at *43. President Trump's Order intrudes upon Congress's prerogatives by overriding its command that USPS shall be an "independent establishment," 39 U.S.C. §§ 201, insulated from partisan machinations and dedicated to the apolitical goal of the "expeditious collection, transportation, and delivery of important letter mail*," id.* § 101(e); *see also id.* §§ 403(b), 501.

118.    The Postal Service's structure reflects its independence. No more than five Governors may be from the same political party, and they must be chosen "solely on the basis of their experience in the field of public service, law or accounting or on their demonstrated ability in managing organizations or corporations (in either the public or private sector) of substantial size." 39 U.S.C. § 202(a). Governors may be removed by the President only for cause. *Id.* And the Board of Governors, not the President, appoints and has the power to remove the Postmaster General. 39 U.S.C. § 202(c). Similarly, the Postal Regulatory Commission is also an "independent establishment," 39 U.S.C. §§ 501, 503, where the "Commissioners shall be chosen solely on the

40

JA79

basis of their technical qualifications, professional standing, and demonstrated expertise in economics, accounting, law, or public administration, and may be removed by the President only for cause." 39 U.S.C. § 502(a).

119.    Notwithstanding these edicts, the Order purports to override the independent judgment of the USPS's leadership and micromanage its internal affairs. Specifically, the Order declares that "the Postmaster General is hereby directed to initiate a proposed rulemaking" that, among other requirements:

- Sets rigid parameters for envelopes containing outbound ballot mail, § 3(b)(i);

- Specifies that "the USPS shall not transmit mail-in or absentee ballots from any individual" who has not properly enrolled in a State-specific list, § 3(b)(iii); and

- Requires USPS to provide each State with a list of individuals "who are enrolled with the USPS," § 3(b)(iv); *see also* E.O. § 4(a) (directing agencies to implement this mandate).

120.    Plaintiffs have a cause of action to remedy this separation-of-powers violation. The Supreme Court's precedents have long recognized that "whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (recognizing "an implied private right of action directly under the Constitution to challenge governmental action under . . . separation-of-powers principles" (citation omitted)).

121.    Consistent with the Supreme Court's practice, the proper remedy is to enjoin operation of those portions of the Order that offend the separation of powers, consistent with the Order's severability clause. *See, e.g.*, *Bowsher v. Synar*, 478 U.S. 714, 734 (1986); *Seila L. LLC v. CFPB*, 591 U.S. 197, 212, 233–34 (2020) (plurality opinion); *see also* E.O. § 6 (severability provision).

## COUNT III: VIOLATION OF THE SEPARATION OF POWERS – UNLAWFUL INTRUSION UPON STATE AUTHORITY

**U.S. Const. art. I, § 4, cl. 1; U.S. Const. art. II, § 1, cl. 2; U.S. Const. amend X**

**(All Defendants)**

122.    In addition to the "horizontal separation of powers among the branches of the National Government," the Constitution also establishes "a vertical separation of powers between the National Government and the States." *Thomas More L. Ctr. v. Obama*, 651 F.3d 529, 564 (6th Cir. 2011) (Sutton, J., concurring in part). This separation is reflected in the Tenth Amendment's reservation "to the States" of all "powers not delegated to the United States by the Constitution, nor prohibited by it to the States." U.S. Const. amend. X. It is further reflected in the Constitution's express reservation of certain rights to the States, at least where Congress has not acted in a contrary manner. *See id.* art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2.

123.    This is especially true in the election context. As the Court recently noted,

> The Constitution addresses two types of power over federal elections: first, the power to determine who is qualified to vote, and second, the power to regulate federal election procedures. In both spheres, the Constitution vests authority first in the States.

*LULAC III*, 2026 WL 252420, at \*5. Thus, "considerations of federalism and the vertical separation of powers" are especially salient where an executive order intrudes on a traditional domain of state authority. *Id.* at \*42.

124.    The Order violates the vertical separation of powers between the federal government and the States by requiring executive officials to take actions that intrude upon matters the Constitution leaves to the States, and where Congress has taken no contrary action. Most notably, the Order requires:

42

JA81

- The Postmaster General of the USPS to make rules governing "all outbound ballot mail" in every State. E.O. § 3(b)(i).

- The Postmaster General of the USPS to create a "list of individuals . . . who are enrolled with the USPS . . . for mail-in or absentee ballots provided by [each] State." E.O. § 3(b)(iv).

- The Postmaster General to make rules stating that "the USPS shall not transmit mail-in or absentee ballots from any individual unless those individuals have been enrolled on a State-specific list." E.O. § 3(b)(iii).

125.    These requirements are profoundly inconsistent with the traditional delegation of election management to the States. In particular, many States—consistent with their delegated constitutional authority—maintain procedures for mail-in and absentee voting that rely on USPS services to transmit ballots. The Order effectively conditions the States' ability to effectuate these procedures on their compliance with the USPS's "State-specific list[s]" of supposedly eligible voters. E.O. § 3(b)(ii)–(iii). It also allows the USPS to decide which "outbound ballot mail" to send or not send, interfering with state procedures for providing their residents with access to mail-in ballots. E.O. § 3(b)(i); *see also id.* § 4(a) (directing agencies to implement this mandate). These provisions are blatantly at odds with the States' reserved authority to "determine who is qualified to vote" and "regulate federal election procedures." *LULAC III*, 2026 WL 252420, at *5.

126.    Although the Order purports to identify sources of legislative and constitutional authority for its edicts, those sources do not support the President's claimed powers—as explained above, they reaffirm that election governance is an area of traditional state governance, and thus reinforce the principles of federalism that the Order subverts. *Supra* § V.

127.    Plaintiffs have a cause of action to remedy this separation-of-powers violation. The Supreme Court's precedents have long recognized that "whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561

43

JA82

U.S. 477, 491 n.2 (2010) (recognizing "an implied private right of action directly under the Constitution to challenge governmental action under . . . separation-of-powers principles" (citation omitted)).

128.    Consistent with the Supreme Court's practice, the proper remedy is to enjoin operation of those portions of the Order that offend the separation of powers, consistent with the Order's severability clause. *See, e.g.*, *Bowsher*, 478 U.S. at 734; *Seila L. LLC* 591 U.S. at 212, 233–34 (plurality opinion); *see also* E.O. § 6 (severability provision).

## COUNT IV: VIOLATION OF THE USPS'S STATUTORY AUTHORITY

## 39 U.S.C. §§ 101, 402

## (All Defendants)

129.    Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

130.    Although the President can use executive orders to direct federal agencies to act or make regulations, his power is limited to "direct[ing] subordinates to carry out their own lawful statutory authority"—he cannot direct them to "exceed[] the limitations imposed by the[ir governing statute's] text." *Georgia v. President of the U.S.*, 46 F.4th 1283, 1295 (11th Cir. 2022) (striking down executive order directing agencies to take actions not authorized by statute); *see Chrysler Corp. v. Brown*, 441 U.S. 281, 306 (1979) (applying a similar analysis); *California v. Trump*, 786 F. Supp. 3d 359, 388–89 (D. Mass. 2025) (striking down executive order that directed an agency to take action not authorized by statute), *appeal docketed*, No. 25-1726 (1st Cir. Aug. 1, 2025).

131.    In examining whether an agency act is authorized by statute, the Court must analyze the text of the statute at issue to determine whether Congress has delegated to the agency the power it seeks to exercise. In doing so, the Court must be mindful that it "expect[s] Congress to speak

44

JA83

clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (per curiam) (internal quotation marks and citation omitted). Further, "[w]here the statute at issue is one that confers authority upon an administrative agency, that inquiry must be shaped, at least in some measure, by the nature of the question presented—whether Congress in fact meant to confer the power the agency has asserted." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (internal quotation marks and citation omitted).

132.   The Order directs the Postmaster General and USPS to take actions that are far afield from any legitimate domain of statutory authority. The USPS, according to its governing statute,

> shall be operated as a basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people. The Postal Service shall have as its basic function the obligation to provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people. It shall provide prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities

39 U.S.C. § 101(a).

133.   Like other federal agencies, the USPS has limited authority to adopt regulations to fulfill its statutory purpose. Specifically, under 39 U.S.C. § 401(2), the USPS may "adopt, amend, and repeal such rules and regulations, not inconsistent with this title, *as may be necessary in the execution of its functions under this title*." Thus, the USPS's authority to make rules is directly tied to its performance of its core, statutorily authorized functions. And courts have repeatedly struck down USPS regulations that were unsupported by a specific statutory directive. *See, e.g.*, *Aid Ass'n*

45

JA84

*for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1175–76 (D.C. Cir. 2003); *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 972–73 (D.C. Cir. 2022).

134.    The Order is replete with directives to the USPS that have nothing to do with its statutorily defined powers.

135.    For example, the Order directs the USPS to impose requirements on any "outbound ballot mail," including by specifying that any such mail must be "marked as Official Election Mail," "automation-compatible and bear[ing] a unique Intelligent Mail barcode," and have "undergone a mail envelope design review by the USPS." E.O. § 3(b)(i); *see also id.* § 4(a) (directing agencies to implement this mandate). These directives require the USPS to impose obligations on state election mail. Nothing in the USPS's statute authorizes such interference with state election procedures.

136.    The Order directs the USPS to assemble a "list of individuals (Mail-In and Absentee Participation List) who are enrolled with the USPS, pursuant to a process specified in the rulemaking directed in this subsection, for mail-in or absentee ballots," and to provide that list to "each State." E.O. § 3(b)(iv); *see also id.* § 4(a) (directing agencies to implement this mandate). This provision necessarily requires the USPS to develop some procedure for the "enrollment" of voters. But nothing in the USPS's statute authorizes the USPS to develop a procedure for enrolling an eligible voter, to compile a list of qualified voters, or to communicate any such list to the States.

137.    Moreover, Section 3(b)(iii) of the Order requires the USPS to refuse to "transmit mail-in or absentee ballots" from any individual not enrolled on the Mail-In and Absentee Participation List. *See also* E.O. § 4(a) (directing agencies to implement this mandate). Nothing in the USPS's statute authorizes the USPS to refuse to carry mail on the basis that the sender or recipient is not on a new, statutorily unauthorized list. To the contrary, 39 U.S.C. § 403(c)

46

JA85

expressly forbids such actions by prohibiting the USPS from "mak[ing] any undue or unreasonable discrimination among users of the mails."

138.    Section 3(b)(iii) is further at odds with specific statutory directives to the USPS concerning the mail it may not send. 39 U.S.C. §§ 3001 through 3018 define specific, clearly delineated categories of "nonmailable matter" that the USPS may not process or transmit—for example, "hazardous material." *See* 39 U.S.C. § 3018(b)(1). These statutes do not suggest that the USPS may refuse to transmit election-related mail because the sender or recipient is not on a list of eligible voters maintained by USPS. Thus, Section 3(b)(iii) effectively creates a new category of "nonmailable matter" from whole cloth—one entirely disjoined from the statutory definition. An agency may not promulgate rules or regulations that are "inconsistent with the statute," but the Order directs the USPS to do just that by ignoring the Congressionally prescribed definitions of "nonmailable matter." *Alon Ref. Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 643–44 (D.C. Cir. 2019).

139.    The Order's provisions directed to the USPS thus plainly instruct the USPS to exceed its statutory mandate. The Court must therefore enjoin each provision of the Order directed to the USPS.

## COUNT V: AGENCY ACTION CONTRARY TO THE PRIVACY ACT; AGENCY ACTION IN EXCESS OF STATUTORY AUTHORIZATION; ARBITRARY AND CAPRICIOUS AGENCY ACTION

### 5 U.S.C. §§ 552A, 706(2)

### (Defendants DHS, USCIS, SSA, Mullin, Edlow, Bisignano)

140.    Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

141.    The APA directs federal courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in

47

JA86

excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

142.    The Privacy Act generally prohibits federal agencies and officers from disclosing "any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains," except in specific limited circumstances. 5 U.S.C. § 552a(b); *see also* Source Book on Privacy at 168, 217 (explaining that Congress sought to make it "legally impossible for the Federal Government in the future to put together anything resembling a '1984' personal dossier on a citizen," and to ensure "proper regard for privacy of the individual, confidentiality of data, and security of the system").[15]

143.    The Privacy Act also specifically prohibits the use of "computer matching programs," except under strictly defined conditions. *See* 5 U.S.C. § 552a(o). Such a "matching program" is "any computerized comparison of . . . two or more automated systems of records or a system of records with non-Federal records for the purpose of . . . establishing or verifying the eligibility" of "applicants for, recipients or beneficiaries of, participants in, or providers" of federal benefits. *Id.* § 552a(a)(8). Section 522a(o) provides that "[*n*]o" federal record "contained in a system of records may be disclosed to a recipient agency or non-Federal agency for use in a

---

[15] A federal "record" is defined as "any item, collection, or grouping of information about an individual" that includes identifying information and is maintained by an agency. *See id.* § 552a(a)(4).

48

JA87

computer matching program" absent a written agreement that, among other things, identifies "the purpose and legal authority for conducting the program." *Id.* § 552a(o)(1) (emphasis added).[16]

144.     As this Court recently explained in ordering the Trump Administration—including most Defendants here—to "strictly comply" with the Privacy Act in implementing the President's *last* executive order affecting federal elections, Defendants' own recent admissions to unlawful disclosures of federal records "underscores" precisely why all disclosures—and especially those that "centralize" information—*must* satisfy the procedural *and* substantive safeguards of the Act. *LULAC III*, 2026 WL 252420, at *55 n.54. "One such risk is the increased threat of misuse that arises when agencies centralize data and make it accessible to greater numbers of users, as DHS and SSA have done through their changes to SAVE and Numident. Another important risk when agencies centralize data is the possibility that false, incomplete, outdated, or otherwise unreliable information will be imported from one system into another." *Id.* (internal citation omitted). Those are the same databases the E.O. mandates the State Citizenship Lists be "derived" from, *see* E.O. § 2(a), yet the Order's mandate directs multiple plain violations of the Privacy Act.

145.     The State Citizenship Lists directed by Sections 2(a) and 4 of the Order violate the Privacy Act because they are a computerized matching program that wholly lacks "legal authority." 5 U.S.C. § 552a(o)(1)(A). The federal "databases" from which the List must be "derived"—"citizenship and naturalization records, SSA records, SAVE data, and other relevant

---

[16] In enacting this provision of the Privacy Act, Congress further codified the prohibition, noting that nothing in the Act "shall be construed to authorize" the "establishment or maintenance by any agency of a national data bank that combines, merges, or links information on individuals maintained in systems of records by other Federal agencies"; the "direct linking of computerized systems of records maintained by Federal agencies"; or "the computer matching of records not *otherwise authorized by law.*" Computer Matching and Privacy Protection Act of 1988, Pub. L. No. 100-503, § 9, 102 Stat. 2507, 2514 (codified at 5 U.S.C. § 552a, note) (emphasis added).

49

JA88

Federal databases"—are each computerized "systems of records" that contain federal "records" covered by the Act. *See* Privacy Act Notice of Modified System of Records, 90 Fed. Reg. 48948, 48949–50 (Oct. 31, 2025) ("SAVE SORN"); Privacy Act Notice of Modified System of Records, 90 Fed. Reg. 50879, 50880 (Nov. 12, 2025) ("SSA Numident SORN"); *see also, e.g.*, *LULAC I*, 780 F. Supp. 3d at 186–88. And because the State Citizenship Lists are—as directed by Sections 2(a) and 4 of the EO—created and "maintained" by "linking information on individuals maintained in systems of records by other Federal agencies" and comparing and compiling information from those systems, their development is a "matching program" within the meaning of the Privacy Act. 5 U.S.C. § 552a(o).

146.    Yet no constitutional, statutory, or other provision of law has authorized the matching of federal records to create the State Citizenship Lists. The sole authority cited in the EO, 42 U.S.C. § 1320b-7, directs DHS to establish a "system for the verification of immigration status" to assist states in determining whether non-citizens (or "aliens") are eligible for benefits. Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, title I, §121(c)(1), 100 Stat. 3359, 3391 (codified at 42 U.S.C. § 1320b-7). Neither that statute nor any other authorizes any of the Defendants to amass citizenship and residence information for *all* citizens for *any* purpose, much less conduct matching of federal records in an effort to broadly distribute information that will purportedly "assist[]" with voter registration—a core responsibility of the States. E.O. § 2(a). If Congress intended to permit such an extraordinary compilation of federal data notwithstanding the specific contrary limitations of the Privacy Act, it would have done so clearly, but it did not. *E.g.*, *West Virginia*, 597 U.S. at 724; *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

147.    The State Citizenship Lists directed by Sections 2(a) and 4 of the Order further violate the Privacy Act's general prohibition on the disclosure of federal data because they fall far

50

JA89

outside the scope of permissible "uses" as defined by the Act. There is a narrow exception to the Act's general prohibition on the disclosure of federal data where an applicable and properly noticed "routine use" applies, *id.* § 552a(b)(3), and the Act in turn defines "routine use" as one that is "compatible with the purpose for which [the data] was collected," *id.* § 552a(a)(7).[17] For a "routine use" to satisfy this "compatib[ility]" requirement, "[t]here must be a . . . concrete relationship or similarity, some meaningful degree of convergence, between the disclosing agency's purpose in gathering the information and in its disclosure." *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 549–50 (3d Cir. 1989); *see Townsend v. United States*, 236 F. Supp. 3d 280, 318 (D.D.C. 2017). The requirement prevents "personal data collected by one [agency] for a stated purpose" from being "used and traded by another organization" for unrelated purposes. *Britt*, 886 F.2d at 550 (quoting 120 Cong. Rec. 36,894 (1974) (statement of Sen. Percy)).

148.    Here, no existing provision of any SORN purports to authorize the use of federal data for the creation or distribution of State Citizenship Lists, either expressly or through any compatible "routine use." *See generally* SAVE SORN, 90 Fed. Reg. at 48948; SSA Numident

---

[17] Under the Act, an agency must "publish in the Federal Register notice of any new use or intended use of the information in [a] system [of records], and provide an opportunity for interested persons to submit written data, views, or arguments to the agency" at least 30 days before using the system in new ways. 5 U.S.C. § 552a(e)(11). Similarly, at least 30 days before establishing or revising a "matching program," an agency must "publish in the Federal Register notice of such establishment or revision." *Id.* § 552a(e)(12). To ensure congressional oversight, any time an agency "proposes to establish or make a significant change in a system of records or a matching program," it must "provide adequate advance notice of any such proposal" to Congress and the Office of Management and Budget (OMB) "to permit an evaluation of the probable or potential effect of such proposal on the privacy or other rights of individuals." 5 U.S.C. § 552a(r); *see also* OMB Circular No. A-108, Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act, at 7 & 12 (2016); 5 U.S.C. § 552a(v)(1) (authorizing OMB to issue Privacy Act guidance that is binding on the agencies).

51

JA90

SORN, 90 Fed. Reg. at 50879. The State Citizenship Lists accordingly violate the "use" provisions of the Privacy Act.

149.    Finally, the State Citizenship Lists directed by Sections 2(a) and 4 of the Order violate the substantive provisions of the Privacy Act and are arbitrary and capricious because the federal data from which they are derived is fundamentally flawed for the very purpose the List purports to serve. The Privacy Act expressly requires agencies that create, maintain, or use federal data to ensure that the records are accurate, relevant, up-to-date, secure, and appropriate for the specific uses for which they are employed—and further requires agencies to prevent "substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained." 5 U.S.C. § 552a(e)(5)–(10).

150.    The State Citizenship Lists, are, however, derived from a patchwork of sources that *guarantee* inaccuracies, outdated information, and unfairness to citizens on whom information is maintained. The E.O. directs Defendants to share the List with state officials 60 days prior to each federal election, for example, but citizens frequently move at all times of year—guaranteeing that at least some residence information disclosed through the database will be inaccurate, and that information about residents of one State will be inappropriately given to another State. Similarly, individuals who are currently not citizens will become naturalized citizens within that same period—guaranteeing inaccuracies with respect to the "citizenship" information provided by each "Citizenship List." Finally, SAVE—DHS's system of records that serves as a primary data source for the State Citizenship Lists, E.O. § 2(a)—itself suffers from known, significant, and harmful errors and inaccuracies. As noted above, a review found that the database was incorrect as to *35%* of individuals' whose information was checked through the database recently in one county in Missouri, and substantial error rates have been reported in other locations.

52

JA91

151.    Defendants, as directed by the EO, have or will imminently take steps to carry out the Order that constitute "final agency action[s] for which there is no other adequate remedy in a court," within the meaning of the APA. 5 U.S.C. § 704. By taking such final action contrary to the Privacy Act, Defendants are in violation of the APA.

152.    Defendants' actions in violation of the Privacy Act inflict direct and irreparable harm on Plaintiffs, their members, and their supporters by disclosing and threatening to disclose their personal information. As federal courts have long recognized, Plaintiffs and their members have fundamental interests in protecting personal or identifying information from disclosure to the extent possible, and the Privacy Act itself reflects this by prohibiting all disclosures that are not authorized by federal law. *Am. Fed'n of Gov't Emps. v. OPM*, 786 F. Supp. 3d 647, 662 (S.D.N.Y. 2025) (first citing Pub. L. No. 93-579 ("Privacy Act"), § 2(a)(4), 88 Stat. 1896 (1974); and then *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting))). The Privacy Act's stricter regulation of computerized matching programs recognizes that use of federal records in such programs substantially *heightens* these fundamental interests, as such uses are capable of amassing strands of information rapidly and unbeknownst to the individual. *See, e.g.*, *Fed. Lab. Rels. Auth. v. U.S. Dep't of Navy*, 966 F.2d 747, 754 (3d Cir. 1992) ("A 'web of federal statutory and regulatory provisions,' including the Privacy Act, and supplemented by state laws, that restrict rap sheet dissemination and other compiled computerized information serve[] to bolster the individual's privacy interest." (quoting *U.S. Dep't of Just. v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 764–65 (1989)).

153.    Plaintiffs are entitled to declaratory and injunctive relief pursuant to the APA and the Privacy Act enjoining all agency action to implement the State Citizenship Lists.

53

JA92

**COUNT VI:  VIOLATION OF THE FIRST AND FIFTH AMENDMENTS**

**U.S. Const. amends. I, V**

**(All Defendants)**

154.    Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

155.    The Supreme Court has long recognized that constitutional principles of free speech, free association, equal protection, and due process establish a federal constitutional right to vote free from excessive burdens. *See, e.g.*, *Anderson*, 460 U.S. at 793; *Burdick*, 504 U.S. at 433. In evaluating the constitutionality of an election regulation, courts weigh "the character and magnitude of the asserted injury to the rights protected by the [Constitution] that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).

156.    Where an election regulation "impos[es] severe burdens on plaintiffs' rights" it "must be narrowly tailored and advance a compelling state interest." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). Even more modest burdens "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (internal quotation marks omitted).

157.    The Executive Order unlawfully burdens the right to vote by threatening millions of Americans with arbitrary disenfranchisement and requiring every American to undertake additional and unspecified efforts to vote by mail or absentee. This burden manifests in numerous ways.

158.    *First*, § 2(a) of the Order requires the Secretary of the Department of Homeland Security "to compile and transmit to the chief election official of each State a list of individuals confirmed to be United States citizens who" meet the Order's definition of voter eligibility. E.O. § 2(a). This "State Citizenship List," according to the Order, will be derived from "Federal citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases," and will be transmitted to the States "no fewer than 60 days before each regularly scheduled Federal election." *Id.*; *see also* § 4(c) (directing DHS to implement this mandate).

159.    The "State Citizenship List," however, is guaranteed to be incomplete and inaccurate. Most obviously, it will exclude individuals who become U.S. citizens within 60 days of an election—who are eligible to vote, but will not be on the list at the time the Order mandates its transmission to the States. The list will also exclude individuals whose information is erroneously reported in the "SAVE" database and other "Federal databases" from which it is compiled. *See supra* § IV.A (discussing potential sources of error in the State Citizenship List). Thus, the Order essentially mandates the provision of an erroneous list of voters, thereby threatening the rights of those voters wrongly omitted from the list. And although the Order directs the Secretary of the Department of Homeland Security to establish procedures for individuals and States to suggest corrections to the list, it does not indicate that any voters will be alerted to their exclusion. A given voter thus may have no way of knowing that the federal government has represented to her home State that she is not eligible to vote, and no opportunity to avail herself of any (as yet undefined) cure provisions.

160.    *Second*, §§ 3(b)(iii) and 3(b)(iv) all but guarantee the disenfranchisement of innumerable voters who rely on mail-in or absentee ballots to participate in the democratic process. Section (3)(b)(iv) requires the Postmaster General to implement rules "specifying that the USPS

shall provide each State with a list of individuals (Mail-In and Absentee Participation List) who are enrolled with the USPS, pursuant to a process specified in the rulemaking directed by this submission, for mail-in or absentee ballots provided by each State." E.O. § 3(b)(iv). The Order says nothing about how the USPS may compile the "Mail-In and Absentee Participation List," or what "enrollment" procedures for voters the USPS must develop. The Order thus appears to give the USPS unbridled discretion to exclude any voter from the "Mail-In and Absentee Participation List." It also appears to allow the USPS to define the procedure for voters to "enroll" in the Mail-In and Absentee Participation List. Section 3(b)(iii), in turn, requires the Postmaster General to enact rules "specifying that the USPS shall not transmit mail-in or absentee ballots from any individual unless those individuals have been enrolled on a State-specific list described in subsection (b)(iv)." E.O. § 3(b)(iii). Thus, for an individual voter excluded from the Mail-In and Absentee Participation List, the consequences are severe: that individual will not be able to cast a ballot by mail at all. Moreover, the Order does not require any notice to voters that the USPS has refused to deliver their ballot, potentially leaving them disenfranchised without their knowledge or any opportunity to ensure their vote is counted. *See also* E.O. § 4(a) (directing agencies to implement this mandate).

161.    This is a substantial and unjustified burden. To vote by mail, a voter must first comply with whatever "enrollment" procedure the USPS enacts to secure her place in the Mail-In and Absentee Participation List. The USPS may then determine—based on completely undefined criteria—whether to place the voter on the List. If she is not on the List and attempts to cast her ballot by mail, the USPS will not "transmit" it. E.O. § 3(b)(iii).

162.    Thus, at a bare minimum, the Order requires all voters who wish to vote by mail to comply with a new procedure—which alone may be a significant burden. But this procedure is

56

also highly likely to exclude numerous voters from the process entirely. *See Fla. Democratic Party v. Detzner*, No. 4:16-cv-607-, 2016 WL 6090943, at *6 (N.D. Fla. Oct. 16, 2016) ("If disenfranchising thousands of eligible voters does not amount to a severe burden on the right to vote, then this Court is at a loss as to what does."); *Richardson v. Tex. Sec'y of State*, No. SA-19-CV-00963-OLG, 2019 WL 10945422, at *11 (W.D. Tex. Dec. 23, 2019) (similar).

163.    This hefty burden makes the Order all but impossible to justify, even if there were weighty government interests to support it. But there are not. The Order's requirements are in no way narrowly tailored to advance any compelling governmental interest.

164.    The only interest identified by the Order is the federal government's "duty" to enforce federal statutes that require citizenship to vote in federal elections. *See* E.O. § 1 (citing statutes). But that purported interest fails to justify the burdens because the federal government has no lawful authority to set voter qualifications. *See, e.g.*, *ITCA*, 570 U.S. at 16 (recognizing "the Elections Clause empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them"); *id.* at 26 (Thomas, J., dissenting) (agreeing that "Congress has no role in setting voter qualifications"). While States are free to regulate voting rights of U.S. citizens, the Constitution does not recognize any federal interest in enforcing those limitations. To the contrary, "[a] Congress empowered to regulate the qualifications of its own electorate, Madison warned, could 'by degrees subvert the Constitution.'" *Id.* at 17 (majority op.) (quoting 2 Records of the Federal Convention of 1787, at 250 (M. Farrand rev. ed. 1966)).

165.    Besides, even if the President did have a permissible interest in enforcing prevention of non-citizen voting, courts have found that instances of non-citizen voting are exceedingly rare. *E.g.*, *Mi Familia Vota*, 719 F. Supp. 3d at 966–67. And, given President Trump's own public statements, it is evident that this purported rationale is mere pretext. President Trump

57

JA96

has openly admitted that the true "governmental interest" motivating the Order is to ensure that for the next "50 years," Republicans will "never lose a race." *See supra* ¶ 54. Attempting to disenfranchise voters for partisan advantage is not a legitimate—let alone compelling—governmental interest.

166. Because the Order severely burdens voters without any offsetting justification, it is unconstitutional and may not be enforced.

**COUNT VII: VIOLATION OF THE VOTING RIGHTS ACT**

**52 U.S.C. § 10502(d)**

**(All Defendants)**

167. Plaintiffs incorporate each Paragraph set forth above as if set forth fully herein.

168. In 1970, Congress amended the Voting Rights Act to require that "each State shall provide by law for the casting of absentee ballots for . . . President and Vice President . . . by all duly qualified residents of such State who may be absent from their election district or unit in such State on the day such election is held and who have applied therefor not later than seven days immediately prior to such election." 52 U.S.C. § 10502(d); *see also* Voting Rights Act Amendments of 1970, Pub. L. No. 91-285, § 202, 84 Stat. 314, 316–17.

169. By enacting this amendment, "Congress provided uniform national rules for absentee voting in presidential and vice-presidential elections" in order to "insure a fully effective voice to all citizens in national elections." *Oregon v. Mitchell*, 400 U.S. 112, 134 (1970); *see also Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 367 (D.N.J. 2020) (noting "Congress's requirement that states permit some form of absentee voting").

58

JA97

170.    The Executive Order yanks away the federal right to vote by mail in presidential elections by prohibiting USPS from transmitting ballots from any individuals not "enrolled" with USPS. E.O. § 3(b)(iii); *see id.* § 4(a) (directing agencies to enforce this mandate).

171.    No State, however, has provided by law that absentee voting is contingent on USPS enrollment.

172.    Nor does the Voting Rights Act recognize USPS enrollment as a condition precedent to the right to vote absentee. Any voter who i) is duly qualified to vote under State law, ii) is absent from their election district on Election Day, iii) applied to vote absentee at least seven days before the election, and iv) returned their ballot by the close of polls on Election Day is entitled to have their vote counted in presidential elections, regardless of whether they are enrolled with USPS. *See* 52 U.S.C. § 10502(d). The Executive Order is thus unlawful.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court exercise its equitable authority to grant the following relief:

A.  Declare that E.O. §§ 2(a), 3(b), 4(a), and 4(c) are *ultra vires* and legally void;

B.  Declare that E.O. §§ 3(b) and 4(a) violate the constitutional separation of powers and are not enforceable;

C.  Declare that E.O. §§ 3(b) and 4(a) violate the vertical separation of powers and the Tenth Amendment to the U.S. Constitution and are not enforceable;

D.  Declare that E.O. §§ 2(a), 4(a), and 4(c) violate the Administrative Procedure Act and are "not in accordance with law" and are "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B)-(C);

E.  Declare that E.O. §§ 3(b) and 4(a) violate the Voting Rights Act, 52 U.S.C. § 10502(d), and are not enforceable;

F.  Declare that E.O. §§ 2(a), 3(b), 4(a), and 4(c) violate the First and Fifth Amendments to the U.S. Constitution and are not enforceable;

59

JA98

G.  Preliminarily and permanently enjoin Defendants Trump, EOP, Mullin, DHS, Edlow, USCIS, Bisignano, and SSA from taking any action to implement E.O. § 2(a);

H.  Preliminarily and permanently enjoin Defendants Trump, EOP, Steiner, and USPS from taking any action to implement E.O. § 3(b);

I.  Preliminarily and permanently enjoin Defendants Trump, EOP, Mullin, DHS, Bisignano, SSA, Steiner, USPS, Lutnick, and DOC from taking any action to implement E.O. § 4(a);

J.  Award Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

K.  Grant such other relief as the Court deems just and proper.

60

JA99

Dated: April 1, 2026

Respectfully submitted,

*/s/ Marc E. Elias*

**ELIAS LAW GROUP LLP**
Marc E. Elias (DC 442007)
Lalitha D. Madduri (DC 1659412)
Jacob D. Shelly (DC 90010127)
Christina Ford (DC 1655542)
Max Accardi (DC 90021259)
Kevin R. Kowalewski (NY 5946645)*
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4490
eliasm@elias.law
lmadduri@elias.law
jshelly@elias.law
cford@elias.law
maccardi@elias.law
kkowalewski@elias.law

Tyler L. Bishop (DC 90014111)
1700 Seventh Ave., Suite 2100
Seattle, WA 98101
T: (206) 656-0177
tbishop@elias.law

**Pro hac vice* application forthcoming

*Counsel for Plaintiffs DSCC, DCCC, Democratic National Committee, Democratic Governors Association, Senate Minority Leader Schumer, and House Minority Leader Jeffries*

JA100

# Exhibit A



THE WHITE HOUSE

WASHINGTON

NEWS    GALLERY    LIVESTREAM    INVESTMENTS    SAVE AMERICA    WH WIRE    CONTACT    NEW



⬉ **PRESIDENTIAL ACTIONS**

ENSURING CITIZENSHIP VERIFICATION AND INTEGRITY IN FEDERAL ELECTIONS

Executive Orders

March 31, 2026

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Help America Vote Act of 2002 (52 U.S.C. 20901 *et seq.*), the National Voter Registration Act of 1993 (52 U.S.C. 20501 *et seq.*), and the Federal Government's constitutional obligation to guarantee a republican form of Government to every State in the Union, U.S. Const. Art. IV, Sec. 4, it is hereby ordered:

Section 1.  Purpose and Policy.  The right to vote in Federal elections is reserved exclusively for citizens of the United States under the Constitution and Federal law.  Federal statutes explicitly prohibit non-citizens from registering to vote or voting in Federal elections and impose criminal penalties for violations.  (18 U.S.C. 241; 18 U.S.C. 611; 18 U.S.C. 1015; and 52 U.S.C. 20511).  The Social Security Administration (SSA) maintains records that, in conjunction with the Department of Homeland Security's (DHS) Systematic Alien Verification for Entitlements (SAVE) program under 42 U.S.C. 1320b-7, can assist in verifying identity and Federal election voter eligibility.

The Federal Government has an unavoidable duty under Article II of the Constitution of the United States to enforce Federal law, which includes preventing violations of Federal criminal law and maintaining public confidence in election outcomes.  To enhance election integrity via the United States Mail, additional measures are necessary.  Secure ballot envelope identifiers provide a reliable, auditable mechanism to enforce Federal law without unduly burdening or infringing on the rights of eligible voters.  Unique ballot envelope identifiers, such as bar codes, enable confirmation that only citizens receive and cast ballots, reducing the risk of fraud and protecting the integrity of Federal elections.

JA102

Sec. 2.  Establishment and Transmission of State Citizenship Lists and Prioritization of Investigations and Prosecutions Related to Election Fraud.  (a)  To the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974 (5 U.S.C. 552a), the Secretary of Homeland Security, through the Director of United States Citizenship and Immigration Services and in coordination with the Commissioner of SSA, shall take appropriate action to compile and transmit to the chief election official of each State a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State (State Citizenship List).  The State Citizenship List shall be derived from Federal citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases.  The State Citizenship List shall be updated and transmitted to State election officials no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election.  The Secretary of Homeland Security shall establish procedures to (i) allow individuals to access their individual records as well as to update or correct them in advance of elections; and (ii) enable States to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto.  An individual's identification on the State Citizenship List does not indicate that the individual has been properly registered to vote in the State.  State and Federal laws and State procedures must still be followed for an individual to be registered to vote.  There may be State laws, not reflected in the State Citizenship List, that preclude voter registration, or the individual may choose not to be registered.

(b)  For purposes of this order, an individual is "eligible to vote in a Federal election" if the individual is a citizen of the United States, 18 years of age or older by the date of the upcoming election, and otherwise qualified under the laws of his or her State.  The Attorney General shall prioritize the investigation and, as appropriate, the prosecution of State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election, including under 18 U.S.C. 2(a), 18 U.S.C. 241, 18 U.S.C. 371, 18 U.S.C. 611(a), 18 U.S.C. 1001, 18 U.S.C. 1015, 52 U.S.C. 10307, and 52 U.S.C. 20511.  Similarly, the Attorney General shall prioritize the investigation and, as appropriate, the prosecution of individuals and public or private entities engaged in, or aiding and abetting, the printing, production, shipment, or distribution of ballots to individuals who are not eligible to vote in a Federal election.

Sec. 3.  United States Postal Service Rulemaking on Mail–In and Absentee Ballots.  (a)  The unlawful use of the mail in connection with elections is prohibited by various Federal statutes, including 18 U.S.C. 1341, 18 U.S.C. 1708, 52 U.S.C. 10307, and 52 U.S.C. 20511.

(b)  To ensure the faithful execution of Federal law, protect the integrity of the mail as a medium for transmitting Federal election ballots and establish uniform standards for mail–in or absentee ballot services implemented through the United States Postal Service (USPS), the Postmaster General is hereby directed to initiate a proposed rulemaking pursuant to 39 U.S.C. 401 and other applicable

JA103

authority within 60 days of the date of this order.  The notice of proposed rulemaking shall include, at minimum, the following:

(i)   Proposed provisions specifying that all outbound ballot mail must be mailed in an envelope that:

(A)  is marked as Official Election Mail, including through designated markings provided by USPS for this purpose, such as the Official Election Mail logo, as necessary and appropriate;

(B)  is automation-compatible and bears a unique Intelligent Mail barcode, or successor USPS technology, that facilitates tracking and is consistent with the other requirements of this section; and

(C)  has undergone a mail envelope design review by the USPS to ensure compliance with USPS mailing standards, including barcode placement.

(ii)   Proposed provisions specifying that, no fewer than 90 days prior to a Federal election, any State may choose to notify the USPS if it intends to allow for mail-in or absentee ballots to be transmitted by the USPS.  As part of that notification, any notifying State should further indicate whether it intends to submit to the USPS, no fewer than 60 days before the election, a list of voters eligible to vote in a Federal election in such State to whom the State intends to provide a mail-in or absentee ballot to be transmitted via the USPS.

(iii)  Proposed provisions specifying that the USPS shall not transmit mail-in or absentee ballots from any individual unless those individuals have been enrolled on a State-specific list described in subsection (b)(iv) of this section with the USPS pursuant to this subsection.

(iv)   Proposed provisions specifying that the USPS shall provide each State with a list of individuals (Mail-In and Absentee Participation List) who are enrolled with the USPS, pursuant to a process specified in the rulemaking directed by this subsection, for mail-in or absentee ballots provided by such State, along with unique ballot envelope identifiers, such as bar codes, for mail-in or absentee ballots provided to such individuals.  The preparation and transmission of each State-specific Mail-In and Absentee Participation List shall comply with the Privacy Act and all applicable use agreements.

(v)   Proposed procedures enabling each State to routinely supplement and provide suggested modifications or amendments to the State's Mail-In and Absentee Participation List in advance of any Federal election, consistent with applicable State law.

(c)  The USPS shall coordinate with the USPS Office of Inspector General and the Department of Justice for investigation of suspected unlawful use of the mail involving Federal election materials.

(d)  Any final rule pursuant to this section shall be issued no later than 120 days from the date of this order.

Sec. 4.  Implementation.  (a)  The Secretary of Homeland Security, the Commissioner of SSA, and the Postmaster General shall coordinate with the Secretary of Commerce in effectuating all relevant aspects of the implementation of this order.

JA104

(b)  The Attorney General shall enforce compliance with the applicable Federal statutes referenced herein and provide guidance to election officials, including any instrumentalities thereof; contractors; individuals involved in the administration of Federal elections; or public or private entities engaged in the printing, production, shipment, or distribution of ballots.

(c)  The Secretary of Homeland Security shall, within 90 days of the date of this order, establish the infrastructure necessary to compile, maintain, and transmit the State Citizenship List described in section 2(a) of this order, and shall designate a point of contact within DHS to receive and process requests from individuals and State election officials regarding the relevant State Citizenship List.  The Commissioner of SSA shall provide all necessary citizenship and identity data to the Secretary of Homeland Security in support of this requirement, consistent with applicable law, the Privacy Act, and all applicable use agreements.

Sec. 5.  Enforcement.  The Attorney General and the heads of executive departments and agencies (agencies) with relevant authority shall take all lawful steps to deter and address noncompliance with Federal law, including withholding Federal funds from noncompliant States and localities where such withholding is authorized by law.  Evidence of violations of existing Federal laws by State or local election officials; States or localities, including any instrumentalities thereof; contractors; individuals involved in the administration of Federal elections; or public or private entities engaged in the printing, production, shipment, or distribution of ballots may be referred to the Department of Justice for consideration of investigation or charges under 18 U.S.C. 2(a), 18 U.S.C. 241, 18 U.S.C. 371, 18 U.S.C. 611(a), 18 U.S.C. 1001, 18 U.S.C. 1015, 52 U.S.C. 10307, and 52 U.S.C. 20511.  States and localities should preserve, for a 5-year period, all records and materials — excluding ballots cast — evidencing voter participation in any Federal election (e.g., ballot envelopes, regardless of carrier).

Sec. 6.  Severability.  If any provision of this order, or the application of any provision to any agency, person, or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other agencies, persons, or circumstances shall not be affected thereby.

Sec. 7.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

       DONALD J. TRUMP

THE WHITE HOUSE,

March 31, 2026.

Related

Fact Sheet: President Donald J. Trump Ensures Citizenship Verification and Voter Eligibility in Federal Elections

Fact Sheets | March 31, 2026
Preserving and Protecting the Integrity of American Elections

Presidential Actions, Executive Orders | March 25, 2025
Fact Sheet: President Donald J. Trump Protects the Integrity of American Elections

Fact Sheets | March 25, 2025
The SAVE America Act Is the Most Popular Election Reform in Decades

Releases | March 12, 2026
Protecting The Meaning And Value Of American Citizenship

Presidential Actions | January 20, 2025

1   2   3   ...   61  NEXT PAGE




GET THE FACTS →

**ABOUT**

Administration

Contact

Internships

Stay Informed

Privacy Policy

**MEDIA**

News

Gallery

Video Library

Media Offenders

White House Wire

**INITIATIVES**

Freedom 250

Investments

Working Families Tax Cuts

AI.Gov

DOGE

**SUBSCRIBE TO THE WH NEWSLETTER**

Your email

SIGN UP

Click here or text 45470 to receive updates

# THE WHITE HOUSE

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    Defendants. | Civil Action No. 26-cv-1114 (CJN) |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>    Defendants. | Civil Action No. 26-cv-1132 (CJN) |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>    Defendants. | Civil Action No. 26-cv-1151 (CJN) |

**DEMOCRATIC PARTY PLAINTIFFS' INDEX OF EXHIBITS**

1

JA108

| Exhibit Number | Document Title |
|---|---|
| 1 | Declaration of Lillie Snyder Boss (Apr. 16, 2026) |
| 2 | Declaration of Erik Ruselowski (Apr. 16, 2026) |
| 3 | Declaration of Liberty Schneider (Apr. 16, 2026) |
| 4 | Declaration of Jillian Edelman (Apr. 8, 2026) |
| 5 | Declaration of Hakeem S. Jeffries (Apr. 14, 2026) |
| 6 | Declaration of Charles E. Schumer (Apr. 16, 2026) |
| 7 | Declaration of Ada Shen (Apr. 17, 2026) |
| 8 | Declaration of Carolyn Betensky (Apr. 17, 2026) |
| 9 | Declaration of Danielle Litwak (Apr. 16, 2026) |
| 10 | Expert Declaration of Dr. Kenneth Mayer (Apr. 17, 2026) |
| 11 | Maddie Gannon, *Trump Stops in Battleground Georgia to Talk Economy, Voter ID Ahead of Midterms*, Spectrum News (Feb. 19, 2026), https://perma.cc/TZC6-RH6W |
| 12 | *Fact Sheet: President Donald J. Trump Ensures Citizenship Verification and Voter Eligibility in Federal Elections*, The White House (Mar. 31, 2026), https://perma.cc/PZP7-3Y8Y |
| 13 | *About SAVE*, USCIS (Mar. 3, 2026), https://perma.cc/97LR-VZ5T |
| 14 | Dep't of Homeland Sec., Ref. No. DHS/USCIS/PIA-006(d), *Privacy Impact Assessment for the Systematic Alien Verification for Entitlements "SAVE" Program* (Oct. 31, 2025) |
| 15 | Vittoria Elliott, *DHS's Data Grab Is Getting Citizens Kicked Off Voter Rolls, New Complaint Says*, Wired (Jan. 22, 2026), https://www.wired.com/story/dhs-data-grab-getting-citizens-kicked-off-voter-rolls/ |
| 16 | Fair Elections Ctr., *Eligible Voters at Risk: Examining Changes to USCIS's SAVE System* (July 2025), https://perma.cc/DED4-6VS7 |
| 17 | *Update Citizenship or Immigration Status*, Soc. Sec. Admin. (last visited Apr. 17, 2026), https://perma.cc/PZP7-3Y8Y |
| 18 | Letter from Nancy Morales Gonzalez, Assoc. Gen. Counsel for Soc. Sec. Admin., to Jon Sherman, Litig. Dir. & Senior Couns. for Fair Elections Ctr. (July 13, 2023) |

JA109

| 19 | Jen Fifield, *A Federal Tool to Check Voter Citizenship Keeps Making Mistakes. It Led to Confusion in Texas*, Tex. Trib. (Feb. 13, 2026), https://perma.cc/PZP7-3Y8Y |
|---|---|
| 20 | Alexandra Berzon & Nick Corasaniti, *Initial Review Finds No Widespread Illegal Voting by Migrants, Puncturing a Trump Claim*, N.Y. Times (Jan. 14, 2026), https://www.nytimes.com/2026/01/14/us/politics/noncitizen-voters-save-tool.html |
| 21 | *SAVE: Verification Process*, USCIS (May 22, 2025), https://www.uscis.gov/save/about-save/save-verification-process |
| 22 | *FAQ: How can I change my address or direct deposit information for my Social Security benefits or Supplemental Security Income (SSI) payments?*, Soc. Sec. Admin. (Sep. 20, 2024), https://perma.cc/U93C-RU6Z |
| 23 | Mehreen S. Ismail, *Number and Percentage of State-to-State Movers Increased Between 2021 and 2022*, U.S. Census Bureau (Nov. 21, 2023), https://perma.cc/QF9E-HUS9 |
| 24 | *Naturalization Statistics*, USCIS (Jan. 24, 2025), https://perma.cc/HX6V-CMAH |
| 25 | Olivia B. Waxman, *Voting by Mail Dates Back to America's Earliest Years. Here's How It's Changed Over the Years*, Time (updated Dec. 12, 2023), https://perma.cc/NH33-8WXJ |
| 26 | *Table 5: Applying for an Absentee Ballot, Including Third-Party Registration Drives*, Nat'l Conf. of State Legislatures (Feb. 24, 2026), https://www.ncsl.org/elections-and-campaigns/table-5-applying-for-an-absentee-ballot |
| 27 | *Table 1: States with No-Excuse Absentee Voting*, Nat'l Conf. of State Legislatures (Mar. 10, 2026) (updated Aug. 26, 2025), https://www.ncsl.org/elections-and-campaigns/table-1-states-with-no-excuse-absentee-voting |
| 28 | *Table 2: Excuses to Vote Absentee,* Nat'l Conf. of State Legislatures (updated Aug. 26, 2025), https://www.ncsl.org/elections-and-campaigns/table-2-excuses-to-vote-absentee |
| 29 | U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* (June 2025) (Excerpts) |
| 30 | M.I.T. Election Data & Sci. Lab, *Voting by Mail and Absentee Voting* (Feb. 28, 2024), https://perma.cc/JA6W-PT4V |
| 31 | M.I.T. Election Data & Sci. Lab, *How We Voted in 2024* (July 21, 2025), https://perma.cc/R3PN-EFZF |
| 32 | *Table 12: States with Postage-Paid Election Mail*, Nat'l Conf. of State Legislatures (Jan. 28, 2024), https://www.ncsl.org/elections-and-campaigns/table-12-states-with-postage-paid-election-mail |

3

JA110

| 33 | Lisa Baertlein, *UPS, FedEx Warn They Cannot Carry Ballots Like U.S. Postal Service*, Reuters (Aug. 16, 2020), https://perma.cc/QYS7-QUZQ |
| 34 | *USPS Releases Report on 2024 Election*, U.S. Postal Serv. (Dec. 3, 2024), https://perma.cc/8ZU7-SADA |
| 35 | Dep't of Homeland Sec., *USCIS Budget Overview, FY 2026 & FY 2027* (Apr. 3, 2026) (Excerpts) |
| 36 | Doug Bock Clark & Jen Fifield, *Inside Trump's Effort to "Take Over" the Midterm Elections*, ProPublica (Apr. 13, 2026), https://perma.cc/VNY7-XAUC |
| 37 | Eileen Sullivan, *DOGE Employees Shared Social Security Data, Court Filing Shows*, N.Y. Times (Jan. 21, 2026), https://www.nytimes.com/2026/01/20/us/politics/doge-employees-social-security-data.html |

4

JA111

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

<table>
<tr>
<td>

DSCC, *et al.*,

    Plaintiffs,

       v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

    Defendants.

</td>
<td>

Civil Action No. 26-cv-1114 (CJN)

</td>
</tr>
<tr>
<td>

LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,

    Plaintiffs,

       v.

EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,

    Defendants.

</td>
<td>

Civil Action No. 26-cv-1132 (CJN)

</td>
</tr>
<tr>
<td>

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,

    Plaintiffs,

       v.

EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,

    Defendants.

</td>
<td>

Civil Action No. 26-cv-1151 (CJN)

</td>
</tr>
</table>

**<u>DECLARATION OF LALITHA D. MADDURI IN SUPPORT OF DEMOCRATIC PARTY PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

JA112

1.      I am over the age of 18 and competent to make this declaration. I am an attorney admitted to practice law in the District of Columbia. I am a partner at the law firm of Elias Law Group LLP, and I represent Plaintiffs the Democratic Senatorial Campaign Committee ("DSCC"), the Democratic Congressional Campaign Committee ("DCCC"), the Democratic National Committee ("DNC"), the Democratic Governors Association ("DGA"), and the Democratic leaders of the U.S. Senate and U.S. House of Representatives, Charles E. Schumer and Hakeem S. Jeffries, respectively (collectively, the "Democratic Party Plaintiffs") in this action.

2.      I respectfully submit this declaration in support of the Democratic Party Plaintiffs' motion for a preliminary injunction in the above captioned matter. I submit this declaration to provide the Court with true and correct copies of certain documents in connection with the motion.

3.      In compliance with this Court's local rules, voluminous exhibits have been edited to exclude irrelevant material and to include only the relevant excerpts for this Court's consideration.

4.      In compliance with this Court's local rules, the Democratic Party Plaintiffs will also provide an index of exhibits.

5.      Attached hereto as **Exhibit 1** is a true and correct copy of the April 16, 2026, Declaration of Lillie Snyder Boss ("Snyder Decl.").

6.      Attached hereto as **Exhibit 2** is a true and correct copy of the April 16, 2026, Declaration of Erik Ruselowski ("Ruselowski Decl.").

7.      Attached hereto as **Exhibit 3** is a true and correct copy of the April 16, 2026, Declaration of Liberty Schneider ("Schneider Decl.").

8.      Attached hereto as **Exhibit 4** is a true and correct copy of the April 8, 2026, Declaration of Jillian Edelman ("Edelman Decl.")

9.    Attached hereto as **Exhibit 5** is a true and correct copy of the April 14, 2026, Declaration of Hakeem S. Jeffries ("Jeffries Decl.").

10.    Attached hereto as **Exhibit 6** is a true and correct copy of the April 16, 2026, Declaration of Charles E. Schumer ("Schumer Decl.").

11.    Attached hereto as **Exhibit 7** is a true and correct copy of the April 17, 2026, Declaration of Ada Shen ("Shen Decl.").

12.    Attached hereto as **Exhibit 8** is a true and correct copy of the April 17, 2026, Declaration of Carolyn Betensky ("Betensky Decl.").

13.    Attached hereto as **Exhibit 9** is a true and correct copy of the April 16, 2026, Declaration of Danielle Litwak ("Litwak Decl.").

14.    Attached hereto as **Exhibit 10** is a true and correct copy of the April 17, 2026, Expert Declaration of Dr. Kenneth Mayer ("Mayer Decl.").

15.    Attached hereto as **Exhibit 11** is a true and correct copy of: Maddie Gannon, *Trump Stops in Battleground Georgia to Talk Economy, Voter ID Ahead of Midterms*, Spectrum News (Feb. 19, 2026), https://perma.cc/TZC6-RH6W.

16.    Attached hereto as **Exhibit 12** is a true and correct copy of: *Fact Sheet: President Donald J. Trump Ensures Citizenship Verification and Voter Eligibility in Federal Elections*, The White House (Mar. 31, 2026), https://perma.cc/PZP7-3Y8Y.

17.    Attached hereto as **Exhibit 13** is a true and correct copy of: *About SAVE*, USCIS (Mar. 3, 2026), https://perma.cc/97LR-VZ5T.

18.    Attached hereto as **Exhibit 14** is a true and correct copy of: Dep't of Homeland Sec., Ref. No. DHS/USCIS/PIA-006(d), *Privacy Impact Assessment for the Systematic Alien Verification for Entitlements "SAVE" Program* (Oct. 31, 2025).

3

19.     Attached hereto as **Exhibit 15** is a true and correct copy of: Vittoria Elliott, *DHS's Data Grab Is Getting Citizens Kicked Off Voter Rolls, New Complaint Says*, Wired (Jan. 22, 2026), https://www.wired.com/story/dhs-data-grab-getting-citizens-kicked-off-voter-rolls/.

20.     Attached hereto as **Exhibit 16** is a true and correct copy of: Fair Elections Ctr., *Eligible Voters at Risk: Examining Changes to USCIS's SAVE System* (July 2025), https://perma.cc/DED4-6VS7.

21.     Attached hereto as **Exhibit 17** is a true and correct copy of: *Update Citizenship or Immigration Status*, Soc. Sec. Admin. (last visited Apr. 17, 2026), https://perma.cc/PZP7-3Y8Y.

22.     Attached hereto as **Exhibit 18** is a true and correct copy of: Letter from Nancy Morales Gonzalez, Assoc. Gen. Counsel for Soc. Sec. Admin., to Jon Sherman, Litig. Dir. & Senior Couns. for Fair Elections Ctr. (July 13, 2023).

23.     Attached hereto as **Exhibit 19** is a true and correct copy of: Jen Fifield, *A Federal Tool to Check Voter Citizenship Keeps Making Mistakes. It Led to Confusion in Texas*, Tex. Trib. (Feb. 13, 2026), https://perma.cc/PZP7-3Y8Y.

24.     Attached hereto as **Exhibit 20** is a true and correct copy of: Alexandra Berzon & Nick Corasaniti, *Initial Review Finds No Widespread Illegal Voting by Migrants, Puncturing a Trump Claim*, N.Y. Times (Jan. 14, 2026), https://www.nytimes.com/2026/01/14/us/politics/noncitizen-voters-save-tool.html.

25.     Attached hereto as **Exhibit 21** is a true and correct copy of: *SAVE: Verification Process*, USCIS (May 22, 2025), https://perma.cc/PZP7-3Y8Y.

26.     Attached hereto as **Exhibit 22** is a true and correct copy of: *FAQ: How can I change my address or direct deposit information for my Social Security benefits or Supplemental Security Income (SSI) payments?*, Soc. Sec. Admin. (Sep. 20, 2024), https://perma.cc/U93C-RU6Z.

JA115

27.     Attached hereto as **Exhibit 23** is a true and correct copy of: Mehreen S. Ismail, *Number and Percentage of State-to-State Movers Increased Between 2021 and 2022*, U.S. Census Bureau (Nov. 21, 2023), https://perma.cc/QF9E-HUS9.

28.     Attached hereto as **Exhibit 24** is a true and correct copy of: *Naturalization Statistics*, USCIS (Jan. 24, 2025), https://perma.cc/HX6V-CMAH.

29.     Attached hereto as **Exhibit 25** is a true and correct copy of: Olivia B. Waxman, *Voting by Mail Dates Back to America's Earliest Years. Here's How It's Changed Over the Years*, Time (updated Dec. 12, 2023), https://perma.cc/NH33-8WXJ.

30.     Attached hereto as **Exhibit 26** is a true and correct copy of: *Table 5: Applying for an Absentee Ballot, Including Third-Party Registration Drives*, Nat'l Conf. of State Legislatures (Feb. 24, 2026), https://www.ncsl.org/elections-and-campaigns/table-5-applying-for-an-absentee-ballot.

31.     Attached hereto as **Exhibit 27** is a true and correct copy of: *Table 1: States with No-Excuse Absentee Voting*, Nat'l Conf. of State Legislatures (Mar. 10, 2026), https://www.ncsl.org/elections-and-campaigns/table-1-states-with-no-excuse-absentee-voting.

32.     Attached hereto as **Exhibit 28** is a true and correct copy of: *Table 2: Excuses to Vote Absentee*, Nat'l Conf. of State Legislatures (updated Aug. 26, 2025), https://www.ncsl.org/elections-and-campaigns/table-2-excuses-to-vote-absentee.

33.     Attached hereto as **Exhibit 29** is a true and correct copy of excerpts of: U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* (June 2025).

34.     Attached hereto as **Exhibit 30** is a true and correct copy of: M.I.T. Election Data & Sci. Lab, *Voting by Mail and Absentee Voting* (Feb. 28, 2024), https://perma.cc/JA6W-PT4V.

35. Attached hereto as **Exhibit 31** is a true and correct copy of: M.I.T. Election Data & Sci. Lab, *How We Voted in 2024* (July 21, 2025), https://perma.cc/R3PN-EFZF.

36. Attached hereto as **Exhibit 32** is a true and correct copy of: *Table 12: States with Postage-Paid Election Mail,* Nat'l Conf. of State Legislatures (Jan. 28, 2024), https://www.ncsl.org/elections-and-campaigns/table-12-states-with-postage-paid-election-mail.

37. Attached hereto as **Exhibit 33** is a true and correct copy of: Lisa Baertlein, *UPS, FedEx Warn They Cannot Carry Ballots Like U.S. Postal Service*, Reuters (Aug. 16, 2020), https://perma.cc/QYS7-QUZQ.

38. Attached hereto as **Exhibit 34** is a true and correct copy of: *USPS Releases Report on 2024 Election*, U.S. Postal Serv. (Dec. 3, 2024), https://perma.cc/8ZU7-SADA.

39. Attached hereto as **Exhibit 35** is a true and correct copy of excerpts of: Dep't of Homeland Sec., *USCIS Budget Overview, FY 2026 & FY 2027* (Apr. 3, 2026).

40. Attached hereto as **Exhibit 36** is a true and correct copy of: Doug Bock Clark & Jen Fifield, *Inside Trump's Effort to "Take Over" the Midterm Elections*, ProPublica (Apr. 13, 2026), https://perma.cc/VNY7-XAUC.

41. Attached hereto as **Exhibit 37** is a true and correct copy of: Eileen Sullivan, *DOGE Employees Shared Social Security Data, Court Filing Shows*, N.Y. Times (Jan. 21, 2026), https://www.nytimes.com/2026/01/20/us/politics/doge-employees-social-security-data.html.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 17, 2026 in Washington, DC,

*/s/ Lalitha D. Madduri*
Lalitha D. Madduri
(DC 1659412)

7

# Exhibit 1

Civil Action No. 26-cv-1114 (CJN) (Lead case)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DSCC, *et al.*,

Plaintiffs,

*v.*

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

Defendants.

Case No. 1:26-cv-01114

## DECLARATION OF LILLIE SNYDER BOSS

I, Lillie Snyder Boss, declare as follows:

1.     I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.     I am the Chief Operating Officer of DSCC. I have served in this role since March 2021. In my role, I oversee DSCC's day-to-day operations. This includes managing the Committee's staff and processes, budget, operations, and initiatives, as well as engaging with all of DSCC's activities as needed. I interact with DSCC's officers and employees at all levels. I also help candidates' campaigns from time to time on their compliance and budget needs.

3.     DSCC, also known as the Democratic Senatorial Campaign Committee, is the Democratic Party's national senatorial committee. Its mission is to elect candidates of the Democratic Party across the country to the U.S. Senate.  In support of its mission, DSCC works with Democratic Senate candidates and their campaigns to encourage and assist Democratic Party members and supporters in registering and successfully casting ballots, and fights to preserve the legal rights of its members and constituents.

1

JA120

4.      DSCC's members include Democratic members of the U.S. Senate, as well as Democratic candidates for U.S. Senate. DSCC currently has members in 46 States (every State except for Indiana, Missouri, Utah and North Dakota). Beyond its formal membership, DSCC's constituency also includes Democratic voters and supporters in all 50 States.

5.      DSCC is actively preparing, budgeting, strategizing, and executing its plans for the 2026 midterm election cycle, which is already underway.

6.      In 2026, there are 35 U.S. Senate seats up for election. The States in which DSCC's members are competing for office in 2026 include: Alabama, Alaska, Arkansas, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Virginia, West Virginia, and Wyoming.

7.      Both DSCC itself and DSCC's members who are candidates for office have an interest in a fair and lawful electoral process for its' members campaigns. Even if DSCC's members succeed in their campaigns, DSCC and its members are harmed by unlawful election rules, as they deprive DSCC and its candidate members of a fair process and an accurate result. That is especially true in years like this one, when the Democratic Party hopes to regain a majority in the U.S. Senate.

**I.      The New E.O.'s Restrictions on Voting by Mail**

8.      On March 31, 2026, President Trump signed an Executive Order (E.O.) titled "*Ensuring Citizenship Verification and Integrity in Federal Elections.*" Section 3(b) of that E.O. purports to give the USPS control over which voters will be eligible to vote a mail ballot via the

JA121

U.S. mail—an extraordinary and unprecedented attempt by the President to transform American elections.

9.      Specifically, Section 3(b) directs the Postmaster General to "initiate a proposed rulemaking" that "shall include, at minimum" a mandate that USPS provide each state with a "Mail-In and Absentee Participation List" of individuals "who are enrolled with the USPS" for "mail-in or absentee ballots" in such state. E.O. § 3(b)(iv). Under the E.O., USPS "shall not transmit mail-in or absentee ballots from any individual" unless that individual appears on the "Mail-In and Absentee Participation List" that USPS has created. *Id.* § 3(b)(iii). The Order does not specify exactly how USPS will determine which individuals appear on the "Mail-In and Absentee Participation List," but it is clear the USPS will have control over such list. Indeed, although states may provide "suggested modifications" to the list, the E.O. does not state that USPS will be required to accept those suggestions. *Id.* § 3(b)(v).

10.     Under the E.O., it is unclear whether voters themselves would have any ability to attempt to add themselves to USPS's "Mail-In and Absentee Participation List" if they believe they are eligible to vote by mail under their own state's laws. Whether or not such a mechanism exists, at a minimum, voters who wish to vote by mail would need to check the list to confirm whether they should expect to receive a ballot via USPS, and attempt to make plans to vote by alternative means if they have been omitted from the list.

11.     The E.O., which fundamentally changes how mail balloting operates, including who would be eligible to receive and send a ballot through the U.S. mail, poses a direct threat to DSCC, DSCC's members, and DSCC's constituents who vote by mail, as well as to DSCC's basic programming and voter turnout strategies.

12.     Section 3(b) of the E.O. will require a fundamental restructuring of several of

DSCC's core programs and poses a severe risk to DSCC's success in the 2026 election cycle and beyond. Indeed, it is clear from President Trump's decade-long attack on mail voting that a significant motivation for the new E.O.—much like the last one—is to harm his political opponents, including DSCC and its candidates.

13.    DSCC is heavily focused on encouraging its constituents to vote, including by mail, and making sure they have the knowledge and resources to do so successfully. Particularly since the pandemic, DSCC has expended significant resources to encourage voters to vote by mail, recognizing that voting by mail is often the least burdensome or most accessible way for voters to participate.

14.    For some voters, voting by mail is the only reasonable option by which they may participate in elections; this may be because they are away from home, or because they have demanding schedules or other challenges that make it more difficult (and, sometimes, impossible) for them to vote in person. For all of these reasons, many of DSCC's members themselves (who are voters in their respective home states) have voted by mail in past elections and are likely to do so again in future elections.

15.    In recent years, DSCC has dedicated significant staff time and resources to developing a comprehensive mail voting program that encompasses voter education, voter assistance, and ballot-cure programs to ensure its constituents are able to cast mail ballots and have them counted. DSCC also funds programs that identify and contact mail voters who have not yet returned their ballot as election day approaches to encourage them to do so. Each federal election cycle, DSCC invests millions of dollars in these programs.

16.    These programs are built based upon our expectation that voters who are eligible to vote by mail under their respective state's laws and wish to do so will in fact be able to cast a mail

4

JA123

ballot via USPS and have that ballot counted. These programs take significant planning and will soon be underway for the 2026 elections.

17.    President Trump's mandate that USPS not transmit a mail ballot for any voter who is not enrolled on USPS's "Mail-In and Absentee Participation List" functionally imposes new requirements to cast a mail ballot, making it harder for DSCC's members and constituents to vote and potentially disenfranchising them altogether if the federal government decides that they are not eligible to cast a ballot via U.S. mail.

18.    The E.O. is especially concerning for DSCC's constituents who are members of the military, their families, Democrats who live abroad, and countless others who rely on voting by mail, including those who are sick or disabled and cannot physically travel in person to cast a ballot. The impact will also fall particularly hard on voters in states where elections are conducted primarily by mail, including States like Oregon and Colorado, where the DSCC has elections this year.

19.    In the last several election cycles, Democrats have been more likely to vote by mail than Republican voters, and DSCC expects that trend to continue. Because the E.O. imposes new restrictions on voting by mail, the E.O. puts DSCC and DSCC's members who are running for election at a competitive disadvantage. Indeed, the E.O. is all but certain to leave some of DSCC's constituents unable to vote by mail altogether. Several of DSCC's members will compete in extremely competitive elections decided by a small number of votes, and the E.O.'s restrictions on mail ballots could be decisive in some of these races. The added burdens on voters to cast mail ballots are not an accidental byproduct of the E.O.—they are likely the intended result.

20.    At this point in the election cycle, DSCC is deep into preparation for the general election and has already made investments into voter education and voter targeting programs.

5

JA124

Those programs are, again, built upon existing mail balloting rules. The E.O., however, either wastes or significantly compromises DSCC's investments in existing programs and efforts like this.

21.    To run effective campaigns, candidates need to know that the rules of the road are clear—and, this year, many Senate candidates have already made investments of resources in their races based on the existing rules, including that voters who are eligible to cast mail ballots will be able to do so.

22.    The E.O. fundamentally disrupts DSCC's efforts to plan for the general election and significantly disrupts the electoral playing field more broadly. It is now far more difficult for DSCC and its members to effectively complete planning and execute DSCC's mail voting strategy because, among other things, the E.O. mandates seismic changes to who may be eligible to receive and cast a ballot via the U.S. mail. The resulting fallout directly impacts DSCC's core operations, including at the most fundamental level.

23.    To give just one example, the E.O.'s changes to mail voting call into question DSCC's voter targeting plans. DSCC targets voters based on how likely DSCC believes a certain voter is likely to vote. Under the E.O., however, DSCC's existing voter targeting plans are compromised, as it is difficult to know whether someone who is a regular vote-by-mail voter will vote if they are not included on USPS's list. This type of issue—which would not exist absent the E.O.—directly frustrates DSCC's ability to make important strategic decisions as to how to operate in the 2026 midterms and compromises investments DSCC has already made for the 2026 cycle.

24.    The E.O. also undermines DSCC's current voter education strategy and DSCC's existing voter scripts. When DSCC talks to voters, DSCC tells them how they can vote in their particular state. At a minimum, the E.O. will require DSCC to change these voter scripts, and it

6

JA125

will also require changes to DSCC's basic voter education strategies.

25.      In short, DSCC has already put significant work into its existing programming and voter turnout strategies for 2026, and those plans are compromised under the E.O. DSCC cannot wait months to make changes to these programs; because these programs and strategies take months to build and execute, if the E.O. is not enjoined several months before mail ballots are sent (which begins in early September 2026 for the 2026 general election), DSCC will be forced to re-allocate investments and re-tool their existing programs to address the changes to mail balloting, and the effect those changes are likely to have on DSCC's voters.

26.      In addition to undermining DSCC's existing programs, to counteract the harm from the E.O., DSCC will be required to develop *new* programs to assist voters in checking whether they are "enrolled" in USPS's "Mail-In and Absentee Participation List" and assisting voters in figuring out how to vote if they are no longer permitted to vote by mail via the USPS. In light of the E.O., DSCC will need to re-evaluate the extent to which it should promote its mail balloting programs. And it will be forced to make these adjustments *in the middle* of the electoral cycle, undermining and prejudicing its ability to make concrete strategic plans and implement them effectively.

27.      A significant part of these new programs will have to be oriented towards ameliorating the inevitable confusion that the E.O. will cause voters. Enrollment with the USPS has never been a part of the mail voting process, and if the E.O. is implemented, some of the sweeping changes that it dictates will come while elections are ongoing. Teaching voters about the new requirement and working to ensure it does not deter voters from voting entirely will be a significant challenge.

7

JA126

28.     Inevitably, even with DSCC's best efforts, voters will be confused, discouraged from voting, and even disenfranchised. For some voters, voting by another method may not be possible at all, especially for those who are not located in-state or have physical, health, or economic limitations that prevent them from voting in-person. And because voters who support Democrats are more likely to vote by mail, DSCC and its candidate members will be harmed. Indeed, this appears to be by design, as the President attempts to change the rules of voting to make it harder for the Democratic Party to retake control of the U.S. Senate.

29.     These new education and voter assistance programs, which would be wholly unnecessary absent the E.O., will come at a significant cost. Because DSCC has not budgeted for such extensive new programs, DSCC will have to scale back or cut the initiatives that it currently has planned for persuading and mobilizing voters to elect Democratic candidates to the Senate.

30.     The resources DSCC has to elect its candidates are finite in any given election cycle. Resources that must be diverted to responding to a seismic change like those contained in President Trump's E.O. necessarily come at the cost of other of DSCC's mission-critical planned activities and expenditures.

31.     If DSCC is required to deploy these resources at any point from now until election day, it will present a lost opportunity for the Party. There are only seven months until election day, and approximately only five months before mail ballots will start to be sent to voters, and there are many primary elections this spring and summer in the run up to November.

32.     Every day and every resource during this critical time that DSCC must spend addressing the impending changes to mail balloting represents a lost opportunity to persuade voters and galvanize supporters that cannot be restored once lost.

8

JA127

II.   **The E.O.'s Creation and Dissemination of "State Citizenship Lists" for Use in Federal Elections**

33.   DSCC, DSCC's members, and DSCC's constituents are also harmed by Section 2(a) of President Trump's E.O., which directs the Department of Homeland Security (DHS) to compile for each State a list of every confirmed U.S. citizen above the age of 18 for upcoming federal elections who resides in that State and to share those lists with the chief election official of each state "no fewer than 60 days before each regularly scheduled Federal election," which would include the 2026 general election.

34.   The E.O. does not explicitly identify the intended use of these lists, but the E.O.'s stated purpose is to assist in "verifying" voter eligibility. The real impact of the lists, however, would be invasions of voter privacy, voter confusion, and likely disenfranchisement of qualified American citizens—all of which comes at DSCC and its members' expense, and just as the President likely intended.

35.   Section 2(a) of the E.O. is wholly unnecessary. It is illegal for foreign nationals to register and vote in federal elections, and our existing law prevents non-citizens from voting. There is zero evidence of widespread voting by non-citizens in U.S. elections. This E.O. will nonetheless harm DSCC, DSCC's members, and DSCC's constituents given the near certainty some number of U.S. citizens will not be included on such lists.

36.   The E.O. specifies that "State Citizenship Lists" will be derived from a variety of federal databases, including in particular DHS's Systematic Alien Verification for Entitlements (SAVE) program and Social Security Administration (SSA) records.

37.   Based on public reporting and the agencies' own reports, I understand that SSA records are often outdated or inaccurate because the agency has not consistently maintained and

9

JA128

does not consistently update such records. And based on similar reporting, I understand that the SAVE database also contains outdated information, particularly for naturalized citizens.

38.    Even if these lists were accurate the moment they are shared with election officials (which will not be the case), they will be outdated virtually the next moment, as voters move within the United States (gaining new residency for voting purposes), gain citizenship, or turn 18 in the months leading up to the election.

39.    DSCC is also particularly concerned about the effect of the State Citizenship Lists on women, who are more likely to support Democratic candidates than men, and who are more likely than men to change their names because of marriage or divorce. Both the creation of these State Citizenship Lists and the attempted matching with of those lists with state voter files will require the attempted matching of names across files. For voters whose names have changed, it may be more difficult to successfully "match" or identify such voters, resulting in their omission from either the State Citizenship Lists or any resulting list a state uses to create a list of eligible voters after those lists are sent to states.

40.    In other words, the creation of these lists using these databases create a serious risk that DSCC's members and supporters who are in fact U.S. citizens will be erroneously not included on such lists and not be permitted to vote, or will face barriers before they are able to have their ballots counted. When fewer of DSCC's members and supporters are able to vote, DSCC and its members' electoral prospects suffer. None of this would happen absent the President's mandate to improperly share flawed information with state and local election officials under the guise of verifying voter eligibility.

41.    Although the E.O. directs DHS to establish procedures for individuals to suggest corrections to the list, it does not indicate that any voters will be alerted to their exclusion. Any

10

JA129

given voter thus may have no way of knowing that the federal government has effectively represented to their home State that they are not eligible to vote, and no opportunity to avail themselves of any (as yet undefined) cure provisions.

42.    And even if the voter is given such opportunity to "correct" the list for their inclusion, doing so will require time and effort. It may also require the voter to produce documentary proof of citizenship (such as a U.S. passport or U.S. birth certificate), which many voters do not have and both of which are expensive and difficult to timely obtain. Given the 60-day window before elections in which states will receive and review these lists, these issues will as a practical matter frustrate Democratic voters' ability to vote and in some cases will disenfranchise them.

43.    Section 2(a) thus threatens the voting rights of any voter who is erroneously excluded from the State Citizenship Lists. In light of the millions of Democratic voters across the United States, there is a serious risk that some of DSCC's members and constituents will be burdened or disenfranchised completely as a result of these lists.

44.    To respond to Section 2(a), DSCC will need to carefully monitor the development of the State Citizenship Lists and will need to have programs in place to help educate its members and constituents as to how they can ensure they are included on the list and get themselves added to the list if they are erroneously omitted.

45.    These voter assistance and voter education programs to address the State Citizenship Lists cannot be created overnight; DSCC must start planning for them imminently for them to be effective and sufficiently resourced.

46.    Just as with the changes to mail balloting, DSCC anticipates that this part of the E.O. will also cause significant confusion for voters. These kinds of citizenship lists will be entirely

JA130

new to the voting process, and this change will come while elections are ongoing. Teaching voters that these lists exist, that they need to confirm they have been properly included as a citizen (and attempt to prove they are a citizen, if they are omitted from the list), and working to ensure that this significant change to the voting process does not deter voters from voting entirely will be a significant challenge. Again, voters will be confused, discouraged from voting, and even disenfranchised.

47.    All of these efforts and changes to counter the harm from the creation and dissemination of State Citizenship Lists, which DSCC would not have to undertake absent the E.O., will require DSCC to expend staff time and other resources that would be dedicated to its other critical programs. These new education and voter assistance programs, which would be wholly unnecessary absent the E.O., will come at a significant cost. Because DSCC has not budgeted for these new, widespread programs, DSCC will have to scale back or cut the initiatives it currently has planned for persuading and mobilizing voters to elect Democratic candidates to the Senate.

48.    If DSCC is required to deploy these resources at any point from now until election day, it will present a lost opportunity for the Democratic Party. There are only seven months until election day, and approximately only five months before the last of State Citizenship Lists are required to be shared with States. Indeed, the E.O. requires those lists to be shared with States "no fewer than 60 days before each regularly scheduled Federal election"—meaning they must be shared between now and early September at the latest for the general election, and much sooner for primary elections happening throughout this year. Every day and every resource that DSCC must spend during this period planning for these voter assistance programs, as well as helping voters check State Citizenship Lists and correcting them, if necessary, represents a lost opportunity

12

JA131

to persuade voters and galvanize supporters that cannot be restored once lost.

49.    Additionally, DSCC is also concerned about Section 2(a)'s threat to the privacy rights of its members and constituents. This part of the E.O. guarantees improper exposure of the personal data of millions of DSCC's members and constituents.

50.    Over the last several months, Democrats have heard from constituents who are extremely concerned about the rapid and seemingly haphazard pace at which DHS and other agencies are making their records readily accessible to a growing list of federal and state officials. DSCC's members and constituents, myself included, are understandably worried about the creation and dissemination of these kinds of lists with voters' personal and sensitive information.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  4/16/2026 _____

*Lillie Snyder Boss*  _____
**Lillie Snyder Boss, Chief Operating Officer**
**DSCC**

13

JA132

# Exhibit 2

Civil Action No. 26-cv-1114 (CJN) (Lead case)

JA133

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DSCC, *et al.*,

                Plaintiffs,

     *v.*

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

                Defendants.

Case No. 1:26-cv-01114

---

**DECLARATION OF ERIK RUSELOWSKI**

---

I, Erik Ruselowski, declare as follows:

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      I am the Chief Operating Officer of DCCC. I first joined DCCC in September 2016. I have served as Chief Operating Officer since February 2022. In my role, I support DCCC's day-to-day operations and manage committee-level initiatives, budgeting, technology, and administration. I engage on an as-needed basis with all of DCCC's activities, and I interact with DCCC's officers and employees at all levels.

3.      DCCC, also known as the Democratic Congressional Campaign Committee, is the Democratic Party's national congressional committee. Its mission is to elect candidates of the Democratic Party from across the country to the U.S. House of Representatives. DCCC pursues its mission by working with Democratic House candidates and campaigns to encourage and assist Democratic Party members and constituents in registering and successfully casting ballots, and by preserving the legal rights of its members and constituents.

1

JA134

4.    DCCC's members include all Democratic members of the U.S. House, as well as Democratic candidates for U.S. House. DCCC currently has members in all States. Beyond its formal membership, DCCC's constituency also includes Democratic voters and supporters throughout the country.

5.    DCCC is actively planning, preparing, budgeting, strategizing, and executing its plans for the upcoming 2026 midterm election cycle, which is already underway. In 2026, all U.S. House seats across the United States are up for election. As of today, DCCC has members who are Democratic candidates for the U.S. House in all 50 States.[1]

6.    Through its "Frontline" program, DCCC provides Democratic members of Congress from competitive seats resources and support to execute effective reelection campaigns. For the 2026 election, DCCC is currently supporting 24 candidates in 14 states through this program, including in California, Connecticut, Indiana, Michigan, North Carolina, New Jersey, New Mexico, Nevada, New York, Ohio, Oregon, Texas, Virginia, and Washington.

7.    DCCC is also spending resources to defeat Republicans in other competitive congressional districts around the country including, for example, in states like Arizona, Iowa, Michigan, North Carolina, Pennsylvania, Tennessee, Virginia, and Wisconsin.

8.    Both DCCC itself and DCCC's members who are candidates for office have an interest in a fair and lawful electoral process for its members' campaigns. Even if DCCC's members succeed in their campaigns, DCCC and its members are harmed by unlawful election rules, as they deprive DCCC and its candidate members of a fair process and an accurate result.

---

[1] At the time of the filing of the Complaint, DCCC had members in 49 States (all but Wyoming). *See* Compl. ¶ 12. DCCC now has a member in Wyoming who is running for U.S. House in 2026.

JA135

That is especially true in years like this one, when the Democratic Party hopes to regain a majority in the U.S. House of Representatives.

### I.      The New E.O.'s Restrictions on Voting by Mail

9.      On March 31, 2026, President Trump signed an Executive Order (E.O.) titled "*Ensuring Citizenship Verification and Integrity in Federal Elections*." Section 3(b) of that E.O. purports to give the U.S. Postal Service control over which voters will be eligible to vote a mail ballot via the U.S. Postal Service—an extraordinary and unprecedented attempt by the President to transform American elections.

10.      Specifically, Section 3(b) directs the Postmaster General to "initiate a proposed rulemaking" that "shall include, at minimum" a mandate that USPS provide each state with a "Mail-In and Absentee Participation List" of individuals "who are enrolled with the USPS" for "mail-in or absentee ballots" in such state. E.O. § 3(b)(iv). Under the E.O., USPS "shall not transmit mail-in or absentee ballots from any individual" unless that individual appears on the "Mail-In and Absentee Participation List" that USPS has created. *Id.* § 3(b)(iii). The Order does not specify exactly how USPS will determine which individuals appear on the "Mail-In and Absentee Participation List," but it is clear the USPS will have control over such list. Indeed, although states may provide "suggested modifications" to the list, the E.O. does not state that USPS will be required to accept those suggestions. *Id.* § 3(b)(v).

11.      Under the E.O., it is unclear whether voters themselves would have any ability to attempt to add themselves to USPS's "Mail-In and Absentee Participation List" if they believe they are eligible to vote by mail under their own state's laws. Whether or not such a mechanism exists, at a minimum, voters who wish to vote by mail would need to check the list to confirm

3

JA136

whether they should expect to receive a ballot via USPS, and attempt to make plans to vote by alternative means if they have been omitted from the list.

12.     The E.O., which fundamentally changes how mail balloting operates, including who would be eligible to receive and send a ballot through the U.S. mail, poses a direct threat to DCCC, DCCC's candidate members, and millions of DCCC's constituents who vote by mail, as well as to DCCC's basic programming and voter turnout strategies.

13.     Section 3(b) of the E.O. will require a fundamental restructuring of several of DCCC's core programs and poses a severe risk to DCCC's success in the 2026 election cycle and beyond. Indeed, it is clear from President Trump's decade-long attack on mail voting that a significant motivation for the new E.O.—much like his last one—is to harm his and the Republican Party's political opponents, including DCCC and its candidates.

14.     DCCC is heavily focused on encouraging Democratic voters to vote, including by mail, and making sure they have the knowledge and resources to do so successfully. Particularly since the pandemic, DCCC has expended significant resources to encourage voters to vote by mail, recognizing that voting by mail is often the least burdensome or most accessible way for voters to participate and have their voices heard in the elections in which they are qualified to vote.

15.     For some voters, voting by mail is the only reasonable option by which they may participate in elections; this may be because they are away from home, or because they have demanding schedules or other challenges that make it more difficult (and, sometimes, impossible) for them to vote in person. For all of these reasons, many of DCCC's members have themselves relied on voting by mail in past elections and are likely to do so again in future elections.

16.     In recent years, DCCC has dedicated significant staff time and resources to developing a comprehensive education, assistance, and ballot-cure program to ensure Democratic

JA137

voters are able to cast mail ballots and have them counted. DCCC also funds programs that identify and contact mail voters who have not yet returned their ballot as election day approaches to encourage them to do so. These programs are built based upon our expectation that voters who are eligible to vote by mail under their respective states' laws and wish to do so will in fact be able to use USPS to receive and send a mail ballot and have that ballot counted. Many of these programs are in the final stages of planning and will be soon underway for the 2026 elections.

17.    President Trump's mandate that the U.S. Postal Service not transmit a mail ballot for any voter who is not enrolled on the U.S. Postal Service's "Mail-In and Absentee Participation List" functionally imposes new requirements to cast a mail ballot, making it harder for DCCC's members and constituents to vote and potentially disenfranchising them altogether if the U.S. Postal Service deems that voter "ineligible" to cast a ballot via U.S. mail.

18.    The E.O. is especially concerning for DCCC's constituents who are members of the military, their families, Democrats who live abroad, and countless others who rely on voting by mail, including those who are sick or disabled and cannot physically travel in person to cast a ballot. The impact will also fall particularly hard on voters in states where elections are conducted primarily by mail, such as California, Colorado, Nevada, Oregon, and Washington. Those states have many competitive elections for the U.S. House in 2026.

19.    In the last several election cycles, Democrats have been more likely to vote by mail than Republican voters, and DCCC expects that trend to continue. For that reason, the E.O. clearly puts both DCCC and its members who are running for election at a competitive disadvantage.

20.    DCCC and its members will be disadvantaged by the extra steps the E.O. imposes on their constituents to vote using the U.S. mail, and even worse, the E.O. is all but certain to leave some of DCCC's constituents unable to vote by mail altogether.

5

JA138

21.     Several of DCCC's members will compete in extremely competitive elections decided by a small number of votes, and the E.O.'s restrictions on mail ballots could be decisive in some of these races. The added burdens on voters to cast mail ballots are not an accidental byproduct of the E.O.—it is likely the intended result.

22.     At this point in the election cycle, DCCC is in the final stages of preparation for its mail-ballot programs in multiple states. In fact, DCCC had already made critical budget decisions to about where to focus its efforts, and mail ballot programs are critical components of its strategy in many places. Moreover, in some states like New Mexico, DCCC and its candidate members have *already* implemented programs for the upcoming primary election aimed at ensuring supporters return their ballots via the mail—in part to test-run and fine-tune their programs ahead of the general election in the fall. Those programs are, again, built upon existing mail balloting rules. The E.O., however, either wastes or significantly compromises DCCC's investments in existing programs and efforts like this.

23.     In the days since President Trump issued the E.O. on March 31, 2026, DCCC's leadership team has been forced to immediately start grappling with how Section 3(b) will impact the Democratic Party's outreach, assistance, and programs for the 2026 general election.

24.     The E.O. fundamentally disrupts DCCC's efforts to plan for the general election and significantly disrupts the electoral playing field more broadly. It is now far more difficult for DCCC and its members to effectively complete planning and execute DCCC's mail voting strategy because, among other things, the E.O. mandates seismic changes to who may be eligible to receive and cast a ballot via the U.S. mail. The resulting fallout directly impacts DCCC's core operations, including at the most fundamental level. To give just one example, the E.O.'s changes to mail balloting compromise polling data that DCCC and its members commissioned and rely on to

6

JA139

determine mail voting patterns that guide its plans for 2026. This type of issue—which would not exist absent the E.O.—directly frustrates DCCC's ability to make important strategic decisions as to how to operate in the 2026 midterms and compromises investments DCCC has already made for the 2026 cycle.

25.    In short, DCCC has already put significant work into its existing programming and voter turnout strategies for 2026, and those plans are compromised under the E.O. DCCC cannot wait months to make changes to these programs; because these programs and strategies take months to build and execute, if the E.O. is not enjoined several months before mail ballots are sent (which begins in early September 2026 for the 2026 general election), DCCC will be forced to re-allocate investments and re-tool their existing programs to address the changes to mail balloting, and the effect those changes are likely to have on DCCC's voters.

26.    In addition to undermining DCCC's existing programs, to counteract the harm from the E.O., DCCC will be forced to develop *new* programs to assist voters in checking whether they are "enrolled" in the U.S. Postal Service's "Mail-In and Absentee Participation List" and assisting voters in figuring out how to vote if they are no longer permitted to vote by mail via the U.S. Postal Service. For some voters, voting by another method may not be possible at all, especially if they are not currently located in-state or have physical, health, or economic limitations that prevent them from voting in-person.

27.    These voter assistance and voter education programs to address the changes to mail balloting cannot be created overnight; DCCC must start planning for them imminently for them to be executed effectively and sufficiently resourced.

28.    A significant part of these new programs will have to be oriented towards ameliorating the inevitable confusion that the E.O. will cause voters. Enrollment with the U.S.

7

JA140

Postal Service has never been a part of the mail voting process, and, if the E.O. is implemented, some of the sweeping changes that it dictates will come while elections are *ongoing*. Teaching voters about the new requirement and working to ensure it does not deter voters from voting entirely will be a significant challenge. Inevitably, even with DCCC's best efforts, voters will be confused, discouraged from voting, and even disenfranchised. And because voters who support Democrats are more likely to vote by mail, DCCC and its candidate members will be harmed. Indeed, this appears to be by design, as the President attempts to change the rules of voting to make it harder for the Democratic Party to retake control of the House of Representatives.

29.    DCCC expects that any new programs that it must create and launch as a result of the E.O. will be particularly difficult—and expensive—to implement in states where vote by mail has become the norm and voters receive mail ballots as a matter of course. The E.O. will also cause significant confusion for voters in those States. In some states that primarily rely on mail voting, including Nevada, receiving a vote-by-mail ballot is so expected that voters must *opt out* of receiving one. The E.O., however, will turn this expectation on its head, functionally requiring voters to *confirm* that they are on USPS's list or find themselves without a way to vote at the last minute.

30.    Before any election season, DCCC also works to analyze voting patterns and anticipate whether there are sufficient early voting and in-person voting locations to support the electorate. When DCCC or its candidate members identify jurisdictions that need additional voting locations, DCCC attempts to work with local election officials to resolve the problem. This work must be done well in advance of in-person voting—jurisdictions typically determine the number and location of voting locations several months in advance of the start of voting for any particular election—and DCCC has already performed some of this analysis for 2026 based on its current

expectations of voting patterns. If Section 3(b) of the E.O. is not enjoined soon, DCCC will need to revisit whether states have sufficient in-person capacity to handle the anticipated shift to in-person voting, particularly in states that primarily rely on vote by mail to conduct elections. In such a scenario, DCCC and its candidate members will need to identify areas where in-person voting will become particularly congested and attempt to work with local election officials to ameliorate the problem, to the extent that is even possible.

31.     These new education and voter assistance programs, which would be wholly unnecessary absent the E.O., will come at a significant cost. Because DCCC has not budgeted for these extensive new programs, it will have to scale back or cut the initiatives that it currently has planned for persuading voters and mobilizing our members and constituents to elect Democratic candidates to the House.

32.     The resources DCCC has to elect its candidates are finite in any given election cycle. Resources that must be diverted to responding to a seismic change like those contained in President Trump's E.O. necessarily come at the cost of other of DCCC's mission-critical planned activities and expenditures.

33.     If DCCC is required to deploy these resources at any point from now until election day, it will present a lost opportunity for the Party. There are only seven months until election day, and approximately only five months before mail ballots will start to be sent to voters, and there are many primary elections this spring and summer in the run up to November.

34.     Every day and every resource during this critical time that DCCC must spend addressing the impending changes to mail balloting represents a lost opportunity to persuade voters and galvanize supporters that cannot be restored once lost.

JA142

## II.    The E.O.'s Creation and Dissemination of State Citizenship Lists for Use in Federal Elections

35.    DCCC, DCCC's members, and DCCC's constituents are also harmed by Section 2(a) of President Trump's E.O., which directs the Department of Homeland Security (DHS) to compile for each State a list of every U.S. citizen above the age of 18 for upcoming federal elections who resides in that State and to share those lists with the chief election official of each state "no fewer than 60 days before each regularly scheduled Federal election," which would include the 2026 general election.

36.    The E.O. does not explicitly identify the intended use of these lists, but the E.O.'s stated purpose is to assist in "verifying" voter eligibility. The real impact of the lists, however, would be invasions of voter privacy, voter confusion, and likely disenfranchisement of qualified American citizens—all of which comes at DCCC and its members' expense, and just as the President likely intended.

37.    Section 2(a) of the E.O. is wholly unnecessary. It is illegal for foreign nationals to register and vote in federal elections, and our existing law prevents non-citizens from voting. There is zero evidence of widespread voting by non-citizens in U.S. elections. The E.O. will nonetheless harm DCCC, DCCC's members, and DCCC's constituents given the near certainty that some number of U.S. citizens will not be included on such lists.

38.    The E.O. specifies that the "State Citizenship Lists" will be derived from a variety of federal databases, including in particular DHS's Systematic Alien Verification for Entitlements (SAVE) program and Social Security Administration (SSA) records.

39.    Based on public reporting and the agencies' own reports, I understand that SSA records are often outdated or inaccurate because the agency has not consistently maintained and

JA143

does not consistently update such records. And based on similar reporting, I understand that the SAVE database also contains outdated information, particularly for naturalized citizens.

40. Even if these lists were accurate the moment they are shared with election officials (which will not be the case), they will be outdated virtually the next moment, as voters move within the United States (gaining new residency for voting purposes), gain citizenship, or turn 18 in the months leading up to the election.

41. DCCC is also particularly concerned about the effect of the State Citizenship Lists on women, who are more likely to support Democratic candidates than men, and who are more likely than men to change their names because of marriage or divorce. Both the creation of these State Citizenship Lists and the attempted matching with of those lists with state voter files will require the attempted matching of names across files. For voters whose names have changed, it may be more difficult to successfully "match" or identify such voters, resulting in their omission from either the State Citizenship Lists or any resulting list a state uses to create a list of eligible voters after those lists are sent to states.

42. In other words, the creation of these lists using these databases create a serious risk that DCCC's members and supporters who are in fact U.S. citizens will be erroneously excluded from such lists and not be permitted to vote, or will face barriers before they are able to have their ballots counted. When fewer of DCCC's members and supporters are able to vote, DCCC and its members' electoral prospects suffer. None of this would happen absent the President's mandate to improperly share flawed information with state and local election officials under the guise of verifying voter eligibility.

43. Although the E.O. directs DHS to establish procedures for individuals to suggest corrections to the list, it does not indicate that any voters will be alerted to their exclusion. Any

11

JA144

given voter thus may have no way of knowing that the federal government has represented to their home State that they are not eligible to vote, and no opportunity to avail themselves of any (as yet undefined) cure provisions.

44.    And even if the voter is given such opportunity to "correct" the list for their inclusion, doing so will require time and effort. It may also require the voter to produce documentary proof of citizenship (such as a U.S. passport or U.S. birth certificate), which many voters do not have and both of which are generally expensive and difficult to timely obtain. Given the 60-day window before elections in which states will receive and review these lists, these issues will as a practical matter frustrate the ability to vote of DCCC's members and constituents and in some cases will disenfranchise them.

45.    Section 2(a) thus threatens the voting rights of any voter who is erroneously excluded from the State Citizenship Lists. In light of the millions of Democratic voters across the United States, there is a serious risk that some of DCCC's members and constituents will be burdened or disenfranchised completely as a result of these lists.

46.    To respond to Section 2(a), DCCC will need to carefully monitor the development of the State Citizenship Lists and will need to have programs in place to help educate its members and constituents as to how they can ensure they are included on the list and get themselves added to the list if they are erroneously omitted.

47.    These voter assistance and voter education programs to address the State Citizenship Lists cannot be created overnight; DCCC must start planning for them imminently for them to be effective and sufficiently resourced.

48.    Just as with the changes to mail balloting, DCCC anticipates that this part of the E.O. will cause significant confusion for voters. These kinds of citizenship lists will be entirely

12

JA145

new to the voting process, and this change will come while elections are ongoing. Teaching voters that these lists exist, that they need to confirm they have been properly included as a citizen (and attempt to prove they are a citizen, if they are omitted from the list), and working to ensure that this significant change to the voting process does not deter voters from voting entirely will be a significant challenge. Again, voters will be confused, discouraged from voting, and even disenfranchised.

49.     All of these efforts and changes to counter the harm from the creation and dissemination of State Citizenship Lists, which DCCC would not have to undertake absent the E.O., require DCCC to expend staff time and other resources that would be dedicated to its other critical programs. These new education and voter assistance programs, which would be wholly unnecessary absent the E.O., will come at a significant cost. Because DCCC has not budgeted for these new, widespread programs, we will have to scale back or cut the initiatives we currently have planned for persuading voters and mobilizing our members and constituents to elect Democratic candidates to the U.S. House.

50.     If DCCC is required to deploy these resources at any point from now until election day, it will present a lost opportunity for the Democratic Party. There are only seven months until election day, and approximately only five months before the last of State Citizenship Lists are required to be shared with States. Indeed, the E.O. requires those lists to be shared with States "no fewer than 60 days before each regularly scheduled Federal election"—meaning they must be shared between now and early September at the latest for the general election, and much sooner for primary elections happening all the time. Every day and every resource that DCCC must spend during this period planning for these voter assistance programs, as well as helping voters check those lists and correcting them, if necessary, represents a lost opportunity to persuade voters and

13

JA146

galvanize supporters that cannot be restored once lost.

51.     DCCC is also concerned about Section 2(a)'s threat to the privacy rights of its members and constituents. This part of the E.O. guarantees improper exposure of the personal data of millions of DCCC's members and constituents.

52.     Over the last several months, Democrats have heard from constituents who are extremely concerned about the rapid and seemingly haphazard pace at which DHS and other agencies are making their records readily accessible to a growing list of federal and state officials. DCCC's members and constituents, myself included, are understandably worried about the creation and dissemination of these kinds of lists with voters' personal and sensitive information.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 4/16/2026
_____

_Erik Ruselowski_
_____
Erik Ruselowski, Chief Operating Officer
DCCC

14

JA147

# Exhibit 3

Civil Action No. 26-cv-1114 (CJN) (Lead case)

JA148

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DSCC, *et al.*,

                Plaintiffs,

      *v.*

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

                Defendants.

Case No. 1:26-cv-01114

---

**DECLARATION OF LIBERTY SCHNEIDER**

---

I, Liberty Schneider, declare as follows:

1. I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2. I am the Deputy Executive Director at the Democratic National Committee, or the "DNC." Before I was promoted to my current role, I served as the DNC's Chief of Staff.

3. In my role as Deputy Executive Director, I oversee many of the DNC's program teams, including organizing, communications, training, fundraising, political strategy, and coalitions. In my previous role as Chief of Staff, I was also heavily involved in programming, committee-wide initiatives, and the DNC's day-to-day operations.

4. The DNC is the Democratic Party's national committee and is dedicated to electing Democratic candidates at the national, state, and local levels. In support of its mission, the DNC encourages and assists Democratic Party members and supporters in successfully casting ballots and fights to preserve the legal rights of its members and voters.

5. The DNC has approximately 450 formal members who are nationwide, including

1

JA149

Doc ID: 52c1946df6139551d84b78c0814ca93aa187eec0

State Party leaders, elected officials, and Democratic voters. These formal members come from all 50 States, Washington D.C., and the five U.S. territories. In fact, 200 of the DNC's formal members are elected to their positions with the DNC specifically to represent those jurisdictions across the country.

6.    The DNC also considers any registered Democrat to be a member of the DNC and the Democratic Party, because Democratic voters influence and ultimately determine the DNC's strategic and political direction by electing DNC members and Democratic candidates to local, state, and federal offices.

7.    Both the DNC itself and DNC members who are candidates for office have an interest in a fair and lawful electoral process for its members' campaigns. Even if these DNC members succeed in their campaigns, the DNC and its members are harmed by unlawful election rules, as they deprive the DNC and its candidate members of a fair process and an accurate result.

8.    The DNC is actively preparing, budgeting, strategizing, and executing its plans for the 2026 midterm election cycle, which is already underway, in all 50 States, Washington D.C., and the five U.S. territories.

## I.    The New E.O.'s Restrictions on Voting by Mail

9.    On March 31, 2026, President Trump signed an Executive Order (E.O.) titled "*Ensuring* Citizenship *Verification and Integrity in Federal Elections*." From the DNC's perspective, the President's E.O. is the perfect combination of voter suppression and voter intimidation. The E.O. fundamentally shakes the foundation the DNC works on to run elections and turn out voters.

10.    Section 3(b) of that E.O. purports to give the USPS control over which voters will be eligible to vote a mail ballot via the U.S. mail—an extraordinary and unprecedented attempt by

2

JA150

Doc ID: 52c1946df6139551d84b78c0814ca93aa187eec0

the President to transform American elections.

11.     Specifically, Section 3(b) directs the Postmaster General to "initiate a proposed rulemaking" that "shall include, at minimum" a mandate that USPS provide each state with a "Mail-In and Absentee Participation List" of individuals "who are enrolled with the USPS" for "mail-in or absentee ballots" in such state. E.O. § 3(b)(iv). Under the E.O., USPS "shall not transmit mail-in or absentee ballots from any individual" unless that individual appears on the "Mail-In and Absentee Participation List" that USPS has created. *Id.* § 3(b)(iii). The Order does not specify exactly how USPS will determine which individuals appear on the "Mail-In and Absentee Participation List," but it is clear that the USPS will have control over such list. Indeed, although states may provide "suggested modifications" to the list, the E.O. does not state that USPS will be required to accept those suggestions. *Id.* § 3(b)(v).

12.     Under the E.O., it is unclear whether voters themselves would have any ability to attempt to add themselves to USPS's "Mail-In and Absentee Participation List" if they believe they are eligible to vote by mail under their own state's laws. Whether or not such a mechanism exists, at a minimum, voters who wish to vote by mail would need to check the list to confirm whether they should expect to receive a ballot via USPS, and attempt to make plans to vote by alternative means if they have been omitted from the list.

13.     The E.O., which fundamentally changes how mail balloting operates, and threatens to change who would be eligible to receive and send a ballot through the U.S. mail, poses a direct threat to the DNC, DNC members who are candidates for office, and all other DNC members who vote by mail, as well as to the DNC's basic programming and voter turnout strategies.

14.     Section 3(b) of the E.O. will require a fundamental restructuring of several of the DNC's core programs and poses a severe risk to the DNC's success in the 2026 election cycle and

3

JA151

Doc ID: 52c1946df6139551d84b78c0814ca93aa187eec0

beyond. Indeed, it is clear from President Trump's decade-long attack on mail voting that a significant motivation for the new E.O.—much like his last one—is to harm his and the Republican Party's political opponents.

15.    The DNC is heavily focused on encouraging its members to vote, including by mail, and making sure they have the knowledge and resources to do so successfully. Particularly since the pandemic, the DNC has expended significant resources to encourage voters to vote by mail, recognizing that method is often the least burdensome or most accessible way for voters to participate.

16.    For some voters, voting by mail is the only reasonable option by which they may participate in elections; this may be because they are away from home, or because they have demanding schedules or other challenges that make it more difficult (and, sometimes, impossible) for them to vote in person. For all of these reasons, many DNC members have relied on voting by mail in past elections and are likely to do so again in future elections.

17.    In recent years, the DNC has dedicated significant staff time, resources, and financial investments to developing comprehensive mail voting programs that encompass voter education, voter assistance, and ballot-cure programs to ensure its members are able to cast mail ballots and have them counted. The DNC also funds programs that identify and contact mail voters who have not yet returned their ballot as election day approaches to encourage them to do so. Each federal election cycle, the DNC invests millions of dollars in these programs.

18.    These programs are based upon expectation that voters who are eligible to vote by mail under their respective states' laws and wish to do so will in fact be able use the U.S. mail to receive and send a mail ballot and have that ballot counted. Many of these programs are currently being planned and will soon be underway for the 2026 elections.

4

JA152

Doc ID: 52c1946df6139551d84b78c0814ca93aa187eec0

19.     President Trump's mandate that the USPS not transmit a mail ballot for any voter who is not enrolled on USPS's "Mail-In and Absentee Participation List" functionally imposes new requirements to cast a mail ballot, making it harder for DNC members to vote and potentially disenfranchising them altogether.

20.     The E.O. is especially concerning for DNC members who are members of the military, their families, Democrats who live abroad, and countless others who rely on voting by mail, including those who are sick or disabled and cannot physically travel in person to cast a ballot. The impact will also fall particularly hard on voters in states where elections are conducted primarily by mail.

21.     Because the general election ballot includes federal, state, and local races, the E.O.'s attempt to interfere with federal elections will have the effect of interfering with races up and down the ballot, including the races of DNC members, who are candidates for election at all levels of government.

22.     In the last several election cycles, Democrats have been more likely to vote by mail than Republican voters, and the DNC expects that trend to continue. Because the E.O. imposes restrictions on voting by mail, the E.O. puts both the DNC and DNC members who are running for election at a competitive disadvantage.

23.     Even worse, the E.O. is all but certain to leave some Democratic voters unable to vote by mail altogether. Several of DNC's members are competing in extremely competitive elections decided by a small number of votes, and the E.O.'s restrictions on mail ballots could be decisive in some of these races. The added burdens on voters to cast mail ballots are not an accidental byproduct of the E.O.—they are likely the intended result.

24.     To run effective campaigns, candidates need to know that the rules of the road are

5

# JA153

Doc ID: 52c1946df6139551d84b78c0814ca93aa187eec0

clear—and, this year, hundreds of candidates have already made investments of resources in their races based on the existing rules.

25.     The E.O. fundamentally disrupts DNC's efforts to plan for the general election and significantly disrupts the electoral playing field more broadly. It is now far more difficult for the DNC and its candidate members to effectively complete planning and execute its programs because, among other things, the E.O. mandates seismic changes to who may be eligible to receive and successfully submit ballots via U.S. mail.

26.     In response to Section 3(b) of the E.O., the DNC will need to spend substantial staff time and resources educating its members about what they need to do to ensure they are "enrolled" on USPS's "Mail-In and Absentee Participation List" and to assist them in complying with the enrollment process. In light of the E.O.'s seismic changes to mail voting, the DNC will also need to re-evaluate the extent to which it should promote its mail balloting programs. And it will be forced to make these adjustments *in the middle* of the electoral cycle, undermining and prejudicing its ability to make concrete strategic plans and implement them effectively.

27.     At a minimum, the E.O. requires significant changes to already planned programs and investments, and it makes existing investments in mail ballot programs less effective. As just one example, the DNC operates iwillvote.com, a website for voters in all 50 States plus the District of Columbia that helps voters navigate the voting process in their respective State. The DNC has already put significant investments into iwillvote.com for the 2026 election cycle, including explainers of each state's specific rules for mail voting. In response to the E.O., however, the DNC will need to reconfigure iwillvote.com to account for the drastic changes to vote by mail.

28.     To respond to Section 3(b), the DNC will also be forced to develop programs to assist voters in how to vote if they are no longer permitted to vote by mail via USPS. For some

6

JA154

Doc ID: 52c1946df6139551d84b78c0814ca93aa187eec0

voters, voting by another method may not be possible at all, especially if they are not currently located in-state or have physical, health, or economic limitations that prevent them from voting in-person.

29.     The DNC anticipates that a significant part of these new programs will be directed towards ameliorating the inevitable confusion and disenfranchisement that the E.O. will cause voters. Enrollment with the USPS has never been a part of the mail voting process, and if the E.O. is implemented, some of the sweeping changes it dictates will come while elections are *ongoing*. Teaching voters about the new requirement and working to ensure it does not prevent voters from voting entirely will be a significant challenge. Despite the DNC's best efforts, some voters will be confused, discouraged from voting, and even disenfranchised. And because voters who support Democrats are more likely to vote by mail, the DNC, its candidate members, and its voter members will be severely and disproportionately harmed. Indeed, this appears to be by design, as the President attempts to change the rules of voting to make it harder for the Democratic Party to win elections.

30.     The DNC's planned voter protection efforts will also suffer as a result of the E.O's drastic changes to the voting process. The DNC's voter protection team has already prepared to answer questions throughout the voting process as it exists today—how to register, ID requirements, and the like—and those efforts will expand in the coming months. In response to the E.O., however, the DNC must revamp its voter protection program, including increasing staff time and volunteers dedicated to voters who need or prefer to cast their ballot by mail, and that team's focus will have to shift away from existing work. The resources the DNC would need to dedicate to its voter protection team would come from staff and volunteers who would otherwise be working to turn voters out to the polls and monitoring polling place operations.

7

JA155

Doc ID: 52c1946df6139551d84b78c0814ca93aa187eec0

31.     In short, the DNC has already put significant work into its existing programming for 2026, and those plans are compromised under the E.O. The DNC cannot wait months to make changes to these programs; because these programs and strategies take months to build and execute, if the E.O. is not enjoined several months before mail ballots are sent (which begins in early September 2026 for the 2026 general election), the DNC will be forced to re-allocate investments and re-tool their existing programs to address the changes to mail balloting, and the effect those changes are likely to have on the DNC's member voters.

32.     The DNC expects that any new programs that it must create and launch as a result of the E.O. will come at a significant cost. Because the DNC has not budgeted for such extensive new programs, it would have to scale back or cut the initiatives that the DNC currently has planned for voter persuasion and get out the vote efforts to mobilize our members to elect Democratic candidates nationwide, up and down the ballot.

33.     The resources the DNC has to elect its candidates are finite in any given election cycle. Resources that must be diverted to responding to a seismic change like those contained in President Trump's E.O. necessarily come at the cost of other of the DNC's mission-critical planned activities and expenditures.

34.     If DNC is required to deploy these resources at any point from now until election day, it will present a lost opportunity for the Party. There are only seven months until election day—and approximately only five months before mail ballots will start to be sent to voters—and there are many primary elections this spring and summer in the run up to November.

35.     Every day and every resource during this critical time that the DNC must spend addressing the impending changes to mail balloting represents a lost opportunity to persuade voters and galvanize supporters that cannot be restored once lost.

8

JA156

Doc ID: 52c1946df6139551d84b78c0814ca93aa187eec0

## II.    The E.O.'s Creation and Dissemination of "State Citizenship Lists" for Use in Federal Elections

36.    The DNC and its members are also harmed by Section 2(a) of President Trump's E.O., which directs the Department of Homeland Security (DHS) to compile for each State a list of every confirmed U.S. citizen above the age of 18 who resides in that State and to share those lists with the chief election official of each state "no fewer than 60 days before each regularly scheduled Federal election," which would include the 2026 general election.

37.    The E.O. does not explicitly identify the intended use of these lists, but the E.O.'s stated purpose is to assist in "verifying" voter eligibility. The real impact of the lists, however, would be invasions of voter privacy, voter confusion, and likely disenfranchisement of qualified American citizens—all of which comes at DNC and its members' expense, and just as the President likely intended.

38.    Section 2(a) of the E.O. is wholly unnecessary. It is illegal for foreign nationals to register and vote in in federal elections in all 50 states, the District of Columbia, and all U.S. territories, and existing law prevents non-citizens from voting. There is zero evidence of widespread voting by non-citizens in U.S. elections. The E.O. will nonetheless harm the DNC and DNC members given the near certainty that DHS will fail to "confirm[]" the citizenship of otherwise eligible United States citizens and will therefore omit some number of them from such lists.

39.    The E.O. specifies that "State Citizenship Lists" will be derived from a variety of federal databases, including in particular DHS's Systematic Alien Verification for Entitlements (SAVE) program and Social Security Administration (SSA) records.

40.    Based on public reporting and the agencies' own reports, I understand that SSA

9

JA157

Doc ID: 52c1946df6139551d84b78c0814ca93aa187eec0

records are often outdated or inaccurate because the agency has not consistently maintained and does not consistently update such records. And based on similar reporting, I understand that the SAVE database also contains outdated information, particularly for naturalized citizens.

41.    Even if these lists were accurate the moment they are shared with election officials (which will not be the case), they will be outdated the next moment, as voters move within the United States (gaining new residency for voting purposes), gain citizenship, or turn 18 in the months leading up to the election.

42.    In other words, the creation of these lists using these databases create a serious risk that DNC members who are in fact U.S. citizens will be erroneously excluded from such lists and will face barriers before they are able to have their ballots counted. When fewer of the DNC's members are able to vote, the DNC and its members' electoral prospects suffer. None of this would happen absent the President's mandate to improperly share flawed information with state and local election officials under the guise of verifying voter eligibility.

43.    Although the E.O. directs DHS to establish procedures for individuals to suggest corrections to the list, it does not indicate that any voters will be alerted to their exclusion. A given voter thus may have no way of knowing that the federal government has effectively represented to their home State that she is not eligible to vote, and no opportunity to avail themselves of any (as yet undefined) cure provisions. And even if the voter is given such opportunity to "correct" the list for their inclusion, doing so will require time and effort. It may also require the voter to produce documentary proof of citizenship (such as a U.S. passport or U.S. birth certificate), which many voters do not have and which may be expensive or difficult to timely obtain. Given the 60-day window before elections in which states will receive and review these lists, these issues will as a practical matter frustrate DNC members' ability to vote and in some cases will disenfranchise

10

JA158

Doc ID: 52c1946df6139551d84b78c0814ca93aa187eec0

them.

44.    Section 2(a) thus threatens the voting rights of any voter who is erroneously excluded from the State Citizenship Lists. In light of the millions of Democratic voters across the United States, there is a serious risk that some DNC members will be burdened or disenfranchised completely as a result of these lists.

45.    To respond to Section 2(a), the DNC will need to carefully monitor the development of the State Citizenship Lists and will need to put programs in place to help educate its members as to how they can ensure they are included on the list and get themselves added to the list if they are erroneously omitted.

46.    These voter assistance and voter education programs to address the State Citizenship Lists cannot be created overnight; the DNC must start planning for them imminently for them to be effective and sufficiently resourced.

47.    Just as with the changes to mail balloting, the DNC anticipates that this part of the E.O. will also cause significant confusion for voters. These kinds of citizenship lists will be entirely new to the voting process, and this change will come while elections are ongoing. Teaching voters that these lists exist, that they need to confirm they have been properly included as a citizen (and attempt to prove they are a citizen, if they are omitted from the list), and working to ensure that this significant change to the voting process does not deter voters from voting entirely will be a significant challenge. Voters will be confused and discouraged from voting; some are even likely to be disenfranchised.

48.    All of these efforts and changes to counter the harm from the creation and dissemination of State Citizenship Lists, which the DNC would not have to undertake absent the E.O., will require the DNC to expend staff time and other resources that would be dedicated to its

11

JA159

Doc ID: 52c1946df6139551d84b78c0814ca93aa187eec0

other critical programs. These new education and voter assistance programs, which would be wholly unnecessary absent the E.O., will come at a significant cost. Because the DNC has not budgeted for these new, widespread programs, it would have to scale back or cut the initiatives it currently has planned for persuading voters and mobilizing our members to elect Democratics nationwide.

49.     If DNC is required to deploy resources to respond to this part of the E.O at any point from now until election day, it will present a lost opportunity for the Democratic Party. There are only seven months until election day, and approximately only five months before the last of State Citizenship Lists are required to be shared with States. Indeed, the E.O. requires those lists to be shared with States "no fewer than 60 days before each regularly scheduled Federal election"—meaning they must be shared between now and early September at the latest for the general election, and much sooner for primary elections happening throughout this year. Every day and every resource that the DNC must spend during this period planning for these voter assistance programs, as well as helping voters check State Citizenship Lists and correcting them, if necessary, represents a lost opportunity to persuade voters and galvanize supporters that cannot be restored once lost.

50.     Additionally, the DNC is also concerned about Section 2(a)'s threat to the privacy rights of its members. This part of the E.O. guarantees improper exposure of the personal data of millions of the DNC's members.

51.     Over the last several months, Democrats have heard from its members who are extremely concerned about the rapid and seemingly haphazard pace at which DHS and other agencies are making their records readily accessible to a growing list of federal and state officials. The DNC's members, myself included, are understandably worried about the creation and

12

JA160

dissemination of these kinds of lists with voters' personal and sensitive information.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 04 / 16 / 2026

*Liberty Schneider*

Liberty Schneider, Deputy Executive Director
Democratic National Committee

13

JA161

Doc ID: 52c1946df6139551d84b78c0814ca93aa187eec0

**Dropbox Sign**                                      Audit trail

| | |
|---|---|
| **Title** | Second EO Declaration |
| **File name** | Libby_Schneider_D...on_2026.04.16.pdf |
| **Document ID** | 52c1946df6139551d84b78c0814ca93aa187eec0 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

| | | |
|---|---|---|
| **SENT** | **04 / 16 / 2026** 17:32:45 UTC | Sent for signature to Libby Schneider (schneiderl@dnc.org) from leviena@dnc.org IP: 208.69.6.2 |
| **VIEWED** | **04 / 16 / 2026** 17:35:15 UTC | Viewed by Libby Schneider (schneiderl@dnc.org) IP: 208.69.6.2 |
| **SIGNED** | **04 / 16 / 2026** 17:35:33 UTC | Signed by Libby Schneider (schneiderl@dnc.org) IP: 208.69.6.2 |
| **COMPLETED** | **04 / 16 / 2026** 17:35:33 UTC | The document has been completed. |

Powered by **Dropbox Sign**

JA162

# Exhibit 4

Civil Action No. 26-cv-1114 (CJN) (Lead case)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DSCC, *et al.*,

               Plaintiffs,

      *v.*

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

               Defendants.

Case No. 1:26-cv-01114

---

**DECLARATION OF JILLIAN EDELMAN**

---

I, Jillian Edelman, declare as follows:

1. I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2. I am the Chief Operating Officer of the Democratic Governors Association, also known as DGA. I joined DGA in February 2022 in this role and have served in it ever since. I oversee DGA's day-to-day operations. In particular, I handle DGA's operational planning, meaning that I make strategic decisions regarding staffing, budgeting, contracts with vendors, expenditures, and more.

3. Plaintiff Democratic Governors Association is a political organization dedicated to supporting Democratic governors and electing Democratic gubernatorial candidates across the United States. DGA works with Democratic gubernatorial candidates and campaigns and provides funding to educate and communicate with Democratic voters; to encourage and assist supporters of the Democratic Party in successfully casting ballots; and to preserve the legal rights of its voters. DGA also supports Democratic incumbent governors by serving as a clearinghouse for best

1

JA164

practices and policies, including for managing, administering, and budgeting for Federal, State, and local elections.

4.    All incumbent Democratic governors currently serve as members of DGA, representing 24 States, the District of Columbia, Guam, and the U.S. Virgin Islands.[1] Each of DGA's members are also voters in their respective states.

5.    At least 11 of these incumbent Democratic governors are candidates for office in their respective States in 2026. These include Governor Hobbs of Arizona, Governor Lamont of Connecticut, Governor Green of Hawaii, Governor Pritzker of Illinois, Governor Mills of Maine, Governor Moore of Maryland, Governor Healy of Massachusetts, Governor Hochul of New York, Governor Kotek of Oregon, Governor McKee of Rhode Island, and Governor Shapiro of Pennsylvania.

6.    In all, DGA is actively planning, preparing, budgeting, and strategizing for 36 gubernatorial races up in the 2026 general election.[2]

7.    Both DGA and DGA's members who are candidates for office have an interest in

---

[1] These members include Andy Beshear (Kentucky), Muriel Bowser (Washington, D.C.), Albert Bryan, Jr. (U.S. Virgin Islands), Tony Evers (Wisconsin), Bob Ferguson (Washington), Josh Green (Hawaii), Maura Healey (Massachusetts), Katie Hobbs (Arizona), Kathy Hochul (New York), Laura Kelly (Kansas), Tina Kotek (Oregon), Ned Lamont (Connecticut), Lou Leon Guerrero (Guam), Michelle Lujan Grisham (New Mexico), Dan McKee (Rhode Island), Matt Meyer (Delaware), Janet Mills (Maine), Wes Moore (Maryland), Mikie Sherrill (New Jersey), Gavin Newsom (California), Jared Polis (Colorado), JB Pritzker (Illinois), Josh Shapiro (Pennsylvania), Josh Stein (North Carolina), Abigail Spanberger (Virginia), Tim Walz (Minnesota), and Gretchen Whitmer (Michigan).

[2] Gubernatorial races in 2026 include Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Vermont, Wisconsin, Wyoming, the District of Columbia, Guam., Northern Mariana Islands, and the U.S. Virgin Islands.

a fair and lawful electoral process for DGA's members' campaigns. Even if DGA's members succeed in their campaigns, DGA and its members are harmed by unlawful election rules, as they deprive DGA and its candidate members of a fair process and an accurate result.

## I.    The New E.O.'s Restrictions on Voting by Mail

8.    On March 31, 2026, President Trump signed Executive Order 14399, titled *"Ensuring Citizenship Verification and Integrity in Federal Elections"* ("E.O. or "Order"). Section 3(b) of that E.O. purports to give USPS control over which voters will be eligible to vote a mail ballot via the U.S. mail—an extraordinary and unprecedented attempt by the President to transform American elections.

9.    Specifically, Section 3(b) directs the Postmaster General to "initiate a proposed rulemaking" that "shall include, at minimum" a mandate that USPS provide each state with a "Mail-In and Absentee Participation List" of individuals "who are enrolled with the USPS" for "mail-in or absentee ballots" in such state. E.O. § 3(b)(iv). Under the E.O., USPS "shall not transmit mail-in or absentee ballots from any individual" unless that individual appears on the "Mail-In and Absentee Participation List" that USPS has created. *Id.* § 3(b)(iii). The Order does not specify exactly how USPS will determine which individuals appear on the "Mail-In and Absentee Participation List," but it is clear that the USPS will have control over such list. Indeed, although states may provide "suggested modifications" to the list, the E.O. does not state that USPS will be required to accept those suggestions. *Id.* § 3(b)(v).

10.    Under the E.O., it is unclear whether voters themselves would have any ability to attempt to add themselves to USPS's "Mail-In and Absentee Participation List" if they believe they are eligible to vote by mail under their own state's laws. Whether or not such a mechanism exists, at a minimum, voters who wish to vote by mail would need to check the list to confirm

3

JA166

whether they should expect to receive a ballot via USPS, and attempt to make plans to vote by alternative means if they have been omitted from the list.

11. The E.O., which would fundamentally change how mail balloting operates, and threatens to change who would be eligible to receive and send a ballot through the U.S. mail, poses a direct threat to DGA, DGA's candidate members, DGA's members who vote by mail, and millions of Democratic voters who vote by mail. Ultimately, if Section 3(b) of the EO is implemented, it would require a fundamental restructuring of several of DGA's investments and would pose a severe risk to DGA's success in the 2026 election cycle and beyond. Indeed, it is clear from President Trump's decade-long attack on mail voting that the new E.O.—much like his last one—is intended to harm his and the Republican Party's political opponents, including DGA and its candidates.

12. To advance its mission of supporting the election of Democrats to governorships across the country, DGA provides funding that is used to educate and assist Democratic voters on how to vote, including through mail ballots, and to ensure that those votes are counted. Such programs include voter education and outreach programs aimed at encouraging mail voting, and ballot cure programs to help ensure that mail ballots are counted. In the last few years, DGA has grown significantly and expanded the support it offers for these programs.

13. DGA invests heavily in campaigns and political parties, and those campaigns and parties in turn run voter assistance programs to ensure that voters are able to cast ballots that will be counted. DGA has also provided funding for programs that identify and contact mail voters who have not yet returned their ballot as election day approaches to encourage them to do so.

14. These programs are built with the understanding that voters who are eligible to vote by mail in their respective state and wish to do so will in fact be able to transmit a mail ballot via

the U.S. mail and have that ballot counted. DGA is in the process of allocating funds and making investments in these programs for the 2026 elections.

15. President Trump's mandate that the USPS not transmit a mail ballot for any voter who is not enrolled on USPS's "Mail-In and Absentee Participation List" functionally imposes new requirements to cast a mail ballot, making it harder for Democratic voters to vote and potentially disenfranchising them altogether if the USPS deems that voter "ineligible" to transmit a ballot via U.S. mail.

16. The E.O. is especially concerning for Democratic voters who are members of the military, their families, Democrats who live abroad, and countless others who rely on voting by mail, such as those who are sick or disabled and cannot physically travel in person to cast a ballot. The impact will also fall particularly hard on voters in states where elections are conducted primarily by mail.

17. Because general election ballots include both federal and state races (including gubernatorial races), the E.O.'s attempt to interfere with federal elections will have the effect of interfering with state races, too, including the races of DGA's members.

18. In the last several election cycles, Democrats have been more likely to vote by mail than Republican voters, and DGA expects that trend to continue. The E.O. thus puts both DGA and DGA's members who are running for election at a competitive disadvantage. DGA and DGA's members will be disadvantaged if the E.O. forces Democratic voters to take extra steps to vote using the U.S. mail or makes them unable to use that method altogether, which is all but certain if the E.O. is implemented. Several of DGA's members will compete in extremely competitive elections decided by a small number of votes, and mail ballots could be decisive in some of these races.

19.     To run effective campaigns, candidates need to know that the rules of the road are clear—and, this year, DGA's members have already made investments of resources in their races based on the existing rules.

20.     In the days after President Trump issued the E.O. on March 31, 2026, DGA's leadership team has been forced to immediately start grappling with how the threatened enforcement of Section 3(b) will impact decisions about resources for the 2026 general election.

21.     At this point this far into the election cycle, DGA has already begun to make and continues to make strategic decisions about how to allocate its resources for its programs. Those decisions are jeopardized by the E.O.'s fundamental changes to who will be eligible to transmit a ballot via the U.S. mail, which has significantly disrupted the electoral playing field. Simply put, President Trump's E.O. has cast a cloud of uncertainty over the rules governing mail ballots in the 2026 election, potentially compromising our existing investments and frustrating our ability to make important strategic decisions as the 2026 midterms continue.

22.     Moreover, if Section 3(b) of the E.O. is implemented, DGA would be required to fund programs to educate voters about what those voters need to do to ensure they are "enrolled" on USPS's "Mail-In and Absentee Participation List" and assist those voters in complying with the enrollment process. In such an event, DGA would also be forced to re-evaluate the extent to which it should assist in promoting mail balloting programs. And it would be forced to make these adjustments *in the middle* of the electoral cycle, undermining and prejudicing decisions it has already made and further frustrating its ability to make concrete strategic plans and implement them effectively.

23.     In the event that Section 3(b) of the E.O. is implemented, DGA will also be forced to fund programs to assist voters in how to vote if they are no longer permitted to vote by mail via

6

JA169

the U.S. mail. For some voters, voting by another method may not be possible at all, especially if they are not currently located in-state or have physical, health, or economic limitations that prevent them from voting in-person.

24.    A significant part of these new programs will have to be oriented towards ameliorating the inevitable confusion that the E.O. will cause voters. Enrollment with the USPS has never been a part of the mail voting process, and if the E.O. is implemented, some of the sweeping changes it dictates will come while elections are ongoing. Teaching voters about the new requirement, how they can comply, and working to ensure it does not deter voters from voting entirely will be a significant challenge. Inevitably, even with DGA's best efforts, voters will be confused, discouraged from voting, and even disenfranchised. And because voters who support Democrats are more likely to vote by mail, DGA and its candidate members will be harmed. Indeed, this appears to be by design, as the President attempts to change the rules of voting to make it harder for the Democratic Party to win elections.

25.    DGA expects that any new programs that it must create and launch as a result of the E.O. will be particularly difficult—and expensive—to implement in states where vote by mail has become the norm and voters receive mail ballots as a matter of course. In a state like California, for example, which has a gubernatorial election this year, all active voters receive a vote-by-mail ballot from the state without having to request one under the existing rules. Attempting to teach those voters that they in fact need to check to see whether they are on USPS's "list" to receive a mail ballot, and helping those voters attempt to make alternate arrangements, if necessary, would be an incredibly resource intensive and expensive effort. The same will be true in other states that primarily rely on vote by mail and that have gubernatorial elections this year, including Arizona, Colorado, Nevada, and Oregon.

26.    Given the expense and breadth of these new programs, DGA cannot wait several months to know whether these programs are necessary. If these programs need to be built—and funded—that is a decision that DGA and its candidate members need to make quickly.

27.    DGA's funding of these new education and voter assistance programs, which would be wholly unnecessary absent the E.O., will come at a significant cost. Because DGA has not budgeted for such extensive new programs, DGA would have to scale back its investments in persuasion and mobilization campaigns.

28.    The resources DGA has to elect its candidates are finite in any given election cycle. Resources that must be diverted to responding to a seismic change like those contained in President Trump's E.O. necessarily come at the cost of other of DGA's mission-critical planned activities and expenditures.

29.    If DGA is required to deploy resources to respond to the E.O. at any point from now until election day, it will present a lost opportunity for DGA. There are only seven months until election day—and approximately only five months before mail ballots will be sent to voters—and there are many primary elections in the run up to November.

30.    Every day and every resource during this critical time that DGA must spend addressing the impending changes to mail balloting represents a lost opportunity to persuade voters and galvanize supporters that cannot be restored once lost. The same is true for every resource DGA spends on programs and initiatives that are based on the rules as they stand today, which the E.O. threatens to change.

31.    Section 3(b) of the E.O. further harms DGA's members because it effectively usurps their authority related to elections. The Constitution leaves the regulation of elections largely to the states. A significant aspect of many of DGA's members' power and authority in their

8

JA171

states stems from their constitutional and statutory authority to influence, support, and sign state election laws. The E.O. improperly claims the ability to displace that authority, impinging on DGA's members' authority and diluting their executive authority in their states.

## II.    The E.O.'s Creation and Dissemination of "State Citizenship Lists" for Use in Federal Elections

32.    DGA and DGA's members who are candidates for office in the 2026 elections are also harmed by Section 2(a) of President Trump's E.O., which directs the Department of Homeland Security (DHS) to compile for each State a list of every confirmed U.S. citizen above the age of 18 for upcoming federal elections who resides in that State and to share those lists with the chief election official of each state "no fewer than 60 days before each regularly scheduled Federal election," which would include the 2026 general election.

33.    The E.O. does not explicitly identify the intended use of these lists, but the E.O.'s stated purpose is to assist in "verifying" voter eligibility. The real impact of the lists, however, would be invasions of voter privacy, voter confusion, and likely disenfranchisement of qualified American citizens—all of which comes at DGA and its members' expense, just as the President likely intended.

34.    Section 2(a) of the E.O. is wholly unnecessary. It is illegal for foreign nationals to register and vote in federal elections, and our existing law prevents non-citizens from voting. There is zero evidence of widespread voting by non-citizens in U.S. elections. The E.O. will nonetheless harm DGA and DGA's members who are candidates for office given the near certainty that some number of U.S. citizens will not be included on such lists.

35.    The E.O. specifies that the "State Citizenship Lists" will be derived from a variety of federal databases, including in particular DHS's Systematic Alien Verification for Entitlements

9

JA172

(SAVE) program and Social Security Administration (SSA) records.

36. Based on public reporting and the agencies' own reports, I understand that SSA records are often outdated or inaccurate because the agency has not consistently maintained and does not consistently update such records. And based on similar reporting, I understand that the SAVE database also contains outdated information, particularly for naturalized citizens.

37. Even if these lists were accurate the moment they are shared with election officials (which will not be the case), they will be outdated the next moment, as voters move within the United States (gaining new residency for voting purposes), gain citizenship, or turn 18 in the months leading up to the election.

38. In other words, the creation of these "State Citizenship Lists" using these databases create a serious risk that Democratic voters who are in fact U.S. citizens will be erroneously not included on such lists and not be permitted to vote, or will face barriers before they are able to have their ballots counted. When fewer Democratic voters are able to vote, DGA and its members' electoral prospects suffer. None of this would happen absent the President's mandate to improperly share flawed information with state and local election officials under the guise of verifying voter eligibility.

39. Although the E.O. directs DHS to establish procedures for individuals to suggest corrections to the list, it does not indicate that any voters will be alerted to their exclusion. Any given voter thus may have no way of knowing that the federal government has represented to her home State that she is not eligible to vote, and no opportunity to avail herself of any (as yet undefined) cure provisions. And even if the voter is given such opportunity to "correct" the list for their inclusion, doing so will require time and effort. It may also require the voter to produce documentary proof of citizenship (such as a U.S. passport or U.S. birth certificate), which many

10

JA173

voters do not have and may be expensive or difficult to timely obtain. Given the 60-day window before elections in which states will receive and review these lists, these issues will as a practical matter frustrate Democratic voters' ability to vote and in some cases will disenfranchise them.

40.    Section 2(a) thus threatens the voting rights of any voter who is erroneously excluded from the State Citizenship Lists. In light of the millions of Democratic voters across the United States, there is a serious risk that voters who would otherwise support DGA's members in their re-election campaigns will be burdened or disenfranchised completely as a result of these lists.

41.    If Section 2(a) of the E.O. is permitted to be implemented, DGA will need to carefully monitor the development of the State Citizenship Lists and help fund programs to educate its Democratic voters as to how they can ensure they are included on the list and get themselves added to the list if they are erroneously omitted.

42.    Just as with the changes to mail balloting, DGA anticipates that this part of the E.O. will also cause significant confusion for voters. These kinds of citizenship lists will be entirely new to the voting process, and this change will come while elections are ongoing. Teaching voters that these lists exist, that they need to attempt to confirm they have been properly included as a citizen (and attempt to prove they are a citizen, if they are omitted from the list), and working to ensure that this significant change to the voting process does not deter voters from voting entirely will be a significant challenge. Again, voters will be confused, discouraged from voting, and even disenfranchised.

43.    All of these efforts and changes to counter the harm from the creation and dissemination of State Citizenship Lists, which DGA would not have to undertake absent implementation of the E.O., would require DGA to scale back investments that would be dedicated

11

JA174

to critical persuasion and mobilization programs.

44.     If DGA is required to deploy resources to respond to this part of the E.O at any point from now until election day, it will present a lost opportunity for DGA. There are only seven months until election day, and approximately only five months before the last of State Citizenship Lists are required to be shared with States. Indeed, the E.O. requires those lists to be shared with States "no fewer than 60 days before each regularly scheduled Federal election"—meaning they must be shared between now and early September at the latest for the general election, and much sooner for primary elections happening throughout this year. Every day and every resource that DGA must spend during this period helping voters check State Citizenship Lists and correcting them, if necessary, represents a lost opportunity to persuade voters and galvanize supporters that cannot be restored once lost.

45.     Additionally, DGA is also concerned about Section 2(a)'s threat to the privacy rights of its members and Democratic voters more generally. This part of the E.O. guarantees improper exposure of the personal data of millions of Democratic voters nationwide.

46.     Over the last several months, DGA's members have heard from constituents who are extremely concerned about the rapid and seemingly haphazard pace at which DHS and other agencies are making their records readily accessible to a growing list of federal and state officials. DGA's members are understandably worried about the creation and dissemination of these kinds of lists with voters' personal and sensitive information.

I declare under penalty of perjury that the foregoing is true and correct.

12

JA175

Executed on: ___4/8/2026_____

*Jillian Edelman*
_____

**Jillian Edelman, Chief Operating Officer**
**DGA**

13

JA176

# Exhibit 5

Civil Action No. 26-cv-1114 (CJN) (Lead case)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>        Plaintiffs,<br><br>    *v.*<br><br>DONALD J. TRUMP, in his official capacity<br>as President of the United States, *et al.*,<br><br>        Defendants. | Case No. 1:26-cv-01114 |

**DECLARATION OF HAKEEM S. JEFFRIES**

I, Hakeem S. Jeffries, declare as follows:

1. I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2. I am the U.S. House Representative from New York's 8th Congressional District. I serve as the Minority Leader of the House of Representatives and the Leader of the House Democratic Caucus.

3. I have been elected to the U.S. House of Representatives seven times. I am also a candidate running for reelection in 2026. I am a citizen of the United States, a resident of the State of New York, and an individual voter in federal, state, and local elections.

4. As Leader of the House Democratic Caucus, I am responsible for helping elect Democratic candidates to the U.S. House in races across the country. This responsibility is critical to the success of the Caucus and to the mission of the Democratic Party as a whole. In my role, I provide direct support to Democratic House campaigns, often in highly competitive battleground states, by helping to fundraise, speaking at campaign events, making financial contributions, and

1

JA178

engaging in other important campaign work. I also work closely with DCCC to help develop strategies and marshal resources to elect Democratic House candidates.

5. On March 31, 2026, President Trump issued Executive Order 14,399, titled "*Ensuring Citizenship Verification and Integrity in Federal Elections*" ("E.O." or "Order"), which purports to direct the USPS to take control over which voters will be eligible to vote a mail ballot via the U.S. mail, and further directs the Department of Homeland Security ("DHS") and Social Security Administration ("SSA") to compile and distribute "State Citizenship Lists" from various federal data sources 60 days before every federal election.

6. The President's flagrantly unlawful E.O., which claims authority that the U.S. Constitution's Elections Clause expressly reserves for the States in the first instance, only to be overridden by the U.S. Congress, will inflict severe and immediate harm on Democratic House candidates and the Democratic Caucus by erecting unlawful barriers to the ability of the voters to successfully vote and by interfering with planning and programming for Democratic House campaigns.

7. Even for Democrats who ultimately succeed in their campaigns despite the myriad of impediments and burdens imposed by the E.O., candidates and their committees will be harmed by the E.O.'s attempt to impose by unlawful rules on the elections process because it will deprive myself and my fellow candidates of a fair process and an accurate result. For the same reasons, the Order is also likely to impede my ability to carry out my responsibilities as Leader. The President's Order also tramples on well-established privacy rights that I and other Americans deeply cherish.

I.    **The New E.O.'s Restrictions on Voting by Mail**

8. President Trump's mandate that the USPS not transmit a mail ballot for any voter who is not enrolled on the USPS's "Mail-In and Absentee Participation List" functionally imposes

2

JA179

new requirements to cast a mail ballot and is sure to harm qualified voters—including members of the military, their families, voters living overseas, voters with disabilities, and countless others—who rely on voting by mail.

9.    Since the pandemic, Democrats have increasingly encouraged voters to vote by mail, because that method is often the least burdensome or most accessible way for voters to participate. As a result, in many states, a greater share of voters who vote by mail are Democrats, including in New York State and New York City. The E.O.'s mandate could disenfranchise mail voters whom the USPS unilaterally deems "ineligible" to cast a ballot via U.S. mail, and will significantly disrupt the plans—in some cases, the ability to vote at all—of millions of Americans who expect to vote by mail this year and beyond. The impact will fall particularly hard on voters in states where elections are conducted primarily by mail, including California, Oregon, Nevada, and Washington.

10.    This most recent E.O., like the President's prior efforts to unilaterally rewrite federal and state election law and take control of the administration of U.S. elections, appears designed to benefit the President's own political party at the Democratic Party's expense. Indeed, it is clear not only from President Trump's years-long attack on mail voting but also his recent public statements that a significant motivation for the E.O. is to harm his political opponents and attempt to solidify the Republican Party's power, regardless of the will of the voters. Permitting the USPS—and the other federal officials who are directed by the Order to facilitate the new changes—to carry out the E.O. would have not only a devastating impact on Democratic campaigns but would also severely threaten Democratic voters' fundamental right to vote.

11.    The 2026 election cycle is already well underway, with multiple primaries having already been conducted under existing and governing law. The unfairness, uncertainty, and

3

JA180

confusion that would result from the E.O.'s fundamental changes to the process for voting by mail will also make it harder for me to effectively support our slate of candidates who have committed to running for office this year. In order to run effective campaigns, candidates need to know that the rules of the road are clear—and, this year, hundreds of candidates have already made investments of resources in their races based on the existing rules. The President's mandate, which attempts to unlawfully change the election rules in a way that tilts the playing field heavily in favor of Republicans, undermines those investments. In short, Section 3(b) of the E.O. makes it more difficult for the House Democratic Caucus to elect candidates to serve in the Caucus.

12.     The E.O.'s unlawful mandate that the USPS refuse to transmit mail ballots for those who are not enrolled on its "Participation List" would also harm members of the Democratic Party and other supporters, including those who live within my congressional district. Many of these voters rely upon the U.S. mail to deliver their ballot. These voters expect that their ballots will count if they comply with our state's laws. Changing the rules by transplanting authority from the States to the federal government to determine who is eligible to vote by mail would confuse voters and make it more likely that they will be disenfranchised.

13.     The E.O. threatens my own voting rights, too. As a voter in New York State, I am entitled to vote by mail for any reason, and I have previously voted by mail given my busy schedule. Under the E.O., however, my eligibility to use USPS to transmit my ballot is now decided by the federal government, not New York State, which has otherwise determined I am eligible to vote by mail.

II.    **The E.O.'s Creation and Dissemination of "State Citizenship Lists" for Use in Federal Elections**

14.     Democratic candidates for U.S. House, myself included, are also harmed by Section

4

JA181

2(a) of President Trump's Order, which directs DHS to compile for each State a list of every U.S. citizen above the age of 18 who resides in that State and to share those lists with the chief election official of each state "no fewer than 60 days before each regularly scheduled Federal election," which would include the 2026 general elections and many preceding primary elections. The Order does not explicitly explain the intended use of the State Citizenship List, but the Order's stated purpose is to assist in verifying voter eligibility.

15. Existing federal law already makes it illegal for foreign nationals to register and vote in federal elections, and there is no evidence of widespread voting by non-citizens in this country. The E.O. is highly unnecessary, yet it threatens to harm the privacy rights of millions of Americans by using protected federal data—including my own records and those of other Democratic Party voters—in unauthorized ways, and further threatens the voting rights of Americans given the near certainty that U.S. citizens will be erroneously omitted from such lists.

16. The E.O. specifies that "State Citizenship Lists" will be derived from a variety of federal databases, including in particular DHS's Systematic Alien Verification for Entitlements (SAVE) program and Social Security Administration (SSA) records.

17. The granting of access and other disclosures of personal information from any federal database, including SAVE and SSA databases, is deeply concerning to me and other Democratic Party officials, as well as to our constituents. I value our country's long-held commitment to protecting Americans' privacy, so I am particularly disturbed that a growing number of federal, state, and local election officials will be compiling and/or receiving federal records without authorization.

18. These particular disclosures are even more concerning because the E.O.'s stated purpose is to purportedly identify the "eligible" voters in any given state, even though the records

5

may not be suitable for that purpose. SSA records, for example, were not created to assess voter eligibility and, to my knowledge, have not gone through the required scrutiny to ensure they are appropriate for that purpose. In fact, SSA has only been required by Congress to maintain consistent records for less than five decades and, in my understanding, the agency does not regularly update these records, including information about citizenship. I also understand that the SAVE program often contains outdated information, particularly for naturalized citizens. I am aware that in some states like Texas, Missouri, and Louisiana, incorrect information from SAVE is already being used to wrongly claim that citizens on voter rolls are noncitizens who are ineligible to vote.

19.     As the former Chief Data Officer at SSA has informed Congress, disclosures of information from these federal databases can be catastrophic when it gets into the wrong hands. That is why the Privacy Act requires strict adherence to its procedural safeguards, and why the agencies are required to ensure that all uses of such records are sound and accurate. I have also heard from concerned constituents who are understandably worried that the federal records being pooled by officials in agencies like DHS and SSA have already or will fall into the hands of individuals who have no authorization to access them, including their state and local officials, as the E.O. now instructs federal officials to do.

20.     As far as I am aware, these agencies have not provided Congress notice that the federal government intends to use these records in the manner directed by the Order. To the contrary, as far as I am aware, the current Admiration has repeatedly disclaimed any effort to build a national database of eligible citizens for use in elections. But last week's Order drops the veil on the President's intentions and makes it clear that DHS will—if it has not already—imminently begin compiling citizenship and residence information on every purportedly "eligible" citizen in

6

JA183

the country to transmit to state election officials. Even if Congress had authorized the creation of such State Citizenship Lists, which it has not, I do not see how the data the government plans to use can possibly satisfy those requirements and accurately convey citizenship and residence information to the states.

21.    Further, even if these "Lists" were accurate when they are shared with election officials (which will not be the case), they will be outdated virtually the next moment, given that voters move within the United States (gaining new residency for voting purposes), gain citizenship, or turn 18 in the months leading up to the election.

22.    Even beyond invading our privacy, the implementation of the President's E.O. will inflict harm on the Democratic Party and its get-out-the-vote efforts. In particular, the creation of the "State Citizenship Lists" using these databases create a serious risk that Democratic voters who are in fact U.S. citizens will be erroneously excluded from such lists and not be permitted to vote, or will face barriers before they are able to have their ballots counted, based on data that will be improperly shared with state and local election officials. When fewer U.S. citizen and eligible Democratic Party supporters are able to vote, our members' electoral prospects suffer, and the Party and candidates' campaigns must take steps to ensure voters are not wrongfully disenfranchised—including, for example, by providing information and assistance to affected voters.

23.    Accounting for these problems necessarily takes a substantial toll on my and other candidates' re-election efforts, particularly because it requires time, resources, and energy that would be spent on our other mission-critical efforts to support electing Democrats to Congress. The E.O. therefore significantly undermines my ability to effectively carry out my responsibilities as the Leader of the House Democratic Caucus. Nothing is more important than ensuring that our

7

JA184

voters are able to vote and have their votes counted. Just as with the President's last effort to take control of federal elections via executive fiat, however, DCCC and Democratic campaigns throughout the country will now have to make monumental and unprecedented investments to ensure that U.S. citizen voters who are otherwise eligible to vote (including those in my district) are not disenfranchised.

24.     By restructuring election rules in a manner that benefits Republicans and significantly disadvantages Democrats, the E.O. harms the electoral prospects of Democratic House candidates and thus harms the ability of the Democratic Party to achieve one of its key electoral goals for 2026—regaining a majority in the House of Representatives.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:    4/14/2026
_____

_____
**Hakeem S. Jeffries**
**U.S. House Minority Leader**

JA185

# Exhibit 6

Civil Action No. 26-cv-1114 (CJN) (Lead case)

JA186

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>                    Plaintiffs,<br><br>        *v.*<br><br>DONALD J. TRUMP, in his official capacity<br>as President of the United States, *et al.*,<br><br>                    Defendants. | Case No. 1:26-cv-01114 |

**DECLARATION OF CHARLES E. SCHUMER**

I, Charles E. Schumer, declare as follows:

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      I am the senior U.S. Senator from New York, the Senate Minority Leader, and the Leader of the Senate Democratic Caucus.

3.      I have been elected to the U.S. Senate five times and was elected to the U.S. House of Representatives nine times prior to that. I am also a current candidate for U.S. Senate. I am a citizen of the United States, a resident of the State of New York, and an individual voter in federal, state, and local elections.

4.      As the Leader of the Senate Democratic Caucus, I am responsible for helping to elect Democratic Party candidates in U.S. Senate elections across the country. This responsibility is critical to the success of the Caucus and to the mission of the Democratic Party as a whole, as the Caucus's ability to influence the legislative agenda in the U.S. Senate depends on the size of its membership.

1

JA187

5.      I play a direct role in helping to increase the size of the Caucus. In my role as Leader, I provide direct support to Democratic Senate campaigns, often in highly competitive battleground states, by helping to fundraise, weighing in on strategy and messaging, speaking at campaign events, and engaging in other important campaign work. I also work closely with DSCC throughout the entire election cycle to recruit new candidates, craft messaging, prioritize party investments, and develop strategies to elect Democratic Senate candidates.

6.      On March 31, 2026, President Trump issued Executive Order 14,399, titled "*Ensuring Citizenship Verification and Integrity in Federal Elections*" ("E.O." or "Order"), which purports to direct the USPS to take control over which voters will be eligible to vote a mail ballot via the U.S. mail, and further directs the Department of Homeland Security ("DHS") and Social Security Administration ("SSA") to compile and distribute "State Citizenship Lists" to state election officials at least 60 days before every federal election.

7.      The President's flagrantly unlawful E.O., which claims authority that the U.S. Constitution's Elections Clause expressly reserves for the States in the first instance, only to be overridden by the U.S. Congress, will inflict harm on Democratic Senate candidates and the Democratic Caucus by erecting unlawful barriers to the ability of the voters to successfully vote and by interfering with planning and programming for Democratic Senate campaigns.

8.      Even where Democrats ultimately succeed in their campaigns despite the myriad of impediments and burdens imposed by the E.O., candidates and their committees will be harmed by the E.O.'s attempt to impose unlawful rules on the elections process because it will deprive myself and my fellow candidates of a fair process and an accurate result. For the same reasons, the Order is also likely to impede my ability to carry out my responsibilities as Leader. The President's Order also tramples on well-established privacy rights, something that I value and that my

2

JA188

constituents value.

## I.       The New E.O.'s Restrictions on Voting by Mail

9.       President Trump's mandate that the USPS not transmit a mail ballot for any voter who is not enrolled on USPS's "Mail-In and Absentee Participation List" functionally imposes new requirements to cast a mail ballot and is sure to harm qualified voters who depend on mail voting to cast their ballots. This includes constituents of mine who are overseas, temporarily located outside New York State (including our military members), or simply depend on mail voting for any personal reason, including illness or disability.

10.       For the past several years, Democrats have increasingly encouraged voters to vote by mail, because that method is often the least burdensome or most accessible way for voters to participate. As a result, in many states, a greater share of voters who vote by mail are Democrats, including in New York. The E.O.'s mandate could disenfranchise mail voters whom USPS unilaterally deems "ineligible" to cast a ballot via U.S. mail, and will significantly disrupt the plans and—in some cases, the ability to vote at all—of millions of Americans who expect to vote by mail this year and beyond. The impact will fall particularly hard on voters in states where elections are conducted primarily by mail, including California, Oregon, Nevada, Colorado, and Washington.

11.       This most recent E.O., like the President's prior efforts to unilaterally rewrite federal and state election law and take control of the administration of U.S. elections, appears designed to benefit the President's own political party at the Democratic Party's expense. Indeed, it is clear not only from President Trump's years-long attack on mail voting but also his recent public statements that a significant motivation for the E.O. is to harm his political opponents and attempt to solidify the Republican Party's power, regardless of the will of the voters. Permitting

3

JA189

USPS—and the other federal officials who are directed by the Order to facilitate the new changes—to carry out the E.O. would frustrate Democratic campaigns, which are built on existing rules about who can vote by mail, and would severely threaten Democratic voters' fundamental right to vote, significantly harming Democratic campaigns.

12.     The 2026 election cycle is well underway, with multiple primaries having already been conducted under existing and governing law. The unfairness, uncertainty, and confusion that would result from the E.O.'s fundamental changes to the process for voting by mail—as directed by the E.O.—will also make it harder for me to effectively support Senate Democrats who have committed to running for office this year. In order to run effective campaigns, candidates need to know that the rules of the road are clear—and, this year, several candidates have already made investments of resources in their races based on the existing rules. The President's mandate, which attempts to unlawfully change the election rules in a way that tilts the playing field heavily in favor of Republicans, undermines those investments. In short, Section 3(b) of the E.O. makes it more difficult for the Senate Democratic Caucus to elect candidates to serve in the Caucus.

13.     The E.O.'s unlawful mandate that the USPS refuse to transmit mail ballots submitted by those who are not enrolled on its "Participation List" would also harm members of the Democratic Party and other supporters, including those who live within New York State. Many of these voters rely upon USPS to deliver their ballot. These voters expect that their ballots will count if they comply with our state's laws. Changing the rules by transplanting authority from States to the federal government to determine who is eligible to vote by mail would confuse voters and make it more likely that they will be disenfranchised.

14.     The E.O. threatens my own voting rights, too. As a voter in New York State, I am entitled to vote by mail for any reason, and I have voted by mail before given my busy schedule.

4

JA190

Under the E.O., however, my eligibility to use USPS to transmit my ballot is now decided by the federal government, not New York State, which has otherwise determined I am eligible to vote by mail.

## II.    The E.O.'s Creation and Dissemination of "State Citizenship Lists" for Use in Federal Elections

15.    Democratic candidates for U.S. Senate, myself included, are also harmed by Section 2(a) of President Trump's Order, which directs DHS to compile for each State a list of every U.S. citizen above the age of 18 who resides in that State and to share those lists with the chief election official of each state "no fewer than 60 days before each regularly scheduled Federal election," which would include the 2026 general elections and many preceding primary elections. The Order does not explicitly explain the intended use of the State Citizenship List, but the Order's stated purpose is to assist in verifying voter eligibility.

16.    Existing federal law already makes it illegal for foreign nationals to register and vote in federal elections, and there is no evidence of widespread voting by non-citizens in this country. The E.O. is highly unnecessary, yet it threatens to harm the privacy rights of millions of Americans by using protected federal data—including my own records and those of other Democratic Party voters—by sharing those records in unauthorized ways, and further threatens the voting rights of Americans given the near certainty that U.S. citizens will not be included on such lists.

17.    The E.O. specifies that "State Citizenship Lists" will be derived from a variety of federal databases, including in particular DHS's Systematic Alien Verification for Entitlements (SAVE) program and Social Security Administration (SSA) records.

18.    The granting of access and other disclosures of personal information from any

5

JA191

federal database, including SAVE and SSA databases, is troubling to me, as well as to my constituents, who have expressed grave concern about the sharing of their personal information, particularly during the current Administration.

19.     These particular disclosures are even more concerning because the E.O.'s stated purpose is to purportedly identify the "eligible" voters in any given state, even though the records may not be suitable for that purpose. SSA records, for example, were not created to assess voter eligibility and, to my knowledge, have not gone through the required scrutiny to ensure they are appropriate for that purpose. In fact, SSA has only been required by Congress to maintain consistent records for less than five decades and, in my understanding, the agency does not regularly update these records, including information about citizenship. I also understand that the SAVE program often contains outdated information, particularly for naturalized citizens. I am aware that in some states like Texas, Missouri, and Louisiana, incorrect information from SAVE is already being used to wrongly claim that citizens on voter rolls are noncitizens who are ineligible to vote.

20.     As the former Chief Data Officer at SSA has informed Congress, disclosures of information from these federal databases can be catastrophic when it gets into the wrong hands. That is why the Privacy Act requires strict adherence to its procedural safeguards, and why the agencies are required to ensure that all uses of such records are sound and accurate. I have also heard from concerned constituents who are understandably worried that the federal records being pooled by officials in agencies like DHS and SSA have already or will fall into the hands of individuals who have no authorization to access them, including their state and local officials, as the E.O. now instructs federal officials to do.

6

JA192

21.    As far as I am aware, these agencies have not provided Congress notice that the federal government intends to use these records in the manner directed by the Order. To the contrary, as far as I am aware, this Administration has repeatedly disclaimed any effort to build a national database of eligible citizens for use in elections. But last week's Order makes it clear that DHS will—if it has not already—imminently begin compiling citizenship and residence information on every purportedly "eligible" citizen in the country to transmit to state election officials. Even if Congress had authorized the creation of such State Citizenship Lists, which it has not, I do not see how the data the government plans to use can possibly satisfy those requirements and accurately convey citizenship and residence information to the states.

22.    Further, even if these "Lists" were accurate the moment they are shared with election officials (which will not be the case), they will be outdated virtually the next moment, given that voters move within the United States (gaining new residency for voting purposes), gain citizenship, or turn 18 in the months leading up to the election.

23.    Even beyond invading voters' privacy rights, the implementation of the President's E.O. will inflict harm on the Democratic Party and its get-out-the-vote efforts. In particular, the creation of the "State Citizenship Lists" using these databases creates a serious risk that Democratic voters who are in fact U.S. citizens will be erroneously excluded from such lists and not be permitted to vote, or will face barriers before they are able to have their ballots counted, based on data that will be improperly shared with state and local election officials. When fewer lawful Democratic Party voters are able to vote, our members' electoral prospects suffer, and the Party and candidates' campaigns must take steps to ensure voters are not wrongfully disenfranchised—including, for example, by providing information and assistance to affected voters.

7

JA193

24.     Accounting for these problems necessarily takes a substantial toll on my and other candidates' re-election efforts, particularly because it requires time, resources, and energy that would be spent on our other mission-critical efforts to support electing Democrats to Congress. The E.O. therefore significantly undermines my ability to effectively carry out my responsibilities as the Leader of the Senate Democratic Caucus. The Party's highest priority is ensuring that our voters and constituents are able to vote and have their votes counted. Just as with the President's last effort to take control of federal elections via executive fiat, however, DSCC and Democratic campaigns throughout the country will now have to make monumental and unprecedented investments to ensure that voters are not disenfranchised.

25.     By restructuring election rules in a manner that benefits Republicans and significantly disadvantages Democrats, the E.O. harms the electoral prospects of Democratic Senate candidates and thus harms the ability of the Democratic Party to achieve one of its key electoral goals for 2026—regaining a majority in the U.S. Senate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _4/16/2026_____

_Charles E. Schumer_____    _____

**Charles E. Schumer**
**U.S. Senate Minority Leader**

8

JA194

# Exhibit 7

Civil Action No. 26-cv-1114 (CJN) (Lead case)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>                    Plaintiffs,<br><br>          *v.*<br><br>DONALD J. TRUMP, in his official capacity<br>as President of the United States, *et al.*,<br><br>                    Defendants. | Case No. 1:26-cv-01114 |

**DECLARATION OF ADA SHEN**

I, Ada Shen, declare as follows:

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      I live in Paris, France, with my family, and I am a duly registered voter in California. I am a Democrat and I typically vote for Democratic candidates.

3.      I am the Deputy Global "Get Out the Vote" ("GOTV") Officer of Democrats Abroad, the official Democratic Party arm for the millions of Americans living outside the United States. I am also the GOTV Coordinator for the EMEA (Europe, Middle East, Africa) Region for Democrats Abroad. In these capacities, I help lead global and regional efforts to assist our members as well as the wider community of Americans living abroad with registering to vote, requesting a ballot, and returning their ballots to their local election offices or officials back home. I am proud to do my part in helping fellow Americans abroad participate in our political and electoral processes.

1

JA196

4.      Democrats Abroad is recognized as a "state" party by the Democratic National Committee ("DNC") and is represented on the DNC by eight elected voting members. Democrats Abroad also sends a voting delegation to the quadrennial Democratic National Convention. Democrats Abroad has 52 official country committees throughout the world. Our country committees help keep our members and Americans abroad informed of their rights to participate in our political processes back home.

5.      Our members live in more than 190 countries around the globe and vote in every state and Congressional district in the U.S. Many of our members are U.S. Citizens who have settled abroad after serving our country, including as members of the Armed Services, the Foreign Service, or other governmental agency work, as well as those who may be studying, working, or living abroad.

6.      In 1998, I moved abroad from California to Beijing, China to work in independent journalism and to improve my Chinese language skills. To vote in the 2000 and 2004 elections, I had to fly home to California from China to cast my ballot in person. In 2007, I became involved with Democrats Abroad and served as a lead "country committee in formation" organizer. Our main activity was voter assistance for the broader American community, where many did not know they had the right to vote in American elections, did not know how to vote from abroad, and struggled to navigate the available postal services to return their election materials and ballots.

7.      While Americans abroad no longer need to fly home to vote, the obstacles to voting are still significant. A former executive for a major American company who was attempting to navigate the overseas voting process told me, "I have two PhDs, but this is hard. Help!" While in China, I organized and led numerous non-partisan voter registration drives to help enfranchise Americans living there in the 2008, 2010, 2012, 2014, and 2016 federal election cycles.

2

JA197

8.      In 2017, my husband and I moved to Paris where I served as Democrats Abroad France's first elected GOTV Officer and later became National Chair. Democrats Abroad France grew voter engagement and participation by more than 40% under my leadership due to expansion of our phone-banking initiatives, SMS and postcard campaigns; voter registration drives at protests, rallies, and community events; and non-partisan voter outreach on campuses and in the wider community.

9.      For military and overseas civilian voters (those eligible to be covered under UOCAVA federal law), the U.S. Postal Service ("USPS") plays a critical role in ensuring that overseas ballots cast will be counted. In some states and under certain conditions, UOCAVA voters may submit their completed Federal Post Card Application ("FPCA")—the federal form used to register to vote or request a ballot—only by postal mail to their local election officials.

10.      Critically, USPS also delivers blank absentee ballots to overseas voters who have requested to receive them, and, for roughly half the states, all their overseas civilian voters are required to return their completed ballots to election offices via postal mail—requiring use of USPS and the international postal mail relay network that USPS partners with in other countries. However, USPS, like postal mail systems in other countries, is merely a carrier network for postal mail delivery and services. USPS does not verify voter eligibility or have any role in making other determinations about who can vote. Additionally, UOCAVA voters have the right to vote in at least U.S. federal elections, and in many states they are allowed to vote in all state and local elections, based on both federal and state laws. Determining detailed and sensitive aspects of voter eligibility in accordance with applicable federal, state, and local laws and regulations is normally the responsibility of state and local election officials in our home states where we vote, a function distinctly separate from the transmission of mail.

3

JA198

11.     I understand that the President issued an Executive Order on March 31, 2026, directing major changes to mail voting protocols in the United States, including by directing the USPS to determine which voters will be able to vote a mail ballot via USPS. Most importantly, the Executive Order states that USPS "shall not transmit mail-in or absentee ballots from any individual" who is not "enrolled with the USPS" based on a list that USPS will provide states. Based on the limited information provided in the Executive Order, it is difficult to see how UOCAVA voters who may no longer actively reside at an address (but under UOCAVA still retain the right to vote at that address based on past ties) would be properly included on such a federally-mandated state list based only on federal government database information, even assuming that these databases were error- and name mismatch-free. It seems far more likely that UOCAVA voters would be missing from such a federally-mandated state list. I am very concerned that many UOCAVA voters would find themselves unable to receive a ballot and unable to remedy any discrepancies and inconsistencies between the proposed federal lists and a correct disposition of the voter's eligibility as properly validated by state and local election authorities.

12.     The President's Executive Order harms me personally as a California voter in multiple ways. I am an overseas voter who has relied on voting by mail through USPS services in the past, just like many thousands of other California voters who live and vote from abroad. I have a reasonable expectation that I can receive my blank ballot by mail if I ask for it, and that my voted ballot will be counted upon being returned by mail as long as I comply with California's election laws in doing so, which conform with existing federal law for overseas voters. But the new Executive Order directs USPS to refuse to handle mail ballots unless a voter appears on their federally mandated state list of mail voters. This harms my right to vote because it conditions my ability to vote by mail on inclusion on this USPS list, even though I have been deemed by my

4

JA199

home state to be eligible to vote by mail, and despite the fact that federal law guarantees me the right to vote by mail in federal elections. The same is true for the millions of other eligible overseas U.S. citizen voters in my shoes. This E.O. creates multiple points of bureaucratic confusion as to whose authority counts should my ballot "fail" to check out—not according to my local election officials, but according to USPS.

13. The President's E.O. makes it such that voters who are currently deemed by their states to be eligible to vote by mail—including overseas voters like me—can no longer fully rely on USPS to deliver our ballots normally, as USPS is now supposed to gatekeep ballot transmission. This disrupts reasonable expectations of mail delivery, due to mystifying and conflicting eligibility criteria informing the federal lists, and without any clear remedy or clear authority to resolve discrepancies. It creates new and confusing bureaucratic hurdles in order to simply exercise a federally-protected right to vote. Only U.S. citizens can vote and only once they have provided detailed personal information matching their voter registration. And the ballot is only counted after a local election official has validated the voter's information against their voter registration. There is simply no need for new USPS processes or double-verification of voters as prescribed by the President's E.O.

14. Even for those living overseas who may have access to alternative voting methods—such as receiving a ballot by email or returning it by email, online upload, or fax—the reality is that the Executive Order affects USPS delivery of ballots imposing additional, cumbersome steps and confusion on what is already a challenging and time-constrained process. These additional steps will vary by state, further increasing complexity. The current official 2026–2027 Voter Assistance Guide issued by the Federal Voting Assistance Program (FVAP), which sets forth eligibility and return rules for UOCAVA voters in every state, spans 485 pages—

5

JA200

illustrating the already significant procedural complexity voters must navigate. State laws governing alternative return methods are highly variable. For example, under California law, UOCAVA voters may request to receive a blank ballot by postal mail or email, which can mitigate delivery failures. However, completed ballots cannot be returned by email or online upload; they may be returned only by postal mail or by fax. Use of fax return is itself contingent on access to a functioning fax service and, in some cases, the execution of additional forms or waivers. California voters abroad who cannot access fax *must* rely on postal mail to return their ballots. As a result, overseas voters in the state—many of whom cannot reasonably be expected to return to the United States just to vote in person—are dependent on a limited and uneven set of transmission options. California is just one state; approximately half of all other U.S. states require that all overseas ballots be returned by postal mail only. The Executive Order's disruption of postal ballot transmission forces voters to navigate a fragmented, state-specific set of alternative procedures, increasing the likelihood of confusion, delay, and error within an already compressed election timeline. Based on my experience mobilizing overseas voters, additional procedural hurdles—such as uncertainty regarding USPS eligibility requirements or the need to identify and access compliant alternative return methods—greatly discourage participation and heighten risk of disenfranchisement.

15.    The E.O.'s restrictions are especially concerning because U.S. citizens living abroad already suffer from a low voter-participation rate. Voting from abroad—even under the current system—is extremely difficult to navigate, as explained. The estimates of non-military U.S. citizens living abroad at any particular time range from 4.5 million to 9 million. But according to FVAP, a voter assistance program run by the U.S. Department of Defense, the voter turnout rate was only about 3.4% of eligible voters in 2022, and around 7.8% in 2020. Final 2024 numbers are

6

JA201

not yet available to my knowledge, but they are likely to be similarly low. These U.S. citizens voting from abroad include important members of our society whose voices should be represented in our democracy—for instance, students, veterans, and Americans working for international companies. They also include service members defending the country overseas, diplomats representing it, aid workers advancing the country's values, educators and researchers contributing to global knowledge, entrepreneurs building cross-border economic ties, and retirees who remain part of the American civic community even from abroad.

16.    Separately, I understand that the Executive Order directs the Department of Homeland Security, U.S. Citizenship and Immigration Services, the Social Security Administration, and other federal agencies to compile and distribute "State Citizenship Lists" derived from multiple federal data sources, to be transmitted to state election officials no fewer than 60 days before each federal election. While the Order does not clearly define all intended uses of these lists, it states that they are to assist in verifying voter eligibility.

17.    This provision harms me as an American citizen by compelling the aggregation, cross-referencing, and dissemination of my personal information across multiple federal agencies and to state officials for purposes that are not clearly limited or defined. I have a strong interest in maintaining the privacy and integrity of my personal data and in ensuring that the federal government complies with statutory protections governing its use. Federal law, including the Privacy Act of 1974, restricts the disclosure and use of personal information maintained in federal systems of records to specified purposes, subject to defined safeguards. The Executive Order, however, directs the consolidation and transmission of sensitive personal data across agencies and to third parties in a manner that, at minimum, expands access to that information and increases the number of officials who may handle it. This materially heightens the risk of unauthorized

7

JA202

disclosure, misuse, or error. That risk is not hypothetical. Federal agencies responsible for maintaining sensitive personal data have, in recent years, been found to have improperly disclosed or inadequately protected such information. Expanding the scope, circulation, and handling of these records—particularly for a newly created and not fully defined purpose—further increases the likelihood that personal data may be exposed, misused, or inaccurately recorded. For me, this constitutes a serious injury: the compelled inclusion of my personal information in a system of broad inter-agency sharing and external dissemination that I cannot meaningfully control, and that exposes me to heightened risks to my privacy and data security.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 4/17/2026 _____

_____

**Ada Shen**

8

JA203

# Exhibit 8

Civil Action No. 26-cv-1114 (CJN) (Lead case)

JA204

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>     Plaintiffs,<br><br>  *v.*<br><br>DONALD J. TRUMP, in his official capacity<br>as President of the United States, *et al.*,<br><br>     Defendants. | Case No. 1:26-cv-01114 (CJN) |

**DECLARATION OF CAROLYN BETENSKY**

I, Carolyn Betensky, declare as follows:

1. I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2. I am a U.S. citizen and registered voter in Providence County, Rhode Island. I have been registered to vote in Rhode Island since I moved to the state in 2004 and I regularly participate in elections. I am a Democrat and typically support Democratic candidates.

3. I have spent most of my professional career as a Professor of English. I am now in my fourth year as Chair of the English Department at the University of Rhode Island.  Prior to this, I served for four years on the national board and eight years on the state board of the American Association of University Professors ("AAUP"), a national faculty union. The AAUP is a strong proponent of academic and intellectual freedom. I remain active in AAUP today.

4. I have, on my own time, also worked to increase voter turnout and engagement on the University of Rhode Island campus. I sometimes help to register university students, who can face significant barriers accessing the franchise as new voters. I have also volunteered as a

1

JA205

nonprofit election observer at the polls.

5.    I am politically active myself and advocate for causes that I care about. For example, I am a member of a brass band that plays at protests and union strikes. We have played at major protests, such as "No Kings"—protests organized to reject the unprecedented actions by our current President to erode our democratic institutions.

6.    I understand that recently, the President issued a new executive order, E.O. 14399, directing fundamental changes to American elections. As I understand it, the E.O. directs the Department of Homeland Security ("DHS"), the United States Citizenship and Nationality Service ("USCIS"), and the Social Security Administration ("SSA") to compile lists of adult citizens in every state, and then orders DHS to transmit those lists to state election officials before federal elections.

7.    The President's order harms me as an American citizen and Rhode Island voter who does not wish for my information to be disclosed or disseminated to an increasing number of federal officials, let alone used to attempt to confirm my voting eligibility.

8.    I am aware that federal laws—consistent with our long-held notions of privacy rights in this country—strictly limit when federal data can be shared and for what purposes. These kinds of protections make good sense to me. I have provided certain federal agencies with sensitive information necessary to carry out their specific duties, but that limited allowance is not intended as permission to share my data with other officials for other purposes. I am very concerned that the order seems to direct the agencies to compile lists that sound a lot like the kind of national registry from the novel "1984."

9.    I know from reporting that the SAVE database—one of the databases the executive order directs officials to use to compile the new "lists"—pools a ton of private information. This

2

JA206

information includes names, addresses, social security numbers, other identifying numbers, citizenship and immigration status, and more. My understanding is that federal officials who are working on building the E.O.'s required lists will be allowed to access that kind of information.

10.    Given that I am a long-time voter and U.S. citizen in Rhode Island, DHS will presumably access records containing my information at SSA and other agencies pursuant to the order to build the lists. As explained, I am deeply troubled by the fact that federal officials in DHS who, as far as I know, have no authority or business accessing my data, will do so.

11.    I am also concerned that the federal government appears to be seeking voter registration data from states under false pretenses, which underscores my concern with the proliferation of data-sharing in the Trump Administration. In my understanding, the government, including the DOJ and DHS, disclaimed efforts to build a national list of citizens or voters. Yet, that appears to be precisely the goal with the new executive order.

12.    As I understand from reporting, the SAVE database and SSA records that will be used often produce wrong information and are generally incomplete. I worry about what will happen when, inevitably, the various sources of data the federal government is pooling suggest that eligible voters are either not citizens or not residents in the state in which they vote. The order itself requires that investigations and prosecutions of individuals the government believes are "ineligible" must be prioritized.

13.    Making matters worse, the E.O. says the government will send supposedly final lists of eligible voters to the states 60 days before every federal election. I know from my experience as a professor that students move frequently, and I know from my experience as a New Englander and Rhode Islander that people move between states (especially geographically smaller states) with some frequency. The fact that someone has moved does not mean that they are

3

JA207

ineligible to vote, or should be subject to investigation and scrutiny by officials who have no business interfering with their affairs.

14.     As for me, I have no idea whether the records SSA and DHS are using match my state records. I was born before the SSA even started collecting citizenship records consistently, and I moved to Rhode Island in 2004. So, I do not know how DHS or SSA would have updated residence information for me. So even if the federal government officials doing this work have citizenship information about me, I do not have confidence that it will match records reflecting my current residence in Rhode Island. And even if they identify me as a citizen and Rhode Island resident, I do not have confidence that Rhode Island will be able to match my information to Rhode Island's state voter file with the federal government's list.

15.     In short, the President's executive order—in particular, its directive to DHS, USCIS, and SSA to compile unprecedented citizenship lists using incomplete and inaccurate federal records—directly harms me and my fellow voters in Rhode Island and throughout the United States. I am deeply troubled by the President's directive to compile, use, and disclose any information about us without authorization—it's an invasion of our privacy, and it risks entirely unfair consequences. The executive order seems certain to result in serious consequences for every day Americans like me and the students I serve.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  4/17/2026  _____

_____

**Carolyn Betensky**

4

JA208

# Exhibit 9

Civil Action No. 26-cv-1114 (CJN) (Lead case)

JA209

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>       Plaintiffs,<br><br>   *v.*<br><br>DONALD J. TRUMP, in his official capacity<br>as President of the United States, *et al.*,<br><br>       Defendants. | Case No. 1:26-cv-01114 (CJN) |

**DECLARATION OF DANIELLE LITWAK**

I, Danielle Litwak, declare as follows:

1. I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2. I am a registered voter in Jersey City, New Jersey. I regularly vote in federal elections. I am a Democrat and typically support that Party's candidates.

3. I am also an attorney, but I submit this declaration in my capacity as an individual voter and resident of New Jersey.

4. When I was in law school, I was a regular volunteer with a non-partisan organization that hosted a voter protection hotline. As a volunteer, I advised voters on their rights leading up to and on election day. I worked closely with voters who called the hotline to ensure that they knew what they had to do to cast a ballot, and how to make their voice heard, including by overcoming any barriers they might meet along the way.

5. I understand that the President issued a new executive order on March 31, 2026, directing major changes to mail voting protocols in the United States. I understand the President's

1

JA210

order directs the Department of Homeland Security ("DHS"), the United States Citizenship and Nationality Service ("USCIS"), and the Social Security Administration ("SSA") to compile "State Citizenship Lists" from various federal data sources and distribute the lists 60 days before every federal election.

6.     The executive order harms me personally as a New Jersey voter who does not wish for her information to be disclosed to an increasing number of federal government officials. Like many other Americans, I am terrified by the growing number of federal officials the Trump Administration is allowing to access, use, and disclose information in these kinds of confidential databases. I care deeply about my own privacy rights, and I expect the government to respect the laws that protect those rights, so the fact that these officials are accessing information they should not be able to access about me, all for the purpose of assessing my eligibility to participate in elections, troubles me greatly.

7.     In my understanding, the federal officials given access to "SAVE," one of the databases that the executive order requires using for matching up federal records, have access to a vast set of sensitive information for anyone who, like me, has a social security number—including names, addresses, dates of birth, unique identifying numbers, citizenship information, and more. It is unclear to me why immigration officials in USCIS would ever have access to that kind of information about me, much less for the purpose of "verifying" my eligibility to vote. As far as I'm aware, federal law does not give federal officials a blanket authorization to use data entrusted to specific federal agencies for specific purpose in any way they wish.

8.     I strongly believe that voter privacy is vital to maintain a healthy democracy and strong civic engagement. I know from my volunteer work with the voter hotline that, for voters to confidently participate in the electoral process in the United States, they must be able to rely on

2

JA211

the basic principle that they will not face harmful repercussions or retaliation just because they choose to participate. If federal officials are pooling together lists of eligible voters for the purpose of investigating and prosecuting individuals who they believe should not be voting, which is exactly what the President's order dictates, I anticipate that many will be far more hesitant to participate.

9.      I am also greatly concerned about the potential risk of improper data leaks of my own information, which are far more likely when broader sets of individuals in the government have access to sensitive databases. In fact, I am aware that officials in some federal agencies have admitted to improperly disclosing and using federal data in the last year. Additionally, close family members have been victim to identity theft stemming from data leaks. As a result of such fraud, they were locked out of their financial accounts, and it was an administrative nightmare to untangle the mess that had been created by someone else having control over their personal information and data. This is yet another reason why I am concerned about the growing number of federal officials getting access to my personal data.

10.      Most importantly, I fear what will happen when, inevitably, the various sources of data the federal government is pooling suggest that eligible citizens are not qualified to vote in their respective states. The order says that investigations and prosecutions of individuals they believe are ineligible must be prioritized, so I worry that individuals in my community—or even myself—who are eligible to vote could be subject to improper investigations because of simple data mismatches.

11.      In short, I am deeply troubled by the order's directive to compile, use, and disclose any information about me and other voters in New Jersey and all over the country. It's an invasion of privacy and threatens serious repercussions to lawful voters like me.

3

JA212

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: <u>4/16/2026</u>

<u>*Danielle Litwak*</u>

**Danielle Litwak**

4

# Exhibit 10

Civil Action No. 26-cv-1114 (CJN) (Lead case)

JA214

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al*., | |
| Plaintiffs, | Case No. 1:26-cv-01114 (CJN) |
| *v.* | |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al*., | |
| Defendants. | |

**EXPERT DECLARATION OF DR. KENNETH MAYER**

I, Kenneth Mayer, declare as follows:

1. I have been asked by counsel in this matter to analyze the process established by Section 2(a) of Executive Order 14399 that creates a "State Citizenship List" for each state, purporting to be lists of eligible U.S. citizens over age 18 with residence in that state, derived from Social Security Administration data and the Systematic Alien Verification for Entitlements (SAVE) system within the Department of Homeland Security, naturalization records, and other federal data.[1]

## Summary of Conclusions

2. The State Citizenship Lists will not – indeed cannot – provide reliable, accurate, or useful data to state election officials about the number, identity, or location of voting-age U.S. citizens residing in a state.

3. The system, and any resulting data, will be riddled with errors and deficiencies. These issues fall into multiple categories: inaccurate and incomplete citizenship information in federal data; a lack of information about residences, residential moves and name changes in federal data; a lack of comprehensive unique identifiers in State Citizenship Lists that would allow election officials to accurately link to voter files or identify eligible but unregistered U.S. citizens residing in a state; and the fact that any State Citizenship List will be out of date the instant it is created.

4. These problems are not trivial – it is certain that any such attempt to create State Citizenship Lists in all 50 states and the District of Columbia will contain many thousands, and likely millions, of errors, falsely identifying citizens as noncitizens, failing to accurately identify citizens and put them on State Citizenship Lists, placing voters in the wrong state, placing voters in the wrong county, failing to incorporate data on name changes through marriage or divorce, and producing data that will be difficult to link to voter files because of a lack of unique individual identifiers across State Citizenship Lists and statewide voter files.

5. Moreover, there is no way for state election officials to assess the reliability of a State Citizenship List, as there is no comparison data that permits identification of bias or errors in any such list. Even the most comprehensive federal data on citizenship relies on surveys (such as the American Community Survey and the Current Population Survey) that produce estimates, not enumerations, and which can only generate estimated aggregate population totals for geographic areas.

6. Section 2(a) of Executive Order 14399 will create massively error-prone and incomplete lists that will be of no practical use to election officials, will create enormous confusion among both voters and election officials, will generate mismatches and both false positive and false negative matches between State Citizenship Lists and voter files, and will cause administrative chaos as election officials try to process millions or even tens of millions of records in State Citizenship Lists with incomplete and incorrect data. If these lists are used to determine who is qualified to vote, it will result in the disenfranchisement of large numbers of eligible voters.

7. There is no evidence of material numbers of non-U.S. citizens registering or voting in U.S. elections. An analysis of documented cases identified 77 instances since 1999, over a time when I estimate that as many as 2.5 billion votes – and quite possibly many more– have been cast in federal, state, and local elections.

---

[1] 91 *Federal Register* 17125, April 3, 2026.

1

JA216

**Qualifications and Expertise**

8. I have a Ph.D. in political science from Yale University (1988), where my graduate training included courses in econometrics and statistics. My undergraduate degree is from the University of California, San Diego (1982), where I majored in political science and minored in applied mathematics.

9. I am Professor Emeritus of Political Science at the University of Wisconsin-Madison and retired in May 2024 after 35 years on the faculty and 24 years as a Full Professor. My CV is attached to this report as Appendix A.

10. All publications that I have authored and published appear in my CV. Those publications include the following peer-reviewed journals: *Journal of Politics*, *American Journal of Political Science*, *Election Law Journal*, *Legislative Studies Quarterly*, *Presidential Studies Quarterly*, *American Politics Research*, *Congress and the Presidency*, *Public Administration Review*, *Political Research Quarterly*, and *PS: Political Science and Politics*. I have also published in law reviews, including the *Richmond Law Review*, the *UCLA Pacific Basin Law Journal*, and the *University of Utah Law Review*. My work on campaign finance has been published in *Legislative Studies Quarterly*, *Regulation*, *PS: Political Science and Politics*, *Richmond Law Review*, the *Democratic Audit of Australia*, and in an edited volume on electoral competitiveness published by the Brookings Institution Press. My research on campaign finance has been cited by the U.S. Government Accountability Office and by legislative research offices in Connecticut and Wisconsin.

11. My work on election administration has been published in the *Election Law Journal*, *American Journal of Political Science*, *Public Administration Review*, *Political Research Quarterly*, and *American Politics Research*.

12. I was part of a research group retained by the Wisconsin Government Accountability Board to review its compliance with federal mandates and reporting systems under the Help America Vote Act, and to survey local election officials throughout the state. I served on the Steering Committee of the Wisconsin Elections Research Center, a unit within the UW-Madison College of Letters and Science.

13. In 2012, I was retained by the U.S. Department of Justice to analyze data and methods regarding Florida's efforts to identify and remove purportedly ineligible noncitizens from the statewide file of registered voters.

14. In 2022, I chaired the Dane County (WI) Election Security Review Committee, which produced a report for county officials on the physical security of election infrastructure.

15. In the past four years, I have testified as an expert witness in trial or deposition or submitted a report in the following cases:

Federal: *Count Us In, et al. v Morales, et al.*, No. 1:25-cv-00864-RLY-MKK (S.D. Ind.); *Coalition for Open Democracy, et al. v Scanlan et al.*, No. 1:24-cv-00312-SE-TSM (D.N.H.); *Equality State Policy Center v. Gray*, No. 25-cv-00117-SWS (D. Wyo.); *LULAC Texas, et al., v. John Scott, et al.,* No. 1:21-cv-0786-XR (W.D. Tex.); *League of Women Voters of Fla., Inc., et al. v. Lee, et al.*, No. 4:21-cv-00186-MW-MAF (N.D. Fla.); *Fair Fight Inc., et al. v. True the Vote, Inc., et al*., No. 2:20-cv-00302-SCJ (N.D. Ga.).

JA217

State: *Montana Federation of Public Employees v. State of Montana et al.,* No. DV-25-268 (1st Jud. Dist. Ct., Lewis and Clark Cnty.); *League of Women Voters of Kansas et al. v. Schwab et al.*, No. 2021-CV-000299 (3d Jud. Dist., Shawnee Cnty. Kan.); *Eucke, et al. v. Wisconsin Elections Commission, et al.*, No. 2024CV007822 (Cir. Ct., Milwaukee City, Wis.); *League of Women Voters of Mo. & Mo. State NAACP v. Missouri, et al.*, No. 22AC-CC04333 (Cir. Ct. of Cole Cnty., Mo.); *Mo. State Conf. of the NAACP et. al. v. Missouri, et al.*, No. 22AC-CC04439 (Cir. Ct. of Cole Cnty., Mo.); *Lake v. Hobbs, et al.*, No. CV-2022-095403 (Maricopa Cnty. Sup. Ct, Ariz.); *Mont. Democratic Party & Mitch Bohn v. Christi Jacobsen*, consolidated No. DV 21-0451 (13th Jud. Ct. Yellowstone Cnty., Mont.).

16. Courts consistently have accepted my expert opinions and the basis for those opinions. No court has ever excluded my expert opinion under *Daubert* or any other standard.

17. Courts have cited my expert opinions in their decisions, finding my opinions reliable and persuasive. *See League of Women Voters of Missouri and Missouri State NAACP v. State of Missouri et al.*, No. 22AC-CC04333 (Cir. Ct. of Cole Cnty., Mo.); *Fair Fight Inc., et al. v. True the Vote, Inc., et al.*, No. 2:20-cv-00302-SCJ (N.D. Ga.); *League of Women Voters v. Thurston*, No. 60CV-21-3138 (5th Div. Cir. Ct. Pulaski Cnty., Ark.); *Mont. Democratic Party & Mitch Bohn v. Christi Jacobsen*, consolidated No. DV 21-0451 (13th Jud. Ct. Yellowstone Cnty., Mont.); *Driscoll v. Stapleton*, No. DV 20 0408 (13th Jud. Ct. Yellowstone Cnty., Mont.); *Priorities U.S.A., et al. v. Missouri, et al.*, No. 19AC-CC00226 (Cir. Ct. Cole Cnty., Mo.); *Whitford v. Gill*, 218 F. Supp. 3d 837 (W.D. Wis. 2016); *One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896 (W.D. Wis. 2016); *Baldus v. Members of Wis. Gov't Accountability Bd.*, 849 F. Supp. 2d 840 (E.D. Wis. 2012); *Milwaukee Branch of the NAACP v. Walker*, 851 N.W. 2d 262 (Wis. 2014); *Baumgart v. Wendelberger*, No. 01-C-0121, 2002 WL 34127471 (E.D. Wis. May 30, 2002).

18. I am being compensated at a rate of $600 per hour for my services in this matter. My work in this case is independent and impartial. My compensation is not dependent on either the substance of my opinion or the outcome of this case.

**Errors In Underlying Citizenship Verification Data**

19. There is no national database of U.S. citizens at the federal level, and no federal system that allows accurate and up-to-date identification of the current residence of the roughly 211 million registered voters[2] or the estimated 241-243 million voting age U.S. citizens.[3]

20. Neither the Social Security Administration nor the DHS SAVE system has comprehensive information about the identity, citizenship, or residence of U.S. citizens.

---

[2] 2024 Election Administration and Voting Survey, U.S. Election Commission. https://www.eac.gov/news/2025/06/30/us-election-assistance-commission-releases-2024-election-administration-and-voting.

[3] U.S. Census Bureau, Citizen Voting Age Population (CVAP) Special Tabulation from the 2020-2024 5-year American Community Survey. https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.html. Michael McDonald (University of Florida) estimates an eligible citizen age population of 243 million in 2024 (after removing the population of voting age citizens who are ineligible because of felony convictions); *see* University of Florida Election Lab https://election.lab.ufl.edu/2024-general-election-turnout/.

3

JA218

21. Neither the Social Security Administration or the DHS SAVE system has comprehensive and up to date information about name changes that occur through marriage or divorce, and which by over a 10-1 margin will affect women more than men (Lin 2023).

22. The Social Security Administration records citizenship data at the time of an application for a Social Security Number,[4] and there is no requirement that individuals update their citizenship information until they apply for benefits or request a replacement card: "[T]there is no obligation for an individual to report to SSA a change in his or her citizenship or immigration status until he or she requests a replacement card or files a claim for a Social Security benefit." (Social Security Administration Office of the General Counsel 2023, 2).

23. The Social Security Administration did not require citizenship information for foreign-born applicants or individuals under age 18 until 1974, and it was not until 1978 that citizenship information was required for all applicants. Even after that, SSA did not consistently retain citizenship data until 1981.[5]

24. The SSA itself warns: "While the citizenship information is accurate for SSA's program purposes, if used later for other purposes, it may not be current." (Social Security Administration Office of the General Counsel 2023, 2). As a result, citizenship data is very likely to be out of date for many naturalized U.S. citizens (Fifield 2025).

25. The Social Security Administration estimates that one-quarter of records in its Master File have no citizenship information at all (Social Security Administration Office of the General Counsel 2023, 2).

26. The Systematic Alien Verification for Entitlements system (SAVE) is not a comprehensive database of U.S. citizens. SAVE was originally created as a way to verify the immigration status and eligibility of individuals applying for public benefits by linking to federal databases, not to create national lists of citizens or verify citizenship generally (Immigration Policy Center 2012).

27. After a 2025 overhaul, SAVE now has the capability to connect to SSA and other federal data for citizenship information (such as state driver's license files or U.S. passport records, see Department of Homeland Security 2025). But it is still reliant on the accuracy of the underlying SSA or other citizenship data at the federal level, which are known to contain errors and gaps (Singh and Reynolds 2025).[6]

---

[4] "The citizenship [data] SSA maintains merely represents a snapshot of the individual's citizenship status at the time of their interaction with SSA. SSA's records do not provide definitive information about an individual's citizenship status" (Social Security Administration Office of the General Counsel 2023, 2).

[5] https://www.ssa.gov/policy/docs/ssb/v69n2/v69n2p55.html. See also Social Security Administration Office of the General Counsel (2023), 2.

[6] DHS can also link to data on Department of State records, which would document citizenship if the individual has a U.S. passport (https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet). However, only about half of U.S. citizens possess a passport (https://www.americanprogress.org/wp-content/uploads/sites/2/2025/01/SAVEact-tables.pdf), and less than half of registered voters nationwide report possessing an unexpired passport with their current legal name (2024 Survey on the Performance of American Elections, MIT Election Data and Science Lab, items q50, q50a, and q50b; https://electionlab.mit.edu/research/projects/survey-performance-american-elections).

28. The result is that any citizenship verification process based on SAVE and SSA data will falsely identify U.S. citizens as noncitizens and fail to accurately identify U.S. citizens, with the effects most likely for naturalized citizens, those who obtained a social security number before 1974, those who have not interacted with the social security system since obtaining their social security number, and those whose names have changed through marriage or divorce.

29. The inaccuracy of SAVE and SSA citizenship data is known to result in errors when it is used to attempt to verify citizenship for voting purposes. When states have submitted voter lists to DHS for mass verification of citizenship through the SAVE process, the resulting lists of purportedly noncitizen registrants have proven to be inaccurate, with naturalized citizens falsely flagged as noncitizens and error rates as high as 80% (Fifield and Despart 2026). In one instance, the SAVE process incorrectly flagged as a noncitizen an individual who had registered to vote at the conclusion of his naturalization ceremony.[7]

## Residential Mobility and Lack of Reliable Information on State Residency

30. Executive Order 14399 is completely silent on the question of how the federal government will determine residency of voting age citizens in a state for purposes of State Citizenship Lists. Section 2 states only that the DHS Secretary "shall take appropriate action to compile and transmit to the chief election official in each State a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain residence in the subject State."

31. It is highly unlikely the federal government has the data or means to accurately identify citizens' residences, including because addresses are not used for matching federal data to confirm citizenship in either the Social Security Administration or SAVE process (under the 2025 changes to SAVE, verification uses only name, date of birth, and either a social security number or an identifier in immigration data such as the Alien Registration number or naturalization certificate number).[8]

32. The problem is further exacerbated by the fact that the U.S. population is mobile, with tens of millions of people changing residence (and even state) from one year to the next. Census data show that between 2023 and 2024, over 7.5 million people moved from one state to another; IRS data show that in 2023, 6.6 million individuals filed a federal tax return with an address in a state different than what they used in 2022. And research shows that over 17 million people move between counties over the course of a year, and between 2015 and 2020 approximately 100 million individuals changed addresses (Morse 2023, 2127).[9]

33. The Electronic Registration Information Center (ERIC), a multistate organization that assists state officials with voter list maintenance, identified 13.9 million registered voters who moved from one state to another between 2013 and 2025, and 30 million registered voters who had moved within a state. This is not a comprehensive national figure, as ERIC membership had varied from 7 to 31 states (plus the District of California) over the period.[10]

---

[7] The problem of outdated citizenship information in administrative files is well known (see paragraph 72, showing that using driver's license files to identify noncitizens resulted in a 99.9% error rate in Florida).
[8] https://www.uscis.gov/save/about-save/save-verification-process.
[9] https://www.census.gov/newsroom/blogs/random-samplings/2014/02/moving-county-to-county.html
[10] https://ericstates.org/statistics/.

34. The problem becomes even more complex because many voters will list a *voting address* (a voter's permanent address, where they are registered to vote for residency purposes) that is different from their *current residential address*. This is one of the paradigmatic reasons for absentee voting—when a voter might be temporarily out of a county, state, or even the country because of things like school, a job, or military service.

35. The differences between a voter's permanent, registration address and temporary, residential address have led to false claims of election fraud in the past, such as in Georgia where an organization (True the Vote) challenged the registration of over 250,000 voters based on claims that the voters had filed a National Change of Address form with the U.S. Postal Service purportedly indicating a move to a different county or state. My analysis of this claim found tens of thousands of obvious errors in the True the Vote data, including misidentified records with duplicate names, tens of thousands of registrants who showed a residential address in a municipality near a university campus or military base, and hundreds of voters with residential addresses on a military base. Students away from home at school and miliary personnel stationed away from home are again classic examples of absentee voters, and any purported national list of eligible state residents is certain to miss many of them.[11] This is also a key reason why National Change of Address forms are not a reliable method of determining a voter's residence for voting purposes.

36. It is unclear how much residential data even exists in either SAVE or in SSA files. Residential address information is not required to apply for a social security number or replacement card.[12] While the SSA has a mechanism to update contact or other information in a social security record, unless an individual is currently receiving benefits, such updates are not required and depend on individuals to initiate the process.[13] By law, social security benefit payments are made electronically via direct deposit to financial institutions, and the agency stopped issuing and mailing paper checks in September 2025.[14]

37. The administrative processes involved in maintaining updated residence and address information in voter files is extremely complex, particularly for eligible voters moving from one state to another (see Morse 2023).

38. State voter files are dynamic and continuously changing as new voters are added, voters are put in inactive status, and voters are removed. In 2024, 29 states allowed some form of same day registration, and 23 states allowed election day registration; over 2.6 million voters used same day or election day registration (US Election Assistance Commission 2025, 143). In 2023 and 2024, election officials reported over 103 million registration transactions, either new registrations or updates. 25.3% of those transactions were new, indicating that the individual was either not registered before, had just turned 18, or had moved from another state (US Election Assistance Commission 2025, 146). EAVS reports that nationwide, 3.4% of all registration activity in 2024 occurred at polling places and early voting sites (US Election Assistance Commission 2025, 144).

---

[11] Expert Report of Kenneth R. Mayer, Ph.D., *Fair Fight Inc., et al. v. True the Vote, Inc., et al.*, Case No. 2:20-CV-00302-SCJ (N.D. Ga.), May 14, 2021.

[12] https://www.ssa.gov/ssnumber/ss5doc.htm. Applicants need proof of identity, citizenship, and date of birth. If an applicant uses a driver's license or state ID, the application process does not appear to even record the address on the license.

[13] https://www.ssa.gov/personal-record; SSA, *FAQ: How can I change my address or direct deposit information for my Social Security benefits or Supplemental Security Income (SSI) payments?* ("If you do not receive Social Security benefits, SSI payments, or Medicare, you do not need to change your address with us.") https://www.ssa.gov/faqs/en/questions/KA-01711.html.

[14] "Direct Deposit of Social Security Benefits," https://www.ssa.gov/oact/progdata/directdeposit.html.

6

39. State Citizenship Lists becomes static the moment they are generated and will be immediately outdated. Such a static file simply cannot capture individuals who move to a state, establish residency, request absentee ballots, or register to vote after the State Citizenship Lists are generated.

40. As a consequence, it is a certainty that any attempt to create a file of state residents using federal data will contain many thousands, if not millions, of inaccurate records because of missing, inaccurate, or outdated information.

**Lack of Comprehensive Unique Individual Identifiers in State Citizenship Lists and State Voter Files**

41. Any use of the State Citizenship Lists by states to determine who may vote or cast a mail ballot immediately presents a significant problem: there is no simple or reliable way to fully and accurately link an individual in a State Citizenship List to the same individual in a state voter file, or to determine that an individual in a voter file is not on that state's State Citizenship List, because there does not appear to be any comprehensive unique individual identifier in State Citizenship Lists that also exists in a state voter file.

42. The problem is ensuring that information about an individual identified in one large-scale administrative file (here, State Citizenship Lists, which will at a minimum contain hundreds of thousands of records in the case of a small state, tens of millions of records in a large state, and over 200 million records nationally[15]) is connected to the *same* individual, who may have a different address, may have moved to another state or may even have changed their name, in another large-scale administrative file (here, a statewide voter list),

43. This is a question of "data linkage," which is a well-known problem with voter file matching across states or matching voter files with other large administrative files (Ansolabehere and Hersch 2017; Huber et al. 2021; NASS 2017; Wisconsin Elections Commission 2021; Enamorado, Fifield, and Imai 2019; Goel et al. 2020; Kim, Schneider and Alvarez 2020; Merivaki 2020).

44. In large databases with a common unique identifier in both data sets being linked – such as a full 9-digit social security number in SSA data or unique voter identification number in a voter file – the linking process can be relatively straightforward (Christen 2012). In this scenario, an individual in one file with a social security number is almost certainly the same individual with that social security number in a different file, assuming that the underlying data exists and has been entered correctly in both files.

45. In the absence of the same unique identifier present in both files being linked, the matching process is much more difficult and is far more likely to result in false positives (linking an individual in one file to a different individual to another) and false negatives (failing to link to the same individual in both files).

46. With respect to State Citizenship Lists, there does not appear to be a unique identifier that could comprehensively exist in both this file and in every state's voter file. The Help America Vote Act requires new registrants after October 29, 2002, to use either a driver's license or state ID to prove identity; voters who do not possess a license or state ID can register using their date of birth and the last four digits of their social security number. While a driver's license number is a unique

---

[15] According to the Census Bureau's 2024 Citizen Voting Age Population (CVAP) Special Tabulation, 4 states have an estimated CVAP exceeding 10 million, and 9 states have a CVAP under 1 million. The totals range from Wyoming (440,292) to California (26,132,799), with a median CVAP of roughly 3.4 million.

7

JA222

individual identifier in a single state, it will not typically exist in SSA or DHS data. And while SSA data will contain an individual's full 9-digit SSN, the full number will often not be present in a voter file, and only the last four digits will be recorded for voters using it rather than a driver's license to register. Many registered voters do not have either identifier associated with their voter file, typically because they registered prior to the effective date of the Help America Vote Act.

47. The last four digits of a social security number, even in combination with a date of birth, is not a unique identifier (Office of the Inspector General, Social Security Administration 2009).

48. As of April 13, 2026, only 25 states are registered as statewide election administration agencies with the SAVE program for use in voter registration or voter list maintenance purposes.[16] This means that the federal government currently does not have access to(or even the capability of accurately processing) complete voter lists in states nationwide.

49. Even if the SAVE system can provide driver's license identification numbers for some individuals (see Department of Homeland Security 2025), that data will not cover every voting age citizen of a state. It will miss individuals with no license or state ID, those who have not provided citizenship information as part of their license application, those who naturalized after obtaining a license, and those who have moved to a new state and have not obtained a driver's license at their new residence at the time when a State Citizenship List was generated.

50. With no comprehensive unique identifiers, data linkage must rely on some other combination of fields to attempt to link an individual in one file to the same individual in another. Often those data fields (such as names and dates of birth) will not be unique. In this scenario, an individual in one file could easily be linked to a different individual in the other, or fail to identify a match even if the same individual is in both files.

51. Names and dates of birth, in particular, are unreliable identifiers in large scale datasets (McDonald and Levitt 2008). A study of electronic medical records in five large health care institutions found that in a total of 9.7 million individual records, over one million had the same first name, last name, and date of birth triplet as at least one other record (McCoy et al.. 2013). In some settings, depending on the demographics of the patient population, the duplication rate was as high as 15.5%.

52. Data in SSA and DHS files will, further, often lack information on surname changes that occur through marriage or divorce, which by more than a 10-1 margin will affect women more than men (Lin 2023). While the Social Security Administration has a process for updating records to include name changes, again, the updates are not required and must be initiated by individuals.[17] I am not aware of any process that links such vital records data to federal citizenship or social security data.

53. Combined with the high likelihood of missing or outdated address information, the lack of a unique individual identifier in both a State Citizenship File and a state voter file means that it will be difficult for state or local election officials to reliably link the two data sets: in many cases, they will be trying to link an individual in State Citizenship Lists to an individual in a voter file who might have a different surname, a different address, or both. In some cases, election officials will be trying to link a record in State Citizenship Lists to someone who does not even live in the state.

54. Moreover, a lack of standardization across fields in multiple large scale databases presents enormous hurdles for data linkage (see Ansolabehere and Hersh 2017). Data can vary between

[16] https://www.uscis.gov/save/about-save/save-agency-search-tool.
[17] https://www.ssa.gov/life-events/change-name.

8

JA223

databases in many ways that hinder accurate linkages: spelling variation in names, nicknames, spaces, the presence or absence of hyphens, single quote marks, double quote marks, upper case and lower case text, compound middle or last names, the formatting of suffixes such as Jr., Sr., or III and whether they are included in a separate field or as part of a last name, 5-digit vs. 9-digit ZIP codes, variation in how address are formatted ("Rd." in one file and "Road" in the other, "Street" and "St," "Fourth" and "4th", "Box" and" PO Box" and on and on). Where there are formatting differences between such fields in the two files, linkages can fail.

55. An additional problem is that voter files can contain erroneous entries and fields, which can prevent accurate linking between files. Voter files may use placeholder dates of birth with default values (such as January 1, 1900, or January 1, 1800) when actual dates of birth are not available or were not recorded for voters prior to the establishment of statewide voter files (see Ansolabehere and Hersh 2010; Ansolabehere and Hersh 2017; Merivaki and Smith 2020; Cao, Kim and Alvarez 2022). Shino et al. (2020) found 145 voters in the Florida statewide voter file with a birth year prior to 1903.

56. For all of these reasons, false positives and false negatives are inevitable, and election officials cannot be sure that they have reliably identified the same individual in both files when no unique identifier exists.

57. It is simply not possible for State Citizenship Lists to accurately capture data for all voting age citizen residents of a state. Nothing – not even a unique identifier such as a social security number or driver's license number – will capture every element of an individual's identifiable information, such as name, address, or even citizenship.

58. Theoretically, even if the identity and citizenship information for every individual is correct and can be linked to voter files with 100% accuracy – which cannot happen for the reasons already explained – any such database will be outdated the instant it is created, and will miss large numbers of eligible voters. And, of course, there is no possibility that these ideal conditions will exist, given the underlying errors and gaps in the federal data, the impossibility of accurately capturing all name changes, and the inherent difficulty of data linkage in files with tens of millions of records with no unique individual identifiers consistently present in both files.

**Election Officials Have No Way of Assessing the Reliability of State Citizenship Lists**

59. The previous sections of this report establish the inevitability of large-scale errors in State Citizenship Lists.

60. Another serious problem is that there is no way for state election officials to assess the reliability of any such lists or whether there is an underlying error or bias in State Citizenship Lists that systematically underreports the number of citizens residing in a state.

61. Again, the problem is that there is no definitive enumeration of U.S. citizens at either the state or federal level, and no possible method of accurately determining the state residency of every U.S. citizen. As a consequence, there is nothing that state election officials can use to comprehensively evaluate the accuracy or reliability of a State Citizenship List.

62. Even a State Citizenship List that begins with a complete statewide voter file will not – indeed, cannot – identify all eligible but unregistered individuals in a state.

9

JA224

63. Efforts to identify eligible but unregistered people by state election agencies and researchers invariably use other administrative data to identify them, generally state driver's license and state transportation ID databases (Bryant et al. 2022; Merivaki and Suttman-Lea 2023; McDonald et al. 2024; Fowler and Sothern 2025).

64. Even this method of identifying eligible but unregistered people is not comprehensive: it will miss eligible voters without a driver's license or ID and eligible voters who have recently moved to a new state but have not yet obtained a new license or ID, may identify voters no longer eligible in a state because of a move, and may miss individuals with an expired license or a license that does not have their current legal name.

65. A 2024 study from the University of Maryland Center for Democracy and Civic Engagement estimated that "nearly 21 million voting age U.S. citizens do not have a current (non-expired) driver's license," another 28 million have a license that does not match their current legal name and address, and nearly 2.6 million voting age U.S. citizens "do not have any form of government issued photo identification" (Rothschild, Novey, and Hanmer 2024). This shows that close to 50 million U.S. citizens may not be accurately identified or located using state driver's license files in creating State Citizenship Lists.

66. A comparison of Census data, American Community Survey data, Current Population Survey, and a national voter file compiled by a private firm (L2) using state voter registration files (Fowler and Sothern 2025) found that none of the data sources comprehensively identified all eligible individual voters, and they each give different numbers of eligible individuals.

67. Fowler and Southern conclude: "Our analysis of multiple data sources on the voting-eligible and registered populations reveals substantial gaps in our understanding of where these populations are located and how policies shape their presence on official voter rolls" (2025, 11).

68. Given the inherent inaccuracy of State Citizenship Lists, it will be impossible to determine whether some bias or inaccuracy exists or may have been intentionally introduced in the creation of such lists.

**Noncitizen Voting and Registration is Vanishingly Rare**

69. The Statewide Citizenship Lists will not promote election integrity or voter confidence. If anything, by promulgating data that is certain to be outdated and inaccurate and creating widespread confusion, EO 14399 will erode confidence in election processes.

70. There is simply no credible evidence of material numbers of noncitizens voting in U.S. elections (Anderman 2024; Minnite 2010; Ansolabehere, Luks and Schaffner 2015; Nowrasteh 2020; Wren et al. 2026). Claims of widespread noncitizen voting or registration invariably turn out to be wildly exaggerated, and the few actual cases of noncitizens on voter rolls are often the result of errors by election officials.[18]

71. A claim that a significant number of noncitizens were voting (Richman, Chattha and Earnest 2014) was thoroughly debunked by the scholars who originally collected the data used to make the claim, concluding that survey error by respondents, improper use of survey data to capture low frequency

---

[18] Supplemental Report of Kenneth R. Mayer, Ph.D., *Coalition for Open Democracy et al. v. Scanlan et al.* Case No. 1:24-cv-00312-SE-TSM (D. N.H.). September 26, 2025, 6.

events, and misinterpretation of the statistical properties of the data completely accounted for the results. (Ansolabehere, Luks, and Schaffner 2015).

72. In 2012, election officials in Florida claimed that over 180,000 noncitizens were registered to vote, based on a comparison between the statewide voter file and state driver's license records. This number was wildly inflated because the driver's license file recorded the individual's citizenship status at the time of application and was not updated if the license holder subsequently naturalized (Brown 2012). The eventual list of noncitizens on the voter rolls dropped to 85, almost all of which were the result of errors. The original list, then, had an error rate of 99.9% based on outdated citizenship data.

73. The Bipartisan Policy Center analysis found 77 confirmed instances of noncitizens voting in the U.S. between 1999 and 2023. Most of these cases involved unintentional errors by voters who did not realize they were ineligible, or mistakes by election officials.[19]

74. Between 1999 and 2023, over 1.4 billion votes were been cast in federal general elections. Presidential primaries over this period add another 300 million votes to the total; midterm primaries another estimated 100 million; off-year statewide elections in Kentucky, Louisiana, Mississippi, New Jersey and Virginia a minimum of 75 million more; and hundreds of millions of ballots cast in local elections, judicial elections, special elections, special district elections, runoff elections, and non-presidential statewide primaries over that time. The total number of votes cast is easily in the range of 2.5 billion, and possibly significantly more.

75. 77 noncitizen votes over this period represents an upper bound of approximately 1 noncitizen vote for every 32 million votes cast, or a rate of roughly 0.0000031%.

**Conclusions**

76. Executive Order 14399 will create massively error-prone and incomplete State Citizenship Lists that will be of no practical use to election officials.

77. Executive Order 14399 will create enormous confusion among both voters and election officials, will generate mismatches and both false positive and false negative matches between State Citizenship Lists and voter files, and will cause administrative chaos as election officials try to process millions or even tens of millions of records in State Citizenship Lists with incomplete and incorrect data.

78. Any use of State Citizenship Lists to determine who is qualified to register and vote in a state will result in the disenfranchisement of large numbers of eligible voters.

79. There is no evidence of material numbers of non-U.S. citizens registering or voting in U.S. elections. An analysis of documented cases identified 77 instances between 1999 and 2023, over a time when I estimate that as many as 2.5 billion votes – and quite possibly many more– have been cast in federal, state, and local elections.

---

[19] https://bipartisanpolicy.org/article/four-things-to-know-about-noncitizen-voting/.

JA226

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: April 17, 2026

_kenneth Mayer_

_____

Dr. Kenneth R. Mayer

12

Sources

Anderman, Allison. 2024. "Debunking Lies About Voting and Citizenship," Brennan Center for Justice, New York University Law School, October 10. https://www.brennancenter.org/our-work/analysis-opinion/debunking-lies-about-voting-and-citizenship.

Ansolabehere, Stephen and Eitan Hersh. 2010. *The Quality of Voter Registration Records: A State-by-State Analysis*. Caltech/MIT Voting Technology Project and Harvard Institute for Quantitative Social Science. July 14.

Ansolabehere, Stephen and Eitan D. Hersh. 2017. "ADGN: An Algorithm for Record Linkage Using Address, Date of Birth, Gender, and Name." *Statistics and Public Policy* 4:1-10.

Ansolabehere, Stephen, Samantha Luks, and Brian F. Schaffner. 2015. "The Perils of Cherry Picking Low Frequency Events in Large Sample Surveys." *Electoral Studies* 40:409-410.

Brown, Robbie. 2012. "Florida's Approach to Purging Voter Rolls of Noncitizens Prompts Federal Lawsuit." *New York Times*, June 12. https://www.nytimes.com/2012/06/13/us/justice-department-sues-florida-over-voter-purge.html

Bryant, Lisa A., Michael J. Hanmer, Alauna C. Safarpour, and Jared McDonald. 2022. "The Power of the State: How Postcards from the State Increased Registration and Turnout in Pennsylvania." *Political Behavior* 44:535-549.

Cao, Jian, Seo-young Silvia Kim and R. Michael Alvarez. 2022. "Bayesian Analysis of State Voter Registration Database Integrity." *Statistics, Politics, and Policy* 13:19-40.

Christen, Peter. 2012. *Data Matching: Concepts and Techniques for Record Linkage, Entity Resolution, and Duplicate Detection*. New York: Springer-Verlag.

Department of Homeland Security. 2025. *Privacy Impact Assessment for the Systematic Alien Verification for Entitlements "SAVE" Program*. DHS Reference No. DHS/USCIS/PIA-006(d), October 31.

Enamorado, Ted, Benjamin Fifield, and Kosuka Imai. 2019. "Using a Probabilistic Model to Assist Merging of Large-Scale Administrative Records." *American Political Science Review* 113:353-371.

Fifield, Jen. 2025. "Details of DHS Agreement Reveal Risks of Trump Administration's Use of Social Security Data for Voter Citizenship Checks." ProPublica. October 30. https://www.propublica.org/article/dhs-social-security-data-voter-citizenship-trump.

Fifield, Jen and Zach Despart. 2026. "A Federal Tool to Check Voter Citizenship Keeps Making Mistakes. It Led to Confusion in Texas." *The Texas Tribune*, February 13.

Fowler, Christopher S. and Billy Southern. 2025. "What We Know and Don't Know About Eligible and Registered Voters in the United States: Population, Age, and Race in Census Surveys and L2 Voter Roll Data," *Social Science Quarterly* 106 (September). https://doi.org/10.1111/ssqu.70080.

Goel, Sharad, Marc Meredith, Michael Morse, David Rothschild, and Houshmand Shirani-Mehr. 2020. "One Person, One Vote: Estimating the Prevalence of Double Voting in U.S. Presidential Elections." *American Political Science Review* 114:456-469.

13

Huber Gregory A., Marc Meredith, Michael Morse, and Katie Steele. 2021. "The Racial Burden of Voter List Maintenance Errors: Evidence from Wisconsin's Supplemental Movers Poll Books." *Science Advances*. February 17.

Immigration Policy Center. 2012. *Using the Systematic Alien Verification for Entitlements (SAVE) Program for Voter Eligibility Verification*. August.

Kim, Seo-young Silvia, Spencer Schneider, and R. Michael Alvarez. 2020. "Evaluating the Quality of Changes in Voter Registration Databases." *American Politics Research* 48:670-676.

Lin, Luona. 2023. *About 8 in 10 Women in Opposite-Sex Marriages Say They Took Their Husband's Last Name.* Pew Research Center. September 7.

McCoy, Allison B., Adam Wright, Michael G. Kahn, Jason S. Shapiro, Elmer Victor Bernstam, and Dean F. Sittig. 2013. "Matching Identifiers in Electronic Health Records: Implications for Duplicate Records and Patient Safety." *BMJ Quality & Safety* 22:219-224.

McDonald, Jared, Alauna C. Safarpour, Michale J. Hamner, and Lisa A. Bryant. 2024. "Evaluating Partisan Registrations Amid the Electronic Registration Information Center (ERIC) Controversy." Bipartisan Policy Center Working Paper. August 16. Forthcoming in *PS: Political Science and Politics*.

McDonald, Michael P. and Justin Levitt. 2008. "Seeing Double Voting: An Extension of the Birthday Problem." *Election Law Journal* 7:111-122.

Mann, Christopher B. and Lisa A. Bryant. 2020. "If You Ask, They Will Come (to Register and Vote): Field Experiments with Election Agencies on Encouraging Voter Registration." *Electoral Studies* 63. https://doi.org/10.1016/j.electstud.2019.02.012.

Merivaki, Thessalia. 2020. "Our Voter Rolls Are Cleaner Than Yours: Balancing Access and Integrity in Voter List Maintenance." *American Politics Research* 48:560-570.

Merivaki, Thessalia and Daniel A. Smith. 2020. "Challenges in Voter Registration." In Mitchell Brown, Kathleen Hale, and Bridgett A. King, *The Future of Election Administration*. Palgrave.

Merivaki, Thessalia and Mara Suttmann-Lee. 2023. "Can Electoral Management Bodies Expand the Pool of Registered Voters? Examining the Effects of Face-to-Face, Remote, Traditional, and Social Media Outreach." *Policy Studies* 44:377-407.

Minnite, Lorraine C. 2010. *The Myth of Voter Fraud*. Ithaca: Cornell University Press.

Morse, Michael. 2023. "Democracy's Bureaucracy: The Complicated Case of Voter Registration Lists." *Boston University Law Review* 103:2123-2198.

Morse, Michae, Rachel Orey, and Joann Bautista. 2025. *Modernizing Voter List Maintenance: An Evidence-Based Framework for Access and Integrity.* Bipartisan Policy Center. September.

National Association of Secretaries of State. 2017. *NASS Report: Maintenance of State Voter Registration Lists – A Review of Relevant Policies and Procedures*.

14

Norwrasteh, Alex. 2020. *Noncitizens Don't Illegally Vote in Detectable Numbers*. CATO Institute. November 25. https://www.cato.org/blog/noncitizens-dont-illegally-vote-detectable-numbers.

Orey, Wren, Theresa Cardinal Brown, Feyisayo Oyolola, and Theo Menon. 2026. *Four Things to Know about Noncitizen Voting.* Bipartisan Policy Center. February 20. https://bipartisanpolicy.org/article/four-things-to-know-about-noncitizen-voting/.

Richman, Jesse T., Gulshan A. Chattha, and David C. Earnest. 2014. "Do Non-Citizens Vote in U.S. Elections?" *Electoral Studies* 36:149-157.

Rothschild, Jillian Andres, Samuel B. Novey, and Michael J. Hanmer. 2024. "Who Lacks ID in America Today? En Exploration of Voter ID Access, Barriers, and Knowledge." Center for Democracy and Civic Engagement, University of Maryland (College Park). January.

Shino, Enrijeta, Michael D. Martinez, Michale P. McDonald, and Danial A. Smith. 2020. "Verifying Voter Registration Records." *American Politics Research* 48:677-681.

Singh, Jasleen and Spencer Reynolds. 2025. *Homeland Security's "SAVE" Program Exacerbates Risks to Voters*. Brennan Center, New York University. July 21.

Social Security Administration, Office of the General Counsel. 2023. Re: Application for Records and Testimony of a Social Security Administration (SSA) Employee in a Federal Civil Case, *Mi Familia Vota, et al. v. Adrian Fontes, in his official capacity as Arizona Secretary of State, et al.*, 22-cv-509 et al. (consolidated) (D. AZ). July 13.

Social Security Administration Office of Inspector General. 2009. *Quick Response Evaluation: Accuracy of the Help American Vote Verification Program Responses*. A-03-09-29115. June.

Social Security Administration Office of Inspector General. 2022. *Audit Report: Match of Utah Death Information Against Social Security Administration Records*. A-06-21-51030. September.

Social Security Administration Office of Inspector General. 2026. *Audit Report: Accuracy of Critical Payments.* 042403. March.

U.S. Election Assistance Commission. 2025. *Election Administration and Voting Survey 2024 Comprehensive Report*. Report from the Election Assistance Commission to the 119th Congress. June.

Wisconsin Elections Commission. 2021. *Electronic Registration Information Center (ERIC) Movers List Update*. February 3, 2021.

15

JA230

**Appendix A - CV**
**Kenneth R. Mayer**
April 2026

Department of Political Science
Affiliate, La Follette School of Public Affairs
University of Wisconsin – Madison

## Education

Yale University, Department of Political Science, Ph.D., 1988.
Yale University, Department of Political Science, M.A., M.Phil.,1987.
University of California, San Diego, Department of Political Science, B.A., 1982.

## Positions Held

University of Wisconsin, Madison. Department of Political Science
        Emeritus Professor, May 2024-present
        Professor, July 2000-May 2024.
        Associate Professor, June 1996-June 2000.
        Assistant Professor, August 1989-May 1996.
Fulbright-ANU Distinguished Chair in Political Science, Australian National University (Canberra,
        ACT), July-December 2006.
Director, Data and Computation Center, College of Letters and Science, University of Wisconsin-
        Madison, June 1996-September 2003
Consultant, The RAND Corporation, Washington DC, 1988-1994. Conducted study of acquisition
        reform, and the effects of acquisition policy on the defense industrial base. Performed computer
        simulations of U.S. strategic force posture and capabilities.
Contract Specialist, Naval Air Systems Command, Washington D.C., 1985-1986. Responsible for cost
        and price analysis, contract negotiation, and contract administration for aerial target missile
        programs in the $5 million - $100 million range.

## Awards

American Political Science Association, State Politics and Policy Section. Award for best Journal Article
        Published in the *American Journal of Political Science* in 2014. Awarded for Burden, Canon,
        Mayer, and Moynihan, "Election Laws, Mobilization, and Turnout."
Robert H. Durr Award, from the Midwest Political Science Association, for Best Paper Applying
        Quantitative Methods to a Substantive Problem Presented at the 2013 Meeting. Awarded for
        Burden, Canon, Mayer, and Moynihan, "Election Laws and Partisan Gains."
Leon Epstein Faculty Fellow, College of Letters and Science, 2012-2015
UW Housing Honored Instructor Award, 2012, 2014, 2017, 2018
Recipient, Jerry J. and Mary M. Cotter Award, College of Letters and Science, 2011-2012
Alliant Underkofler Excellence in Teaching Award, University of Wisconsin System, 2006
Pi Sigma Alpha Teaching Award, Fall 2006
Vilas Associate, 2003-2004, University of Wisconsin-Madison Graduate School.
2002 Neustadt Award. Awarded by the Presidency Research Group of the American Political Science
        Association, for the best book published on the American presidency in 2001. Awarded for
        *With the Stroke of a Pen: Executive Orders and Presidential Power*.
Lilly Teaching Fellow, University of Wisconsin-Madison, 1993-1994.
Interfraternity Council award for Outstanding Teaching, University of Wisconsin-Madison, 1993.
Selected as one of the 100 best professors at University of Wisconsin-Madison, Wisconsin Student
        Association, March 1992.

16

JA231

Olin Dissertation Fellow, Center for International Affairs, Harvard University, 1987-1988

## Service as an Expert Witness

1. *College Democrats of North Carolina et al. v. North Carolina State Board of Elections, et al.,* Case No.1:26-cv-092-TDS-JLW (M.D. NC)
2. *Count Us In, Women4Change, and Josh Montagne v. Morales, et al.,* No.: 1:25-CV-00864-RLY-MKK (S.D. Ind.)
3. *Montana Federation of Public Employees v. State of Montana et. al.,* Case No. DV-25-268 (1st Jud. Dist. Ct., Lewis and Clark Cty.)
4. *League of Women Voters of Kansas et al. v Schwab et al.*, Case No. 2021-V-000299 (3d Jud. Ct., Shawnee Cty., KS Civil Dept.)
5. *Coalition for Open Democracy et al. v. Scanlan et al.,* Case No. 1:24-cv-00312-SE-TSM (D.N.H.)
6. *Equality State Policy Center v. Gray et al.*. Civil Action No. 25-cv-000117-SWS (D. Wyo.).
7. *Eucke, et al. v. Wisconsin Elections Commission, et al.,* 2024CV007822 (Cir. Ct., Milwaukee Cty., WI), voter challenges (2024).
8. *League Of Women Voters of Missouri and Missouri State NAACP v. State of Missouri et al.*, Case No. 22AC-CC04333 (Cir. Ct. of Cole Cnty., MO), voter registration (2024).
9. *Montana Public Interest Research Group, et al.*, *v. Jacobsen, et al.*, Case No. 6:23-cv-00070-DWM (D. Mont,), voter registration (2024).
10. *Vote.org, et al., v. Georgia State Election Board, et al*, Case No. 1:22-cv-01734-JPB (N.D. GA), election administration (2023).
11. *March for Our Lives Idaho and Idaho Alliance for Retired Americans v. McGrane*, Case No. 1:23-cv-00107-AKB (D. Idaho), election administration (2023).
12. *Vote.org, et al. v. Cord Byrd, et al.*, Case No. 4:23-cv-111-AW-MAF (N.D. Fla.).
13. *Northeast Ohio Coalition for the Homeless et al. v. .Frank LaRose,* Case No. 1:23-cv-26-DCN (E.D. Ohio), election administration (2023).
14. *Missouri State Conference of the NAACP, et. al. v. State of Missouri, et al.,* Case No. 22AC-CC04439 (Cir. Ct. of Cole Cnty., MO) voting rights, voter ID (2023).
15. *Lake v. Hobbs, et al.*, Case No. CV-2022-095403 (Maricopa Cty. Sup. Ct, AZ), election contest (2022).
16. *LULAC Texas et al. v. Scott et al.,* Case No. 1:21-cv-0786-XR (W.D. Tex.), election administration (2022).
17. *Montana Democratic Party and Mitch Bohn v. Christi Jacobsen*, Consolidated Case No. DV 21-0451 (13th Judicial Ct. Yellowstone Cty., MT), election administration (2022).
18. *Fair Fight Inc., et al. v. True the Vote, Inc., et al*., Case No. 2:20-CV-00302-SCJ (N.D. GA), election administration (2022).
19. *League of Women Voters of Arkansas et al. v. Thurston et al*., Case No. 60CV-21-3138 (5th Circ. Ct., Pulaski Cty., AR), election administration (2021).
20. *League of Women Voters of Florida, Inc., et al. v. Lee, et al.*, Case No. 4:21-cv-00186-MW-MAF (N.D. Fla.), election administration (2021).
21. *Johnson, et al., v. WEC, et al.*, 2021 WI 87 (Wis. 2021), redistricting.
22. *Majority Forward and Gamliel Warren Turner, Sr. v. Ben Hill County Board of Elections, et al.*, Case No. 1:20-CV-00266-LAG (M.D. Ga), election administration (2020).
23. *Pearson et al. v. Kemp et al.,* Case No. 1:20-cv-4809-TCB (N.D. Ga), election administration (2020).
24. *North Carolina Alliance for Retired Americans et al. v. North Carolina State Board of Elections* (Wake Cty., NC), absentee ballots (2020).
25. *LaRose et al. v. Simon*, Case No. 62-CV-20-3149 (2d Jud. Dist. Ct., Ramsey Cty., MN), absentee ballots (2020).
26. *Michigan Alliance for Retired Americans et al. v Benson et al*. No 2020-000108-MM (Mich.

JA232

Court of Claims), absentee ballots (2020).

27. *The New Georgia Project et al. v. Raffensperger et al*. No. 1:20-CV-01986-EL0052 (N.D. Ga.), absentee ballots (2020).
28. *Driscoll v. Stapleton*, Case No. DV 20 0408 (13ᵗʰ Judicial Ct. Yellowstone Cty., MT), absentee ballots (2020).
29. *The Andrew Goodman Foundation v. Bostelmann*, Case No. 19-cv-955 (W.D. Wisc.), voter ID (2020).
30. *Kumar v. Frisco Independent School District et al.*, Case No. 4:19-cv-00284 (E.D. Tex.), voting rights (2019).
31. *Fair Fight Action v. Raffensperger* Case No. 1:18-cv-05391-SCJ (N.D. Ga.), voting rights (2019)
32. *Vaughan v. Lewisville Independent School District*, Case No. 4:19-cv-00109 (E.D. Texas), voting rights (2019).
33. *Dwight et al. v Raffensperger*, Case No: 1:18-cv-2869-RWS (N.D. Ga.), redistricting, voting rights (2018).
34. *Priorities U.S.A.et al. v. Missouri et al.,* Case No. 19AC-CC00226 (Cir. Ct. of Cole Cty., MO), voter ID (2018).
35. *Tyson v. Richardson Independent School District*, Case No. 3:18-cv-00212 (N.D. Texas), voting rights (2018).
36. *League of Women Voters of Michigan, et al. v. Johnson*, Case No. 2:17-cv-14148-DPH-SDD (E.D. Mich.), redistricting (2018).
37. *One Wisconsin Institute, Inc., et al. v. Nichol, et al*., 198 F. Supp. 3d 896 (W.D. Wis.), voting rights (2016).
38. *Whitford et al. v. Gill et* al, 218 F. Supp. 3d 837, (W.D. Wis.), redistricting (2016).
39. *Milwaukee NAACP et al. v. Scott Walker et. al*, N.W.2d 262 (Wis. 2014), voter ID (2012).
40. *Baldus et al. v. Brennan et al.,* 849 F. Supp. 2d 840 (E.D. Wis.), redistricting, voting rights (2012).
41. *County of Kenosha v. City of Kenosha,* Case No. 22-CV-1813 *(*Wis. Cir. Ct., Kenosha Cty.), municipal redistricting (2011).
42. *McComish et al. v Brewer et al.*. 2010 WL 2292213 (D. Ariz.), campaign finance (2009).
43. *Baumgart et al. v. Wendelberger et al.*, 2002 WL 34127471 (E.D. Wis.), redistricting (2002).

## **Grants**

"A Multidisciplinary Approach for Redistricting Knowledge." Principal Investigator. Co-PIs Adeline Lo (UW Madison, Department of Political Science), Song Gao (UW Madison, Department of Geography), and Barton Miller and Jin-Yi Cai (UW Madison, Department of Computer Sciences). UW 2020 Program, Wisconsin Alumni Research Foundation. July 1, 2020-June 30, 2023. $410,711.

"Analyzing Nonvoting and the Student Voting Experience in Wisconsin." Dane County (WI) Clerk, $44,157. November 2016-December 2017. Additional support ($30,000) provided by the Office of the Chancellor, UW-Madison.

Campaign Finance Task Force, Stanford University and New York University, $36,585. September 2016-August 2017.

"How do You Know? The Structure of Presidential Advising and Error Correction in the White House." Graduate School Research Committee, University of Wisconsin, $18,941. July 1, 2015-June 30, 2016.

"Study and Recommendations for the Government Accountability Board Chief Inspectors' Statements and Election Incident Report Logs." $43,234. Co-PI. With Barry C. Burden (PI), David T. Canon (co-PI), and Donald Moynihan (co-PI). October 2011-May 2012.

"Public Funding in Connecticut Legislative Elections." Open Society Institute. September 2009-December 2010. $55,000.

"Early Voting and Same Day Registration in Wisconsin and Beyond." Co-PI. October 2008- September

18

JA233

2009. Pew Charitable Trusts. $49,400. With Barry C. Burden (PI), David T. Canon (Co-PI), Kevin J. Kennedy (Co-PI), and Donald P. Moynihan (Co-PI).

City of Madison, Blue Ribbon Commission on Clean Elections. Joyce Foundation, Chicago, IL. $16,188. January-July 2008.

"Wisconsin Campaign Finance Project: Public Funding in Connecticut State Legislative Elections." JEHT Foundation, New York, NY. $84,735. November 2006-November 2007.

"Does Public Election Funding Change Public Policy? Evaluating the State of Knowledge." JEHT Foundation, New York, NY. $42,291. October 2005-April 2006.

"Wisconsin Campaign Finance Project: Disseminating Data to the Academic, Reform, and Policy Communities." Joyce Foundation, Chicago, IL. $20,900. September 2005- August 2006.

"Enhancing Electoral Competition: Do Public Funding Programs for State and Local Elections Work?" Smith Richardson Foundation, Westport, CT. $129,611. December 2002-June 2005

WebWorks Grant (implementation of web-based instructional technologies), Division of Information Technology, UW-Madison, $1,000. November 1999.

"Issue Advocacy in Wisconsin during the 1998 Election." Joyce Foundation, Chicago, IL. $15,499. April 1999.

Instructional Technology in the Multimedia Environment (IN-TIME) grant, Learning Support Services, University of Wisconsin. $5,000. March 1997.

"Public Financing and Electoral Competitiveness in the Minnesota State Legislature." Citizens' Research Foundation, Los Angeles, CA, $2,000. May-November 1996.

"The Reach of Presidential Power: Policy Making Through Executive Orders." National Science Foundation (SBR-9511444), $60,004. September 1, 1995-August 31, 1998. Graduate School Research Committee, University of Wisconsin, $21,965. Additional support provided by the Gerald R. Ford Library Foundation, the Eisenhower World Affairs Institute, and the Harry S. Truman Library Foundation.

The Future of the Combat Aircraft Industrial Base." Changing Security Environment Project, John M. Olin Institute for Strategic Studies, Harvard University (with Ethan B. Kapstein). June 1993-January 1995. $15,000.

Hilldale Student Faculty Research Grant, College of Letters and Sciences, University of Wisconsin (with John M. Wood). 1992. $1,000 ($3,000 award to student)

"Electoral Cycles in Federal Government Prime Contract Awards" March 1992 – February 1995. National Science Foundation (SES-9121931), $74,216. Graduate School Research Committee at the University of Wisconsin, $2,600. MacArthur Foundation, $2,500.

C-SPAN In the Classroom Faculty Development Grant, 1991. $500

## Professional and Public Service

Town of Middleton, Review of Polling Place Resource Allocation, 2023 (with Jessie Munson).

Chair, Election Security Review Committee, Dane County, Wisconsin 2022.

Participant and Board Member, 2016 White House Transition Project, PIs Martha Joynt Kumar (Towson State University) and Terry Sullivan (University of North Carolina-Chapel Hill).

Education and Social and Behavioral Sciences Institutional Review Board, 2008-2014. Acting Chair, Summer 2011. Chair, May 2012- June 2014.

Participant, U.S. Public Speaker Grant Program. United States Department of State (nationwide speaking tour in Australia, May 11-June 2, 2012).

Expert Consultant, Voces de la Frontera. Milwaukee Aldermanic redistricting, (2011).

Expert Consultant, Prosser for Supreme Court. Wisconsin Supreme Court election recount (2011).

Chair, Blue Ribbon Commission on Clean Elections (Madison, WI), August 2007-April 2011.

Consultant, Consulate of the Government of Japan (Chicago) on state politics in Illinois, Indiana, Minnesota, and Wisconsin, 2006-2011.

Section Head, Presidency Studies, 2006 Annual Meeting of the American Political Science Association.

Co-Chair, Committee on Redistricting, Supreme Court of Wisconsin, November 2003-December 2009.

19

JA234

Section Head, Presidency and Executive Politics, 2004 Annual Meeting of the Midwest Political Science Association, Chicago, IL.

Presidency Research Group (organized section of the American Political Science Association) Board, September 2002-present.

Book Review Editor, *Congress and the Presidency*, 2001-2006.

Editorial Board, *American Political Science Review*, September 2004-September 2007.

Consultant, Governor's Blue Ribbon Commission on Campaign Finance Reform (Wisconsin), 1997.

## PUBLICATIONS
### Books

*Presidential Leadership: Politics and Policymaking*, 14th edition.. Lanham, MD: Rowman and Littlefield, 2026. With George C. Edwards, III and Steven J. Wayne. Previous editions 10th (2018), 11th (2020), 12th (2023), 13th (2024).

*The Enduring Debate: Classic and Contemporary Readings in American Government.* 9th ed. New York: W.W. Norton & Co., 2023. Co-edited with David T. Canon and John Coleman. Previous editions 1st (1997), 2nd (2000), 3rd (2002), 4th (2006), 5th (2009), 6th (2011), 7th (2013), 8th (2017).

*The 2016 Presidential Elections: The Causes and Consequences of an Electoral Earthquake*. Lanham, MD: Lexington Press, 2017. Co-edited with Amnon Cavari and Richard J. Powell.

*Faultlines: Readings in American Government*, 5th ed. New York: W.W. Norton & Co. 2017. Co-edited with David T. Canon and John Coleman. Previous editions 1st (2004), 2nd (2007), 3rd (2011), 4th (2013).

*The 2012 Presidential Election: Forecasts, Outcomes, and Consequences*. Lanham, MD: Rowman and Littlefield, 2014. Co-edited with Amnon Cavari and Richard J. Powell.

*Readings in American Government*, 7th edition. New York: W.W. Norton & Co. 2002. Co-edited with Theodore J. Lowi, Benjamin Ginsberg, David T. Canon, and John Coleman). Previous editions 4th (1996), 5th (1998), 6th (2000).

*With the Stroke of a Pen: Executive Orders and Presidential Power*. Princeton, NJ: Princeton University Press. 2001. Winner of the 2002 Neustadt Award from the Presidency Studies Group of the American Political Science Association, for the Best Book on the Presidency Published in 2001.

*The Dysfunctional Congress? The Individual Roots of an Institutional Dilemma*. Boulder, CO: Westview Press. 1999. With David T. Canon.

*The Political Economy of Defense Contracting*. New Haven: Yale University Press. 1991.

### Articles

"Modeling Region Affiliation with Fuzzy Membership Based on Spatial and Social Interactions." *Annals of the Association of American Geographers*. September 2025. With Jake Kruse and Song Gao. https://doi.org/10.1080/24694452.2025.2551044.

"Identifying Rich Clubs in Spatiotemporal Interaction Networks." *Annals of the American Association of Geographers* 115:899-922 (March 2025). With Jake Kruse, Song Gao, Yuhan Ji, Keith Levin, and Qunying Huang.

"Guardians at the Gate: Poll Worker Retention in a Challenging Election Environment." *Election Law Journal* 24:62-73. With Robert M. Stein, Barry C. Burden, Matt Lamb, et al.

"Bringing Spatial Interaction Measures into Multi-Criteria Assessment of Redistricting Plans Using Interactive Web Mapping," *Cartography and Geographic Information Science* 51:513-532 (2025) .with Jake Kruse, Song Gao, Yuhan Ji, and Daniel P. Szabo.

"Mapping Literature with Networks: An Application to Redistricting." *Political Analysis* 31:669-678 (2023). With Adeline Lo, Devin Judge-Lord, and Kyler Hudson.

"The Random Walk Presidency," *Presidential Studies Quarterly* 51: 71-95 (2021)

"Voter Identification and Nonvoting in Wisconsin - Evidence from the 2016 Election." *Election Law Journal* 18:342-359 (2019). With Michael DeCrescenzo.

20

JA235

"Waiting to Vote in the 2016 Presidential Election: Evidence from a Multi-county Study." *Political Research Quarterly* 71 (2019). With Robert M. Stein, Christopher Mann, Charles Stewart III, et al.

"Learning from Recounts." *Election Law Journal* 17:100-116 (No. 2, 2018). With Stephen Ansolabehere, Barry C. Burden, and Charles Stewart, III.

"The Complicated Partisan Effects of State Election Laws." *Political Research Quarterly* 70:549-563 (No. 3, September 2017). With Barry C. Burden, David T. Canon, and Donald P. Moynihan.

"What Happens at the Polling Place: Using Administrative Data to Look Inside Elections." *Public Administration Review* 77:354-364 (No. 3, May/June 2017). With Barry C. Burden, David T. Canon, Donald P. Moynihan, and Jacob R. Neiheisel.

"Working Through the Unworkable? The View from Inside an Institutional Review Board." *PS: Political Science and Politics* 49:289-293 (No. 2, April 2016).

"Alien Abduction, and Voter Impersonation in the 2012 U.S. General Election: Evidence from a Survey List Experiment." *Election Law Journal* 13:460-475 No.4, December 2014). With John S. Ahlquist and Simon Jackman.

"Election Laws, Mobilization, and Turnout: The Unanticipated Consequences of Election Reform." *American Journal of Political Science*, 58:95-109 (No. 1, January 2014). With Barry C. Burden, David T. Canon, and Donald P. Moynihan. Winner of the State Politics and Politics Section of the American Political Science Association Award for the best article published in the *AJPS* in 2014.

"Executive Power in the Obama Administration and the Decision to Seek Congressional Authorization for a Military Attack Against Syria: Implications for Theories of Unilateral Action." *Utah Law Review* 2014:821-841 (No. 4, 2014).

"Public Election Funding: An Assessment of What We Would Like to Know." *The Forum* 11:365-485 (No. 3, 2013).

"Selection Method, Partisanship, and the Administration of Elections." *American Politics Research* 41:903-936 (No. 6, November 2013). With Barry C. Burden, David T. Canon, Stéphane Lavertu, and Donald Moynihan.

"The Effect of Administrative Burden on Bureaucratic Perception of Policies: Evidence from Election Administration." *Public Administration Review* 72:741-451 (No. 5, September/October 2012). With Barry C. Burden, David T. Canon, and Donald Moynihan.

"Early Voting and Election Day Registration in the Trenches: Local Officials' Perceptions of Election Reform." *Election Law Journal* 10:89-102 (No. 2, 2011). With Barry C. Burden, David T. Canon, and Donald Moynihan.

"Is Political Science Relevant? Ask an Expert Witness," *The Forum*: Vol. 8, No. 3, Article 6 (2010).

"Thoughts on the Revolution in Presidency Studies," *Presidential Studies Quarterly* 39 (no. 4, December 2009).

"Does Australia Have a Constitution? Part I – Powers: A Constitution Without Constitutionalism." *UCLA Pacific Basin Law Journal* 25:228-264 (No. 2, Spring 2008). With Howard Schweber.

"Does Australia Have a Constitution? Part II: The Rights Constitution." *UCLA Pacific Basin Law Journal* 25:265-355 (No. 2, Spring 2008). With Howard Schweber.

"Public Election Funding, Competition, and Candidate Gender." *PS: Political Science and Politics* XL:661-667 (No. 4,October 2007). With Timothy Werner.

"Do Public Funding Programs Enhance Electoral Competition?" In Michael P. McDonald and John Samples, eds., *The Marketplace of Democracy: Electoral Competition and American Politics* (Washington, DC: Brookings Institution Press, 2006). With Timothy Werner and Amanda Williams. Excerpted in Daniel H. Lowenstein, Richard L. Hasen, and Daniel P. Tokaji, *Election Law: Cases and Materials.* Durham, NC: Carolina Academic Press, 2008.

"The Last 100 Days." *Presidential Studies Quarterly* 35:533-553 (No. 3, September 2005). With William Howell.

"Political Reality and Unforeseen Consequences: Why Campaign Finance Reform is Too Important To Be Left To The Lawyers," *University of Richmond Law Review* 37:1069-1110 (No. 4, May

21

2003).

"Unilateral Presidential Powers: Significant Executive Orders, 1949-1999." *Presidential Studies Quarterly* 32:367-386 (No. 2, June 2002). With Kevin Price.

"Answering Ayres: Requiring Campaign Contributors to Remain Anonymous Would Not Resolve Corruption Concerns." *Regulation* 24:24-29 (No. 4, Winter 2001).

"Student Attitudes Toward Instructional Technology in the Large Introductory US Government Course." *PS: Political Science and Politics* 33:597-604 (No. 3 September 2000). With John Coleman.

"The Limits of Delegation – the Rise and Fall of BRAC." *Regulation* 22:32-38 (No. 3, October 1999).

"Executive Orders and Presidential Power." *The Journal of Politics* 61:445-466 (No.2, May 1999).

"Bringing Politics Back In: Defense Policy and the Theoretical Study of Institutions and Processes." *Public Administration Review* 56:180-190 (1996). With Anne Khademian.

"Closing Military Bases (Finally): Solving Collective Dilemmas Through Delegation." *Legislative Studies Quarterly*, 20:393-414 (No. 3, August 1995).

"Electoral Cycles in Federal Government Prime Contract Awards: State-Level Evidence from the 1988 and 1992 Presidential Elections." *American Journal of Political Science* 40:162-185 (No. 1, February 1995).

"The Impact of Public Financing on Electoral Competitiveness: Evidence from Wisconsin, 1964-1990." *Legislative Studies Quarterly* 20:69-88 (No. 1, February 1995). With John M. Wood.

"Policy Disputes as a Source of Administrative Controls: Congressional Micromanagement of the Department of Defense." *Public Administration Review* 53:293-302 (No. 4, July-August 1993).

"Combat Aircraft Production in the United States, 1950-2000: Maintaining Industry Capability in an Era of Shrinking Budgets." *Defense Analysis* 9:159-169 (No. 2, 1993).

### Book Chapters

"Framing Controversies over Free Speech and Academic Freedom in The University Setting." In *Campus Free Speech*, Lori Cox Han and Jerry Price, eds. *ABC-CLIO*. 2023. With Howard Schweber.

"Is President Trump Conventionally Disruptive, or Unconventionally Destructive?" In *The 2016 Presidential Elections: The Causes and Consequences of an Electoral Earthquake*. Lanham, MD: Lexington Press, 2017. Co-edited with Amon Cavari and Richard J. Powell.

"Lessons of Defeat: Republican Party Responses to the 2012 Presidential Election. In Amnon Cavari, Richard J. Powell, and Kenneth R. Mayer, eds. *The 2012 Presidential Election: Forecasts, Outcomes, and Consequences*. Lanham, MD: Rowman and Littlefield. 2014.

"Unilateral Action." George C. Edwards, III, and William G. Howell, *Oxford Handbook of the American Presidency* (New York: Oxford University Press, 2009).

"Executive Orders," in Joseph Bessette and Jeffrey Tulis, *The Constitutional Presidency*. Baltimore: Johns Hopkins University Press, 2009.

"Hey, Wait a Minute: The Assumptions Behind the Case for Campaign Finance Reform." In Gerald C. Lubenow, ed., *A User's Guide to Campaign Finance Reform.* Lanham, MD: Rowman & Littlefield, 2001.

"Everything You Thought You Knew About Impeachment Was Wrong." In Leonard V. Kaplan and Beverly I. Moran, ed., *Aftermath: The Clinton Impeachment and the Presidency in the Age of Political Spectacle.* New York: New York University Press. 2001. With David T. Canon.

"The Institutionalization of Power." In Robert Y. Shapiro, Martha Joynt Kumar, and Lawrence R. Jacobs, eds. *Presidential Power: Forging the Presidency for the 21st Century*. New York: Columbia University Press, 2000. With Thomas J. Weko.

"Congressional-DoD Relations After the Cold War: The Politics of Uncertainty." In *Downsizing Defense*, Ethan Kapstein ed. Washington DC: Congressional Quarterly Press. 1993.

"Elections, Business Cycles, and the Timing of Defense Contract Awards in the United States." In Alex Mintz, ed. *The Political Economy of Military Spending*. London: Routledge. 1991.

"Patterns of Congressional Influence In Defense Contracting." In Robert Higgs, ed., *Arms, Politics, and*

22

JA237

*the Economy: Contemporary and Historical Perspectives*. New York: Holmes and Meier. 1990.

## Monographs

*2008 Election Data Collection Grant Program: Wisconsin Evaluation Report*. Report to the Wisconsin Government Accountability Board, September 2009. With Barry C. Burden, David T. Canon, Stéphane Lavertu, and Donald P. Moynihan.

*Issue Advocacy in Wisconsin: Analysis of the 1998 Elections and A Proposal for Enhanced Disclosure*. September 1999.

*Public Financing and Electoral Competition in Minnesota and Wisconsin*. Citizens' Research Foundation, April 1998.

*Campaign Finance Reform in the States*. Report prepared for the Governor's Blue Ribbon Commission on Campaign Finance Reform (State of Wisconsin). February 1998. Portions reprinted in Anthony Corrado, Thomas E. Mann, Daniel Ortiz, Trevor Potter, and Frank J. Sorauf, ed., *Campaign Finance Reform: A Sourcebook.* Washington, D.C.: Brookings Institution, 1997.

"Does Public Financing of Campaigns Work?" *Trends in Campaign Financing*. Occasional Paper Series, Citizens' Research Foundation, Los Angeles, CA. 1996. With John M. Wood.

*The Development of the Advanced Medium Range Air-to-Air Missile: A Case Study of Risk and Reward in Weapon System Acquisition*. N-3620-AF. Santa Monica: RAND Corporation. 1993.

*Barriers to Managing Risk in Large Scale Weapons System Development Programs*. N-4624-AF. Santa Monica: RAND Corporation. 1993. With Thomas K. Glennan, Jr., Susan J. Bodilly, Frank Camm, and Timothy J. Webb.

## Other

"Presidents Can't Declassify Documents with Green Lantern Superpowers." *The Monkey Cage* (Washington Post), August 19, 2022. With Andrew Rudalevige.

"Campaign Finance: Some Basics." Bauer-Ginsberg Campaign Finance Task Force, Stanford University. September 2017. With Elizabeth M. Sawyer.

"The Wisconsin Recount May Have a Surprise in Store after All." *The Monkey Cage* (Washington Post), December 5, 2016. With Stephen Ansolabehere, Barry C. Burden, and Charles Stewart, III.

Review of Jason K. Dempsey, *Our Army: Soldiers, Politicians, and American Civil-Military Relations*. *The Forum* 9 (No. 3, 2011).

"Voting Early, but Not Often." *New York Times*, October 25, 2010. With Barry C. Burden.

Review of John Samples, *The Fallacy of Campaign Finance Reform* and Raymond J. La Raja, *Small Change: Money, Political Parties, and Campaign Finance Reform*. *The Forum* 6 (No. 1, 2008).

Review Essay, *Executing the Constitution: Putting the President Back Into the Constitution*, Christopher S, Kelley, ed.; *Presidents in Culture: The Meaning of Presidential Communication*, David Michael Ryfe; *Executive Orders and the Modern Presidency: Legislating from the Oval Office*, Adam L. Warber. In *Perspective on Politics* 5:635-637 (No. 3, September 2007).

"The Base Realignment and Closure Process: Is It Possible to Make Rational Policy?" Brademas Center for the Study of Congress, New York University. 2007.

"Controlling Executive Authority in a Constitutional System" (comparative analysis of executive power in the U.S. and Australia), manuscript, February 2007.

"Campaigns, Elections, and Campaign Finance Reform." *Focus on Law Studies*, XXI, No. 2 (Spring 2006). American Bar Association, Division for Public Education.

"Review Essay: Assessing The 2000 Presidential Election – Judicial and Social Science Perspectives." *Congress and the Presidency* 29: 91-98 (No. 1, Spring 2002).

Issue Briefs (Midterm Elections, Homeland Security; Foreign Affairs and Defense Policy; Education; Budget and Economy; Entitlement Reform) *2006 Reporter's Source Book*. Project Vote Smart. 2006. With Meghan Condon.

23

JA238

"Sunlight as the Best Disinfectant: Campaign Finance in Australia." Democratic Audit of Australia, Australian National University. October 2006.

"Return to the Norm," *Brisbane Courier-Mail*, November 10, 2006.

"The Return of the King? Presidential Power and the Law," *PRG Report* XXVI, No. 2 (Spring 2004).

Issue Briefs (Campaign Finance Reform, Homeland Security; Foreign Affairs and Defense Policy; Education; Budget and Economy; Entitlement Reform), *2004 Reporter's Source Book*. Project Vote Smart. 2004. With Patricia Strach and Arnold Shober.

"Where's That Crystal Ball When You Need It? Finicky Voters and Creaky Campaigns Made for a Surprise Electoral Season. And the Fun's Just Begun." *Madison Magazine*. April 2002.

"Capitol Overkill." *Madison Magazine*, July 2002.

Issue Briefs (Homeland Security; Foreign Affairs and Defense Policy; Education; Economy, Budget and Taxes; Social Welfare Policy), *2002 Reporter's Source Book*. Project Vote Smart. 2002. With Patricia Strach and Paul Manna.

"Presidential Emergency Powers." *Oxford Analytica Daily Brief*. December 18, 2001.

"An Analysis of the Issue of Issue Ads." *Wisconsin State Journal*, November 7, 1999.

"Background of Issue Ad Controversy." *Wisconsin State Journal*, November 7, 1999.

"Eliminating Public Funding Reduces Election Competition." *Wisconsin State Journal*, June 27, 1999.

Review of *Executive Privilege: The Dilemma of Secrecy and Democratic Accountability*, by Mark J. Rozell. *Congress and the Presidency* 24 (No. 1, 1997).

"Like Marriage, New Presidency Starts In Hope." *Wisconsin State Journal*. March 31, 1996.

Review of *The Tyranny of the Majority: Fundamental Fairness in Representative Democracy*, by Lani Guinier. *Congress and the Presidency* 21: 149-151 (No. 2, 1994).

Review of *The Best Defense: Policy Alternatives for U.S. Nuclear Security From the 1950s to the 1990s*, by David Goldfischer. *Science, Technology, and Environmental Politics Newsletter* 6 (1994).

Review of *The Strategic Defense Initiative*, by Edward Reiss. *American Political Science Review* 87:1061-1062 (No. 4, December 1993).

Review of *The Political Economy of Defense: Issues and Perspectives*, Andrew L. Ross ed. *Armed Forces and Society* 19:460-462 (No. 3, April 1993)

Review of *Space Weapons and the Strategic Defense Initiative*, by Crockett Grabbe. *Annals of the American Academy of Political and Social Science* 527: 193-194 (May 1993).

"Limits Wouldn't Solve the Problem." *Wisconsin State Journal*, November 5, 1992. With David T. Canon.

"Convention Ceded Middle Ground." *Wisconsin State Journal*, August 23, 1992.

"CBS Economy Poll Meaningless." *Wisconsin State Journal*, February 3, 1992.

"It's a Matter of Character: Pentagon Doesn't Need New Laws, it Needs Good People." *Los Angeles Times*, July 8, 1988.

**Conference Papers**

"A New Individual-Level Model for Estimating and Simulating the Effects of Redistricting." Presented at the 2023 Annual Meeting of the Midwest Political Science Association, Chicago, IL, April 12-16, 2023. With Blake Reynolds.

"Voter Identification and Nonvoting in Wisconsin – Evidence from the 2016 Election." Presented at the 2018 Annual Meeting of the Midwest Political Science Association, Chicago, IL April 5-8, 2018. With Michael G. DeCrescenzo.

"Learning from Recounts." Presented at the Workshop on Electoral Integrity, San Francisco, CA, August 30, 2017, and at the 2017 Annual Meeting of the                American Political Science Association, San Francisco, CA, August 31-September 3, 2017. With Stephen Ansolabehere, Barry C. Burden, and Charles Stewart, III.

"What Happens at the Polling Place: Using Administrative Data to Understand Irregularities at the Polls." Conference on New Research on Election Administration and Reform, Massachusetts Institute of Technology, Cambridge, MA, June 8, 2015. With Barry C. Burden, David T. Canon, Donald P.

24

JA239

Moynihan, and Jake R Neiheisel.

"Election Laws and Partisan Gains: What are the Effects of Early Voting and Same Day Registration on the Parties' Vote Shares." 2013 Annual Meeting of the Midwest Political Science Association, Chicago, IL, April 11-14, 2013. Winner of the Robert H. Durr Award.

"The Effect of Public Funding on Electoral Competition: Evidence from the 2008 and 2010 Cycles." Annual Meeting of the American Political Science Association, Seattle, WA, September 1-4, 2011. With Amnon Cavari.

"What Happens at the Polling Place: A Preliminary Analysis in the November 2008 General Election." Annual Meeting of the American Political Science Association, Seattle, WA, September 1-4, 2011. With Barry C. Burden, David T. Canon, Donald P. Moynihan, and Jake R. Neiheisel.

"Election Laws, Mobilization, and Turnout: The Unanticipated Consequences of Election Reform." 2010 Annual Meeting of the American Political Science Association, Washington, DC, September 2-5, 2010. With Barry C. Burden, David T. Canon, Stéphane Lavertu and Donald P. Moynihan.

"Selection Methods, Partisanship, and the Administration of Elections. Annual Meeting of the Midwest Political Science Association, Chicago, IL, April 22-25, 2010. Revised version presented at the Annual Meeting of the European Political Science Association, June 16-19, 2011, Dublin, Ireland. With Barry C. Burden, David T. Canon, Stéphane Lavertu and Donald P. Moynihan.

"The Effects and Costs of Early Voting, Election Day Registration, and Same Day Registration in the 2008 Elections." Annual Meeting of the American Political Science Association, Toronto, Canada, September 3-5, 2009. With Barry C. Burden, David T. Canon, and Donald P. Moynihan.

"Comparative Election Administration: Can We Learn Anything From the Australian Electoral Commission?" Annual Meeting of the American Political Science Association, Chicago, IL, August 29-September 1, 2007.

"Electoral Transitions in Connecticut: Implementation of Public Funding for State Legislative Elections." Annual Meeting of the American Political Science Association, Chicago, IL, August 29-September 1, 2007. With Timothy Werner.

"Candidate Gender and Participation in Public Campaign Finance Programs." Annual Meeting of the Midwest Political Science Association, Chicago IL, April 7-10, 2005. With Timothy Werner.

"Do Public Funding Programs Enhance Electoral Competition?" 4th Annual State Politics and Policy Conference," Akron, OH, April 30-May 1, 2004. With Timothy Werner and Amanda Williams.

"The Last 100 Days." Annual Meeting of the American Political Science Association, Philadelphia, PA, August 28-31, 2003. With William Howell.

"Hey, Wait a Minute: The Assumptions Behind the Case for Campaign Finance Reform." Citizens' Research Foundation Forum on Campaign Finance Reform, Institute for Governmental Studies, University of California Berkeley. August 2000.

"The Importance of Moving First: Presidential Initiative and Executive Orders." Annual Meeting of the American Political Science Association, San Francisco, CA, August 28-September 1, 1996.

"Informational vs. Distributive Theories of Legislative Organization: Committee Membership and Defense Policy in the House." Annual Meeting of the American Political Science Association, Washington, DC, September 2-5, 1993.

"Department of Defense Contracts, Presidential Elections, and the Political-Business Cycle." Annual Meeting of the American Political Science Association, Washington, DC, September 2-5, 1993.

"Problem? What Problem? Congressional Micromanagement of the Department of Defense." Annual Meeting of the American Political Science Association, Washington DC, August 29 - September 2, 1991.

**Talks and Presentations**

"Turnout Effects of Voter ID Laws." Rice University, March 23, 2018; Wisconsin Alumni Association, October 13, 2017. With Michael DeCrescenzo.

"Informational and Turnout Effects of Voter ID Laws." Wisconsin State Elections Commission, December 12, 2017; Dane County Board of Supervisors, October 26, 2017. With Michael

25

JA240

DeCrescenzo.

"Voter Identification and Nonvoting in Wisconsin, Election 2016. American Politics Workshop, University of Wisconsin, Madison, November 24, 2017.

"Gerrymandering: Is There A Way Out?" Marquette University. October 24, 2017.

"What Happens in the Districting Room and What Happens in the Courtroom" Geometry of Redistricting Conference, University of Wisconsin-Madison October 12, 2017.

"How Do You Know? The Epistemology of White House Knowledge." Clemson University, February 23, 2016.

Roundtable Discussant, Separation of Powers Conference, School of Public and International Affairs, University of Georgia, February19-20, 2016.

Campaign Finance Task Force Meeting, Stanford University, February 4, 2016.

Discussant, "The Use of Unilateral Powers." American Political Science Association Annual Meeting, August 28-31, 2014, Washington, DC.

Presenter, "Roundtable on Money and Politics: What do Scholars Know and What Do We Need to Know?" American Political Science Association Annual Meeting, August 28-September 1, 2013, Chicago, IL.

Presenter, "Roundtable: Evaluating the Obama Presidency." Midwest Political Science Association Annual Meeting, April 11-14, 2012, Chicago, IL.

Panel Participant, "Redistricting in the 2010 Cycle," Midwest Democracy Network,

Speaker, "Redistricting and Election Administration," Dane County League of Women Voters, March 4, 2010.

Keynote Speaker, "Engaging the Electorate: The Dynamics of Politics and Participation in 2008." Foreign Fulbright Enrichment Seminar, Chicago, IL, March 2008.

Participant, Election Visitor Program, Australian Electoral Commission, Canberra, ACT, Australia. November 2007.

Invited Talk, "Public Funding in State and Local Elections." Reed College Public Policy Lecture Series. Portland, Oregon, March 19, 2007.

Fulbright Distinguished Chair Lecture Tour, 2006. Public lectures on election administration and executive power. University of Tasmania, Hobart (TAS); Flinders University and University of South Australia, Adelaide (SA); University of Melbourne, Melbourne (VIC); University of Western Australia, Perth (WA); Griffith University and University of Queensland, Brisbane (QLD); Institute for Public Affairs, Sydney (NSW); The Australian National University, Canberra (ACT).

Discussant, "Both Ends of the Avenue: Congress and the President Revisited," American Political Science Association Meeting, September 2-5, 2004, Chicago, IL.

Presenter, "Researching the Presidency," Short Course, American Political Science Association Meeting, September 2-5, 2004, Chicago, IL.

Discussant, Conference on Presidential Rhetoric, Texas A&M University, College Station, TX. February 2004.

Presenter, "Author Meets Author: New Research on the Presidency," 2004 Southern Political Science Association Meeting, January 8-11, New Orleans, LA.

Chair, "Presidential Secrecy," American Political Science Association Meeting, August 28-31,2003, Philadelphia, PA.

Discussant, "New Looks at Public Approval of Presidents." Midwest Political Science Association Meeting, April 3-6, 2003, Chicago, IL.

Discussant, "Presidential Use of Strategic Tools." American Political Science Association Meeting, August 28-September 1, 2002, Boston, MA.

Chair and Discussant, "Branching Out: Congress and the President." Midwest Political Science Association Meeting, April 19-22, 2001, Chicago, IL.

Invited witness, Committee on the Judiciary, Subcommittee on Commercial and Administrative Law, U.S. House of Representatives. *Hearing on Executive Order and Presidential Power*,

26

JA241

Washington, DC. March 22, 2001.

"The History of the Executive Order," Miller Center for Public Affairs, University of Virginia (with Griffin Bell and William Howell), January 26, 2001.

Presenter and Discussant, Future Voting Technologies Symposium, Madison, WI May 2, 2000.

Moderator, Panel on Electric Utility Reliability. Assembly Staff Leadership Development Seminar, Madison, WI. August 11, 1999.

Chair, Panel on "Legal Aspects of the Presidency: Clinton and Beyond." Midwest Political Science Association Meeting, April 15-17, 1999, Chicago, IL.

Session Moderator, National Performance Review Acquisition Working Summit, Milwaukee, WI. June 1995.

American Politics Seminar, The George Washington University, Washington D.C., April 1995.

Invited speaker, Defense and Arms Control Studies Program, Massachusetts Institute of Technology, Cambridge, MA, March 1994.

Discussant, International Studies Association (Midwest Chapter) Annual Meeting, Chicago IL, October 29-30, 1993.

Seminar on American Politics, Princeton University, January 16-17,1992.

Conference on Defense Downsizing and Economic Conversion, October 4, 1991, Harvard University.

Conference on Congress and New Foreign and Defense Policy Challenges, The Ohio State University, Columbus OH, September 21-22, 1990, and September 19-21, 1991.

Presenter, "A New Look at Short Term Change in Party Identification," 1990 Meeting of the American Political Science Association, San Francisco, CA.

**University and Department Service**

Cross-Campus Human Research Protection Program (HRPP) Advisory Committee, 2019-present.

UW Athletic Board, 2014-2022.

General Education Requirements Committee (Letters and Science), 1997-1998.

Communications-B Implementation Committee(Letters and Science), 1997-1999

Verbal Assessment Committee (University) 1997-1998.

College of Letters & Science Faculty Appeals Committee (for students dismissed for academic reasons).

Committee on Information Technology, Distance Education and Outreach, 1997-98.

Hilldale Faculty-Student Research Grants, Evaluation Committee, 1997, 1998.

Department Computer Committee, 1996-1997; 1997-1998, 2005-2006. Chair, 2013-present.

Faculty Senate, 2000-2002, 2002-2005. Alternate, 1994-1995; 1996-1999; 2015-2016.

Preliminary Exam Appeals Committee, Department of Political Science, 1994-1995.

Faculty Advisor, Pi Sigma Alpha (Political Science Honors Society), 1993-1994.

Department Honors Advisor, 1991-1993.

Brown-bag Seminar Series on Job Talks (for graduate students), 1992.

Keynote speaker, Undergraduate Honors Symposium, April 13 1991.

Undergraduate Curriculum Committee, Department of Political Science, 1990-1992; 1993-1994.

Individual Majors Committee, College of Letters and Sciences, 1990-1991.

Dean Reading Room Committee, Department of Political Science, 1989-1990; 1994-1995.

**Teaching**

Undergraduate

Introduction to American Government (regular and honors)

The American Presidency

Campaign Finance

Election Law

Classics of American Politics

Presidential Debates

Comparative Electoral Systems

27

JA242

Legislative Process
Theories of Legislative Organization
Senior Honors Thesis Seminar

Graduate
Contemporary Presidency
American National Institutions
Classics of American Politics
Legislative Process

28

JA243

# Exhibit 11

Civil Action No. 26-cv-1114 (CJN) (Lead case)

# Trump talks economy, voter ID in Georgia ahead of midterms

**spectrumlocalnews.com**/us/snplus/politics/2026/02/19/trump-visit-georgia

February 19, 2026



POLITICS

## Trump stops in battleground Georgia to talk economy, voter ID ahead of midterms

BY Maddie Gannon Georgia
UPDATED 6:20 PM ET Feb. 19, 2026 PUBLISHED 11:08 AM ET Feb. 19, 2026

ROME, Ga. — President Donald Trump traveled to the battleground state of Georgia on Thursday, marking his latest domestic trip aimed at selling his leadership and record with less than nine months to go until November's midterm elections.

**What You Need To Know**

President Donald Trump traveled to the battleground state of Georgia Thursday, where he stopped at a local drive-in chain restaurant and steel factory before delivering remarks

- The trip was framed as set to be centered on the economy but featured significant focus on Trump's desire for a national voter ID requirement and an end to mail-in voting

JA245

1/3

- The president has stepped up his travel within the U.S. in recent weeks as he hopes to help Republicans keep control of the House and Senate in this year's midterm elections and specifically pitch Americans on the state of the economy under his watch

- The trip also came just weeks after the FBI came to Fulton County – which is Georgia's biggest by population and is home to many registered Democrats – to enter election offices and take voting records and ballots from the 2020 election

The visit, which saw the president stop at a local drive-in chain restaurant and steel factory before delivering remarks, was framed by the White House as set to be centered on the economy. But it also had a heavy focus on Trump's false claims of voter fraud in a state that was at the center of his qualms with the 2020 election and as the FBI's recent visit to election offices in Fulton County hung over the trip.

Trump's first stop upon touching down in Rome, Georgia, was at The Varsity, a local chain restaurant serving American classics. The president mingled with people and workers in the joint, signing hats and touting his no-taxes-on-tips-and-overtime policies implemented in his signature legislation passed by Republicans in Congress this past summer. One man said he had a lifetime achievement award with former President Joe Biden's signature on it and asked Trump to sign it instead.

The president then visited Coosa Steel where he was set to tour the facility and talked tariffs with the company's owner, Andrew Saville, ahead of giving formal remarks.

The president has stepped up his travel within the U.S. in recent weeks as he hopes to help Republicans keep control of the House and Senate in this year's midterm elections. He's hoping specifically to pitch Americans on the state of the economy under his watch. Despite some polls showing concerns about prices and the impacts of his tariff agenda, Trump has insisted an "economic boom" is taking place under his leadership and recently took ownership of it after many in his adminsitration said they were digging out of a hole Biden left them.

The latest consumer price index report from the Bureau of Labor Statistics showed inflation fell to 2.4% in January compared to a year earlier, marking an unexpected cooling even with the figure still slightly above the Federal Reserve's target rate of 2%.

Delivering remarks after touring the steel factory, Trump lauded the state of the economy, insisting his tariffs have made a positive difference in turning things around. But he lamented that he has been waiting "forever" for a decision from the Supreme Court that is set to determine whether the president has the authority to impose the tariffs under the emergency power he has cited and made fun of the media's focus on "affordability," which played a large role in off-year local elections in 2025 in which Democrats scored some major victories. He reiterated his belief that the focus on affordability was a "con job."

JA246

Ahead of his stop in Georgia, the White House issued a press release highlighting gas prices in the state, the money it says residents will save as a result of the tax relief in his signature legislation and the impact of his immigration crackdown, which has caused controversy around the country.

But the trip also came just weeks after the FBI came to Fulton County — which is Georgia's biggest by population and is home to many registered Democrats — to enter election offices and take voting records and ballots from the 2020 election. Director of National Intelligence Tulsi Gabbard was also spotted on-site, sparking questions and speculation.

Trump also used much of his remarks Thursday to repeat his false 2020 election claims while urging an end to voting by mail and the addition of a requirement for people to show an ID to cast a ballot.

"We'll never lose a race — for 50 years, we won't lose a race," Trump said of Republicans if the two policies are implemented. "We want voter ID, we want proof of citizenship, and we don't want mail-in ballots."

The president and Republicans in Congress have been pushing legislation that would implement such an ID requirement, but a handful of Democrats in the Senate would have to back the bill for it to clear the chamber's filibuster rules. On mail-in voting, Trump said he would allow it for members of the military, people who are ill or disabled, or those "away, even for a vacation."

His stop at the steel facility, meanwhile, was located in the district once represented by former Republican Rep. Marjorie Taylor Greene until just last month, when she stepped down from Congress after weeks of public feuding with Trump — particularly over Jeffrey Epstein and the president's focus on foreign policy — despite previously being one of his most vocal supporters in the House.

There is a special election to fill her seat set to take place in just weeks and the Trump-backed candidate, district attorney and Air Force veteran Clay Fuller, spoke ahead of the president Thursday.

JA247

# Exhibit 12

Civil Action No. 26-cv-1114 (CJN) (Lead case)

JA248

# Fact Sheet: President Donald J. Trump Ensures Citizenship Verification and Voter Eligibility in Federal Elections

whitehouse.gov/fact-sheets/2026/03/fact-sheet-president-donald-j-trump-ensures-citizenship-verification-and-voter-eligibility-in-federal-elections

Jacqueline Kotkiewicz                                                                   March 31, 2026



[Fact Sheets](#)

The White House

**VERIFYING ELIGIBILITY IN FEDERAL ELECTIONS:** Today, President Donald J. Trump signed an Executive Order to strengthen election integrity by ordering citizenship verification for Federal elections and modernizing and securing mail-in and absentee ballot procedures through the United States Postal Service (USPS).

- The Order directs the Secretary of Homeland Security, in coordination with the Social Security Administration, to compile and transmit to each State a State Citizenship List of confirmed U.S. citizens who will be 18 or older at the time of the next upcoming Federal election and reside in that State.
    - The lists will be updated and transmitted no fewer than 60 days before each regularly scheduled Federal election and individuals and States will be allowed to access, update, or correct records.
- The Order directs the Postmaster General to initiate rulemaking to require all mail-in and absentee ballots transmitted by USPS to be placed in secure ballot envelopes marked as Official Election Mail with unique Intelligent Mail barcodes that facilitate tracking.

JA249

- The Order requires the USPS to transmit ballots only to individuals enrolled on a State-specific Mail-in and Absentee Participation List, ensuring that only eligible absentee or mail-in voters receive absentee or mail-in ballots.
- The Order directs the Attorney General to:
     (1) prioritize the investigation and prosecution, under applicable Federal statutes, of election officials, individuals, and other entities that violate the law by issuing or distributing Federal ballots to ineligible voters; and
     (2) in coordination with other relevant agencies, withhold Federal funds from noncompliant States and localities, as appropriate.

**PROTECTING THE INTEGRITY OF OUR ELECTIONS:** President Trump is taking decisive action to prevent non-citizens from voting in Federal elections and to protect the security of mail-in and absentee ballots.

- The right to vote in Federal elections is reserved exclusively for United States citizens under the Constitution and Federal law.
- Federal statutes explicitly prohibit non-citizens from registering to vote or casting ballots in Federal elections, yet lax verification and self-certification loopholes in some States have left gaps that undermine public confidence in election outcomes.
- The Federal government has a duty to prevent violations of Federal criminal law in Federal elections and to maintain public confidence in election outcomes.
- The Federal government has existing tools – including the Social Security Administration's records and the Department of Homeland Security's Systematic Alien Verification for Entitlements (SAVE) program – that can assist in verifying voter identity and eligibility in Federal elections.

**MAKING ELECTIONS SECURE AGAIN:** Voters deserve elections they can trust, and that confidence is being restored thanks to President Trump.

- President Trump is following through on his promise to secure our elections.
     On the campaign trail in 2024, President Trump vowed: "We will secure our elections, and they will be secure once and for all."
- Unlike the Biden Administration, which pursued its political agenda instead of fair elections, President Trump is putting the American people back in charge.
- In March 2025, President Trump signed an Executive Order to strengthen voting integrity in a variety of ways, including through verifying State voter-registration lists, enforcing Federal law to prohibit States from counting ballots received after Election Day, and banning foreign nationals from interfering in U.S. elections.
- President Trump has repeatedly called on Congress to pass the SAVE America Act, a straightforward, commonsense bill to ensure that only American citizens cast ballots.

JA250

# Exhibit 13

Civil Action No. 26-cv-1114 (CJN) (Lead case)

# About SAVE | USCIS

 **uscis.gov**/save/about-save/about-save

March 3, 2026



## About SAVE

SAVE is an online service administered by U.S. Citizenship and Immigration Services (USCIS) that provides point in time immigration status and U.S. citizenship information to federal, state, local, territorial, and tribal agencies. SAVE is fast, secure, and reliable, and enables registered user agencies to make accurate decisions for applicants seeking benefits and licenses.

Over 1,300 agencies nationwide use SAVE to support their benefit eligibility and licensing determinations. This includes agencies such as those that provide health care benefits, social security benefits, education grants and assistance, state driver's licenses and ID cards, and occupational and professional licenses.

In fiscal year 2025, SAVE processed 198 million cases.

## What SAVE Does

✔ Verifies a benefit or license applicant's immigration status or U.S. citizenship, including naturalized, acquired, and U.S.-born citizenship, for user agencies within seconds.

✔ Helps ensure that only applicants who are eligible for benefits and licenses receive them.

JA252

✔ Incorporates privacy principles and security measures into user agencies' processes and procedures.

✔ Is easy to use and offers online training tools and resources to assist user agencies.

## What SAVE Does Not Do

**X** Determine applicant eligibility for a specific benefit or license. That determination is made by the benefit issuing or licensing agency.

**X** Provide employment eligibility verification to employers. For more information on employment eligibility verification visit [e-verify.gov](e-verify.gov).

**X**  Share information provided by user agencies for administrative (non-criminal) immigration enforcement purposes.

JA253

# Exhibit 14

Civil Action No. 26-cv-1114 (CJN) (Lead case)

# Privacy Impact Assessment

### for the

# Systematic Alien Verification for Entitlements "SAVE" Program

**DHS Reference No. DHS/USCIS/PIA-006(d)**

**October 31, 2025**



# Abstract

> 1. **The abstract is the single paragraph that will be used to describe the program and the Privacy Impact Assessment.[1]**

The U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, Verification Division administers the Systematic Alien Verification for Entitlements (SAVE) Program. The SAVE Program is an online inter-governmental service designed to help federal, state, territorial, tribal, local government agencies, benefit-granting agencies, other authorized entities and licensing bureaus, as authorized by law, determine citizenship and immigration status of individuals within their jurisdiction for the purpose of granting benefits, licenses, as well as for other lawful purposes. U.S. Citizenship and Immigration Services is publishing an update to this Privacy Impact Assessment to describe the collection, use, maintenance, and disclosure of personally identifiable information, as well as the risks associated with these updates. The purpose of this update is to discuss the changes to the tool, including: (1) documenting use of the tool for voter registration and voter maintenance list verification, (2) collection of Social Security numbers which may include those of U.S. born citizens for all benefit or license related uses of the program, (3) sharing of information between U.S. Citizenship and Immigration Services, the Social Security Administration, and the Department of State, (4) a new bulk upload feature for the program, and (5) reducing the fee for non-Federal government agencies.

# Overview

> 2. **The overview provides the context and background necessary to understand the project's purpose and mission and the justification for operating a privacy sensitive project.**

The U.S. Citizenship and Immigration Services administers the SAVE Program. The SAVE Program is an online fee-based intergovernmental initiative designed to help federal, state, tribal, and local government agencies and licensing bureaus confirm immigration status information.[2]

---

[1] Pursuant to Section 208 of the E-Government Act of 2002, agencies are required to conduct a Privacy Impact Assessment before developing or procuring Information Technology systems or projects that collect, maintain or disseminate information in identifiable form from or about members of the public. The Office of Management and Budget issued Guidance for Implementing the Privacy Provisions of the E-Government Act of 2002, which defines "information in identifiable form" as information in an Information Technology system or online collection: (i) that directly identifies an individual (e.g., name, address, social security number or other identifying number or code, telephone number, email address, etc.) or (ii) by which an agency intends to identify specific individuals in conjunction with other data elements. Furthermore, an individual is defined as "a citizen of the United States or an alien lawfully admitted for permanent residence."

[2] It is the intent of the current Administration to provide more of a supporting role to state, local, tribal, and territory governments. The U.S. Department of Homeland Security has determined to better serve and support non-Federal

The SAVE Program provides status verifications to requesting federal, state, territorial, tribal, and local government agencies; benefit granting agencies; and other authorized entities and licensing bureaus. The U.S. Citizenship and Immigration Services (or a contractor acting on its behalf) will confirm immigration and/or United States citizenship status as authorized by law, to the extent that such disclosure is necessary to enable these agencies to make decisions. These decisions may relate to: (1) determining eligibility for a federal, state, or local public benefit; (2) issuing a license or grant; (3) issuing a government credential; (4) conducting a background investigation; (5) registering voters or developing/ managing voter maintenance lists; or (6) any other lawful purpose.

A federal, state, territorial, tribal, or local government agency that provides a public benefit or license, or that is otherwise authorized by law to engage in an activity related to the verification of immigration status, may enroll in the SAVE Program as a registered agency. By using the SAVE Program, federal, state, territorial, tribal, and local registered agencies can request immigration status information to determine the applicant's eligibility for a benefit or a license. It is important to note that the program does not make the determinations on an applicant's eligibility for a specific benefit or license or eligibility to vote (at the local, state, or national level). Instead, it provides immigration status information to agencies to allow them to make an informed decision prior to issuing benefits or licenses or denying voting benefits. The registered agency analyzes the SAVE Program's response against the agency's own eligibility criteria to make an award determination. The SAVE Program may not always know the outcome of the benefit adjudication.

The SAVE Program has access to multiple immigration record systems from government agencies to confirm immigration status. All SAVE Program-registered agencies must adhere to a Memorandum of Agreement or Computer Matching Agreement, which include binding responsibilities regarding proper information usage and handling. The Memorandum of Agreement also stipulates the terms for billing and payment, if applicable. As part of its billing and registration process, the SAVE Program collects personally identifiable information, such as the registered agency's point of contact name and professional contact information, as well as registered agency and demographic information. The SAVE Program staff may also collect sensitive information such as registered agency credit card information and other data relevant to the billing process from the federal, state, territorial, tribal, or local government agencies using the SAVE Program. The U.S Citizenship and Immigration Service collects, maintains, and safeguards this information in accordance with U.S. Department of Homeland Security privacy and information technology policies.

The U.S. Citizenship and Immigration Services is currently implementing a comprehensive

---

government agencies, by eliminating the fees for their use of the SAVE Program.

optimization of the SAVE Program. The U.S. Citizenship and Immigration Services has developed a phased approach to further the U.S. Department of Homeland Security mission. This Privacy Impact Assessment supports use of the SAVE Program for (1) voter registration and voter maintenance list verification; (2) collection of Social Security numbers, which may include those of U.S. born citizens for all benefit- or license-related uses of the program; (3) sharing of information between U.S. Citizenship and Immigration Services, the Social Security Administration, and the Department of State; (4) a new bulk upload feature for the program; and (5) removing the fee for non-Federal government agencies.

### *Social Security Administration Data Sharing*

On January 20, 2025, and March 25, 2025, the President issued Executive Orders 14159, *Protecting the American People Against Invasion* and 14248, *Preserving and Protecting the Integrity of American Elections* respectively.[3] Executive Order 14159 includes a requirement for the Secretary to "…promptly issue guidance to ensure maximum compliance by [Department of Homeland Security] personnel with the provisions of 8 U.S.C. 1373 and 8 U.S.C. 1644 and ensure that State and local governments are provided with the information necessary to fulfill law enforcement, citizenship, or immigration status verification requirements authorized by law...."[4] Executive Order 14248 outlines that, "…Federal laws, such as the National Voter Registration Act (Pub. L. 103-31) and the Help America Vote Act (Pub. L. 107-252), require States to maintain an accurate and current Statewide list of every legally registered voter in the State. And [Department of Homeland Security] is required to share database information with States upon request so they can fulfill this duty."[5] Executive Order 14248 directs the Secretary to "…ensure that State and local officials have, without the requirement of the payment of a fee, access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who are already registered…" The Department of Homeland Security is also required under Executive Order 14248, in coordination with the Department of Government Efficiency Administrator, to "review each State's publicly available voter registration list and available records concerning voter list maintenance activities as required by 52 U.S.C. § 20507, alongside Federal immigration databases and State records requested, including through subpoena where necessary and authorized by law, for consistency with Federal requirements."

The Commissioner of Social Security also must assist states in determining whether individuals are eligible to register and vote by taking all appropriate action to make available the Social

---

[3] *See* Protecting the American People Against Invasion (January 2025) *available at* https://www.federalregister.gov/documents/2025/03/28/2025-05523/preserving-and-protecting-the-integrity-of-american-elections; and Preserving and Protecting the Integrity of American Elections (March 2025) *available at* https://www.federalregister.gov/documents/2025/01/29/2025-02006/protecting-the-american-people-against-invasion.
[4] 8 U.S.C.§ 1373; 8 U.S.C. §1644.
[5] 8 U.S.C. 1373(c).

Security Number Verification Service, the Death Master File, and any other Federal databases containing relevant information to all State and local election officials engaged in verifying the eligibility of individuals registering to vote or who are already registered.[6]

Most registered agencies may not have access in their voter, benefits, or licenses records to a U.S. Department of Homeland Security-issued identifier, (such as Alien Registration Number (Alien Number or A-number), Naturalization Certificate number, or Citizenship Certificate number) to initiate the initial SAVE Program query. To address this concern, the U.S. Citizenship and Immigration Services is incorporating a feature to allow SAVE Program-registered agencies to query records by Social Security numbers. Registered agencies will provide the U.S. Citizenship and Immigration Services with the individual's first and last name(s), date of birth and a full 9-digit or partial Social Security number. Registered agencies may additionally provide a U.S. Department of Homeland Security enumerator. The U.S. Citizenship and Immigration Services will provide the Social Security Administration with this information and in turn they will provide the U. S. Citizenship and Immigration Service with the following responses:

- Social Security number match (True/False);

- Name match (True/False);

- Date of birth match (True/False);

- Citizenship Indicator;

    o "A" - U.S. citizen;

    o "B" - Legal alien, eligible to work;

    o "C" - Legal alien, not eligible to work;

    o "D" – Other;

    o "E" - Alien student - restricted work authorized; and

    o "F" - Conditionally legalized alien.

- Foreign Born indicator (Citizenship code is not present, but individual was foreign born);

- State/Country code;

- American Samoa indicator (True/False);

- Alien Registration number (where applicable);

---

[6] Executive Order 14248 § 3(a).

- Death indicator (Yes / No); and

- Error code descriptions (transaction and record levels).

Of note, if a registered agency provides the names, dates of birth, and Social Security numbers of U.S. citizens by birth, the SAVE Program will maintain and process this information. For instance, a state may provide the U.S. Citizenship and Immigration Services information for all residents that are registered to vote within their jurisdiction. This would include U.S. citizens by birth. The U. S. Citizenship and Immigration Services will process this information as stated above and provide the appropriate response.

The SAVE Program now has a list processor feature to allow registered agencies to upload a list of individuals' case data instead of creating individual cases. A requesting agency, once signed into the program, will have an option to "upload" a list of individuals for the U.S. Citizenship and Immigration Services to verify citizenship and immigration status. Once uploaded, the SAVE Program creates individual cases for everyone identified on the uploaded list. The U. S. Citizenship and Immigration Services then sends from the list to the Social Security Administration the name, Social Security number, and date of birth of the individuals identified by the registered agency. The Social Security Administration then sends the status information (citizenship indicator noted above) back to the SAVE Program. The SAVE Program, if required, also queries other various systems (see below *List of Federal Systems Used to Respond to Registered Agency Queries*), and provides a consolidated result in each case file. The registered agency has the option of logging back into the program after twenty-four hours and searching for each case or generating a Web Agency Audit Report within the SAVE Program that can provide status information for multiple cases.

Additionally, program users will be able to download a list of individuals from the original list that the registered agency submitted, that the U.S. Citizenship and Immigration Services was not able to process. For example, a registered agency's list may not have a unique identifier for several individuals. To capture these incomplete cases, the program creates a spreadsheet that includes everyone who is not processed and requests additional information such as a Social Security number (corrected Social Security number), or Alien Registration Number. The registered agency can then update the spreadsheet provided with the additional information and upload it again into the program. The U.S. Citizenship and Immigration Services then provides the registered agency's account with the following information:

- Verification number (SAVE Program generated);

- Initial request date;

- Identification type;

- Identification number;

- Last name;

- Benefit code;

- Benefit description;

- Initial request response (Lawful status, No lawful status, Deceased);

- Additional request date;

- Additional request response (Lawful status, No lawful status, Deceased);

- Third step request date;

- Third step resolution (Lawful status, No lawful status, Deceased); and

- Closed date.

### *Department of State Data Sharing*

Registered agencies may provide either a U.S. passport number or a photocopy of a U.S. passport as documentation of citizenship or immigration status. If a U.S. passport number is submitted, the SAVE Program will verify it against information from U.S. Department of State-issued passport. Additionally, the SAVE Program will receive or access information in the U.S. Department of State's Consular Consolidated Database / American Citizen Record Query system, which is a consular search engine used by the U.S. Department of State to manage and access records related to United States citizens, particularly for consular protection and services, including managing passport requests and applications.

### *State Driver's Licensing Agencies and Other Organizations Maintaining Driver's License Information Data Sharing*

Within the U.S., driver's licenses are the most widely used form of identification. The SAVE Program can use driver's license and state identification card numbers to check and confirm identity information by working with state driver's licensing agencies and national agencies that store driver's license information for legal purposes (such as the National Law Enforcement Telecommunications System). When the registered agency provides a driver's license or state identification card number as the enumerator to verify the identity of the applicant, the SAVE Program will use state driver's licensing agencies or another source (such as the National Law Enforcement Telecommunications System) to validate the information and gain access to other government enumerators. This will allow the SAVE Program to match against other sources to verify immigration status and U.S. citizenship, which will improve accuracy and efficiency for SAVE registered agencies.

---

*Auditing of Federal and State Oversight Programs Data Sharing*

The SAVE Program will support organizations that have entered into required agreements with the U.S. Citizenship and Immigration Services and have a legal oversight authority over a program or benefit type supported by the SAVE Program through reporting capabilities for auditing purposes. User agencies with a legal authority to monitor and audit benefits granted may view case data such as biographic data, enumerators, case submission date/time, and the SAVE Program response information. Reporting options exist for individual agencies and their case data. Additionally, user agencies with legal authority may now be granted SAVE Program access to view other user agencies' case data through a linking mechanism based on either benefit type granted (e.g. Medicare) or by state. This new account type will have reporting options to view case data. Other account types enable user agencies to create cases within the SAVE Program to verify applicant current eligibility for benefits previously granted. This will allow federal and state oversight agencies to ensure user agencies are properly verifying immigration status or citizenship before making an eligibility determination. Oversight agencies can also ensure previously approved applicants remain eligible for the benefits they are receiving.

*List of Federal Systems Used to Respond to Registered Agency Queries*

The following is a list of federal information systems that the SAVE Program queries for responses to registered agencies:

**United States Citizenship and Immigration Services Systems:**

- Central Index System;[7]

- Electronic Immigration System;[8]

- Computer Linked Application Information Management System 3;[9]

- Enterprise Citizenship and Immigration Services Centralized Operational Repository;[10]

- GLOBAL (not an acronym);

---

[7] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, PRIVACY IMPACT ASSESSMENT FOR THE CENTRAL INDEX SYSTEM, DHS/USCIS/PIA-009, *available at* Privacy Documents for USCIS | Homeland Security.

[8] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, PRIVACY IMPACT ASSESSMENT FOR THE USCIS ELECTRONIC IMMIGRATION SYSTEM, DHS/USCIS/PIA-056, *available at* Privacy Documents for USCIS | Homeland Security.

[9] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, PRIVACY IMPACT ASSESSMENT FOR THE COMPUTER LINKED APPLICATION INFORMATION MANAGEMENT SYSTEM AND ASSOCIATED SYSTEMS, DHS/USCIS/PIA-016, *available at* Privacy Documents for USCIS | Homeland Security.

[10] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, PRIVACY IMPACT ASSESSMENT FOR THE ENTERPRISE CITIZENSHIP AND IMMIGRATIONS SERVICES CENTRALIZED OPERATIONAL REPOSITORY, DHS/USCIS/PIA-023, *available at* Privacy Documents for USCIS | Homeland Security.

- RAILS (not an acronym);[11]

- Customer Profile Management System;[12] and

- Salesforce Customer Relationship Management Customer Relationship Management.

**Other U.S. Department of Homeland Security Systems:**

- U.S. Department of Homeland Security OneNet;

- U.S. Immigration and Customs Enforcement Student and Exchange Visitor Program;[13]

- U.S. Immigration and Customs Enforcement, Enforcement Integrated Database;[14]

- U.S. Customs and Border Protection Arrival and Departure Information System;[15] and

- Transportation Security Administration Office of Intelligence and Analysis Technology Infrastructure Modernization Program.[16]

**Other Federal Agency Systems:**

- U.S. Military Entrance Processing Command Integrated Resource System;

- U.S. Department of Education Federal Student Aid Central Processing System;

- U.S. Department of Health and Human Services Centers for Medicare & Medicaid Services;

- U.S. Social Security Administration Numident system;

- U.S. Department of Justice Executive Office for Immigration's Immigration Review Information Exchange System;

---

[11] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, PRIVACY IMPACT ASSESSMENT FOR RAILS, DHS/USCIS/PIA-075, *available at* Privacy Documents for USCIS | Homeland Security.

[12] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, PRIVACY IMPACT ASSESSMENT FOR THE CUSTOMER PROFILE MANAGEMENT SERVICE, DHS/USCIS/PIA-060, *available at* Privacy Documents for USCIS | Homeland Security.

[13] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, PRIVACY IMPACT ASSESSMENT FOR THE STUDENT AND EXCHANGE VISITOR PROGRAM, DHS/ICE/PIA-001, *available at* Privacy Documents for ICE | Homeland Security.

[14] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, PRIVACY IMPACT ASSESSMENT FOR THE ENFORCEMENT INTEGRATED DATABASE, DHS/ICE/PIA-015, *available at* Privacy Documents for ICE | Homeland Security.

[15] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CUSTOMS AND BORDER PROTECTION, PRIVACY IMPACT ASSESSMENT FOR THE ARRIVAL AND DEPARTURE INFORMATION SYSTEM, DHS/CBP/PIA-024, *available at* Privacy Documents for CBP | Homeland Security.

[16] *See* U.S. DEPARTMENT OF HOMELAND SECURITY, TRANSPORTATION SECURITY ADMINISTRATION, PRIVACY IMPACT ASSESSMENT FOR THE TRANSPORTATION SECURITY ADMINISTRATION OFFICE OF INTELLIGENCE AND ANALYSIS TECHNOLOGY INFRASTRUCTURE MODERNIZATION PROGRAM, DHS/TSA/PIA-042, *available at* Privacy Documents for TSA | Homeland Security.

- U.S. Department of State Consular Consolidated Database; and

- U.S. Department of State American Citizen Record Query System.

# Fair Information Practice Principles

The U.S. Department of Homeland Security conducts Privacy Impact Assessments on developed or procured information technology systems involving the collection, maintenance, or dissemination of information in identifiable form or that make substantial changes to existing information technology that manages information in identifiable form, as required by Public Law 107-347, Section 208, "The E-Government Act of 2002," and any applicable and implementing Office of Management and Budget guidance; or proposed rulemakings affecting personal information as required by Section 222(a)(4) of the Homeland Security Act of 2002; or technologies that sustain, and do not erode, privacy protections relating to the use, collection, and disclosure of personal information pursuant to 6 U.S.C § 142(a)(1).

In response to these obligations, the U.S. Department of Homeland Security Privacy Office developed a set of Fair Information Practice Principles [17] from the underlying concepts of the Privacy Act of 1974[18] to encompass the full scope of the information and interactions of the U.S. Department of Homeland Security. The Fair Information Practice Principles account for the nature and purpose of the information being collected in relation to the U.S. Department of Homeland Security's mission to preserve, protect, and secure. The Fair Information Practice Principles are a set of eight principles that are rooted in the tenets of the Privacy Act.

| 3. What specific legal authorities and/or agreements permit the collection of information by the project in question? |
|---|
| In accordance with a 1986 Congress mandate, the U.S. Citizenship and Immigration Services, previously the Immigraton and Naturalization Service, established the SAVE Program to verify the citizenship and immigration status of individuals seeking government benefits for use by benefit granting agencies when making benefit determinations. The following provides authority for the program to collect, maintain, and share personally identifiable information: <br><br> • Immigration and Nationality Act, Public Law 82-414, 66 Statutory 163 (June 27, 1952); <br><br> • Homeland Security Act of 2002, Public Law Number 107-296, 116 Statutory 2135 |

---

[17] U.S. Department of Homeland Security, Privacy Policy Guidance Memorandum 2008-01, The Fair Information Practice Principles: Framework for Privacy Policy at the Department of Homeland Security (2008), *available at* https://www.dhs.gov/privacy-policy-guidance.
[18] Privacy Act of 1974, 5 U.S.C. § 552a, as amended.

(November 25, 2002);

- Immigration Reform and Control Act of 1986, Public Law 99-603, 11 Statutory 3359 (November 6, 1986);

- Personal Responsibility and Work Opportunity Reconciliation Act of 1996 , Public Law 104-193, 110 Statutory 2105 (August 22, 1996);

- Title IV, Subtitle A, of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Public Law 104-208, 110 Statutoty 3009 (September 30, 1996);

- Real ID Act of 2005, Public Law 109-13, 119 Statutory 231 (May 11, 2005);

- Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, 124 Statutory 119 (Mar. 23, 2010), as amended by the Health Care and Education Reconciliation Act of 2010, Public Law 111-152, 124 Stat. 1029 (March 30, 2010);

- Federal Aviation Administration Extension, Safety and Security Act of 2016, Public Law 114-190, 130 Statutory 615 (July 15, 2016); and

- Social Security Act of 1935, Public Law 74–271, 49 Statutory 620 (Aug. 14, 1935) as amended, 42 U.S.C. § 1306.

In addition, the Systematic Alien Verification for Entitlements Program has an obligation under 8 U.S.C. 1373(c) to "respond to an inquiry by a federal, state or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information."

The Social Security Administration is aiding by sending to, and receiving, U.S. Department of Homeland Security and U.S. Citizenship and Immigration Services information regarding the citizenship or immigration status, lawful or unlawful, of individuals within its records. The Social Security Administration is authorized to participate in this information sharing under the authority of the Social Security Act, 42 U.S.C. § 1306, and pursuant to 8 U.S.C. § 1373(a).

4.  **Will this information be maintained as part of system of records,[19] as defined in the Privacy Act, 5 U.S.C. §552a?**

---

[19] The term "system of records" means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual.

Yes, information retrieved by the Social Security Administration, U.S. Department of State, and registered agencies will be maintained in the DHS/USCIS-004 Systematic Alien Verification for Entitlements (SAVE) Program System of Records.[20]

**5. From which population does the project collect, maintain, use, and/or disseminate personally identifiable information?[21]**

☒ a. Members of the public

☐ b. U.S. Department of Homeland Security employees and/or contractors

☐ c. Other federal employees

**6. What personally identifiable information is collected, maintained, used, or disseminated?**

The U.S. Citizenship and Immigration Services may collect the following information about aliens; legal permanent residents; and U.S. born, naturalized, and derived citizens from registered agencies:

- Name (last, first, middle);
- Unique identifiers;
    - Alien Regstriaton Number (Alien number or A-Number)/U. S. Citizenship and Immigration Services Number;
    - I-94 Arrival/Departure Record number;
    - Student and Exchange Visitor Information System Identification number;
    - Receipt number/card number;
    - Naturalized Certificate number; and
    - Citizenship Certificate number.

---

[20] *See* DHS/USCIS-004 Systematic Alien Verification for Entitlements, 90 Fed. Reg. 48948 (October 31, 2025), *available at* System of Records Notices | Homeland Security.

[21] Personally identifiable information means any information about an individual maintained by an agency, including, but not limited to, education, financial transactions, medical history, and criminal or employment history and information which can be used to distinguish or trace an individual's identity, such as their name, social security number, date and place of birth, mother's maiden name, biometric records, etc., including any other personal information which is linked or linkable to an individual. *See* OMB M-06-19, Reporting Incidents Involving Personally Identifiable Information.

- Visa or Passport (Foreign and/or United Sates) numbers;

- Social Security number or Individual Tax Identification Number;

- Driver's license or state identification number;

- Date of birth;

- Country of birth;

- Citizenship or nationality;

- Class of Admission code and Date of entry;

- File Control Office;

- Benefit sought; and

- Immigration documentation.

The United States Citizenship and Immigration Services shares the following information to the Social Security Administration about U.S. born, naturalized, and/or derived citizens:

- Name (last, first, middle);

- Date of birth;

- Social Security number (full and partial); and

- U.S. Department of Homeland Security-issued identifier (such as Alien Registration Number).

The U. S. Citizenship and Immigration Services maintains the following information from the Social Security Administration:

- Social Security number match (True/False);

- Name match (True/False);

- Date of birth match (True/False);

- Citizenship indicator;

    o "A" - U.S. citizen;

    o "B" - Legal alien, eligible to work;

    o "C" - Legal alien, not eligible to work;

    o "D" – Other;

    o "E" - Alien student - restricted work authorized; and

JA267

- o   "F" - Conditionally legalized alien.

- Foreign Born indicator (Citizenship code is not present, but individual was foreign born);

- State/country code;

- American Samoa indicator (True/False);

- Alien Registration Number (Alien Number or A-Number) (where applicable);

- Death indicator (Yes / No); and

- Error code descriptions (transaction and record levels).

The United States Citizenship and Immigration Services provides the following information to requesting agencies:

- Verification number (system generated);

- Initial request date;

- Identification type;

- Identification number;

- Last name;

- Benefit code;

- Benefit description;

- Initial request response (lawful status, no lawful status, deceased);

- Additional request date;

- Additional request response (lawful status, no lawful status, deceased);

- Third step request date;

- Third step resolution (lawful status, no lawful status, deceased); and

- Closed date.

The U.S. Citizenship and Immigration Services shares the following information to the U.S. Department of State:

- Full name;

- Date of birth;

JA268

- Social Security number; and/or

- U.S. passport number.

The U.S. Citizenship and Immigration Services may maintain the following information from the U.S. Department of State:

- Full name;

- Date of birth;

- Certificate of Citizenship;

- Certificate of Naturalization;

- Alien RegistrationNumber (Alien Number or A-Number);

- U.S. passport book or passport card number;

- U.S. passport book or passport card issuance date;

- U.S. passport endorsement code(s) where applicable; and

- Images of U.S. passport book or passport card.

| 7. | What is the intended use of personally identifiable information? |
|---|---|

The SAVE Program uses personally identifiable information about individuals to help federal, state, territorial, tribal, and local government benefit-granting agencies, other authorized entities and licensing bureaus, as authorized by law, verify the citizenship and/or immigration status of individuals within their jurisdiction as they determine eligibility for benefits, credentials, and licenses; and verify voter registration. The U.S. Citizenship and Immigration Services also uses the personally identifiable information for federal security background investigations and other lawful purposes.

The U.S. Citizenship and Immigration Services uses a variety of data for cross-referencing. In this way, the U. S. Citizenship and Immigration Services ensures that data is accurate and current, identifies inconsistencies between or among databases, and minimizes fraud. Additionally, the U.S. Citizenship and Immigration Services collects personally identifiable information from individual users of the system to provide accountability of system usage in the event of misuse and abuse of the system. Further, the U. S. Citizenship and Immigration Services use personally identifiable information to register SAVE user agencies and other administration functions.

The U. S. Citizenship and Immigration Services will use the Social Security number from

requesting agencies to query the Social Security Administration Enumeration System to assist in providing U.S. citizenship or immigration status of individuals. Federal, state, local, tribal, and territory governments generally use the SAVE Program to assist in awards of benefits, voter registration verification, as well as identifying fraud.

The U.S. Citizenship and Immigration Services will compare U.S. passport information against information available in U.S. Department of State accessed systems to verify a match or no match. Using a passport number, the SAVE Program will be able to verify acquired or derived citizenship for individuals with a U.S. passport directly from the source records. Images of the U.S. Passport document may also be submitted by agencies when applicable to be used by status verifiers as part of the verification process. This ensures that personally identifiable information contained on the document can be used to verify the document and subsequently the citizenship status of the individual. Additionally, the U.S. Citizenship and Immigration Services will use U.S. passport application information, specifically, the Certificate or Citizenship or Certificate of Naturalization, to quickly verify citizenship status in certain cases and reduce its response time to registered users.

| **8. How long and under which retention schedule is the information retained?** |
|---|
| Pursuant to the National Archives and Records Administration Authority N1-566-08-07, the U.S. Citizenship and Immigration Services maintains records within the SAVE Program for ten years from the date of the completion of the verification, unless the records are part of an ongoing law enforcement investigation in which case the U.S. Citizenship and Immigration Services may retain them until completion of the investigation. |

| **9. With whom will personally identifiable information be shared?** | |
|---|---|
| ☐ Within the Component/Office | Specify: |
| ☒ Other-U.S. Department of Homeland Security Component(s)/Office(s) | Specify: When potential fraud or misuse is indicated by the SAVE Program information, this information may be shared, on a case-by-case basis, with U.S. Department of Homeland Security internal law enforcement organizations to include:<br><br>• U.S. Immigration and Customs Enforcement; and<br><br>• U.S. Customs and Border Protection. |



| | |
|---|---|
| ☒ State, local, tribal, or territorial entities | Specify: A list of all requesting agencies and their purpose for accessing the SAVE Program is accessible at https://www.uscis.gov/save/save-agency-search-tool. Additionally SAVE may retrieve information from state driver's license and identification issuing agencies (such as Department of Motor Vehicles). |
| ☐ Public | Specify: |
| ☐ Private sector | Specify: |
| ☐ Foreign governments | Specify: |
| ☐ Foreign entities | Specify: |
| ☒ Other: | Specify: Social Security Administration, U.S. Department of State, and National organizations maintaining driver's license and state identification information (such as the National Law Enforcement Telecommunications System). |

**10.  How are individuals provided notice prior to the collection of information? If notice is not provided, explain why not.**

Each registered agency completes a Memorandum of Agreement with the U.S. Citizenship and Immigration Services and agrees to provide notice to individuals within their jurisdiction of their use of information and sharing with the U.S. Citizenship and Immigration Services. Additionally, the U.S. Citizenship and Immigration Services provides notice through this Privacy Impact Assessment as well as system of records notices mentioned in Section 4. Each state holds the responsibility to provide notice of their use of information at the time of their collection or additional use of the information.

**11. What opportunities are available for individuals to consent to uses, decline to provide information, or opt out?**

The U.S. Citizenship and Immigration Services does not provide opportunities to individuals within the jurisdiction of the registered agency to consent to the U.S. Citizenship and Immigration Services use of their information. Pursuant to the above-mentioned legal authorities

listed in Section 3, the U. S. Citizenship and Immigration Services must provide individual information to the Social Security Administration and the U.S. Department of State to allow the Requesting Agency to determine the immigration status of applicants and registrants of benefits, licenses, or for voter registration verification. Each registered agency holds the responsibility to provide opportunities for consent of their use of individuals' information. Additionally, each registered agency holds the responsibility to determine whether an individual has a legal right to decline providing information to them based on applicable law.

### 12. What procedures are in place to allow individuals to correct inaccurate or erroneous information?

Individuals may request access to their information maintained by the U.S. Citizenship and Immigration Services by submitting a request at https://www.uscis.gov/records/request-records-through-the-freedom-of-information-act-or-privacy-act.

Requesters are required to provide their Alien Registration Number and/or full name, date, and place of birth, and return address.

Individuals should provide all written requests to contest or amend their information reviewed by the SAVE Program, with appropriate proof of identity, class of admission, and other relevant identifying information, as well as a statement about the incorrect. Depending on the originating source of information, the request may be satisfied within the U.S. Citizenship and Immigration Services, or the individual may be referred to the appropriate record holding agency. If the source of data is from a U.S. Citizenship and Immigration Services download and the SAVE Program confirms the data is incorrect, often by comparing the documents with the information in the program and cross-referencing other U.S. Citizenship and Immigration Services Verification Information System databases, the SAVE Program will contact the appropriate system owner recommending that the data be corrected.[22] Alternatively, the individual may make an appointment by calling the U.S. Citizenship and Immigration Services Contact Center at 800-375-5283 (TTY 800-767-1833). When appearing for the appointment, the person should provide accompanying supporting documentation, including proof of identity, class of admission, and other relevant identifying information. The SAVE Program customer agencies may change their profile information directly within the U.S. Citizenship and Immigration

---

[22] The Verification Information System is a composite information system incorporating data from various U.S. Department of Homeland Security and Social Security Administration databases and functions as the underlying information technology that supports the SAVE Program. The Verification Information System supports the U.S. Citizenship and Immigration Service's ability to verify whether a newly hired employee is authorized to work in the United States and the citizenship or immigration status verification of individuals seeking certain government benefits. The Verification Information System, including the services it houses, is in the Amazon Web Service cloud environment.

Services Verification Information System application. To correct typographic errors in your U.S. Citizenship and Immigration Services record or document, visit egov.uscis.gov/e-request.

### 13. What administrative, technical, and physical controls are used to protect the information?

The SAVE Program requires potential enrollees and customer agencies to register for participation in the program and sign an appropriate data sharing agreement. Once the enrollees submit the required documentation, all users must complete a web-based training course that explains functionality and security requirements.

The Systematic Alien Verification for Entitlements Program's internal users take the mandatory annual U.S. Department of Homeland Security Computer Security Training and the U.S. Citizenship and Immigration Services Privacy Awareness Training. Additionally, staff who administer the SAVE Program are required take special, role-based training. External SAVE Program users complete online tutorials. The tutorials also cover the procedures and policies associated with the use of the SAVE Program and includes privacy-related topics.

The Verification Information System, as the underlying technology supporting the SAVE Program has been Certified and Accredited and received a full authority to operate in April 2014. The system has been approved to participate in the Ongoing Authorization process and is continually monitored for compliance with the National Institute of Science and Technology policies to ensure compliance with the Federal Information System Management Act. The SAVE Program implements access controls for both internal and external customers, such as account names and passwords to access the program. The program has an automated mechanism to ensure that users change their passwords at specified intervals. Additionally, the program implements the following technical controls:

- Password data is encrypted within the system;

- The system is located within a multi-layered firewall architecture;

- The system follows a robust set of security controls that meet the U.S. Department of Homeland Security System Security Policy requirements. The certification and accreditation process ensures that the U.S. Citizenship and Immigration Services documents and verifies these security controls through the certification and accreditation process;

- The system uses secure hypertext transfer protocol protected communications during all data transmissions between the client workstation and the system;

- Passwords are encrypted when making database connections; and

- Procedures are in place to ensure that any potential breaches of information are reported within one hour of being found.

---

**14. How does the Component ensure that personally identifiable information is used appropriately?**

The SAVE Program has a comprehensive audit trail tracking and maintenance function that stores information about users who submit queries, when the query was processed, the query response, who received the query response, and when the user received the query response. The audit logs have restricted access based on user roles. These logs are external to system administration access methods and protected from modification. U.S. Citizen and Immigration Services personnel periodically review these audit logs to monitor user activity. Registered agencies must abide by all security requirements that they agreed to when they enrolled in the program. Attempts to evade the security controls can result in loss of access to the SAVE Program.

Some registered agencies use a single sign-on for all their individual users. In these cases, the SAVE Program will not collect information from individual users because individual users will appear as one agency user. In the case of single sign-on access to users, the U.S. Citizenship and Immigration Services requires the agency to sign an addendum to their Memorandum of Agreement which states that every user of the system must be assigned a unique identifier. If requested, the agency provides this information to the U.S. Citizenship and Immigration Services to allow for a clear audit trail for all transactions.

## Associated Privacy Risks and Mitigations

| Privacy Risk: | There is a risk that the U.S. Citizenship and Immigration Services may share inaccurate information with registered agencies, which could in turn impact a registered user agency's eligibility determination for an individual. |
|---|---|
| Mitigation: | The U.S. Citizenship and Immigration Services **partially mitigates** this risk. Generally, the SAVE Program has a 3-step process. The first step is a general query of the system. However, due to misspelling of names, transposed numbers, or incomplete information, the SAVE Program may produce inaccurate results. To mitigate this, the SAVE Program has a manual step process where a U.S. Citizenship and Immigration Services staff member will try to reconcile the request manually. The third step is for |

| | |
|---|---|
| | the U.S. Citizenship and Immigration Services to get additional documentation from the registered agency. However, this only partially mitigates the risk since the new request using Social Security numbers does not allow for a second and third step review. The U.S. Citizenship and Immigration Services does not have direct access to the Social Security Administration system to support these additional steps. Additionally, registered agencies may not go through all steps to ensure accuracy of information. |

| | |
|---|---|
| **Privacy Risk:** | There is a risk that all United States citizens, including natural born U.S. citizens, have not been provided notice that the SAVE Program collects or maintains their information for citizenship and immigration status. |
| **Mitigation:** | The United States Citizenship and Immigration Services **partially mitigates** this risk. It is the responsibility of each registered agency to provide notice to individuals within their jurisdiction of their use of information and sharing with the U.S. Department of Homeland Security/U.S. Citizenship and Immigration Services. The U.S. Citizenship and Immigration Services is publishing this privacy impact assessment and related System of Records Notice to provide transparency regarding the new categories of information collected and shared to assist registered agencies in verifying citizenship and immigration status of individuals applying for a benefit or license and voter registration verification. The SAVE Program's "Register an Agency for SAVE" explains how an eligible agency can create a Memorandum of Agreement with the U.S. Citizenship and Immigration Services. These agreements require registered user agencies to comply with the Privacy Act of 1974, 5 U.S.C. § 552a, as amended, and other applicable laws, regulations, and policies. These policies include transparency and notice to individuals regarding agencies collection and use of personally identifiable information. |

| | |
|---|---|
| **Privacy Risk:** | There is a risk that the U.S. Citizenship and Immigration Services may use the information it obtains from registered agencies, the Social Security Administration, and the U.S. Department of State, for purposes not authorized by statute or for which it was originally collected. |
| **Mitigation:** | The United States Citizenship and Immigration Services **mitigates this risk** by only collecting information as authorized by the Immigration and Naturalization Act and other authorities mentioned within this Privacy |

| | Impact Assessment. The purpose for sharing Social Security numbers with the Social Security Administration and receiving information is to allow user agencies to verify the citizenship or immigration status of individuals applying for a benefit, license, or voter registration verification. The purpose for sharing and receiving U.S. passport information with the U.S. Department of State is to verify the citizenship or immigration status of individuals applying for a benefit, license or for voter registration verification. Also, each registered agency must execute a Memorandum of Agreement or Computer Matching Agreement with the U.S. Citizenship and Immigration Services that includes terms that the SAVE Program will be used in accordance with the law. |
|---|---|

| **Privacy Risk:** | There is a risk that the new category individuals covered by this assessment/notice, specifically, United States born citizens do not have the opportunity to individually participate or consent in how the U.S. Citizenship and Immigration Services uses their information. |
|---|---|
| **Mitigation:** | The U.S. Citizenship and Immigration Services **cannot mitigate** this risk. Each user agency is responsible for complying with federal and local authorities. The U.S. Citizenship and Immigration Services assumes that each user agency factors in the principles of notice, individual participation, and consent prior to providing information to the U.S. Citizenship and Immigration Services. The U.S. Citizenship and Immigration Services only uses the information for the authorized purpose(s) identified within this Privacy Impact Assessment. Individuals should consult their local government agencies to determine the appropriate opt-in or opt-out statute, regulations and policies. |

| **Privacy Risk:** | There is a risk that individuals may access the SAVE Program that do not have a need to know of the information. |
|---|---|
| **Mitigation:** | The U.S. Citizenship and Immigration Services mitigates this risk by requiring the SAVE Program's potential enrollees and customer agencies to register for participation in the program and sign a Memorandum of Agreement or Computer Matching Agreement. After all required documentation is submitted, all users must complete a web-based training course that explains functionality and security requirements.

The SAVE Program's internal users complete the mandatory annual privacy |



|  | and information technology training. External program complete take on-line tutorials explaining the program. The tutorials also cover the procedures and policies associated with the use of the program. |
|---|---|

## Contact Official

Brian Broderick
Division Chief (Acting)
Verification Division
U.S. Citizenship and Immigration Services

## Responsible Official

Angela Y. Washington
Component Privacy Officer
Office of Privacy
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security
USCIS.PrivacyCompliance@uscis.dhs.gov

## Approval Notice:

By signing below, the U.S. Department of Homeland Security Chief Privacy Officer approves this Privacy Impact Assessment for the SAVE Program. If, however, during the operational course of this program or U.S. Citizenship and Immigration Services' use of this technology changes from what has been documented or the U.S. Department of Homeland Security Privacy Office becomes aware of evidentiary changes to the intended use of the personally identifiable information or the scope of the personally identifiable information collected, of the program or technology is determined to be ineffective, the Chief Privacy Officer reserves the right to revoke approval of this Privacy Impact Assessment.

## Approval Signature

Original, signed copy on file with the U.S. Department of Homeland Security Privacy Office.

_____

Roman Jankowski
Chief Privacy Officer
U.S. Department of Homeland Security
Privacy@hq.dhs.gov

JA277

# Exhibit 15

Civil Action No. 26-cv-1114 (CJN) (Lead case)

# DHS's Data Grab Is Getting Citizens Kicked Off Voter Rolls, New Complaint Says

**wired.com**/story/dhs-data-grab-getting-citizens-kicked-off-voter-rolls

Vittoria Elliott                                                                    January 22, 2026

Even before winning reelection, President Donald Trump and his supporters put immigration at the center of their messaging. In addition to other conspiracy theories, the right-wing went all in on the false claim that immigrants were voting illegally in large numbers. The Trump administration has since poured billions of dollars into immigration enforcement, and in March, Trump issued an executive order requiring the Department of Homeland Security to ensure that states have "access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who are already registered."

In May, DHS began encouraging states to check their voter rolls against immigration data with the Systematic Alien Verification for Entitlements (SAVE) program, run by US Citizenship and Immigration Services (USCIS). SAVE now has access to data from across the federal government, not just on immigrants but on citizens as well.

Experts have warned that using disparate sources of data—all collected for different purposes–could lead to errors, including identifying US citizens as noncitizens.

Featured Video

According to the plaintiffs in a new legal complaint, it appears that it's already happening.

The complaint, filed against DHS and the Social Security Administration (SSA) in the Washington, DC, District Court by the League of Women Voters and the Electronic Privacy Information Center (EPIC), alleges that the new SAVE expansion has led to American citizens being kicked off state voter rolls and that the creation of what amounts to a national citizenship data bank is unconstitutional.

"Eligible US citizen voters will be wrongfully purged from voter rolls based on inaccurate data from the illegally overhauled SAVE system," says Nikhel Sus, deputy chief counsel at Citizens for Responsibility and Ethics in Washington, which is counsel for the plaintiffs in the case. DHS did not respond to a request for comment.

SAVE was created in 1986 as a way for states to check whether immigrants applying for government services were eligible to receive them, and it did not have access to information on natural-born American citizens. But as the Trump administration has sought to crack down on immigration, DHS has radically expanded the tool.

JA279

Last April, WIRED reported that SAVE was querying data from the SSA, the Internal Revenue Service, and state voter data. On May 22, DHS announced a "partnership" with the SSA and rolled out SAVE as a tool that state and local governments could use for voter verification. The goal, according to USCIS spokesperson Matthew Tragesser, was to "identify and stop aliens from hijacking our elections." Twenty-two states, including Florida, Texas, and Louisiana, have agreements in place to use SAVE to verify voters' citizenship by bulk-uploading information from voter rolls and personal identification information, the suit alleges. But in doing so, the complaint argues, some of these states are already disenfranchising eligible voters.

In October, Texas secretary of state Jane Nelson announced that the state had identified 2,724 "potential noncitizens" who were registered to vote. One of those, Anthony Nel, is, in fact, a US citizen. According to the complaint, SAVE identified Nel as a noncitizen "based on outdated data, leading to his voter registration being wrongfully canceled in December 2025." In response to a request for comment, Texas assistant secretary of state for communications Alicia Pierce referred WIRED to the October press release where the state announced the findings from its use of SAVE.

"We're talking about a known error rate that will result—and already has resulted—in multiple people being kicked off the voter rolls, going into a critical election," says John Davisson, director of litigation and senior counsel at EPIC, which is one of the plaintiffs in the case.

States are not supposed to immediately purge someone flagged by SAVE from their rolls but are supposed to reach out to the voter to confirm their status. But if voters don't receive the notice or aren't able to respond in time, their registration is at risk of being canceled. "It's a burden that lawfully registered voters shouldn't have to bear," says Davisson.

Research has shown that instances of noncitizens voting are extremely rare. Trump and his supporters have spent years spreading misinformation and conspiracy theories about the integrity of US elections, making it a focal point of the right-wing media ecosystem. "Just by identifying potential noncitizen voters through SAVE, regardless of whether they actually are noncitizens, this false narrative will be further fueled," says Sus. "There is a broader concern about sowing distrust in the integrity of our election results."

The complaint argues, "DHS and SSA lack any statutory or constitutional authority to transform SAVE into a national data bank to conduct citizenship checks for purposes of determining individuals' eligibility to vote in elections." It argues that the inclusion of social security data not only introduced potential inaccuracies but effectively transformed SAVE into something else—a citizenship database.

A privacy threshold analysis (PTA) conducted by USCIS, which was obtained through a Freedom of Information Act request by the plaintiffs and has been reviewed by WIRED, warns that USCIS knew that "shortfalls in data accuracy in the system could cause incomplete or false results," even as DHS was encouraging states to use the tool. The PTA marked SAVE as "not in compliance"

with privacy regulations, in part because it had not yet issued a system of records notice, the legal notice required to inform the public that social security data was being shared for immigration purposes.

The PTA, which was completed in July 2025, noted that inaccuracies in the new SAVE system could be due to a lack of electronic records, particularly from the SSA, which were "not reliably recorded pre-1981." The PTA further notes that USCIS "is not the source agency for Social Security Administration–related information" and therefore "cannot verify accuracy" of SSA data.

"Voters are being wrongfully and illegally removed from the rolls on the basis of data that is known to be inaccurate," says Davisson.

Leland Dudek, former acting commissioner of the SSA, says the PTA accurately reflects potential issues with social security data being used in SAVE. "Social Security numbers were never intended for this use case," says Dudek. "The records of Social Security are for the discreet and explicit purposes of old age survivors, disability insurance, and Social Security insurance." Social Security numbers are issued to people legally allowed to work in the US and do not change once someone naturalizes. Immigration and naturalization processes are managed by DHS, and naturalized citizens are not required to tell SSA if they naturalize, meaning SSA data may be out of date. (In March 2025, SSA suspended a program that automatically mailed Social Security cards to newly naturalized citizens and people authorized to work in the US, requiring instead that they physically appear at one of the agency's regional offices.).

Dudek says the new SAVE tool was likely not fit to be rolled out for voter identification. "It needed to be rolled out in a way that was thoughtful," he says. "When you're targeting the most fundamental right of democracy, you have to give consideration and gather input."

This use of social security data to create a kind of national citizenship verification system, Sus says, extends far beyond the authority of DHS. "Congress has provided no specific statutory authorization for the Department of Homeland Security to create a national citizenship data bank to look up any American's citizenship status," Sus says. "DHS is effectively imposing a backdoor, federal documentary proof-of-citizenship requirement for voters whose citizenship SAVE can't confirm. Not only will this needlessly burden the voting rights of US citizens, but it undermines Congress' choice to not adopt a documentary proof-of-citizenship requirement for voting."

As the midterms inch closer, other government systems are being proposed to further tamp down on voting access. Congress is considering a SAVE Act that would require proof of citizenship to vote. Billionaire Elon Musk has publicly supported ending the congressional filibuster to pass an "election integrity" law. Earlier this week, a different court filing indicated that a member of the Department of Government Efficiency team at the SSA had signed a "Voter Data Agreement" with a political advocacy organization seeking to "find evidence of voter fraud and to overturn election results in certain states."

JA281

The hurdles from the SAVE program, meanwhile, are more than enough to keep voting advocates concerned. Sus worries that the SAVE program could introduce further barriers to voting in the run-up to the 2026 midterm elections. "In Texas, there are primary elections coming up in March," he says. "If a voter's registration is canceled close to that election, and they don't have time to get together the documentary proof of citizenship that is required to reinstate their registration, then they may lose the right to vote."

JA282

# Exhibit 16

Civil Action No. 26-cv-1114 (CJN) (Lead case)

# ELIGIBLE VOTERS AT RISK: EXAMINING CHANGES TO USCIS'S SAVE SYSTEM



**Fair Elections Center**

## Issue Brief | July 2025

Changes fueled by election-denier conspiracy theories are in the works for a system created by the Department of Homeland Security ("DHS") nearly forty years ago to verify citizenship status and legal presence in the United States. DHS recently announced major modifications to its Systematic Alien Verification for Entitlements system, or SAVE, for the state and local election agencies that use it in the voting context (not to be confused with the anti-voter SAVE Act which is pending in Congress and fueled by the same conspiracy theories[1]). Most significantly, state and local agencies can now query the system using Social Security numbers and submit queries in bulk uploads. Though technical in nature, these changes may impact voters across the country, especially as more states sign up to use the retooled system.

The SAVE system is administered by DHS via U.S. Citizenship and Immigration Services ("USCIS"). Originally created by the Immigration Reform and Control Act of 1986[2] and then expanded by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996,[3] the SAVE system is used to verify or determine citizenship in response to inquiries from federal, state, and local officials, usually related to applications for public benefits.[4] In recent years, state and local election officials in certain states have used SAVE to verify the citizenship of voter registrants and currently registered voters who provide a DHS-issued immigration identifier.[5] User agencies sign a memorandum of agreement ("MOA") with USCIS and, in the past, were charged a fee for each case they submitted to SAVE. Prior to the Trump administration, ten states had MOAs to use SAVE for voter registration and/or list maintenance purposes: Arizona, Colorado, Florida, Georgia, Idaho, Mississippi, Ohio, South Carolina, Tennessee, and Virginia.[6]

---

(1) *SAVE Act (2025)*, Fair Elections Ctr., https://fairelectionscenter.org/advocacy/save-act-2025/ (last visited July 21, 2025).

(2) 42 U.S.C. § 1320b-7(d)(3); *see also* Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 121(a)(1)(C), 100 Stat. 3359, 3384–86 (1986). After the Department of Homeland Security was created, operation of SAVE was transferred from INS to USCIS.

(3) *About SAVE: History*, U.S. Citizenship and Immigr. Servs., https://www.uscis.gov/save/about-save/save-governing-laws (last updated Jan. 24, 2025).

(4) *Id.*

(5) U.S. Gov't Accountability Off., GAO-17-204, Immigration Status Verification for Benefits: Actions Needed to Improve Effectiveness and Oversight 2 (Mar. 2017), https://www.gao.gov/assets/gao-17-204.pdf [hereinafter "GAO-17-204"]; *see also Voter Registration and Voter List Maintenance Fact Sheet*, U.S. Citizenship and Immigr. Servs., https://www.uscis.gov/save/current-user-agencies/guidance/voter-registration-and-voter-list-maintenance-fact-sheet (last updated June 13, 2025).

(6) In total, 1,297 federal, state and local agencies are listed as SAVE user agencies, some for multiple benefit categories. *SAVE Agency Search Tool*, U.S. Citizenship and Immigr. Servs., https://www.uscis.gov/save/about-save/save-agency-search-tool?items_per_page=10 (last visited July 28, 2025) (deduplicated).

JA284

1



## Major Changes in SAVE's Query Function

The ability to query SAVE with only a Social Security number represents a *huge* shift in SAVE's functionality. Since its inception, SAVE could only be searched using a DHS-issued immigration identifier (e.g., an Alien Registration Number or a naturalization certificate number) and only had access to records maintained by DHS. Because DHS only has records for individuals who were at one point in time noncitizens, SAVE has *only* ever been able to verify naturalized and some derived citizens, and *not* U.S.-born U.S. citizens or derived citizens who have not applied for a certificate of citizenship. In the voting context, these limitations have restricted SAVE's applicability because most voters do not have a DHS-issued immigration identifier,[7] and most states do not collect that information even for voters who do. Because of this query limitation, those who advocate for broader investigation of voters' citizenship status have called for changing the look-up process.[8]

The Trump administration's restrictive March 2025 Executive Order ("the EO") on voting[9] made clear the SAVE system was within the Trump administration's sights. The EO purported to direct the Secretary of Homeland Security to "ensure that State and local officials have, without the requirement of the payment of a fee, access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who are already registered" and to "take all lawful and appropriate action to make available information from relevant databases to State and local election officials engaged in verifying the citizenship of individuals registering to vote or who are already registered."[10]

---

(7) For context, only one in ten U.S. citizens ages eighteen and older (i.e., potential eligible voters) are naturalized citizens. Katherine Schaeffer, *1 in 10 eligible voters in the U.S. are naturalized citizens*, Pew Research Center (Sept. 19, 2024), https://www.pewresearch.org/short-reads/2024/09/19/1-in-10-eligible-voters-in-the-u-s-are-naturalized-citizens/.

(8) *See, e.g., Secretary of State Wes Allen Urges DHS to Improve Citizenship Verification for Voter Registration*, Ala. Sec'y of State (Mar. 10, 2025), https://www.sos.alabama.gov/newsroom/secretary-state-wes-allen-urges-dhs-improve-citizenship-verification-voter-registration (announcing joint letter to DHS Secretary Noem from 21 Secretaries of State requesting changes to SAVE); *America First Legal Sends All 50 States a Plan on How to Use Federal Law to Prevent Foreign Nationals from Voting*, Press Release, America First Legal (June 24, 2024), https://aflegal.org/resource/america-first-legal-sends-all-50-states-a-plan-on-how-to-use-federal-law-to-prevent-foreign-nationals-from-voting/.

(9) Executive Order No. 14248, "Preserving and Protecting the Integrity of American Elections," 90 Fed. Reg. 14005 (Mar. 25, 2025).

(10) *Id*.

2

## Search by SSN

Then, in May, the Trump administration dropped the major announcement: SAVE could now be queried with a Social Security number ("SSN") as the applicant's enumerator—meaning, for the first time, no DHS-issued immigration identifier was needed.[11] At face value, this new function could simply have meant that user agencies would now have another option for attempting to query DHS records, with the continued limitation that only individuals with an immigration history would appear in the results, verifying only naturalized citizens and some derived citizens. But in a quiet update to a fact sheet, the Trump administration revealed the more significant change: "When an SSN is provided, SAVE is able in many cases to verify U.S.-born U.S. citizens for voter verification purposes, through information accessed through the SSA [Social Security Administration]."[12] Again, since its use began in the voting context, SAVE has only ever been used to investigate the citizenship of naturalized and derived citizens. The mechanics behind this new functionality are not clear, as the USCIS press release simply states that SAVE has a "new partnership with the Social Security Administration."[13] This change follows a DHS announcement on April 22, 2025, that there would be a "comprehensive optimization" of SAVE made possible by a collaboration with the Department of Government Efficiency ("DOGE").[14]

## Bulk uploads of voter data

Changes have also been made to SAVE that allow for bulk searching, permitting user agencies to enter data and query for more than one individual at a time.[15] Previously, SAVE users could only submit queries for one individual at a time, manually typing each piece of information into the system. Now, users can fill out a spreadsheet template to submit "bulk uploads" of personal data for SAVE to query, including first and last names, dates of birth, and one or more numeric identifier (i.e., A-number/USCIS number, naturalization or citizenship number, or SSN).[16] In the months since these announcements, DHS claims it has "run more than 9 million voter records through the upgraded SAVE system," with early analysis showing 99.99% were confirmed citizens.[17]

---

(11) *Optimizing SAVE: New Options to Create Cases with a Social Security Number and by Bulk Upload*, U.S. Citizenship and Immigr. Servs. (May 22, 2025), https://www.uscis.gov/save/current-user-agencies/news-alerts/optimizing-save-new-options-to-create-cases-with-a-social-security-number-and-by-bulk-upload.

(12) *Voter Registration and Voter List Maintenance Fact Sheet, supra* note 5.

(13) *USCIS Deploys Common Sense Tools to Verify Voters*, U.S. Citizenship and Immigr. Servs. (May 22, 2025), https://www.uscis.gov/newsroom/news-releases/uscis-deploys-common-sense-tools-to-verify-voters.

(14) *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database*, U.S. Dep't of Homeland Sec. (Apr. 22, 2025), https://www.dhs.gov/news/2025/04/22/dhs-uscis-doge-overhaul-systematic-alien-verification-entitlements-database.

(15) *Optimizing SAVE, supra* note 11.

(16) *SAVE Bulk Uploader: how to create SAVE cases in bulk through an import process*, U.S. Citizenship and Immigr. Servs., https://www.uscis.gov/save/current-user-agencies/news-alerts/optimizing-save-new-options-to-create-cases-with-a-social-security-number-and-by-bulk-upload (follow "SAVE Bulk Upload Tool Instructional Guide" hyperlink) (last visited July 21, 2025).

(17) Jude Joffe-Block & Miles Parks, *The Trump administration is building a national citizenship data system*, NPR (June 29, 2025, 5:00 AM), https://www.npr.org/2025/06/29/nx-s1-5409608/citizenship-trump-privacy-voting-database.

## Serious Data Reliability Concerns with SSA's Available Citizenship Data

If SAVE can actually operate as the Trump administration promises, there is major cause for concern with this new SSA partnership. First and foremost, the citizenship data maintained by the Social Security Administration ("SSA") is not always reliable, and SSA has admitted as much.

The key limitation with SSA data is that the only citizenship data SSA possesses is provided by the individual at a single moment in time. When someone applies for an SSN and the corresponding card, the individual must disclose their current citizenship status,[18] which allows SSA to issue the appropriate type of card.[19] Critically, however, SSA has no process for automatically updating the citizenship data it maintains; rather, SSA relies on SSN-holders to inform SSA of any change in their status.[20] In fact, in response to a subpoena in federal litigation, SSA admitted that "the citizenship SSA maintains *merely represents a snapshot of the individual's citizenship status at the time of their interaction with SSA. SSA's records do not provide definitive information about an individual's citizenship status.*"[21] SSA's information is merely a snapshot because "there is no obligation for an individual to report to SSA a change in their immigration status unless the individual is receiving Social Security payments."[22] A 2006 audit of SSA data exposed the resulting discrepancies, estimating that SSA's citizenship status data was inaccurate for seven percent of numberholders classified as non-citizens in that they "were actually U.S. citizens—but had not updated their immigration/citizenship status with SSA."[23] That may seem like a small percentage, but in 2006, that translated to *3.3 million U.S. citizens* being falsely identified as non-citizens.[24] More broadly, that same audit also compared SSA data to corresponding DHS records and found discrepancies between the two (i.e., differing names, date of birth, or citizenship status) in 4.1% of the SSA Numident records reviewed.[25]

---

(18) Letter from Nancy Morales Gonzalez, Assoc. Gen. Couns. for Gen. L., Div. 1, U.S. Soc. Sec. Admin., to Jon Sherman, Litig. Dir. & Senior Couns., Fair Elections Ctr. 2 (July 13, 2023) (available at https://fairelectionscenter.org/wp-content/uploads/2025/07/SSA-Touhy-Decision-letter.July-13-2023-signed.pdf); Privacy Act of 1974, as Amended; Proposed Routine Use, 75 Fed. Reg. 82121, 82123 (Dec. 29, 2010) (noting that SSA's records on individual numberholders include "[a] citizenship code that identifies the numberholder's status as a U.S. citizen or the work authorization of a non-citizen").

(19) U.S. Soc. Sec. Admin., Publ'n No. 05-10002, Your Social Security Number and Card 2–3 (Jan. 2025), https://www.ssa.gov/pubs/EN-05-10002.pdf (the three types of cards are: 1) cards for U.S. citizens or permanent residents, 2) cards for non-citizens authorized to work in the U.S., and 3) cards for non-citizens without work authorization).

(20) *Id*. at 7 ("If your immigration status changed or you became a U.S. citizen, you should tell us so we can update your records.").

(21) Letter from Nancy Morales Gonzalez, *supra* note 18, at 2 (emphasis added).

(22) *Id.*

(23) U.S. Soc. Sec. Admin. Off. of the Inspector Gen., No. A-08-06-26100, Congressional Response Report: Accuracy of the Social Security Administration's Numident File 13 (Dec. 18, 2006), https://oig-files.ssa.gov/audits/full/A-08-06-26100_0.pdf.

(24) *Id.*

(25) *Id.* at 5 & n.11.

In addition to the snapshot-in-time limitation, SSA was not even required to collect citizenship information from applicants until the Social Security Amendments of 1972 mandated that "applicants for social security account numbers [provide] such evidence as may be necessary to establish the age, citizenship, or alien status, and true identity of such applicants."[26] Even after this change in law, SSA did not begin to consistently maintain citizenship information until 1981,[27] meaning SSA likely has no information regarding the citizenship status of U.S.-born voters older than their mid-forties. In fact, SSA has recently estimated that "approximately ¼ of [its] records do not have an indication of citizenship present."[28]

Concerns about SSA data reliability build on longstanding DHS data issues with the SAVE system, including user errors caused by mistyping, an inability to connect maiden names with current names, the risk of stale data due to backlogs in DHS's processing of records, or the inability to capture changes to the records of derived citizens. If states rely on outdated records to remove people from the voter rolls, *eligible voters will be prevented from voting*.

Despite these concerns, the Trump administration's rollout of the SSN-query does not mention these potential pitfalls with the data nor discuss how to protect against inaccurate citizenship determinations. But in light of these data reliability questions, state officials should not take results based on SSA data as a reliable determination of non-citizenship.

> *Given the inaccuracies inherent in the data as admitted by the agency, [the SAVE system] is not an appropriate tool to facilitate rejecting voter registration applications or conduct voter list maintenance activities, especially in light of the other safeguards in place to ensure that only citizens are voting.*

---

(26) Social Security Amendments of 1972, Pub. L. 92-603, § 137(2), 86 Stat. 1329, 1364–65 (1972).

(27) Letter from Nancy Morales Gonzalez, *supra* note 18, at 2.

(28) *Id*. at 3 (citing *Computer Matching Agreement Between Department of Health and Human Services, Centers for Medicare & Medicaid Services, and Social Security Administration for Determining Enrollment or Eligibility for Insurance Affordability Programs under the Patient Protection and Affordable Care Act* (accessible at https://www.ssa.gov/privacy/cma/CMS%20SSA%20CMA%20Re-establishment.ACA%202008.Final.Signed%20by%20DIBs%209.29.20%20(002).pdf).

## Lack of Transparency Around the Use of SSA Data by SAVE

Of course, beyond the fact that the underlying data is ill-suited for citizenship verification, very little is known about how the administration is implementing these changes to SAVE because very little has been publicly explained by DHS, USCIS, SSA, or DOGE.[29] Recent updates to the SAVE User Reference Guide merely state that "SAVE compares the information against Social Security Administration records."[30]

## What can we learn from E-Verify?

One possibility is that SAVE is copying a mechanism used by another closely related USCIS system that is able to query SSA data. E-Verify is "a web-based system through which employers electronically confirm the employment eligibility of their employees,"[31] originally enacted as the "Basic Pilot" program in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996.[32] It is housed within USCIS, like SAVE, but jointly administered by USCIS *and* SSA.[33] Within USCIS, SAVE and E-Verify run on the same "technical infrastructure," the Verification Information System ("VIS")."[34]

---

(29) The Privacy Act of 1964 requires System of Records Notices (SORNs) to be published when there is, among other things, any change to a system of records that is "substantive in nature." Off. of Mgmt. & Budget, Exec. Off. of the President, Circular No. A-108, Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act 5 (Dec. 23, 2016), https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/A108/omb_circular_a-108.pdf. However, as of July 21, 2025, no new SORN has been published documenting the recent changes to SAVE.

(30) *SAVE User Reference Guide*, U.S. Citizenship and Immigr. Servs. § 9.1, https://www.uscis.gov/save/current-user-agencies/guidance/save-user-reference-guide (follow "Print Manual" hyperlink) (last updated June 4, 2025). This specific section of the User Reference Guide appears to have been updated July 16, 2025.

(31) *About E-Verify*, E-Verify, https://www.e-verify.gov/about-e-verify (last updated Apr. 10, 2018).

(32) *History and Milestones: Chronological summary of the milestones of the E-Verify Program*, E-Verify, https://www.e-verify.gov/about-e-verify/history-and-milestones (last updated Mar. 10, 2025); *see also* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 401–05, 110 Stat. 3009-546, -655–66 (1996).

(33) *About E-Verify*, *supra* note 31.

(34) U.S. Dep't of Homeland Sec., Privacy Impact Assessment for the Verification Information System Supporting Verification Programs 2 (Apr. 1, 2007), https://www.dhs.gov/sites/default/files/publications/privacy_pia_uscis_vis.pdf [hereinafter "2007 VIS PIA"]. In fact, the two systems were so intertwined that USCIS used to issue a single E-Government Act of 2002-mandated Privacy Impact Assessment ("PIA") for VIS that discussed both SAVE and E-Verify. It was only around 2010 that they changed this practice to issue separate PIAs for SAVE and E-Verify, although both still rely on VIS. *See* U.S. Dep't of Homeland Sec., Privacy Impact Assessment for the E-Verify Program 2 (May 4, 2010), https://www.dhs.gov/sites/default/files/publications/privacy_pia_uscis_everify.pdf; U.S. Dep't of Homeland Sec., Privacy Impact Assessment for the Systematic Alien Verification for Entitlements (SAVE) Program 2 (August 26, 2011), https://www.dhs.gov/sites/default/files/publications/privacy_pia_uscis_save.pdf.

An employer using E-Verify "creates a case" using the information on a new employee's Form I-9, including their full SSN, and VIS then compares that information to SSA data and, if needed, DHS records to determine the employee's eligibility for employment in the United States.[35] VIS first queries the SSA Numident System for a match; if SSA data indicates that the individual is a noncitizen, VIS will then query DHS data to verify employment eligibility.[36] Until recently, only E-Verify was able to access SSA data and query using an SSN,[37] with VIS interfacing directly with SSA without pulling SSA data into its own system to maintain.[38]

Without further information, it is impossible to decipher how and under what authority SAVE has been equipped to query SSA data, though the E-Verify mechanism discussed here may hold some clues. The pitfalls of E-Verify also foreshadow issues likely to occur with the new SAVE functionality, with its website highlighting the well-known reasons that it often fails to match with SSA data: the employee has not reported a change in name or citizenship status to SSA; the employee's name, SSN, or date of birth is incorrect in SSA records, or there is some other mismatch; or the employer entered the employee's information incorrectly in E-Verify. [39]

## How are election officials acquiring SSNs in the first place?

On top of all of these unknowns, this additional major question stands out: *how are state officials and/or the federal government acquiring the full SSNs needed to query the SAVE system?* Though not expressly stated in public materials, it appears that full, 9-digit SSNs are required to use SAVE's new SSN-query.[40] This would track E-Verify's functionality, which requires entering the full SSN, as provided on Form I-9, into the system. And public reporting confirms as much, noting that the ability to query the SAVE system using the last four digits of an SSN (along with full name and birthdate) is being contemplated for a *forthcoming* SAVE upgrade.[41]

---

(35) *Verification Process*, E-Verify, https://www.e-verify.gov/employers/verification-process (last updated Sept. 15, 2022).

(36) 2007 VIS PIA, *supra* note 34, at 2–3. If SSA is able to confirm citizenship using SSA data, no further action is taken by VIS. *Id*. at 3. If SSA cannot verify the employee's information, the employee will be instructed to update their information with SSA. *Id*.; *DHS and SSA Mismatches, E-Verify*, https://www.e-verify.gov/employers/verification-process/tentative-nonconfirmations/dhs-and-ssa-mismatches (last updated Aug. 1, 2022).

(37) *Compare* Privacy Act of 1974; System of Records, 84 Fed. Reg. 28326, 28330 (June 18, 2019) (SORN for E-Verify explicitly lists the "SSA Numident System" as one of the sources from which "records are obtained" for its operation), *with* Privacy Act of 1974; System of Records, 85 Fed. Reg. 31798, 31802 (May 27, 2020) (SORN for SAVE does not mention any SSA systems as sources of data).

(38) *See* 2007 VIS PIA, *supra* note 34, at 2–3 (describing queries being "sent from VIS" and then SSA "send[ing]" a response back).

(39) *Tentative Nonconfirmations (Mismatches)*, E-Verify, https://www.e-verify.gov/employers/verification-process/tentative-nonconfirmations-mismatches (last updated May 8, 2024).

(40) Screenshots of the SAVE interface show "123456780," nine digits, as an exemplar SSN. *SAVE User Reference Guide, supra* note 30, § 8.1.

(41) Joffe-Block, *supra* note 17.

JA290

But in the vast majority of states, election officials do not collect SSNs from voters. Only five states are permitted to request full SSNs on their voter registration applications.[42] In the other forty-five states and the District of Columbia, registrants have the option of providing their driver's license number (issued by the state in which they are seeking to register) or the last four digits of their SSN.[43] So it is far more common for statewide voter registration systems to contain the last four digits of SSNs than full SSNs. But even that truncated identifier is not collected from every voter registration applicant, because many voter registration applicants satisfy the voter registration requirements of state and federal law by simply recording their state driver's license or state ID number.[44] The prospect of running queries with only the last four digits of the SSN is also alarming, as the last four digits alone are not a unique identifier. Even when combined with full name and birthdate, there may still be more than one individual that matches.[45]

The only way for state election officials to obtain full or even partial SSNs for additional voters in their state would be to pull data from the state Department of Motor Vehicles ("DMV"). If that is the mechanism, it only raises more questions than it answers. Does this disclosure of SSNs by the DMV comply with state laws limiting sharing of personal data, especially SSNs? How are state and local election officials ensuring accuracy when matching between voter files and DMV data? And for voters who never provided a driver's license or state ID number to elections officials, how are election officials identifying such voters in DMV records?



---

(42) New Mexico, Kentucky, South Carolina, Tennessee, and Virginia are allowed to request full SSNs on their respective voter registration applications. *Help America Vote Verification (HAVV) Transactions by State*, U.S. Soc. Sec. Admin., https://www.ssa.gov/data/havv/ (last visited July 21, 2025) [hereinafter "HAVV Transactions by State"]; *see also* 52 U.S.C. § 21083(a)(5)(D) (codifying a carveout for states that are permitted to use SSNs on voter registration applications in accordance with section 7 of the Privacy Act of 1974).

(43) HAVV Transactions by State, *supra* note 42; 52 U.S.C. § 21083(a)(5)(A)(i). There are also provisions for registration applicants who do not have either a driver's license or SSN. *See* 52 U.S.C. § 21083(a)(5)(A)(ii).

(44) *See* 52 U.S.C. § 21083(a)(5)(A)(i); HAVV Transactions by State, *supra* note 42. When an applicant does provide the last four digits of their SSN, the state can use a verification system set up by the Social Security Administration—the Help America Vote Verification System ("HAVV")—to verify the applicant's identity. HAVV Transactions by State, *supra* note 42. The state provides the applicant's name, date of birth, and last four digits of the SSN, and HAVV looks for matches within its data. *Id.*

(45) *See, e.g.*, *Social Security Administration (SSA) Weekly Data for Help America Vote Verification (HAVV) Transactions by State - January 2011 to Present Totals*, U.S. Soc. Sec. Admin., https://www.ssa.gov/data/havv/havv-totals-since-2011.html (last visited July 21, 2025) (use drop down menu in "HAVV Data" to select "January 2011 to Present Totals") (of the HAVV verification transactions submitted since 2011, where full name, birthdate, and last four of SSN were queried against SSA data, 6,635 transactions matched with multiple *living* people, and 3,859 matched with at least one living person and at least one deceased person).



## New and Unexplained Limit on Required Additional Verification Processes

Another concerning aspect of the overhaul relates to SAVE's process for "additional verification." Additional verification is a critical step that user agencies, if prompted due to a failed initial verification, are *required* to initiate before denying a benefit to an applicant—or here, before they call a voter's or registrant's citizenship status into question.[46] But when USCIS announced it had enabled SAVE queries using an SSN, USCIS also disclosed that "SAVE cannot conduct additional verification using an SSN alone."[47] Additional verification involves escalating the case to a USCIS team of "status verifiers" who attempt to manually verify citizenship.[48] The manual verifier can conduct a more intensive review of DHS records and documents, including correcting for any discrepancies causing a name mismatch such as a missing hyphen or a truncated name, data transposition, letters and numbers out of sequence, typographical errors, and outdated or maiden names that predate a name change due to marriage,[49] as well as accessing additional DHS records.[50]

---

(46) *SAVE User Reference Guide*, *supra* note 30, § 9.2 ("Users must follow proper SAVE verification procedures, including performing additional verification if required by SAVE or requested by the applicant.... User agencies may not rely on an initial SAVE response to deny an application for benefits where additional verification is required by SAVE or requested by the applicant. They must follow all required SAVE verification procedures.").

(47) *Voter Registration and Voter List Maintenance Fact Sheet*, *supra* note 5; *see also SAVE User Reference Guide*, *supra* note 30, § 9.2.

(48) GAO-17-204, *supra* note 5, at 17 ("Additional verification entails an in-depth query by USCIS status verifiers to determine the applicant's immigration status if such status cannot be returned by SAVE upon initial verification.").

(49) *See*, *e.g.*, USCIS 30(b)(6) Dep. at 112:5-21, 114:5-12, 115:24-116:12, 116:18-117:1, 130:14-131:14, *Mi Familia Vota v. Fontes*, 22-cv-00509 (D. Ariz.), ECF No. 679-3 (available at https://fairelectionscenter.org/wp-content/uploads/2025/07/Excerpted-USCIS-depo-transcriptbw.pdf). The highlights in the transcript are deposition designations submitted to the district court prior to the trial in November 2023 and are original to the filed version.

(50) GAO-17-204, *supra* note 5, at 10–11.

It is clear the Trump administration knows about the required additional verification procedures for SAVE user agencies, mentioning the requirement in both the DHS press release and the fact sheet that announced SAVE could now verify the citizenship of U.S-born citizens.[51] These references are in line with longstanding guidance on the SAVE system, which makes clear that the entire verification process "is necessary because user agencies may not rely on a SAVE response to deny an application for benefits unless the agency has followed all SAVE verification procedures…. Otherwise, the user agency may deny eligible persons benefits that they are lawfully entitled to receive."[52] Yet they have expanded SAVE system capacities to include query by SSN and affirmatively stated that when only an SSN is available, USCIS will not or cannot conduct that mandatory additional verification.[53] But failure to complete the entire verification process leaves individuals susceptible to an unreliable initial query of SAVE that was never intended to represent a final, conclusive determination.[54] Many individuals have their status accurately verified through additional verification, when initial verification failed to return any information. This predicament will only ensnare more voters, as user agencies are now able to submit long lists of individuals using the new bulk upload feature. Even before these changes, user agencies routinely failed to complete additional verification.[55] More troublingly, there is no evidence that DHS or USCIS specifically holds SAVE user agencies accountable when they fail to complete the entire verification process.[56]

---

(51) *Optimizing SAVE, supra* note 11 (noting that "[u]sers must complete all verification steps required by SAVE before relying on a SAVE response to deny a benefit or license, including requesting and submitting the benefit applicant's immigration documentation to SAVE when required."); *Voter Registration and Voter List Maintenance Fact Sheet, supra* note 5.

(52) *SAVE Program Guide* (revised March 2019), at 6–7. USCIS produced this document in response to a subpoena during the *Mi Familia Vota v. Fontes* consolidated litigation, and it was admitted as an exhibit at trial. The Guide is on file with the author.

(53) *Voter Registration and Voter List Maintenance Fact Sheet*, *supra* note 5; *see also SAVE User Reference Guide, supra* note 30, § 9.2.

(54) *SAVE User Reference Guide, supra* note 30, § 9.2 ("User agencies may not rely on an initial SAVE response to deny an application for benefits where additional verification is required by SAVE or requested by the applicant. They must follow all required SAVE verification procedures."); *see also* GAO-17-204, *supra* note 5, at 15–24.

(55) *See* GAO-17-204, supra note 5, at 15–24. A 2017 report from the Government Accountability Office found that, between 2012 and 2016, an average of 57.3% of user agencies prompted to request additional verification failed to do so over 50% of the time, 44.9% failed to do so over 75% of the time, 25.7% failed to do so over 90% of the time, and 14.1% failed to do so 100% of the time. *Id*. at 18.

(56) *See, e.g.,* GAO-17-204, *supra* note 5, at 17 (noting that "USCIS does not have sufficient controls to help ensure agencies are completing the necessary steps [in the status verification process]."). Numerous recommendations were directed at improving monitoring and compliance of user agency activities. *See id*. at 52.

Noting that user agencies will be unable to request additional verification with just an SSN, system users who receive no information at initial verification in response to an SSN-only query are instead instructed to "verify the information used to enter the case was correct. If entered correctly, user agencies should direct the applicant to contact SSA to update their records. Or, user agencies may enter a new case on the applicant with a DHS enumerator if applicable."[57] This concerning refusal to enable additional verification shifts the burden onto the voter, who now must figure out how to update their records with SSA if election officials rely on that information to threaten the voter's registration. And what happens to the voter's status in the meantime? For currently registered voters subject to SAVE searches as part of list maintenance processes, will they be removed from the voter rolls or placed in a suspense status until they can update their information with SSA? For voter registration applicants, will their applications be outright rejected until their SSA records are updated? Will individuals be able to provide proof of citizenship directly to election officials instead?

> **The actions state and local officials will take in response to the results —or non-results—from the SAVE system remain a crucial unknown.**

It is also unclear what steps DHS is taking—beyond updating the fact sheet on its website—to inform state and local election officials of the changes to the SAVE system and updated requirements. The "SAVE Tutorial for Registered Users" publicly available on the USCIS website is outdated and does not mention anything about the new SSN-query feature.[58] The "SAVE User Reference Guide," advertised as "current as of June 2025," only notes that SSNs may be used to query SAVE and does not mention anything about how state and local officials should interpret results from SSN-queries.[59] The guide was not updated until July 16, 2025, to reflect that SSN-queries would not go through additional verification.[60] Public reporting also suggests that at least some state officials who have entered into agreements with USCIS to use SAVE have not been briefed on any of the changes, including Idaho Secretary of State Phil McGrane.[61]

_____

(57) *Voter Registration and Voter List Maintenance Fact Sheet, supra* note 5.

(58) *SAVE Tutorial for Registered Users,* U.S. Citizenship and Immigr. Servs., https://www.uscis.gov/save/current-user-agencies/save-tutorial-for-registered-users (follow "SAVE Tutorial" hyperlink) (last updated May 14, 2025).

(59) *See SAVE User Reference Guide, supra* note 30, §§ 8, 9.

(60) *SAVE User Reference Guide, supra* note 30, §§ 9.1, 9.2 (follow hyperlinks on left to navigate to section-specific pages with "last reviewed/updated" dates).

(61) Joffe-Block, *supra* note 17.

JA294

11

## Leaving Voters at Risk

*The data reliability concerns, combined with new limits on the additional verification process, raise the specter that state election officials will be given inaccurate or incomplete citizenship information.*

If state officials are not aware of these pitfalls, voters in their states will pay the price. And with the advent of bulk searches, states will likely be reviewing SAVE results for hundreds if not thousands of voters at a time. The potential impact to voters can be divided into two categories:

**First**, how will state officials react if SAVE queries SSA data and reports that an individual is *not a citizen*? As discussed above, this result is likely to ensnare naturalized citizens who did not update their citizenship status with SSA after naturalizing. If election officials rely on the stale SSA data instead of the voter's attestation to citizenship, will the voter at least be given an opportunity to troubleshoot with SSA or otherwise prove their citizenship before being removed from the rolls?

**Second**, what conclusions will USCIS, DOGE, or state and local election officials draw from the *absence* of information in response to the query? If no information is available regarding an individual in response to a query of the newly modified SAVE system, it is unknown how that result will be conveyed to state and local election officials, and just as important, it is unknown what election officials using the system may conclude from that result. As discussed above, this absence of SSA data is most likely to impact voters who received an SSN before SSA began collecting citizenship data in the 1970s. And the disregard for additional verification procedures means that failed initial verifications will be the last word for voters subjected to an SSN-query. Will election officials then ignore the voter's registration application attesting to citizenship in favor of *an absence* of information in SAVE or SSA? The Trump administration has been largely silent on this question, which leaves room for varying treatment across states.

JA295



## New States Gaining Access to SAVE, Additional Changes Announced

In recent weeks, additional state and local agencies have been added to the list of user agencies for SAVE. Election-related agencies for Alabama, Arkansas, Indiana, Iowa, Louisiana, Michigan, Missouri, North Carolina, North Dakota, Texas, and Wyoming, as well as 30 Florida counties, are now listed publicly on USCIS's website as authorized to use SAVE for voter registration and/or list maintenance purposes.[62]

In addition to enabling bulk searches, the Trump administration has also announced that it is eliminating the fees associated with running a query through SAVE as of April 1, 2025.[63]

---

(62) *SAVE Agency Search Tool: Filtered Results,* U.S. Citizenship and Immigr. Servs., https://www.uscis.gov/save/about-save/save-agency-search-tool?benefit_category[0]=97&benefit_category[1]=98&items_per_page=10&page=0 (last visited July 28, 2025) (filtering the list of agencies to the "Benefit Categor[ies]" of "Voter List Maintenance" and "Voter Registration").

(63) *DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database, supra* note 14; *USCIS Deploys Common Sense Tools to Verify Voters*, *supra* note 13.

JA296

## CONCLUSION

Recent modifications to the SAVE system raise questions of accuracy, data reliability, and federal administrative overreach into election administration. Advocates and journalists need to ensure the transparency of system changes to the greatest extent possible. To protect the freedom to vote for all citizens, election officials should avoid relying on incomplete, inaccurate, or even absent information. In particular, the ways states interpret the retooled SAVE system's results should be closely scrutinized to ensure these new processes do not make it harder for eligible voters to vote.

*Fair Elections Center intends the information contained herein to be used only as a general guide. This document does not constitute legal advice and should not be used as a substitute for consultation with a legal professional licensed in the appropriate jurisdiction.*

### GET IN TOUCH



**Fair Elections Center**
**1825 K St. NW | Suite 701**
**Washington, DC | 20006**

**info@fairelectionscenter.org**

**www.fairelectionscenter.org**

*Fair Elections Center is a nonpartisan organization dedicated to safeguarding the future of our democracy through innovative efforts focused on voting rights and civic engagement. We use advocacy, litigation, organizing, education, and technology to protect and expand the right to vote, understanding the particular impact on disenfranchised, underrepresented, and marginalized communities. Through our unique partnerships with hundreds of campuses across the country, we are able to empower millions of new voters to participate in our democracy. Our litigation and advocacy efforts across dozens of states allows us to anticipate and counteract threats to free and fair elections. With our visionary use of technology we are able to support election administration throughout the nation.*

JA297

# Exhibit 17

Civil Action No. 26-cv-1114 (CJN) (Lead case)

 An official website of the United States government  Here's how you know

 Social Security

Español   Sign in   Menu

Home    Personal Social Security record    Update citizenship or immigration status

# Update citizenship or immigration status

You'll make this change by requesting a replacement Social Security card.

Keep your immigration or citizenship status up-to-date. This helps you access benefits, work legally, and avoid delays or issues with services.

## Request a replacement card

To update your status, apply online for a replacement Social Security card. You'll make an appointment as part of the application. Bring proof of your identity and new status to your appointment. After we update your information, you'll receive your replacement card by mail in 5 to 10 business days.

**Get started**

## For support completing this task

# Call us

Available in most U.S. time zones Monday through Friday, 8 a.m. to 7 p.m., in English, Spanish, and other languages.

Call +1 800-772-1213

Tell the representative you want to update your citizenship or immigration status.

Call TTY +1 800-325-0778 if you're deaf or hard of hearing.

Number & card

**Personal record**

Change name

Update contact information

Communication preferences

**Update citizenship or immigration status**

What to do when someone dies

Correct date of birth

Return to top

# Support                                    Languages

JA300

Contact us

Find an office

Forms

Publications

Report fraud

Español

Other languages

Plain language

## Services for

Employers & businesses

Government agencies

Other groups

Representatives

## Resources

Careers

Chief actuary data

Communications

Financial reports

Initiatives

Research & policy

Social Security Administration

 SSA.gov

**An official website of the Social Security Administration**

About SSA

Privacy policy

Accessibility statement

Performance reports

Civil rights and compliance

Office of the Inspector General

FOIA requests

JA301

Looking for U.S. government information and services? **Visit USA.gov**

Looking for U.S. government information and services? **Visit USA.gov**

JA302

# Exhibit 18

Civil Action No. 26-cv-1114 (CJN) (Lead case)



# SOCIAL SECURITY
Office of the General Counsel
Office of General Law

July 13, 2023

Sent via email and U.S. Mail

Jon Sherman
Litigation Director & Senior Counsel
Fair Elections Center
1825 K Street NW, Suite 450
Washington D.C. 20006
(Tel.) 202-331-0114
jsherman@fairelectionscenter.org

Re: Application for Records and Testimony of a Social Security Administration (SSA) Employee in a Federal Civil Case, *Mi Familia Vota, et al. v. Adrian Fontes, in his official capacity as Arizona Secretary of State, et al.*, 22-cv-509 et al. (consolidated) (D. AZ)

Dear Mr. Sherman:

You filed an application requesting deposition testimony and supporting documents in this matter from an SSA employee regarding the accuracy and reliability of using SSA databases to verify current U.S. citizenship status. Your case involves two consolidated actions challenging Arizona statutes that implement new citizenship investigation procedures for voter registration applicants and existing registered voters. The procedures require local election officials to compare county voter registration information with data contained in SSA's databases to verify citizenship status and voter eligibility. You allege that doing so will cause naturalized voter registration applicants and registered voters to be erroneously flagged as non-citizens based on old or inaccurate data in SSA databases.

You requested information concerning the frequency SSA databases are updated regarding U.S. citizenship status and the procedures SSA uses to update those databases. You also requested any recent Office of the Inspector General (OIG) report, study, or investigation that includes a review of the accuracy and reliability of U.S. citizenship data or information contained in SSA databases. You stated that you do not seek any internal SSA communications or the underlying data stored in SSA databases. You assert that the information sought from SSA is directly relevant to the claims at issue in your case. This letter constitutes the final decision on your application pursuant to the agency's regulations governing a request for testimony by employees and the production of records and information in legal proceedings. As discussed in further detail below, I am denying your application for testimony but providing information and references to publicly available information about the accuracy of SSA's citizenship status.

SOCIAL SECURITY ADMINISTRATION     BALTIMORE, MD  21235-0001

JA304

Page 2 – Jon Sherman

Further, to the extent you seek nonpublic records or testimony from the Office of the Inspector General, you should direct a request in compliance with 20 C.F.R. Part 403 to:  Office of the Inspector General, Social Security Administration, 300 Altmeyer Building, 6401 Security Boulevard, Baltimore, MD 21235-6401. *See* 20 C.F.R. § 403.125.

Citizenship Information in SSA Records

While SSA records provide an indication of citizenship, they do not provide definitive information on U.S. citizenship.  The Department of Homeland Security (DHS) is responsible for maintaining current immigration and work authorization status for all noncitizens.  Individuals achieve citizenship in various ways.  The agency responsible for recording and confirming citizenship status depends on how citizenship was achieved.  The responsible agency may be DHS, Department of State, or the States.  See SSA - POMS: GN 00303.100 - United States (U.S.) Citizenship - 06/05/2018.  SSA is not the agency responsible for making citizenship determinations.  Individuals report their citizenship status to SSA when they apply for a Social Security number (SSN).  See SSA - POMS: RM 10210.500 - General Information on Evidence of U.S. Citizenship for a Social Security Number (SSN) Card - 07/31/2019.  SSA did not begin to consistently maintain citizenship information until 1981.  See Social Security History (ssa.gov) (explaining that SSA requirements regarding citizenship arose in the 1970s).  Accordingly, SSA does not have citizenship information for all individuals who have been issued an SSN.  Moreover, there is no obligation for an individual to report to SSA a change in their immigration status unless the individual is receiving Social Security payments.  See SSA - POMS: GN 00303.001 - Requirement of United States (U.S.) Citizenship or Appropriate Alien Status - 06/27/2012 and SSA - POMS: RS 00204.010 - Lawful Presence Payment Provisions - 01/04/2017.  As such, the citizenship SSA maintains merely represents a snapshot of the individual's citizenship status at the time of their interaction with SSA. SSA's records do not provide definitive information about an individual's citizenship status.

Moreover, we have publicly posted on our website information about the accuracy and reliability of the citizenship data that we maintain in the limited data exchanges in which we provide this information, such as:

- Section VI of Model State Computer Matching and Privacy Protection Act Agreement: Individuals applying for SSNs report their citizenship status at the time they apply for their SSNs. There is no obligation for an individual to report to SSA a change in his or her immigration status until he or she files for a Social Security benefit. State Agencies must independently verify citizenship data through applicable State verification procedures and follow the notice and opportunity to contest procedures specified in Section V of this Agreement before taking any adverse action against any individual.

- Section VII of Match 1051: The SSA Enumeration System database used for SSN matching is 100 percent accurate based on SSA's Office of Quality Review 'FY 2018 Enumeration Accuracy Review Report (April 2019).' This review includes the citizenship information provided at the time the individual applied for their SSNs. However, there is no obligation for an individual to report to SSA a change in his or her citizenship or immigration status until he or she requests a replacement card or files a claim for a Social Security benefit. While the citizenship information is accurate for SSA's program purposes, if used later for other purposes, it may not be current. SSA is not the custodian of U.S. citizenship records.

Page 3 – Jon Sherman

- Section X of Match 1097:
  SSA's assessment of its citizenship data indicates that approximately ¼ of those records do not have an indication of citizenship present.  However, SSA notes that while the indication of citizenship present in its records has increased over the years, it still only represents a snapshot in time.  Accordingly, while SSA may have more records with an indication of citizenship, this information may not be available at the time of SSA's data exchange with CMS.

*See* Computer Matching Programs (ssa.gov) (providing a copy of all SSA matching agreements).

Testimony Denial

An agency employee may appear in a legal proceeding to which the agency is not a party and testify about any SSA function or any information or record SSA created or acquired as a result of the discharge of official duties.  However, under SSA regulations, such appearance and testimony require the prior authorization of the Commissioner or her designee.  20 C.F.R. § 403.100.  Similar regulations governing Federal employee testimony have consistently been upheld as legitimate. *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951); *Smith v. Cromer*, 159 F.3d 875 (4th Cir. 1998); *Swett v. Schenk*, 792 F.2d 1447 (9th Cir. 1986).

We may consider several factors in determining whether to authorize testimony in cases in which SSA is not a party.  Those factors include but are not limited to: the risk of violation of law or compromise of Government privilege; the burden on SSA; and the interest served by allowing the testimony.  20 C.F.R. § 403.130.  Your application does not establish the criteria necessary to allow an SSA employee to testify.

While your request may not risk violation of law, granting your request for testimony would burden the agency and unduly expend the resources of the agency for a lawsuit that does not involve SSA. *See* 20 C.F.R. § 403.130(b).  To provide the requested testimony, SSA would be required to divert at least one SSA employee from his or her assigned duties, thereby reducing SSA's ability to timely perform its own work, with no counterbalancing benefit to SSA.  *See* 20 C.F.R. § 403.130(b)(1). Moreover, as explained above, the information sought is available through public information.  *See* 20 C.F.R. § 403.130(b)(2).  In addition, this request presumes SSA would be authorized to share such information with the State of Arizona and we have not identified any request from the State of Arizona to share such information for this purpose, or agency approval to such data sharing.

Further, we have considered the interests that would be served by providing testimony in this case and find that the testimony would not serve SSA's interests. 20 C.F.R. § 403.130.  While a state government official is involved in this case, permitting testimony would provide no benefit to SSA as SSA has no interest in the outcome of this case. 20 C.F.R. § 403.130(c)(2)-(3).  Moreover, the testimony is not needed to prevent fraud or misconduct, prevent a miscarriage of justice, or preserve the rights of an accused individual to due process in a criminal proceeding.  *See* 20 C.F.R. § 403.130(c)(4)-(5).

Page 4 – Jon Sherman

Thank you for your cooperation in this matter. If you have any questions, please contact Marty Budetti at (913) 219-0672.

Sincerely,

*/s/ Jessica Vollmer* for

Nancy Morales Gonzalez
Associate General Counsel
 for General Law, Division 1

JA307

# Exhibit 19

Civil Action No. 26-cv-1114 (CJN) (Lead case)

JA308

# A federal tool to check voter citizenship keeps making mistakes. It led to confusion in Texas.

⭐ **texastribune.org**/2026/02/13/save-voter-citizenship-tool-mistakes-confusion

Jen Fifield                                                February 13, 2026



*This article is co-published with ProPublica, a nonprofit newsroom that investigates abuses of power. Sign up for ProPublica's Big Story newsletter to receive stories like this one in your inbox as soon as they are published.*

When county clerk Brianna Lennon got an email in November saying a newly expanded federal system had flagged 74 people on the county's voter roll as potential noncitizens, she was taken aback.

Lennon, who'd run elections in Boone County, Missouri, for seven years, had heard the tool might not be accurate.

The flagged voters' registration paperwork confirmed Lennon's suspicions. The form for the second person on the list bore the initials of a member of her staff, who'd helped the man register — at his naturalization ceremony. It later turned out more than half the Boone County voters identified as noncitizens were actually citizens.

A similar situation has been playing out in Texas, where county clerks have likewise found numerous examples of misidentified voters across the state.

JA309

The source of the bad data was a Department of Homeland Security tool called the Systematic Alien Verification for Entitlements, or SAVE.

Once used mostly to check immigrants' eligibility for public benefits, SAVE has undergone a dramatic expansion over the last year at the behest of President Donald Trump, who has long falsely claimed that millions of noncitizens lurk on state voter rolls, tainting American elections.

At Trump's direction, DHS has pooled confidential data from across the federal government to enable states to mass-verify voters' citizenship status using SAVE. Many of the nation's Republican secretaries of state have eagerly embraced the experiment, agreeing to upload all or part of their rolls.

But an examination of SAVE's rollout by ProPublica and The Texas Tribune reveals that DHS rushed the revamped tool into use while it was still adding data and before it could discern voters' most up-to-date citizenship information.

As a result, SAVE has made persistent mistakes, particularly in assessing the status of people born outside the U.S., data gathered from local election administrators, interviews and emails obtained via public records requests show. Some of those people subsequently become U.S. citizens, a step that the system doesn't always pick up.

According to correspondence between state and federal officials, DHS has had to correct information provided to at least five states after SAVE misidentified some voters as noncitizens.

Texas and Missouri were among the first states to try the augmented tool.

In Missouri, state officials acted on SAVE's findings before attempting to confirm them, directing county election administrators to make voters flagged as potential noncitizens temporarily unable to vote. But in hundreds of cases, the tool's determinations were wrong, our review found. Lennon was among dozens of clerks statewide who raised alarms about the system's errors.

"It really does not help my confidence," she said, "that the information we are trying to use to make really important decisions, like the determination of voter eligibility, is so inaccurate."

In Texas, news reports began emerging about voters being mistakenly flagged as noncitizens soon after state officials announced the results of running the state's voter roll through SAVE in October.

Our reporting showed these errors were more widespread than previously known, involving at least 87 voters across 29 counties. County election administrators suspect there may be more. Confusion took hold when the Texas secretary of state's office sent counties lists of flagged voters and directed clerks to start demanding proof of citizenship and to remove people from the rolls if they didn't respond.

JA310

"I really find no merit in any of this," said Bobby Gonzalez, the elections administrator in Duval County in South Texas, where SAVE flagged three voters, all of whom turned out to be citizens.

Even counting people flagged in error, the first bulk searches using SAVE haven't validated the president's claims that voting by noncitizens is widespread. At least seven states with a total of about 35 million registered voters have publicly reported the results of running their voter rolls through the system. Those searches have identified roughly 4,200 people — about 0.01% of registered voters — as noncitizens. This aligns with previous findings that noncitizens rarely register to vote.

Brian Broderick leads the verification division of U.S. Citizenship and Immigration Services, the DHS branch that oversees SAVE. In an interview this month, he acknowledged the system can't always find the most current citizenship information for people not born in the U.S. But he defended the tool, saying it was ultimately up to states to decide how to use SAVE data.

"So we're giving a tool to these folks to say, 'Hey, if we can verify citizenship, great, you're good. If we can't, now it's up to you to determine whether to let this person on your voter rolls,'" Broderick said.

In Texas, Secretary of State Jane Nelson declined an interview request. Her spokesperson, Alicia Pierce, said the office hadn't reviewed SAVE's citizenship determination before sending lists to counties because it isn't an investigative agency. In a statement, Pierce added that the use of SAVE was part of the office's "constitutional and statutory duty to ensure that only eligible citizens participate in Texas elections."

A spokesperson for Missouri Secretary of State Denny Hoskins called SAVE a valuable resource even though some people it flagged might later be confirmed as citizens. "No system is 100% accurate," Hoskins said in an interview, "but we're working to get it right."

Asked whether it was problematic that his office directed clerks to temporarily bar voters from casting ballots before verifying SAVE's findings, Hoskins said that was a "good point."

While 27 states have agreed to use SAVE, others have hesitated, concerned not only about inaccuracies, but also about privacy and the data's potential to be used in immigration enforcement. Indeed, speaking at a recent conference, Broderick said that when SAVE flags voters as noncitizens, they are also referred to DHS for possible criminal investigation. (It is a crime to falsely claim citizenship when registering to vote.)

People who've been flagged by SAVE in error say it's jarring to have to provide naturalization records to stay eligible to vote when they know they've done nothing wrong.

JA311



JA312

Sofia Minotti was erroneously flagged as a potential noncitizen voter by a Department of Homeland Security tool. Shelby Tauber for ProPublica and The Texas Tribune

Sofia Minotti, who lives north of Dallas in Denton County, was born in Argentina but became a U.S. citizen years ago. Nonetheless, she was one of 84 Denton County voters identified by SAVE as a potential noncitizen. She and 11 others have since provided proof of citizenship, giving the system an error rate in the county of at least 14%.

The real rate is probably higher, a county official acknowledged, since some of those sent notices to prove their citizenship might not respond in time to meet the deadline. They'll have to be reinstated to vote in the midterms later this year.

Minotti, though still on the rolls, felt singled out unfairly.

"I'm here legally, and everything I've done has been per the law," she said. "I really have no idea why I had to prove it."

Election administrators in many states have long hungered for better access to federal information on citizenship status.

States don't typically require people to provide proof of citizenship when they sign up to vote, only to attest to it under penalty of perjury. Previous efforts to use state data to catch noncitizens on voter rolls have gone poorly. Texas officials had to abandon a 2019 push after it became clear their methodology misidentified thousands of citizens, many of them naturalized, as ineligible voters.

Until recently, SAVE hadn't been much of a resource. State and local election officials needed to have voters' DHS-assigned immigration ID numbers — information not collected in the registration process — to verify their citizenship status. Plus, officials had to pay to conduct searches one by one, not in bulk.

In March, Trump issued an executive order that required DHS to give states free access to federal citizenship data and partner with the Department of Government Efficiency to comb voter rolls.

The order triggered a series of meetings at USCIS designed to comply with a 30-day deadline to remake SAVE, a document obtained by the American Civil Liberties Union and reviewed by ProPublica shows.

The system's main addition was confidential Social Security Administration data, which allowed states to search using full or partial Social Security numbers and incorporated information on millions of Americans who were not previously in Homeland Security databases.

JA313

David Jennings, Broderick's deputy at USCIS, had pressed his team to move quickly, he said on a June video call with members of former Trump lawyer Cleta Mitchell's Election Integrity Network, which has spread false claims about noncitizen voting.

"We tested it and deployed it to our users in two weeks," Jennings said on the call, which ProPublica obtained a recording of. "I think that's remarkable. Kind of proud of it."

Jennings added that to get quick access to the Social Security data, which has been tightly guarded, USCIS partnered with DOGE. (In an unrelated matter, DOGE has since been accused of misusing Social Security data.) Jennings did not respond to questions from ProPublica and the Tribune.

Perhaps because of its accelerated timetable, USCIS expanded the system before meeting legal requirements to inform the public about how the data would be collected, stored and used, according to voting rights organizations that sued. (UCSIS did not respond to a request for comment about this.). It also blew past concerns from voter advocacy groups about the accuracy of SSA's citizenship data, which multiple audits and analyses have shown is often outdated or incomplete. This is particularly true for people not born in the U.S., who often get Social Security numbers well before they become citizens.

According to emails obtained by ProPublica and the Tribune, SAVE first checks SSA's citizenship information. If that shows a voter isn't a citizen, DHS searches other databases, but it can be difficult to locate and match all the data the systems have on a person. This can lead to errors.

Broderick said in the interview that Trump's executive order dramatically accelerated the timetable for launching SAVE, getting agencies to cooperate and move quickly. But he insisted the work was done responsibly.

"Do I think it was reckless? Do I think it wasn't planned? Do I think it wasn't tested? Absolutely not," he said.

By September, Texas had uploaded its entire list of more than 18 million registered voters into SAVE. Alabama, Arkansas, Indiana, Louisiana, Missouri, Montana, Tennessee, Utah and Wyoming put voter data into the system, too.

They would soon start to unveil what SAVE had found.

One of the first out of the gate was Texas. In late October, with early voting underway in state and local elections, Nelson, the secretary of state, announced SAVE had identified 2,724 potential noncitizens on the rolls.

But as Nelson delegated the task of investigating those voters' statuses to local election officials, confusion took hold.

JA314

At a meeting, Nelson's staff told county clerks' offices to investigate flagged voters and then send notices to those for whom they were unable to confirm citizenship. In a follow-up email, Nelson's staff told the clerks they should already have heard from someone in the office with more details.

That set off a chain of messages on the local officials' email group

Travis County voter registration director Christopher Davis said he hadn't been contacted and had just learned the county had 97 flagged voters. Marsha Barbee, in Wharton County near Houston, shared that she talked to a Nelson staffer who said she'd been directed not to tell local officials about their lists because they were in the middle of early voting.

"They said we have enough on our plates and didn't want us to worry right now," Barbee wrote.

In the absence of clear state guidance, clerks proceeded inconsistently. Some said they didn't act on their lists, waiting for more direction. Others, unsure how to investigate flagged voters' status, said they simply sent notices asking for proof of citizenship, though some opted not to remove nonresponsive voters from the rolls.

"I give them many chances; I don't just expire them right away," Dee Wilcher, a clerk in East Texas' Anderson County, said about flagged voters, adding that she wanted to avoid removing citizens from the rolls and looking "stupid."

Chris McGinn, executive director of the Texas Association of County Election Officials, said many clerks expressed frustration with the secretary of state's lack of guidance and failure to help with investigations. When he shared clerks' concerns, McGinn said Nelson's staff didn't respond, leading him to conclude that checking SAVE's findings wasn't an agency priority.

He called the state's use of SAVE "more political and appearance-based" than a practical way to ensure election integrity.

One way to check SAVE's findings would have been to get information from the Texas Department of Public Safety, which requires proof of citizenship if residents register to vote when obtaining a driver's license. The secretary of state's office didn't do this and didn't direct counties to either.

Several county officials said they hadn't thought to ask DPS for information; those who did often found the agency had documentation showing some of the voters who SAVE identified as noncitizens were in fact citizens.

In the Texas Panhandle, Potter County elections officials quickly confirmed through DPS that three of nine voters on their list had proof of citizenship on file. In neighboring Randall County, DPS helped officials verify that one in five had a U.S. passport, according to interviews with the local officials.

In December, Travis County learned that 11 of the 97 voters flagged by SAVE had proven their citizenship to DPS. After getting the data, the county's voter registrar, Celia Israel, said in an interview that she felt even more uncomfortable about moving forward with sending notices to voters, given SAVE's errors.

"It has proven to be inaccurate," she said. "Why would I rely on it?"

To be sure, SAVE also identified some people who weren't eligible to vote, clerks said. Several came across instances in which voters marked on registration forms that they weren't citizens, but were registered by election office staffers in error. Clerks also said voters have told them they'd misunderstood questions about eligibility when getting drivers' licenses. (It's not clear if any of those registered in error voted; overall, noncitizens rarely vote.)

ProPublica and the Tribune surveyed the 177 Texas counties that had voters flagged by SAVE, receiving data from 97 that had either checked DPS records or sent notices to voters to try to verify SAVE's citizenship information. Overall, more than 5% of the voters SAVE identified as noncitizens proved to be citizens. In some smaller counties, most of those flagged were eligible to vote. That includes six of 11 in the Panhandle's Moore County, and two of three in Erath County, near Dallas.

But some of those who didn't respond to notices also might be citizens.

In Denton County, where Sofia Minotti lives, checks by elections administrator Frank Phillips' staff delivered clear answers on the citizenship status of 26 of the 84 voters flagged by SAVE. Twelve, including Minotti, proved they were citizens. Fourteen more had marked on their registration forms that they weren't and the blame rested with workers for registering them nonetheless.

Phillips said he removed anyone who didn't provide proof by the deadline from the rolls to comply with the secretary of state's instructions, but he fears some were eligible voters.

"What is bugging me is I think our voter rolls may be more accurate than this database," Phillips said. "My gut feeling is more of these are citizens than not."

At least initially, Missouri took a more targeted approach to SAVE than Texas did. State officials used the system to search for information on a subset of about 6,000 voters they had reason to think might not be citizens, according to emails between federal and state officials.

The state had results by October, but in early November, a USCIS official wrote to Missouri and four other states to say some people flagged by SAVE as noncitizens were actually citizens, emails obtained through public records requests show.

"We have continued to refine our processes used to obtain and review the citizenship data available to us," the official wrote, adding that one such improvement revealed the errors.

JA316

The staffer attached amended search results, but Missouri officials withheld the attachment from its response to a public records request and did not respond to a question about how many corrections were made.

Based on the updated data from USCIS, Missouri sent lists of flagged voters to county election administrators in November. ProPublica and the Tribune obtained these lists for seven of 10 most populous counties in the state, which show SAVE initially identified more than 1,200 people as noncitizens just in these areas.

The Missouri secretary of state's office told election administrators it would work to verify SAVE's citizenship determinations. In the meantime, local officials were instructed to change the status of flagged voters, making them temporarily unable to vote.

The lists were met with swift pushback from county election officials, who, like Lennon, soon spotted people they knew to be citizens and questioned the directive's legality. On a group call in November, they traded examples, saying they recognized neighbors, colleagues and people they'd helped to register at naturalization ceremonies.

In St. Louis, the Board of Election Commissioners didn't alter the eligibility of anyone on its flagged voter list after being advised not to by its attorney.

Rachael Dunn, a spokesperson for Hoskins, the Missouri secretary of state, said state law allows officials to change voters' status during investigations into their eligibility — for example, if there are signs they've moved. The laws she cited don't directly address investigations into citizenship status, however.

In early December, some 70 clerks, Republicans and Democrats, wrote a letter to Missouri House Speaker Jonathan Patterson saying there were better ways than SAVE to keep noncitizens off voter rolls.

Weeks later, the state's election integrity director, Nick La Strada, wrote USCIS to ask why a voter that SAVE had identified as a noncitizen in October had showed up in a more recent search as a citizen.

A USCIS official replied that between the initial search and the follow-up, DHS had gotten access to passport data, which contains more up-to-date citizenship information on some people not born in the U.S.

The USCIS staffer explained that some of the most accurate citizenship information — which is within DHS' own records — still wasn't searchable in SAVE because running that kind of search would require the voter's DHS identifier, which can't always be located. The staffer said they were working on improvements but those could take until March.

JA317

"You don't start with something at that scale until you work the bugs out, and that is not the case here," Clinton Jenkins, president of the Missouri Association of County Clerks and Election Authorities, said in an interview. Jenkins is also the clerk for Miller County in the Ozarks.

In early January, in what was framed as a "SAVE review update," the secretary of state's office sent counties across Missouri revised lists with reduced numbers of voters identified as potential noncitizens. It instructed election administrators to move voters who'd been initially flagged in error by SAVE back to active status, restoring their eligibility to vote.

Dunn, Hoskins' spokesperson, didn't specify what prompted these adjustments. Even the new lists may not be final, she acknowledged. Once the review is complete, the state has said it plans to send letters to those still on the lists, demanding proof of citizenship and giving recipients 90 days to respond.

The addition of new data to SAVE makes it a more valuable resource, she maintained, "while also reinforcing the need for careful, layered review before any action is taken."

After the January revision, St. Louis County's initial list of 691 potential noncitizens dropped to 133.

Zuzana Kocsisova, who lives in St. Louis, was among those incorrectly flagged by SAVE on its first pass. Originally from Slovakia, she became a U.S. citizen in 2019. She showed ProPublica and the Tribune a copy of her naturalization certificate, which she keeps with a letter from Trump congratulating her for "becoming a citizen of this magnificent land."

When a reporter told her that SAVE had initially identified her as a potential noncitizen, she said she wasn't surprised. She saw it as part of the Trump administration's targeting of immigrants. She was more frustrated than relieved to learn that she wasn't on the smaller list of flagged voters sent in January.

"Overall, it seems like this process has done more to worry people who can vote than to identify actual registered voters who don't qualify," she said. "It's just a waste of resources. I don't think it makes the elections any more safe."

In Boone County, where Lennon is the clerk, the count of flagged voters fell from 74 to 33 and the naturalized citizen who Lennon's staff helped register was no longer on the list.

Lennon said she and other county clerks would happily accept data that helps them correctly identify noncitizens on their voter rolls. But so far, SAVE hasn't done that. And until it does, she said, she won't purge voters purely because SAVE has flagged them.

"This is not ready for prime time," Lennon said. "And I'm not going to risk the security and the constitutional rights of my voters for bad data."

JA318

*Mollie Simon* of ProPublica contributed research. *Doug Bock Clark* of ProPublica contributed reporting.



*Learn about The Texas Tribune's policies*, including our partnership with *The Trust Project* to increase transparency in news.

JA319

# Exhibit 20

Civil Action No. 26-cv-1114 (CJN) (Lead case)

JA320

# Initial Review Finds No Widespread Illegal Voting by Migrants, Puncturing a Trump Claim

nytimes.com/2026/01/14/us/politics/noncitizen-voters-save-tool.html

Alexandra Berzon, Nick Corasaniti                                         January 14, 2026



It was a common refrain for Donald J. Trump and his allies during the 2024 campaign: The Biden administration was purposely encouraging mass numbers of immigrants to cross the border in order to vote illegally.

As president, Mr. Trump has pushed his administration to address the alleged crimes, including prompting many states to upload tens of millions of voter records through a federal immigration verification tool run out of the Department of Homeland Security.

But with the review underway, the results so far indicate there is no evidence of widespread fraud, according to interviews with government officials and documents reviewed by The New York Times.

Out of 49.5 million voter registrations that have been checked, the department referred around 10,000 cases to Homeland Security Investigations for further investigation of noncitizenship, or roughly .02 percent of the names processed, according to Matthew Tragesser, a spokesman for U.S. Citizenship and Immigration Services, the D.H.S. agency that oversees the program. A Justice Department spokeswoman also said the administration believed around 10,000 registered noncitizen voters had been found.

JA321

They did not specify how many of those people had voted.

Even that number could be inflated. The verification tool has mistakenly flagged some people who appear to actually be citizens, according to some local election officials.

In Charlotte County, Fla., for instance, the elections supervisor Leah Valenti, an appointee of Ron DeSantis, the Republican governor, said she found that just 15 out of 176,000 names she uploaded to D.H.S. came back as noncitizens. Of those, she found that three were people mistakenly added to the rolls who never intended to register to vote; they have since been removed. Two others already sent in documentation to prove their naturalized citizenship, she said.

"We didn't get a mass onslaught of people," said Ms. Valenti, who is a proponent of using the D.H.S. system to verify voters' eligibility. "We have clean voter rolls."

Mr. Tragesser said the program was "doing exactly what it is supposed to do — providing states with an easy-to-use tool to stop aliens from hijacking our elections."

While the findings affirm that noncitizens do sometimes wind up on the voter rolls, the small numbers so far puncture the claims that Mr. Trump and his allies have made for the past decade that elections are riddled with illegal votes cast by undocumented immigrants. Studies consistently show little if any evidence for such crimes on a large scale.

The review, which is voluntary for states or local election departments, has prompted complaints from officials in Democratic-run states who have declined to participate. They have warned that the system could effectively create a federal database containing personal information on some 200 million people — with a risk of erroneously flagging legal voters and impeding their access to the ballot box.

"We're talking about a system here that is unproven, untested and therefore unreliable," said Steve Simon, the Democratic secretary of state in Minnesota and former president of the nonpartisan National Association of Secretaries of State.

Abigail Jackson, a White House spokeswoman, suggested that the newly expanded verification program might identify more noncitizen voters if it were used by Democratic states, many of which have voter ID laws and other voter restrictions that are less strict than those in some Republican states.

"This process takes time, especially given strong opposition from blue states, with notoriously bad voter roll maintenance, that have refused to check their rolls" against the D.H.S. system, Ms. Jackson said.

Election officials in Democratic-run states say they already have effective ways to ensure only citizens are voting in federal elections.

JA322

The D.H.S.-run program has long been used primarily to help government officials verify citizenship status for people applying for drivers licenses or trying to gain access to health care or Social Security benefits.

For years, some local election officials have had arrangements with D.H.S. to use the tool to verify the citizenship of voters. But the program, called the Systematic Alien Verification for Entitlements, or SAVE, was not designed for the mass uploads that would be needed to fully vet voter rolls.

Under the first Trump administration, officials explored the idea of expanding the tool by making it easier for election officials to use. But some homeland security officials worried that doing so would lead to mistakes and could potentially disenfranchise voters based on faulty matches or determinations.

Yet last year, the administration moved to expand the use of the SAVE system for voter records in response to an executive order from Mr. Trump. It began sending invites to state election officials that would allow them to upload voter data on a mass scale — including full name, date of birth and social security numbers — to check for anyone who was not a citizen on their voter rolls. The administration has also, for the first time, brought in data from the Social Security Administration that had previously been kept separate.

At least 14 states — all with Republican secretaries of state — publicly indicated last year that they would use the revamped D.H.S. system to upload voter information, according to an analysis of public statements, records and interviews with people involved.

Eleven Democratic secretaries of state wrote a letter to D.H.S. in December, raising alarms about the potential impact on eligible voters, warning that the expanded version of SAVE "will introduce unnecessary and unwarranted reliability, privacy and security issues into the sensitive voter information data we are entrusted to protect."

Many Democratic states have also refused to provide similar information to the Department of Justice, which is suing at least 24 states that have refused to turn over data.

JA323

Image



President Trump frequently claimed during the 2024 campaign that large numbers of noncitizens would be voting for president.Credit...Doug Mills/The New York Times

Even if the data does not show widespread illegal voting, some Trump allies say that weeding out any cases is worthwhile.

"I would say a single illegal ballot is one too many," said Jason Snead, who leads the Honest Elections Project, a conservative elections group.

JA324

Image



Election workers scanning ballots in Philadelphia.Credit...Michelle Gustafson for The New York Times

Phil McGrane, the Idaho secretary of state, said in an interview that his spot checks using SAVE had found small numbers of noncitizens on the voter rolls. But he appreciated that D.H.S. had made the tool easier to use.

"The cases are rare, but it can happen and tools make it less burdensome and less work," Mr. McGrane said. "I think upgrades have been really beneficial to the system overall."

In some cases, the reviews are identifying voters who appear to be citizens, inviting more confusion, election officials say.

In Missouri, 70 county clerks in December signed a letter sent to state House and Senate leadership describing the system as flawed, saying it regularly included "individuals we know to be U.S. citizens — our neighbors, colleagues and even voters we have personally registered at naturalization ceremonies."

St. Louis County, Mo., found that around 35 percent of roughly 690 people initially flagged by the SAVE tool were registered at naturalization ceremonies, said Rick Stream, the Republican election director for the county.

JA325

A spokeswoman for the Missouri secretary of state's office said that the state's review using the SAVE tool was still in the early stages and that it would not be based solely on the tool itself. "Any potential issues identified through this process must be researched, verified and resolved at the local level in accordance with Missouri law and due process," she said.

In South Carolina, a top election official emailed a wide array of federal agencies, expressing confusion over the tool after seeing preliminary results in July.

"Unfortunately, the information has raised more questions than it answered," she wrote, according to emails obtained by American Oversight, a watchdog group.

In Louisiana, the system found 403 noncitizens out of 3 million registered voters, or .01 percent, with 83 having voted, according to a November memo obtained by The Times through a public records request. The memo also identified that some of the people were eligible for prosecution. "I want to be clear: Noncitizens illegally registering or voting is not a systemic problem in Louisiana," Secretary of State Nancy Landry, a Republican, said in a public statement in September.

Hamed Aleaziz contributed reporting.

JA326

# Exhibit 21

Civil Action No. 26-cv-1114 (CJN) (Lead case)

# Verification Process

 uscis.gov/save/about-save/save-verification-process

May 22, 2025



## Minimum Requirements for Verification

To create a SAVE case the user agency must submit:

The applicant's **biographic information**

- First name and last name; and
- Date of birth

The **public benefit(s)** requested by the applicant

AND

At least **one unique identifier** such as:

- USCIS/Alien Registration number (A-Number)
- Form I-94, Arrival/Departure Record number
- Student and Exchange Visitor Information System (SEVIS) ID number
- Naturalization/Citizenship Certificate number
- Card Number/I-797 Receipt number
- Social Security number (for initial verification only [1]

JA328

SAVE cannot verify a benefit applicant's immigration status or U.S. citizenship using a driver's license number, U.S. passport number, foreign passport number without another immigration enumerator, Consular Report of Birth Abroad or other non-DHS documentation. SAVE also cannot verify an applicant's status using only first and last name.

To increase the likelihood of an immediate response without additional verification, user agencies should enter all available identifiers SAVE allows, exactly as they appear on the applicant's document(s).

For additional information about immigration documents and immigration identifiers user agencies may encounter, see SAVE's Commonly Used Immigration Documents page.

**Access Methods**

**Initial Verification Process**

**Additional Verification Process**

# Need More Information?

If you need more help, please email us at SAVE.help@uscis.dhs.gov.

For more information about registering for SAVE, please visit our website at /node/41383.

[1] User agencies can only create a SAVE case with a Social Security number when logged into SAVE using a web browser and is not currently available for SAVE web services connections. SAVE accepts a Social Security number (SSN) to create a case and complete initial automated verification only. An immigration enumerator is required for additional manual verification.

JA329

# Exhibit 22

Civil Action No. 26-cv-1114 (CJN) (Lead case)

# How can I change my address or direct deposit information for my Social Security benefits or Supplemental Security Income (SSI) payments?

September 20, 2024 · _En español_ · Share

If you do not receive Social Security benefits, SSI payments, or Medicare, you do not need to change your address with us.

If you get Social Security benefits (retirement, survivors, or disability) or are enrolled in Medicare, you can change your U.S. mailing address or direct deposit information online. You can do this using the **My Profile** tab in your personal _my_ Social Security account. You can also decide when the change takes effect. U.S. citizens are able to change their international address as well.

These services are not currently available to people who receive SSI payments. However, if you do receive SSI, you can use the **My Profile** tab to check your address and payment method, and update your phone number.

If you receive SSI payments, do not have a U.S. mailing address, or are unable to change your address or direct deposit online, you can call us at **1-800-772-1213** (TTY **1-800-325-0778**), Monday through Friday, 8:00 a.m. - 7:00 p.m. local time. Or, you can contact your local Social Security office.

## More Information

- How Do I Sign Up For An Electronic Payment?
- _Get Your Payments Electronically_

JA331

# Exhibit 23

Civil Action No. 26-cv-1114 (CJN) (Lead case)

# About 8.2 Million People Moved Between States in 2022

**CB** census.gov/library/stories/2023/11/state-to-state-migration.html

By Mehreen S. Ismail

November 21, 2023



## Number and Percentage of State-to-State Movers Increased Between 2021 and 2022

The number of people who moved between states rose from nearly 7.9 million people in 2021 to approximately 8.2 million people in 2022, according to newly released U.S. Census Bureau estimates.

The American Community Survey (ACS) shows state-to-state movers also made up a larger share of all movers between 2021 and 2022, increasing from 18.8% to 19.9%.

Inmigration rates — the number of people moving into a state as a share of that state's total number of movers — were higher than the national state-to-state migration rate of 19.9% for states concentrated in the South and West.

This increase in the number and share of state-to-state movers continued [a decade-long trend of rising state-to-state migration even as overall migration has declined](). Between 2021 and 2022, the overall national migration rate – the number of movers in the United States relative to the population age 1 year and over – dropped from 12.8% to 12.6%.

JA333

The Census Bureau regularly publishes estimates of state-to-state migration flows. Estimates are based on 1-year data from the 2022 ACS. The ACS asks respondents who moved in the past year to report their previous place of residence, allowing us to assess migration between origin and destination geographies.

By examining state-to-state migration patterns, we can better understand resources needed in response to changes in states' demographic, social and economic profiles.

## Inmigration Rates

Inmigration rates — the number of people moving into a state as a share of that state's total number of movers — were higher than the national state-to-state migration rate of 19.9% for states concentrated in the South and West (Figure 1).



Figure 1.
**State Inmigration Rates Compared to National State-to-State Migration Rate: 2022**

**Difference from the national rate***

- Higher
- Not statistically different
- Lower

\* Difference is significant at the 90 percent confidence level.
Note: The national state-to-state migration rate is 19.9 percent. For more information, visit <https://www.census.gov/data/tables/time-series/demo/geographic-mobility/state-to-state-migration.html>.
Source: U.S. Census Bureau, State-to-State Migration Flows, 2022.

The District of Columbia had one of the highest (44.3%) inmigration rates. Most (13,093) people moving into the District of Columbia arrived from neighboring Maryland.

JA334

California had the lowest (11.1%) inmigration rate. Despite a relatively large number of in-movers, California also had a relatively large base of movers overall, helping to explain the state's low inmigration rate. Most (44,279) people moving to California arrived from Texas.

## Outmigration Rates

Outmigration rates — the number of people moving out of a state as a share of that state's total number of movers — tended to be higher than the national state-to-state migration rate for states in the Northeast and West (Figure 2).



Figure 2.
**State Outmigration Rates Compared to National State-to-State Migration Rate: 2022**

Difference from the national rate*
- Higher
- Not statistically different
- Lower

* Difference is significant at the 90 percent confidence level.
Note: The national state-to-state migration rate is 19.9 percent. For more information, visit <https://www.census.gov/data/tables/time-series/demo/geographic-mobility/state-to-state-migration.html>.
Source: U.S. Census Bureau, State-to-State Migration Flows, 2022.

The District of Columbia had the highest (46.6%) outmigration rate, with most people moving to neighboring Maryland (17,770) or Virginia (13,582).

Texas had the country's lowest (11.7%) outmigration rate, with most of those who did move relocating to California (42,479) or Florida (38,207).

JA335

## Notable State-to-State Migration Flows

Some of the largest state-to-state migration flows in 2022 involved people moving to and from highly populated states (Table 1). The two largest flows, which were not statistically different from each other in size, came either to or from the four most populous states: large numbers of people moved from California to Texas and from New York to Florida.

Table 1.
**Selected State-to-State Migration Flows: 2022**

| Origin state | Destination state | Number of movers |
|---|---|---|
| California | Texas | 102,442 |
| New York | Florida | 91,201 |
| New York | New Jersey | 75,103 |
| California | Arizona | 74,157 |
| Florida | Georgia | 51,380 |

Source: U.S. Census Bureau, State-to-State Migration Flows: 2022.

Other large state-to-state migration flows involved people moving from highly populated to neighboring states. For example, many people moved from New York, the fourth most populous state, to New Jersey.

## User Notes

All estimates are for the population age 1 year and over. Estimates of national and state-level migration rates reflect people who moved between states and the District of Columbia relative to all movers, including people who moved from Puerto Rico and abroad. Estimates of state-to-state migration flows reflect people who moved between the states and the District of Columbia.

***Mehreen Ismail is a survey statistician in the Census Bureau's Social, Economic, and Housing Statistics Division.***

This article was filed under:

[Data Services](#)
[Migration](#)
[Population](#)

## Subscribe

Our email newsletter is sent out on the day we publish a story. Get an alert directly in your inbox to read, share and blog about our newest stories.

[Sign Up Today](#)
Contact our [Public Information Office](#) for media inquiries or interviews.

JA336

Page Last Revised - December 21, 2023

JA337

# Exhibit 24

Civil Action No. 26-cv-1114 (CJN) (Lead case)

# Naturalization Statistics

🌐 **uscis.gov**/citizenship-resource-center/naturalization-statistics

January 24, 2025



The United States has a long history of welcoming immigrants from all parts of the world. During the last decade, USCIS welcomed more than 7.9 million naturalized citizens into the fabric of our nation.

Deciding to become a U.S. citizen is an important milestone in an immigrant's life. Candidates for citizenship must show they are committed to the unifying principles that bind us as Americans. For that commitment, in return, they will enjoy the rights and privileges fundamental to U.S. citizenship.

## Fiscal Year 2024 Naturalization Statistics[1]

USCIS welcomed 818,500 new citizens in fiscal year 2024 during naturalization ceremonies held across the United States and around the world. Although a 7% decrease from last year, the 3-year total is more than 2.6 million new citizens.

**Monthly Naturalizations in FY 2024**

USCIS was able to return to normal year production levels for naturalization applications in FY 2021, despite limitations due to the COVID-19 pandemic. In FY 2024, USCIS production levels for naturalization applications continue to surpass pre-pandemic levels. The 2010-2019 annual

JA339

average (pre-COVID-19 period) was 730,100, and FY 2024 is up 12% from that, at 818,500 U.S. naturalizations.



**FY 2024 Naturalizations**

- October: 63,300
- November: 63,700
- December: 53,500
- January: 68,500
- February: 69,500
- March: 77,200
- April: 71,700
- May: 76,300
- June: 69,900
- July: 67,400
- August: 64,800
- September: 72,900

JA340

The Houston (3.3% of all naturalizations), Dallas (3.3%), Chicago (3.3%), Newark (3.2%), and San Francisco (2.9%) field offices naturalized the largest number of new citizens in FY 2024.

**Countries of Birth**

Among the top five countries of birth for people naturalizing in FY 2024, Mexico was the lead country, with 13.1% of all naturalizations, followed by India (6.1%), the Philippines (5.0%), the Dominican Republic (4.9%), and Vietnam (4.1%). The top five countries of birth comprised 33% of the naturalized citizens in FY 2024.



**State, City/Borough, and Core-Based Statistical Area of Residence**

Applicants who submit a Form N-400, Application for Naturalization, list their current address on the form. Using this information, USCIS can determine the state of residence at the time a person applied for naturalization. Of all citizens naturalized in FY 2024, 70% resided in 10 states (in descending order): California, Florida, New York, Texas, New Jersey, Illinois, Virginia, Georgia, Massachusetts, and Washington. More than 50% resided in the top four states.

The top five cities (including boroughs) where people who naturalized resided were (in descending order): Miami, Brooklyn, the Bronx, Houston, and Los Angeles.

JA341



**Map Information**

■ Top 10 States
- California
- Florida
- New York
- Texas
- New Jersey
- Illinois
- Virginia
- Georgia
- Massachusetts
- Washington

⦿ Top 5 Cities / Boroughs
Miami, FL | 2.2%
Brooklyn, NY | 2.0%
Bronx, NY | 1.5%
Houston, TX | 1.4%
Los Angeles, CA | 1.1%

The top five [Core Based Statistical Areas](#) (CBSAs) where people who naturalized resided were (in descending order): New York-Newark-Jersey City (14.4%), Miami-Fort Lauderdale-Pompano Beach (6.9%), Los Angeles-Long Beach-Anaheim (6.5%), Washington-Arlington-Alexandria (3.9%), and Houston-The Woodlands-Sugar Land (3.2%).

## Age and Sex[2]

More than 37% of citizens naturalized in FY 2024 were 30 to 44 years old. The median age of those naturalizing in FY 2024 was 42 years. About 17% were younger than 30 years old, and 23 new citizens were centenarians (age 100 and older)!

Women made up over 55% of those naturalized in FY 2024, and they were the majority in every age group.



## MEDIAN AGE

| FEMALE | - 42 - | MALE |
|---|---|---|
| 55.1% | | 44.9% |
| 4.1% | 18-24 | 4.0% |
| 5.2% | 25-29 | 4.1% |
| 6.8% | 30-34 | 5.0% |
| 7.3% | 35-39 | 6.1% |
| 6.4% | 40-44 | 5.6% |
| 5.2% | 45-49 | 4.5% |
| 4.9% | 50-54 | 4.0% |
| 4.6% | 55-59 | 3.6% |
| 3.6% | 60-64 | 2.9% |
| 6.9% | 65 & OVER | 5.0% |

**Naturalization Eligibility**

To be eligible for naturalization, an applicant must fulfill certain eligibility requirements set forth in the Immigration and Nationality Act (INA). The requirements generally include being a lawful permanent resident (LPR) for at least five years.[3] There are also other special naturalization provisions that exempt certain applicants, including certain spouses of U.S. citizens and applicants with military service, from one or more of the general requirements for naturalization. Most people who naturalized in FY 2024 were eligible for naturalization based on being LPRs for at least 5 years (INA Section 316(a)), followed by applicants who were eligible based on being LPRs for at least 3 years and married to a U.S. citizen for 3 years (INA Section 319(a)) and applicants who were eligible based on their military service during a designated period of hostilities (INA Section 329).

| Section of Law | Section of Law Description | Percent of Total |
|---|---|---|
| INA Section 316(a) | LPR for 5 years | 83.8% |
| INA Section 319(a) | LPR for 3 years (married to U.S. citizen 3 years) | 14% |

JA343

| Section of Law | Section of Law Description | Percent of Total |
|---|---|---|
| INA Section 329 | Military service during designated period of hostilities | 2% |
| All other | All others | 0.2% |

In general, an alien must spend at least 5 years as a lawful permanent resident to be eligible for naturalization while a spouse of a U.S. citizen must spend at least 3 years as a lawful permanent resident.[4] The median years spent as an LPR for all citizens naturalized in FY 2024 was 7.5 years.



The median years spent as an LPR varied by the citizens' country of birth. The countries with the largest number of new citizens in FY 2024 and their median years spent as an LPR are shown below. Out of these top countries, applicants from Mexico spent the longest time, with 10.9 years, and applicants from Nigeria spent the shortest, with 5.4 years.

JA344



JA345



## Class of Admission

Most people who naturalized came to the United States as immediate relatives of U.S. citizens or through family-sponsored preference categories, followed by employment-based preference categories, refugees and asylees, and the Diversity Immigrant Visa Program.

**Immediate Relatives of USCs**

| Spouses 18.2% | Parents 7.4% | Children 4.0% | **29.6%** |

**Family Preferences** — 18.9%

**Employment Preferences** — 11.9%

**Refugees and Asylees**

| Refugees 6.3% | Asylees 3.1% | **9.4%** |

**Diversity** — 4.0%

**Unknown** — 22.8%

**Other** — 3.4%

## Naturalization Test Initial Pass Rate

JA346

Section 312 of the INA requires that naturalization applicants demonstrate an ability to read, write, and speak words in ordinary usage in the English language and have a knowledge and understanding of U.S. history and government (civics). To meet these requirements and become naturalized citizens, applicants must pass an English test (which includes understanding, speaking, reading, and writing) and a civics test.

The naturalization test consists of two components: an English and a civics component. Applicants who fail one or both test components will have a second opportunity to pass the portions of the test that they failed, called a re-exam. The pass rate below represents the cumulative pass rate of applicants who took both the English test and the current version of the civics test since Oct. 1, 2023. It also counts those who were exempt from one of more portions of the naturalization test or had an approved Form N-648, Medical Certification for Disability Exceptions, as passing.



The first percentage (89.7%) denotes the pass rate of applicants who took the initial exam only and includes applicants who were exempt from one of more portions of the naturalization test or had an approved Form N-648. The second percentage (94.4%) denotes the pass rate of applicants who took the initial and re-exam and includes applicants who were exempt from one of more portions of the naturalization test or had an approved Form N-648.

**Attorney or Accredited Representative**

An attorney or accredited representative appearing before DHS must file Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, in each case to establish their eligibility to represent a client in an immigration matter.  In FY 2024, 17.8% of those naturalized had a Form G-28 filed by an attorney or accredited representative to represent them in their naturalization proceedings. Over 64% of all applicants who had a Form G-28 filed by an attorney or accredited representative were over the age of 40.

JA347



## Fee Waiver[5]

USCIS is funded largely by application and petition fees. Recognizing that some applicants cannot pay the filing fees, USCIS established a fee waiver process for certain forms and benefit types, including the Form N-400, Application for Naturalization.[6] USCIS will approve a fee waiver only if the applicant clearly demonstrates that they are unable to pay the filing fees. USCIS carefully considers the merits of each fee waiver request before making a decision.

### Fee Waiver Eligibility

The applicant, their spouse, or the head of their household receives a means-tested benefit.

JA348

**Fee Waiver Eligibility**

The applicant's household income is at or below 150 percent of the Federal Poverty Guidelines at the time the applicant files.

The applicant is currently experiencing a financial hardship that prevents the applicant from paying the filing fee, including unexpected medical bills or emergencies.

In FY 2024, 14.3% of those naturalized had an approved fee waiver. Females (9.0%) had more fee waivers than males (5.3%). Those 65 and older had the most fee waivers out of all age groups that naturalized in FY 2024 (3.9%).



**More Naturalization Statistics**

Naturalization receipts, approvals, denials, and pending applications by field office are also published quarterly on the USCIS Immigration and Citizenship Data page.

- FY 2024 Quarter 1 (XLSX, 38.94 KB)
- FY 2024 Quarter 2 (XLSX, 38.41 KB)
- FY 2024 Quarter 3 (XLSX, 38.01 KB)
- FY 2024 Quarter 4 (XLSX, 62.45 KB)
- Military Naturalization Statistics
- Characteristics of People Who Naturalized Between FY 2015 and FY 2019
- Trends in Naturalization Rates: FY 2018 Update
- Naturalization Test Performance

JA349

**Tables**

| Country of birth | FY 2024 |
|---|---|
| Mexico | 107,700 |
| India | 49,700 |
| Philippines | 41,200 |
| Dominican Republic | 39,900 |
| Cuba | 33,700 |
| Vietnam | 33,400 |
| China | 24,300 |
| El Salvador | 21,900 |
| Jamaica | 20,000 |
| Colombia | 17,900 |
| All Others | 428,800 |
| **Total** | **818,500** |

Data Table 1: Approved naturalizations for FY 2024 and top 10 countries

**Source:** USCIS, ELIS. Data accessed October 2024.
**Notes:** Due to rounding, the totals may not sum.

| State of residence | FY 2024 |
|---|---|
| California | 150,200 |
| Florida | 93,300 |
| New York | 87,100 |
| Texas | 79,800 |
| New Jersey | 45,600 |
| Illinois | 27,200 |
| Virginia | 24,900 |

JA350

| State of residence | FY 2024 |
|---|---|
| Georgia | 24,600 |
| Massachusetts | 23,600 |
| Washington | 23,500 |
| All Others | 238,700 |
| **Total** | **818,500** |

Data Table 2: Approved naturalizations for FY 2024 and top 10 states

**Source:** USCIS, ELIS. Data accessed October 2024.
**Notes:** Due to rounding, the totals may not sum.

| City of residence | FY 2024 |
|---|---|
| Miami | 17,700 |
| Brooklyn | 16,500 |
| Bronx | 12,100 |
| Houston | 11,600 |
| Los Angeles | 9,300 |
| New York | 7,800 |
| San Jose | 7,500 |
| Chicago | 6,600 |
| Las Vegas | 5,800 |
| San Diego | 5,500 |
| All others | 718,100 |
| **Total** | **818,500** |

Data Table 3: Approved naturalizations for FY 2024 and top 10 cities/boroughs

JA351

**Source:** USCIS, ELIS. Data accessed October 2024.

**Notes:** Due to rounding, the totals may not sum.

| CBSA of residence | FY 2024 |
|---|---|
| New York-Newark-Jersey City, NY-NJ-PA | 118,000 |
| Miami-Fort Lauderdale-West Palm Beach, FL | 56,700 |
| Los Angeles-Long Beach-Anaheim, CA | 53,400 |
| Washington-Arlington-Alexandria, DC-VA-MD-WV | 31,700 |
| Houston-The Woodlands-Sugar Land, TX | 26,300 |
| Chicago-Naperville-Elgin, IL-IN-WI | 25,400 |
| San Francisco-Oakland-Hayward, CA | 25,200 |
| Dallas-FortWorth-Arlington, TX | 24,900 |
| Atlanta-Sandy Springs-Roswell, GA | 20,000 |
| Seattle-Tacoma-Bellevue, WA | 18,500 |
| All Others | 418,500 |
| **Total** | **818,500** |

Data Table 4: Approved naturalizations for FY 2024 by top 10 CBSAs

**Abbreviation:** CBSA = Core-Based Statistical Area.

**Source:** USCIS, ELIS. Data accessed October 2024.

**Notes:** Due to rounding, the totals may not sum. Some zip codes have multiple CBSAs.

| Age group | Sex | | | Total |
|---|---|---|---|---|
| | Female | Male | Unknown | |
| 18-24 | 33,400 | 33,000 | 200 | 66,600 |
| 25-29 | 42,600 | 33,300 | 300 | 76,300 |
| 30-34 | 55,700 | 41,000 | 400 | 97,200 |
| 35-39 | 59,200 | 49,600 | 500 | 109,400 |
| 40-44 | 52,500 | 46,000 | 500 | 98,900 |

JA352

| Age group | Sex Female | Male | Unknown | Total |
|-----------|------------|------|---------|-------|
| 45-49 | 42,400 | 32,400 | 400 | 79,400 |
| 50-54 | 40,200 | 36,600 | 400 | 72,900 |
| 55-59 | 37,500 | 29,100 | 300 | 66,900 |
| 60-64 | 29,400 | 23,400 | 200 | 53,000 |
| 65 and Over | 56,200 | 41,100 | 500 | 97,700 |
| **Total** | **449,200** | **365,600** | **3,700** | **818,500** |

Data Table 5: Approved naturalizations for FY 2024 by age and sex

**Source:** USCIS, ELIS. Data accessed October 2024.
**Notes:** Due to rounding, the totals may not sum. There are some missing dates of birth.

| Class of admission | FY24 |
|--------------------|------|
| **Immediate relatives of U.S. citizens** | 242,400 |
| Spouses | 149,200 |
| Parents | 60,600 |
| Children | 32,600 |
| **Family preferences** | 154,900 |
| **Employment preferences** | 97,000 |
| **Refugees and asylees** | 77,000 |
| Refugees | 51,600 |
| Asylees | 25,400 |
| **Diversity** | 33,000 |
| **Unknown** | 186,200 |
| **Other** | 27,900 |
| **Total** | **818,500** |

JA353

Data Table 6: Approved naturalizations for FY
2024 and class of admission

**Source:** USCIS, ELIS. Data accessed October 2024.
**Notes:** Due to rounding, the totals may not sum.

| Age group | G-28 No | G-28 Yes | Total |
|---|---|---|---|
| 18-24 | 58,600 | 7,900 | 66,600 |
| 25-29 | 65,100 | 11,100 | 76,300 |
| 30-34 | 81,700 | 15,000 | 97,200 |
| 35-39 | 91,400 | 18,000 | 109,400 |
| 40-44 | 81,700 | 17,200 | 98,900 |
| 45-49 | 64,000 | 15,500 | 79,400 |
| 50-54 | 57,500 | 15,400 | 72,900 |
| 55-59 | 52,600 | 14,300 | 66,900 |
| 60-64 | 42,100 | 10,900 | 53,000 |
| 65 and Over | 77,600 | 20,100 | 97,700 |
| **Total** | **672,600** | **145,900** | **818,500** |

Data Table 7: Approved naturalizations for FY
2024 and Form G-28 by age

**Source:** USCIS, ELIS. Data accessed October 2024.
**Notes:** Due to rounding, the totals may not sum.

| Sex | Fee Waiver No | Fee Waiver Yes | Total |
|---|---|---|---|
| Female | 375,900 | 73,300 | 449,200 |
| Male | 322,600 | 43,000 | 365,600 |
| Unknown | 3,200 | 400 | 3,700 |
| **Total** | **701,800** | **116,700** | **818,500** |

JA354

Data Table 8: Approved naturalizations for
FY 2024 and fee waiver by sex

**Source:** USCIS, ELIS. Data accessed October 2024.
**Notes:** Due to rounding, the totals may not sum.

| Age group | Fee Waiver | | Total |
| | No | Yes | |
|---|---|---|---|
| 18-24 | 53,900 | 12,600 | 66,600 |
| 25-29 | 67,400 | 8,900 | 76,300 |
| 30-34 | 87,200 | 10,000 | 97,200 |
| 35-39 | 98,900 | 10,500 | 109,400 |
| 40-44 | 89,600 | 9,300 | 98,900 |
| 45-49 | 72,100 | 7,400 | 79,400 |
| 50-54 | 64,700 | 8,200 | 72,900 |
| 55-59 | 57,700 | 9,200 | 66,900 |
| 60-64 | 44,000 | 9,100 | 53,000 |
| 65 and Over | 66,200 | 31,500 | 97,700 |
| **Total** | **701,800** | **116,700** | **818,500** |

Data Table 9: Approved naturalizations for FY
2024 and fee waiver by age

**Source:** USCIS, ELIS. Data accessed October 2024.
**Notes:** Due to rounding, the totals may not sum.

[1] Due to system updates and adjudicative outcomes, these naturalization statistics may differ from statistics in data reports published on the USCIS Immigration and Citizenship Data webpage and by the Office of Homeland Security Statistics.

[2] Age and sex statistics are after removing unknowns. Counts with unknowns can be found in Data Table 5.

[3] Read more information on the general eligibility requirements for naturalization on our website.

JA355

[4] The median years spent as an LPR is based on the time between the date USCIS approved an individual's adjustment of status application or when the individual entered the United States as an LPR and the date the individual took the Oath of Allegiance. In most cases, the effective date of LPR status is the date USCIS approves the applicant's adjustment of status application or the date the applicant is admitted into the United States with an immigrant visa. For certain classifications, however, the effective date of becoming an LPR may be a date that is earlier than the actual approval of the status (commonly referred to as a "rollback" date). For example, a refugee is generally considered an LPR as of the date of entry into the United States, and an asylee is generally considered an LPR 1 year before the date USCIS approves the adjustment application. Thus, for asylees and refugees who adjust to LPR status, the time spent as an LPR may be shorter than the 5-year period generally required for naturalization because they are eligible to apply for naturalization 5 years from the rollback date.

[5] Read more information on filing a fee waiver on our website. A reduced fee is not the same as a fee waiver and is not included in this analysis. Read more information on requesting a reduced filing fee on our website.

[6] Current or former military members do not have to pay any fees for applying for naturalization under INA 328 or 329.  The Department of Defense pays the application fees on their behalf. They are not included as part of the fee waiver group in this analysis.

JA356

# Exhibit 25

Civil Action No. 26-cv-1114 (CJN) (Lead case)

JA357

# When Mail-In Ballots Started in U.S.

T **time.com**/5892357/voting-by-mail-history

Olivia B. Waxman

September 28, 2020

- [History](#)
- [politics](#)

## Voting by Mail Dates Back to America's Earliest Years. Here's How It's Changed Over the Years

[ADD TIME ON GOOGLE](#)

Updated: Published:



An illustration of Pennsylvania soldiers voting published in the Oct. 29, 1864, issue of Harpers's Weekly. Library of Congress

JA358

Living through the COVID-19 pandemic has been compared to living through wartime. Now, the list of parallels is growing: according to a New York *Times* analysis, when Americans vote this November election offices could receive more than double the number of mailed ballots they received in 2016.

In the U.S., showing up in person to cast one's ballot on Election Day has always been the standard way of exercising that fundamental right. But over the centuries, voting by mail has become an attractive alternative for many—thanks in large part to the influence of wartime necessity.

Even the scattered examples of absentee voting (the terms are often used interchangeably) that can be traced to the colonial era tend to fit the pattern: In 17th-century Massachusetts, men could vote from home if their homes were "vulnerable to Indian attack," according to historian Alex Keyssar's book *The Right to Vote: The Contested History of Democracy in the United States,* and the votes of some Continental Army soldiers were presented in writing "as if the men were present themselves" in Hollis, N.H., in 1775 during the American Revolution.

But it was during the Civil War that America first experimented with absentee voting on a large scale, as so many of the men who were eligible to vote were away from home fighting. During the 1864 presidential election—in which Republican incumbent President Abraham Lincoln defeated Democratic candidate George McClellan—Union soldiers voted in camps and field hospitals, under the supervision of clerks or state officials.

"Excuse-required absentee voting started during the Civil War—a product of the competition between Abraham Lincoln and George McClellan," Paul Gronke, a professor of political science at Reed College and founder of the non-partisan Early Voting Information Center, told TIME in 2016. "Lincoln wanted to assure that he got the votes of the soldiers who were serving away from home."

*Get your history fix in one place: sign up for the weekly TIME History newsletter*

After the Civil War ended, the same logic held. In later conflicts, states increasingly made it possible for soldiers away from home to vote. During World War I, nearly all states let soldiers vote from afar "at least during war time," according to Keyssar's book. And it was in that same time period that people with a non-military, work-related reason for being away from home on Election Day started to be able to vote absentee, too. At the 1917-1918 Massachusetts Constitutional Convention, one delegate advocated for accommodating those "in industry", arguing that railroad employees and traveling salesmen who are away from home on Election Day are "toiling and sacrificing…for the common good," just as soldiers do.

JA359

Industrialization and the expansion of transportation options allowed people to travel far and wide in the growing national economy, making that argument all the more powerful. Some laws required witnesses and a notary public's signature, but officials were looking for a way to make sure that people on the road could still have their electoral voices heard.

"In the early 20th century, we're becoming a much more mobile country," says John C. Fortier, author of *Absentee and Early Voting* and director of governmental studies at the Bipartisan Policy Center. "States will make exceptions for certain types of people, such as railroad workers, or people who are sick. There is a movement—not nationally, we do everything differently state by state—but of states adopting some form of voting for selected populations who met certain criteria."

In the decades that followed, people who voted by mail generally had to have a specific reason for not being able to vote in person on Election Day. That began to change in 1978, when California became the first state to allow voters to apply for an absentee ballot without having to provide an excuse, according to Gronke.

Oregon also claims several firsts in the history of voting by mail. The first entirely mail-in federal primary election took place in the state in 1995, and the first mail-only general election took place in the state in 1996, when Ron Wyden was elected to the U.S. Senate to replace Bob Packwood, who resigned amid a sexual harassment scandal. Since 2000, after 70% of voters approved a ballot initiative instituting the program, Oregon has been an all vote-by-mail state.

As TIME reported in its recent roundup of state laws for voting by mail in 2020, five states were already holding entirely mail-in elections before the pandemic—Colorado, Hawaii, Oregon, Washington and Utah. Twenty-nine states and Washington D.C. allowed "no excuse" mail-in absentee voting, and 16 states allowed voters to cast a ballot by mail if they had an excuse. In the 2016 presidential election, about 1 in 4 voters cast their votes via ballots mailed to them. Despite claims of vote fraud when voting is conducted outside of polling places, only 0.00006% of the 250 million votes by mailed ballots nationwide were fraudulent, according to MIT political scientists who analyzed numbers from the Heritage Foundation's Election Fraud Database.

In addition, scholars at Stanford University's Democracy and Polarization Lab analyzing 1996-2018 data in three of these universal vote-by-mail states (California, Utah and Washington) didn't find vote-by-mail advantaged one political party over another—contrary to President Trump's claim that Republicans would never win an election again if vote-by-mail programs expanded—and only found a "modest increase in overall average turnout rates."

Vote-by-mail programs, as Fortier puts it, are "generally not pulling more people into the voting place, except for making it more convenient for those who vote anyway."

During a period of time full of uncertainties, election officials say American voters can count on vote-by-mail programs being "safe and secure." What's also certain is that the 2020 Election is another milestone in the centuries-long history of voting by mail.

JA360

## Must-Reads from TIME

- [American Men Are Set to Be Automatically Registered for the Draft. Here's What to Know](#)
- [Catholic Vance Breaks Silence on Trump's Jesus-Like Image Amid Outcry From Other Conservatives](#)
- [How NASA Achieved the Historic Artemis II Splashdown](#)
- [Starmer Says He's 'Fed Up' With Trump as Europe Splinters From U.S. Over Iran War](#)
- [White House: Strait of Hormuz Closure 'Completely Unacceptable' Under Ceasefire](#)
- [Trump Tries to Explain Away Posting an AI Image Likening Himself to Jesus](#)

JA361

# Exhibit 26

Civil Action No. 26-cv-1114 (CJN) (Lead case)

JA362

4/17/26, 10:20 AM

Case 1:26-cv-01114-CJN  Document 55-28  Filed 04/17/26  Page 2 of 18
Table 5: Applying for an Absentee Ballot, Including Third-Party Registration Drives

Brief

# Table 5: Applying for an Absentee Ballot, Including Third–Party Registration Drives

Updated February 24, 2026

**Related Topic:**   **Elections**



**Voting Outside the Polling Place Report**
This table is part of NCSL's Voting Outside the Polling Place report.

How voters may submit absentee/mail ballot applications varies by state. All states will permit a voter to submit an application by mail (usually via an official application form, which may be available online for download) or in person at a local election official's office. Many states also allow applications by email (usually with a scanned application). In general, most states require the request to be in writing. Some states offer additional options, such as online portals or requests by phone, as well.

In order to have enough time to receive an absentee/mail ballot application, verify the information and send the ballot out, election officials usually need to receive absentee ballot applications a week or more before the election. Some states have statutory deadlines for applications closer to the election, but if a voter applies too close it's possible there may not be enough turnaround time to receive the ballot in the mail. In emergency cases, however, absentee ballots can be requested after these deadlines.

Seventeen states, Puerto Rico, the Virgin Islands have statutory deadlines for absentee/mail ballot applications that are more than seven days before the election:

- Alaska, Arizona, Florida, Georgia, Idaho, Indiana, Iowa, Kentucky, Missouri, Nebraska, New York, Oklahoma, Puerto Rico, Rhode Island, South Carolina, Tennessee, Texas, Virgin Islands and Virginia.

Seven states set their statutory deadlines for absentee/mail ballot applications at seven days (one week) before the election:

- Arkansas, Kansas, Maryland, New Jersey, North Carolina, Ohio and Pennsylvania.

Eighteen states have statutory deadlines for absentee/mail ballot applications that are fewer than seven days before the election:

- Alabama, Connecticut, Delaware, Illinois, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, New Hampshire, New Mexico, North Dakota, South Dakota, West Virginia, Wisconsin and Wyoming.

JA363

The remaining eight states and Washington, D.C. conduct mostly-mail elections.

## Applying for an Absentee Ballot

| State | Statute | Eligibility | Application Deadlines | Application Submission Methods |
|---|---|---|---|---|
| **Alabama** | Ala. Code §17-11-3 <br><br> §17-11-4 | Excuse required. | Applications by mail: Seven days before the elections <br><br> Applications returned in-person: Five days before the election. | Mail, in-person. |
| **Alaska** | Alaska Stat. §15.20.081 | Anyone. | Applications by mail: Ten days before the election. <br><br> Electronically delivered applications: 5 p.m. the day before the election. | Mail, in-person, email, fax, online. |
| **Arizona** | Ariz. Rev. Stat. § 16-542 | Anyone. | Eleven days before the election at 5 p.m. | Mail, in-person, email, online, phone. |
| **Arkansas** | Ark. Code § 7-5-404 | Excuse required. | Applications returned by mail or electronically: seven days before the election. <br><br> Applications returned in-person: The Friday before the election. | Mail, in-person, email, fax. |

JA364

| California | | Ballots are delivered to all voters. | N/A | N/A |
|---|---|---|---|---|
| **California** | | Ballots are delivered to all voters. | N/A | N/A |
| **Colorado** | | Ballots are delivered to all voters. | N/A | N/A |
| **Connecticut** | Conn. Gen. Stat. § 9-140 | Excuse required. | The day before the election. If faxing or emailing application, the original application form must be received by close of polls on Election Day or the mail-ballot will not count. | Mail, in-person, email, fax, online. |
| **Delaware** | 15 Del. Code § 5503 | Excuse required. | The day before the election at noon. | Mail, in-person, email, fax, online. |
| **District of Columbia** | | N/A | Ballots are delivered to all voters. | N/A |
| **Florida** | Fla. Stat. Ann. §101.62 | Anyone. | Twelve days before the election at 5 p.m. | Mail, in-person, email, fax, online, phone. |
| **Georgia** | Ga. Code Ann. § 21-2-381, § 21-2-385 | Anyone. | Eleven days before the election. | Mail, in-person, email, fax. |
| **Hawaii** | | Ballots are delivered to all voters. | N/A | N/A |

JA365

Case 1:26-cv-01114-CJN   Document 55-28   Filed 04/17/26   Page 5 of 18

| Idaho | Idaho Code § 34-1002 | Anyone. | Application for mail-in absentee ballot: Eleven days before the election at 5 p.m.<br><br>Application for in-person absentee voting in a polling place: The Friday before the election at 5 p.m. | Mail, in-person, email, fax, online. |
|---|---|---|---|---|
| Illinois | 10 ILCS 5/19-2 et seq. | Anyone. | Application returned by mail or electronically: Five days before the election,<br><br>Application returned in-person: The day before the election. | Mail, in-person, email. |
| Indiana | Ind. Code § 3-11-4-2, § 3-11-4-3 | Excuse required. | Twelve days before the election. | Mail, in-person, email, fax, online. |
| Iowa | Iowa Code § 53.2 | Anyone. | Fifteen days before the election at 5 p.m. | Mail, in-person. |
| Kansas | Kan. Stat. Ann. § 25-1122, § 25-1128 | Anyone. | The Tuesday before the election.<br><br>For presidential preference primary only: 30 days before the election. | Mail, in-person, fax. |
| Kentucky | Ky. Rev. Stat § 117.085 | Excuse required. | Fourteen days before the election. | Online. |

JA366

| | | | | |
|---|---|---|---|---|
| **Louisiana** | La. Rev. Stat. § 18:1307 et seq. | Excuse required. | Four days before the election at 4:30 p.m. | Mail, in-person, email, fax, online. |
| **Maine** | 21-A Me. Rev. Stat. A. § 753-B | Anyone. | Three business days before the election. | Mail, in-person, fax, phone, online. |
| **Maryland** | Md. Election Law Code, § 9-305<br><br>COMAR 33.11.02.01(D)(2) | Anyone. | For requests that the ballot be sent by mail or faxed: The Tuesday before the election.<br><br>For requests that the ballot be sent by the internet: The Friday before the election.<br><br>For in-person requests: Election Day. | Mail, in-person, email, fax, online. |
| **Massachusetts** | Mass. Gen. Laws Ann. ch. 54 § 89 | Anyone. | Five business days before the election at 5 p.m. | Mail, in-person, email, fax, online. |
| **Michigan** | Mich. Comp. Laws §§ 168.759, 168.761 | Anyone. | For mail ballot requests: Four days before the election.<br><br>Applications returned in person for ballots to be cast at the clerks office: 4 p.m. on the day before Election Day. | Mail, in-person, email, fax, online. |
| **Minnesota** | Minn.  Stat. § 203B.04 | Anyone. | The day before the election. | Mail, in-person, |

JA367

| | | | | email, fax, online. |
|---|---|---|---|---|
| **Mississippi** | Miss. Code Ann. § 23-15-625, § 23-15-627 | Excuse required. | Not specified. | Mail, in-person, phone. |
| **Missouri** | Mo. Rev. Stat. § 115.279 | Anyone. | The second Wednesday before the election; the day before the election at 5 p.m. for in-person requests. | Mail, in-person, email, fax. |
| **Montana** | Mont. Code Ann § 13-13-211, § 13-13-212 | Anyone. | The day before the election at noon. | Mail, in-person, email, fax. |
| **Nebraska** | Neb. Rev. Stat. § 32-941 | Anyone. | The second Friday before the election. | Mail, in-person, email, fax. |
| **Nevada** | | Ballots are delivered to all voters. | N/A | N/A |
| **New Hampshire** | N.H. Rev. Stat. Ann. §657:4, §657:15, §654:17 | Excuse required.<br><br>Voters must submit information demonstrating citizenship, age, domicile and identity. | For requests by mail, email or fax: The day before the election at noon.<br><br>For in-person requests: The day before the election at 5 p.m. | Mail, in-person, email, fax. |
| **New Jersey** | N.J. Rev. Stat. § 19:63-3 | Anyone. | For applications returned by mail: Seven days before the election. | Mail, in-person. |

JA368

| | | | For applications returned in-person: The day before the election at 3 p.m.. | |
|---|---|---|---|---|
| **New Mexico** | N.M. Stat. Ann., § 1-6-5 | Anyone. | Fourteen days before the election. | Mail, in-person, online. |
| **New York** | N.Y. Elec. Law § 8-400 | Excuse required. | Applications for mail ballot through online application or mail: Ten days before the election.<br><br>For in-person requests: The day before the election. | Mail, in-person, email, fax, online. |
| **North Carolina** | N.C. Gen. Stat. § 163-228, § 163-230.1 | Anyone. | The second Tuesday before the election at 5 p.m. | Mail, in-person, email, fax. |
| **North Dakota** | N.D. Cent. Code § 16.1-07-05, § 16.1-07-07 | Anyone. | "In a timely manner" for mailed-out ballots; Election Day at 4 p.m. for in-person requests. | Mail, in-person, email, fax. |
| **Ohio** | Ohio Rev. Code § 3509.03 | Anyone. | Seven days before the election by close of business. | Mail, in-person. |
| **Oklahoma** | 26 Okla. Stat. Ann. § 14-103, § 14-105, § 14-115.1 | Anyone. | The third Monday before an election at 5 p.m. | Mail, in-person, email, fax, online |
| **Oregon** | | Ballots are delivered to all voters. | N/A | N/A |

JA369

| Pennsylvania | 25 Pa. Stat. § 3146.2 et seq. | Anyone. | The Tuesday before the election at 5 p.m. | Mail, in-person, online. |
|---|---|---|---|---|
| Puerto Rico | 16 L.P.R.A. § 4735 | Excuse required. | Forty-five days before the election. | Mail, in-person, email, online. |
| Rhode Island | R.I. Gen. Laws §17-20-2.1 | Excuse required. | Twenty-one days before the election at 4 p.m. The application will be accepted if it is postmarked by the 21st day before the election and received by the 18th day before the election, | Mail, in-person, online. |
| South Carolina | S.C. Code Ann. § 7-15-330 | Excuse required. | Eleven days before the election at 5 p.m. | Mail, in-person, phone. |
| South Dakota | S.D. Codified Laws § 12-19-2, 12-19-2.1 | Anyone. | The day before the election at 5 p.m.. | Mail, in-person. |
| Tennessee | Tenn. Code Ann. § 2-6-202 | Excuse required. | Ten days before the election. | Mail, in-person, email. |
| Texas | Tex. Elec. Code Ann. §84.007 | Excuse required. | Eleven days before the election at noon.<br><br>If the application was submitted by fax or email, then the physical application must also be received by | Mail, in-person, email, and fax. |

JA370

| | | | the early voting clerk by the fourth business day after the fax or email is received. | |
|---|---|---|---|---|
| **Utah** | | Ballots are delivered to all voters. | N/A | N/A |
| **Vermont** | | Ballots are delivered to all voters. (General elections only.) | N/A | N/A |
| **Virgin Islands** | 18 V.I.C. § 664 | Excuse required. | For applications returned by mail or email: Fourteen working days before the election.<br><br>For applications returned to the board in-person: The Monday before the election. | Mail, in-person, email. |
| **Virginia** | Va. Code Ann. § 24.2-701 | Excuse required. | Eleven days before the election at 5 p.m. | Mail, in-person, email, fax, online. |
| **Washington** | | Ballots are delivered to all voters. | N/A | N/A |
| **West Virginia** | W. Va. Code, §3-3-5 | Excuse required. | Six days before the election. | Mail, in-person, email, fax. |
| **Wisconsin** | Wis. Stat. § 6.86 | Anyone. | Five days before the election at 5 p.m. | Mail, in-person, |

JA371

4/17/26, 10:20 AM
Case 1:26-cv-01114-GJN   Document 55-28   Filed 04/17/26   Page 11 of 18
Table 5: Applying for an Absentee Ballot, including Third-Party Registration Drives

| State | Statute | | | |
|---|---|---|---|---|
| | | | | email, fax, online. |
| **Wyoming** | Wyo. Stat § 22-9-104, § 22-9-105 | Anyone. | The day before the election. | Mail, in-person, phone. |

As part of get-out-the-vote efforts or civic engagement programs, some organizations like to assist voters in requesting and returning absentee/mail ballot applications. Some states place restrictions on these activities by prohibiting third-party groups from distributing or collecting absentee/mail ballot applications, or designate deadlines or turnaround times for groups that do this. These are often meant to encourage third-party groups to submit completed applications in a timely manner to ensure that voters receive absentee/mail ballots in a timely manner.

Sixteen states, Puerto Rico, the Virgin Islands and Washington, D.C., place no restrictions, or do not specify restrictions, on third-party groups distributing or collecting completed absentee/mail ballot applications:

- Delaware, Idaho, Maine, Maryland, Montana, Nebraska, New Jersey, New York, North Carolina, North Dakota, Ohio, Pennsylvania, Puerto Rico, Rhode Island, South Dakota, Virgin Islands, Virginia and Wisconsin.

Eight states permit third-party groups to distribute and/or collect completed absentee/mail ballot applications, but specify deadlines or turnaround times:

- Arizona, Illinois, Indiana, Iowa, Kansas, Minnesota, New Mexico and Wyoming.

Nineteen states restrict or prohibit third-party individuals or groups from distributing or collecting absentee/mail ballot applications:

- Alabama (no restriction on distribution), Alaska, Arkansas, Connecticut, Florida, Georgia, Kentucky, Louisiana, Massachusetts, Michigan, Mississippi, Missouri, New Hampshire, Oklahoma, South Carolina, Tennessee, Texas, West Virginia and Wyoming.

The remaining eight states and the District of Columbia conduct mostly-mail elections.

| State | Statute | Third-Party Distribution & Collection Rules |
|---|---|---|
| **Alabama** | Ala. Code §17-11-4 | Only the voter may deliver his or her own application in person. It is a felony for a third party to receive payment or gift for distributing, requesting, collecting, completing, or delivering a voter's absentee ballot application. |

JA372

| State | Statute | Third-Party Distribution & Collection Rules |
|---|---|---|
| **Alaska** | Alaska Stat. §15.20.081 | Third-party groups are restricted to supplying only their own affiliated members with an application. An application may not be submitted to any intermediary that could control or delay the submission of the application or gather data on the applicant. An application may be returned by a friend, relative or associate for delivery. |
| **Arizona** | Ariz. Rev. Stat. § 16-542 | Third parties may distribute/collect/submit applications. Applications collected by third parties must be submitted within six days of receipt, under penalty of $25 per day for each completed form withheld from submittal. Any person who knowingly fails to submit a completed early ballot request form before the submission deadline for the election immediately following the completion of the form is guilty of a class 6 felony. |
| **Arkansas** | Ark. Code § 7-5-404 | Only a designated bearer, authorized agent or long-term care facility administrator of a voter may deliver absentee applications in person on behalf of voters. |
| **California** |  | N/A |
| **Colorado** |  | N/A |
| **Connecticut** | Conn. Gen. Stat. § 9-140 | Third parties must register with town clerk before distributing five or more applications; unsolicited application mailings must meet certain criteria. No person shall pay or give any compensation to another person for distribution of absentee ballot applications. |
| **Delaware** | 15 Del. Code § 5503 | No restrictions specified. |
| **District of Columbia** |  | N/A |
| **Florida** | Fla. Stat. Ann. §101.62 | voter's immediate family or the voter's legal guardian may request an absentee ballot on behalf of a voter. |

JA373

| State | Statute | Third-Party Distribution & Collection Rules |
|---|---|---|
| **Georgia** | Ga. Code § 21-2-381, § 21-2-385 | Applications may be submitted by immediate family members over 18 years old only on behalf of a physically disabled voter; proof of relationship must be provided. |
| **Hawaii** | | N/A |
| **Idaho** | Idaho Code § 34-1002 | No restrictions specified. |
| **Illinois** | 10 ILCS 5/19-2 et seq. | Any person may produce, reproduce, distribute or return to an election authority the application for a vote-by-mail ballot. Applications must be returned to the election authority within seven days of receipt, or within two days of receipt if within two weeks of the election. Failure to turn over an application is a petty offense with a fine of $100 per application. |
| **Indiana** | Ind. Code § 3-11-4-2, § 3-11-4-3 | A person handling another voter's absentee application must indicate the date received by voter and deliver to county election board within 10 days or by the application deadline. |
| **Iowa** | Iowa Code § 53.2 | Third parties, including parties, candidates and committees, may distribute and collect applications from voters but must return an application within 72 hours of completion. |
| **Kansas** | Kan. Stat. Ann. § 25-1122, § 25-1128 | Any person or third party may engage in distribution and collection of advance voting ballots but must deliver any application within two days of completion. |
| **Kentucky** | Ky. Rev. Stat. § 117.085 | |
| **Louisiana** | La. Rev. Stat. § 18:1307 et seq. | No person, except the immediate family of any voter, shall hand deliver more than one voter's application to vote by mail. |
| **Maine** | 21-A Me. Rev. Stat. Ann. § | No restrictions on who may distribute, collect or solicit applications; immediate family members may make a |

JA374

| State | Statute | Third-Party Distribution & Collection Rules |
|---|---|---|
| | 753-A, § 753-B | request on behalf of a voter. |
| **Maryland** | Md. Election Law Code § 9-305 | No restrictions specified. |
| **Massachusetts** | Mass. Gen. Laws Ann. ch. 54 § 89 | Family members of eligible absentee voters may apply for an absentee ballot on the voter's behalf in person or by mail. |
| **Michigan** | Mich. Comp. Laws § 168.759 | Only applicants, their immediate family or other household member may offer to return, agree to return or solicit to return an application; violation of this law is a misdemeanor. |
| **Minnesota** | Minn. Stat. § 203B.04 | No restrictions on who may distribute, collect or solicit applications. Must be returned to elections office within 10 days of completion. |
| **Mississippi** | Miss. Code Ann. § 23-15-625, § 23-15-627 | Any person may apply for an absentee ballot on another voter's behalf, but they must sign and print their name and address on the application. Only immediate family members of a voter may make application orally in person. No person may solicit ballot applications or absentee ballots for persons staying in any skilled nursing facility unless they are a family member or designated by the voter. |
| **Missouri** | Mo. Rev. Stat. § 115.279 | Application delivery may only be made in person by the voter or their guardian or a relative in the second degree by consanguinity or affinity. |
| **Montana** | Mont. Code Ann. § 13-13-211, § 13-13-212, § 13-13-213 | A third party or designated agent may return the application on behalf of a voter. |
| **Nebraska** | Neb. Rev. Stat. § 32-941 | No restrictions specified. |

JA375

| State | Statute | Third-Party Distribution & Collection Rules |
|---|---|---|
| **Nevada** | | N/A |
| **New Hampshire** | N.H. Rev. Stat. Ann. §657:4, §657:15 | Third parties may distribute and collect absentee applications so long as they use the prescribed form and identify themselves in communication with voter. |
| **New Jersey** | N.J. Rev. Stat. § 19:63-3 | No restrictions specified. |
| **New Mexico** | N.M. Stat. Ann. § 1-6-4.3, § 1-6-5 | Third parties may distribute, collect or solicit absentee applications from voters so long as they are submitted within 48 hours of completion. A person who collects applications for mailed ballots and fails to submit them is guilty of a petty misdemeanor. A person who intentionally alters another voter's completed application is guilty of a fourth-degree felony. |
| **New York** | N.Y. Elec. Law § 8-400 | Applications may be requested by a voter's family or household member or an authorized agent. |
| **North Carolina** | N.C. Gen. Stat. § 163-228, § 163-230.1 | Any person or third party can distribute, collect and submit an absentee request on behalf of a voter. |
| **North Dakota** | N.D. Cent. Code § 16.1-07-05, § 16.1-07-07 | No restrictions on who may distribute/collect/solicit applications; although, any mailings require approval from county auditor. |
| **Ohio** | Ohio Rev. Code § 3509.03 | No restrictions specified. |
| **Oklahoma** | 26 Okla. Stat. Ann. § 14-103, § 14-105, § 14-115.1 | Prohibited to deliver an absentee application for another voter unless they are an authorized agent of an incapacitated voter. |
| **Oregon** | | N/A |

JA376

| State | Statute | Third-Party Distribution & Collection Rules |
|---|---|---|
| **Pennsylvania** | 25 P.S. §3146.2 et seq. | No restrictions specified. |
| **Puerto Rico** | 16 L.P.R.A. § 4735 | No restrictions specified. |
| **Rhode Island** | R.I. Gen. Laws §17-20-2.1 | No restrictions specified. |
| **South Carolina** | S.C. Code § 7-15-330 | Only immediate family or an authorized representative may request or submit an application on behalf of a voter; no third-party distribution is allowed. |
| **South Dakota** | S.D. Codified Laws § 12-19-2, §12-19-2.1 | No restrictions specified. |
| **Tennessee** | Tenn. Code Ann. § 2-6-202 | Only one application may be furnished to a voter by the election commission; it is a class E felony to give an application to any person and a class A misdemeanor to give an unsolicited request for application to any person. |
| **Texas** | Tex. Election Code §84.0041, §84.007 | It is a felony to knowingly submit an application for a ballot by mail without the knowledge and authorization of the voter or altering the information provided by the voter on the application. |
| **Utah** | | N/A |
| **Vermont** | | N/A |
| **Virgin Islands** | 18 V.I.C. § 664 | Anyone may deliver an application on the voter's behalf; no restrictions on who may distribute applications. |
| **Virginia** | Va. Code Ann. § 24.2-701 | No restrictions specified. |

JA377

Case 1:26-cv-01114-CJN    Document 55-28    Filed 04/17/26    Page 17 of 18

| State | Statute | Third-Party Distribution & Collection Rules |
|---|---|---|
| **Washington** | | N/A |
| **West Virginia** | W. Va. Code §3-3-5 | Only the voter may apply for an absentee ballot in person. |
| **Wisconsin** | Wis. Stat. § 6.86 | No restrictions specified. |
| **Wyoming** | Wyo. Stat. § 22-9-104 et seq. | A request for a ballot may be made on behalf of a voter by another individual as long as the required information in the application is completed and accurate. Other than an election official, a person may not distribute an unsolicited absentee ballot application form to a qualified elector. |

## Note: This page should be used for general informational purposes only.

Our organization does not run elections and cannot provide legal advice. If you are a voter looking for assistance, please contact your local election official. You can find your local election official's website and contact information by using this database from the US Vote Foundation.

## Related Resources

Updated April 16, 2026

## National Popular Vote

Read about the National Popular Vote compact in this overview of state legislation.

**Elections, Redistricting**

> *Table*

Updated April 16, 2026

## State Voting Rights Acts

The federal Voting Rights Act, originally enacted in 1965 and amended twice since then, outlaws race-based discrimination in voting, protects the voting rights of people with disabilities or limited English proficiency and plays an important role in redistricting. Several states have enacted their own Voting Rights Acts that mirror the federal act in many ways and go into further detail in some cases.

JA378

**Elections**

| Map | Table |

Updated April 14, 2026

# Artificial Intelligence (AI) in Elections and Campaigns

Policy makers and campaigns are having to adapt to the explosion in artificial intelligence (AI). This page covers statutes and legislation that relate to AI in elections and campaigns.

**Elections**

| Table |

# Exhibit 27

Civil Action No. 26-cv-1114 (CJN) (Lead case)

JA380

Case 1:26-cv-01114-CJN    Document 55-29    Filed 04/17/26    Page 2 of 7

**Summary**

# Table 1: States with No-Excuse Absentee Voting

Updated March 10, 2026

**Related Topic:**  **Elections**



### Voting Outside the Polling Place Report

This table is part of NCSL's Voting Outside the Polling Place report.

Twenty-eight states offer "no-excuse" absentee voting, which means that any voter can request and cast an absentee/mail ballot, no excuse or reason necessary.

Eight states and Washington, D.C., conduct elections entirely by mail (California, Colorado, Hawaii, Nevada, Oregon, Utah, Vermont and Washington), which means voters do not need to request a ballot, and instead automatically receive one.

The remaining states require a voter to provide an excuse to qualify for an absentee/mail ballot. See Table 2: Excuses to Vote Absentee for details.

JA381

## No-Excuse Absentee Voting



Excuse required absentee/mail voting

No-excuse absentee/mail voting     All-mail elections

## States with No-Excuse Absentee Voting

| State | Statute | Details |
| --- | --- | --- |

JA382

Case 1:26-cv-01114-CJN     Document 55-29     Filed 04/17/26     Page 4 of 7

| State | Statute | Details |
| --- | --- | --- |
| Alaska | Alaska Stat. § 15.20.010 | No-excuse absentee voting |
| Arizona | Ariz. Rev. Stat. § 16-541 | No-excuse absentee voting |
| California | Cali. Elec Code § 3000.5 | All-mail elections |
| Colorado | Colo. Rev. Stat. §1-5-401 | All-mail elections |
| District of Columbia | D.C. Code § 1–1001.05 | All-mail elections |
| Florida | Flor. Stat. § 101.62 | No-excuse absentee voting |
| Georgia | Georgia Code § 21-2-380 | No-excuse absentee voting |
| Hawaii | Hawaii Stat. §11-101 | All-mail elections |
| Idaho | Idaho Code §34-1001 | No-excuse absentee voting |
| Illinois | 10 ILCS 5/19-1 | No-excuse absentee voting |
| Iowa | Iowa Code § 53.1 | No-excuse absentee voting |
| Kansas | Kan. Stat. Ann.§ 25-1119(a) | No-excuse absentee voting |
| Maine | 21-A ME Rev Stat § 751 | No-excuse absentee voting |
| Maryland | Md. Elec Law §9-304 | No-excuse absentee voting |

JA383

| State | Statute | Details |
|---|---|---|
| Massachusetts | M.G.L.A. 54 § 25B | No-excuse absentee voting |
| Michigan | M.C.L.A. 168.759 | No-excuse absentee voting |
| Minnesota | Minn. Stat. § 203B.02 | No-excuse absentee voting |
| Montana | Mont. Code § 13-13-201 | No-excuse absentee voting |
| Nebraska | Neb. Rev. Stat. Ann. §32-938 | No-excuse absentee voting |
| Nevada | NRS §293 | All-mail elections |
| New Jersey | N.J. Rev. Stat. § 19:63-3 | No-excuse absentee voting |
| New Mexico | N.M. Stat. § 1-6-3 | No-excuse absentee voting |
| New York | N.Y. Election Law § 8-700 | No-excuse absentee voting |
| North Carolina | N.C. Gen Stat § 163-226 | No-excuse absentee voting |
| North Dakota | N.D. Cent. Code § 16.1-07-01 | No-excuse absentee voting |
| Ohio | Ohio Rev Code § 3509.02 | No-excuse absentee voting |
| Oklahoma | 26 OK Stat § 14-105 | No-excuse absentee voting |
| Oregon | Ore. Rev. Stat. §254.465 | All-mail elections |
| Pennsylvania | 25 P.S. § 3150.11 | No-excuse absentee voting |

JA384

Table 1: States with No-Excuse Absentee Voting

| State | Statute | Details |
|-------|---------|---------|
| Rhode Island | R.I. Gen Laws § 17-20-2 | No-excuse absentee voting<br><br>(Rhode Island lists several excuses to vote absentee, but also specifies "No specific reason necessary." Since any Rhode Islander can request an absentee ballot, NCSL has categorized it as no excuse required.) |
| South Dakota | S.D. Cod. Laws § 12-19-1 | No-excuse absentee voting |
| Utah | Utah Code Ann. §20A-3a-302 | All-mail elections |
| Vermont | 17 VSA § 2537a | All-mail elections (general elections only) |
| Virginia | VA Code Ann. § 24.2-700 | No-excuse absentee voting |
| Washington | Rev. Code of Wash. 29A.40.010 | All-mail elections |
| Wisconsin | Wis. Stat. § 6.86 (1)(ac) | No-excuse absentee voting |
| Wyoming | WY Stat § 22-9-102 | No-excuse absentee voting |

# Note: This page should be used for general informational purposes only.

Our organization does not run elections and cannot provide legal advice. If you are a voter looking for assistance, please contact your local election official. You can find your local election official's website and contact information by using this database from the US Vote Foundation.

## Related Resources

Updated April 14, 2026

### Artificial Intelligence (AI) in Elections and Campaigns

Policy makers and campaigns are having to adapt to the explosion in artificial intelligence (AI). This page covers statutes and legislation that relate to AI in elections and campaigns.

JA385

**Elections**

Table

Updated April 13, 2026

# How States Differentiate Presidential Primaries from State Primaries

This webpage shows which states use different types of primaries for presidential elections versus state elections.

**Elections**

Table

Updated April 10, 2026

# Federal Requests for Statewide Voter Lists

The Civil Rights Division of the Department of Justice began sending requests to chief election officials across the country to inspect copies of their statewide voter registration lists in May 2025. Since then they've sued more than half of the states and Washington, D.C. for not providing the lists that include sensitive voter information.

**Elections**

Table

JA386

# Exhibit 28

Civil Action No. 26-cv-1114 (CJN) (Lead case)

JA387

# Table 2: Excuses to Vote Absentee

Updated August 26, 2025

**Related Topic:**    **Elections**



**Voting Outside the Polling Place Report**
This table is part of NCSL's Voting Outside the Polling Place report.

All states, by federal law, are required to send absentee ballots to military and overseas voters for federal elections. See the 1986 Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA).

Aside from military and overseas voters, some states have "no-excuse absentee" voting, which means any voter can request a mail ballot without providing an excuse, and a few send all voters ballots by mail. Fourteen states, Puerto Rico and the Virgin Islands only permit certain voters to request an absentee ballot by mail, based on an "excuse" of why that voter can't make it to the polls on Election Day.

All states permit voters who will be outside of their home county to vote absentee, as well as voters with an illness or disability who know ahead of time that they won't be able to make it to the polls. Many other states allow elderly voters to vote absentee or allow voters to request an absentee ballot in case of an emergency—such as an unforeseen illness, confinement to a medical facility or an accident resulting in injury.

The table below summarizes and compares other acceptable excuses in the states that require one.

Note: This table is meant to summarize the acceptable excuses for states that require an excuse to vote absentee. Since it is comparative, it is not necessarily comprehensive of all excuses in a given state. Visit state election webpages for additional information on each state's requirements.

*ACP stands for Address Confidentiality Program, which protects the information of victims of domestic violence, sexual assault or stalking.

| State | Out of County on Election Day | Illness or Disability | Persons Over a Certain Age | Work Shift is During all Voting Hours | Student Living Outside of County | Election Worker or Poll Worker | Religious Belief or Practice | ACP* Participant | Incarcerated (but Still Qualified to Vote) | Jurors |
|---|---|---|---|---|---|---|---|---|---|---|
| **Alabama** Ala. Code § 17-11-3 | ✓ | ✓ | | ✓ | ✓ | ✓ | | | ✓ | |
| **Arkansas** Ark. Stat. Ann. § 7-5-402 | ✓ | ✓ | | | | | ✓ | | | |
| **Connecticut** Conn. Gen. Stat. § 9-135 | ✓ | ✓ | | | | ✓ | ✓ | | | |
| **Delaware** Del. Code Ann. tit, 15, § 5502 | ✓ | ✓ | | ✓ | | | ✓ | | | |
| **Indiana** Ind. Code §3-11-10-24 | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | | |
| **Kentucky** Ky. Rev. Stat. | ✓ | ✓ | ✓ | | ✓ | | | ✓ | ✓ | |

JA388

| State | Out of County on Election Day | Illness or Disability | Persons Over a Certain Age | Work Shift is During all Voting Hours | Student Living Outside of County | Election Worker or Poll Worker | Religious Belief or Practice | ACP* Participant | Incarcerated (but Still Qualified to Vote) | Jurors |
|---|---|---|---|---|---|---|---|---|---|---|
| §117.085(1)(a), §117.077 | | | | | | | | | | |
| **Louisiana** La. Rev. Stat. Ann. § 18:1303 | ✓ | ✓ | 65-plus | | ✓ | ✓ | | ✓ | ✓ | ✓ |
| **Mississippi** Miss. Code Ann. § 23-15-715 | ✓ | ✓ | 65-plus | | | | | | | |
| **Missouri** Mo Rev. Stat. § 115.277 | ✓ | ✓ | | | | ✓ | ✓ | ✓ | ✓ | |
| **New Hampshire** N.H. Rev. Stat. Ann. § 657:1 | ✓ | ✓ | | ✓ | | | ✓ | | | |
| **Puerto Rico** P.R. Code Ann. tit, 16-§ 9.34.- | ✓ | ✓ | | ✓ | ✓ | | | | ✓ | |
| **South Carolina** S.C. Code Ann. § 7-15-320 | ✓ | ✓ | 65-plus | ✓ | | | | | ✓ | |
| **Tennessee** Tenn. Code-Ann. § 2-6-201 | ✓ | ✓ | 60-plus | ✓ | ✓ | ✓ | ✓ | | | ✓ |
| **Texas** Tax Election Code Ann. § 82.001 et seq. | ✓ | ✓ | 65-plus | | | | | ✓ | ✓ | |
| **Virgin Islands** V.I. Code Ann. tit. 18 § 661 | ✓ | ✓ | | | ✓ | | ✓ | | ✓ | |
| **West Virginia** | ✓ | ✓ | "Advanced Age" | ✓ | ✓ | | | ✓ | ✓ | |

JA389

| State | Out of County on Election Day | Illness or Disability | Persons Over a Certain Age | Work Shift is During all Voting Hours | Student Living Outside of County | Election Worker or Poll Worker | Religious Belief or Practice | ACP* Participant | Incarcerated (but Still Qualified to Vote) | Jurors |
|---|---|---|---|---|---|---|---|---|---|---|
| W. Va. Code, § 3-3-1 | | | | | | | | | | |

## Note: This page should be used for general informational purposes only.

Our organization does not run elections and cannot provide legal advice. If you are a voter looking for assistance, please contact your local election official. You can find your local election official's website and contact information by using this database from the US Vote Foundation.

## Related Resources

Updated April 14, 2026

### Artificial Intelligence (AI) in Elections and Campaigns

Policy makers and campaigns are having to adapt to the explosion in artificial intelligence (AI). This page covers statutes and legislation that relate to AI in elections and campaigns.

**Elections**

Table

Updated April 13, 2026

### How States Differentiate Presidential Primaries from State Primaries

This webpage shows which states use different types of primaries for presidential elections versus state elections.

**Elections**

Table

Updated April 10, 2026

### Federal Requests for Statewide Voter Lists

The Civil Rights Division of the Department of Justice began sending requests to chief election officials across the country to inspect copies of their statewide voter registration lists in May 2025. Since then they've sued more than half of the states and Washington, D.C. for not providing the lists that include sensitive voter information.

**Elections**

Table

JA390

# Exhibit 29

Civil Action No. 26-cv-1114 (CJN) (Lead case)

# Election Administration and Voting Survey 2024 Comprehensive Report

A Report from the U.S. Election Assistance Commission to the 119th Congress



JA392

## Appendix A: Descriptive Tables

### Executive Summary Table 1: 2024 EAVS at a Glance

| State | Total EAVS Jurisdictions | Total Active Registered Voters | Total CVAP | Total Voter Turnout | Turnout as % of Active Reg. | Turnout as % of CVAP |
|---|---|---|---|---|---|---|
| Alabama | 67 | 3,466,606 | 3,871,866 | 2,272,911 | 65.6% | 58.7% |
| Alaska [1] | 1 | 565,242 | 540,681 | 340,981 | 60.3% | 63.1% |
| American Samoa [2] | 1 | 15,948 | -- | 10,215 | 64.1% | -- |
| Arizona [3] | 15 | 4,366,786 | 5,384,019 | 3,477,975 | 79.6% | 64.6% |
| Arkansas | 75 | 1,359,659 | 2,270,663 | 1,122,278 | 82.5% | 49.4% |
| California | 58 | 22,836,602 | 26,042,367 | 16,164,330 | 70.8% | 62.1% |
| Colorado | 64 | 4,074,612 | 4,390,366 | 3,240,754 | 79.5% | 73.8% |
| Connecticut [4] | 169 | 2,292,818 | 2,660,107 | 1,820,891 | 79.4% | 68.5% |
| Delaware | 3 | 742,370 | 770,737 | 514,367 | 69.3% | 66.7% |
| District of Columbia | 1 | 469,969 | 508,689 | 328,871 | 70.0% | 64.7% |
| Florida [5] | 67 | 14,028,831 | 16,313,597 | 10,999,125 | 78.4% | 67.4% |
| Georgia | 159 | 7,174,961 | 7,917,054 | 5,297,500 | 73.8% | 66.9% |
| Guam | 1 | 62,098 | -- | 30,283 | 48.8% | -- |
| Hawaii | 5 | 765,998 | 1,053,254 | 522,236 | 68.2% | 49.6% |
| Idaho [6] | 44 | 1,178,750 | 1,445,124 | 917,469 | 77.8% | 63.5% |
| Illinois [7] | 108 | 8,104,485 | 9,036,650 | 5,717,147 | 70.5% | 63.3% |
| Indiana | 92 | 4,288,091 | 5,058,179 | 2,986,839 | 69.7% | 59.0% |
| Iowa | 99 | 2,016,967 | 2,387,401 | 1,674,011 | 83.0% | 70.1% |
| Kansas | 105 | 1,871,857 | 2,146,714 | 1,342,102 | 71.7% | 62.5% |
| Kentucky | 120 | 3,219,361 | 3,414,611 | 2,086,090 | 64.8% | 61.1% |
| Louisiana [8] | 64 | 2,734,059 | 3,398,688 | 2,021,588 | 73.9% | 59.5% |
| Maine [9] | 497 | 1,041,826 | 1,126,987 | 842,447 | 80.9% | 74.8% |
| Maryland | 24 | 4,231,112 | 4,411,478 | 3,028,813 | 71.6% | 68.7% |
| Massachusetts | 351 | 4,369,280 | 5,136,750 | 3,512,930 | 80.4% | 68.4% |
| Michigan [10] | 83 | 7,267,666 | 7,646,222 | 5,706,503 | 78.5% | 74.6% |
| Minnesota | 87 | 3,853,668 | 4,258,921 | 3,271,069 | 84.9% | 76.8% |
| Mississippi [11] | 82 | 1,965,948 | 2,222,109 | 1,225,176 | 62.3% | 55.1% |
| Missouri | 116 | 4,075,977 | 4,698,865 | 3,126,837 | 76.7% | 66.5% |
| Montana [12] | 56 | 691,534 | 888,190 | 612,423 | 88.6% | 69.0% |
| Nebraska [13] | 93 | 1,190,813 | 1,420,996 | 965,145 | 81.0% | 67.9% |

★ ★ ★    vi

JA393

| State | Total EAVS Jurisdictions | Total Active Registered Voters | Total CVAP | Total Voter Turnout | Turnout as % of Active Reg. | Turnout as % of CVAP |
|---|---|---|---|---|---|---|
| Nevada | 17 | 2,052,976 | 2,243,354 | 1,486,297 | 72.4% | 66.3% |
| New Hampshire [14] | 320 | 1,008,603 | 1,117,113 | 829,090 | 82.2% | 74.2% |
| New Jersey [15] | 21 | 6,066,940 | 6,397,695 | 4,321,921 | 71.2% | 67.6% |
| New Mexico | 33 | 1,254,851 | 1,552,694 | 927,923 | 73.9% | 59.8% |
| New York | 62 | 12,429,981 | 13,945,400 | 8,389,626 | 67.5% | 60.2% |
| North Carolina [16] | 100 | 6,986,365 | 8,017,902 | 5,756,106 | 82.4% | 71.8% |
| North Dakota | 53 | -- | 589,860 | 371,974 | -- | 63.1% |
| Northern Mariana Islands | 1 | 19,329 | -- | 12,610 | 65.2% | -- |
| Ohio | 88 | 7,054,966 | 8,948,378 | 5,851,625 | 82.9% | 65.4% |
| Oklahoma | 77 | 2,095,952 | 2,953,778 | 1,573,274 | 75.1% | 53.3% |
| Oregon [17] | 36 | 3,060,374 | 3,212,722 | 2,269,608 | 74.2% | 70.6% |
| Pennsylvania [18] | 67 | 8,407,874 | 9,930,217 | 7,074,875 | 84.1% | 71.2% |
| Puerto Rico [19] | 1 | 1,987,317 | 2,670,201 | 1,283,628 | 64.6% | 48.1% |
| Rhode Island | 39 | 734,885 | 824,795 | 522,164 | 71.1% | 63.3% |
| South Carolina | 46 | 3,417,493 | 4,065,128 | 2,566,404 | 75.1% | 63.1% |
| South Dakota | 66 | 627,248 | 683,617 | 435,739 | 69.5% | 63.7% |
| Tennessee | 95 | 4,458,851 | 5,329,651 | 3,090,161 | 69.3% | 58.0% |
| Texas | 254 | 16,611,078 | 20,149,798 | 11,488,820 | 69.2% | 57.0% |
| U.S. Virgin Islands | 1 | 31,171 | -- | 15,952 | 51.2% | -- |
| Utah | 29 | 1,793,182 | 2,327,211 | 1,466,896 | 81.8% | 63.0% |
| Vermont [20] | 247 | 460,415 | 523,322 | 361,604 | 78.5% | 69.1% |
| Virginia | 133 | 5,898,922 | 6,397,071 | 4,511,853 | 76.5% | 70.5% |
| Washington [21] | 39 | 5,013,112 | 5,604,117 | 3,949,810 | 78.8% | 70.5% |
| West Virginia | 55 | 1,118,468 | 1,404,377 | 769,206 | 68.8% | 54.8% |
| Wisconsin [22] | 1,851 | 3,933,068 | 4,518,555 | 3,434,185 | 87.3% | 76.0% |
| Wyoming [23] | 23 | 296,960 | 442,989 | 271,123 | 91.3% | 61.2% |
| U.S. Total | 6,461 | 211,144,275 | 244,271,230 | 158,211,780 | 74.8% | 64.7% |

 

JA394

| State | Total In-Person Election Day Ballots Cast and Counted | Total Mail Ballots Cast and Counted (Excluding UOCAVA) | Total In-Person Early Ballots Cast and Counted | Total Polling Places | Total Poll Workers |
|---|---|---|---|---|---|
| Alabama | -- | 126,055 | -- | 2,010 | 7,835 |
| Alaska [1] | 175,541 | 48,744 | 92,281 | 524 | 2,979 |
| American Samoa [2] | 9,035 | 189 | 991 | 41 | 300 |
| Arizona [3] | 496,753 | 2,597,974 | 349,129 | 781 | 7,642 |
| Arkansas | 294,235 | 23,843 | 810,714 | 1,030 | 5,720 |
| California | 1,836,518 | 13,062,318 | 878,489 | 3,818 | 41,643 |
| Colorado | 141,556 | 2,957,550 | 109,209 | 366 | 7,587 |
| Connecticut [4] | -- | 118,362 | 715,275 | 739 | 3,590 |
| Delaware | 268,718 | 33,659 | 210,295 | 282 | 3,797 |
| District of Columbia | 82,396 | 168,111 | 72,914 | 75 | 1,367 |
| Florida [5] | 2,596,761 | 2,945,893 | 5,364,821 | 4,162 | 46,833 |
| Georgia | 1,239,125 | 268,751 | 3,768,395 | 2,658 | 18,580 |
| Guam | 24,291 | 104 | 5,774 | 22 | 360 |
| Hawaii | 0 | 483,078 | 39,158 | 13 | 301 |
| Idaho [6] | 508,734 | 179,777 | 225,973 | 856 | 6,140 |
| Illinois [7] | 2,666,185 | 1,016,208 | 2,001,203 | 5,213 | 41,042 |
| Indiana | 1,372,508 | 1,603,815 | 1,397,345 | 1,654 | 16,957 |
| Iowa | -- | -- | -- | 1,663 | -- |
| Kansas | 604,319 | 147,276 | 557,906 | 1,177 | 9,468 |
| Kentucky | 1,267,653 | 116,324 | 687,057 | 1,580 | 12,641 |
| Louisiana [8] | 1,047,445 | 119,694 | 849,784 | 2,032 | 16,580 |
| Maine [9] | 463,500 | 215,242 | 157,116 | 514 | 6,253 |
| Maryland | 1,145,134 | 744,244 | 974,945 | 1,991 | 22,986 |
| Massachusetts | 1,713,191 | 1,173,112 | 600,225 | 1,634 | 9,556 |
| Michigan [10] | 2,453,252 | 2,017,704 | 1,214,409 | 5,169 | 45,363 |
| Minnesota | 1,960,360 | 446,576 | 850,705 | 2,685 | 34,886 |
| Mississippi [11] | 1,010,752 | -- | -- | 1,746 | -- |
| Missouri | 2,067,247 | 178,526 | 867,936 | 2,240 | 18,740 |
| Montana [12] | -- | -- | -- | 411 | 4,422 |
| Nebraska [13] | 564,660 | 307,135 | 80,304 | 1,083 | 7,951 |
| Nevada | 247,291 | 656,140 | 543,461 | 288 | 3,904 |

★ ★ ★  viii

JA395

| State | Total In-Person Election Day Ballots Cast and Counted | Total Mail Ballots Cast and Counted (Excluding UOCAVA) | Total In-Person Early Ballots Cast and Counted | Total Polling Places | Total Poll Workers |
|---|---|---|---|---|---|
| New Hampshire [14] | 730,273 | 92,945 | 0 | 307 | -- |
| New Jersey [15] | -- | 828,200 | -- | 4,620 | 13,242 |
| New Mexico | 252,629 | 111,527 | 556,395 | 668 | 4,221 |
| New York | 4,320,467 | 836,987 | 2,986,704 | 5,197 | 102,259 |
| North Carolina [16] | 1,175,905 | 298,269 | 4,224,909 | 3,360 | 28,374 |
| North Dakota | 181,998 | 89,429 | 99,007 | 172 | -- |
| Northern Mariana Islands | 5,571 | 915 | 6,124 | 13 | 96 |
| Ohio | 3,130,240 | 1,060,236 | 1,536,604 | 3,267 | 40,084 |
| Oklahoma | 1,174,876 | 98,548 | 294,037 | 2,067 | 7,269 |
| Oregon [17] | -- | 2,253,114 | -- | 36 | -- |
| Pennsylvania [18] | 5,043,808 | 1,933,707 | -- | 7,752 | 46,172 |
| Puerto Rico [19] | 1,071,954 | 132,157 | 4,004 | 1,337 | -- |
| Rhode Island | 290,699 | 51,995 | 173,547 | 430 | 3,709 |
| South Carolina | 977,341 | 98,782 | 1,476,843 | 2,088 | 18,122 |
| South Dakota | 273,648 | 159,335 | 0 | 493 | 2,697 |
| Tennessee | 856,491 | 86,904 | 2,132,535 | 1,889 | 16,750 |
| Texas | 2,329,171 | 384,221 | 8,703,181 | 6,135 | 42,324 |
| U.S. Virgin Islands | 6,832 | 613 | 8,506 | 11 | 140 |
| Utah | 104,350 | 1,341,595 | 36,381 | 114 | 1,110 |
| Vermont [20] | 122,386 | 234,038 | 2,631 | 262 | -- |
| Virginia | 2,053,905 | 474,332 | 1,840,239 | 2,673 | 29,760 |
| Washington [21] | -- | 3,890,945 | 171 | 67 | -- |
| West Virginia | 431,925 | 22,377 | 310,305 | 1,486 | 8,602 |
| Wisconsin [22] | 1,870,285 | 570,657 | 977,648 | 2,696 | -- |
| Wyoming [23] | 154,579 | 38,217 | 76,943 | 218 | 2,079 |
| U.S. Total | 52,816,493 | 46,846,449 | 48,872,528 | 95,815 | 772,433 |

**Executive Summary Table 1 Calculation Notes:**

Total EAVS Jurisdictions uses a count of Federal Information Processing Standards (FIPS) code by state.
Total Active Registered Voters uses question A1b.



Total CVAP uses the 2023 one-year estimate of the CVAP from the U.S. Census Bureau.

Total Voter Turnout uses question F1a.

Turnout as % of Active Registration uses F1a/A1b x 100.

Turnout as % of CVAP uses F1a/CVAP x 100.

Total In-Person Election Day Ballots Cast and Counted uses question F1b.

Total Mail Ballots Cast and Counted (Excluding UOCAVA) uses the sum of questions F1d and F1g.

Total In-Person Ballots Cast Before Election Day and Counted uses question F1f.

Total Polling Places uses question D2a.

Total Poll Workers uses question D7a.

**Executive Summary Table 1 Data Notes:**

General Notes:

- Casewise deletion at the state level was used in calculating national percentages. The percentage calculations at the national level (U.S. Total) only used data from those states that provided data for the numerator and denominator of the calculation. For example, since there was no CVAP estimate for most U.S. territories, their turnout data (F1a) were not used for the calculation of "Turnout as % of CVAP" at the national level.
- Items that are displayed as a dash (--) indicate that all jurisdictions within the state responded "Data Not Available," "Does Not Apply," or "Valid Skip" to the EAVS item(s) used in the calculation or left the item(s) blank.
- The percentages shown in this table are rounded to one decimal place. Percentages that round to less than 0.1% are displayed as 0.0%.
- The CVAP is an estimate of the number of U.S. citizens 18 years of age or older in the state. This report used the one-year American Community Survey (ACS) state estimate for 2023 instead of the five-year estimate to ensure the CVAP was as current as possible. The estimate for the year 2024 was unavailable by the time this report was finalized. Some states may have reported more active registered voters than CVAP because the 2023 CVAP is being compared to 2024 data.
- The Total Voter Turnout column includes voters who cast a ballot that was counted.

[1]  F1d includes ballots sent by electronic transmission (fax and online delivery).

[2]  Some UOCAVA voters are also mail ballot voters.

[3]  Mohave County noted that the total number reported in the official election canvass could differ from the voting history reports within the voter registration database because the system was live during the entirety of the voting period. This means voters who cast a ballot in the election and who were eligible to vote in Mohave County at the time the ballot was cast, moved from the county, or became ineligible after the ballot was tabulated. This reflects the discrepancy of ballots tabulated versus voters who received voting credit.

[4]  In some jurisdictions, the totals for F1 exceed the totals for A1 because the source in A1 does not account for same day registration.

[5]  Responses reflect data submitted by each respective county election official.

[6]  Idaho does not have inactive voters.

[7]  Data provided come from 108 different election authorities and not from a single source. Data might not provide a completely accurate picture because there are different available data within each election authority.

[8]  The total reported in F1 includes voters who were given credit for voting but whose ballots may have been blank or otherwise invalidated after acceptance.

[9]  Provisional ballots are not counted separately from other ballots. Provisional ballot totals are reflected in F1b, F1d, or F1f as applicable.

★ ★ ★   x

JA397

[10] Voters reported in A1 are eligible to vote. Those defined as "inactive" need only to confirm their address before receiving a ballot. Participation in past elections is not a factor in defining eligibility.

[11] The number of absentee ballots (in-person and mail-in) is calculated together and cannot be separated.

[12] The total number of registered/eligible voters consists of active and inactive voters. Montana reports a total registered/eligible voters of 800,573. The difference between this number and what is reported in EAVS is provisional and pending voters. The reported number of ballots counted is from the state canvass report. Data in F1b-F1g cannot be provided because some ballots marked for counting in the system were not actually counted due to issues with the ballot.

[13] Nebraska does not have "inactive" voters. Nineteen counties in Nebraska are entirely vote by mail and some precincts are also vote by mail.

[14] The information provided is based on the local officials' entries into the state voter registration system as of March 27, 2025. These numbers may continue to fluctuate as cities and towns add additional entries or make corrections.

[15] F1a is taken from statewide certified results. These results do not break down the ballots cast by Election Day (F1b) and early voting (F1f) ballots cast.

[16] The results of this survey include point-in-time data from multiple datasets and log files and thus may differ slightly from other publicly posted datasets. UOCAVA ballots are reported with mail ballots.

[17] Oregon does not track the number of inactive voters. The data reported in F1 include ballots returned and accepted for counting.

[18] The Pennsylvania Department of State cannot provide a number for F1f because in-person return of mail ballots is not explicitly tracked in the voter registration system.

[19] In Puerto Rico, voters classified as inactive must first reactivate their voter status before being allowed to cast a ballot. This process requires the voter to verify their address and update their registration information with the Puerto Rico State Election Commission (Comisión Estatal de Elecciones [CEE]). Depending on the circumstances, reactivation may involve completing a specific form or providing a document that confirms their residence. Once their status is updated, the voter is allowed to vote in their assigned precinct without restrictions. This process differs from the classification under the NVRA in the United States, which refers to voters who are still eligible but require address verification before voting. For the 2024 elections in Puerto Rico, the voter registration deadline was September 21, 2024. Any voter who did not update their registration before this date would remain classified under their previous status until the next registration period.

[20] Some jurisdictions may have entered incorrect or incomplete data; therefore, some calculations and datasets may be misconstrued. We have updated the data as best we can.

[21] Washington remains a vote-by-mail state where voters can register and vote on or before Election Day. The total reported in F1g, which includes voters who cast a mailed ballot in jurisdictions that conduct elections entirely by mail, also accounts for in-person voters who were issued a mailed ballot packet at a voting center and could deposit it in a ballot drop box or return it by mail. Additionally, the total reported in F1f, representing voters who cast a ballot at an in-person early voting location and whose ballots were counted, includes those who used a disability access unit.

[22] The number of jurisdictions in Wisconsin changed over the two-year period covered by the 2022 EAVS due to incorporations, mergers, and similar mechanisms. Wisconsin is not subject to the NVRA and does not have inactive registered voters. The reported registration totals include military voters, even though they are not required to "register" in Wisconsin because they still have a voter record created. Wisconsin is not a vote-by-mail state but does allow voters to request that an absentee ballot be mailed to them. Poll worker data are no longer tracked by the state. Wisconsin canvass-required data track individual contests, and therefore, the total ballots cast in any election is highly unlikely to match the total votes cast in any one contest. Wisconsin voters are not required to vote in each contest on the ballot and undervotes are the likely cause of data on the total ballots cast being higher than the number of votes in a contest. Some data in Sections A-E will not match with their equivalent in Section F for the following reasons: In cases where two voter records for the same voter are



**xi** | Executive Summary

merged together, the election participation record moves with the merge; however, the absentee ballot record does not, the system does not see them as being associated with the same voter. Or, because in Wisconsin, provisional ballot data have to be recorded into the database on election night, voters who register on Election Day are usually not entered into the database until after Election Day, and these two records cannot be linked in our database, since voter records may be created after Election Day, and are therefore not always connected to their provisional ballot record.

[23] In Wyoming, voters designated as "inactive" are not considered registered and eligible voters. They may be eligible upon re-registration or may be inactive due to becoming ineligible (e.g. felony, moved out of state).

★ ★ ★  **xii**

JA399

# Exhibit 30

Civil Action No. 26-cv-1114 (CJN) (Lead case)

JA400


**MIT ELECTION DATA + SCIENCE LAB**

# Voting by mail and absentee voting

Americans have traditionally voted in neighborhood polling places, but since the 1980s, many states have eased rules on issuing absentee ballots, allowed voters to cast ballots in person before Election Day, or even begun mailing ballots to all voters.

The movement to vote by mail reached new levels with the 2020 elections and the COVID-19 pandemic, and although it subsequently declined by more than 10 points in 2022, 32 percent of voters chose to cast their ballots this way in that election.

*This explainer was last updated on February 28, 2024.*

### INTRODUCTION

Absentee voting and balloting by mail have generally been viewed as synonymous in the United States because historically, absentee ballots were distributed by mail to voters temporarily away from their homes, and typically no one else was allowed to use this mode of voting. For this reason, both topics are considered together in this explainer. The figure below shows the percentage of voters who cast their ballots since 1996 by each of the three major modes of voting—in person on Election Day, in person before Election Day, and by mail/absentee. The statistics are based on self-reports by respondents to the Voting and Registration Supplement of the Current Population Survey (CPS). (The data for 2020 are based on responses to the Survey of the Performance of American Elections.)

JA401

Ballots cast over time, by mode



Source: Voting and Registration Supplement of the Current Popula

*A line graph showing the trends of method of voting from 1996 to 2022. The x-axis is the year and the y-axis is the percentage of the electorate. Blue corresponds to vote by mail, orange corresponds to voting in-person before Election Day, and yellow corresponds to voting in-person on Election Day.*

JA402

The rise in voting by mail (VBM) raises several important academic and policy issues. Do generous vote-by-mail policies increase turnout? Does an increased rate of voting by mail decrease civic engagement, or decrease the impact of an "October surprise," that is, an event at the end of a political campaign intended to affect the outcome? How does the process of counting votes cast by mail impact when we know the winners of an election?

## HISTORY AND EXPANSION

The idea that ballots could be cast anywhere other than a physical precinct close to a voter's home hasn't always been embraced in the United States (and still isn't in many other countries). What we in the U.S. now call absentee voting <u>first arose</u> during the Civil War, when Union and Confederate soldiers were allowed to cast ballots from their battlefield units and have them be counted back home.

The issue of absentee voting next became a major issue during World War II, when Congress passed laws in 1942 and 1944 related to soldiers stationed overseas. Both laws became embroiled in controversies over states' rights and the voting rights of African Americans in southern states, so their effectiveness was muted. Subsequent laws, particularly the Uniformed and Overseas Citizens Absentee Voting Act (<u>UOCAVA</u>) and the Military and Overseas Voter Empowerment (<u>MOVE</u>) Act, have been more effective in encouraging voting by active service members through absentee voting.

States began passing absentee ballot laws for civilians in the late 1800s. The first laws were intended to accommodate voters who were away from home or seriously ill on Election Day. The number of absentee ballots distributed was relatively small, and the administrative apparatus was not designed to distribute a significant number.

JA403



In the 1980s, California became the first state to allow eligible voters to request absentee ballots for any reason at all, including their convenience. By 2023, 28 states and the District of Columbia adopted no-excuse absentee laws. The figure below classifies states according to their absentee/mail ballot regimes. According to data in the 2022 Election Administration and Voting Survey (EAVS), an average of 23.3% of voters in no-excuse states cast their ballots by mail, compared to an average of 5.4% in states that still required an excuse.

Absentee ballot regimes in the U.S.



Source: National Conferen

A map of the United States showing the distribution of absentee ballot regimes for each state. Orange indicates all-mail states, blue indicates states where an excuse is required to vote by mail, and pink indicates states where no excuse is required.

JA405

Ever since California instituted no-excuse absentee voting, twenty-eight states have taken the next step and allowed all residents to request an absentee ballot for every election. These permanent absentee states now have even greater use of absentee ballots. In 2022, the Survey of the Performance of American Elections (SPAE) reported that over 85% of voters in Washington, Oregon, Colorado, Hawaii, and Utah (all states with permanent absentee laws) voted with an absentee ballot.

The next wave in the expansion of voting by mail occurred during the 2020 election season, in which many states temporarily altered their absentee/mail ballot laws to grant greater access to mail balloting during the COVID-19 pandemic. The result was a significant increase in voting by mail for 2020, reflected clearly in the first figure above.

## VBM: THE OREGON SYSTEM

In a referendum that passed in 1998, Oregon went a step further than California by agreeing to issue all its ballots by mail. Washington followed suit in 2011, and Colorado in 2013.  More recently, these states were joined by Hawaii and Utah, which passed laws to begin voting by mail permanently with the 2020 election. While they have not made the complete switch to an all-vote-by-mail system, California, D.C., Nevada, New Jersey, and Vermont mailed ballots to all voters in 2020, as a COVID-related adaptation. (In the same year, Montana allowed counties to decide whether to mail ballots to all registered voters in their county.)

It's important to note that although Colorado, Oregon, Washington, Hawaii, and Utah now distribute all their ballots by mail, voters do not *return* them all by mail. According to responses to the 2022 SPAE, 21% of mail ballots were returned to some physical location such as a **drop box** or local election office. Thus, it's more accurate to describe these states as "distribute ballots by mail" states.

JA406

**ADMINISTRATIVE ISSUES**

The expanding opportunities to cast an absentee ballot or to vote by mail have not been uncontroversial. Perhaps the most important issues have been the question of whether expanding VBM opportunities increases voter turnout, and concerns over electoral integrity.

Facilitating VBM presumably reduces the costs of voting for most citizens, so one would expect it to increase turnout, yet the scientific literature on this empirical question about turnout has been mixed. An early study of the effects of VBM on turnout in Oregon argued that its implementation had caused turnout to increase by 10%. However, subsequent research has had difficulty replicating these initial findings. More recent research, using a variety of quasi-experimental methods, suggests the causal effect of VBM in these states in presidential election years is around 2 percentage points, although it may be as high as 8 points in Colorado.

The safest conclusion to draw is that extending VBM options increases turnout modestly in midterm and presidential elections but may increase turnout more in primaries, local elections, and special elections. This modest increase likely comes in two ways: by bringing marginal voters into the electorate and by retaining voters who might otherwise drop out of the electorate.

Another question surrounding VBM is whether it increases voter fraud. Two major features of VBM raise these concerns. First, the ballot is cast outside the public eye, and thus the opportunities for coercion and voter impersonation are greater. Second, the transmission path for VBM ballots is not as secure as traditional in-person ballots. These security concerns relate both to ballots being intercepted and ballots being requested without the voter's permission.

As with all forms of voter fraud, documented instances of fraud related to VBM are rare. However, even many scholars who argue that fraud is generally rare agree that fraud with VBM voting seems to be more frequent than with in-person voting. Two of the best-known cases of voter fraud involving absentee voting occurred in 1997 in Georgia and Miami. More recently, a political campaign manager

JA407

within North Carolina's ninth Congressional district defrauded voters by collecting unfilled ballots and then filling in the rest of it to favor the campaign's candidate, leading to a new election.

Finally, skeptics of convenience voting methods such as VBM argue that they encourage voters to cast their ballots before all the information from the campaign is revealed, thus putting early voters at a civic disadvantage. In response, as more voters cast early ballots by mail or in person, campaigns have less incentive to hold onto negative information about their opponents in the hope of gaining an advantage through an October surprise. Empirically, it's important to note that the earliest voters tend to be the strongest partisans and, thus less likely to be swayed by last-minute information.

## SUGGESTED READINGS

Absher, Samuel, and Jennifer Kavanagh. 2023. *The Impact of State Voting Processes in the 2020 Election: Estimating the Effects on Voter Turnout, Voting Method, and the Spread of COVID-19*. RAND Corporation. https://www.rand.org/pubs/research_reports/RRA112-25.html (August 1, 2023).

Altamirano, Jose, and Tova Wang. 2022. *Ensuring All Votes Count: Reducing Rejected Ballots*. Harvard University: Ash Center for Democratic Governance and Innovation.

Atkeson, Lonna Rae et al. 2022. "Should I Vote-by-Mail or in Person? The Impact of COVID-19 Risk Factors and Partisanship on Vote Mode Decisions in the 2020 Presidential Election" ed. Noam Lupu. *PLOS ONE* 17(9): e0274357.

Berinsky, Adam J., Nancy Burns, and Michael W. Traugott. 2001. "Who Votes by Mail?: A Dynamic Model of the Individual-Level Consequences of Voting-by-Mail Systems." *Public Opinion Quarterly* 65 (2): 178–197.

Cottrell, David, Michael C. Herron, and Daniel A. Smith. 2021. "Vote-by-Mail Ballot Rejection and Experience with Mail-in Voting." *American Politics Research*: 1532673X211022626.

———. 2023. *Election Administration and Voting Survey 2022 Comprehensive Report*. https://www.eac.gov/sites/default/files/2023-06/2022_EAVS_Report_508c.pdf (July 6, 2023).

Gronke, Paul, Eva Galenes-Rosenbaum, Peter A. Miller, and Daniel Toffey. 2008. "Convenience Voting." *Annual Review of Political Science* 11*:* 437–455.

Gronke, Paul, and Peter Miller. 2012. "Voting by Mail and Turnout in Oregon: Revisiting Southwell and Burchett." *American Politics Research* 40 (6): 976–997.

Inbody, Donald S. 2016. *The Soldier Vote: War, Politics, and the Ballot in America.* New York: Palgrave Macmillan.

Keyssar, Alexander. 2006. *The Right to Vote: The Contested History of Democracy in the United States.* New York: Basic Books.

McDonald, Michael P, Juliana K Mucci, Enrijeta Shino, and Daniel A Smith. 2022. "Mail Voting and Voter Turnout."

National Conference of State Legislatures | Voting Outside the Polling Place: Absentee, All-Mail, and Other Voting at Home Options

National Vote at Home Institute | Research Center

Ritter, Michael. 2023. "Assessing the Impact of the United States Postal System and Election Administration on Absentee and Mail Voting in the 2012 to 2020 U.S. Midterm and Presidential Elections." *Election Law Journal: Rules, Politics, and Policy* 22(2): 166–84.

Southwell. Priscilla L.,  and Justin I. Burchett. "The Effect of All-mail Elections on Voter Turnout." *American Politics Quarterly* 28 (1): 72–79.

Thompson, Daniel M., Jennifer A. Wu, Jesse Yoder, and Andrew B. Hall. "Universal Vote-by-Mail Has No Impact on Partisan Turnout or Vote Share." *PNAS* 117(25).

U.S. Vote Foundation | Election Dates & Deadlines

Vote.org | Voting Information

# Exhibit 31

Civil Action No. 26-cv-1114 (CJN) (Lead case)



# MIT ELECTION DATA + SCIENCE LAB

# HOW WE VOTED IN 2024

## A TOPICAL LOOK AT THE SURVEY OF THE PERFORMANCE OF AMERICAN ELECTIONS

Charles Stewart III

## ACKNOWLEDGMENTS

Charles Stewart III is the Kenan Sahin Distinguished Professor of Political Science and the Director of the MIT Election Data and Science Lab.

Mason Reece and Ning Soong provided invaluable assistance in preparing this report.

## ABOUT THIS REPORT

The findings, interpretations, and conclusions expressed in this report do not necessarily represent the views or opinions of the Massachusetts Institute of Technology or other organizations or individuals who provided advice for the 2024 survey or report.

The MIT Election Data & Science Lab encourages dissemination of knowledge and research; this report may be reproduced in whole or in part for non-commercial or educational purposes so long as full attribution to its authors is given.

JA412

# EXECUTIVE SUMMARY

The Survey of the Performance of American Elections (SPAE) provides information about how Americans experience voting in the most recent federal election. Conducted in every presidential election since 2008, the SPAE is the only national survey of election administration that focuses on the voting process and offers insights into the performance of elections in the individual states.

In 2024, a total of 10,200 registered voters participated in the survey conducted by YouGov, with 200 responses collected from each state as well as the District of Columbia. The study received financial support from the Election Trust Initiative.

Among the findings discussed in this report are the following:

## VOTING BY MAIL

» The use of mail ballots in 2024 decreased from pandemic-era levels but stayed above historical norms.
  » The percentage of voters casting ballots by mail decreased to 29%, down from 43% in 2020 but up from 21% in 2016.

» The partisan divide in mail voting continued, with more Democrats than Republicans utilizing this method, although the gap narrowed because of declining usage among Democrats.
  » Thirty-seven percent of Democrats reported voting by mail, compared to 24% of Republicans. This is a decrease from 60% for Democrats and 32% for Republicans in 2020.

» Patterns of ballot returns continued to evolve, with drop box usage rebounding and Postal Service usage decreasing modestly.
  » The use of mail to return ballots mailed to voters rebounded in 2022 to 62%, compared to 53% in 2020. Twenty-one percent of mail ballots were returned to drop boxes, which remains virtually unchanged from 2020.

» Very few mail-in voters reported issues with requesting or completing their ballots.

» Nearly three percent of voters who returned their ballots at a drop box reported witnessing something disruptive, such as demonstrators, during the drop-off process.

## VOTING IN-PERSON

» The percentage of voters casting ballots on Election Day increased to 40%, up from 31% in 2020 but down from 60% in 2016. Meanwhile, the percentage of voters casting ballots during early voting saw a slight uptick compared to 2020, rising to 31% from 26%.

» Most in-person voters noted a smooth process.
  » Over 98% reported no issues with registration or equipment.
  » The percentage of voters who reported that it was very easy to find their polling place on Election Day declined to 77%, down from 87% in 2020. Comparable statistics for early voting were 85% and 84%.

» In-person voting at schools has gradually declined over the past decade, and they are no longer the most common sites for Election Day voting.
  » The percentage of Election Day voters casting a ballot at a school decreased to 22%, down from 28% in 2020. In contrast, the percentage of those voting at a community center increased to 32%, up from 21% in 2020.

» Average wait times for both Election Day and early voters decreased.
  » Eleven percent of voters on Election Day waited over 30 minutes to cast their ballots, compared to 14% in 2020. Fifteen percent of early voters experienced wait times exceeding 30 minutes, a decrease from 21% in 2020.

» The percentage of voters reporting that they showed a photo ID to vote increased since 2016 (when the question was last asked), and more voters reported having a driver's license than before.
  » In 2024, 85% of individuals who voted in person showed identification, an increase from 75% in 2016.
  » The most common form of ID presented was the driver's license or state ID card

JA413

(66% of Election Day voters, 85% of early voters), followed by voter registration cards (30% of Election Day voters and 11% of early voters).

» Disruptions at polling places were infrequent, although there was a marked increase in reported picture-taking.
  » Fourteen percent of Election Day voters and 8% of early voters reported encountering disruptions while voting. The most common disruptions involved voters speaking loudly and disputes between a voter and an election worker or another voter.

### REASONS FOR NOT VOTING

» Approximately 7% of respondents indicated that they did not vote in 2024, likely due to social responsibility bias lowering this percentage.

» The leading reason for not voting was dissatisfaction with the candidates (21%), followed by illness or disability (12%) and "other" reasons (12%).

» Few respondents mentioned administrative obstacles like ID issues or confusion about where to vote.

### CONFIDENCE IN ELECTIONS

» Voter confidence was high across all levels in 2024.
  » The percentage of voters who reported being very or somewhat confident that their vote was counted as intended increased to 96%, up from 91% in 2020.
  » The percentages of respondents who expressed confidence in the vote count for their city/county, state, and nationwide were 93%, 89%, and 83%, respectively.

» The partisan gap in confidence narrowed considerably.
  » In 2024, 88% of Republicans and 79% of Democrats expressed confidence in the nationwide vote count, compared to 22% and 93% in 2020, respectively.
  » In 2024, 90% of Republicans and 91% of Democrats expressed confidence in the accuracy of their state's vote count, compared to 63% and 95%, respectively, in 2020.

### ELECTION SECURITY MEASURES

» Voter awareness about election security measures remained low.
  » When asked about their knowledge of whether their state or locality practiced one of 11 security measures, about one-third of respondents indicated that none of these measures was implemented by election officials.
  » Respondents were most aware that election officials conducted logic and accuracy testing of voting machines (37%) and handled paper ballots securely (37%).

» Support for most security practices rose from 2022 to 2024, particularly among Republicans.
  » The most widely endorsed security measures included securing paper ballots, conducting logic and accuracy testing, and performing post-election audits.
  » The security measures that received the least support were partisan poll watchers and conducting "war games" to prepare for cyber-attacks.

### FRAUD

» Respondents continue to believe that voter fraud is rare, but attitudes remain polarized along partisan lines.

### REFORM

» Support remained robust for mandatory paper backups of voting machines, requiring photo ID, automatically updating registration when voters change addresses, designating Election Day as a holiday, and selecting election officials on a nonpartisan basis. These reforms garnered majority backing from both parties.

» Support for cell phone voting, universal vote-by-mail, Internet voting, and mandating that all votes be cast on hand-marked paper ballots did not receive majority backing from either party.

4

# CONTENTS

ACKNOWLEDGMENTS ................................................... 2

ABOUT THIS REPORT ................................................... 2

EXECUTIVE SUMMARY ................................................... 3

INTRODUCTION ................................................... 6

USE OF VOTE MODE ................................................... 7

VOTING BY MAIL ................................................... 9
      The voting-by-mail experience
      Returning mail ballots
      Ballot tracking

VOTING IN-PERSON ................................................... 14
      Wait time to vote
      Voter identification
      Disruptions in polling places

NOT VOTING ................................................... 24

CONFIDENCE IN THE ELECTION ................................................... 25
      Confidence in one's own vote vs. the county, state, and nation
      Partisan polarization of confidence in state and nation

INCREASING THE SECURITY OF ELECTIONS ................................................... 31

REFORM ................................................... 37

CONCLUSION ................................................... 40

METHODOLOGICAL NOTE ................................................... 41

JA415

# INTRODUCTION

The Survey of the Performance of American Elections (SPAE) provides detailed information about how Americans experienced voting in the most recent federal election. Conducted in every presidential election since 2008—and in the federal midterm elections of 2014 and 2022—the SPAE is the only national survey focused specifically on election administration. It offers valuable insights into how well the voting process works in each state.

In 2024, the SPAE surveyed 10,200 registered voters, with 200 respondents from each state and the District of Columbia. The survey was administered by YouGov and supported by the Election Trust Initiative.

This report presents key findings from the 2024 SPAE and updates the previous report based on the 2020 survey. In a few cases, survey items overlap with those in the Cooperative Election Study (CES). Where possible, we also include results from the 2010 and 2018 midterms using comparable items from the CES. To provide long-term context on voter turnout and voting methods, we draw on data from the Voting and Registration Supplement of the Current Population Survey (CPS), conducted by the U.S. Census Bureau.

This report reviews the substantive issues addressed by the SPAE. Technical information, including the questionnaire and data, is available through the Harvard Dataverse.[1]

---

[1] The URL for the SPAE Dataverse is https://dataverse.harvard.edu/dataverse/SPAE.

JA416

# USE OF VOTE MODE

The 2020 election saw the biggest and most dramatic shift in how Americans vote in American history. Because of permanent and temporary changes made to state election laws, emergency declarations, and voter concern about public health, the percentage of voters casting ballots by mail in 2020 doubled compared to 2016. The 2022 and 2024 elections saw some backing off this surge, mostly due to Democrats shifting back to in-person voting. Still, overall, voting by mail in 2024 was well ahead of the trend that had been established prior to 2020.

For the past three decades, the percentage of voters casting ballots in person on Election Day has declined, as more have cast ballots either in person before Election Day or by mail. These changes, particularly regarding voting by mail, accelerated dramatically in 2020, with the percentage of voters casting votes on Election Day dropping from 60% in 2016 to 31% in 2020.[2] (See Figure 1.) Ballots cast by mail nearly dou-

bled, from 23% to 43%, while votes cast early and in person continued their steady pace upward.

Election Day voting rebounded somewhat in 2022 compared to 2020, while voting by mail and early in-person voting declined slightly—mail balloting more than early voting. (The early voting decline in 2022 fits into the long-established pattern of early voting declining slightly compared to the previous presidential election.) Still, the overall usage pattern of mail ballots in 2022 was more like 2020 than the pattern in the previous midterm election, 2018. The decline in Election Day voting accelerated again in 2024 as the percentage of early voters continued its steady march upward. Voting by mail remained steady in 2022.

The national trend in voting mode usage from 2020 to 2024 saw a decline in voting by mail and an increase in both Election Day and early voting. This general pattern was present in many states, but not in all. Figure 2 uses a ternary (or triplot) graph to describe the mix of voting modes in each state in 2020 and 2024, at least as reported in the Census Bureau's Voting and Reg-

---

[2] Voting mode statistics in this subsection are taken from the Voting and Registration Supplement of the Current Population Survey.

**FIGURE 1. VOTING MODE USAGE, 1996 - 2024.**



Data sources: Census Bureau, Voting and Registration Supplement, 1996 – 2024.

JA417

istration Supplement.[3] The data tokens represent the mix of voting modes reported in 2024. The gray lines attached to the data tokens trace the path of each state from where they were in 2020. Most grey lines trace a path to the northeast in the figure, which is consistent with a decline in both Election Day and mail voting and a rise in early in-person voting in these states. However, there are exceptions. For instance, Pennsylvania, New Hampshire, and Alabama showed increases in Election Day voting and a decline in mail voting without a growth in early voting.

A close examination of the triplot graph reveals some important clusters of states in how their voters distribute across the three modes. Only three states remained at the top of the graph, indicating that only Alabama, Mississippi, and New Hampshire retained the tradi-

---

[3] Voters in states at the very top of the triangle all cast their ballots on Election Day. Voters in states at the lower left corner all cast their ballots by mail. Voters in states in the lower right-hand corner all cast their ballots early in-person.

tional model of favoring Election-Day-only voting and allowing absentee voting for narrowly defined reasons. Second, while there are now a significant number of states in the lower left-hand of the graph, indicating states where mail voting predominates, the number of voters who reported voting in person increased notably in 2024.

However, the most important pattern in the figure is the aggregation of states in the middle of the triangle. States in this location have no majority voting mode. In practice, they have three voting modes that roughly equal numbers of voters use. This is significant because each additional voting mode not only introduces substantial administrative complexity for state and local election officials, but the complexity of one voting mode interacts with the complexity of the other voting modes in the state. The fact that about half of the states now are responsible for managing three different voting modes helps document one dimension in which election administration has become much more complicated for state and local officials.

**FIGURE 2. CHANGE IN VOTING MODE USAGE BY STATE, 2020 TO 2024.**



Data sources: SPAE.[1]

---

[1] For the remainder of this report, the data sources of figures and tables will all be the SPAE. Exceptions will be noted.

JA418

# VOTING BY MAIL

Among the three major modes of voting, the most politically contentious has been voting by mail. The expansion of voting by mail in 2020 was understandable in light of widespread concerns about congregating in large groups because of COVID. Still, its rapid expansion also led to a backlash among many who believed the expansion was unwarranted. Certainly, many who supported the expansion of voting by mail as an emergency measure in 2020 did not support its permanent expansion.

These dynamics are illustrated in Figure 3, which maps voting-by-mail usage in each state in the 2016, 2020, and 2024 presidential elections. Before 2020, the greatest percentage of mail ballots were cast in the Western states. In 2020, voting by mail occurred at very high rates nationwide, with one major exception—the south-central part of the country, ranging from Texas to Missouri and over to Tennessee. In 2024, the Mountain West and Pacific coast states continued with high levels of mail balloting. In con-trast, the area of the country with low levels of mail balloting—defined as fewer than 20% of votes cast by mail—spread to include virtually all of the South (except Florida) and pockets of the upper Midwest and Northeast.

Finally, we examine the most politically important feature of the changing patterns of voting by mail: the role of party. The 2020 election saw the development of a strong divide between Republicans and Democrats over the use of mail ballots, first at the elite level, and then at the grassroots. As Figure 4 shows, between 2008 and 2016 Democrats were slightly more likely to vote by mail than Republicans. However, this difference was primarily an artifact of which states had chosen to conduct their elections entirely by mail. In 2020, the partisan gap in voting by mail opened wide. In 2022, and then again in 2024, the gap closed somewhat, although this was primarily due to Democrats pulling back in the use of voting by mail rather than Republicans increasing their usage.

**FIGURE 3. GEOGRAPHIC DISTRIBUTION OF VOTING BY MAIL, 2016 - 2024.**



9

**FIGURE 4. VOTING BY MAIL BY PARTY, 2008 - 2024.**



Data source:  SPAE (2008, 2012, 2014, 2016, 2020, 2022, 2024); Cooperative Election Study (2010, 2018).

## THE VOTING-BY-MAIL EXPERIENCE

A core feature of the SPAE is that it asks voters directly about their experience voting. With respect to voting by mail, the SPAE includes three key questions, which are reflected in the following graphs. In every iteration of the survey, mail voters have been asked whether they had any problems getting their absentee or mail ballots sent to them, if they had any problems marking their ballot, and how easy it was to follow all the instructions necessary to cast their ballot and return it to be counted.

As the graphs in Figure 5 show, the experience of mail voters in 2024 was similar to prior years. Ninety-nine percent of mail voters stated there were no problems in getting their absentee or mail ballot sent to them. Ninety-nine percent said they encountered no problems marking or completing their ballot. Eighty-four percent said it was very easy to follow all the instructions necessary to cast their ballot and return it. In the end, 72% of voters by mail said they were very confident that their vote was counted as intended.

## RETURNING MAIL BALLOTS

An important issue that arose in the 2020 election was how best to return mail ballots. Historically, experience in vote-by-mail states had suggested that the most secure and convenient way for voters to return their mail ballots was through drop boxes provided by the election authority.  In addition, controversy arose over the capacity of the United States Postal Service to deliver mail ballots in time to be counted in November.  Election administrators responded by expanding opportunities to return ballots through modes other than the mail, and voters took advantage of those opportunities.

However, the use of drop boxes has become politically controversial, as have most features of mail-voting policy.  This has led some states to outlaw the use of drop boxes after 2020.  It may also have led Republicans to be less likely to use drop boxes as a method of returning mail ballots.

As Figure 6 shows, although nearly half of mail ballots in 2020 were returned in person—down from 2016, when two-thirds of all mail ballots were returned through the Postal Service—the share of ballots returned by mail rebounded in 2022. In 2024, the share of ballots returned by mail declined again, with voters primarily shifting to drop boxes. Voters were also slightly more likely to report returning their ballots at election offices or polling places.

**FIGURE 5.  EXPERIENCE CASTING A MAIL BALLOT.**



**FIGURE 6. HOW MAIL BALLOTS WERE RETURNED, 2016 - 2024.**



JA421

Of course, most of the country was new to the experience of voting by mail in 2020, and patterns of mail-ballot return may have differed between those new to the practice and those more experienced. It is instructive to compare how voters returned their ballots in the long-standing vote-by-mail states of Colorado, Oregon, and Washington to the rest of the nation. The two graphs in Figure 7 show how voters in those three states returned their ballots, compared to voters in the other states and D.C.

Although drop box usage declined in 2022 in both the long-standing vote-by-mail states and in all other states, it rebounded in 2024 across both categories. In Colorado, Oregon, and Washington, the rebound did not reach 2020 levels. However, in the remaining states, drop box usage did return to 2020 levels. And, despite the rebound in drop box usage across both groups, the fraction of voters reporting that they returned their ballot via the Postal Service remained higher in 2024 than in 2020, despite ongoing concerns about declining service quality in mail delivery.

Partisanship does not appear to have played a strong role in the overall rebound in use of the Postal Service to return mail ballots by 2024. In 2020, 56% of Republicans reported returning their mail ballots through the Postal Service, compared to 51% of Democrats. By 2024, these percentages had risen to 61% for Republicans and 59% for Democrats.

## DISRUPTIONS AT DROP BOXES

In recent years, election experts have expressed concern that groups or lone individuals might intimidate voters coming to deposit their ballots at drop boxes or to vote at polling places. Although there have been isolated reports of disruptions at polling places, the consensus among observers has been that voting has

**FIGURE 7. HOW MAIL BALLOTS WERE RETURNED, COMPARING LEGACY VBM STATES WITH ALL OTHERS, 2016 - 2024.**



JA422

gone smoothly, despite these reports. Media reports and other attempts to compile lists of voter problems run into the obvious issue that such accounts are anecdotal and rarely systematic. Consequently, there is value in asking a representative sample of voters what they observed when they voted or dropped off their ballot.

To address this issue, in both 2022 and 2024, the SPAE asked the following question of those who reported depositing their ballot at a drop box: "When you returned your ballot to a drop box, did you directly observe any of the following events taking place near the drop box?" The closed-ended response categories were:

1.  People peacefully holding signs or giving out literature in support of a candidate or ballot question.
2.  Individuals or groups of people casting doubt on whether the election was fraudulent.
3.  Individuals or groups of people seeming to challenge whether some people were properly dropping off ballots.
4.  Individuals or groups, other than police officers, carrying a gun.
5.  Someone taking pictures of voters or election workers who did not seem to be a reporter.
6.  Anything else that seemed disruptive.

Respondents were also allowed to report that they saw none of these things.

Among those who answered the question, roughly 1% of drop-box users reported seeing someone claim the election was fraudulent, someone challenge ballot drop-offs, or some other form of disruption. (See Figure 8.) Despite frequent media coverage, almost no one reported seeing someone—other than a reporter—taking pictures of voters or election workers, or someone carrying a gun. (Indeed, while 1% of respondents reported seeing someone carrying a gun when using a drop box in 2022, no one reported this in 2024.) The most frequent observation was of individuals peacefully holding signs, though only 2.2% of respondents noted this. Overall, 97.5% of those who returned ballots via drop boxes in 2024 reported seeing nothing disruptive, virtually identical to the 96.6% reported in 2022.

## BALLOT TRACKING

The availability of online ballot tracking for those voting by mail has grown significantly over the past few elections. The use of ballot tracking exploded during the 2020 election, paralleling the surge in voting by mail. By 2022, almost every state offered by-mail voters the ability to track whether their mail ballot had been received for counting.

In 2022, for the first time, the SPAE asked respondents who reported voting by mail whether they used online ballot tracking. Among those who answered the question, 40% said they used this service.

In 2024, the SPAE again asked by-mail voters whether they had used online ballot tracking. Unfortunately, due to a programming error in the survey, discovered only after the survey had been fielded, the 2024 results are not comparable to those from 2022. Therefore, readers interested in the use of ballot tracking are referred to the 2022 SPAE report.

**FIGURE 8. PERCENTAGE OF RESPONDENTS WHO REPORTED OBSERVING DISRUPTIONS AT DROP BOXES, 2022 AND 2024.**



JA423

# VOTING IN-PERSON

Although the expansion of voting by mail was the most notable issue in election administration in 2020 and beyond, in-person voting has remained important. Indeed, as previously noted, in-person voting rebounded in both 2022 and 2024.

The challenge of managing in-person voting can be categorized into three components: people, places, and things. Particularly during the exigent circumstances of the 2020 election, responding to the demand for in-person voting was strained by the potential lack of poll workers, polling places, and the resources necessary to carry out in-person voting. Had voting by mail not been so successful in 2020, the in-person voting system would likely have faced an insurmountable strain. In the aftermath of 2020, more voters have returned to casting their ballots in person, although not yet at pre-2020 levels.

Responses to the SPAE indicate that the evolution of voting modes over the past three federal elections has been met with positive feedback from voters, at least regarding their personal experience. This has been true for both in-person voters and those voting by mail.

The SPAE asks in-person voters about problems with voter registration and voting equipment, how well things were run at the polling place, and the performance of poll workers. As with mail voting, in-person voters reported very similar—and overall positive—experiences compared to past years. Among those who voted on Election Day, for example, 77% said it was very easy to find their polling place, 98% said they had no problems with registration, 99% did not encounter problems with voting equipment, 83% said the polling place was very well-run, and 65% rated the performance of poll workers as excellent. (See Figure 9.) These statistics are virtually identical to all past SPAE studies.

## FIGURE 9. EXPERIENCE VOTING ON ELECTION DAY.



JA424

The one notable exception was the question about the ease of finding the polling place. In 2024, 77% of Election Day voters said it was "very easy" to find their polling place, down from an average of 88% in earlier years. Meanwhile, the percentage who said it was "fairly easy" doubled—from 10% to 20%. In other words, most Election Day voters in 2024 still found their polling place with ease, though their experience was slightly less seamless than in the past.

The experience of early voters was very similar to that of Election Day voters. Eighty-five percent said it was very easy to find their polling place. Ninety-eight percent said they had no problems with registration when they tried to vote. Ninety-nine percent did not encounter any problems with the voting equipment. Eighty-seven percent said the polling place was very well-run, and 73% rated the performance of the poll workers as excellent. (See Figure 10.) These results are also consistent with those from past years.

Voter experiences on Election Day and early voting were very similar. Where they differed, it was in the slightly better experience among early voters in finding their polling place (77% "very easy" on Election Day vs. 85% for early voters) and in their assessment of poll worker performance (65% "excellent" on Election Day vs. 73% for early voters).

In 2024, 68% of Election Day voters said they were very confident that their ballot was counted as intended, with another 24% saying they were somewhat confident. (See Figure 11.) Ballot-counting confidence was similarly high among early voters: 71% said they were very confident, and 25% said they were somewhat confident. These increases in confidence compared to 2020 are discussed in more detail below.

## FIGURE 10. EXPERIENCE VOTING EARLY



**FIGURE 11. CONFIDENCE THAT VOTES WERE COUNTED AS CAST, 2008 - 2024.**



## WHERE PEOPLE VOTED

Arranging for places for people to vote in person has become more difficult in recent years. The COVID pandemic in 2020 accelerated the pace of difficulties. In 2020, with schools closing, churches not holding services, rising concerns about infections in nursing homes, and apprehension among first responders about interacting with the public, the availability of schools, churches, senior centers, and fire stations — traditional high-demand polling places in the past — was in question. Furthermore, concerns over school safety have put pressure on the use of these facilities as polling places.

Patterns related to in-person voting locations continued from 2020 on into 2024, with one major exception. (See Figure 12.) The major long-term trend for Election Day has been the decline in the use of schools, which continued in 2024. In fact, in 2024, schools were no longer the most common Election Day polling place. The leading location was community centers, which rocketed from 20% of Election Day voters in 2022 to 32% of voters in 2024, a large and statistically different increase from 2020 and 2022. In addition,

churches, traditionally in second place behind schools in Election Day voting locations, fell to 16% of voters, down from 21% in both 2020 and 2022. Elsewhere, 12% voted in other types of government buildings (courthouses, government office buildings, etc.), 4% in libraries, and 15% in all other places.

Early voting typically takes place in different types of buildings as it spans a longer period, attracting more voters. "Other government buildings," including courthouses, city halls, and election offices, have been the most common locations for casting early in-person votes. (See Figure 13.) The decline in the use of these facilities has stabilized since the drop in 2020. Similar to Election Day voting, the usage rates of building types remained very similar to those observed in 2020, except for a significant increase in community centers. In 2024, 36% of early in-person voters cast a ballot in an "other government building," 26% in a community center, 13% in a library, 7% in a school, 4% in a church, and 13% in all other facilities.

JA426

**FIGURE 12.  WHERE VOTERS CAST BALLOTS ON ELECTION DAY, 2008 - 2024**



**FIGURE 13. WHERE VOTERS CAST BALLOTS EARLY, 2008 - 2024**



JA427

## WAIT TIME TO VOTE

The issue of voter wait times became salient immediately after the 2012 election, when President Obama cited long lines in Florida during his victory speech, calling on Americans "to fix that." Efforts to reduce wait times were successful in the following three federal elections, but increased again in 2020. Wait times were much greater in 2020 than 2016, reversing the gains made over the preceding decade. Wait times in 2024 were still above the levels of 2016 but have not returned to the levels of 2020.

Our benchmark for wait times is the percentage of voters who waited over 30 minutes to cast a ballot. (The thirty-minute benchmark was established in the 2014 report of the Presidential Commission on Election Administration.[4]) As illustrated in Figure 14, 15% of early voters and 11% of Election Day voters waited more than 30 minutes.

There were a few pockets of long wait times, measured by the percentage of voters reporting that they waited more than thirty minutes to cast a ballot. In 2024, five states (Alaska, Delaware, Indiana, North Carolina, and Oklahoma) saw more than 20% of all in-person voters waiting over thirty minutes to vote in person; 22 states saw more than 10% of all in-person voters waiting over thirty minutes.

Unlike most years, there were no statistically significant differences in the rates at which different racial groups waited more than thirty minutes. For instance, 13.0% of whites, 13.1% of African Americans, and 13.6% of Hispanics waited more than thirty minutes.

**FIGURE 14. PERCENTAGE OF VOTERS WAITING MORE THAN 30 MINUTES TO VOTE, 2008 - 2024.**



---

[4] U.S. President's Commission on Election Administration, The American Voting Experience: Report and Recommendations of the President's Commission on Election Administration, 2014, https://web.mit.edu/supportthevoter/www/files/2014/01/Amer-Voting-Exper-final-draft-01-09-14-508.pdf.

JA428

**FIGURE 15. PERCENTAGE OF IN-PERSON VOTERS WHO WAITED LONGER THAN 30 MINUTES TO VOTE.**



Note:  States with fewer than 50 in-person voters in the sample are excluded.

## VOTER IDENTIFICATION

The core activity of precinct election officials in voting is voter authentication and preparing the ballot to give to the voter.  Voter identification and registration are the two essential components of the authentication procedures in the United States.  Earlier studies have documented that registration problems arise commonly and, in the 2000 general election, kept approximately 3% of people from voting.  Since 2000, many states have strengthened voter identification laws, raising the possibility that applying identification rules at the polls could create further difficulties in voting.

In 2024, approximately 85% of individuals who voted in person showed identification, an increase from 75% in 2016, the last year when voter ID questions appeared in the SPAE.  Presenting identification was slightly more prevalent in 2024 during early voting (86%) compared to Election Day (83%).  Regardless of whether they voted early or on Election Day, the most common type of identification provided by voters was a driver's license or state identification card (66% of Election Day voters and 85% of early voters), followed by a voter registration card (30% of Election Day voters and 11% of early voters).

The SPAE questionnaire asked about the types of ID voters had access to, regardless of their state's requirements or what they presented at the polling place.  The most common form of ID possessed by respondents was a driver's license (97%), an increase from 2016 (88%).  When asked if their driver's license was unexpired, bore the same name under which the voter was registered, and displayed the same address where the voter was registered, the percentage of respondents was 85%, rising from 76% in 2016. Forty-six percent of registered voters reported having an unexpired passport with the same name as the one under which they are registered to vote, compared to 36% in 2016. Eighty-three percent of respondents indicated they could easily locate their official birth certificate, unchanged from 2016.

Finally, the SPAE also asked voters to list other types of ID they held and whether those forms of ID contained a photo.  The distribution of voters who possessed each ID is reported in Table 1.

19

JA429

**TABLE 1. POSSESSION OF FORMS OF IDENTIFICATION OTHER THAN DRIVER'S LICENSES AND PASSPORTS, 2024**

| ID Type | Have ID with Photo (%) | Have ID without Photo (%) |
|---|---|---|
| Public assistance ID card | 7.4 | 3.6 |
| Military ID card | 5.6 | 0.4 |
| Out-of-state ID card | 6.7 | 0.7 |
| ID card from a Native American tribe | 0.8 | 0.4 |
| In-state private university ID card | 4.5 | 0.7 |
| Out-of-state private university ID card | 1.9 | 0.3 |
| In-state public university ID card | 6.8 | 0.6 |
| Out-of-state public university ID card | 1.7 | 0.2 |
| License to carry a firearm | 5.9 | 3.1 |
| Voter registration card | 9.1 | 35.2 |
| ID card issued by another federal agency | 7.4 | 1.2 |
| ID card issued by another state agency | 14.6 | 0.5 |
| ID card issued by another local agency | 3.8 | 0.5 |

Whether respondents reported showing identification varied based on the state's voter ID law, as classified by the National Conference of State Legislatures (NCSL).[5] The NCSL classifies voter ID laws into five categories: strict photo ID, non-strict photo ID, strict non-photo ID, non-strict non-photo ID, and states without a voter ID law that only meet the Help America Vote Act (HAVA) minimum standard.[6] Nearly 100% of voters in states with a voter ID law exceeding the HAVA minimum showed some form of ID, whereas only 56% of voters in HAVA minimum states showed ID.

The percentage of voters who reported showing photo identification also varied by NCSL classification. Notably, the percentage of respondents in HAVA-minimum states who reported showing photo ID when they voted increased from 2016 to 2024, from 21% to 28%, while the percentage showing photo ID in all other states dropped. The steepest drop was in the three strict non-photo ID states (Arizona, North Dakota, and Wyoming), where 62% of voters reported showing a photo ID, down from 83% in 2016.

The SPAE asks respondents who showed photo ID whether they were specifically requested to do so or if they did it because it was convenient. These differences are summarized in Table 2. Notably, in all states except for HAVA minimum states, the percentage of voters reporting that they showed a photo ID declined compared to 2016, as did the percentage of voters who reported that they were specifically requested to show a photo ID.

---

[5] NCSL Voter ID Laws. https://www.ncsl.org/elections-and-campaigns/voter-id. Accessed May 1, 2025.

[6] In a "HAVA minimum" state, voters generally do not require any identification to vote, although they may have to attest to their identity by providing a signature, but first-time voters who registered by mail without providing a copy of their identification must show some form of identification, which does not have to include a photo.

20

JA430

**TABLE 2. PERCENTAGE OF VOTERS SHOWING PHOTO ID BY ID LAW CLASSIFICATION, 2016 AND 2024.**

| NCSL classification | N states | | Showed photo ID (%) | | Requested specifically (%) | |
|---|---|---|---|---|---|---|
| | 2016 | 2024 | 2016 | 2024 | 2016 | 2024 |
| HAVA minimum | 18 | 14 | 20.9 | 28.1 | 8.2 | 9.1 |
| Strict Photo ID | 7 | 9 | 93.4 | 86.0 | 64.8 | 54.6 |
| Non-Strict Photo ID | 8 | 13 | 84.9 | 82.8 | 52.5 | 48.9 |
| Strict Non-Photo ID | 3 | 3 | 83.1 | 62.1 | 54.4 | 37.3 |
| Non-Strict Non-Photo ID | 14 | 11 | 76.5 | 78.0 | 38.3 | 42.1 |

Note: excludes first-time voters

Previous research into using photo ID to vote has examined racial disparities concerning the requirement to show an ID at polling places. The data from 2024 indicate that these disparities persisted in a surprising way. In the HAVA-minimum states, African American voters were twice as likely to report that they showed a photo ID when they went to vote as White voters (50% vs. 26%). (See Table 3.) On the other hand, African Americans reported showing photo ID to vote at a lower rate than Whites in both strict and non-strict photo ID states. (There were insufficient African American respondents in strict non-photo ID and non-strict non-photo ID states to report relative percentages.)

These statistics illustrate the significant flexibility that election workers have in implementing state voter-identification laws, at least as experienced by voters.

**TABLE 3. PERCENTAGE OF VOTERS SHOWING PHOTO ID BY ID LAW CLASSIFICATION, BY RACE, 2024.**

| NCSL classification | Race | | | |
|---|---|---|---|---|
| | White | Black | Hispanic | All Other |
| HAVA minimum | 25.5% | 49.8% | 24.7% | 35.1% |
| Strict Photo ID | 88.7% | 77.0% | * | 91.6% |
| Non-Strict Photo ID | 83.3% | 75.2% | 73.7% | 94.2% |
| Strict Non-Photo ID | 69.9% | * | * | * |
| Non-Strict Non-Photo ID | 80.1% | * | * | * |

*Fewer than 50 observations in sample.

JA431

## DISRUPTIONS IN POLLING PLACES

Following the 2020 elections, there have been increased concerns about the safety and security of election workers and facilities. Although most public concern has focused on election officials and their offices, the election community has also worried that violence, or at least disruptions, could erupt in polling places themselves.

To gauge the degree to which voters encountered concerning behavior, starting in 2022, the SPAE included two related batteries of questions, which were repeated in 2024. The first asked about disruptions observed in polling places, both on Election Day and during early voting. The second asked about activities outside of polling places. (A related set of questions was posed to those who used drop boxes. See the voting-by-mail section for a discussion of these items.)

Voters who cast their votes in person, either on Election Day or during early voting, were asked, "When you went to vote, did you directly observe any of the following events taking place in the polling place? (Mark all that apply.)" The events mentioned were:

» People in the polling place talking loudly or acting in a way that disrupted the voting.

» A voter in a dispute with an official election worker.
» A voter in a dispute with another voter.
» An individual, other than a police officer, carrying a gun.
» Someone who was not an official election worker challenging whether someone could vote.
» Someone taking pictures of voters or election workers who did not seem to be a reporter.
» Anything else that seemed disruptive.

Respondents were also allowed to state that they observed none of these events.

In 2024, an overwhelming number of in-person voters—86% of Election Day voters and 92% of early voters—reported that they observed none of these potentially disruptive behaviors. In 2022, these figures were 90% and 91%, respectively.

In both 2022 and 2024, these potentially disruptive behaviors were generally more common on Election Day than in early voting. (See Figure 16.) The exception in 2024 was the catch-all category "anything else disruptive." In addition, the percentage of Election Day voters reporting that someone was taking pic-

**FIGURE 16. OBSERVATION OF DISRUPTIVE BEHAVIORS IN IN-PERSON POLLING PLACES, 2022 AND 2024.**



JA432

tures in their polling place skyrocketed to 5.9%, up from 1.4%. (Whether this represents an increase in voters attempting to document the process, intimidate others, or take "ballot selfies" is unknown.) After picture taking, the most commonly reported disruptive behaviors were disputes with poll workers or voters, and people talking loudly. (Often, the loud talking was noted alongside the disputes.)

In-person voters were also asked about their observations outside the polling place with this question: "When you went to vote, did you directly observe any of the following events taking place outside the polling place?" The possible responses were as follows:

» People peacefully holding signs or giving out literature in support of a candidate or ballot question.
» Individuals or groups of people casting doubt on whether the election was fraudulent.
» Individuals or groups of people seeming to challenge whether some people could enter the polling place to vote.
» Individuals or groups, other than police officers, carrying a gun.

» Someone taking pictures of voters or election workers who did not seem to be a reporter.
» Anything else that seemed disruptive. (Please describe what you observed.)
» I didn't observe any of these things.

The first response, with people peacefully holding signs or passing out literature, should not be considered a disruption, although voters may find even these activities intimidating. In 2024, 21.2% of respondents reported seeing this type of activity, compared to 21.5% in 2022.

Observations of disruptions outside early voting sites were generally much less frequent than similar behaviors noted inside those locations. (See Figure 17.) In addition, many more respondents observed people taking pictures outside Election Day polling places than in 2022, just as they noticed more picture-taking inside those same polling places. Finally, disruptive activities, apart from picture-taking, were generally as common in 2024 Election Day polling places as they were in 2022. However, they were generally less frequent in early-voting sites.

**FIGURE 17. OBSERVATION OF DISRUPTIVE BEHAVIOR OUTSIDE IN-PERSON POLLING PLACES, 2022 AND 2024.**



JA433

# NOT VOTING

In 2024, 6.8% of respondents reported that they did not vote, virtually the same as in 2020 (6.0%). To understand the reasons for not voting, these respondents were asked, "What was the main reason you did not vote?" The categories presented to these respondents were as follows:

» I forgot
» I'm not interested
» Too busy
» Did not like the candidates
» I am not registered
» I did not have the correct form of identification
» Out of town
» Sick or disabled
» Transportation
» Bad weather
» The line at the polls was too long
» I was not allowed to vote at the polls, even though I tried
» I requested but did not receive an absentee ballot
» I did not know where to vote
» I did not feel that I knew enough about the choices
» I was worried about the COVID-19 virus
» Other
» Don't know

The three most common responses in 2024 were "did not like the candidates" (20.9%), "other" (11.6%), and "sick or disabled" (12.1%). (See Figure 18.) With the exception of the "COVID" response, the distribution of reasons for not voting in 2024 corresponded closely with responses from 2020. The "other" responses were truly a catch-all category, but significant numbers of respondents who chose it mentioned believing the election was rigged, having moved recently, and believing that elections were one-sided in their state.

It is notable that reasons for not voting due to election administration issues, such as not receiving a mail ballot, lacking an ID, not knowing where to vote, and encountering long lines, were cited less frequently in 2024 than reasons related to the respondent's personal situation, including disengagement from the process or being sick or out of town.

**FIGURE 18. REASONS FOR NOT VOTING, 2020 AND 2024.**



JA434

# CONFIDENCE IN THE ELECTION

From its inception, the SPAE has measured confidence in election administration among registered voters. This issue has become increasingly important in recent years, as discord over the conduct of elections has grown.

The SPAE asks four similarly worded questions to probe levels of confidence across four levels of interest: personal, local, state, and national. In particular, the four questions are:

» How confident are you that your vote in the [year] General Election was counted as you intended? [asked only of respondents who reported they successfully voted]
» Think about vote counting throughout your county or city, and not just your own personal situation. How confident are you that votes in your county or city were counted as voters intended in the [year] general election? [not asked in 2008]
» Now, think about vote counting throughout [state]. How confident are you that votes in [state] were counted as voters intended in the [year] general election? [not asked in 2008]
» Finally, think about vote counting throughout the country. How confident are you that votes nationwide were counted as voters intended in the [year] general election? [not asked in 2008]

There are five response categories for each question: very confident, somewhat confident, not too confident, not at all confident, and I don't know.

The general pattern of responses to these questions in 2024 mirrored that of previous years. Respondents expressed the highest confidence that their own votes were counted as intended, slightly less confidence that votes in their county were counted correctly, even less confidence about votes in the state, and the least confidence regarding votes nationwide. (See Figure 19.)

## CONFIDENCE IN ONE'S OWN VOTE VS. THE COUNTY, STATE, AND NATION

Underlying these general patterns are important dynamics that show how confidence has evolved over time and how it differs among groups.

We begin this discussion with the respondent's own vote. As has been the case in previous years, over two-thirds of respondents were very confident that their personal votes were counted as intended in 2024. (See Figure 20.) The results on this score have been virtually unchanged over the past two decades.

Although confidence in the vote count at the county level has been lower than confidence in one's own vote, the time trend also remained stable in 2024 compared to past years. (See Figure 21.)

**FIGURE 19. SUMMARY OF VOTE CONFIDENCE RESPONSES, 2024.**



JA435

**FIGURE 20. PERSONAL CONFIDENCE IN VOTE COUNT, 2008 - 2024.**



**FIGURE 21. CONFIDENCE IN COUNTY OR CITY VOTE COUNTING, 2012 - 2024.**



JA436

It is in asking about confidence that votes in the state were counted as intended, where the movement in the time trend becomes apparent.  Confidence that votes were counted as intended softened in 2020 when respondents were asked about their state. (See Figure 22.)  The percentage of voters who were very confident actually rose slightly in 2020 compared to past years, but the percentage of those who were somewhat confident fell significantly, from 38% to 29%.  In addition, the percentage of respondents who answered "not at all confident" doubled, rising from 3% to 6%.

Responses in 2024 continued the slight upward trend seen in 2022.  Since 2020, overall Confidence (very confident + somewhat confident) has increased from 80% to 89%, while overall lack of confidence (not too confident + not at all confident) has fallen from 20% to 11%.

Respondents' answers to the questions regarding confidence in votes nationwide have been the most volatile over time, especially beginning with the 2020 election. In 2020, both the percentage of respondents indicating they were very confident that votes were counted as intended nationwide and the percentage reporting that they were not confident at all increased from 2016.  (See Figure 23.)  In 2022, the percentage of

respondents who indicated they were not at all confident decreased to 13%, further declining to 5% in 2024.

Over the past three elections, the proportion of respondents indicating they were somewhat confident has followed the trend of the not-at-all-confident responses.  In 2020, only 23% of respondents expressed some confidence in the nationwide vote count, down from 44% in 2016. However, in 2022, that percentage increased to 32%, rising again to 46% in 2024.

Another way to appreciate how nationwide confidence has shifted over the past three elections is to combine the two "confident" and "not confident" responses into single measures.  This is done in Figure 24.  As the graph shows, the proportion of respondents expressing some lack of confidence in nationwide vote counting grew substantially in 2020, but has steadily receded since then.  In 2024, the combined confidence measure showed the largest value ever recorded by the SPAE, although this is due to the recent growth in the proportion of respondents who stated they were somewhat confident of the nationwide vote count.

**FIGURE 22. CONFIDENCE IN STATE VOTE COUNTING, 2012 - 2024.**



JA437

**FIGURE 23. CONFIDENCE IN NATIONWIDE VOTE COUNTING, 2012 - 2024.**



**FIGURE 24.  SIMPLIFIED CONFIDENCE IN NATIONWIDE VOTE COUNTING, 2012 - 2024.**



## PARTISAN POLARIZATION OF CONFIDENCE IN STATE AND NATION

Recent trends in voter confidence, particularly at the state and national levels, stem from the polarization of attitudes toward the electoral process along partisan lines. During presidential election years, the nationwide confidence measure particularly reflects the well-known winner-loser effect, where supporters of the presidential winner experience a rise in confidence while supporters of the loser see a decline.

In 2016, 80% of Republicans stated they were very or somewhat confident that votes across the country were counted as intended (nationwide confidence), compared to 69% of Democrats.  (See Figure 25.)  In 2020, confidence among Democrats rose to 93%, while the percentage of Republicans who were either very or somewhat confident fell to 22%. Democratic confidence remained essentially unchanged in 2022, whereas Republican confidence increased by twenty points. By 2024, Democrats and Republicans became more aligned in the nationwide confidence measure, with Republican confidence rising to 88% and Democratic confidence decreasing to 79%.

28

JA438

Of particular interest here is the confidence in vote counting across the states. The states administer elections and, therefore, bear the brunt of controversy in close and contested elections. Dissatisfaction with election administration in many states, especially battleground states, led to intense state legislative activity in 2021 and beyond.

In 2020, the gap in state confidence between Democrats and Republicans grew to a 32-point difference, having been nearly zero in 2016. (See Figure 26.) Although considerable, it was significantly smaller than the 71-point partisan gap in national confidence. By 2024, the gap had nearly vanished between Democrats and Republicans.

In reporting on the 2020 SPAE results, we noted that in some states, the partisan gap in confidence about state voting was enormous, while in others, it was small or non-existent. The states that exhibited the largest partisan gaps shared one of two characteristics. They were either states where Donald Trump narrowly lost (Michigan, Pennsylvania, Wisconsin, Nevada, and Georgia) or states that implemented universal vote-by-mail (Nevada, New Jersey, Oregon, Washington, Colorado, and California).

In 2024, the Democratic-Republican gap closed in all but thirteen states—Mississippi, Florida, Alabama, Oklahoma, Tennessee, Louisiana, South Dakota, South Carolina, Texas, Kansas, Wyoming, Ohio, and Arkansas. (See Figure 27.) Furthermore, while in 2020 Democrats in nearly every state showed greater confidence in voting than Republicans, in 2024 some states saw Republicans more confident than Democrats, and vice versa in others.

While it is beyond the scope of this report to explain these partisan changes in states, it appears that older patterns from before 2020 reemerged in 2024. Specifically, Democrats became less confident than Republicans in states with large Republican majorities. Moreover, Republican confidence continued to lag behind Democrats in states with many mail ballots, even after accounting for partisan dominance in the state.

**FIGURE 25. CONFIDENCE IN NATIONWIDE VOTE COUNTING BY PARTY, 2012 - 2024.**



**FIGURE 26. CONFIDENCE IN STATE VOTE COUNTING BY PARTY, 2012 - 2024.**



**FIGURE 27. DEMOCRATIC-REPUBLICAN DIFFERENCE IN STATE VOTE CONFIDENCE, 2020 AND 2024.**



30

JA440

# INCREASING THE SECURITY OF ELECTIONS

With the 2016 election came increased awareness of the security threats surrounding elections. Before 2016, these threats had primarily been physical, related to safeguarding ballots from theft or tampering. Concerns were also raised about the accuracy of voting equipment and the ability to detect attempts to compromise that equipment. These worries fueled a movement to mandate paper ballots and post-election audits. During the 2016 election, a new type of threat emerged: cyberattacks on election administration infrastructure. This shift led to a renewed focus on cybersecurity.

Whether cyber or physical, security has become a more salient issue for the public over the past few years. To gauge where voters stand on this issue, the SPAE added a battery of questions in 2022 to measure how much voters know about the efforts officials make to secure elections and which of these measures are most reassuring to voters. In 2024, the SPAE included a measure related to poll worker audits to act as a placebo, helping to assess the reliability of other results.[7]

The first question assessed voter knowledge. All respondents were asked, "Which of the following actions, if any, are you aware of that occur to ensure elections are secure and free from fraud locally and in [your state] (Check all that apply)." The response categories were as follows:

1. Election officials test every machine used in the election to ensure they are secure.
2. Non-partisan poll watchers observe the election to ensure it's fair.
3. Poll watchers affiliated with the political parties or candidates observe the election to ensure it's fair.
4. Election officials conduct audits of ballots after every election to confirm the results were accurate.

5. Paper ballots are stored in secure facilities so there is always a paper trail and audits and recounts can be conducted.
6. Election officials work with law enforcement to prosecute those who commit voter fraud.
7. Impartial teams of election judges conduct signature verification on each mail-in ballot received.
8. Election officials work closely with national security agencies, such as the Department of Homeland Security, and the military to prevent foreign interference.
9. Election officials work with the [state] National Guard on Election Day to prevent cyber-attacks.
10. Election officials conduct ''war games'' with election officials across the state and the National Guard to protect the election from cyber-attacks.
11. Poll workers are randomly audited to review compliance with election laws.[8]
12. None of the above.

Respondents were then asked, "Regardless of whether your state does the following, how would knowing that [your state] took the following actions impact how much confidence you have in the security and integrity of [your state's] election system?" The response categories were identical to those of the knowledge question.

Responses to the knowledge question indicate that voters are not very aware of the measures election officials take to secure elections. First, 33% of respondents in 2022 and 29% of those in 2024 stated that officials took none of these measures. Second, among the practices that respondents claimed to know about, the responses in 2024 were very similar to those in 2022. (See Figure 28.) In 2024, 37% of respondents reported knowing that their state conducted logic and accuracy (L&A) tests, and a similar percentage claimed to know that paper ballots were stored securely and accounted for. The only items that saw statistically significant changes from 2022 were knowledge that election officials work with law enforcement to prosecute voter

---

[7] As far as we know, states do not regularly conduct "poll worker audits." As discussed below, in 2022, we concluded that responses to the security questions were prone to problems of "nonattitudes" being expressed about a low-salience concern.

[8] As mentioned above, this item was added in 2024 to allow us to explore the role of nonattitudes in expressing opinions about election security.

31

JA441

fraud (27% in 2024, up from 22%) and that they worked with national security agencies to guard against election interference. Finally, 17% of respondents claimed to know that "poll workers are randomly audited to review compliance with election laws," even though this is a practice that is not regularly conducted, as far as we know.

The second question regarding security measures asks which activities would enhance confidence in the security and integrity of their state's elections. Responses to this question in 2024 were also similar to those in 2022, with one important difference: respondents were more supportive of all these security measures in 2024 than in 2022. (See Figure 29.) Indeed, each of these practices received strong endorsement from respondents, with two exceptions: conducting "war games" to plan against cyber-attacks and partisan poll watchers. L&A testing, securing ballots, and post-election audits are at the top of the list when it comes to items that respondents said would assure them of the election's security and integrity. At the bottom of the list is the presence of partisan poll watchers, while nonpartisan poll watchers are regarded much more highly.

**FIGURE 28. REPORTED KNOWLEDGE OF STATE AND LOCAL ELECTION SECURITY PRACTICES.**



Note: "Poll workers audited" was added in 2024 as a placebo to study nonattitudes about security measures.

**FIGURE 29. PERCENTAGE OF RESPONDENTS REPORTING THAT CONFIDENCE WOULD BE INCREASED "A LOT" OR "SOMEWHAT" BY SECURITY PRACTICES.**



Note: "Poll workers audited" was added in 2024 as a placebo to study nonattitudes about security measures.

JA442

Due to the partisan divide that has emerged regarding confidence in elections and the longstanding differences over the prevalence of fraud, it is informative to understand whether there is a partisan split concerning which activities would foster trust in the security and integrity of elections. In 2022, there were some partisan differences about what boosts respondents' confidence, but these were small.

In 2024, for the most part, those partisan differences diminished, primarily because Republicans grew more confident in most of these practices. (See Figure 30.) Partisan differences increased regarding fraud prosecution, signature verification, and the practices of partisan poll watchers. Additionally, Republican confidence grew for each of these practices, sometimes substantially.

**FIGURE 30. PARTISAN CHANGE IN THE PERCENTAGE OF RESPONDENTS REPORTING THAT CONFIDENCE WOULD BE INCREASED "A LOT" OR "SOMEWHAT" BY SECURITY PRACTICES, 2022 - 2024.**



Note: The arrows begin at the percentage associated with the party in 2022; the arrow head indicates the percentage associated with the party in 2024.

33

JA443

# FRAUD

For over a decade, the SPAE has asked respondents to indicate how frequently they believe certain fraudulent or illegal activities occur in their city or county. These activities include people voting with absentee ballots intended for another person, noncitizens voting, voter impersonation, individuals voting more than once, election officials fraudulently altering the reported vote count, and individuals stealing or tampering with ballots that have been cast. In 2022, four new items were introduced: vote counting software manipulated to not count ballots as intended, paying voters to cast a ballot for a particular candidate, voting under fraudulent voter registrations, and submitting too many ballots in drop boxes. These new items were continued in 2024.

In 2024, the percentage of respondents who indicated that these activities were very common or occurred occasionally ranged from 20% (changing vote count) to 29% (absentee ballot fraud). (See Figure 31.)

However, the partisan divide on these issues was significant. The overall percentage of voters who believed these activities occurred remained consistent with trends observed over the past dozen years. (See Figure 32.)

## PARTISAN PATTERNS IN BELIEFS ABOUT FRAUD

Historically, Republicans have been more inclined than Democrats to believe in a high frequency of voter fraud within the SPAE. This gap widened significantly in 2020 and showed only a slight moderation in 2022 and 2024. Figure 33 illustrates one example of this, with respondents' answers to a question about stealing or tampering with ballots that have already been voted. In the 2016 election, the percentage of Democrats and Republicans saying this almost never or infrequently occurred was only 8 percentage points apart — 77% for Democrats and 69% for Republicans.

**FIGURE 31. REPORTED FREQUENCY OF FRAUD OCCURRENCE IN 2024, OVERALL AND BY PARTY.**



Note: Percent answering "very common" or "occasionally."

JA444

**FIGURE 32. TIMELINE OF FRAUD ATTITUDES, 2008 - 2024.**



**FIGURE 33. PARTISAN DIFFERENCES IN BELIEFS ABOUT HOW COMMONLY PEOPLE STEAL OR TAMPER WITH BALLOTS.**



Note: Percentage answering "almost never" or "infrequently."

JA445

By 2020, the gap widened to 41 points (84% for Democrats and 43% for Republicans). In 2022, the gap decreased to 29 points, as the percentage of Democrats asserting that tampering with ballots almost never or infrequently occurred dropped to 78%, while rising to 47% among Republicans. In 2024, the percentage of Democrats increased slightly to 80%, but most notably, the percentage of Republicans rose dramatically to 61%. Thus, the gap narrowed compared to 2020, yet it is now comparable to the gap measured in 2012.

Similar patterns have been evident in all the fraud items on the SPAE. (See Figure 34.) In 2014 and 2016,

the percentage of Republicans who reported that various types of fraud occurred "almost never" or "infrequently" increased, and in a couple of cases, nearly matched Democratic responses. Republicans became much less likely to provide these positive assessments in 2020 and 2022, but in 2024, their evaluations of the frequency of fraud became more optimistic. Nonetheless, Democrats were more likely to respond that fraud was uncommon in 2024.

**FIGURE 34. PARTISAN DIFFERENCES IN BELIEFS ABOUT HOW COMMONLY ALL TYPES OF FRAUD OCCUR, 2008 - 2024.**



Note: Percentage answering "almost never" or "infrequently."

# REFORM

Finally, there's the issue of election reform. For over a dozen years, the SPAE has asked respondents for their opinions on eleven reform ideas that various groups have advocated for from time to time. These reforms include voting over the Internet, voting by mail, designating Election Day as a holiday, and moving it to a weekend. In 2022 and 2024, two new items were introduced: counting all ballots by hand and ranked-choice voting.

» The wording of the reform proposals is as follows:
» Allow voting over the Internet [Internet voting]
» Voting using cell phones [cell phone voting]
» Run all elections by mail [all vote-by-mail]
» Automatically register all citizens over 18 to vote [AVR]
» Allow people to register on Election Day at the polls {EDR]
» Require all people to show a government-issued photo ID when they vote [photo ID]
» Require electronic voting machines to print a paper backup of the ballot [paper backups]
» Move Election Day to a weekend [Election Day weekend]

» Make Election Day a national holiday [Election Day holiday]
» Only select election officials on a non-partisan basis [nonpartisan officials]
» Make it so that when a registered voter moves, he or she is automatically registered to vote at the new home [change reg when moving]
» Prohibit the use of computers to mark or count ballots. [no computerized voting machines]
» Conduct elections using ranked-choice voting [RCV]

The 2024 response categories were "support strongly," "support somewhat", "oppose somewhat," and "oppose strongly."

In 2024, responses remained consistent with previous years.  The most popular reforms included requiring computerized voting machines to have paper backups, mandating voters to show photo ID to vote, permitting automatic updates to a voter's registration upon moving, electing officials on a bipartisan basis, and designating Election Day as a national holiday.  (See Figure 35.)  Similar to previous years, the least popular

**FIGURE 35. SUPPORT FOR ELECTION REFORMS, BY PARTY, 2024.**



Note:  Percentage of respondents supporting "strongly" or "somewhat."

JA447

reforms were cell phone voting, Internet voting, and universal voting by mail.

Among the items introduced in 2022, neither ranked choice voting nor the prohibition of computerized voting machines received support from a majority of respondents. However, both items displayed patterns of partisan support, with a majority of Democrats in favor of RCV and nearly half of Republicans backing the ban on computerized voting machines.

As in previous years, opinions regarding most of these reforms were divided along party lines. The only reform in 2024 without some partisan divide was the requirement for electronic machines to include paper backups.

Examining trends in reform support over the past decade, attitudes have gradually shifted from one election to the next. (See Figure 36.) For most reforms, we observe a gradual drift in a supportive direction over the past decade, except for Internet voting and possibly the requirement of photo IDs. The trend in support for voter ID is particularly noteworthy. Since 2008, support among Republicans has steadily increased to the point where it is nearly unanimously favored by Republican respondents (92.4% support in 2024). Support among Democrats weakened in the early years covered by the data but has rebounded in recent years. Indeed, in 2024, most Democrats supported requiring photo IDs in all but three states (Minnesota, Vermont, and Maine) and the District of Columbia.

Another reform where partisan attitudes have notably shifted in recent years is universal vote-by-mail. Before 2020, Democrats were more likely to support the reform than Republicans, but neither group gave it majority approval. For instance, in 2016, 14% of Republicans and 36% of Democrats expressed their favor for universal VBM. That 22-point gap more than doubled

## FIGURE 36. TRENDS IN ELECTION REFORM SUPPORT, 2008 - 2024.



Note: Percentage of respondents supporting "strongly" or "somewhat."

38

JA448

in 2020, rising to 54 points, with 10% of Republicans favoring it compared to 64% of Democrats. The gap narrowed somewhat in 2022, decreasing to 43 points, with 15% of Republicans and 58% of Democrats in support. In 2024, it narrowed further to 28 points, with 15% of Republicans and 42% of Democrats supporting.

Support for universal vote-by-mail is an intriguing topic to examine, given the impact of absentee/mail voting in 2020. Before 2020, respondents in Colorado, Oregon, and Washington — states that have held all vote-by-mail elections for several cycles — were significantly more favorable toward voting by mail than the rest of the country. (See Figure 37.) Although Republicans in these states have tended to support voting by mail at much lower rates than Democrats, in the 2012 and 2016 elections, their support for voting by mail was in the range of 40 to 50%. However, in 2020, Republican support plummeted to 15% in these three states, while support among Democrats continued to grow, reaching 90%. Democratic backing for voting by mail in these three states remained high in 2022, but fell to 75% in 2024. In other words, most

Republicans continue to be uneasy with VBM in these states, despite showing signs of warming to the practice before 2020. Conversely, support among Democrats may also be softening.

In 2020, seven states adopted universal vote-by-mail for the first time. Hawaii and Utah had already chosen this option before 2020, while New Jersey did so only in 2020. Among the six states that first implemented VBM in 2020 and have retained it since then, support for universal VBM was low prior to 2020, even among Democrats. In 2020, support surged to 71% among Democrats and declined among Republicans. Since then, Republican support has returned to 2016 levels in 2024, while Democratic support has dropped considerably. Furthermore, in the states that did not have VBM in 2024, support for universal VBM remained even lower among both Democrats and Republicans. Support among Democrats increased sharply in 2020 but has declined considerably since then. Republican opposition to VBM in these states has stayed unchanged for the past decade.

**FIGURE 37. SUPPORT FOR HOLDING ALL ELECTIONS BY MAIL, 2008 - 2024.**



Note: Percentage of respondents supporting "strongly" or "somewhat."

JA449

# CONCLUSION

The reverberations from the 2020 election continued to be felt in 2024, although the experiences of voters in 2024 echoed many themes that were prevalent before the pandemic. Voters reported positive experiences when voting, whether in person or by mail. They maintained long-term trends by increasingly abandoning voting on Election Day in favor of early voting. They expressed confidence in how elections were conducted at all levels of government, although they felt much more confident about their own experiences than about the experiences of voters nationwide. Furthermore, although concerns about disruptions in the election process persist, voters witnessed little, if any, of this firsthand.

A topic that garnered much attention in 2020, partisan polarization, continued to manifest itself among voters in 2024, although the extent of this polarization was significantly less compared to 2020. Similarly, Democrats and Republicans maintained significantly different views on how the electoral process should be reformed—although they shared opinions on some issues, such as paper trails for electronic voting machines and non-partisan election administration—and the scale of the vote fraud problem—although both Democrats and Republicans are more likely to assert that fraud of all types is infrequent.

The information and security environments that have emerged in recent years have caused election officials to dedicate more of their time to communicating with voters and enhancing their security practices. If there is a sour note in this report, it is that voters, while trusting elections and believing fraud is uncommon, remain unaware of what election officials are doing to secure the vote.

Nonetheless, in the context of ongoing negative news regarding election administration, the news from the SPAE in 2024 is, overall, positive: voters had a good experience and trust the results. Of course, this is merely a snapshot in time, and the next election might present different results. However, as surveying the voting public for over a decade has shown, despite the broader currents of controversy surrounding election administration, the lived experiences of voters remain fairly stable and positive. These surveys also show that election administration can become a concern for voters, not due to their own experiences, but because of what they hear about others' experiences

and how election administration (in other locations) can impact outcomes. This volatility in how voters interpret the larger context of voting makes regularly surveying them crucial, as the political process continues to respond to significant policy concerns that arise among voters throughout the election cycle.

40

JA450

# METHODOLOGICAL NOTE

This report does not show the confidence intervals ("margins of error") for the statistics reported. This is to enhance the readability and flow of the report. Due to the large sample sizes used to compute most statistics, the margins of error are generally quite small, often comparable to the size of the data tokens used to display the statistics. This section offers the reader a guide to the approximate 95% confidence intervals of the statistics reported here.

The two major determinants of confidence intervals are (1) the size of the (sub)sample and (2) the size of the estimated statistics (e.g., percentage). The sample size of the complete SPAE is 10,200 for each year except 2008, when the District of Columbia was not sampled. In that year, the total sample size was 10,000. Some statistics are broken down by party affiliation. In 2024, there were 5,135 self-identified Democrats, including leaners (50.3% of the sample), 3,764 Republicans, including leaners (36.9%), and 1,301 either non-leaning independents or identifiers of other parties (12.8%) in the sample. Some analyses in this report break down the sample by voting method. In 2024, the overall sample included 3,828 respondents who reported voting on Election Day, 2,691 who voted in person before Election Day, 2,977 who voted by mail, 680 who stated they did not vote, and 24 who indicated they voted but did not remember how.

The following table reports the confidence intervals for various proportions based on the sample size and the estimated proportion. The sample sizes correspond to the overall sample size for 2024 (10,200), as well as to the different partisan and vote-mode sub-samples. For example, if an estimate from the entire SPAE sample shows that 10% of respondents answered in a certain way, the 95% confidence interval (or margin of error) would be ± 0.59 percentage points. If the statistic were calculated for Democrats alone, the 95% confidence interval would be ± 0.82 points.

This table indicates that the 95% confidence intervals for the percentages reported in this report typically range from 1 to 2 percentage points.

| Basis of sample size | Sample size | Probability | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 10% | 25% | 50% | 75% | 90% |
| Overall | 10,100 | 0.59 | 0.84 | 0.98 | 0.84 | 0.59 |
| Democrats | 5,135 | 0.82 | 1.18 | 1.37 | 1.18 | 0.82 |
| Republicans | 3,764 | 0.96 | 1.38 | 1.60 | 1.38 | 0.96 |
| Independents | 1,301 | 1.63 | 2.35 | 2.72 | 2.35 | 1.63 |
| Election Day | 3,828 | 0.95 | 1.37 | 1.58 | 1.37 | 0.95 |
| Early | 2,691 | 1.13 | 1.64 | 1.89 | 1.64 | 1.13 |
| Mail | 2,977 | 1.08 | 1.56 | 1.80 | 1.56 | 1.08 |
| Non-voters | 680 | 2.25 | 3.25 | 3.76 | 3.25 | 2.25 |

JA451

This report also compares differences between sub-samples; for instance, the percentage of Democrats who indicated they were very confident their vote was counted as intended compared to the percentage of Republicans. The 95% confidence interval for the difference of two proportions is calculated using the size of the two samples being compared and the associated percentage statistics for each sample. The table below presents examples of 95% confidence intervals for various percentages linked to Republican and Democratic samples. For example, if 10% of Democrats agreed with a particular question and 25% of Republicans did, the confidence interval for this difference (15 points) would be + 1.6 percentage points.

| Democratic % | Republican % | | | | |
|---|---|---|---|---|---|
| | 10% | 25% | 50% | 75% | 90% |
| 10% | 1.3 | 1.6 | 1.8 | 1.6 | 1.3 |
| 25% | 1.5 | 1.8 | 2.0 | 1.8 | 1.5 |
| 50% | 1.7 | 1.9 | 2.1 | 1.9 | 1.7 |
| 75% | 1.5 | 1.8 | 2.0 | 1.8 | 1.5 |
| 90% | 1.3 | 1.6 | 1.8 | 1.6 | 1.3 |

To err on the side of caution, percentage differences in this report of less than 3 percentage points should not be regarded as a statistically significant difference.

Aside from confidence intervals, a second methodological issue is misreporting whether someone has voted. It is well established in the political science literature that respondents to public opinion surveys often misreport that they voted, a phenomenon explained by the term "social desirability bias." (That is, non-voters often do not want to admit that they did not vote.) Therefore, it is likely that the non-voting rate among SPAE respondents was much greater than the 6.8% reported. As part of the SPAE project, the official state voting records of SPAE respondents are double-checked, and a code is added to the dataset indicating which respondents were validated as having voted. As of the writing of this report, that validation has not been completed—it usually takes a year to finish this task—therefore, the statistics concerning the experience of reported voters undoubtedly include individuals who did not vote but claimed they did.

JA452



# Exhibit 32

Civil Action No. 26-cv-1114 (CJN) (Lead case)

JA454

Table 12: States With Postage-Paid Election Mail

Summary

# Table 12: States With Postage–Paid Election Mail

Updated January 28, 2024

**Related Topic:** **Elections**



**Voting Outside the Polling Place Report**
This table is part of NCSL's Voting Outside the Polling Place report.

In most cases, it is up to the voter to pay for postage to return an absentee/mail ballot envelope to the election official. Some see this as a barrier to returning a ballot, or as a type of poll tax. One solution to this potential issue is to have ballot drop boxes widely available. In states that hold all-mail elections, returning by drop box or in person is the most common return method. Another option is for election officials to pre-pay postage for voters to return their ballots.

Nineteen states and Washington, D.C., require local election officials to provide return postage for mailed ballots. This is typically a business-reply mailing, so that local officials only pay for return postage for the ballots that are actually returned via the U.S. Postal Service. Note: New Jersey leaves it up to the discretion of county clerks to provide a postage-paid envelope (N.J.S.A. 19:63-12).

It's important to note that the U.S. Postal Service has a policy of prioritizing election mail, especially ballots, and will deliver a ballot envelope even if it does not have sufficient postage. Typically, though, the post office will bill the local election office for the price of postage. If the majority of voters don't affix postage, this could be a significant expense for a local election office.

For military and overseas voters, federal law specifies that ballots can be returned to election officials using a free postage-paid symbol when mailed from a U.S. Post Office, Military Postal Service Agency (APO/FPO) or U.S. Diplomatic Pouch Mail. However, if voters return the ballot through a foreign mail system or via common carrier (such as FedEx, DHL or UPS), they must pay the rate for that service themselves.

The table below provides details and citations for the 19 states and Washington, D.C., that provide postage-paid envelopes to voters.

## States With Postage–Paid Election Mail

| State | Statute | Details |
|-------|---------|---------|
| **Arizona** | Ariz. Rev. Stat. Ann. § | "The county recorder or other officer in charge of elections shall mail the early ballot and the envelope for its return postage |

JA455

| State | Statute | Details |
|---|---|---|
| | 16-542 | prepaid to the address provided by the requesting elector…" |
| California | Cal. Elections Code § 3010 | "The elections official shall deliver all of the following to each qualified applicant: (2) All supplies necessary for the use and return of the ballot, including an identification envelope with prepaid postage for the return of the vote by mail ballot."<br><br>Note: Counties bear the cost but since this is a state-mandated program, counties can claim reimbursement of those costs from the state general fund. |
| Delaware | Del. Code Ann. tit. 15, § 5504 | "Postage for all mailings made pursuant to this subsection shall be prepaid by the Department." |
| District of Columbia | D.C. Code Ann. § 1-1001.05 | "Before any upcoming voter registration or absentee ballot deadlines and with reasonable time for qualified electors to return materials to the Board:<br>(A) Provide to every unregistered qualified elector in the Department of Corrections' care or custody and endeavor to provide to every unregistered qualified elector in the Bureau of Prisons' care or custody:<br><br>(i) A voter registration form and postage-paid return envelope" |
| Hawaii | Hawaii Rev. Stat. § 11-182 | "The mailed distribution and return of absentee ballots shall be at no cost to the voter. The State and counties shall share in the cost of all postage associated with the distribution and return of absentee." |
| Idaho | Idaho Code § 34-308 | "The clerk shall issue a ballot, by mail, to every registered voter in a mail ballot precinct and shall affix postage to the return envelope sufficient to return the ballot."<br><br>Note: This applies to mail ballot precincts, which must be designated by the board of county commissioners and have no more than 140 registered electors at the last general election. |
| Indiana | Ind. Code § 3-11-4-20 | "An absentee ballot...shall be enclosed in an envelope, unsealed and stamped for return to the county election board by at least first class mail. One (1) side of the envelope must bear the name, |

Table 12: States With Postage-Paid Election Mail

| State | Statute | Details |
|---|---|---|
| | | official title, and post office address of the county election board. The pre-addressed, stamped envelope shall be furnished by the county election board." |
| **Iowa** | Iowa Code § 53.8 | "The absentee ballot and affidavit envelope shall be enclosed in or with an unsealed return envelope marked postage paid which bears the same serial number as the affidavit envelope." |
| **Maryland** | Md. Elections Code Ann. § 9-310 | "The ballot/return envelope described...provided to a voter voting by absentee ballot shall include prepaid postage." |
| **Massachusetts** | Mass. Gen. Laws Ann. ch. 54, § 25B | "The mailing of an early voting ballot shall include...an outer envelope that is pre-addressed to the local election official with postage guaranteed." |
| **Minnesota** | Minn. Stat. § 203B.07 | "Ballot return envelopes, with return postage provided, must be preaddressed to the auditor or clerk and the voter may return the ballot by mail or in person to the office of the auditor or clerk..." |
| **Missouri** | Mo. Rev. Stat. § 115.285 | "Mailing envelopes for use in returning ballots shall be printed with business reply permits so that any ballot returned by mail does not require postage. All fees and costs for establishing and maintaining the business reply and postage-free mail for all ballots cast shall be paid by the secretary of state through state appropriations." |
| **Nevada** | Nev. Rev. Stat. § 293.323 | "The return envelope sent pursuant to subsection 1 must include postage prepaid by first-class mail if the absent voter is within the boundaries of the United States, its territories or possessions or on a military base." |
| **New Mexico** | N.M. Stat. Ann. § 1-6-8 | "The secretary of state shall prescribe the form of, procure and distribute to each county clerk a supply of: (1) official inner envelopes for use in sealing the completed mailed ballot; (2) official mailing envelopes for use in returning the official inner envelope to the county clerk, which shall be postage -paid; provided that only the official mailing envelope for absentee ballots in a political party primary shall contain a designation of party affiliation..." |

JA457

Table 12: States With Postage-Paid Election Mail

| State | Statute | Details |
|-------|---------|---------|
| **Oregon** | Or. Rev. Stat. § 254.473 | "Except as provided in subsection (2) of this section, for each election held in this state, electors shall be provided with a return identification envelope that may be returned by business reply mail. The state shall bear the cost of complying with this subsection." |
| **Rhode Island** | R.I. Gen. Laws § 17-20-10 | "Upon the ballots becoming available, the secretary of state shall immediately issue and mail, by first-class mail, postage prepaid, a mail ballot to each eligible voter who has been certified. With respect to voters who have applied for these mail ballots under the provisions of § 17-20-2(1), the secretary of state shall include with the mail ballots a stamped, return envelope addressed to the board of elections."<br><br>Note: According to this press release, postage is covered by the secretary of state's budget. |
| **Virginia** | Va. Code § 24.2-706 | "the general registrar shall, at the time when the printed ballots for the election are available, send by the deadline set out in § 24.2-612, obtaining a certificate or other evidence of either first-class or expedited mailing or delivery from the United States Postal Service or other commercial delivery provider, or deliver to him in person in the office of the registrar, the following items and nothing else: ...An envelope, properly addressed and postage prepaid, for the return of the ballot to the general registrar by mail or by the applicant in person, or to a drop-off location." |
| **Washington** | Wash. Rev. Code § 29A.40.091 | "Return envelopes for all election ballots must include prepaid postage." |
| **West Virginia** | W. Va. Code § 3-3-5 | "Within one day after the official designated to supervise and conduct absentee voting has both the completed application and the ballot, the official shall mail to the voter at the address given on the application the following items as required and as prescribed by the Secretary of State: .... One postage paid envelope, unsealed, designated "Absent Voter's Ballot Envelope No. 2..." |

JA458

Table 12: States With Postage Paid Election Mail

| State | Statute | Details |
|-------|---------|---------|
| **Wisconsin** | Wis. Stat. § 6.87 | "If the ballot is mailed, and the ballot qualifies for mailing free of postage under federal free postage laws, the clerk shall affix the appropriate legend required by U.S. postal regulations. Otherwise, the clerk shall pay the postage required for return when the ballot is mailed from within the United States. If the ballot is not mailed by the absentee elector from within the United States, the absentee elector shall provide return postage." |

## Note: This page should be used for general informational purposes only.

Our organization does not run elections and cannot provide legal advice. If you are a voter looking for assistance, please contact your local election official. You can find your local election official's website and contact information by using this database from the US Vote Foundation.

## Related Resources

Updated April 14, 2026

### Artificial Intelligence (AI) in Elections and Campaigns

Policy makers and campaigns are having to adapt to the explosion in artificial intelligence (AI). This page covers statutes and legislation that relate to AI in elections and campaigns.

**Elections**

Table

Updated April 13, 2026

### How States Differentiate Presidential Primaries from State Primaries

This webpage shows which states use different types of primaries for presidential elections versus state elections.

**Elections**

Table

Updated April 10, 2026

### Federal Requests for Statewide Voter Lists

JA459

The Civil Rights Division of the Department of Justice began sending requests to chief election officials across the country to inspect copies of their statewide voter registration lists in May 2025. Since then they've sued more than half of the states and Washington, D.C. for not providing the lists that include sensitive voter information.

### Elections

Table

JA460

# Exhibit 33

Civil Action No. 26-cv-1114 (CJN) (Lead case)

JA461

# Exclusive: UPS, FedEx warn they cannot carry ballots like U.S. Postal Service

reuters.com/article/business/exclusive-ups-fedex-warn-they-cannot-carry-ballots-like-us-postal-service-idUSKCN25B00D

Lisa Baertlein                                                                August 16, 2020



LOS ANGELES (Reuters) - United Parcel Service and FedEx on Friday shot down social media calls that they step in to deliver mail-in ballots from the U.S. Postal Service, which is warning states of potentially "significant" delays.

"State ballots must be postmarked to be considered valid and only the USPS has lawful postmarking status. Therefore UPS, FedEx and other private parties cannot technically be involved in shipping ballots," UPS told Reuters in a statement.

Advertisement · Scroll to continue

"FedEx does accept individual ballots, and we advise that customers planning to return their ballots via FedEx should closely review their state's guidelines on absentee voting and deadlines for ballots or related election documents," FedEx said.

Republican President Donald Trump on Thursday said he opposed providing funds for the struggling Postal Service for mail voting, which is expected to surge to 50% as the coronavirus pandemic rages ahead of the Nov. 3 presidential election.

The Postal Service said on Friday it has written to 46 states and the District of Columbia warning there is a significant risk voters will not have enough time to complete and return their ballots.

Advertisement · Scroll to continue

In a viral Twitter post here on Thursday, author and radio host David Rothkopf said there was a "big opportunity" for UPS and FedEx to deliver ballots for free. "You'll overnight become the most

JA462

beloved and respected organization in America," he wrote.

Various laws and regulations for the most part prohibit private delivery companies from handling mail-in and absentee ballots, the companies and experts told Reuters. Exceptions include deliveries deemed "extremely urgent" by statute and deliveries on the day of and afternoon prior to election day.

In some states, collection would be prohibited because it would be considered "ballot harvesting," said Tammy Patrick, a former Arizona election official and senior advisor to the Democracy Fund foundation.

There are other hurdles that those companies, already coping with a pandemic-related surge in e-commerce shipments, would have to overcome.

For example, the Postal Service touches every U.S. mailbox six days a week. Private companies visit only when they have a delivery or an pre-arranged pickup - and they do not have blanket coverage in rural areas.

Amazon.com's upstart delivery service has also been floated as an alternative. That service does not do residential pickups.

Representatives from Amazon and the Postal Service did not immediately respond to requests for comment.

"Establishing a protocol of how they would collect the ballots would be a challenge," Patrick said.

Domestic costs would skyrocket since delivery firms charge significantly more for deliveries than the price of a 55-cent stamp, which is the cost to return many ballots.

And, international costs would be "astronomical," Patrick said.

Reporting by Lisa Baertlein in Los Angeles; Editing by Greg Mitchell and Daniel Wallis

Our Standards: The Thomson Reuters Trust Principles. ↗ , opens new tab

JA463

# Exhibit 34

Civil Action No. 26-cv-1114 (CJN) (Lead case)

# USPS releases report on 2024 election – USPS Employee News

 **news.usps.com**/2024/12/03/usps-releases-report-on-2024-election

December 3, 2024



On average, USPS delivered completed ballots from voters to election officials within one day during the 2024 general election.

The Postal Service processed 99.22 million ballots for last month's general election, with 99.88 percent delivered from voters to election officials within seven days.

On average, completed ballots were delivered from voters to election officials within one day.

The data, which covers the period from Sept. 1 through Nov. 15, is included in a post-election analysis report that USPS released this week.

The report also shows 99.64 percent of ballots sent by voters to election officials were delivered within five days, while 97.73 percent of ballots sent by voters to election officials were delivered within three days.

JA465

The Postal Service also deployed extraordinary measures in the weeks before Election Day in areas of the Southeast that were devastated by hurricanes Helene and Milton. As a result, performance results for votes by mail from those affected areas were comparable with the rest of the nation, the report said.

The extraordinary measures included extra deliveries and collections, special pickups; specialized sorting plans at processing facilities to expedite delivery to local election boards; and local handling and transportation of ballots.

The organization delivered 3.37 billion pieces of Political Mail and Election Mail in 2024, according to the report.

The Postal Service report also offers recommendations to election officials in the nearly 8,000 election jurisdictions across the nation, including:

• Following and implementing the organization's advice on mailpiece preparation;

• Applying visibility tools to Election Mail and Ballot Mail;

• Understanding postal operations; and

• Continuing voter education initiatives on state laws and reasonable mailing deadlines.

The organization's Dec. 2 news release has more information.

JA466

# Exhibit 35

Civil Action No. 26-cv-1114 (CJN) (Lead case)

JA467

# Department of Homeland Security

## *U.S. Citizenship and Immigration Services*

### *Budget Overview*



**Fiscal Year 2026**

**Congressional Justification**

**Department of Homeland Security**                                    **U.S. Citizenship and Immigration Services**

The FY 2026 discretionary funding supports the E-Verify Program.

E-Verify is a web-based system that allows enrolled employers to confirm the eligibility of their employees to work in the United States. The Systematic Alien Verification for Entitlements (SAVE) program is funded within IEFA. Due to the similarities between E-Verify and SAVE, both programs use the Verification Information System and secondary IT systems and services. Shared costs are distributed between the two programs. USCIS is incorporating a phased-in user fee increase to $3.10 per verification request, regardless of whether the case involves additional verification requests. Simultaneously, USCIS is eliminating fees for non-federal agencies to expand the use of SAVE.

# Department of Homeland Security

## *U.S. Citizenship and Immigration Services*

### *Immigration Examinations Fee Account*



**Fiscal Year 2026**

**Congressional Justification**

**U.S. Citizenship and Immigration Services**                                              **Immigration Examinations Fee Account**

# Table of Contents

*Immigration Examinations Fee Account* .........................................................................................................1

Budget Comparison and Adjustments.................................................................................................... 3

Summary of Budget Changes ................................................................................................................ 8

Justification of Pricing Changes ........................................................................................................... 9

Justification of Program Changes ....................................................................................................... 10

Personnel Compensation and Benefits................................................................................................ 12

Non-Pay Budget Exhibits .................................................................................................................... 13

## Immigration Examinations Fee Account
## Budget Comparison and Adjustments
## Comparison of Fee Collections
*(Dollars in Thousands)*

|  | FY 2024 Enacted | FY 2025 Full-Year CR | FY 2026 President's Budget | FY 2025 to FY 2026 Total Changes |
|---|---|---|---|---|
| Immigration Examination Fee Account: Non-Premium | $4,543,266 | $5,648,253 | $5,370,186 | ($278,067) |
| Immigration Examination Fee Account: Premium | $1,401,304 | $1,364,221 | $1,372,397 | $8,176 |
| **Total** | **$5,944,570** | **$7,012,474** | **$6,742,583** | **($269,891)** |
| Subtotal Mandatory - Fee | $5,944,570 | $7,012,474 | $6,742,583 | ($269,891) |

The Immigration Examinations Fee Account (IEFA) is the primary funding source for U.S. Citizenship and Immigration Services (USCIS). The IEFA provides the resources to:

- Strengthen and effectively administer the immigration system.
- Strengthen national security safeguards and combat fraud.
- Reinforce quality and consistency in administering immigration benefits.

**Fee Authority:** The IEFA is authorized via Sections 286(m), (n), (t), and (u) of the *Immigration and Nationality Act* (INA) (8 U.S.C. § 1356(m), (n), (t), (u)). In addition, section 286(u) of the INA, (8 U.S.C. § 1356(u)), provides the Secretary with authority to establish and collect a premium fee for the premium processing of certain immigration benefit types. The *Continuing Appropriations Act, 2021 and Other Extensions Act*, P.L. 116-159, which was signed into law on October 1, 2020, contains the *Emergency Stopgap USCIS Stabilization Act* (USCIS Stabilization Act). The USCIS Stabilization Act increased the fee for petitions that were previously designated for premium processing service, broadened the authorized use of funds, and allows for the expansion of premium processing to new categories of petitions and applications.

**Fee Uses:** Fees collected with the submission of immigration benefit requests are deposited into IEFA and used to fund the full cost of processing immigration benefit requests, including the cost of providing services without charge to applicants whose fees are waived or to whom a fee exemption applies.

**U.S. Citizenship and Immigration Services**                    **Immigration Examinations Fee Account**

The IEFA supports the following activities:

- Adjudication Operations: Contains Directorate and Program Offices (DPOs) responsible for safeguarding the integrity of the nation's lawful immigration system by leading agency efforts to combat fraud, detect national security and public safety threats, and maximize law enforcement and Intelligence Community partnerships. The Fraud Detection and National Security Directorate (FDNS) leads the Agency's efforts to determine whether individuals or organizations filing for immigration benefits pose a threat to national security, public safety, or the integrity of the Nation's immigration system. Both the Field Office Directorate and the Service Center Operations Directorate perform the processing of immigration benefit applications in offices located throughout the United States. Embedded within each of these directorates are officers dedicated to improving the accuracy, integrity, and timeliness of USCIS decisions. Also included are public safety components and support services such as guard services, janitorial services, rent and other overhead.

- Immigration Policy and Support: Supports policy and advisory components as well as program office components not included elsewhere. Also includes components responsible for management of space, contracts, security, emergency management, enterprise risk management, training, human resources, as well as costs associated with design, development, and deployment of IT services and solutions in support of immigration policy and the USCIS enterprise.

- Refugee, Asylum and International Operations: The Refugee, Asylum and International Operations Directorate (RAIO) is responsible for adjudicating asylum and refugee status applications for individuals seeking protection from persecution. RAIO also facilitates the process for qualifying relatives of admitted principal refugees and approved principal asylees to immigrate to the United States. The International and Refugee Affairs Division (IRAD) is responsible for the administration of the Secretary of Homeland Security's exercise of authority to grant parole to certain individuals outside the United States for urgent humanitarian or significant public benefit reasons and is currently abiding by the regulations outlined under executive order 14013. IRAD also manages USCIS' permanent international presence. The Asylum Division adjudicates affirmative asylum applications, including conducting applicant interviews, and conducts credible fear screenings.

- Immigration Records and Applicant Services: Contains DPOs that primarily provide interaction and services to inter/intra agency partners and the general public and associated overhead, as well as provides for the development of both external public products and internal communications, the administration of biometric services and identity services at application support centers, facilitating FBI namechecks and biometric checks, responses to Freedom of Information Act (FOIA) requests, file management and handling services for non-FOIA requests, administering the Systematic Alien Verification for Entitlements (SAVE) Program, and managing immigration data systems.

- Premium Processing (Including Transformation)[1]: Expenditures from the collection of premium processing fees in front line DPOs (SCOPS, FOD and RAIO) and program office components to support information technology and other infrastructure improvements in adjudication processes, personnel and contracts supporting the processing of premium processing requests, other costs associated with overheads and the lockbox operations, and otherwise offset the cost of providing adjudications and naturalization services.

---

[1] The uses of premium processing fees are statutorily defined in 8 U.S.C. 1356(u).

**U.S. Citizenship and Immigration Services**                                    **Immigration Examinations Fee Account**

**Change Mechanism**: Notice and comment rulemaking for non-premium funds; direct final rule for premium funds.

- Non-premium: USCIS conducts a biennial fee review, which takes into consideration existing operations, workload volume forecasts, and proposed policy initiatives to determine if current fees will recover the full cost of its operations including the cost of services provided at no charge. If USCIS determines its fees will not recover full cost, then the Department of Homeland Security (DHS) may propose to adjust its fees via a notice and comment rulemaking in the Federal Register. DHS receives public comments on USCIS' Notice of Proposed Rulemaking (NPRM), incorporates feedback as appropriate, and publishes a final rule in the Federal Register to adjust fees.

- Premium: USCIS is authorized to adjust its premium processing fee on a biennial basis by the percentage (if any) by which the Consumer Price Index for All Urban Consumers (CPI-U) for the month of June preceding the date on which such adjustment takes effect exceeds CPI-U for the same month of the second preceding calendar year. DHS issues a direct final rule in the Federal Register to reflect this change and notify the public.

USCIS published the FY 2022/2023 IEFA Fee Rule NPRM in the Federal Register on January 4, 2023. The Public Comment period for this NPRM ended March 13, 2023. The NPRM proposed updates to the Fee Schedule and additional changes in forms and fee structure.[2] The Final IEFA Fee Rule was published on January 31, 2024, with an effective date of April 1, 2024.[3]

On December 28, 2023, USCIS issued a final fee rule to increase premium processing fees to reflect the amount of inflation for the period of June 2021 to June 2023 according to the CPI-U. The effective date of the final fee rule was February 26, 2024.[4] The adjustment increased premium processing fees from $1,500 to $1,685, $1,750 to $1,965, and $2,500 to $2,805.

**Previous Changes:**
Current non-premium fees became effective on April 1, 2024.[5] The fees for petitions that were previously designated for premium processing service were last adjusted on October 1, 2020, in accordance with P.L. 116-159. USCIS implemented the new premium processing fees on February 26, 2024.[6]

**Recovery Rate:** IEFA non-premium fees are intended to recover full cost. Premium fees are not intended to recover full cost. The charts below are provided to identify the recovery rate over the past five years.

---

[2] For additional information, see the Unified Agenda entry for the USCIS fee schedule at Federal Register: U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements

[3] https://www.federalregister.gov/documents/2024/01/31/2024-01427/us-citizenship-and-immigration-services-fee-schedule-and-changes-to-certain-other-immigration

[4] https://www.federalregister.gov/documents/2023/12/28/2023-28529/adjustment-to-premium-processing-fees

[5] For additional information on non-premium fee changes, please see 89 FR 6194: https://www.federalregister.gov/documents/2024/01/31/2024-01427/us-citizenship-and-immigration-services-fee-schedule-and-changes-to-certain-other-immigration.

[6] Reminder: Adjustment to Premium Processing Fees Takes Effect Today, https://www.uscis.gov/newsroom/alerts/reminder-adjustment-to-premium-processing-fees-takes-effect-today (Release Date 02/26/2024).

**U.S. Citizenship and Immigration Services**                    **Immigration Examinations Fee Account**

As of April 1, 2024, USCIS is now collecting fees according to the final FY 2022/2023 Fee Rule.[7]

## Historical Collections and Cost Recovery Rate[8]

| (Dollars in Thousands) | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | Five-Year Total |
|---|---|---|---|---|---|---|
| Immigration Examinations Fee Account (Non-Premium) | $3,334,165 | $3,726,269 | $3,590,798 | $3,838,685 | $4,962,119 | $19,452,036 |
| Total of Eligible Expenses | $3,367,355 | $3,540,254 | $3,537,038 | $3,861,198 | $4,373,988 | $18,679,833 |
| **Cost Recovery %** | **99.0%** | **105.3%** | **101.5%** | **99.4%** | **113.4%** | **104.1%** |

| (Dollars in Thousands) | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | Five-Year Total |
|---|---|---|---|---|---|---|
| Immigration Examinations Fee Account (Premium) | $493,000 | $987,116 | $1,244,039 | $1,082,835 | $1,256,101 | $5,063,091 |
| Total of Eligible Expenses | $528,474 | $761,681 | $872,076 | $1,216,570 | $1,314,571 | $4,693,372 |
| **Cost Recovery %** | **93.3%** | **129.6%** | **142.7%** | **89.0%** | **95.6%** | **107.9%** |

**Changes in Fee Collections:** In April 2024, USCIS implemented a new fee rule for non-premium fees. This was the first increase in non-premium fees since FY 2017. Revenue collection for FY 2024 exceeded forecast based upon the increase in fees. Revenue collection for FY 2025 is forecast to increase from FY 2024 as it will be the first full year of the new fees. USCIS is also projecting an increase in forms receipts in FY 2025, enhancing collections. In February 2024, USCIS implemented an inflationary adjustment to premium processing fees. This led to an increase in collections in FY 2024. USCIS expects premium revenue collections to continue to increase in FY 2025 as this will be the first full year of the new fees.

---

[7] USCIS current fee schedule: https://www.uscis.gov/sites/default/files/document/forms/g-1055.pdf
[8] Includes minor variations due to rounding.

**U.S. Citizenship and Immigration Services**                                    **Immigration Examinations Fee Account**

## Immigration Examinations Fee Account
## Budget Spending Authority Request[9]

*(Dollars in Thousands)*

| | FY 2024 Enacted | | | FY 2025 Full-Year CR | | | FY 2026 President's Budget | | | FY 2025 to FY 2026 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| Adjudication Operations (Immigration Services) | 13,244 | 11,866 | $2,124,623 | 13,608 | 12,670 | $2,342,432 | 13,731 | 12,840 | $2,358,416 | 123 | 170 | $15,984 |
| Immigration Policy and Support (Immigration Services) | 3,316 | 2,971 | $1,413,157 | 3,115 | 2,948 | $1,695,132 | 3,419 | 2,890 | $1,671,586 | 304 | (58) | ($23,546) |
| Refugee and Asylum Operations (Immigration Services) | 2,014 | 1,805 | $424,950 | 2,061 | 1,851 | $435,558 | 2,474 | 2,016 | $433,605 | 413 | 165 | ($1,953) |
| Immigration Records and Applicant Services (Immigration Services) | 1,544 | 1,383 | $605,761 | 1,841 | 1,706 | $663,621 | 1,691 | 1,445 | $718,054 | (150) | (261) | $54,433 |
| Premium Processing Including Transformation (Immigration Services) | 3,293 | 2,950 | $1,332,887 | 3,578 | 3,129 | $1,423,812 | 3,534 | 2,913 | $1,357,573 | (44) | (216) | ($66,239) |
| **Total** | **23,411** | **20,975** | **$5,901,378** | **24,203** | **22,304** | **$6,560,555** | **24,849** | **22,104** | **$6,539,234** | **646** | **(200)** | **($21,321)** |
| Subtotal Mandatory - Fee | 23,411 | 20,975 | $5,901,378 | 24,203 | 22,304 | $6,560,555 | 24,849 | 22,104 | $6,539,234 | 646 | (200) | ($21,321) |

---

[9] "Budget Spending Authority Request" refers to the funding USCIS anticipates to obligate, as opposed to "Budget Authority" which refers to budget resources.

# Immigration Examinations Fee Account
## Summary of Budget Changes
*(Dollars in Thousands)*

| | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
|---|---|---|---|---|---|
| **FY 2024 Enacted** | **23,411** | **20,975** | **$3,291,256** | **$2,610,122** | **$5,901,378** |
| **FY 2025 Full-Year CR** | **24,203** | **22,304** | **$3,707,133** | **$2,853,422** | **$6,560,555** |
| **FY 2026 Base Budget** | **24,203** | **22,304** | **$3,707,133** | **$2,853,422** | **$6,560,555** |
| **Total Technical Changes** | - | - | - | - | - |
| 2025 Civilian Pay Raise and Annualization | - | - | $18,051 | - | $18,051 |
| Annualization of Enhancements | - | 415 | $68,561 | - | $68,561 |
| **Total Annualizations and Non-Recurs** | **-** | **415** | **$86,612** | **-** | **$86,612** |
| Enhancement Priorities Adjustment | - | (271) | ($46,690) | - | ($46,690) |
| Hiring Priorities Adjustment | - | (968) | ($138,470) | - | ($138,470) |
| **Total Pricing Changes** | **-** | **(1,239)** | **($185,160)** | **-** | **($185,160)** |
| **Total Adjustments-to-Base** | **-** | **(824)** | **($98,548)** | **-** | **($98,548)** |
| **FY 2026 Current Services** | **24,203** | **21,480** | **$3,608,585** | **$2,853,422** | **$6,462,007** |
| **Total Transfers** | - | - | - | - | - |
| H-1B Transfer | (109) | (109) | ($16,760) | ($1,240) | ($18,000) |
| IRAD Transfer | 413 | 413 | $60,681 | ($28,604) | $32,077 |
| SAVE Expansion | 109 | 109 | $18,447 | $52,300 | $70,747 |
| SCOSS Contract | 233 | 211 | $23,444 | ($31,041) | ($7,597) |
| **Total Program Changes** | **646** | **624** | **$85,812** | **($8,585)** | **$77,227** |
| **FY 2026 Request** | **24,849** | **22,104** | **$3,694,397** | **$2,844,837** | **$6,539,234** |
| **FY 2025 TO FY 2026 Change** | **646** | **(200)** | **($12,736)** | **($8,585)** | **($21,321)** |

# Immigration Examinations Fee Account
## Justification of Pricing Changes
*(Dollars in Thousands)*

| | FY 2026 President's Budget | | | | |
| --- | --- | --- | --- | --- | --- |
| | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
| **Pricing Change 1 - Enhancement Priorities Adjustment** | - | **(271)** | **($46,690)** | - | **($46,690)** |
| Adjudication Operations (Immigration Services) | - | (44) | ($6,490) | - | ($6,490) |
| Immigration Policy and Support (Immigration Services) | - | (54) | ($10,921) | - | ($10,921) |
| Refugee and Asylum Operations (Immigration Services) | - | (105) | ($17,187) | - | ($17,187) |
| Immigration Records and Applicant Services (Immigration Services) | - | (6) | ($939) | - | ($939) |
| Premium Processing Including Transformation (Immigration Services) | - | (62) | ($11,153) | - | ($11,153) |
| **Pricing Change 2 - Hiring Priorities Adjustment** | - | **(968)** | **($138,470)** | - | **($138,470)** |
| Adjudication Operations (Immigration Services) | - | (97) | ($13,869) | - | ($13,869) |
| Immigration Policy and Support (Immigration Services) | - | (327) | ($47,934) | - | ($47,934) |
| Refugee and Asylum Operations (Immigration Services) | - | (248) | ($35,709) | - | ($35,709) |
| Immigration Records and Applicant Services (Immigration Services) | - | (124) | ($17,518) | - | ($17,518) |
| Premium Processing Including Transformation (Immigration Services) | - | (172) | ($23,440) | - | ($23,440) |
| **Total Pricing Changes** | - | **(1,239)** | **($185,160)** | - | **($185,160)** |

# Immigration Examinations Fee Account
## Justification of Program Changes
*(Dollars in Thousands)*

| | FY 2026 President's Budget | | | | |
| --- | --- | --- | --- | --- | --- |
| | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
| **Program Change 1 - H-1B Transfer** | **(109)** | **(109)** | **($16,760)** | **($1,240)** | **($18,000)** |
| Adjudication Operations (Immigration Services) | (65) | (65) | ($10,056) | ($744) | ($10,800) |
| Premium Processing Including Transformation (Immigration Services) | (44) | (44) | ($6,704) | ($496) | ($7,200) |
| **Program Change 2 - IRAD Transfer** | **413** | **413** | **$60,681** | **($28,604)** | **$32,077** |
| Refugee and Asylum Operations (Immigration Services) | 413 | 413 | $60,681 | ($28,604) | $32,077 |
| **Program Change 3 - SAVE Expansion** | **109** | **109** | **$18,447** | **$52,300** | **$70,747** |
| Immigration Records and Applicant Services (Immigration Services) | 109 | 109 | $18,447 | $52,300 | $70,747 |
| **Program Change 4 - SCOSS Contract** | **233** | **211** | **$23,444** | **($31,041)** | **($7,597)** |
| Adjudication Operations (Immigration Services) | 188 | 188 | $20,211 | ($11,192) | $9,019 |
| Immigration Policy and Support (Immigration Services) | 45 | 23 | $3,233 | $18,023 | $21,256 |
| Premium Processing Including Transformation (Immigration Services) | - | - | - | ($37,872) | ($37,872) |
| **Total Program Changes** | **646** | **624** | **$85,812** | **($8,585)** | **$77,227** |

## Program Change 1 – H-1B Transfer:

| *($ in thousands)* | Pos | FTE | Amount |
| --- | --- | --- | --- |
| Base: Current Services & Transfers | 109 | 109 | $18,000 |
| Program Change | (109) | (109) | ($18,000) |

**Description/Justification**

This program transfers 109 positions to the H-1B Nonimmigrant Petitioner Account to process H-1B applications to replace contract work that is ending. These personnel will focus on managing electronic adjudications and supporting the H-1B processing efforts.

## Program Change 2 – IRAD Transfer:

| *($ in thousands)* | Pos | FTE | Amount |
| --- | --- | --- | --- |
| Base: Current Services & Transfers | 87 | 87 | $76,561 |
| Program Change | 413 | 413 | $32,077 |

**U.S. Citizenship and Immigration Services**                    **Immigration Examinations Fee Account**

**Description/Justification**

This program change funds an additional 413 positions that were supported by appropriations in the Operations and Support Account and transitions these costs to USCIS's fee account.

**Program Change 3 – SAVE Expansion:**

| ($ in thousands) | Pos | FTE | Amount |
|---|---|---|---|
| Base: Current Services & Transfers | 300 | 300 | $74,145 |
| Program Change | 109 | 109 | $70,747 |

**Description/Justification**

This program change funds 109 positions and non-pay costs for a total increase of $70.7M to strengthen SAVE by enhancing its infrastructure and applications to handle workload and system usage growth; this increase will also support the development and deployment of a voter verification service that can provide voter verification and voter list maintenance without requiring a DHS enumerator. This requirement currently limits States' ability to leverage the existing SAVE service due to their inability to obtain and provide DHS-issued enumerators. USCIS will create engagements with organizations to fully understand States' needs and expectations for a voter verification service, take a user-centric approach to designing such a service, developing technical capability by leveraging existing Verification Information System (VIS) services, modifying other VIS services, and in some cases building new functionality.

**Program Change 4 – SCOSS Contract:**

| ($ in thousands) | Pos | FTE | Amount |
|---|---|---|---|
| Base: Current Services & Transfers | 381 | 381 | $109,880 |
| Program Change | 233 | 211 | ($7,597) |

**Description/Justification**

The Service Center Operations Support Services (SCOSS) Contract will expire on November 30, 2025, and will not be renewed. This program change removes the contract costs and increases payroll costs to account for the insourced positions needed to accomplish the work that would have been handled by the contract if it were renewed. USCIS projects cost savings by eliminating the contract and moving away from manual processing to electronic form intake.

**U.S. Citizenship and Immigration Services**                              **Immigration Examinations Fee Account**

## Immigration Examinations Fee Account
## Personnel Compensation and Benefits
### Pay Summary
*(Dollars in Thousands)*

| | FY 2024 Enacted | | | | FY 2025 Full-Year CR | | | | FY 2026 President's Budget | | | | FY 2025 to FY 2026 Total Changes | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate |
| Adjudication Operations (Immigration Services) | 13,244 | 11,866 | $1,804,948 | $152.05 | 13,608 | 12,670 | $1,974,711 | $155.86 | 13,731 | 12,840 | $2,002,631 | $155.97 | 123 | 170 | $27,920 | $0.11 |
| Immigration Policy and Support (Immigration Services) | 3,316 | 2,971 | $571,313 | $192.22 | 3,115 | 2,948 | $757,180 | $256.68 | 3,419 | 2,890 | $715,611 | $247.44 | 304 | (58) | ($41,569) | ($9.23) |
| Refugee and Asylum Operations (Immigration Services) | 2,014 | 1,805 | $286,677 | $158.77 | 2,061 | 1,851 | $296,270 | $160.06 | 2,474 | 2,016 | $322,921 | $160.18 | 413 | 165 | $26,651 | $0.12 |
| Immigration Records and Applicant Services (Immigration Services) | 1,544 | 1,383 | $219,914 | $158.95 | 1,841 | 1,706 | $276,106 | $161.84 | 1,691 | 1,445 | $278,239 | $192.55 | (150) | (261) | $2,133 | $30.71 |
| Premium Processing Including Transformation (Immigration Services) | 3,293 | 2,950 | $408,404 | $138.39 | 3,578 | 3,129 | $402,866 | $128.75 | 3,534 | 2,913 | $374,995 | $128.73 | (44) | (216) | ($27,871) | ($0.02) |
| **Total** | **23,411** | **20,975** | **$3,291,256** | **$156.85** | **24,203** | **22,304** | **$3,707,133** | **$166.19** | **24,849** | **22,104** | **$3,694,397** | **$167.11** | **646** | **(200)** | **($12,736)** | **$0.93** |
| | | | | | | | | | | | | | | | | |
| Subtotal Mandatory - Fee | 23,411 | 20,975 | $3,291,256 | $156.85 | 24,203 | 22,304 | $3,707,133 | $166.19 | 24,849 | 22,104 | $3,694,397 | $167.11 | 646 | (200) | ($12,736) | $0.93 |

## Pay by Object Class
*(Dollars in Thousands)*

| | FY 2024 Enacted | FY 2025 Full-Year CR | FY 2026 President's Budget | FY 2025 to FY 2026 Total Changes |
|---|---|---|---|---|
| 11.1 Full-time Permanent | $2,257,890 | $2,480,516 | $2,472,607 | ($7,909) |
| 11.3 Other than Full-time Permanent | $13,089 | $14,829 | $14,981 | $152 |
| 11.5 Other Personnel Compensation | $68,935 | $99,149 | $102,097 | $2,948 |
| 12.1 Civilian Personnel Benefits | $950,107 | $1,112,139 | $1,104,206 | ($7,933) |
| 13.0 Benefits for Former Personnel | $1,235 | $500 | $506 | $6 |
| **Total - Personnel Compensation and Benefits** | **$3,291,256** | **$3,707,133** | **$3,694,397** | **($12,736)** |
| **Positions and FTE** | | | | |
| Positions - Civilian | 23,411 | 24,203 | 24,849 | 646 |
| FTE - Civilian | 20,975 | 22,304 | 22,104 | (200) |

**CIS – IEFA - 12**
JA481

**U.S. Citizenship and Immigration Services**                                              **Immigration Examinations Fee Account**

# Immigration Examinations Fee Account
## Non-Pay Budget Exhibits
### Non-Pay Summary
*(Dollars in Thousands)*

| | FY 2024 Enacted | FY 2025 Full-Year CR | FY 2026 President's Budget | FY 2025 to FY 2026 Change |
|---|---|---|---|---|
| Adjudication Operations (Immigration Services) | $319,675 | $367,721 | $355,785 | ($11,936) |
| Immigration Policy and Support (Immigration Services) | $841,844 | $937,952 | $955,975 | $18,023 |
| Refugee and Asylum Operations (Immigration Services) | $138,273 | $139,288 | $110,684 | ($28,604) |
| Immigration Records and Applicant Services (Immigration Services) | $385,847 | $387,515 | $439,815 | $52,300 |
| Premium Processing Including Transformation (Immigration Services) | $924,483 | $1,020,946 | $982,578 | ($38,368) |
| **Total** | **$2,610,122** | **$2,853,422** | **$2,844,837** | **($8,585)** |
| | | | | |
| Subtotal Mandatory - Fee | $2,610,122 | $2,853,422 | $2,844,837 | ($8,585) |

## Non-Pay by Object Class
*(Dollars in Thousands)*

| | FY 2024 Enacted | FY 2025 Full-Year CR | FY 2026 President's Budget | FY 2025 to FY 2026 Change |
|---|---|---|---|---|
| 21.0 Travel and Transportation of Persons | $29,762 | $34,470 | $34,573 | $103 |
| 22.0 Transportation of Things | $12,085 | $20,407 | $20,407 | - |
| 23.1 Rental Payments to GSA | $268,263 | $272,484 | $271,728 | ($756) |
| 23.2 Rental Payments to Others | $202 | $205 | $196 | ($9) |
| 23.3 Communications, Utilities, & Miscellaneous | $133,949 | $136,057 | $136,292 | $235 |
| 24.0 Printing and Reproduction | $8,756 | $12,828 | $12,828 | - |
| 25.1 Advisory & Assistance Services | $993,312 | $980,650 | $934,612 | ($46,038) |
| 25.2 Other Services from Non-Federal Sources | $54,348 | $105,619 | $105,632 | $13 |
| 25.3 Other Purchases of goods and services | $370,449 | $367,268 | $367,191 | ($77) |
| 25.4 Operations & Maintenance of Facilities | $2,599 | $3,138 | $3,138 | - |
| 25.7 Operation & Maintenance of Equipment | $178,075 | $255,002 | $262,677 | $7,675 |

**CIS – IEFA - 13**

**U.S. Citizenship and Immigration Services**                    **Immigration Examinations Fee Account**

| | | | | |
|---|---|---|---|---|
| 26.0 Supplies & Materials | $27,093 | $27,174 | $27,253 | $79 |
| 31.0 Equipment | $471,996 | $492,241 | $522,431 | $30,190 |
| 32.0 Land and Structures | $55,064 | $141,092 | $141,092 | - |
| 41.0 Grants, Subsidies, and Contributions | $82 | - | - | - |
| 42.0 Insurance Claims and Indemnities | $4,087 | $4,787 | $4,787 | - |
| **Total - Non Pay Budget Object Class** | **$2,610,122** | **$2,853,422** | **$2,844,837** | **($8,585)** |

# Department of Homeland Security

## *U.S. Citizenship and Immigration Services*

### *Immigration Examinations Fee Account*



**Fiscal Year 2027**

**Congressional Justification**

# Table of Contents

*Immigration Examinations Fee Account* ..........................................................................................................1

**Budget Comparison and Adjustments** ........................................................................................ 3

**Summary of Budget Changes**........................................................................................................ 9

**Justification of Pricing Changes** ............................................................................................... 10

**Personnel Compensation and Benefits**...................................................................................... 11

**Non-Pay Budget Exhibits** ........................................................................................................... 14

## Immigration Examinations Fee Account
## Budget Comparison and Adjustments
## Comparison of Fee Collections
*(Dollars in Thousands)*

|  | FY 2025 Full-Year CR | FY 2026 Annualized CR | FY 2027 President's Budget | FY 2026 to FY 2027 Total Changes |
|---|---|---|---|---|
| Immigration Examination Fee Account: Non-Premium | $5,648,253 | $4,901,196 | $5,241,614 | $340,418 |
| Immigration Examination Fee Account: Premium | $1,364,221 | $1,472,163 | $1,520,270 | $48,107 |
| **Total** | **$7,012,474** | **$6,373,359** | **$6,761,884** | **$388,525** |
| Subtotal Mandatory - Fee | $7,012,474 | $6,373,359 | $6,761,884 | $388,525 |

The Immigration Examinations Fee Account (IEFA) is the primary funding source for U.S. Citizenship and Immigration Services (USCIS). The IEFA provides the resources to:

- Strengthen and effectively administer the immigration system.
- Strengthen national security safeguards and combat fraud.
- Reinforce quality and consistency in legally administering immigration benefits.

**Fee Authority:** The IEFA is authorized via Sections 286(m), (n), (t), and (u) of the *Immigration and Nationality Act* (INA) (8 U.S.C. § 1356(m), (n), (t), (u)). In addition, section 286(u) of the INA, (8 U.S.C. § 1356(u)), provides the Secretary with authority to establish and collect a premium fee for the premium processing of certain immigration benefit types. The *Continuing Appropriations Act, 2021 and Other Extensions Act*, Pub. L. 116-159, which was signed into law on October 1, 2020, contains the *Emergency Stopgap USCIS Stabilization Act* (USCIS Stabilization Act). The USCIS Stabilization Act increased the fee for petitions that were previously designated for premium processing service, broadened the authorized use of funds, and allowed for the expansion of premium processing to new categories of petitions and applications. On July 4, 2025, the *Working Families Tax Cut Act (WFTC)* (Public Law 119-21) was signed into law, and established additional fees for various immigration-related forms, benefits, statuses, petitions, applications, and requests administered by multiple government agencies, including USCIS. USCIS will collect and retain a portion of the revenue from some of these fees in the IEFA. The remaining revenue will be deposited with the general fund of the Treasury.

**Fee Uses:** Fees collected with the submission of immigration benefit requests are deposited into IEFA and used to fund the full cost of processing immigration benefit requests, including the cost of providing services without charge to applicants whose fees are waived or to whom a fee exemption applies.

**U.S. Citizenship and Immigration Services**                                    **Immigration Examinations Fee Account**

The IEFA supports the following activities:

- Adjudication Operations: Contains Program Offices and Directorates (PODs) responsible for safeguarding the integrity of the nation's lawful immigration system by leading agency efforts to combat fraud, detect national security and public safety threats, and maximize law enforcement and Intelligence Community partnerships. The Fraud Detection and National Security Directorate (FDNS) leads the Agency's efforts to determine whether individuals or organizations filing for immigration benefits pose a threat to national security, public safety, or the integrity of the Nation's immigration system. The Field Operations Directorate (FOD) plays a critical role in robust vetting and screening by conducting thorough in-person interviews with applicants, which serve as a key mechanism for verifying identities, assessing eligibility, and detecting potential fraud or security concerns. These interviews are integral to the agency's multilayered approach to safeguarding the immigration system. The Service Center Operations Directorate (SCOPS) is responsible for processing and making final eligibility determinations on immigration benefit applications and petitions at offices nationwide. SCOPS conducts comprehensive security vetting and eligibility analysis through system checks and rigorous document review. In collaboration with FDNS, law enforcement, and other partners, SCOPS identifies emerging concerns and trends, ensuring appropriate follow-up actions to protect American communities, combat fraud, put American workers first, and end the exploitation of various programs, bringing integrity to the immigration system. Embedded within each of these directorates are personnel dedicated to improving the accuracy, integrity, and timeliness of USCIS decisions. Also included are public safety components and support services such as guard services, janitorial services, rent and other overhead.

- Immigration Policy and Support: Supports USCIS policy review and decision-making processes, coordinating the development, clearance, and submission of all policy documents for the Director's review and approval. In addition, supports the governance of official communications between policy and advisory components and Congress, DHS headquarters, and other DHS components, and advisory components as well as program office components not included elsewhere. Also includes components responsible for management of space, contracts, security, emergency management, enterprise risk management, training, human resources, as well as costs associated with design, development, and deployment of IT services and solutions in support of immigration policy and the USCIS enterprise.

- Refugee, Asylum, and International Operations.  Similar to FOD and SCOPS, The Refugee, Asylum and International Operations Directorate (RAIO) is responsible for safeguarding the integrity of the nation's lawful immigration system by processing immigration benefit applications in offices domestically and internationally. In certain scenarios, RAIO also interviews aliens requesting refugee or asylum status in the United States that are interdicted at sea by the U.S. Coast Guard, encountered at the border, or otherwise apprehended by U.S. Immigration and Customs Enforcement or U.S. Customs and Border Protection. Embedded within the directorate are personnel dedicated to improving the accuracy, integrity, and timeliness of USCIS decisions. Also included are public safety components and support services such as guard services, janitorial services, rent and other overhead.

- Immigration Records and Applicant Services: Contains PODs that primarily provide interaction and services to inter/intra agency partners and the general public and associated overhead, as well as provides for the development of both external public products and internal communications, the administration of biometric services and identity services at application support centers, facilitating FBI namechecks and biometric checks,

responses to Freedom of Information Act (FOIA) requests, file management and handling services for non-FOIA requests, administering the Systematic Alien Verification for Entitlements (SAVE) Program, and managing immigration data systems.

- Premium Processing (Including Transformation)[1]: Expenditures from the collection of premium processing fees in front line PODs (SCOPS, FOD and RAIO) and program office components to support information technology and other infrastructure improvements in adjudication processes, personnel and contracts supporting the processing of premium processing requests, other costs associated with overheads and the lockbox operations, and otherwise offset the cost of providing adjudications and naturalization services.

**Change Mechanism**: Notice and comment rulemaking for non-premium funds; direct final rule for premium funds.

- Non-premium: USCIS conducts a biennial fee review, which takes into consideration existing operations, workload volume forecasts, and proposed policy initiatives to determine if current fees will recover the full cost of its operations including the cost of services provided at no charge. If USCIS determines its fees will not recover full cost, then the Department of Homeland Security (DHS) may propose to adjust its fees via a notice and comment rulemaking in the Federal Register. DHS receives public comments on USCIS' Notice of Proposed Rulemaking (NPRM), incorporates feedback as appropriate, and publishes a final rule in the Federal Register to adjust fees.

- Premium: USCIS is authorized to adjust its premium processing fee on a biennial basis by the percentage (if any) by which the Consumer Price Index for All Urban Consumers (CPI-U) for the month of June preceding the date on which such adjustment takes effect exceeds CPI-U for the same month of the second preceding calendar year. DHS issues a direct final rule in the Federal Register to reflect this change and notify the public.

- Working Families Tax Cut Act Fees: On July 4, 2025, the President signed into law the Working Families Tax Cut Act (WFTC) (Public Law 119-21).  This law established several new provisions and fees related to the Immigration and Nationality Act. The new fees are provided as minimum amounts for FY 2025, and DHS is authorized to adjust most of them as determined necessary using rulemaking and are required to be adjusted annually based on the Consumer Price Index for All Urban Consumers (CPI-U).

**Previous Changes:**
Current non-premium fees became effective on April 1, 2024.[2] The fees for petitions that were previously designated for premium processing service were last adjusted on October 1, 2020, in accordance with Pub. L. 116-159. USCIS implemented the new premium processing fees on February 26, 2024.[3]

---

[1] The uses of premium processing fees are statutorily defined in 8 U.S.C. 1356(u). H.R.8089 - Emergency Stopgap USCIS Stabilization Act of 2020 expanded premium processing services.
[2] For additional information on non-premium fee changes, please see 89 FR 6194:  https://www.federalregister.gov/documents/2024/01/31/2024-01427/us-citizenship-and-immigration-services-fee-schedule-and-changes-to-certain-other-immigration.
[3] Reminder: Adjustment to Premium Processing Fees Takes Effect Today, https://www.uscis.gov/newsroom/alerts/reminder-adjustment-to-premium-processing-fees-takes-effect-today (Release Date 02/26/2024).

**U.S. Citizenship and Immigration Services**                    **Immigration Examinations Fee Account**

**Recovery Rate:** IEFA non-premium fees are intended to recover full cost, excluding the revenue generated by the new WFTC fees. Premium fees are not intended to recover full cost. The charts below are provided to identify the recovery rate over the past five years[4].

As of April 1, 2024, USCIS is now collecting fees according to the final FY 2022/2023 Fee Rule.[5]

---

[4] FY 2025 Non-premium IEFA revenue includes USCIS' share of WFTC revenue collections.
[5] USCIS current fee schedule: https://www.uscis.gov/sites/default/files/document/forms/g-1055.pdf

**CIS – IEFA - 6**
JA489

**U.S. Citizenship and Immigration Services**   **Immigration Examinations Fee Account**

## Historical Collections and Cost Recovery Rate[6]

| (Dollars in Thousands) | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Five-Year Total |
|---|---|---|---|---|---|---|
| Immigration Examinations Fee Account (Non-Premium) | $3,726,269 | $3,590,798 | $3,838,685 | $4,962,119 | $5,890,626 | $22,008,497 |
| Total of Eligible Expenses | $3,540,254 | $3,537,038 | $3,861,198 | $4,373,988 | $4,726,322 | $20,038,800 |
| **Cost Recovery %** | **105.3%** | **101.5%** | **99.4%** | **113.4%** | **124.6%** | **109.83%** |

| (Dollars in Thousands) | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Five-Year Total |
|---|---|---|---|---|---|---|
| Immigration Examinations Fee Account (Premium) | $987,116 | $1,244,039 | $1,082,835 | $1,256,101 | $1,594,602 | $6,164,693 |
| Total of Eligible Expenses | $761,681 | $872,076 | $1,216,570 | $1,314,571 | $1,306,902 | $5,471,800 |
| **Cost Recovery %** | **129.6%** | **142.7%** | **89.0%** | **95.6%** | **122.0%** | **112.66%** |

**Changes in Fee Collections:** In April 2024, USCIS implemented a new fee rule for non-premium fees. This was the first increase in non-premium fees since FY 2017. Revenue collection for FY 2025 exceeded FY 2024 as it was the first full year of the new fees being implemented. Additionally, USCIS experienced an increase in forms' receipts in FY 2025, resulting in higher revenue collections than anticipated. In February 2024, USCIS implemented an inflationary adjustment to premium processing fees. This led to an increase in premium revenue collections in FY 2025 as it reflected the full year of the new fees. Additionally, the WFTC enacted several new unwaivable fees that USCIS now charges in addition to the current fees. This suggests that revenue collections through FY 2027 will continue to increase.

---

[6] Includes minor variations due to rounding.

**U.S. Citizenship and Immigration Services**  **Immigration Examinations Fee Account**

## Immigration Examinations Fee Account
## Budget Spending Authority Request[7]
*(Dollars in Thousands)*

| | FY 2025 Full-Year CR | | | FY 2026 Annualized CR | | | FY 2027 President's Budget | | | FY 2026 to FY 2027 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| Adjudication Operations (Immigration Services) | 13,608 | 12,670 | $2,342,432 | 13,755 | 12,431 | $2,387,529 | 13,755 | 12,431 | $2,392,662 | - | - | $5,133 |
| Immigration Policy and Support (Immigration Services) | 3,115 | 2,935 | $1,695,132 | 3,288 | 2,975 | $2,235,599 | 3,288 | 2,975 | $2,237,261 | - | - | $1,662 |
| Refugee and Asylum Operations (Immigration Services) | 2,061 | 1,851 | $435,558 | 2,531 | 2,301 | $506,620 | 2,531 | 2,301 | $507,568 | - | - | $948 |
| Immigration Records and Applicant Services (Immigration Services) | 1,841 | 1,719 | $663,621 | 1,522 | 1,369 | $682,960 | 1,522 | 1,369 | $683,566 | - | - | $606 |
| Premium Processing Including Transformation (Immigration Services) | 3,578 | 3,129 | $1,423,812 | 3,301 | 2,986 | $1,380,783 | 3,301 | 2,986 | $1,381,722 | - | - | $939 |
| **Total** | **24,203** | **22,304** | **$6,560,555** | **24,397** | **22,061** | **$7,193,491** | **24,397** | **22,061** | **$7,202,779** | **-** | **-** | **$9,288** |
| Subtotal Mandatory - Fee | 24,203 | 22,304 | $6,560,555 | 24,397 | 22,061 | $7,193,491 | 24,397 | 22,061 | $7,202,779 | - | - | $9,288 |

---

[7] "Budget Spending Authority Request" refers to the funding USCIS anticipates to obligate, as opposed to "Budget Authority" which refers to budget resources.

# Immigration Examinations Fee Account
## Summary of Budget Changes
*(Dollars in Thousands)*

| | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
|---|---|---|---|---|---|
| **FY 2025 Full-Year CR** | **24,203** | **22,304** | **$3,707,133** | **$2,853,422** | **$6,560,555** |
| **FY 2026 Annualized CR** | **24,397** | **22,061** | **$3,715,181** | **$3,478,310** | **$7,193,491** |
| **FY 2027 Base Budget** | **24,397** | **22,061** | **$3,715,181** | **$3,478,310** | **$7,193,491** |
| **Total Technical Changes** | - | - | - | - | - |
| **Total Annualizations and Non-Recurs** | - | - | - | - | - |
| 2026 Civilian Pay Raise and Annualization | - | - | $9,288 | - | $9,288 |
| **Total Pricing Changes** | - | - | **$9,288** | - | **$9,288** |
| **Total Adjustments-to-Base** | - | - | **$9,288** | - | **$9,288** |
| **FY 2027 Current Services** | **24,397** | **22,061** | **$3,724,469** | **$3,478,310** | **$7,202,779** |
| **Total Transfers** | - | - | - | - | - |
| **Total Program Changes** | - | - | - | - | - |
| **FY 2027 Request** | **24,397** | **22,061** | **$3,724,469** | **$3,478,310** | **$7,202,779** |
| **FY 2026 TO FY 2027 Change** | - | - | **$9,288** | - | **$9,288** |

# Immigration Examinations Fee Account
# Justification of Pricing Changes
*(Dollars in Thousands)*

| | FY 2027 President's Budget | | | | |
| --- | --- | --- | --- | --- | --- |
| | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
| **Pricing Change 1 - 2026 Civilian Pay Raise and Annualization** | - | - | **$9,288** | - | **$9,288** |
| Adjudication Operations (Immigration Services) | - | - | $5,133 | - | $5,133 |
| Immigration Policy and Support (Immigration Services) | - | - | $1,662 | - | $1,662 |
| Refugee and Asylum Operations (Immigration Services) | - | - | $948 | - | $948 |
| Immigration Records and Applicant Services (Immigration Services) | - | - | $606 | - | $606 |
| Premium Processing Including Transformation (Immigration Services) | - | - | $939 | - | $939 |
| **Total Pricing Changes** | - | - | **$9,288** | - | **$9,288** |

## Change 1 – 2026 Civilian Pay Raise Annualization

This pricing change represents the cost of four quarters of the calendar year 2026 1.0 percent civilian pay increase.

# Immigration Examinations Fee Account
## Personnel Compensation and Benefits
### Pay Summary
*(Dollars in Thousands)*

| | FY 2025<br>Full-Year CR | | | | FY 2026<br>Annualized CR | | | | FY 2027<br>President's Budget | | | | FY 2026 to FY 2027 Total<br>Changes | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate |
| Adjudication Operations (Immigration Services) | 13,608 | 12,670 | $1,974,711 | $155.86 | 13,755 | 12,431 | $2,053,427 | $165.19 | 13,755 | 12,431 | $2,058,560 | $165.61 | - | - | $5,133 | $0.41 |
| Immigration Policy and Support (Immigration Services) | 3,115 | 2,935 | $757,180 | $257.81 | 3,288 | 2,975 | $664,551 | $223.05 | 3,288 | 2,975 | $666,213 | $223.61 | - | - | $1,662 | $0.56 |
| Refugee and Asylum Operations (Immigration Services) | 2,061 | 1,851 | $296,270 | $160.06 | 2,531 | 2,301 | $379,277 | $164.83 | 2,531 | 2,301 | $380,225 | $165.24 | - | - | $948 | $0.41 |
| Immigration Records and Applicant Services (Immigration Services) | 1,841 | 1,719 | $276,106 | $160.62 | 1,522 | 1,369 | $242,194 | $176.98 | 1,522 | 1,369 | $242,800 | $177.42 | - | - | $606 | $0.44 |
| Premium Processing Including Transformation (Immigration Services) | 3,578 | 3,129 | $402,866 | $128.75 | 3,301 | 2,986 | $375,732 | $125.83 | 3,301 | 2,986 | $376,671 | $126.15 | - | - | $939 | $0.31 |
| **Total** | **24,203** | **22,304** | **$3,707,133** | **$166.19** | **24,397** | **22,061** | **$3,715,181** | **$168.36** | **24,397** | **22,061** | **$3,724,469** | **$168.78** | **-** | **-** | **$9,288** | **$0.42** |
| | | | | | | | | | | | | | | | | |
| Subtotal Mandatory - Fee | 24,203 | 22,304 | $3,707,133 | $166.19 | 24,397 | 22,061 | $3,715,181 | $168.36 | 24,397 | 22,061 | $3,724,469 | $168.78 | - | - | $9,288 | $0.42 |

### Pay by Object Class
*(Dollars in Thousands)*

| | FY 2025<br>Full-Year CR | FY 2026<br>Annualized CR | FY 2027<br>President's Budget | FY 2026 to FY 2027<br>Total Changes |
|---|---|---|---|---|
| 11.1 Full-time Permanent | $2,480,517 | $3,273,642 | $3,281,826 | $8,184 |
| 11.3 Other than Full-time Permanent | $14,829 | - | - | - |
| 11.5 Other Personnel Compensation | $99,148 | $3,571 | $3,580 | $9 |
| 12.1 Civilian Personnel Benefits | $1,112,139 | $436,880 | $437,972 | $1,092 |
| 13.0 Benefits for Former Personnel | $500 | $1,088 | $1,091 | $3 |
| **Total - Personnel Compensation and Benefits** | **$3,707,133** | **$3,715,181** | **$3,724,469** | **$9,288** |
| **Positions and FTE** | | | | |
| Positions - Civilian | 24,203 | 24,397 | 24,397 | - |
| FTE - Civilian | 22,304 | 22,061 | 22,061 | - |

U.S. Citizenship and Immigration Services                                    Immigration Examinations Fee Account

# Pay Cost Drivers
*(Dollars in Thousands)*

| Pay Cost Drivers *(Dollars in Thousands)* | FY 2025 Full-Year CR | | | FY 2026 Annualized CR | | | FY 2027 President's Budget | | | FY 2026 to FY 2027 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FTE | Amount | Rate | FTE | Amount | Rate | FTE | Amount | Rate | FTE | Amount | Rate |
| Immigration Services Officer | 10,666 | $1,698,363 | $159.23 | 10,593 | $1,734,710 | $163.76 | 10,593 | $1,739,047 | $164.17 | - | $4,337 | $0.41 |
| Asylum Officer | 1,296 | $223,932 | $172.79 | 1,335 | $224,696 | $168.31 | 1,335 | $225,258 | $168.73 | - | $562 | $0.42 |
| Adjudication Officer | 291 | $68,344 | $234.86 | 404 | $90,669 | $224.43 | 404 | $90,896 | $224.99 | - | $227 | $0.56 |
| Hearings and Appeals | 69 | $16,308 | $236.34 | 67 | $15,671 | $233.90 | 67 | $15,710 | $234.48 | - | $39 | $0.58 |
| Refugee Officer | - | - | - | 460 | $86,313 | $187.64 | 460 | $86,529 | $188.11 | - | $216 | $0.47 |
| Other | 9,982 | $1,700,186 | $170.33 | 9,202 | $1,563,122 | $169.87 | 9,202 | $1,567,029 | $170.29 | - | $3,907 | $0.42 |
| **Total – Pay Cost Drivers** | **22,304** | **$3,707,133** | **$166.21** | **22,061** | **$3,715,181** | **$168.40** | **22,061** | **$3,724,469** | **$168.83** | **-** | **$9,288** | **$0.43** |

## Explanation of Pay Cost Drivers:

**Immigration Services Officer:** This cost driver funds salaries and benefits of USCIS Immigration Services Officers. Immigration Services Officers research and analyze applications, petitions and supporting documentation; interview petitioners and applicants to assess credibility; and deny or grant petitions and applications. Starting in FY 2026, 185 Immigration Services Officer and other positions were transferred from the Fraud Prevention and Detection Account (FPDA) to IEFA.

**Asylum Officer:** This cost driver funds salaries and benefits of USCIS Asylum Officers. Asylum Officers conduct interviews, process Credible Fear claims, and adjudicate asylum applications that are not made in Immigration Court.

**Adjudication Officer:** This cost driver funds the salaries and benefits of USCIS Adjudication Officers. Adjudication Officers review applications for immigration benefits and make decisions regarding these requests based on their extensive knowledge of immigration laws and practices.

**Hearings and Appeals:** This cost driver funds salaries and benefits of USCIS Hearings and Appeals staff. Hearings and Appeals staff support a wide range of legal services involving administrative, criminal, and civil prosecutions in support of mandamus and other immigration-related litigation actions.

**U.S. Citizenship and Immigration Services**                    **Immigration Examinations Fee Account**

**Refugee Officer:** This cost driver funds the salaries and benefits of USCIS Refugee Officers. Refugee Officers establish identity and make findings of eligibility for refugee and related benefits by analyzing facts, identifying, and examining documents for authenticity, and researching and analyzing appropriate information, law, and country conditions.

**Other:** This cost driver funds salaries and benefits of non-Mission Critical Occupation Positions that include: legal, privacy, policy and strategy, equal opportunity and inclusion, procurement operations; management of property, plant, and equipment, and other material resources; budget, planning and performance measures, strategic sourcing, financial and capital asset management; human resources and personnel recruitment, hiring, training, leadership development, employee benefits, and work-life programs, immigration forms, print services, and the management of security and emergency management operations.

# Immigration Examinations Fee Account
## Non-Pay Budget Exhibits
## Non-Pay Summary
*(Dollars in Thousands)*

| | FY 2025 Full-Year CR | FY 2026 Annualized CR | FY 2027 President's Budget | FY 2026 to FY 2027 Change |
|---|---|---|---|---|
| Adjudication Operations (Immigration Services) | $367,721 | $334,102 | $334,102 | - |
| Immigration Policy and Support (Immigration Services) | $937,952 | $1,571,048 | $1,571,048 | - |
| Refugee and Asylum Operations (Immigration Services) | $139,288 | $127,343 | $127,343 | - |
| Immigration Records and Applicant Services (Immigration Services) | $387,515 | $440,766 | $440,766 | - |
| Premium Processing Including Transformation (Immigration Services) | $1,020,946 | $1,005,051 | $1,005,051 | - |
| **Total** | **$2,853,422** | **$3,478,310** | **$3,478,310** | **-** |
| | | | | |
| Subtotal Mandatory - Fee | $2,853,422 | $3,478,310 | $3,478,310 | - |

**U.S. Citizenship and Immigration Services**                                    **Immigration Examinations Fee Account**

# Non-Pay by Object Class
*(Dollars in Thousands)*

| | FY 2025<br>Full-Year CR | FY 2026<br>Annualized CR | FY 2027<br>President's Budget | FY 2026 to<br>FY 2027 Change |
|---|---|---|---|---|
| 21.0 Travel & Transportation of Persons | $34,470 | $28,531 | $28,531 | - |
| 22.0 Transportation of Things | $20,407 | $21,369 | $21,369 | - |
| 23.1 Rental Payments to GSA | $272,484 | $377,719 | $377,719 | - |
| 23.2 Rental Payments to Others | $205 | - | - | - |
| 23.3 Communications, Utilities, & Miscellaneous | $136,057 | $88,724 | $88,724 | - |
| 24.0 Printing & Reproduction | $12,828 | $12,920 | $12,920 | - |
| 25.1 Advisory & Assistance Services | $980,650 | $574,792 | $574,792 | - |
| 25.2 Other Services from Non-Federal Sources | $105,619 | $1,505,536 | $1,505,536 | - |
| 25.3 Other Purchases of Goods & Services | $367,268 | $11,162 | $11,162 | - |
| 25.4 Operations & Maintenance of Facilities | $3,138 | $150 | $150 | - |
| 25.7 Operation & Maintenance of Equipment | $255,002 | $153,830 | $153,830 | - |
| 26.0 Supplies & Materials | $27,174 | $28,472 | $28,472 | - |
| 31.0 Equipment | $492,241 | $504,117 | $504,117 | - |
| 32.0 Land & Structures | $141,092 | $166,663 | $166,663 | - |
| 41.0 Grants, Subsidies, & Contributions | - | $24 | $24 | - |
| 42.0 Insurance Claims & Indemnities | $4,787 | $4,301 | $4,301 | - |
| **Total - Non Pay Budget Object Class** | **$2,853,422** | **$3,478,310** | **$3,478,310** | **-** |

U.S. Citizenship and Immigration Services                    Immigration Examinations Fee Account

# Non-Pay Cost Drivers
*(Dollars in Thousands)*

| | FY 2025 Full-Year CR | FY 2026 Annualized CR | FY 2027 President's Budget | FY 2026 to FY 2027 Total Changes |
|---|---|---|---|---|
| IT Systems Development and Maintenance | $827,526 | $979,844 | $979,844 | - |
| Lockbox Operations | $192,768 | $693,025 | $693,025 | - |
| Overhead and Shared Services | $656,251 | $496,805 | $496,805 | - |
| Threat Detection and Prevention | $49,275 | $337,629 | $337,629 | - |
| Records Management | $216,764 | $225,898 | $225,898 | - |
| Administrative | $281,168 | $217,048 | $217,048 | - |
| Expedited Application Processing | $288 | $136,060 | $136,060 | - |
| Expedited Activities | $124,204 | $100,624 | $100,624 | - |
| Humanitarian Services | $34,811 | $56,218 | $56,218 | - |
| Processing of Non-Naturalization Applications | $56,963 | $36,197 | $36,197 | - |
| Identity Information and Customer Service | $47,830 | $26,515 | $26,515 | - |
| Cybersecurity | $91,290 | $25,957 | $25,957 | - |
| Systematic Alien Verification for Entitlements (SAVE) | $987 | $17,952 | $17,952 | - |
| Freedom of Information Act (FOIA) | $11,036 | $10,763 | $10,763 | - |
| Naturalization Processing | $250,502 | $6,769 | $6,769 | - |
| Other Costs | $11,759 | $111,006 | $111,006 | - |
| **Total Non-Pay** | **$2,853,422** | **$3,478,310** | **$3,478,310** | **-** |

## Explanation of Non-Pay Cost Drivers:

**IT Systems Development and Maintenance:** IT costs associated with developing new systems and maintaining existing ones. Costs include workstation refresh, Quality and Independent Verification & Validation Services for Delivery, Databricks, Software, and Software License/Maintenance Agreements.

**Lockbox Operations:** This cost driver contains services provided by its fiscal agent to collect and deposit revenue from immigration fees. The Lockbox performs the initial intake and data entry of applications, scanning of materials, transmission of data to USCIS case management systems, transfer of files to USCIS processing centers, and depositing of checks into USCIS' Treasury accounts.

**Overhead and Shared Services:** Costs include shared service costs such as: rent, Federal Protective Services (FPS) security, guard services, mail and postage, and utilities.

**Threat Detection and Prevention:** Security costs associated with non-cybersecurity threat detection and prevention. Costs include background investigations, National Counterterrorism Center interagency agreement, and Integrated Security Support Management System agreement with DHS.

**Records Management:** All defined costs that support the processing of non-FOIA records retrieval and general records retention. Costs include the NARA Interagency Agreement, and National Records Center shipping and supplies.

**Administrative:** This cost driver contains non-pay administrative costs. Contains the non-premium costs for the Lease Acquisitions Program which funds the acquisition of space and facilities. Contains permanent change of station costs, training, supplies, transit subsidy, equipment purchases, bulk mail, General Services Administration (GSA) leased vehicles, and travel not associated with any other non-pay cost driver category. Also contains support contracts such as Email as a Service, leadership development, virtual conferencing contracts, and Program Management Office (PMO) Support Services. The increase in administrative costs is attributed to the increase in training and equipment costs for onboarding additional personnel.

**Expedited Application Processing:** Non-pay costs from the Premium account for premium processing of applications. This includes the cost for the Next Gen Service Center Operations Support Contract. This cost driver funds contractual costs for correspondence management, fee receipting, data entry, and file operations support for four of the five USCIS service centers: California Service Center, Nebraska Service Center, Texas Service Center, and Vermont Service Center. This contract is overseen by the Service Center Operations and Office of Intake and Document Production as USCIS continues to transition to an electronic adjudicative process.

**Expedited Activities**: Costs from the Premium account used for other purposes. Contains the National Benefits Center (NBC) Records Contract, the lease acquisition program costs funded by premium funds, GSA Rent, FPS, background investigations and other costs.

**Humanitarian Services:** Costs supporting Asylum, Interpreter and Transcription Services, Travel, Training, and the Asylum Vetting Center.

**Processing of Non-Naturalization Applications:** Costs that support non-naturalization, non-humanitarian front line work.

**Identity Information and Customer Service:** Costs associated with providing information to the public and facilitating public interaction with USCIS. Costs include Person-Centric Identity Management development and implementation costs, Electronic Immigration System helpdesk, Worldwide Refugee Admissions Processing System, Citizenship and Immigration Data Repository Application Development, and Customer Engagement Center.

**Cybersecurity:** This cost driver supports security programs responsible for the protection of the USCIS network, systems, and information ensuring a reliable and secure environment.

**U.S. Citizenship and Immigration Services**                    **Immigration Examinations Fee Account**

**Systematic Alien Verification for Entitlements (SAVE):** This cost driver funds the Verification Information System webservices along with the Telephony Contact Center, program management support, licensing, independent test evaluation, and other operating expenses required to run the SAVE program.

**Freedom of Information Act (FOIA):** This cost driver funds support services (FOIA processors) in support of FOIA/Privacy Act (PA) requests.

**Naturalization Processing:** This cost driver funds costs associated with processing naturalization applications such as costs for conducting the naturalization ceremony.

**Other Costs:** Funds the remaining management and support costs for the day-to-day operations across USCIS.

# Exhibit 36

Civil Action No. 26-cv-1114 (CJN) (Lead case)

JA502

# Inside Trump's Effort to "Take Over" the Midterm Elections — ProPublica

Ｐ propublica.org/article/trump-midterm-elections-takeover

Doug Bock Clark                                                                April 13, 2026



## Reporting Highlights

- **Safeguards Destroyed:** In advance of this year's midterm elections, President Donald Trump has systematically demolished federal guardrails that prevented him from overturning the 2020 election.
- **Changing of Guard:** At least 75 career staff are gone. Two dozen appointees, including many from the election denial movement, have been hired. Ten helped try to overturn the 2020 vote.
- **Political Interference:** Once-fringe actors now have access to vast powers, which they've already used to push forward unprecedented actions that critics say amount to partisan interference.

These highlights were written by the reporters and editors who worked on this story.

In mid-December 2020, federal officials responsible for protecting American elections from fraud converged in a windowless, dim, [fortified room](#) at the Justice Department's downtown Washington, D.C., headquarters.

They had been summoned by Attorney General William Barr.

JA503

Over the preceding weeks, Donald Trump's claims that the presidential election had been stolen from him had reached a crescendo. He'd become obsessed with a conspiracy theory that voting machines in Antrim County, Michigan, had switched votes from him to Joe Biden.

With each day, Trump ratcheted up the pressure to unleash the might of the federal government to undo his defeat.

Barr interrogated experts from the Cybersecurity and Infrastructure Security Agency, crammed in beside top FBI officials around a cheap table. He needed the group of around 10 to answer a crucial question: Was it really possible the 2020 presidential vote had been hacked?

ProPublica's description of the previously unreported meeting comes from several people who were in the room or were briefed on the gathering. Everyone understood that the meeting represented an important moment for the nation, they said. Barr, who did not respond to requests for comment, had walked a delicate line with Trump, instructing the FBI to investigate allegations of election irregularities while declaring publicly there had been no evidence "to date" of widespread fraud.

The nonpartisan specialists from CISA, backed by their FBI counterparts, explained they'd unravelled what had happened in Antrim County. A clerk had made a mistake when updating ballot styles on machines, leading to a software problem that initially transferred votes from Republicans to Democrats, they said. There was no fraud, just human error — which would soon be publicly confirmed through a hand count of the county's ballots.

Animation by Matt Rota and Henrike Lendowski

Listening intently, Barr seemed to understand both the truth and that telling it to the president would almost certainly cost him his job.

At the end of the meeting, Barr turned to his top deputy, made hand motions as if he was tying on a bandana and said he was going to "kamikaze" into the White House.

What happened next is well known. When Barr met with Trump in the Oval Office on Dec. 14, the president launched into a monologue about how the events in Antrim County were "absolute proof" that the election had been stolen. Barr waited to get a word in edgewise before telling his boss what the experts from CISA had told him.

Then Barr offered his resignation letter, which Trump accepted. Barr left believing he'd done his part to preserve democratic norms.

"I was saddened," Barr wrote of Trump in his memoir. "If he actually believed this stuff he had become significantly detached from reality."

JA504

Barr was one of many federal officials — most of them Trump appointees — who refused to bend to the president's demands, which only intensified after Barr was gone. Although rioters inspired by Trump managed to delay the certification of his defeat by storming the Capitol on Jan. 6, 2021, ultimately the institutional guardrails of American democracy held — barely.

But if faced with the same tests today, the guardrails and people that held the line would largely be missing, an examination by ProPublica found.

ProPublica scrutinized what happened the last time Trump lost a national election. Some of that happened in plain sight: After a cascade of defeats in court, Trump began pressuring state and local officials to overturn the results. But more happened behind the scenes, like the meeting that helped persuade Barr to hold the line.

Our reporting uncovered previously undisclosed aspects of a federal effort to safeguard the results of the 2020 vote, which involved at least 75 people across several agencies. Today, nearly all of those people are gone, having resigned, been fired or been reassigned, particularly in the departments of Justice and Homeland Security. That included the cybersecurity specialists who had established that the Antrim County allegations were false and reported their findings to Barr.

The people we identified as resisting attempts to overturn the 2020 results have been replaced by roughly two dozen people Trump has installed in positions that could affect elections. Ten of them actively worked to reverse the 2020 vote, and the rest are associates of such people. In some cases, ProPublica found, officials have been hired from activist groups that are pillars of the election denial movement. Experts warn that shows the movement has merged with the federal government.

These new officials could influence how Trump reacts to the upcoming midterms as polling shows Republicans are approaching what could be a significant electoral loss, with the president's approval rating nearing record lows, and public concern growing about the weak economy, the administration's mass deportation effort and the war on Iran. Seemingly in preparation to head off such a blow, Trump has stepped up his efforts to "nationalize" the 2026 elections, saying that Republicans need "to take over" the midterms. Democrats who monitored Trump's attempts to block his 2020 loss have begun to question whether he will allow a "blue wave," particularly if it flips control of a House of Representatives that impeached him twice in his first term.

ProPublica's examination reveals new details on how the president has unleashed his loyalists to transform elections. This includes the background of this year's FBI raid in Georgia to seize 2020 election materials and how they are using federal resources to search for noncitizens voting. Ultimately, ProPublica's reporting shows how thoroughly and expansively the Trump administration has overhauled the federal government into what some fear is a vehicle for making sure elections go his way.

JA505

ProPublica's reporting is based on interviews with roughly 30 current or former executive branch officials familiar with the work of Trump loyalists installed in election roles. Most spoke on condition of anonymity because they fear retribution, including those knowledgeable about the December 2020 Barr meeting.

The Trump administration maintains its actions will make U.S. elections fairer and more secure — and keep those prohibited from voting, such as noncitizens, from doing so.

"Election integrity has always been a top priority for President Trump," White House spokesperson Abigail Jackson said in a statement. "The President will do everything in his power to defend the safety and security of American elections and to ensure that only American citizens are voting in them."

Spokespeople for the DOJ and DHS emphasized that their departments are focused on ensuring elections are free and fair, and that they are working closely with the states to achieve those goals. Contentions to the contrary, they say, are false.

A few guardrails have endured, preventing Trump from fully realizing his agenda for elections. Judges have blocked key parts of a March 2025 executive order in which Trump attempted to exert greater federal control over aspects of voting, and some Republican state officials have fought back against Justice Department lawsuits demanding state voter rolls.

Late last month, Trump issued another executive order on elections that attempts to exert unparalleled federal control over mail-in voting and voter eligibility, which Democrats and voting rights groups are challenging in court.

Experts say 2026 will serve as an unprecedented stress test of the integrity of American elections.

"Our election system withstood" Trump's "attacks following the 2020 election," said Sen. Alex Padilla, a California Democrat who has led the pushback to the administration's actions on elections, "but this will be an even tougher test, with more election deniers having access to federal power than ever before."

Animation by Matt Rota and Henrike Lendowski

## The Dismantling

Barr has said that in the high-stakes days following the 2020 election, he felt like he was playing Whac-A-Mole with Trump's "avalanche" of false election claims.

The investigators at DHS' Cybersecurity and Infrastructure Security Agency supplied intelligence that disproved many of them, not just those involving Antrim County.

JA506

CISA was created by Trump in his first term to counter cyber threats in the aftermath of Russia's efforts to influence the 2016 vote. It soon came to provide crucial expertise and support to thousands of local election officials grappling with increasingly sophisticated attacks.

After the 2020 election, it also played a crucial part in puncturing fallacies spread by Trump supporters, producing a "Rumor Control" website to rebut them. And it partnered with state officials and technology vendors to release a statement calling the election "the most secure in American history." Trump swiftly fired Chris Krebs, whom he had appointed to lead CISA, but Krebs' defense of the election's soundness reverberated widely in the media and on Capitol Hill.

Among Trump's first actions upon returning to the Oval Office was eviscerating CISA.

Starting in February 2025, DHS leadership put employees focused on countering disinformation and helping safeguard elections on leave. The leadership also froze the agency's other election security work, which included assessing local election offices for physical and cybersecurity risks, and disseminating sensitive intelligence information on threats. Eventually, all three dozen or so CISA employees specializing in elections were fired or transferred to work in other areas.

"It took years of dedicated, bipartisan, cross-sector partnership to build the security infrastructure we've had, and dismantling CISA leaves a gaping hole," said Kathy Boockvar, an elections security expert who served as Pennsylvania's secretary of state from 2019 to 2021. "We are making the job of securing our democracy exponentially harder."

A DHS spokesperson told ProPublica that the changes at CISA were in response to "a ballooning budget concealing a dangerous departure from its statutory mission," which included "electioneering instead of defending America's critical infrastructure." The spokesperson said that CISA's mission is still to coordinate protection of critical infrastructure, including by supporting local partners against cyber threats.

It isn't just CISA that's been gutted.

The Trump administration has discarded or diminished other federal initiatives with roles in protecting election integrity or blocking foreign interference. While many of these actions have been reported, together they reveal the full sweep of the changes.

First, the administration got rid of the National Security Council's election security group, which convened departmental leaders to coordinate federal actions related to voting. Then in August, the administration dismantled the Foreign Malign Influence Center, a branch of the Office of the Director of National Intelligence that had stymied efforts by Russia, China and Iran to interfere in the 2024 election.

A spokesperson for ODNI said the center was redundant and that its functions were folded into other parts of the office's intelligence apparatus in ways that "arguably makes our ability to monitor and address threats from foreign adversaries stronger, more efficient and more effective."

JA507

However, former national security officials, including one who had worked at the center, told ProPublica that its functions had largely ceased. Caitlin Durkovich, who led the NSC's election security work during the Biden administration, said that under Trump the federal government has "abandoned" its traditional role in preserving election integrity and security.

"Nearly every program and capability to stop bad actors and support election administrators has been dismantled," she said. "Heading into the midterms, this leaves states and localities exposed, without the intelligence support or federal coordination they need to detect and respond to threats in real time — precisely when the stakes are highest."

The early months of the second Trump administration also brought seismic changes to three parts of federal law enforcement with central roles in elections.

Kash Patel, the FBI's new director, dismantled the public corruption team, which had been deployed in previous administrations to help monitor possible criminal activity on Election Day. The Foreign Influence Task Force, which aimed to combat foreign influence in U.S. politics, was also disbanded. (An FBI spokesperson said the bureau "remains committed to detecting and countering foreign influence efforts by adversarial nations.")

Furthermore, the Justice Department substantially reduced the role of its Public Integrity Section, which had been responsible for making sure the department's inquiries weren't improperly influenced by politics.

After the 2020 election, senior lawyers in the section warned against having the FBI investigate fraud claims raised by Trump allies, saying that the agency's involvement could damage its reputation and appear motivated by partisanship. In this instance, they were overruled by Barr and his deputies, but former officials said this was a rare case in which their guidance was ignored. The need to directly overrule the unit, they said, made it a roadblock — one that no longer exists.

A month after Trump returned to the Oval Office, the unit's top staff resigned when agency leaders directed them to dismiss corruption charges against then-New York City Mayor Eric Adams. More resigned later or were transferred. The 36-person section was reduced to two. The administration no longer mandates that it review politically sensitive cases, according to multiple people familiar with the matter.

Another key DOJ office, the Civil Rights Division's voting section, had enforced federal laws that protect voting rights, particularly those that combat racial discrimination. In December 2020, the assistant attorney general overseeing the Civil Rights Division was one of the many department leaders who said they would resign if Trump promoted Jeffrey Clark, a leader who supported Trump's efforts to overturn the election results, to head the department after Barr's resignation. This mass threat of resignation ultimately led Trump to not promote Clark.

JA508

But now, nearly all of the section's roughly 30 career lawyers have resigned or been moved. This largely started last spring after Harmeet Dhillon, Trump's assistant attorney general for civil rights, put out a memo saying their mission would shift from ensuring voting rights to enforcing Trump's executive order on elections.

The Trump administration then filled the section with conservative lawyers who are now litigating against the lawyers they replaced. At least four of those newly appointed lawyers participated in challenging the 2020 vote or have worked with people who helped Trump try to overturn the 2020 election.

"It's just a shocking and depressing reversal of the federal government's role in making real the promise of nondiscrimination in voting and racial equality," said Anna Baldwin, an appellate attorney for the Civil Rights Division who resigned last year and is now one of those litigating against the Justice Department in a new role at Campaign Legal Center.

The Justice Department didn't respond to specific questions about the dismantling of the Public Integrity Section or the change in mission for the Civil Rights Division.

In all, at least 75 career officials who'd played important roles in elections work at DHS, DOJ and other departments have left or been fired, ProPublica found.

Animation by Matt Rota and Henrike Lendowski

## Team America

Late last summer, after the Trump administration had forced out most of the career specialists, a small group of political appointees began convening at the Department of Homeland Security's headquarters.

The group — which once called itself "Team America," according to sources familiar with the matter — looked for federal levers it could pull to make Trump's March executive order about elections a reality, an effort that has not been previously reported.

They represented the new type of people running the show.

Its core members included David Harvilicz, a DHS assistant secretary tasked with overseeing the security of election infrastructure, including voting machines, and three of his top staffers. As ProPublica has reported, Harvilicz had co-founded an AI company with an architect of Trump's claims about Antrim County.

Despite the setbacks the executive order had met with in court, there "was not a whole lot of discussion or disagreement" about acting on the directive from Harvilicz or one of his deputies, said a former federal official who interacted with group members. "It was just us saluting to do it."

JA509

This small group was part of a wider team at DHS, DOJ and the White House seeking to push forward the president's agenda. Some of Trump's new guard are well known: After the 2020 election, Patel pressured military officials to help investigate a conspiracy theory about voting machines, according to a former Justice Department official. (Patel did not respond to a request for comment but claimed in congressional testimony that he did not recall the event.) Others, like Harvilicz, are more obscure but still wield consequential powers.

These newcomers are seeking to carry out Trump's executive orders and are unlikely to push back against his false claims that American elections are rife with fraud.

Team America members have echoed or spread such material themselves.

Heather Honey, who serves under Harvilicz in a newly created position focused on elections, falsely asserted that there were more ballots cast in Pennsylvania than voters in the 2020 presidential election. Trump cited this claim, which has been traced back to her, while exhorting his followers to march on the Capitol on Jan. 6, 2021.

At least 11 administration appointees, including Honey, have ties to the Election Integrity Network, a conservative grassroots organization seeking to transform American elections. It is led by Cleta Mitchell, a lawyer who tried to help Trump overturn the 2020 election. Gineen Bresso, who holds a top job in the White House counsel's office, coordinated with the network's leadership in 2024 as the Republican National Committee's election integrity chair, ProPublica has reported. Since moving into government, Honey has maintained close ties to Mitchell's organization, and she and at least two other federal officials have given its members private briefings.

Experts say these former activists who helped forge a movement built on the idea that the 2020 election was stolen from Trump are seeking to make sure that does not happen again.

"The election denial movement is now interwoven within the federal government, and they are working together toward a shared goal of reshaping elections" in ways that undermine the freedom to vote, said Brendan Fischer, a director at the Campaign Legal Center, a nonpartisan, pro-democracy legal organization. "It's not just last-minute slapdash attempts to overturn the results" as in 2020, "but more systematic efforts to influence how elections are run months ahead of time."

In response to questions sent to DHS, Harvilicz and Honey, a DHS spokesperson disputed that they were seeking to use the department's powers to advantage Trump, writing that its employees "are focused on keeping our elections safe, secure, and free" and working to "implement the President's policies." In response to questions about their ties to the election denial movement, the spokesperson wrote, "To meet the diverse and evolving challenges the Department faces, we hire experts with diverse backgrounds who go through a rigorous vetting process."

JA510

Mitchell did not respond to detailed questions from ProPublica. The White House answered questions sent to Bresso about her connection to Mitchell's network by reiterating its commitment to making American elections secure.

Through the fall and winter, as the Justice Department demanded that states turn over confidential voter roll information, Team America worked to solve problems hindering the use of digital tools to comb the lists for noncitizens who had illegally registered to vote. Honey and others ironed out the technical details of merging information from different agencies and crafted data-sharing contracts. When Honey or others hit roadblocks, they'd go to the White House or senior DHS leaders who "would come in hot" to clear her path, said officials who interacted with them.

Initially, the plan was to run voter information obtained by DOJ through a Homeland Security tool called the Systematic Alien Verification for Entitlements system.

More recently, according to two people familiar with the matter, Team America has worked to harness a more powerful tool used by another branch of DHS, Homeland Security Investigations, to increase its ability to search for noncitizen voters and bring criminal charges against them.

While DHS told ProPublica that SAVE has identified more than 21,000 potential noncitizens on voter rolls in the past year, officials who have checked those results in detail have found vast inaccuracies, as ProPublica has reported. Most states — including those with millions of voters — have eventually marked only a few to a few hundred potential noncitizens as registered to vote, and far less have ever voted. The DHS spokesperson also called SAVE "secure and reliable."

As the election approaches, current and former officials and election security experts expressed concerns that Harvilicz and Honey, who've espoused debunked conspiracy theories about elections, are in positions to control the narrative around the vote's soundness.

It's hard to debunk false claims "coming with the seal of the federal government," said Derek Tisler, counsel and manager with the Brennan Center for Justice's elections and government program. "I certainly worry what damage that could do to voters' confidence."

Animation by Matt Rota and Henrike Lendowski

## Red Flags

Perhaps nothing better reflects the breakdown of the guardrails that thwarted Trump's rashest impulses in 2020 than his creation last fall of a special White House post reinvestigating his loss to Biden.

In December 2020, just days after Barr rebuffed Trump's Antrim County claims, lawyers in the White House counsel's office helped prevent the president from heeding activists' call to essentially declare martial law to seize voting machines. This multihour shouting and cussing match has been called the craziest meeting of the first Trump administration.

JA511

But the lawyer whom Trump hired in 2025 as his director of election security and integrity, Kurt Olsen, had worked to overturn Trump's loss in court in 2020 and was later sanctioned by judges, including for making baseless allegations about Arizona elections.

Olsen's work in the second Trump administration has breached the firewall between the White House and DOJ officials, established after Watergate to prevent law enforcement officers from making decisions based on political pressure, said Gary Restaino, a former U.S. attorney in Arizona.

"This is not a constitutional or even a statutory requirement," Restaino said, "but it's a democracy requirement to make sure that citizens throughout America understand that decisions about life and liberty are being made in an objective and consistent manner."

In a previously unreported series of events, around the end of 2025, Olsen flew to Georgia to meet with Paul Brown, the head of the FBI's Atlanta field office, according to people familiar with the matter.

Olsen wanted the FBI to seize 2020 ballots from Fulton County, a Democratic stronghold, and gave Brown a report he claimed would justify the extraordinary action. Brown and his team emphasized to Olsen that any investigation his team did would be independent and fair.

When Brown and his team examined the report, they found that Georgia's election board had already looked into its allegations, dismissing many altogether, and concluding that others came down to human error, not criminal wrongdoing. The report had been assembled by a longtime ally of Olsen's and participant in the Election Integrity Network who had a history of discredited claims, ProPublica has reported.

Based on their own investigation, Brown's team submitted an affidavit to their superiors at DOJ that did not make a strong enough case to move forward with what Olsen wanted.

Soon after, Brown was offered a choice: retire or be moved to a new office, people with knowledge of the exchange told ProPublica.

Olsen did not respond to requests for comment.

An FBI spokesperson said that Brown "elected to retire" and that its "work in the election security space is entirely consistent with the law."

Brown's ouster after refusing to carry out the seizure of 2020 election materials has been reported, but Olsen's involvement and the details of their interactions leading to Brown's retirement have not been previously disclosed.

With Brown gone, the case moved ahead under his replacement.

Trump administration officials also took another step to keep control of the investigation.

JA512

Then-Attorney General Pam Bondi chose Thomas Albus, whom Trump had appointed as U.S. attorney for the Eastern District of Missouri, to prosecute the case even though it fell far outside his usual regional jurisdiction. Albus had been meeting with Olsen since around the time the White House lawyer was hired, ProPublica has reported. (Albus declined a request for comment.)

In late January, the FBI carried out an unprecedented raid in Fulton County — and the agency's affidavit, put together by Albus and Brown's replacement, cited a version of the report Olsen gave to Brown as evidence supporting the seizure. ProPublica was part of a news coalition that sued to unseal the affidavit.

An FBI spokesperson said that its agents "followed all procedure to ensure everything was in proper order, and FBI evidence team had the necessary court-authorized search warrant before they arrived on site."

Ryan Crosswell, who worked in the Justice Department's Public Integrity Section for around half a decade, handling a number of election cases, called Brown's replacement and Albus' involvement a "red flag" because of the unusual circumstances of their appointments.

"They're just moving through people until they find someone who's willing to do exactly what they want," Crosswell said.

The Justice Department did not respond to a question about Crosswell's comment.

The extraordinary raid was also enabled in a previously unreported way by the destruction of the DOJ's Public Integrity Section.

Multiple former lawyers for the section said they likely would have tried to block the Fulton County investigation because it lacked strong evidence, had a clear political slant and went against department directives that actions should not be taken "for the purpose of giving an advantage or disadvantage to any candidate or political party."

Crosswell said, "Based on everything we know, if PIN was still there, we'd say no."

John Keller was principal deputy chief of the Public Integrity Section from 2020 to 2025 and was acting chief when he resigned in early 2025. He worries that allegations of irregularities in the upcoming election will be handled on a partisan basis.

"Without that review and without apolitical, objective, honest brokers involved in the process, there is a much greater risk for intentional manipulation or inadvertent interference," Keller said.

Animation by Matt Rota and Henrike Lendowski

JA513

## "Dismantling the Brain"

The week the FBI seized Fulton County's ballots, about half of the nation's secretaries of state converged on Washington, D.C., for their winter conference.

They had urgent questions about elections for Bondi, then-DHS Secretary Kristi Noem and other luminaries who had promised to appear at the event. But none of the headline names showed, leaving conference attendees staring at an empty podium, until the session was abruptly canceled.

The breakdown was emblematic of a widening chasm between state officials and the parts of the federal government that had, until recently, worked with them to secure American elections.

Shenna Bellows, Maine's Democratic secretary of state, said in an interview that the trust between the Trump administration and states is "absolutely demolished."

This loss of trust reflects that election deniers have assumed so many top roles at federal agencies. Honey sometimes represents DHS on cross-departmental conference calls with state election chiefs, an unsettling reality for those who spent years countering the false claims she made from outside the government.

On a February call, state officials expressed confusion about whether the Cybersecurity and Infrastructure Security Agency would still assess their election systems for physical and cyber vulnerabilities. Honey said it would, but Bellows said she'd been told it wouldn't.

Two DHS officials told ProPublica CISA's remaining staff avoids election work, afraid they could lose their jobs if they engage with state and local officials. "In CISA, elections are a toxic poison," one said.

A DHS spokesperson said state and federal officials are still working together "every single day" to protect elections and that "The claim that DHS has a broken partnership with states and made our elections less secure is simply false."

The cuts to career election specialists and their divisions have eliminated information channels that spotlighted threats as voting took place, including Election Day command posts run by the Justice Department and FBI. Another information channel, which DHS used to fund, will still operate but will be available only to state and local election offices, not the federal government.

Jessica Cadigan, a former FBI intelligence analyst who investigated Election Day threats, said FBI headquarters' command post was critical to her cases.

"That is dismantling the brain, if you will," she said. "They are the ones that piece the whole thing together."

JA514

An FBI spokesperson said the agency will still have capabilities to monitor the situation on the ground through designated election crimes coordinator experts in all its field offices.

Jena Griswold, Colorado's Democratic secretary of state, has come to see the federal government as adversarial to elections and election administration, rather than a partner.

Colorado is one of around 30 states the Justice Department has sued for confidential voter roll information. At least four courts that have fully considered those cases so far have dismissed them, although the Justice Department has appealed most of the decisions. (The others are pending.) Griswold told ProPublica she has added another lawyer to her staff to fight whatever comes next from the Trump administration.

"Donald Trump," she said, "has made American elections less safe."

# Exhibit 37

Civil Action No. 26-cv-1114 (CJN) (Lead case)

JA516

# DOGE Employees Shared Social Security Data, Court Filing Shows

𝕋  nytimes.com/2026/01/20/us/politics/doge-employees-social-security-data.html

Eileen Sullivan                                                          January 21, 2026



Employees with the Department of Government Efficiency who were detailed to the Social Security Administration last March shared sensitive data through a nonsecure third party server, in violation of agency security policies, the Justice Department disclosed in a court filing.

The Social Security Administration does not know what data was shared on the server or whether it still exists there, the Justice Department said in a Jan. 16 formal correction to statements that Social Security Administration officials made to a federal court in Maryland last spring.

But the disclosure about the third-party server confirms concerns among career government employees and data security experts that DOGE's chaotic access to sensitive government data risks sharing this data broadly and without knowing what data was exposed or who has seen it. Last August, the Social Security Administration's chief data officer, shortly before resigning, filed a whistle-blower complaint over DOGE employees' activities, saying they had shared a crucial database on a private server.

The Justice Department's filing addresses the period last March at the height of the conflict between career Social Security officials and DOGE over the sharing of sensitive information.

JA517

1/3

The Justice Department's "corrections to the record" identified sworn statements that senior agency officials made asserting that the agency revoked DOGE employees' access to sensitive data, statements the department later found to be false, though federal lawyers said the officials did not know they were false at the time.

According to the Justice Department, the inconsistencies were revealed through an internal agency review last fall. The agency notified Justice Department lawyers about its findings on Dec. 10. The department filed corrections to the court more than a month later.

The Social Security Administration did not immediately respond to a request for comment.

Representatives John B. Larson of Connecticut and Richard E. Neal of Massachusetts, both Democrats, called for the DOGE employees to be prosecuted "for these abhorrent violations of the public trust."

Mr. Larson is the top Democrat on the House Ways and Means subcommittee on Social Security. Mr. Neal is the top Democrat on the full committee.

"We have been warning about privacy violations at Social Security and calling out Elon Musk's 'DOGE' for months," Mr. Larson and Mr. Neal said in a joint statement on Tuesday evening.

In its corrections filing, the Justice Department also disclosed that a political advocacy group contacted two members of the DOGE Social Security team, asking for an analysis of state voter rolls the advocacy group obtained. The group was not identified in the court filing, but the Justice Department said the group's goal was "to find evidence of voter fraud and to overturn election results in certain states."

One of the DOGE employees signed an agreement with the advocacy group, which the Social Security Administration appeared to learn through a review of emails. The Justice Department did not provide details about what came of the agreement and whether sensitive data was shared inappropriately.

"Every Republican on the Ways and Means Committee must break their silence on what could very well be the largest data breach in our nation's history, and as we have now learned, may have implications for election security," Mr. Larson and Mr. Neal said.

Federal lawyers referred the two DOGE employees to the Office of Special Counsel for a potential violation of the Hatch Act, a Depression-era law enacted to ensure that the federal workforce operates free of political influence or coercion.

Joe Spielberger, the senior policy counsel at a nonpartisan watchdog group, the Project on Government Oversight, said it was a good sign that the Trump administration would make such a referral. But, he said, the corrections filing "goes way beyond potential Hatch Act violations, to say the least."

JA518

He said the filing raised questions about whether the Social Security Administration misled the court last year about what officials knew at the time.

Nicholas Nehamas contributed reporting.

JA519

# EXHIBIT 1

**Declaration of Michael Mayhew (May 1, 2026)**

JA520

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*, <br><br>         Plaintiffs, <br>     v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br>         Defendants. | Case No. 1:26-cv-01114-CJN |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br><br>         Plaintiffs, <br>     v. <br><br> EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, <br><br>         Defendants. | Case No. 1:26-cv-01132-CJN |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*, <br><br>         Plaintiffs, <br>     v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br>         Defendants. | Case No. 1:26-cv-01151-CJN |

**DECLARATION OF MICHAEL MAYHEW**

JA521

1.      My name is Michael Mayhew. I serve as Deputy Associate Director of the Immigration Records and Identity Services Directorate within U.S. Citizenship and Immigration Services (USCIS). I have served in this position since February 2022.

2.      In my professional capacity as the Deputy Associate Director, I am responsible for the management of USCIS's immigration records and identity services portfolio.

3.      The following declaration is based on my personal knowledge and information that I acquired in my official capacity and in the performance of my official functions.

4.      DHS and USCIS are in receipt of Executive Order 14,399, Ensuring Citizenship Verification and Integrity in Federal Elections, issued on March 31, 2026.

5.      I am aware that deliberations are currently ongoing within DHS and USCIS regarding implementation of the Executive Order. Those deliberations include consideration of feasibility and consistency with applicable law, including but not limited to the Privacy Act of 1974 (5 U.S.C. 552a), as contemplated explicitly by Sections 2(a) and 7(b) of E.O. 14,399.

6.      USCIS has been directed to develop a recommendation to DHS leadership for DHS's implementation of E.O. 14,399.

7.      USCIS has not yet begun preparation of any "State Citizenship List" as contemplated by E.O. 14,399.

8.      USCIS has not yet made any recommendations or final decisions regarding the "State Citizenship Lists" discussed in E.O. 14,399.

JA522

9.      USCIS has not yet made any recommendations or final decisions regarding what federal databases might be used in preparation of the "State Citizenship Lists" that are contemplated by the E.O.

10.     After USCIS completes its review, USCIS will provide its recommendations to DHS regarding implementation of E.O. 14,399.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 1st day of May 2026 in Camp Springs, Maryland.

MICHAEL X
MAYHEW
Digitally signed by
MICHAEL X MAYHEW
Date: 2026.05.01
17:59:36 -04'00'

MICHAEL X. MAYHEW
Deputy Associate Director
Immigration Records and Identity Services Directorate
United States Citizenship and Immigration Services

JA523

# EXHIBIT 2

**Declaration of Jessica Burns MacBride (May 1, 2026)**

JA524

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>       Plaintiffs,<br>   v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>       Defendants. | Case No. 1:26-cv-01114-CJN |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>       Plaintiffs,<br>   v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>       Defendants. | Case No. 1:26-cv-01132-CJN |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>       Plaintiffs,<br>   v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>       Defendants. | Case No. 1:26-cv-01151-CJN |

**<u>DECLARATION OF JESSICA BURNS MACBRIDE</u>**

1

JA525

I, Jessica Burns MacBride, hereby declare upon penalty of perjury:

1.  I am the Head of Program Policy and Data Exchange at the Social Security Administration (SSA), in Woodlawn, Maryland, and I have served in this role since September 4, 2025.  I am a Career Senior Executive.

2.  In my role as Head of Program Policy and Data Exchange, I am responsible for leading and overseeing efforts related to SSA's program policy and data sharing initiatives, including but not limited to federal inter-agency data exchanges contemplated by Executive Orders.

3.  This declaration outlines the current status of SSA's efforts in response to Executive Order 14,399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, signed on March 31, 2026.  These statements are made with my personal knowledge and review of documents and information furnished to me in the course of my official duties.

4.  SSA is in receipt of Executive Order 14,399.

5.  Deliberations are ongoing within SSA regarding implementation of the Executive Order.  Those deliberations include considerations of feasibility and legality, including but not limited to the Privacy Act of 1974 (5 U.S.C. § 552a), as contemplated by Sections 2(a) and 7(b) of the Executive Order.

6.  SSA has not yet made any final decisions about its role in implementation of the Executive Order.

I declare the foregoing to be true and correct, upon penalty of perjury.

2

JA526

Date: __5/1/2026_____          Signed: ___*Jessica Burns MacBride*_____

                                        Jessica Burns MacBride
                                        Head
                                        Program Policy and Data Exchange
                                        Social Security Administration

3

# EXHIBIT 3

**Declaration of Steven W. Monteith (May 1, 2026)**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Case No. 1:26-cv-01114-CJN |

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>Defendants. | Case No. 1:26-cv-01132-CJN |

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>Plaintiffs,<br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Case No. 1:26-cv-01151-CJN |

**DECLARATION OF STE EN W  MONTEITH**

I, Steven W. Monteith, under penalty of perjury and in lieu of affidavit as permitted by 28 U.S.C. § 1746, state as follows:

JA529

1. I have been employed by the United States Postal Service (Postal Service) since 1989 and am currently the Chief Customer and Marketing Officer (CCMO) and Executive Vice President of the Postal Service, a position I have held since November 2020.  In this position, my responsibilities as assigned by the Postmaster General include the planning and implementation of corporate strategies and initiatives to increase revenue and financial contributions to the Postal Service, as well as overseeing the workforces in several organizational units: Customer Experience, International   usiness, Marketing, Product Solutions, Sales Intelligence, and Industry Engagement and Outreach. The Product Solutions unit includes the Election Mail and Government Services team, which manages Election Mail, and the Product Classification group, which manages mail preparation and entry rules.  Prior to my current position, I held positions at the Postal Service in operations, finance, marketing and retail.

2. As the CCMO, I am familiar with Executive Order 14,399, titled "Ensuring Citizenship Verification and Integrity in Federal Elections," which has been received by the Postal Service.

3. I am aware that deliberations are currently ongoing within the Postal Service regarding the implementation of the Executive Order.  Those deliberations include considerations of how to implement the directives in the Executive Order operationally, as well as legal considerations, including compliance with the Privacy Act of 1974 (5 U.S.C. § 552a), as contemplated explicitly by Section 3(b)(iv) and 7(b) of the Executive Order.

4. As the Postal Service is still in the deliberation phase of determining how to implement the Executive Order, we have not yet published a proposed rule, nor have we reached any final decisions about the substance of a proposed rule.

2

JA530

5. Once the Postal Service issues a proposed rule, it will be published in the Federal Register and available for public comment. Following the comment period, if the Postal Service issues a final rule, it will also be published in the Federal Register. The Postal Service will not publish a final rule until it has reviewed and considered all comments submitted in response to the proposed rule.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed at Washington, D.C. on the 1st day of May 2026

E-SIGNED by Steven Monteith
on 2026-05-01 13:03:52 EDT

_____

Steven W. Monteith

3

JA531

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DSCC, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    Defendants. | Civil Action No. 26-cv-1114 (CJN) |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>    Defendants. | Civil Action No. 26-cv-1132 (CJN) |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>    Defendants. | Civil Action No. 26-cv-1151 (CJN) |

**SECOND DECLARATION OF LALITHA D. MADDURI IN SUPPORT OF DEMOCRATIC PARTY PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

JA532

1.      I am over the age of 18 and competent to make this declaration. I am an attorney admitted to practice law in the District of Columbia. I am a partner at the law firm of Elias Law Group LLP, and I represent Plaintiffs the Democratic Senatorial Campaign Committee ("DSCC"), the Democratic Congressional Campaign Committee ("DCCC"), the Democratic National Committee ("DNC"), the Democratic Governors Association ("DGA"), and the Democratic leaders of the U.S. Senate and U.S. House of Representatives, Charles E. Schumer and Hakeem S. Jeffries, respectively (collectively, the "Democratic Party Plaintiffs") in this action.

2.      I respectfully submit this declaration in support of the Democratic Party Plaintiffs' motion for a preliminary injunction in the above captioned matter. I submit this declaration to provide the Court with a true and correct copy of documents in connection with the motion, the exhibit numbers for which are numbered to correspond to exhibits submitted with the opening motion.

3.      Attached hereto as **Exhibit 38** is a true and correct copy of: DHS, *Attention SAVE Program User Agencies: New CSV Bulk Upload Template Required for Case Creation* (May 1, 2026),    https://www.uscis.gov/save/current-user-agencies/news-alerts/attention-save-program-user-agencies-new-csv-bulk-upload-template-required-for-case-creation.

4.      Attached hereto as **Exhibit 39** is a true and correct copy of: Tierney Sneed, *Trump and GOP Test Precedent With Aggressive Voter Roll Purges*, CNN (May 4, 2026), https://www.cnn.com/2026/05/04/politics/voter-roll-purges-election-day.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 8, 2026 in Washington, DC

*/s/ Lalitha D. Madduri*
Lalitha D. Madduri
(DC 1659412)

2
JA533

# Exhibit 38

Civil Action No. 26-cv-1114 (CJN) (Lead case)



**U.S. Citizenship
and Immigration
Services**

MENU

# Attention SAVE Program User Agencies: New CSV Bulk Upload Template Required for Case Creation

Effective April 30, the SAVE system has updated its CSV Bulk Upload Template to include a new optional field: **Custom Agency Reference**. This field enables agencies to enter a custom identifier (up to 40 characters) for each individual, enhancing your ability to track cases using internal identifiers. The Custom Agency Reference will remain associated with the case throughout processing and will also appear in the Response File when retrieving case results in bulk.

**Action Required:**

Agencies must download and use the new CSV template for all bulk upload case submissions. Bulk uploads using previous templates will be rejected by the system.

This update provides greater flexibility for agencies to align SAVE case results with internal databases and systems of record.

Please ensure your teams are informed and begin using the new template immediately to avoid disruptions in case processing.

USCIS will continue to release enhancements to SAVE as we optimize this service to provide a single, reliable source for verifying immigration status and U.S. citizenship referenced in DHS, USCIS, DOGE Overhaul Systematic Alien Verification for Entitlements Database.

Last Reviewed/Updated: 05/01/2026



Need Help?
Chat with Emma™

JA535

# Exhibit 39

Civil Action No. 26-cv-1114 (CJN) (Lead case)

 Subscribe

POLITICS • 6 MIN READ

# Trump and GOP test precedent with aggressive voter roll purges

UPDATED MAY 4, 2026

By  Tierney Sneed





Voters fill out ballots at a polling station in New York on November 5, 2024. *(Leonardo Munoz/AFP/Getty Images/File)*

For decades, it's generally been assumed that any mass purges of voter rolls had to be completed at least 90 days out from an election.

But Republicans and the Trump administration are now testing the scope of the federal law that imposes that ban on "systematic" removal programs within three months of an election, as President Donald Trump pushes for more aggressive reviews of voter rolls for non-citizens and other ineligible voters.

JA537

The Justice Department has **launched a sprawling effort** to obtain nearly every state's voter registration file and to review those files for suspected non-citizens. For its review, the DOJ is using a federal immigration database tool known as SAVE – or the Systematic Alien Verification for Entitlements – which **has shown itself** prone to produce false positives.

Advertisement

Some state election officials have indicated they want the freedom to remove names in the months or weeks before an election, but other election officials – along with voter advocates – are concerned that eligible voters are at risk of being disenfranchised with the ramp up in the purge programs, especially as Trump tries to get more involved. They say that the so-called "quiet period" is needed to give eligible voters who are mistakenly caught up in such removals adequate time to get back on the rolls.

Trump and top officials in his administration been relentless in their claims that a flood of foreigners on the voter rolls have polluted elections, even though studies have shown non-citizen voting to be very rare.

That the Trump administration is attempting to insert the federal government more directly in the voting process makes the Republicans' legal arguments about the quiet period "more concerning," said Brent Ferguson, the senior director of strategic litigation at Campaign Legal Center, which has successfully sued states for violating the National Voter Registration Act's 90-day "quiet period."

"It sets up a situation where the federal government itself is the actor trying to purge voters from the rolls in the days before the election, which is clearly illegal," Ferguson said.

Advertisement

An appeals court ruled in **2014 that Florida could not use** the SAVE data system to purge its rolls within 90 days of the election because of the quiet period provision in the NVRA.

The Trump administration and Republicans argue that the ban does not apply to purges aimed at non-citizens and other people who should have never been registered in the first place.

Another appeals court rejected that argument when it was made by Republican state officials in Virginia. But the Supreme Court in **2024 issued an emergency order** in that case that let then-Virginia Gov. Glenn Youngkin restart a voter removal program just days before the election that used state records to identify alleged non-citizens. (Democratic Gov. Abigail Spanberger formally ended the program when she took office this year and the lawsuit was settled.)

Now the Republican National Committee is **asking the Supreme Court** to take up the question on the merits in a case arising from Arizona. The Justice Department **has claimed** in the litigation over its demands for state registration files that the quiet period doesn't apply to voter roll review it is undertaking. And in Ohio, Republican Secretary of State Frank LaRose is **making similar arguments** to defend his list maintenance programs that use SAVE and state DMV data.

Advertisement

Advocates for more aggressive list maintenance programs say that there are fail-safes in place to protect against disenfranchisement.

"The argument that states – and especially election officials – shouldn't do their jobs or maintain accurate voter rolls because of a technicality is absurd," RNC spokesperson Zach Parkinson told CNN.

JA538

Parkinson said he rejects the idea that "we can't have election integrity because an imagery person might be disenfranchised."

## Flawed data-matching programs

Already, Republican election officials have embraced more aggressive voter list maintenance programs, with several states taking advantage of the overhaul Trump did to SAVE to expand the federal databases it draws upon, and to make it easier for states to use. But those officials have found that a significant number of the people that SAVE has flagged as likely non-citizens in the comparison are in fact citizens.

Advertisement

For instance, an Idaho review of its voter rolls last year using the SAVE system initially found 760 potential noncitizens among its nearly 1.1 million registered voters.

But after further investigation, only about three dozen were referred to law enforcement to be probed for non-citizen registration or voting activity, Idaho Secretary of State **Phil McGrane told CNN.**

In the meantime, local election clerks have complained that they've received little or no guidance from their state election chiefs who have passed along lists of people SAVE has tagged as likely non-citizens.

According to a lawsuit **challenging Texas' use of SAVE**, what local officials do with those lists varies greatly county-by-county. Some counties do additional investigations into those matches – using state records that document citizenship records – to narrow the pool of voters who are then notified they will have their registrations cancelled unless they show proof of citizenship. Other counties are sending notices to every voter identified by SAVE as a suspected non-citizen.

Advertisement

Conservatives stress that there are backup options to protect eligible voters who miss the notice from their election officials that their registrations are being cancelled unless they provide proof they're citizens.

In the Virginia case, for instance, the state argued at the time that any citizen who was wrongly removed could re-register when they showed up at the polls, under the state's same day registration laws. In states without same day registration, such voters would have access to provisional voting, which allows voters to cast ballots that are set aside and only counted once the eligibility issues are resolved on the back end.

The Department of Homeland Security told CNN earlier last month that as part of its revamp of the SAVE program, it's tasked 150 employees to conduct "manual checks" of the matches produced by the program for "inconsistencies" before sending those results to the state.

As of early April, DHS had identified 21,000 individuals as a potential non-citizens on the voter rolls out of 60 million cases submitted – a rate of 0.035%. However, a larger share – about 3% of all comparisons – have come back as inconclusive, according to Wren Orey, the director of the Bipartisan Policy Center's Elections Project.

Advertisement

"When you're doing that within that 90-day period, that risk is just higher that those voters won't have adequate time or notice to be able to provide the documents that they'll need ahead of the election," Orey told CNN. "Maybe their birth certificate doesn't meet the requirements. Maybe they don't have one handy, maybe they don't have a passport. That could take months to get."

In addition, ending the quiet period for those types of purges could "dump" more work on election officials who will have to investigate whether the data matches are accurate while they're in the final sprint to prepare for an election, said Charles Stewart, an MIT professor who studies election systems.

"There is a reason why you do these investigations away from the election," Stewart said.

## The bubbling legal fight

The Arizona case asking the Supreme Court to resolve the scope of the NVRA's quiet period is unlikely to be resolved before the midterm elections. But it's possible that emergency litigation could force courts to weigh in on any removal programs conducted weeks or days before November's vote, as was the case with lawsuits challenging Virginia's and Alabama's efforts to remove voters just before the 2024 election.

As Trump's national citizenship voter verification bill has floundered in Congress, states have passed laws requiring regular checks of the voter rolls against SAVE, setting up the potential that the issue will be back on the Supreme Court's emergency docket this fall.



### Up next


Efforts to game the 2026 election intensify as Republicans draw new maps
6 MIN READ


The world's biggest democracy has purged electoral rolls, leaving many without a vote
5 MIN READ


FBI seizure of Fulton County election ballots happened quickly after criminal probe opened, new timeline shows
4 MIN READ

Defiant border czar brushes away MAGA critics, says 'mass deportations are coming'
3 MIN READ


The Supreme Court keeps overturning precedent. It swears that it's not
6 MIN READ


Charting how Trump became a historically unpopular president
6 MIN READ

### Most popular

**1**  Exclusive: Inmates describe being punished for speaking out about Ghislaine Maxwell

**2**  What we know about the Canvas hack impacting thousands of schools

**3**  Pentagon releases 'never-before-seen' files detailing UFOs

**4**  Virginia Supreme Court blocks referendum that would have helped Democrats win up to four more US House seats

**5**  What the numbers tell us about hantavirus

**6**  Multiple hikers killed, others rescued after volcano erupts in Indonesia

**7**  Trump is not getting what he initially wanted from the Iran war

**8**  This American doctor thought he was going on vacation. He ended up treating hantavirus patients

**9**  Iran imposes new rules for Strait of Hormuz in bid to secure wartime gains

**10**  30 years after Kristin Smart vanished, a new search renews hope for answers. Here's what we know

Search CNN...

Subscribe

Sign in

US

World

Politics

Business

Markets

Health

CNN Underscored

Entertainment

Tech

Style

Travel

Sports

Science

Climate

Weather

Ukraine-Russia War

Israel-Hamas War

Watch

Listen

Games

About CNN

Politics

FOLLOW CNN POLITICS

DOWNLOAD THE CNN APP

  

Terms of Use    Privacy Policy    Manage Cookies    Ad Choices    Accessibility & CC    About    Subscribe    Newsletters    Transcripts    Help Center

© 2026 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

JA541

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    Defendants. | Civil Action No. 26-cv-1114 (CJN) |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al*.,<br><br>    Defendants. | Civil Action No. 26-cv-1132 (CJN) |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al*.,<br><br>    Defendants. | Civil Action No. 26-cv-1151 (CJN) |

**DEMOCRATIC PARTY PLAINTIFFS' SUPPLEMENTAL INDEX OF EXHIBITS**

JA542

| Exhibit Number[*] | Document Title |
|---|---|
| 1 | Declaration of Lillie Snyder Boss (Apr. 16, 2026) |
| 2 | Declaration of Erik Ruselowski (Apr. 16, 2026) |
| 3 | Declaration of Liberty Schneider (Apr. 16, 2026) |
| 4 | Declaration of Jillian Edelman (Apr. 8, 2026) |
| 5 | Declaration of Hakeem S. Jeffries (Apr. 14, 2026) |
| 6 | Declaration of Charles E. Schumer (Apr. 16, 2026) |
| 7 | Declaration of Ada Shen (Apr. 17, 2026) |
| 8 | Declaration of Carolyn Betensky (Apr. 17, 2026) |
| 9 | Declaration of Danielle Litwak (Apr. 16, 2026) |
| 10 | Expert Declaration of Dr. Kenneth Mayer (Apr. 17, 2026) |
| 11 | Maddie Gannon, *Trump Stops in Battleground Georgia to Talk Economy, Voter ID Ahead of Midterms*, Spectrum News (Feb. 19, 2026), https://perma.cc/TZC6-RH6W |
| 12 | *Fact Sheet: President Donald J. Trump Ensures Citizenship Verification and Voter Eligibility in Federal Elections*, The White House (Mar. 31, 2026), https://perma.cc/PZP7-3Y8Y |
| 13 | *About SAVE*, USCIS (Mar. 3, 2026), https://perma.cc/97LR-VZ5T |
| 14 | Dep't of Homeland Sec., Ref. No. DHS/USCIS/PIA-006(d), *Privacy Impact Assessment for the Systematic Alien Verification for Entitlements "SAVE" Program* (Oct. 31, 2025) |
| 15 | Vittoria Elliott, *DHS's Data Grab Is Getting Citizens Kicked Off Voter Rolls, New Complaint Says*, Wired (Jan. 22, 2026), https://www.wired.com/story/dhs-data-grab-getting-citizens-kicked-off-voter-rolls/ |
| 16 | Fair Elections Ctr., *Eligible Voters at Risk: Examining Changes to USCIS's SAVE System* (July 2025), https://perma.cc/DED4-6VS7 |
| 17 | *Update Citizenship or Immigration Status*, Soc. Sec. Admin. (last visited Apr. 17, 2026), https://perma.cc/PZP7-3Y8Y |

---

[*] The Democratic Party Plaintiffs' Supplemental Index encompasses exhibits cited in their April 17, 2026 motion for a preliminary injunction as well as their May 8, 2026 reply brief.

| 18 | Letter from Nancy Morales Gonzalez, Assoc. Gen. Counsel for Soc. Sec. Admin., to Jon Sherman, Litig. Dir. & Senior Couns. for Fair Elections Ctr. (July 13, 2023) |
|---|---|
| 19 | Jen Fifield, *A Federal Tool to Check Voter Citizenship Keeps Making Mistakes. It Led to Confusion in Texas*, Tex. Trib. (Feb. 13, 2026), https://perma.cc/PZP7-3Y8Y |
| 20 | Alexandra Berzon & Nick Corasaniti, *Initial Review Finds No Widespread Illegal Voting by Migrants, Puncturing a Trump Claim*, N.Y. Times (Jan. 14, 2026), https://www.nytimes.com/2026/01/14/us/politics/noncitizen-voters-save-tool.html |
| 21 | *SAVE: Verification Process*, USCIS (May 22, 2025), https://www.uscis.gov/save/about-save/save-verification-process |
| 22 | *FAQ: How can I change my address or direct deposit information for my Social Security benefits or Supplemental Security Income (SSI) payments?*, Soc. Sec. Admin. (Sep. 20, 2024), https://perma.cc/U93C-RU6Z |
| 23 | Mehreen S. Ismail, *Number and Percentage of State-to-State Movers Increased Between 2021 and 2022*, U.S. Census Bureau (Nov. 21, 2023), https://perma.cc/QF9E-HUS9 |
| 24 | *Naturalization Statistics*, USCIS (Jan. 24, 2025), https://perma.cc/HX6V-CMAH |
| 25 | Olivia B. Waxman, *Voting by Mail Dates Back to America's Earliest Years. Here's How It's Changed Over the Years*, Time (updated Dec. 12, 2023), https://perma.cc/NH33-8WXJ |
| 26 | *Table 5: Applying for an Absentee Ballot, Including Third-Party Registration Drives*, Nat'l Conf. of State Legislatures (Feb. 24, 2026), https://www.ncsl.org/elections-and-campaigns/table-5-applying-for-an-absentee-ballot |
| 27 | *Table 1: States with No-Excuse Absentee Voting*, Nat'l Conf. of State Legislatures (Mar. 10, 2026) (updated Aug. 26, 2025), https://www.ncsl.org/elections-and-campaigns/table-1-states-with-no-excuse-absentee-voting |
| 28 | *Table 2: Excuses to Vote Absentee,* Nat'l Conf. of State Legislatures (updated Aug. 26, 2025), https://www.ncsl.org/elections-and-campaigns/table-2-excuses-to-vote-absentee |
| 29 | U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* (June 2025) (Excerpts) |
| 30 | M.I.T. Election Data & Sci. Lab, *Voting by Mail and Absentee Voting* (Feb. 28, 2024), https://perma.cc/JA6W-PT4V |
| 31 | M.I.T. Election Data & Sci. Lab, *How We Voted in 2024* (July 21, 2025), https://perma.cc/R3PN-EFZF |

| 32 | *Table 12: States with Postage-Paid Election Mail*, Nat'l Conf. of State Legislatures (Jan. 28, 2024), https://www.ncsl.org/elections-and-campaigns/table-12-states-with-postage-paid-election-mail |
|----|---|
| 33 | Lisa Baertlein, *UPS, FedEx Warn They Cannot Carry Ballots Like U.S. Postal Service*, Reuters (Aug. 16, 2020), https://perma.cc/QYS7-QUZQ |
| 34 | *USPS Releases Report on 2024 Election*, U.S. Postal Serv. (Dec. 3, 2024), https://perma.cc/8ZU7-SADA |
| 35 | Dep't of Homeland Sec., *USCIS Budget Overview, FY 2026 & FY 2027* (Apr. 3, 2026) (Excerpts) |
| 36 | Doug Bock Clark & Jen Fifield, *Inside Trump's Effort to "Take Over" the Midterm Elections*, ProPublica (Apr. 13, 2026), https://perma.cc/VNY7-XAUC |
| 37 | Eileen Sullivan, *DOGE Employees Shared Social Security Data, Court Filing Shows*, N.Y. Times (Jan. 21, 2026), https://www.nytimes.com/2026/01/20/us/politics/doge-employees-social-security-data.html |
| 38 | DHS, *Attention SAVE Program User Agencies: New CSV Bulk Upload Template Required for Case Creation* (May 1, 2026), https://www.uscis.gov/save/current-user-agencies/news-alerts/attention-save-program-user-agencies-new-csv-bulk-upload-template-required-for-case-creation |
| 39 | Tierney Sneed, *Trump and GOP Test Precedent With Aggressive Voter Roll Purges*, CNN (May 4, 2026), https://www.cnn.com/2026/05/04/politics/voter-roll-purges-election-day |

4

JA545

# Exhibit 40

Civil Action No. 26-cv-1114 (CJN) (Lead case)

JA546

**Listen to On NOTUS: Sen. Mark Kelly on War, Space and Politics**

TRUMP WHITE HOUSE

# Trump Is Pushing Forward His Plan for Voter Lists

The White House is meeting with DOJ, DHS and USPS about creating the lists.



Rahmat Gul/AP

By Jose Pagliery

May 14, 2026 05:46 AM     Updated: May 14, 2026 05:45 AM

President Donald Trump's attempt to impose federally approved voter lists on states and restrict mail-in voting is moving full-steam ahead.

White House officials have held discussions in recent weeks about putting the plan into action with the help of the Justice Department, the postmaster general and a known election conspiracy theorist who's been put in charge of "election integrity" at the Department of Homeland Security.

According to a government official with direct knowledge of these discussions, the talks have involved top administration officials at particular departments. The official responsibilities of the individuals involved hints at how the government is planning to implement — and defend — the policy in court. This source provided evidence that these discussions have involved DOJ Civil Rights Division head Harmeet Dhillon and her deputies; U.S. Postal Service CEO David Steiner; and Heather Honey, a far-right activist whose disproven research fueled Trump's 2020 election challenges.

Honey is now the DHS deputy assistant secretary for election integrity in the department's Office of Strategy, Policy and Plans. She has been described as a "protege" of Cleta Mitchell, a Republican lawyer who guided Trump as he attempted to cling to power after losing his 2020 reelection bid.

JA548

TRENDING



### Sen. Rand Paul's Son William Hurled Antisemitic Insults at Rep. Mike Lawler



### Pennsylvania's Crucial Swing Voters Say Congress Is Failing Them



### Chris Van Hollen Is Awaiting Kash Patel's Alcohol Abuse Test Results



### How the CDC's Hantavirus Response Became a PR Crisis

Trump's March 31 executive order, titled "Ensuring Citizenship Verification and Integrity in Federal Elections," tasks DHS with establishing what it calls a "state citizenship list" and calls for the DOJ to "prioritize" the prosecution of state and local officials who distribute ballots to anyone not eligible to vote. The nation's postal service is also ordered to create rules that would force states to submit rosters of eligible voters to USPS in order to distribute mail-in ballots.

Progressive groups have decried the maneuver as an attempt to violate the Constitution by having the federal government seize control of state-run elections.

JA549

Speaking on background, a White House staffer would not acknowledge that these discussions have taken place but said "it is standard process for administration officials to coordinate on implementing President Trump's executive orders. We do not comment on private meetings that may or may not have happened."

USPS also would not confirm that Steiner attended these discussions, and it merely issued a statement saying that "the Postal Service is examining the executive order, and we are working on a draft of a proposed rule."

DOJ and DHS did not respond to questions sent Wednesday afternoon.

Former DOJ officials told NOTUS the involvement of the department's civil rights division is indicative of how Dhillon has transformed its mission to one that is aimed at cementing MAGA's political control. And three election law attorneys expressed deep concern that the head of the post office is directly involved.

"This is a state issue they're meddling in," said Sara Tindall Ghazal, a member of the Georgia State Election Board. "The U.S. Postal Service is allegedly an independent entity that is not supposed to come under any sort of jurisdiction under federal agencies. I'm deeply concerned if they are talking about restricting the rights of voters, because it's very

JA550

clear that the administration does not have any authority in determining how people can vote if they're registered to vote."

Evidence provided to NOTUS shows that several White House officials and lawyers have led those discussions, including Deputy Homeland Security Advisor Anthony Salisbury, who was previously the Homeland Security Investigations special agent in charge in Miami.

The evidence also shows that top DOJ brass are also involved in the discussions, including associate deputy attorney general Aakash Singh, principal associate deputy attorney general Trent McCotter and a counselor to the attorney general, Henry Whitaker.

The timing of these discussions also has the potential to affect two ongoing lawsuits brought by elections-rights advocates challenging Trump's executive order. The government is trying to stop a judge from issuing a preliminary injunction that would halt the order. To further the government's argument, officials at various agencies have made declarations that imply these agencies have taken minimal steps to move forward on implementing Trump's directive.

Steven Monteith, USPS's chief marketing officer and the executive in charge of planning corporate strategies, issued a declaration that said "deliberations are currently ongoing within the Postal Service regarding the implementation of the executive order." Michael

JA551

Mayhew, who oversees immigration and identity records as deputy associate director of DHS's U.S. Citizenship and Immigration Services, signed a similar declaration that noted "deliberations are currently ongoing within DHS and USCIS."

However, neither official makes any mention that those talks involve more than half a dozen White House officials.

That point could be particularly relevant at a court hearing scheduled to take place in Washington on Thursday, when U.S. District Judge Carl Nichols will consider whether to step in. In a legal brief filed last week, DOJ lawyers argued that the federal judge is not in a position to block the order, in part, because any notion that the White House is directly controlling the implementation is premature.

The DOJ called it an "abstract legal question unless and until the Postal Service actually issues a rule that injures the plaintiffs and it does so only because it was directed to by the president — rather than, for example, as an exercise of the agency's own independent judgment."

Danielle Lang, an attorney at the Campaign Legal Center, one of the advocacy groups that initiated that lawsuit, told NOTUS that the revelations that White House officials are so involved in ongoing discussions shows "who's driving the bus."

"It's bringing together their top political leaders from those various agencies to give various marching orders, it seems to me," she said.

Lang said she's particularly concerned about "the presence of folks like Heather Honey and Harmeet Dhillon, who've been long on the train of conspiracies around voting."

*Correction: An earlier version of this story incorrectly said Trenton McCotter was an associate deputy attorney general; he is a principal associate deputy attorney general.*

AUTHOR

JA552

 *Jose Pagliery* is a reporter at NOTUS.

**THE LATEST ON NOTUS**

 **China's 'Great Rejuvenation' Meets Trump's 'Make America Great Again'**

 **How a Translation Loophole Allowed Rubio to Enter China Despite Sanctions**

 **House Republicans Are on a Collision Course With Trump on Housing**

 **Denise Powell Rides Wave of Outside Spending to Victory in Nebraska**

Subscribe to our newsletters  |  About NOTUS™  |  Work for us  |  Press Releases  |  Support FAQ  |

Contact us  |  RSS Feed  |  Terms of Use  |  Privacy Policy

© 2026 NOTUS MEDIA, LLC

JA553

# Exhibit 41

Civil Action No. 26-cv-1114 (CJN) (Lead case)



## CERTIFICATION OF AUTHENTICITY

May 19, 2026

**Client:** Michelle DePass

**Audio File Transcribed by GMR Transcription Services, Inc.:**

**File Name:**
316988_Acting_Attorney General Blanche Testifies on Oversight of Justice Dept

To Whom It May Concern:

I, Beth Worthy, President at GMR Transcription, do hereby certify under the penalty of perjury, under the laws of the state of California, that:

The transcript provided by GMR Transcription Services, Inc. is a full, true, and correct transcription of the audio file mentioned above, having been transcribed and reviewed by GMR Transcription to the best of the company's ability. I further certify that neither I, nor the transcriptionist, have any personal association with the case; nor am I, nor the transcriptionist in any way interested in the outcome thereof.

Executed May 19, 2026.

Sincerely,

**Beth Worthy**
**President**
Email: Beth@gmrtranscription.com
Phone: (714) 202-9653

2552 Walnut Ave. Suite 100 Tustin, CA 92780
www.gmrtranscription.com

JA555

| Gary Peters: | I can't imagine IGs are going to say, "Okay, we want fewer of us even though we have an 18-to-1 return." Also, say, "We're the guardian to make sure that people can trust what happens in the federal government." It makes no sense to me to have that cut. I think it speaks volumes about what this administration is really focused on, and it's not about reducing waste, fraud, and abuse. You don't do that by decimating the IG Corps. You certainly saw him fire a number of IGs earlier and have serious concerns. |
|---|---|
| | Mr. Blanche, the president also signed an Executive Order on March 31 directing the Department of Justice, the Department of Homeland Security, and the Postal Service to take a series of actions related to federal elections, including the creation of a federal citizenship list and new rules on mail ballot distribution. That order is rightly being challenged in federal court as these are state functions. However, recent reporting indicated that the implementation of that order is being coordinated through the White House meetings involving senior Department of Justice leadership, including Assistant Attorney General Harmeet Dhillon. My question for you, sir, is what is the department's role in implementing the March 31st Executive Order? |
| Todd Blanche: | Well, I want to be careful because it is under litigation, but it's as you just described. It's working with other agencies within the administration to implement the goals. I think they are appropriate goals to make sure that we have free and fair elections, to make sure that those are implemented, whether it's the DOJ that needs to implement them or some other federal agency. |
| Gary Peters: | Well, you have other agencies. The same reporting identified the official leading the Department of Homeland Security's work, as you said you're all working together on this, who now serves as the DHS Deputy Assistant Secretary for Election Integrity. Her name is Heather Honey, who is in that position. Ms. Honey's prior claims were central to the effect that challenged the 2020 election results. Claims, as you know, have been widely disproven. |
| | It's not true, none of this stuff. She's a key player there. My question for you, sir, is whether the department is taking policy direction either formally or informally. You say they are from your previous answer, but from an official whose prior work was built on disproven claims about a prior federal election? |
| Todd Blanche: | Our policy direction comes from President Trump and his leadership team. I know the person you're speaking about. She's |

**316988_Acting Attorney General Blanche Testifies on Oversight of Justice Dept**
**Todd Blanche, Gary Peters, Bill Hagerty**

2

part of DHS and certainly in meetings that we have about election integrity. However, as far as whether Harmeet Dhillon or I take policy directions, we take them from the president.

Gary Peters: Interesting. A person who was part of these widely disproven false allegations and a president who, of course, subscribes to that as well. That's what you're telling me. That's what's driving this effort by the federal government to basically take powers that the Constitution reserves for our states. Thank you, Mr. Chairman.

**[End of Audio]**

**Duration: 4 minutes**

# EXHIBIT 1

**Supplemental Declaration of Michael Mayhew (May 22, 2026)**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>　　　　　Plaintiffs,<br>　　v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>　　　　　Defendants. | Case No. 1:26-cv-01114-CJN |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>　　　　　Plaintiffs,<br>　　v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>　　　　　Defendants. | Case No. 1:26-cv-01132-CJN |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>　　　　　Plaintiffs,<br>　　v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>　　　　　Defendants. | Case No. 1:26-cv-01151-CJN |

**SU  LEMENTAL DECLARATION OF MICHAEL MAYHEW**

JA559

1.      My name is Michael Mayhew. I serve as Deputy Associate Director of the Immigration Records and Identity Services Directorate within U.S. Citizenship and Immigration Services (USCIS). I have served in this position since February 2022.  I previously provided a declaration in the above-captioned matters, signed on May 1, 2026.  I am updating my previous declaration with information accurate as of today.

2.      In my professional capacity as the Deputy Associate Director, I am responsible for the management of USCIS's immigration records and identity services portfolio.

3.      The following declaration is based on my personal knowledge and information that I acquired in my official capacity and in the performance of my official functions.

4.      DHS and USCIS are in receipt of Executive Order 14,399, Ensuring Citizenship Verification and Integrity in Federal Elections, issued on March 31, 2026.

5.      I am aware that deliberations are currently ongoing within DHS and USCIS regarding implementation of the Executive Order. Those deliberations include consideration of feasibility and consistency with applicable law, including but not limited to the Privacy Act of 1974 (5 U.S.C. 552a), as contemplated explicitly by Sections 2(a) and 7(b) of E.O. 14,399.

6.      USCIS has presented a recommendation regarding the "State Citizenship Lists" discussed in E.O. 14,399 to the DHS.

7.      USCIS has not yet created any "State Citizenship List" as contemplated by E.O. 14,399.

8.      DHS has not yet made any final decisions regarding implementation of E.O. 14,399.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that, as of the date of this declaration, the foregoing is true and correct to the best of my knowledge.

Executed this 22nd day of May 2026 in Charleston, South Carolina.

2

MICHAEL X
MAYHEW

Digitally signed by
MICHAEL X MAYHEW
Date: 2026.05.22
15:47:43 -04'00'

MICHAEL X. MAYHEW
Deputy Associate Director
Immigration Records and Identity Services Directorate
United States Citizenship and Immigration Services

3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEMOCRATIC CONGRESSIONAL CAMPAIGN COMMITTEE, et al., | Civil Action No. 1:26-1114 |
| Plaintiffs, | |
| vs. | Washington, DC May 14, 2026 |
| DONALD. F. TRUMP, et al, | |
| Defendants. / | 2:10 p.m. |

## TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING PROCEEDINGS
### BEFORE THE HONORABLE CARL J. NICHOLS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

**For the Plaintiffs:**  Lalitha Madduri
**(DSCC, DCCC, DNC, DGA,**  Jacob D. Shelly
**Charles Schumer &**  Kevin R. Kowalewski
**Hakeem Jeffries)**  Max Accardi
ELIAS LAW GROUP LLP
250 Massachusetts Ave NW, Ste. 400
Washington, DC 20001
Emails:  lmadduri@elias.law
kkowalewski@elias.law
jshelly@elias.law
maccardi@elias.law


**For the Plaintiffs:**  Danielle M. Lang
**(LULAC, Secure**  Anna Marks Baldwin
**Families Initiative**  CAMPAIGN LEGAL CENTER
**AZ Students' Assoc.)**  1101 14th St. NW, Suite 400
Washington, DC 20005
Emails: dlang@campaignlegalcenter.org
abaldwin@campaignlegalcenter.org

APPEARANCES CONT'D.:

**For the Plaintiffs:**          Orion de Nevers
**(NAACP, Common Cause,**        John Freedman
**CC Education Fund,**             ARNOLD & PORTER KAYE SCHOLER LLP
**BMV Fund, Inc.,**               601 Massachusetts Ave., NW
**BVM Capacity, Bldg.**           Washington, DC 20001
**Institute, Inc.)**         Emails: orion.denevers@arnoldporter.com
                                     john.freedman@arnoldporter.com


**For Defendants:**              Stephen M. Pezzi
**(Donald J. Trump,**            Esam Al-Shareffi
**Executive Office of**           DoJ - CIV- Federal Programs
**the President,**                1100 L Street, NW
**U.S. DoJ, USPS,**               Washington, DC 20530
**U.S. DHS, USCIS,**              Email: stephen.pezzi@usdoj.gov
**SSA, U.S. DoC,**                       esam.k.al-shareffi@usdoj.gov
**et al.)**


**For the Movants:**             Louis J. Capozzi, III
(States of MO, AL,                Missouri Attorney General's Office
FL, LA, MO, OK,                   815 Olive Street, Suite 200
SC, SD and TX)                    St Louis, Missouri 63101
                                  Email: Louis.Capozzi@ago.mo.gov


**Reported By:**                 **LORRAINE T. HERMAN, RPR, CRC**
                                  Official Court Reporter
                                  U.S. District & Bankruptcy Courts
                                  333 Constitution Avenue NW
                                  Washington, DC 20001
                                  lorraine_herman@dcd.uscourts.gov


**\*\*\***   Proceedings recorded by stenotype shorthand.
**\*\*\***   Transcript produced by computer-aided transcription.

**P R O C E E D I N G S**

**DEPUTY CLERK:** Good afternoon, Your Honor. This is civil case year 2026-1114, *DSCC, et al. vs. President Donald J. Trump, et al.; Movant, State of Missouri, et al.*

Counsel, please come forward and introduce yourselves for the record, beginning with the plaintiffs.

**MS. MADDURI:** Good afternoon. May it please the Court. My name is Lali Madduri, and I represent the Democratic Party plaintiffs.

**THE COURT:** Ms. Madduri, good afternoon.

**MS. LANG:** Good afternoon, Your Honor. I'm Danielle Lang, and I'm representing the LULAC plaintiffs, and I'm joined at counsel table with Anna Baldwin, my colleague.

**THE COURT:** Good afternoon.

**MS. LANG:** Good afternoon.

**MR. de NEVERS:** Good afternoon, Your Honor. Orion de Nevers on behalf of the NAACP plaintiffs. I'm joined at counsel table by John Freedman.

**THE COURT:** Good afternoon as well.

**MR. PEZZI:** Good afternoon, Your Honor. Stephen Pezzi from the Department of Justice on behalf of the United States. With me at counsel's table are Joey Borson and Esam Al-Shareffi, also of the Department of

Justice.

THE COURT: Counsel, good afternoon.

MR. CAPOZZI: Good afternoon, Your Honor. Louis Capozzi on behalf of the State defendants.

THE COURT: Also, good afternoon.

We're obviously here on a hearing and argument on the preliminary injunction motions filed in each of the three consolidated cases.

I intend to proceed as follows, which is to hear first from the plaintiffs and then, of course, from the defendants. Obviously, we have the federal defendants and then the State defendants and then go back to the plaintiffs for a short rebuttal as warranted.

I obviously don't have lights or other timers in the courtroom. I don't have a set amount of time specifically that I intend to hold anyone to.

I should say I have read everything. I think I have a pretty good handle on the facts, the state of play and certainly a good amount of the law. As you can imagine, I will have some questions as you go.

I think it's fair to say that both sides should do everything they can, to the extent there is going to be a division of argument, to avoid repetition. I don't want to trod on already-trodden ground, or whatever the saying is.

And again, I don't have a hard and fast either

time for either side or a hard and fast end point, but it seems to me that something in the nature of 45 minutes per side for the opening and response, with something very short, five or ten minutes, for rebuttal should work. I'll leave it to you-all to decide how you'd like to divide the respective 45 minutes and the like.

And then sometimes I come into hearings and I say, this is what I really think you should focus on or I want the argument to be structured in the following way, but I don't think that's necessary here. I think we can have counsel sort of direct the arguments they would like to address, but obviously reacting, I think, to some extent to my questions.

With that, why don't we start with whichever counsel for plaintiffs is going to lead us off.

Ms. Madduri.

**MS. MADDURI:** Good afternoon. Again, I am Lali Madduri on behalf of the Democratic Party plaintiffs. And I should have said, I'm joined by my colleagues Jacob Shelly, Max Accardi and Kevin Kowalewski for the Democratic Party plaintiffs.

**THE COURT:** Very well.

**MS. MADDURI:** The very founding of this country was premised on the rejection of an all-powerful executive. We do not have a head of state who enjoins plenary power to

proclaim their preferences into law.  Instead, we have a President who is tasked with enforcing the statutes enacted by Congress and exercising powers reserved to him by the Constitution.

This case is pretty straightforward on the merits. There is no statute that authorizes the commands in the Executive Order we are challenging.  Specifically, no statute authorizes the President to compile state citizenship lists by attempting to match data across various federal agencies, and no statute authorizes the President to prohibit the transmission of ballots.

Nor is this the --

**THE COURT:**  Would anyone be injured if a list was compiled by the federal government consistent with the Executive Order and then not transmitted to any state?

**MS. MADDURI:**  Yes.  And that would violate the Privacy Act.

**THE COURT:**  How is that?

**MS. MADDURI:**  That would violate the Privacy Act, Your Honor.

**THE COURT:**  What's the injury?

**MS. MADDURI:**  The injury arises upon the disclosure of that information among agencies.

**THE COURT:**  Who is injured?  Surely, the parties are not.

MS. MADDURI: Our individual members.

THE COURT: Your individual members would be injured if a list is compiled, but that wouldn't injure them in connection with voting. That would be an injury that is about the sharing of information among federal agencies.

MS. MADDURI: That's right. That's a privacy harm that arises when the matching occurs, as --

THE COURT: That has nothing to do with voting. That could be a list compiled for any purpose.

MS. MADDURI: It would depend on exactly how but, yes, under the dictates of the E.O., where we're matching data from various federal sources --

THE COURT: That assumes that that compilation is done in a matter that is inconsistent with the Privacy Act --

MS. MADDURI: Yes.

THE COURT: -- or other legal issues.

MS. MADDURI: Sorry?

THE COURT: It seems to me that there clearly are procedural requirements under the Privacy Act that may or may not be complied with here. We just don't know yet. Right?

MS. MADDURI: There could also be procedural harms; and that would be a separate issue. Our Privacy Act claim is actually pretty simple. The Privacy Act does not

allow the, sort of, matching and exchanging of computer records that the E.O. requires. So the injury arises at that point. And there is nothing left to figure out about that.

It's already stated in the E.O. that they're going to take SSA data, naturalization records, citizenship records and at least SSA data and match those across federal databases and --

THE COURT: And if that happened and nothing more, that would be irreparable harm sufficient to get a PI?

MS. MADDURI: Yes, I think it would be.

THE COURT: Again, that has nothing to do with voting. It has nothing to do with transmission of the list to the States. It has nothing to do with the State doing anything with the information.

MS. MADDURI: Even before --

THE COURT: That would just be like, the compilation of a list, without more, injures our members because they have a Privacy Act interest in not having this compilation be put together, even if nothing happens with that list.

MS. MADDURI: Yeah, that's right.

At the instant that that private data, that the Privacy Act -- Congress has identified as information that should not be exchanged, and specifically should not be

exchanged to create this sort of citizenship list or master database that the Privacy Act makes very clear is prohibited, the disclosure of that very highly sensitive information and the matching between the computer programs, right then and there, there is irreparable injury to the people whose records are disclosed and used in that way.

THE COURT: What if DHS decides that it cannot compile a list in a way that would be consistent with the Privacy Act, and it says, well, the E.O. says to the extent feasible and consistent with applicable law, including but not limited to the Privacy Act. We can't do that and, therefore, we are not going to compile the list. Would anyone be hurt then?

MS. MADDURI: [No response]

THE COURT: Would there be a Privacy Act injury, even if the list isn't compiled, because DHS concludes it can't do so because of the Privacy Act?

MS. MADDURI: The issue right now is whether that injury is certainly impending or not or is likely to occur. And that is likely to occur because courts have explained time and time again that those clauses, those savings clauses, and the feasibility clause Your Honor referenced, cannot authorize commands that themselves are unambiguously lawful. And the President can't command subordinates to lawfully -- like, for example, he can't, say, lawfully

engage in racial discrimination.

**THE COURT:** Do you agree that a list could be compiled where at least some procedural protections required by the Privacy Act are complied with? Maybe the timing doesn't work out but one could do a sworn notice, and maybe the dates don't work, but the Privacy Act does have requirements. Do you think that there is no world in which a list could be compiled that complied with the Privacy Act?

**MS. MADDURI:** Yes, I think that's exactly right.

The gist of our Privacy Act claim, that's at issue in the PI, is that it's simple. The Privacy Act prohibits the federal agencies from disclosing any records containing personal information and then using a computer program to match that. And that's exactly what it dictates.

It can't be read to defeat itself through the savings clause; that's pretty clear. And that's for a good reason. Right?

"Inconsistent with law" precluded this court from examining whether the E.O. is, in fact, consistent with law, judicial review at that point would be meaningless.

**THE COURT:** Well, wait. Why isn't it the case that I could say, the list hasn't been compiled yet. We don't know how it's going to be compiled. The government, while this case is pending, has an obligation to inform me every step along the way.

And when it decides how it's going to compile this list, when it's going to compile it, how it's going to compile it and how it's going to do the data analytics matching, it has to notify me first. And at that point, I can decide whether there's a Privacy Act violation.

Because right now we have a direction from the President to engage in this analysis and then to go do the list, but we don't know how DHS is actually going to compile the list.

**MS. MADDURI:** The problem is that there is no lawful way to compile it. So it doesn't actually matter how they do it, whether they put it in Excel, whether they keep the states separate.

**THE COURT:** Your view is that DHS will, because of the Executive Order, violate the Privacy Act, even though the Executive Order says, don't violate the Privacy Act.

**MS. MADDURI:** Yeah, and that's because we argue here that the challenge provisions are invalid in all possible applications. So the savings clause doesn't preclude review at this point because there is actually no way to lawfully implement it.

The feasibility reference, too, I think it operates the same way as the legality provision here, in that it can't destroy the unlawful command because it actually faces no barrier. Feasibility is explained in

*Trump v. New York* and *Common Cause v. Trump*, in this district and goes to technical feasibility requirements.

So it would be relevant if, you know, there's not the software that needs to exist to create it or whether there's new infrastructure that might be required. But there are no technical barriers here that would prevent implementation and the government hasn't identified any.

Actually, the E.O. itself overcomes any conceivable barrier because another unequivocal provision of the E.O., that's 4(c), that's unconstrained by a feasibility qualifier, orders the Secretary of Home--

**COURT REPORTER:** Excuse me. Please slow down.

**MS. MADDURI:** Sorry.

So Section 4(c) orders, the Secretary of Homeland Security shall, within 90 days, establish the infrastructure necessary to compile, maintain and transmit the citizenship list described in Section 2(a).

So if there was any doubt about that feasibility piece, the unequivocal command of the E.O. itself renders it meaningless. That boilerplate feasibility language just doesn't function to actually do anything here.

And so that's the issue here. The commands are fundamentally unsavable, regardless of how they go about implementation. If they do anything to effectuate the order, it's illegal. There's just no way to do it lawfully.

**THE COURT:** In your view, it is both a right dispute and illegal for the executive branch to compile a list consistent with Section 2, even if that list is never transmitted to the states?

**MS. MADDURI:** That's right.

**THE COURT:** Even if a state never uses the list, or even if the list is used in a way that is perfectly consistent with each state's law about voter registration?

**MS. MADDURI:** Yeah, that's right.

**THE COURT:** This injury has nothing to do with voting.

**MS. MADDURI:** It's privacy.

**THE COURT:** I know. I'm talking about this particular injury we are talking about. This particular injury has nothing to do with voting. It has nothing to do with elections. Certainly, not directly. It's an injury about the sharing of information internal to the executive branch.

**MS. MADDURI:** I think that is the technical injury that arises from disclosures within the federal government. And then there would be another injury, of course, when you actually disclose to states, regardless of the use that they actually implement it for.

I think it's also really difficult to consider the Executive Order as a whole, which is very, very clear that

it regulates elections. It's intended to make sure there's no non-citizens on the rolls. It just needs to be --

**THE COURT:** Let's talk about the list first.

As I understand it, we have been talking about the compilation of the list. The Executive Order requires the list to be put together in a way that is consistent with Section 4.

Then each state version of the list -- again, assuming this is all determined to be, at least by the terms of the Executive Order, appropriate, lawful, whatever, but each list gets transmitted to a state. Each state's version of the list. And then each state then does something with the list. Right?

How is that regulating any state's election or any state's decision about who is going to be a registered voter in that state?

**MS. MADDURI:** I think the election regulation aspect of the list is -- it's sort of inherent from the start. Right? These lists are being compiled to identify voters who are eligible, both in their citizenship, their age and their residency. So I think there is an aspect of it that is inherently tied to elections.

**THE COURT:** Does the State of Massachusetts have to do anything under this E.O.? Can the State of Massachusetts -- even if it receives the list, would the

State of Massachusetts be free to ignore the list it receives from DHS?

MS. MADDURI: I think yes, the state could ignore it. But I think here, we actually have a bunch of states who are in the litigation.

THE COURT: Okay. But would a voter in Massachusetts, nevertheless, have standing, in your view, to sue to challenge the E.O.?

MS. MADDURI: Yes, for the privacy harms that exist.

THE COURT: No, no. On the voting harm. I get your privacy part. I am now moving on to the fact that this list might be provided to states and states might decide to do something or not with the list.

So now I'm hypothesizing that the State of Massachusetts receives this list from DHS. If Massachusetts decides to do nothing with the list -- we don't know right now whether that's going to happen or not -- would a voter in Massachusetts have standing to challenge the E.O., because of registration, voting in Massachusetts or any other effect on the vote in Massachusetts this year?

MS. MADDURI: I think the issue there is what we're looking at right now is the likely injuries that could flow from this order. So I don't want to say --

THE COURT: What is likely to happen to a voter in

Massachusetts?

MS. MADDURI: In a state that definitively says they will not look at this list, they will not touch it, they will never do anything with it, it's harder. I think it's harder to establish that that voter has standing to challenge it.

THE COURT: If a state does use the list -- again, I am now hypothesizing a world where the list is compiled. It's transmitted to each of the 50 states. I know there is more than just 50 states in the sense that there's districts and territories, but just for simplicity. Right? Those are the 50 states. And a state -- pick one. I don't mean to be...

California says, we want to look at the list and we're going to check our voter registration list against the list that we've just received from the federal government.

And let's say California removes some people from the list at that point that it shouldn't have from its voter registration list. Why couldn't a California voter effected sue California for having violated its California law or federal law in how it uses this information?

MS. MADDURI: I think a voter could definitely also sue California, but here --

THE COURT: But why isn't that intervening act by a third party enough to break the causal change between this

E.O. and how a voter in California is affected, since at least now we don't know whether California would or wouldn't do that?

MS. MADDURI: I think that it's the natural consequence of the E.O. that states are going to use it that way.

THE COURT: Is it the natural consequence of the E.O. that Massachusetts will rely on the list in its voter registration analysis?

MS. MADDURI: I think it's very possible that there are some states who don't use it. But I think what we know here from the states who have intervened in the case, they have already told us they want to use these lists to examine --

THE COURT: Don't they have to use it in a way that's unlawful also?

MS. MADDURI: I'm sorry. What?

THE COURT: To have a claim against a state, a state would have to not just employ the list. It would have to do so in a way that is unlawful somehow. It's not enough to just look at a list. You have to look at a list and do something with it that is inappropriate or unlawful.

So we have to hypothesize not just that some states will use the list, but that those states will use the list in a way that is itself unlawful.

So you have to assume the list is unlawfully inadequate as formulated as a federal list. You then have to hypothesize that it's disseminated to each of the 50 states. You have to assume that some states will use the list. Then you have to assume that the list is used in a way that harms some of that state's voters, perhaps by having them inappropriately removed from the registration list or whatever; and that that was a violation of some legal obligation of the state.

We don't know, sitting here today, whether any or all of those steps are going to happen.

**MS. MADDURI:** So I think we actually do know that some of them are going to happen.

**THE COURT:** Okay.

**MS. MADDURI:** We already know exactly how the lists are going to be compiled and the databases that they are going to use, which includes the SAVE database and Social Security information.

We know, and it's uncontested in the record, that those databases and those records are rife with errors, and there is probably literally no way to include appropriate residency information on those, which the E.O. commands that it happen. So voters are either going to be misidentified, wrongly identified or omitted from these lists.

We also know that the E.O. commands that they go

to the states. So that is also something that is ordered by the E.O.

We also know that there are at least 10 states who are here today saying we are going to use those error-prone, defective lists to check our voting records.

**THE COURT:** What if they don't remove a single person from their voting lists because of the federal list? What if they say: We have our voter registration lists. We think ours is more robust. It's good. We've double checked it, but we've decided that we're not going to remove anyone from our list because of this federal list.

**MS. MADDURI:** I think voters are also injured along the way. Right? Even if they are subject to these investigations, that they are wrongly accused of not being citizens, that they have to go and prove other identity, even if they are not actually ultimately removed, there is an injury from that that is redressable.

**THE COURT:** What is that injury if they are not removed?

So I get that a voter would be injured if, for example, as a result of this process, a voter can't vote in -- again, to use my example, in California. The voter who should be registered in California is not registered as a result of this list being received and used by California. I totally get it.

Do you argue in your brief that the voter who has to expend effort between now and the vote would be injured, sort of like in an organizational standing -- I know it's not organizational standing, but would be injured by having to take steps to ensure that that voter is properly registered?

**MS. MADDURI:** Yes.

**THE COURT:** Okay.

**MS. MADDURI:** When you add barriers to voting or extra steps that are imposed on some voters to access the franchise, that is a redressable injury and that --

**THE COURT:** I get one could argue that. Do you argue that in your brief?

**MS. MADDURI:** Yes.

**THE COURT:** Okay. Where is that? I'm not suggesting that you didn't. I just don't recall that.

**MS. MADDURI:** I will get you the citation, Your Honor.

**THE COURT:** Okay.

**MS. MADDURI:** But, yes, we absolutely argue that you don't need to be disenfranchised to be injured by these lists. If there are additional hurdles that you have to overcome, other burdens that you have to overcome, that is a cognizable injury, and *Crawford*, from the U.S. Supreme Court, tells us that. Right?

You don't have to be disenfranchised even -- that case was about voter ID and even voters who had access to ID still had standing to bring those claims. They are still injured by adding an extra step or an extra burden in the process of casting their ballots. So absolutely, you do not need to be disenfranchised to be injured for purposes --

THE COURT: Can we just go back to the privacy harm for a second? I realize I kind of took you off of that. But imagine that the list was compiled in the way that you say violates the Privacy Act. Imagine, hypothetically, I, for whatever reason, didn't enjoin the compilation of the list. I asked the government to make sure that it tells me what's up and it provides me regular updates.

And then the government says: This is our plan. We're going to compile the list. We are doing so now.

I have related questions, which are, one, why couldn't I then, with a concrete, specific plan developed by DHS about the list, take up the question of whether to enjoin its -- sort of the turning on of the list. Right? This is how we're going to do it. But I say stop.

Or, if they do it, why couldn't I order something thereafter that would either make the list unusable -- I mean, preclude the government from using it -- or preclude it from being maintained?

Both of those go to the question of why is there irreparable harm now or why would the harm be irreparable for that interim period between -- let's imagine, again, the list is now a thing and I hold, after a week or two and we know what the thing is, that it's unlawfully compiled. Right? Reverse it.

**MS. MADDURI:** I think two things:

One is that there isn't a way to lawfully compile it. So waiting for those details or waiting to see how they --

**THE COURT:** I know that's your position.

**MS. MADDURI:** -- and what's the harm?

**THE COURT:** Let's assume that I'm not so sure about that.

**MS. MADDURI:** Okay.

**THE COURT:** But let's just assume that you're right about that even, but what's the harm, or how really irreparable is a harm to someone if their information is put -- their information, which the federal government already has, is put into another database for a period of time where nothing else has happened with that information, and maybe even after some period of time I can unwind it?

**MS. MADDURI:** So I guess I would say that, one, it's not unwindable once the disclosure is made. And Congress has already made a judgment about --

THE COURT: I'm saying, before there is a disclosure -- right now we have an Executive Order. That list has not been compiled yet. Right?

You want an injunction to prevent the compilation of the list. My question is, let's imagine that the compilation occurs. I've learned that the compilation has occurred. I decide that that list is unlawfully compiled and I say, don't disseminate it, or if it was, pull it back and dismantle the list.

What is the irreparable harm in this interregnum period between now and that that warrants a PI?

MS. MADDURI: Congress has made a judgment in the Privacy Act that that disclosure that you're talking about in the beginning, the compilation itself of highly-sensitive data, things like Social Security numbers, going between agencies in the federal government is unlawful and an irreparable harm. And so that is a harm in itself that is irreparable. Once that data is disseminated, it's disseminated.

THE COURT: Do you think the view that they are standing there is consistent with the Supreme Court's decision in *Trans Union*?

What action or kind of case around the framing or the founding would look most like that kind of Article III injury?

Because what you are saying is, a plaintiff can sue now, is injured now, if information is shared between parts of the federal government. Congress has said that's important enough to allow Privacy Act cause of action. I'm not quibbling with that point.

But in *Trans Union*, the Supreme Court says, well, just because you have a cause of action, you have to ask if there is an analog at the founding for the kind of case or the kind of injury that courts would typically be looking at.

And so my question is: What's the best case from 1789 era where plaintiffs were permitted to bring claims like that?

Again, I'm focused just on this Privacy Act period now. I get the voting stuff. That's pretty clear to me that that would be injury.

**MS. MADDURI:** Okay. I think -- I don't have a case from the 1700s, but the analog torts from before both breach of confidence and intrusion upon seclusion and the -- and courts have consistently recognized that those are analogous harms to what the Privacy Act is addressing. So there is a cause of action that's been recognized for a long time that is very analogous to exactly what we're talking about here.

**THE COURT:** Okay. So that would mean there is

Article III standing. But, then, I take it the corollary, in your view, is that that's harm. It's injury for Article III purposes. It's harm for purposes of the PI standard. And it's irreparable because even if it happens in this three- to four-week period and is reversed or stopped or discontinued or whatever, that four-week period, that harm is still irreparable.

MS. MADDURI: Yes. Because the harm occurs upon the disclosure. It's very, very clear that the federal government cannot disclose records this way, and the Privacy Act is extremely clear that the purpose -- part of the big purpose of that was to prevent the sort of creation of this federalized database of citizens. That is foundational to the Privacy Act. So Congress has made a judgment that that is a very serious harm that is redressable.

THE COURT: Is there a damages cause of action for someone whose information is shared, say, from the SSA to DHS in a way that they say is unlawful?

MS. MADDURI: There is a retroactive --

THE COURT: So then why is the harm irreparable? Congress has said you can get damages for unlawful sharing. It seems like Congress has said that that harm is reparable through a damages action.

MS. MADDURI: Monetary damages are available for Privacy Act, but they're not adequate alternatives to the

injunctive relief to prevent the harm in the first place. So damages and injunctions just belong to two different genres. Several courts from this District have recognized that.

As Judge Bates observed in AFL-CIO, the Supreme Court has all but said that in dicta. As Judge Kollar-Kotelly observed in LULAC III, that conclusion also purports with the Supreme Court's more recent holding that the Privacy Act's remedial scheme does not preclude parallel remedies under the Fair Credit Reporting Act.

**THE COURT:** But you still have to establish that the irreparable harm is substantial, both that the harm is irreparable, of course -- that there's harm, that it's irreparable, and that it warrants injunctive relief here.

So why is the harm, which, perhaps, can be remedied in part by a damages action, why is it so irreparable that an injunction now is warranted?

**MS. MADDURI:** I think because Congress has made that judgment that these sorts of disclosures are highly offensive. And we also have declarations attached to our brief where various voters have attested to the fact that they would find these disclosures highly offensive and, therefore, irreparable to them.

So I think it's a judgment that Congress has made, and there's also factual evidence in the record supporting

that finding.

THE COURT: Okay.

MS. MADDURI: That's exactly the sort of evidence that courts rely upon in granting a preliminary injunction in this context.

THE COURT: Okay. Are you Section 2 person only? Are you going to do Section 3 as well?

MS. MADDURI: I was going to also do Section 3, but I want to be mindful of the time.

THE COURT: I, of course, want to talk about Section 3, but I also want to give your co-counsel an opportunity to speak, and I don't want to get in the middle of that. I am at least ready to talk about the Postal Service angle here.

MS. MADDURI: I would be happy to take a few of your questions, Your Honor, and then I will turn it over.

THE COURT: It seems to me that the state of play in the Postal Service is different but shares some characteristics with the list, which is Executive Order says to the Postal Service: You must, you shall go to a notice of proposed rulemaking that includes the following things, covers the following topics and shall do certain things, and then the final rule has to be issued 120 days from now -- or from the Executive Order.

So right now, I think it's fair to say no one

knows exactly what's going to be in the NPRM or the final rule. You agree with that?

**MS. MADDURI:** I think it is very clear from the E.O. that we know exactly what is being mandated here. It's some of the things Your Honor said. The rule shall include specific ballots assigned. The rule shall include USPS creating a list for voters to enroll on to be able to get their mail ballots. And it requires USPS not to deliver ballots to those people. Those are clear, detailed commands and not merely some sort of suggestion.

**THE COURT:** What if the Postal Service says, we are independent. Everyone knows that we have an independence of sorts. We have to go through our normal NPRM process. We have to look at the legality of these things. We think some of these are not legal. We don't think we have the authority to engage in some of the things the Executive Order requires us to do.

So the NPRM has some components of the E.O. and it doesn't have others, and if they pick a third rail or a third way for other parts.

And then there are comments that say, what are you talking about? All of this is unlawful or whatever. And then the final rule looks different than the NPRM, which looks different than the E.O.

How does the E.O. -- before the Postal Service

gets to the final rule, how does the E.O. affect anyone, as it relates to mail?

MS. MADDURI: So the E.O. is unequivocal in its terms. Right? So it's very clear what they have to do. And for --

THE COURT: No. Very specific question. How does the E.O., before those other things have happened, affect anyone?

MS. MADDURI: For my clients, it effects them --

THE COURT: Let's put it this way. No mail is being transmitted as required by the E.O. unless and until the final rule passes. You agree with that?

MS. MADDURI: I'm sorry. Can you say that one more time?

THE COURT: No mail is going to be transmitted as required by the E.O. unless and until the final rule comes out.

MS. MADDURI: Yes. No mail would actually be done. But I think the issue here is that for our standing and for our irreparable harm, that harm doesn't actually need to befall us for us to be able to get --

THE COURT: Who is "us" and what's the harm you're talking about?

MS. LANG: The Democratic Party plaintiffs.

THE COURT: We have -- there are at least four

different theories of standing here on harm.  So you need to be specific.

MS. MADDURI:  Okay.

THE COURT:  You are talking about the committee itself?

MS. MADDURI:  All of the committees, yes, and candidates who we represent.

THE COURT:  Okay.  And how are they harmed or injured in the Article III sense right now by the order without the rule?

MS. MADDURI:  Because the order is unequivocal in what it requires, well in advance of it actually being implemented, the Democratic Party plaintiffs are being forced to compete on an unlawful playing field.

We are actively right now planning and preparing for hundreds of elections, and because of the E.O. we are going to have to divert resources now from other electoral efforts, like persuasion mobilization, to counteract the provision's effects on our voters' ability to stay on the rolls.

So that's a here-and-now issue that we are experiencing, and the election context is just so critical here.  This is not a situation where we can wait and see before preparing to mitigate those harms.

THE COURT:  So you want me to enjoin what exactly?

You want me to preclude the U.S. Postal Service from even issuing a notice of a proposed rulemaking in light of the E.O. or enjoining the E.O. insofar as it requires that even if it's possible that the rulemaking will result in a perfectly lawful regulation?

MS. MADDURI: Our view would be that there is no way for the rule to turn out to be perfectly lawful.

THE COURT: That assumes that the Postal Service will, as a result of this process, engage in an unlawful rulemaking.

MS. MADDURI: The rule that's mandated is unlawful from the getgo.

THE COURT: I know. It assumes that the Postal Service will not follow the law.

MS. MADDURI: Yes. And that is because, on the face of the E.O., the only thing that's there is a savings clause --

THE COURT: Your view is that the Postal Service is independent. So why wouldn't I have to assume that the Postal Service, perhaps different from other agencies, would exercise an independence and say, Whoa, this order asks us to think about things that actually aren't lawful and we're not going to do that and we're not going to propose that as part of the rulemaking.

MS. MADDURI: I think this E.O. actually looks a

lot like the prior E.O. command in the last presidential order that required EAC to adopt a documentary proof of citizenship requirement for the federal form.

Again, EAC was an independent agency with its own rule-adoption process, just like USPS, but the order ordered that they shall adopt this documentary proof of citizenship. And like here, the government adamantly argued that the outcome of the order was not preordained, including because the E.O. said that the EAC should carry out the order through appropriate action. And it has a similar savings clause just like here.

And again, like here, the government said that the Court should read Section 2 as little more than a suggestion that the EAC require that documentary proof of citizenship. A suggestion that they said the EAC was free to ignore and reject in the ordinary course of its rulemaking. Again, just like it implies for Section 3 here.

Despite those claims, Judge Kollar-Kotelly reached the same conclusion we believe the Court should reach here, because the plain text of the E.O. requires an unlawful rulemaking.

And it's not -- it's not actually just this wide-open situation. The White House's statements confirm that this is not a mere suggestion. It says that the USPS shall not deliver ballots for people who are not on this

list.  That's the White House fact sheet, that statement.

And despite USPS's -- sorry, despite the government's representations, USPS is actively working to implement the order.  Even just today, there was reporting that the head of USPS has been meeting with both the President, DHS, to effectuate the order.  So those are all facts that indicate that the process is under way to effectuate exactly what the order says.

That outcome also makes sense here because no factual development is necessary before the issues are sufficiently crystalized for this Court to evaluate, because there is no lawful way for USPS to implement the order.

**THE COURT:**  Could I -- and I understand that point.

So it seems to me that the E.O. requires a rulemaking.  And I get your point that there can be no rulemaking consistent with the E.O. that's lawful.  But if the rule that -- and I think you've agreed with me that the Postal Service isn't going to be transmitting any letters consistent with the E.O. until the -- or do anything until the rulemaking is done.

When we have a rule from the Postal Service, why couldn't I take up then whether to enjoin the rule?

**MS. MADDURI:**  I mean, so at this point we need to prove that the likely harm is impending.  For us, we just

can't wait until the end of that period to figure out these programs. Every day right now is an opportunity to persuade voters and galvanize supporters that we can't get back. Every minute and every penny that we're spending counteracting the harms of this E.O. now that requires really clear and specific outcomes --

THE COURT: Aren't some of those harms inconsistent with what the Supreme Court said in *Alliance* was required for standing?

MS. MADDURI: No. Absolutely not, Your Honor. The core of our clients' business is elections, is voter turnout, is voter education, is voter mobilization and persuasion. So this is a very direct harm and we are actively diverting -- we are about to actively divert resources to address that harm.

THE COURT: So while you may advocate against this rule and against this E.O., which might itself not be enough under *Alliance*, what you're having to do is, I guess, alternative get-out-the-vote efforts to get people registered in a way that would ensure that if this list happens, they wouldn't be foreclosed by it. And then on the mailing, what are you doing as to the Postal Service rules?

MS. MADDURI: Exactly the same thing. We have to develop programs now to educate voters about the sea change in elections.

The USPS has never had a role in dictating who gets a mail ballot.  They've never administered any aspect of elections.  Voters have never done that and never been used to it.  They need to be educated.  They need to be told what they need to do.  They need help processing all of that and actually complying with the results, including checking things like the citizenship list.

So there's the injury under *Alliance* and the diversion of resources that affects our core mission.  And then there is also irreparable harm that is going on right now because we have to take those steps now to be able to prepare for the election.

The election context here is really critical and unique, and we cannot wait.  It's not something that can be recovered later.  The election goes.  Our campaigns go.  And there is no way to compensate for that harm retroactively.

I will turn it over so my co-plaintiffs have some time.

**THE COURT:**  Thank you.

If everyone could -- especially for Madam Court Reporter, but also for my benefit, remind us of your name before you start speaking.  Thank you.

**MS. LANG:**  Of course, Your Honor.  Danielle Lang.

**THE COURT:**  Ms. Lang.

**MS. LANG:**  I'm here with the LULAC plaintiffs.  I

will dive right in to some of the questions about injury that Your Honor had that I think get to the heart of this case, because I think the defendants don't really offer much on the way of merits and are entirely focused on injury.

And I think my colleague, you know, was correct on all of the points about injury, but I want to kind of underscore a few things.

When it comes to the privacy harm, you were asking about the kind of connection to elections. And the context here is important. That this is done in an elections context is really important. We have evidence in the record, for example, from the head of LULAC about the chill that this is creating for voters, especially voters in mixed-use families.

The federal government has been engaged for the past year or so in an effort to try to compile citizenship information and to tell states to use its current systems for citizenship information, to clean their voter rolls and find alleged non-citizens in the rolls.

And what that has already led to and what voters already know is that naturalized citizens are getting kicked off the rolls. Texas, in its papers, has argued that it's improbable or implausible that states will take these lists and then kick voters off the rolls.

I don't know how Texas can make that argument

because Texas ran its entire voter registration list already against the USCIS SAVE system.

Approximately 2700 voters came out as being potential non-citizens and the Secretary of State, sight unseen, without looking at any other records or doing any investigation, sent that information to the counties and said that that's a reason to believe these are ineligible voters and start the process of removing them.

And as a result, many naturalized citizens have already been removed, have had to come forward and prove their citizenship in a way that their peers that are natural-born citizens did not have to do so.

So in that context, the kind of chill that the head of LULAC talks about in knowing that the federal government is about to kind of send out these massive lists of who they claim are alleged citizens and who is not included --

THE COURT: What is it chilling?

MS. LANG: Participation, quite frankly, Your Honor.

THE COURT: So I totally get and don't even mean -- I hope no one suggests these questions quibble at all with someone being removed from a voter list who shouldn't be. That is harm. But walk me through at each stage what the chill is.

What I was trying to do with your counterpart was to say, okay, there is this period where the list is being compiled, and we can call it whatever we want to call it, but let's just call it the intra-federal government compilation. Before it's been sent to any state.

That may violate the Privacy Act. I get it. Privacy Act cause of action, injury. Those are the conversations I had with your colleague.

But until the list is shared or up until the point before it's sharing, what is the injury exactly now?

MS. LANG: So I think this is -- my colleague mentioned the kind of intrusion upon seclusion, and that is exactly what was held in the original Executive Order.

THE COURT: That's about the sharing within the government. Right?

MS. LANG: That is.

THE COURT: Is it your argument that people are presently being chilled in their voting participation or their future voting participation because they know the information is going to be shared within the government? Just without more.

MS. LANG: A couple of points, Your Honor. One, I think there is -- put aside the question of chill. There is an irreparable harm when your private information is being shared when it's not supposed to; that is intrusion upon

seclusion.  That is *Alliance for Retired Americans vs. Bessent*.  That's the other LULAC case.

THE COURT:  I recognize that.  That's true if you're not even going to vote.

MS. LANG:  Of course.

THE COURT:  But that is not a voting chill.  You were talking about chill on voters.

MS. LANG:  Yes.

THE COURT:  And their participation.  What I'm trying to understand is what is your theory for why voters or potential voters are presently chilled in the event that what we're talking about is the compilation of the list at the federal government before it's shared.

MS. LANG:  The federal government has been engaged in a project for the last year of compiling data and then looking for alleged non-citizens and then seeking to investigate those folks, with an incredibly high error rate, such that naturalized citizens are being targeted regularly, and that information is being shared with law enforcement.

And that is the current environment, is an environment where there is an Executive Order that is telling voters that if you're going to try to be on the voter registration rolls, if you're going to try to send in a mail ballot, the federal government is going to be looking into your information and whether or not it matches their

data. That, undoubtedly, has an impact on voters.

I also wanted to kind of take a step back and put this case and the questions about injury in the frame of elections because the Supreme Court has talked about standing in elections in a different way.

I think it's really important for this Court to read the standing jurisprudence developed in the new *Bost* case. Or I'm told it's actually pronounced "boast." So I'm going to correct myself.

In the *Bost* case, the Court recognized that sometimes it's not that complicated when it comes to injury. That if you have folks who are deeply engaged in the electoral process -- and that's what they said. They said sometimes courts overcomplicate this analysis.

That if you have a candidate who is deeply involved in the electoral process, they are invested in a fair and lawful process. And they are harmed by the lack of a fair or lawful process, and that's the end of the analysis.

And that can't just be about candidates. Right? There are lots of other folks who have deep investments in a fair electoral process, more than just the average voter. And that's our clients. Right? League of United Latin American Citizens, one of their core missions is engaging their electorate in participation. They certainly have a

deep investment in a lawful and fair playing field for our elections. And the *Bost* case protects those types of injuries.

Then you have to look at what *Bost* said about why it's so important to decide these cases early.

In a standing case, the Supreme Court went out of its way to talk about why it's important to decide election law cases early; that you can't wait; that you can't make them wait -- candidates wait to prove that this is going to, you know, sway the outcome or be determinative but, instead, they should be able to get into court early and settle the rules because that's crucial.

In fact, if plaintiffs don't do that, if they don't get in early, the Supreme Court has repeatedly stepped in and stayed injunctions and said that issuing court injunctions in the midst of an electoral process is simply not appropriate for a federal court.

And I think that answers your question about why can't you wait until July 29th, when this final roll has to be decided? There's a lot of reasons, but one of them is that by July 29th, I can guarantee you that defendants will be arguing that it's too late for you to issue an injunction; that we are in the middle of an electoral process; that these lists have already been created; that they need to be in the implementation mode and it's simply

too late for a federal court --

**THE COURT:** I think we're mixing and matching some doctrines here, though. Because there are Article III limits of standing and ripeness that are non-negotiable and there are prudential concerns about issuing injunctions too close to elections that are disfavored.

I get that. But you don't really get to have the prudential conversation until you've satisfied yourself you have jurisdiction.

**MS. LANG:** I agree, Your Honor. But I do point to *Bost*, which was a standing case that did raise the *Purcell* prudential concerns, and I think it's the combination of those two.

So *Bost* speaks to injury and we meet the typical injury requirements that I'm happy to discuss further, but on the prudential piece, I agree, *Bost* was reminding courts that we need to decide these cases; we need to decide them early; and waiting will erode public confidence in elections. And that's exactly where we sit now.

If we wait until the defendants send out lists of millions of American voters out to states and say, you should use this to vet your voter registration lists, the harm to individual voters, the harm to those who are deeply invested in the electoral process, much of that just cannot be unrung.

You know, quite frankly, it would put election officials in a really difficult spot because you can't unring the bell. Once an election official has seen a list and seen a comparison and has a list of voters that they now have question marks about, a lot of election officials are going to feel like they can't ignore that; that they would be abdicating their duty if they ignored that.

You know, I think you had a case recently, the *Heinz Immigration Law* case, that has some relevance here because the concern at that point was about redressability. Right? That there had already been these kind of downstream consequences of the policy that led to a bunch of individual immigration judge decisions that the Court didn't have the ability to redress.

If we wait, we are going to run into similar redressability concerns here, as state and local election officials make decisions, and that's one of the reasons why we can't wait.

As long as we're talking about the *Heinz* case, I would also point to that on the causation piece. You asked earlier about why isn't the kind of intervening actions of state actors going to be a breaking in the causation for Section 2(a)?

And I think your analysis in *Heinz* is right on there; that, you know, this was a nature of consequence that

would flow from the federal government compiling a list, sending it to a state, saying, these are your eligible voters and, oh, by the way I prioritized prosecution --

THE COURT: One of the plaintiffs here is Senator Schumer. For Senator Schumer to be harmed by the provision of the list to New York, one would have to assume that New York -- I mean, in a very -- to be harmed in a very concrete way, one has to assume that the State of New York takes the list from the federal government, accepts it, uses it, culls their voter rolls and does so in a way that harms Senator Schumer.

Why are those plausible assumptions? He's a plaintiff. The theory has to be that an election that is happening in New York -- because that's where we are; we're in an off-cycle -- that that election is going to be affected, right, by New York's use of the list.

MS. LANG: A couple of responses, Your Honor. I don't represent Senator Schumer.

THE COURT: I know.

MS. LANG: We represent organizations that have individual members in all 50 states. They are harmed --

THE COURT: Different states may use the list differently.

MS. LANG: Absolutely. But I would point out that also --

THE COURT: Isn't that the problem? If we don't know how each of the 50 states will use the list, then there are going to be some states where maybe the list doesn't get used at all. Hypothetically, New York. Hypothetically, no harm to the people in New York, or at least to the candidates like Senator Schumer.

Other states may use it some but in a lawful way. Again, assuming it's provided in a way that -- I mean, just assume it goes and then other states may not. Why should I assume that if you've just conceded that the 50 states may treat it differently, that it is either unlawful across the board or why is it -- why do I have to assume it's plausible to assume the worst outcome in at least a good number of states?

MS. LANG: A couple of responses, Your Honor.

I think I want to kind of separate the merits and the injury here. So the order is unlawful because the President has no authority to issue this order. That's true regardless of what the states do with the list. That is a merits question about *Youngstown*...

THE COURT: I get that is an argument you make.

MS. LANG: Yeah.

THE COURT: But you also have to have standing and your harm has to be irreparable.

MS. LANG: I completely agree.

**THE COURT:** For present purposes.

**MS. LANG:** I completely agree, Your Honor, and a couple of responses on that.

It is undoubtedly the case that some states are going to use this. We have examples of how states have already done precisely the same thing, even when they're getting less pressure from the federal government. When the federal government is not sending a list but instead just offering up a service, states are doing that. Texas did that.

So it is not about, kind of, some implausible assumption. It is the facts on the ground and also 10 states that have intervened to say, We want to use this list.

So it doesn't have to be that the irreparable harm is going to happen in all 50 states. It is going to happen in many states, undoubtedly.

The other piece of this it assumes that there is going to be statewide uniformity, when that is not true. County and local officials are going to -- in many states, county and local election officials have a lot of autonomy, and they can choose to use this list to remove voters, even if their state isn't telling them to do so.

This is not a top-down system when it comes to states. This is a highly local enterprise. So even in

New York, I would bet top dollar that there will be election officials that look at that threat, saying -- the next sentences in the Executive Order say, "Prioritize any official that allows people who are not eligible to vote." We gave you a list of eligible voters and we are going to prioritize the criminal prosecution of election officials that allow ineligible voters to vote.

I will bet top dollar there will be local election officials in every state in the United States. But that's not the requirement under the injury. You could have one state and that injury is going to be irreparable to our clients in that state. That is undeniable.

**THE COURT:** But that then runs into -- I mean, the Supreme Court has been pretty clear that the injunction has to be tailored to the people who are hurt. How can a nationwide injunction, in effect, work here when by hypothesis there won't be any voting-related effect in at least some counties or some states?

**MS. LANG:** I think, you know, nothing in that decision suggests that you have to have perfect knowledge. The idea was just that you need to tailor a remedy to give complete relief to the plaintiff. So an individual plaintiff can't seek nationwide relief; that's just plainly, on its face, overbroad.

But where you have information being sent to all

50 states and you have an organization with -- you know, organizations that collectively have over a million members in all 50 states, facing those dangers and facing serious risk in all of those states, that's going to be sufficient for irreparable harm.

And the sword of Damocles, the Court has, on numerous occasions, cited to the *Newby* case for the proposition that the sword of Damocles doesn't actually have to fall here. That's the *TikTok* case. Yes, this Executive Order has not been enforced yet but, as the *TikTok* case says, you know, as soon as it does get enforced, it's going to have injury. And that's the case here.

That's also the *Friends of the Earth* case, saying, we didn't know exactly when the injury is going to befall the plaintiffs, but it's going to befall them and it's going to befall them before we can get to final judgment in this case. That is absolutely certain.

And I think that what the elections context tells us is there is no harm more irreparable than harms to elections. There is no money you can provide to plaintiffs. There is no re-dos. There is no kind of going back and unwinding election administration.

This is an incredibly intricate exercise with thousands of election officials affected, and once that information flows down with an indication that it should be

used to administer elections, the damage will be done at that point.

And, quite frankly, this Executive Order appears to be drafted in a way to cause the maximum amount of chaos and confusion. Right? It's all set up to have a timeline that's happening while elections are happening.

You know, I'm a Pennsylvanian. I'm going to be voting next week in my primary. I won't be affected because, you know, the deadline for these lists falls a little bit later. But very soon these deadlines are going to roll around while primaries are happening. It's right in the middle, while we're preparing to send out UOCAVA ballots 45 days before an election.

You know, there's this idea that they're going to send out these state citizenship lists 60 days before an election but they are going to be stale the very next day. People move. People turn 18.

You know, residency is a qualification that's defined by state law. Even if the federal government had address information for people, which it does not, that would not tell the federal government how to define who is a resident for purposes of voting in any of those states.

And so the maximum amount of confusion. You know these lists are going to land on local election officials' desks and they are going to be told, Up to you what to do

with it. I work with local election officials every day. That is their nightmare. They need clear direction. So the irreparable harm, I think, is made.

Then the question is, is there any prudential reason why the Court should hold off? And I think the prudential reasons cut all in the opposite direction. *Purcell*. The need for clarity. The need to resolve confusion for voters.

The safeguarding of Americans' understanding that their democracy is going to be governed by the rules of the road and by the rule of law and not by the whims of a president that's asserting power he does not have. Those are crucial prudential questions that go towards resolving this case now.

That doesn't, you know, answer the injury question. That's a separate question. But I think we plainly address that here. We're not in a circumstance where, for example, defendants are saying they are not going to enforce this Executive Order. They are saying, Oh, we don't know.

But the declarations are actually very opaque. There's been more news today in various news articles --

THE COURT: I saw the supplemental filing.

MS. LANG: There's two news articles that came out last night and today about moves that the White House has

been making to actually implement this. None of that information, of course, is in the declarations. It seems as though the declarations are actually from folks who are not even involved in the deliberations.

So this could come down on plaintiffs, the sword of Damocles, any day. It could come out the day after a PI is denied here on the basis that there's no irreparable harm. And by the time we get back here, we re-argue this, so much of that damage will already be done. And I think that's why it's really important that the Court act now.

**THE COURT:** Thank you very much, Counsel.

**MS. LANG:** Thank you.

**MR. de NEVERS:** Good afternoon, Your Honor.

**THE COURT:** Good afternoon.

**MR. de NEVERS:** Orion de Nevers for the NAACP, Common Cause and Black Voters Matter.

The text of this Executive Order requires USPS to propose a rule under which it would decline to deliver the mail ballots of voters it has determined are ineligible to vote by mail and federal elections. That is an unequivocal directive to USPS to become a national mail voting registrar.

Defendants have identified no constitutional or statutory authorization permitting the president to issue this directive. So it is *ultra vires* and violates the

separation of powers.

The order also requires DHS to compile and transmit to states purported list of U.S. citizens, adults in those states, which State intervenor say at Page 11 of their intervention brief, will allow them to verify the accuracy of their own voter registration list and to modify their lists as needed.

DHS has no authorization to play that role and no constitutional or statutory provision authorizes this directive either.

My clients are voter-enablement organizations that are assisting voters on the ground every day in the middle of an election cycle. They have attested across nine detailed declarations that this order has forced them into overdrive to overhaul their voter assistance and protections programs to counteract the effects of this order in the middle of the primary season and with the general election less than six months away.

These declarations detail immediate, ongoing and irreparable harms that directly interfere with each of their core missions. With over 40 primary elections scheduled to take place between now and September 4th, the day on which these lists will be released, and the general election looming two months later, this injury is happening now.

Plaintiffs' declarations make clear that they are

already mobilizing to retool their operations in response to the order, efforts that divert resources from their ordinary work registering and turning out voters.

Time is the most precious resource in an election, and these organizations do not have the luxury of waiting until USPS's proposed rule is released or until DHS's lists are unveiled, to build the infrastructure necessary to respond to these impediments.

Our declarations are very detailed about what these organizations are doing and the harms it is causing them now. They are currently right now developing infrastructure to educate voters on how to obtain the kind of evidence that they would use to correct any wrongful exclusions from these lists. That's the Sterling declaration, Paragraph 16; the Albright declaration, Paragraphs 18 and 20.

They are currently right now retraining volunteers. That is the Albright declarations at Paragraphs 18 and 20.

They are currently educating their partners, their members, members of the public and voters on what they need to do in response to these orders. That's the Sterling declaration in Paragraph 16; the Nunez declaration at Paragraph 16; and the Albright declaration in Paragraphs 19 and 20.

They are currently right now overhauling their online and written materials and developing new materials in response to these orders.  That's the Sterling declaration at Paragraph 16 and the Albright declaration at Paragraph 20.

And they are already having to counteract the chill that these orders, coupled with threats of enforcement, are inflicting on their members and their volunteers.  That's the Nunez declaration at 20 and the Albright declaration at 18 and Paragraphs 21 and 22.

Your Honor, I think the Giddings declaration is particularly stark on this point.  Paragraph 16 of the Giddings declaration, and Mr. Giddings is a volunteer for Common Cause.

He attests:  "This order intimidates me and impedes my work, even though I only support eligible voters. I have seen election workers and volunteers falsely accused of abetting election fraud, and I believe I will be targeted for helping voters in the criminal/legal field system in light of these accusations and the order.  I have already had long conversations with wife and family about how I could be targeted.  These are real harms that are occurring right now to real people that are diverting the resources of these organizations as they try to counteract these harms."

There are, of course, more imminent harms to come,

and what *Newby* teaches us is that these harms to voter registration organizations cannot be repaired after the fact.

At Page 9 of *Newby*, "New obstacles that make it more difficult for civic organizations to accomplish their primary mission of registering voters impose injury for purposes of both standing and irreparable harm."

That's precisely the harm that's being inflicted on my clients here.

I don't want to reprise too much of what my colleagues have already said. If the Court has specific questions about our clients or anything else, the Court would have --

**THE COURT:** No. I appreciate it, Counsel. Thank you very much for your time.

Who is going to take the lead for the government?

**MR. PEZZI:** Good afternoon, Your Honor. Stephen Pezzi from the Department of Justice, on behalf of the United States.

These lawsuits -- the first of these lawsuits, at least, was filed literally the day after the Executive Order was issued. And that very much informs the reason why plaintiffs' claims here are premature, certainly for purposes of a motion for preliminary injunction, in which they need to show not only standing, ripeness, et cetera,

but also irreparable harm, but why we think the lawsuit should be dismissed without prejudice in its entirety.

I'm happy to go through each provisions of the Executive Order, some of which Your Honor has already addressed today.

So to start with the proposed rulemaking from the Postal Service, which is discussed in Section 3(b) of the Executive Order, there's a lot of talk about the President's directive and what sort of authority the Postal Service might have.

To be absolutely clear, what is called for by that section of the Executive Order is for the Postal Service to initiate a proposed rulemaking. That is a very important distinction for purposes of judicial review.

The proposed rule on its own does not cause any Article III harm to anyone. It's not a final agency action for purposes of the APA or any of the other statutes that are referenced in these filings, and it's just generally not subject to judicial review.

*In re: Murray Energy*, a D.C. Circuit case authored by then Judge Kavanaugh, it says courts do not have the authority to review proposed agency rules. Several other cases say this. We don't even have a proposed rule here, of course. We are before the proposed rule.

So while I understand at least some of plaintiffs'

concerns and their speculation about why they expect to dislike the ultimate outcome, if any, of that rulemaking, the way that that sort of thing is challenged, certainly in the D.C. Circuit but not just in the D.C. Circuit, is the proposed rule will be issued.

Plaintiffs and anyone can offer comments on the proposed rule, comments about the legality of the rule, comments about the policy considerations underlying the rule.

The agency will consider those comments, and if the agency does finalize a rule -- which, to be clear, the Executive Order itself directs a proposed rule. Does not direct either the publication of a final rule nor the contents of any final rule.

But if the agency does finalize a rule and plaintiffs remain dissatisfied with its contents, nothing will stop them from bringing that challenge at that time. And the parties can then, you know, litigate whatever issues remain, whether it's threshold issues, the merits or both.

**THE COURT:** Would that be in this case or in a new case, in the government's view?

**MR. PEZZI:** I think that depends a little bit on what happens procedurally. We have asked for dismissal for lack of subject matter jurisdiction; that would be a dismissal without prejudice.

If plaintiffs remained dissatisfied, you can imagine a world where they filed a new complaint, you can imagine a world where there is an amended complaint.  So I think that could proceed in a few different directions, depending on what relief Your Honor ordered.  But the relief requested by our motion to dismiss -- and I recognize we're here today on --

**THE COURT:**  It's not fully briefed, but I get it.  It may get decided.

Mr. de Nevers just walked through all of the ways in which the declarations reflect that people working for these organizations are presently having to do different additional and extra work than they would have otherwise, but for the Executive Order, because it's reasonable to assume that the world of elections is going to be different --

Perhaps not.  We don't know exactly how.  And I think the plaintiffs quibble with that, but let's just assume it, but it will be different.  So they are doing all sorts of work, changing their websites, educating people and the like.

Why isn't that injury, in fact, right now from the E.O.?

**MR. PEZZI:**  Sure.  I think I'd answer that in two ways, Your Honor.  For one thing, I think a lot of that

argument and certainly a lot of plaintiffs' filings and declarations, I think, sound like they are drafted in a pre-*Alliance* world, where there's a lot of diversion of resources, case law based on an old case called *Havens Realty* about an organization expending resources to respond to the government's action.

The original *Havens Realty* case itself was about a much narrower set of circumstances.

**THE COURT:** I've written about *Havens* and *Alliance* and D.C. Circuit, *PETA*, and the like. This isn't expending resources to advocate against the rule. This is expending resources because of the rule.

It's saying the rule is going to -- not the rule but the regime is going to mean that people who otherwise would have been registered to vote, aren't. And we are responding to that.

That is not advocating against this. This is a response to the change to elections that's going to result quite naturally from the E.O. and what it puts in motion.

**MR. PEZZI:** Yes, Your Honor.

So I think to that, if we are interpreting plaintiffs' allegations of injury that way, I think there is a factual response and then a doctrinal response.

The factual response is, I don't think it would be prudent to be advising anyone on that basis at this time

because what the government or what the agencies reference in this order are going to do to implement this order is not only not clear to plaintiffs, it has not even been decided within the government. And I think the declarations are clear about there being ongoing deliberations to that effect as we speak.

THE COURT: I mean, it is possible, from the government's perspective, that the agencies won't do, either in the NPRM or in the list context, what the E.O. requires or might do something that's directionally different.

But why is it unreasonable for the plaintiffs to plan for a world in which the E.O. is fully implemented in its full-throatedness?

MR. PEZZI: Fully implementing the E.O. would mean implementing all of the provisions of the E.O.

THE COURT: Correct.

MR. PEZZI: Some of which make very clear that agencies are supposed to be considering not just the legality of the actions contemplated by the E.O., but as well as some of the very feasibility issues that plaintiffs were referencing today. So, I mean, plaintiffs have a lot of concerns about is this possible, is the data good enough --

THE COURT: In light of the fact that these elections -- well, primary is before then, but elections are

six months or less from now.  Why isn't it reasonable, prudent and, frankly, common sense that plaintiffs would be planning for elections that are -- that end up following this or affected by the strongest version of the E.O.?

MR. PEZZI:  Certainly, if plaintiffs want to prepare for the worst --

THE COURT:  You told me that it would be unreasonable to advise a client to do anything until the federal government has taken steps here, and I'm saying that seems crazy.  It would be reasonable and prudent to advise your clients to plan for the strong version.

MR. PEZZI:  Certainly, Your Honor.  I didn't mean to suggest that.  Just what I'm trying to get at is, I think if plaintiffs want to prepare for the worst possible interpretation of what this E.O. could be implemented in their darkest fears, that is their right.  But I guess to get to the doctrinal answer --

THE COURT:  That's not standing.

MR. PEZZI:  That's not standing and that's certainly not irreparable harm.  Under Article III, they need to show either actual injury or imminent injury.  The sort of speculation that maybe they are prudent to think about, you know, what the world might look like in six months, but federal court, under Article III, can't base any ruling and certainly not a preliminary injunction ruling

based on that sort of speculation.

Certainly not speculation that assumes the worst about government actors, rather than presuming regularity in government actors, as the Supreme Court and the D.C. Circuit has said.

And especially here, with an E.O. that itself goes out of the way not just to say this shall be implemented consistent with applicable law, which is the sort of language that, to be clear, both the Supreme Court and the D.C. Circuit have looked to in judicial review of executive orders.

**THE COURT:** Right. There is a 2002 opinion where Judge Ginsburg relies on a provision like that in a way that was favorable to the government.

But let's perhaps try to set out the different components of alleged injury and just take the government's view on all of them, or at least as it relates to the list because, at least the way I think about it, is there is a period of time where the government is going to be involved in what I would call federal-government-only effort.

It's intra-federal government sharing of information. If anything happens, it would be intra-federal government. It would be the compilation of the list.

And as I understand it, plaintiffs' principal argument there is that sharing of information could be a

violation of the Privacy Act.  Right?

MR. PEZZI:  Yes, Your Honor.

THE COURT:  If the government does start to compile a list that is -- however it compiles it, but takes lists and it is -- information is shared as to databases, I get the government's position may be that that was totally lawful in context because it complied with the various legal prohibitions or obligations.

But if the plaintiffs have a different view, don't plaintiffs have standing to articulate their Privacy Act argument about why that sharing, that intra-federal government sharing, was unlawful?

MR. PEZZI:  Respectfully, no, Your Honor.  We do not think they even have standing to make that sort of a claim.  Certainly, no irreparable harm, which I will get to in a minute.  I would love to talk a little bit about the merits, too, because that came up a little bit today in a way that I don't think was addressed in much detail in the briefs.

Even on standing, *Trans Union* makes very clear that your name appearing on the wrong list or in the wrong file in some cabinet somewhere by itself is not Article III injury.

So what plaintiffs need to show is something more, and part of that something more is something traditionally

recognized as the basis for a lawsuit in U.S. courts.

I heard today analogies to the tort of intrusion upon seclusion and breach of confidence. And those analogies to those common law torts have appeared in a good bit of other litigation in this courthouse and elsewhere in the last 18 months or so, and have certainly generated some opinions, some of which the government agrees with and some of which the government disagrees with.

Even the opinions that the government disagrees with, I mean, we're talking usually in those opinions about sharing of generally sensitive private information, sometimes medical information from the Social Security Administration, sometimes tax return data from Department of Treasury, sometimes Social Security numbers. I think I heard Social Security numbers referenced today. This Executive Order does not say anything about Social Security numbers. It certainly doesn't say anything about sharing private medical data, tax return information.

The sort of information we are talking about here, I think, is one's citizenship status, yes or no; maybe whether or not someone is over the age of 18, yes or no. I have never heard of a case premised on a privacy violation, that satisfied Article III or otherwise, on the theory that someone has a privacy right to keep it a secret from one government agency to another government agency as to whether

or not they are a U.S. citizen, and I think I would give the same answer about whether or not someone is over the age of 18.

But I don't even think we get there even accepting as true all of the mostly District Court case law on that issue in the last year or two. Again, I think some courts have got that right, some courts have got that wrong in the government's view. But I don't think this case even gets to that point.

Even in the cases in which this is litigated, there's actually several cases from this courthouse in which the government has ultimately lost on the Article III standing version of that question but has successfully defeated a preliminary injunction on the theory that, even if it's enough to show Article III standing, it's certainly not certain imminent, irreparable harm to share information within the government.

Now, if there's a disclosure, that obviously could potentially raise some different questions, but I think what we're talking about here, we're still just talking about sharing within the government.

**THE COURT:** Right. I was at least trying to break up the causal chain set out by the E.O. as to the list, which seems to me to require first -- I mean, there is work that has to go into defining how the list will be compiled

and the like, but the result of that, if it happens, will be a list is compiled within the federal government.

And, you know, thereafter, the E.O. contemplates it being shared, but that would have to go after the list is compiled. So I'm just trying to understand both what the standing and irreparable harm is in that interim period or whatever we want to call it.

But, frankly, also -- and this is a question to your side, which is, if the case is still pending and it turns out that even if hypothetically I were to deny the PI on the present record but the case is still pending, I assume, but I would like a commitment from the government, that in the event material steps are taken that effect where we are in that causal chain, that I will be aware of it.

**MR. PEZZI:** Yes, Your Honor. Understood completely. Obviously, the request we've requested in our Motion to Dismiss would be dismissal of the litigation.

**THE COURT:** I understand. But that motion to dismiss is not yet fully briefed. What I have before me is a PI. If I decide only the PI and I were to deny it, that would mean the case was still pending. And that means, at least hypothetically, that the facts would change as to the basis for the PI denial.

I assume that the government would tell me, for example, if it came up with a concrete plan for how the list

would be compiled, even if that was just as to the internal intra government part.

MR. PEZZI: Fair enough, Your Honor.

I mean, if the case --

THE COURT: I didn't hear a commitment.

MR. PEZZI: If Your Honor needs a commitment, I'm happy to -- I think it might make sense to confer with plaintiffs about a schedule for that sort of commitment and exactly what the contours of that commitment might be.

THE COURT: Sure. It only is relevant if I deny the PI.

MR. PEZZI: Yes, Your Honor.

THE COURT: So I get that it's a contingent commitment, in any event.

MR. PEZZI: Yes, Your Honor.

Look, if the case remains pending, we understand Your Honor will remain interested in the developments to the extent they bear on standing, and I'm confident we could work something out to ensure that there are no major surprises to the Court.

THE COURT: Right. The government may not want discovery, but it might be willing to agree with the plaintiffs on updates or something like that.

MR. PEZZI: I'm sure there is something we could work out to that effect were the mission to dismiss to

remain pending or if it were denied.

THE COURT: Right.

MR. PEZZI: On the irreparable harm question, I mean, unless Your Honor has other questions on the lists, I just want to make clear on the merits. I mean, maybe this is not something we need to get into today. I didn't expect to be talking a lot about the Privacy Act today, but there were some pretty strong statements about categorical prohibitions on sharing information --

THE COURT: No, I would like the government's view on how the relevant agencies, or at least DHS, would be able to compile a list of the kind generally contemplated by the E.O. consistent with the Privacy Act.

MR. PEZZI: Yes, Your Honor.

So, I mean, if we were to get past, you know, the feasibility constraint, which is explicitly in the text of the order, about compile these lists to the extent feasible.

Then, if and when decisions would be made about what databases would be used to generate these lists -- which contrary to what I think I heard from plaintiffs is not answered by the text of the E.O. itself, and as the declaration makes clear, has not yet been decided.

If and when those sorts of decisions are made, I do not think it is correct to say that it is impossible to share information like this within the government and still

complying with the Privacy Act.

There are certainly some procedural requirements that might be implicated. So, for example, typically, there needs to be a routine use identified for even intra government disclosures of information protected by the Privacy Act. Routine uses are enacted and amended with some frequency. Usually there is a 30-day notice and comment process.

DHS and SSA actually went through this relatively recently in another case in this district. We have some quotations from Footnote 7 from the *League of Women Voters vs. DHS*.

**THE COURT:** Right.

**MR. PEZZI:** So the disclosure issue, I think, could potentially be resolved by amendments to the systems of record notices that govern sharing of information like this, if that were to be necessary.

I heard some discussion of matching, computer matching. I mean, there is also language in the Privacy Act about computer-matching agreements.

I'm not sure that would be implemented here. Again, it's not really possible to really answer the question before we know exactly what data would be sharing, in what databases, with who and how, but there is certainly no categorical prohibition on matching government

information from one database to another.

I have seen plaintiffs argue that a document called a computer-matching agreement is required to be published in those circumstances. I think the government's view on that sometimes differs with private litigants.

Again, these are all the sorts of things that, by the text of the E.O. itself, DHS and to the extent it's relevant, the other agencies here, are being asked to consider. And they will and are considered these very topics.

If they ultimately reach a conclusion that plaintiffs dislike, I don't really see why they couldn't bring that claim in the normal course. We might, again, have more threshold arguments. I mean, there are some questions, some of which were previewed here, about, is there a Privacy Act cause of action for this sort of injunctive relief on behalf of an organization instead of an individual?

So there would be plenty of things still to litigate. We would at least know what we would be litigating, rather than this sort of shadowboxing over a hypothetical list that certainly hasn't been created yet and might not be created, at least in the form that plaintiffs are assuming or on the timeline the plaintiffs are assuming and so on.

THE COURT: All right.

So that's sort of this early period, for lack of a better word, that's through compilation, assuming it happens then. But let's just assume hypothetically a list is compiled. And, you know, the government's position at the time is it was compiled consistent with its obligations and the plaintiffs say, No.

I have sort of two different questions. The first is -- but I think you just said it -- which is we could litigate then or at some point between now and then, once we have more concreteness, whether that manner of compiling the list is consistent with the Privacy Act.

MR. PEZZI: Generally, yes, Your Honor. It wouldn't surprise me if we, again, still raised some threshold arguments, but the timing question, I agree completely.

THE COURT: Right. I mean, look, I'm not suggesting that the government might not have other arguments later that perhaps don't present themselves now, but it's not as if we would lose the opportunity to litigate the compilation of a list at some later time, perhaps when there's more concreteness.

So you have the list that is compiled. But then the next step contemplated by the E.O. is its dissemination, assuming it exists, to the states. What's the government's

argument for why that's lawful?  If it were to happen.

**MR. PEZZI:**  So I think it would be plaintiffs' burden to explain, first of all, why it is unlawful.  I think this --

**THE COURT:**  Usually, when the plaintiff comes in and says, this is why we have a likelihood of success on the merits, the government says, No, you don't.  I know you don't know what the list looks like exactly yet, so you're shadowboxing, to use your word.  But what's your best argument for why dissemination of the list would be lawful?

**MR. PEZZI:**  Certainly, Your Honor.  I don't mean to be cute with that answer.  I just say, one of the biggest reasons that plaintiffs offer, for example, is because they think this would be an unlawful disclosure under the Privacy Act.

So some of the very matters we were just discussing about with respect to the Privacy Act might be very relevant to that question of whether that sort of transmission of the list is lawful or unlawful.

I mean, there might be other questions raised.  We acknowledge that.  You could certainly imagine a list like that being used for many lawful purposes or just not being used at all and, thus, not being a final agency action subject to judicial review.

You can also imagine it being used for

post-election law enforcement activity. We've heard a lot about the time between now and the upcoming elections. Nothing in the Executive Order says that this list shall only be used for voter registration or the upcoming election cycle, et cetera.

So, I mean, it's a little hard to address these questions in the abstract, obviously, because we don't have any sort of details yet about what any such list would look like, how and when it is being transmitted, to whom, for what purpose.

**THE COURT:** Right. It doesn't -- it seems to me that -- and obviously, I asked plaintiffs' counsel this. The list doesn't purport -- I'm sorry. The Executive Order provisions about the list doesn't purport to require any particular state to use the list in any particular way.

But the Executive Order does -- and this may not be feasible and it may not be lawful for reasons that the government will, from the government's perspective presently, like, think about in the future.

But the E.O. by its terms requires the list to be communicated to state election officials no fewer than 60 days before each regularly-scheduled federal election, one of which is this fall.

**MR. PEZZI:** Yes, Your Honor.

**THE COURT:** So the E.O. -- put aside what it might

be used for.  The E.O. contemplates/requires the list to go to the states something like no later than early September.

MR. PEZZI:  Yes, Your Honor.

So, I mean, if those deadlines hold and a list is generated and a list is sent on that timeline -- I think it's important to remember what sort of list we are even talking about here.

So the text of the E.O. itself, the list is described as, quote, a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of the upcoming election who maintain a residence in the subject state.

I mean, it's not a list of, you know, individuals to be targeted.  It's not a list of non-citizens.  It's a list of individuals who are confirmed to be citizens in the view of the federal agencies compiling the list.

And so you can imagine a whole host of lawful and even uncontroversial uses of such a list.  I think the intervenor state defendants even make a reference in some of their filings to how such a list could be used.

Now, I also heard a lot about, for example, plaintiffs are concerned about Texas, for example.  They raised examples in their view of Texas being overzealous in its list maintenance or how they manage their voter rolls.

We don't, in the federal government, have a

position on that issue today for the very important reason that that is an argument about Texas, not an argument about the federal government.

So, I think, if and when a list is created and if that list is ultimately sent to the states, whether the states do the things with those lists that plaintiffs are concerned about, for the most part it's not a concern of the federal government and not something that this Court in this lawsuit will be managing.

Now, obviously, if the federal government violates the law on the way to creating or sending those lists in a way that causes someone an Article III injury, that's something that they can seek judicial review over.

But a lot of the story that we heard from plaintiffs' presentation today was far downstream of anything the federal government has done or will do. Instead, it's about how individual states might manage their voter rolls. So I think even setting aside the sort of speculation inherent in some of those concerns.

THE COURT: If the government -- again, we are downstream now. The government sends California a list that is 10,000 people short. And LULAC says, well, we have to deal with this. We have to tell California why this is off. We need to assist people getting their names back on the voter -- or ensuring they don't get taken off of

California's lists or whatever.

It's now gone to California. We care about making sure that people are properly registered and not de-registered to vote in California.

Does LULAC have standing at that point? Put aside who it sues.

**MR. PEZZI:** So I think the mere transmission of a list --

**THE COURT:** What if the list is provably under-inclusive?

**MR. PEZZI:** Again, it's --

**THE COURT:** Yeah.

**MR. PEZZI:** It's entirely hypothetical now. But if we're just talking about the mere transmission of a list, no requirement and not even a suggestion that the state should do something with that list, I don't think there's going to be standing to sue the federal government for sending someone a list.

Again, if I could just bracket some of the Privacy Act questions for a moment. I mean, if that was a flagrant violation of the Privacy Act or something, then maybe we would have some privacy question. But, I mean, the --

**THE COURT:** I'm talking about the organization itself taking steps to deal with the fact that this list,

which hasn't previously existed, and, again, by hypothesis is wrong or under-inclusive or whatever, and they -- as part of their core mission, we want to make sure that all registered, you know, voters are registered and don't get de-registered. So we're now having to take all sort of steps. Not advocating against this policy. We're actually taking concrete steps to get people or to ensure that people stay registered.

**MR. PEZZI:** Yes. I mean, certainly someone would have standing to sue a state if what a state did with that list was something improper with respect to its voter rules. Whether it also had standing to sue the federal government merely for sending an imperfect list, I think, is a harder question.

Here, again, I think the list can be a useful tool in saying, okay, if you appear on this list, there is no further inquiry really needed to confirm that this person -- or there is less further inquiry needed. To be clear, there actually will still be further inquiry needed under state law, which is referenced in the order itself.

For example, you could end up with a felon on that list who is a 35-year-old U.S. citizen not eligible to vote as a matter of state law.

**THE COURT:** Someone who actually doesn't reside in the state notwithstanding the federal list.

MR. PEZZI: Certainly. I'm sure no list is ever going to be perfect. So I think -- I mean, maybe you'll hear more from the states about this. But certainly a responsible state would not take that list and then immediately or automatically throw off every single person on their voter rolls who does not per appear on that list.

If they were to do such a thing, it would, A, not be something the federal government told them to do in this Executive Order, and, B, there might be other state or federal law, even constitutional law backstops, that vented at least some of that.

We are now very far downstream, of course, in terms of speculating about what states might do with a possible future list. And I think, as of today, I mean, the Executive Order itself, of course, doesn't do any of this. And I think that's all that Your Honor needs to decide today.

THE COURT: All right. So now let's go to the Postal Service.

I mean, obviously, the list has -- there are some calendar-related parts of the E.O. as to the list, but it's sort of backing up from or away from the election.

On the rulemaking, it's forward looking. Right? It's 60 days NPRM, 120 days final rule.

I get the government's position is we want you to

dismiss this case on Article III and other grounds, and that would surely, in the government's view, happen before that 120-day period ends.

But if it didn't, I assume the government would agree with the fact that if that rule dropped on whatever the day is now, 120 days out, plaintiffs would have a much more concrete target to litigate the lawfulness of whatever the Postal Service has decided it wants to do.

MR. PEZZI: Yes, Your Honor.

THE COURT: Or can do.

MR. PEZZI: Yes, Your Honor.

I mean, absolutely. We litigate, you know, the legality of final rules all the time.

THE COURT: Yes, I remember.

MR. PEZZI: I'm sure, Your Honor.

So, you know, I'm sure we would maybe have some remaining threshold arguments, although most of the threshold arguments in the briefings before Your Honor right now would be gone at that point with respect to the Postal Service.

We might have some other small issues to fight over with respect to jurisdiction and justiciability, but at that point, there would be a concrete rule before Your Honor that I'm sure the parties could and would --

THE COURT: The problem is, from -- at least from

a prudential perspective, that is end of July. Right? Yeah. And that's -- now we are on the cusp of election season, and we are starting to really bump up against *Purcell* and other prudential concerns that --

I mean, hypothetically, the Postal Service says, yes, we think the following things should be done as to mail-in and absentee ballots, and people start planning for that new world, hypothetically, and then I come in and have to decide whether to enjoin it or not. And the government says, Well, you shouldn't do that; we are on the eve of elections. So why shouldn't I take it up now?

**MR. PEZZI:** It's a fair question, Your Honor. I'd answer it in two ways. Plaintiffs' counsel has said -- I think said that she can guarantee that the government would raise a *Purcell* argument at that stage. I think that is overstating things significantly.

I, of course, can't and won't take an argument off the table about what the world will look like in August from the lectern today, but it's far from clear to me that that sort of consideration would apply here.

I think part of our argument in this case on the merits is likely to resist the suggestion from some of the plaintiffs' filings here that what's happening here is election administration at all. So there may be a world in which that principle is relevant to this litigation,

depending on what it looks like at that time. I definitely don't think it is a guarantee.

The more important answer, though, is that although I to some extent sympathize with plaintiffs' concerns about wanting to plan for an upcoming election, and I share plaintiffs' views about the importance of elections, there is no Article III elections exception.

So ultimately, the arguments we have raised here apply in an election context like they would in any other context. I don't think plaintiffs can get judicial review of a proposed rule or a possible future list that may or may not ever leave the federal government just because they are worried about how it might interact with an election.

I mean, that's ultimately the doctrinal answer to that question, that I don't think it is relevant to the consideration before Your Honor today about, you know, whether plaintiffs have shown jurisdiction.

One small point of clarification to offer, I think the premise of one of Your Honor's questions and some of plaintiffs' arguments perhaps suggested or perhaps I misheard Your Honor about the way the two -- that these lists might interact.

To be absolutely clear, I don't read the Executive Order -- the state citizenship lists that are described in Section 2(a) of the Executive Order, I don't think that's

necessarily the same list as the lists that are referenced to the Postal Service.

THE COURT: Oh, to the extent that I asked a question that suggested that, that is not my assumption.

MR. PEZZI: I just wanted to clarify that for the record. I think there is more than one list, I guess, referenced in this order, and just wanted that to be clear.

THE COURT: Obviously, for PI purposes, you have irreparable harm, and I get that there's a relationship between irreparable harm and injury, obviously. And then on likelihood of success, the plaintiffs have to establish that it's likely that I have jurisdiction and that they're likely to prevail.

I realize that a lot of paper was devoted to the jurisdictional-like arguments. But what's the best argument that the Postal Service could issue a rule that says that it will not transmit mail-in or absentee ballots from an individual unless an individual has been enrolled on a state-specific list of a kind identified under Section 3?

MR. PEZZI: Sure, Your Honor. I don't think I have --

THE COURT: I know your position is, well, they might not do it. Who knows whether the NPRM is going to include that? They have an independent obligation. All that stuff.

But what is the best argument as to why a rule to that effect is within the U.S. Postal Service's authority?

MR. PEZZI: I think the answer to that question would depend on exactly what the Postal Service is doing, what statutory authority they invoke to take that action, and it's just not the kind of thing that we can address in the abstract.

I know that's a somewhat unsatisfying answer, but I am very hesitant to just sort of canvas the U.S. Code for how could the Postal Service do such a thing.

I mean, obviously, as the declarations show and as plaintiffs' notice today seems to confirm fully consistently with the declarations, by the way, in the government's view, these very questions are under consideration within the government right now.

THE COURT: I think that notice cuts multiple ways.

MR. PEZZI: Candidly, I think it cuts in favor of the government.

THE COURT: I figured you would.

MR. PEZZI: It confirms that the declarations -- assuming what is in that article is accurate, it is fully consistent with the story told by the declarations, which is that there are ongoing deliberations in the government and no final decisions have been made.

**THE COURT:** Right. Okay. Anything else you would like to add, Counsel, before I give the states a chance?

**MR. PEZZI:** Just one small thing on the merits I just wanted to point to because it was heavily featured in plaintiffs' reply briefs.

Obviously, a lot of our arguments in this case point to not just the sort of what the plaintiffs call the savings clause in the Executive Order about applicable law, but also some of the other language about feasibility constraints.

They cite to a 2018 Ninth Circuit case that says a savings clause shouldn't be read to destroy the Executive Order. They cite to a three-judge District Court and opinion authored by Judge Katz as the common cause case, which quotes in a footnote that language.

I mean, the most important thing about that is, all that language predates the Supreme Court's *Trump v. New York* opinion. That is the most important authority for this argument that we raise in the brief.

So we think, notwithstanding what the Ninth Circuit thought in 2018, the Supreme Court in 2020 very clearly thought it was very important that the presidential memorandum at issue about the census in that case had feasibility and legality constraints, and so we think that's important to our argument here.

Actually, that common cause opinion, that three-judge District Court opinion, was in some respects vindicated by that Supreme Court opinion. That was reviewing the same presidential memorandum. So there is some language in a footnote that plaintiffs like, but I think the thrust of that opinion is fully consistent with the government's argument here, as well as the D.C. Circuit's prior decision in *Albaugh*.

**THE COURT:** Which is the opinion I mentioned earlier.

**MR. PEZZI:** Yes, Your Honor.

So unless Your Honor has any other questions, that's all I have to say.

If and when the time comes where if this litigation remains on Your Honor's docket, like I said, I'm sure we can work out something --

**THE COURT:** You will take my request for an update under advisement.

**MR. PEZZI:** I think it would be prudent to confer both within the government and with plaintiffs before I --

**THE COURT:** I agree with that.

**MR. PEZZI:** But I'm sure we could work something out.

**THE COURT:** Thank you, Counsel.

**MR. PEZZI:** Thank you, Your Honor.

**MR. CAPOZZI:**  Good afternoon, Your Honor. Louis Capozzi on behalf of the State defendants.

**THE COURT:**  Mr. Capozzi.

**MR. CAPOZZI:**  I know we've been going for a long time.  I'll try not to repeat my colleague's points as to why the Court should deny a preliminary injunction.  The State defendants have made some additional arguments, and I want to focus on those.

First, I would like to go through some of the standings theories and just offer some comments there.  On resource diversion standing, our position is that the Supreme Court abolished resource diversion standing in *Alliance for Hippocratic Medicine*.  We would point the Court to the Second Circuit's decision.  That's 167 F.4th at 6 to 18.

You know, in our brief we talk about how, really, the injuries alleged here are indistinguishable from those in *Alliance for Hippocratic Medicine*.  Today my friends on the plaintiffs' side talk about educating volunteers, educating voters, lots of educating and lots of training.

The Alliance for Hippocratic Medicine made the same allegations.  They talked about needing to educate the public in response to the challenged policies as well, but that is not the type of injury the Supreme Court credited; that's not --

What the Supreme Court talked about was a direct impairment, and the analogy that the Court used was a manufacturer supplying defective goods directly to a retailer. That's very different than, you know, government enacts a policy and, in response, we have to train people, you know, to take some vague actions in response. I mean, that's just a self-inflicted injury under *Clapper*. That's what the U.S. Supreme Court said in *Alliance for Hippocratic Medicine*.

We would submit that under that decision there is no resource diversion standing here.

Now, the Court asked if it's unreasonable to plan. Is it unreasonable for the plaintiffs to plan for what the federal government could do following the E.O., following the proposed rule, following the final rule?

I don't think it's crazy, but I don't think it was crazy what the plaintiffs in *Clapper v. Amnesty International* did. They also took steps to plan, and they tried to point to that as a basis for standing, and the Supreme Court said that's a causation problem. That's a self-inflicted injury. You can plan. We are not going to say that you can't plan. But that's a self-inflected that can't confer standing.

Another theory of standing is that unidentified voters could be removed from the voter registration rolls.

There is a lot of layers of speculation that the Court has already talked about with different counsel. The one I would like to focus on is the states, where the states come into this.

My friends suggest that the states are just going to get these lists and then start throwing voters off the list. You know, on Page 13 of their reply brief, the DNC says that the states will reflexively, quote, pull voters from the registration rolls, end quote, but that just doesn't seem plausible.

Within each state -- I mean, first of all, some states won't use the lists. I think that seems pretty clear. Even among the states that want to consider looking at the lists, every state has different laws on removing voters from the voter registration list. There's also lots of federal case law limiting the ability of states to remove voters from the registration list. This is going to vary state by state, and in a lot of states it's going to vary county by county as well.

In Texas, for example, which my friends on the other side talked about, voter registration is done at the county level. So we are speculating not just about what the 50 states are going to do with the lists but what tens of thousands of county election officials around the country might do. So that's just way too much speculation to be a

concrete injury or for it to be fairly traceable under *Allen v. Wright*.

I want to talk about candidate standing briefly. My friend from LULAC suggested that in *Bost*, that *Bost* stands for the proposition that you can basically always challenge an election-related rule if you're a candidate. But I think *Bost* is more limited and more careful than that.

*Bost* talked about candidates having standing to challenge rules that affect the counting of votes. That's not what this case is about. This is about, maybe, voter registration lists being effected, maybe. That's not at issue in *Bost*.

But even if we can understand *Bost* to reach rules that are maybe related to voter registration, there's just way too much speculation required to conclude that voter registration rolls will be changed, let alone in a way that would actually disadvantage plaintiffs' candidates. So this is a pretty far cry from *Bost*.

The Supreme Court has warned about boundless theories of standing. We would encourage the Court to reject this kind of boundless understanding of candidate standing. It doesn't reach any rule tangentially related to elections.

In terms of privacy violations, I don't want to dwell on this too much. I think *Trans Union* makes clear

that plaintiffs' asserted privacy violations are not cognizable injuries. Plaintiffs have not met their burden to show a common-law analog.

They talk about the tort of interference with private affairs. But another judge in this court talked about that tort in *Alliance for Retired Americans v. Bessent*. I would suggest that case supports the state.

The element of that tort is it has to be an interference with private affairs that would be highly offensive to a reasonable person; that's the element of that tort. It's just hard to see how citizenship information and your age, you know, yes/no citizen, yes/no over 18, that that would be highly offensive to a reasonable person.

A lot of the cases plaintiffs cite are about things like Social Security information, private medical information, banking information. In the *Venetian* case, which the DNC cites a lot, that's about internal trade secrets and hiring strategies that they didn't want turned over to the union for leverage in collective bargaining negotiations.

So just the fact that you're a citizen, when, in order to register to vote, you already have to say that you're a citizen, I don't see how the element of that tort can be satisfied here.

Finally, the NAACP talks about a fear of

prosecution injury. You heard a lot about chill and people being scared. The Supreme Court has a pretty demanding standard defined that a fear of prosecution or a chill injury is imminent. *Clapper v. Amnesty International*, again, is the standard.

My friend cited *Susan B. Anthony List v. Driehaus*. That is not apt. That is a First Amendment chill injury. Supreme Court has recognized a different imminent standard, especially for First Amendment claims. There is no First Amendment claims here.

But in any event, the evidence of prosecution in *Susan B. Anthony List* was a lot stronger, including the fact that the plaintiff had recently been prosecuted under the challenged statute.

Here, all we have are vague allegations of chill. There is no allegation of an intent to violate any of the challenged federal laws. There is no evidence of investigations. There is no past prosecutions. There is really nothing.

I will turn now to the merits. Section 2(a) --

**THE COURT:** Briefly.

**MR. CAPOZZI:** Briefly.

First, nothing said about Section 2(b) today. So I understand plaintiffs to not be pressing their challenge to Section 2(b).

On 2(a), I would just refer the Court to the arguments made in our brief that I think the plaintiffs have sort of misframed this case. They say that the Executive needs to point to affirmative statutory authorization to compile information within the executive branch.

We would say under the *Youngstown* Justice Jackson concurrence, the Executive has some inherent authority to manage information already in its possession.

Of course, the backup information is the Privacy Act. All kinds of questions there. Whether it's a routine use. Whether there's a cause of action at all. Whether the order can be implemented in a way consistent with the Privacy Act, as the order instructs. You know, I don't need to repeat all of that.

Finally, on Section 3 of the E.O., you know, we don't have a final rule. We don't even have a proposed rule. I also think that there is a very serious constitutional problem with the remedy that plaintiffs are asking for.

They are asking for an order barring the President from asking an agency to engage in rulemaking. That's a pretty radical remedy. There's really -- certainly no binding precedent that supports an injunction like that.

I think they would have to satisfy a clear statement rule, as suggested in the Supreme Court's

*Braidwood* case, to show that Congress could bar the President from supervising USPS. I don't think they've even tried to meet that burden.

They respond to the state's constitutional argument by saying, well, USPS is like the Federal Reserve. The Federal Reserve is allowed to be independent. But these agencies are really nothing alike. As the U.S. Supreme Court's landmark decision in *Myers* -- and even *Humphrey's Executor* makes clear. *Humphrey's Executor* distinguished the Postal Service.

So just because Congress, in 1970, purported to make it independent does not mean that USPS is like the Federal Reserve, which has a historical lineage tracing back to the first bank of the United States.

So, with respect, if the Court enjoined the President from trying to supervise USPS from trying to ask them to consider rulemaking, that would violate Article II of the Constitution.

Unless the Court has any questions, we would ask the Court to deny the PI.

**THE COURT:** Thank you very much, Counsel.

I am going to allow plaintiffs 10 minutes for rebuttal, to be divided however -- yeah, use that clock at your own peril.

**MS. LANG:** Fair enough, Your Honor.

**THE COURT:** It actually seems right today, which is, I guess, the old adage. A stopped clock; that's the joke.

**MS. LANG:** Fair enough.

I'll try to move through things quickly, Your Honor.

On the last question about remedy, I think that the states are just wrong about what the remedy has been asked for. We are not asking for an injunction against the President. The President can write down on a piece of paper an Executive Order.

The question -- the remedy is to enjoin the implementation of the unlawful sections of the order. *Youngstown* is very clear that the President needs to have authority to issue the order.

I went back and reread *Youngstown* today. It's not about the authority of the folks to follow through and whatnot, although that's relevant too. But the question here today is: Did the President have the power to issue this order?

And I didn't hear anything from the other side explaining how he would have the power, given the structure of our Constitution, the electors clause, the qualifications clause, as well as the places where Congress has spoken on this issue, how possibly, under a *Youngstown* framework, the

President has the authority, not just to perhaps issue an order to USPS -- generally, I don't think it can -- but to issue this order. And there's been no argument about that.

I think that all of these arguments about why you shouldn't step in today are setting up Goldilocks strategies that would actually prevent this Court from answering that straightforward and incredibly important question: Can the President issue orders trying to change our election laws?

And the answer to that is, No. But if you look at the defendants' brief, for example, they say, well, maybe you can challenge 3(b) if that rule goes into effect and USPS did it solely because of the Executive Order.

I think that's plainly setting up an impossible standard for plaintiffs down the line to prove that USPS didn't, notwithstanding this Executive Order, just decide on its own judgment to do this.

That's just one more reason why it's important that we not be deprived of the opportunity of addressing the merits of this question about the ultra vires acts of the President.

And those ultra vires acts of the President are having present-day effects. Throughout an election year, our clients are talking to voters. They're not going to get a second chance to talk to that voter. If they're out at the grocery store talking to a voter today, they are meant

to tell them how to register, how to stay registered, how to vote absentee.

They can't do that in the way they normally do with this amount of uncertainty. So the harm is happening today. This is a preliminary injunction that's not mandatory. It's meant to maintain the status quo.

And prudential considerations like *Purcell* all weigh in favor of keeping the status quo, especially when the defendants don't even put forward any argument that this could actually happen in a lawful manner.

The final thing I want to say is, I think all of the cases that defendants cite focusing on other cases where courts have declined to intervene pre-enforcement or pre-implementation of rules, they actually cut against the state -- or against the Department of Justice.

For example, if you were to look at the Executive Order from Trump -- the census case -- and you were to put that next to this Executive Order, you'll know why you should come to a different outcome.

That Executive Order said the Department of Commerce should give the President some information, and then the President, within his discretion, later would decide what to do with that information to promote a policy goal.

That's not this order. This order does not come

back to the President to decide what to do later. This isn't an order that says here's what's going to happen and here's what's going to happen on a very specific timeline that runs directly into ongoing mid-term elections.

And every one of the other cases that they cite has the same exact problem. Whether it's *Center for Democracy and Tech* or *Defendants of Wildlife*, those are cases where there was maybe no -- you know, *Defendants of Wildlife*, it was just that they were going to issue a regulation. There was no information about what the regulation would contain.

Likewise, the E.O. in *Center for Democracy and Tech* directed an agency to clarify the law and consider various things. It did not have directions about what would be in the order.

And so they cut completely against them here.

The plaintiffs have established an irreparable injury, and under those circumstances, the Court should not credit various delay strategies that would deny plaintiffs an adequate remedy.

**THE COURT:** Thank you, Counsel.

**MS. LANG:** Thank you, Your Honor.

**MR. de NEVERS:** Orion de Nevers for the NAACP plaintiffs, Your Honor.

Just three quick points. On the USPS point,

Your Honor, the government was hardly willing to commit to the proposal you came up with today.  They certainly have not committed to USPS implementing this order in a lawful way.

There is no lawful way for USPS to implement the order.  That's why this is a facial challenge that needs no further factual development.  The President of the United States has no authority to direct the USPS to propose a rule that violates its own statutes.

The Court doesn't need to reach this question about the President's authority to direct USPS in the abstract.  This rule would violate the requirement that the Postal Service provide only necessary postal services, its universal service, and non-discrimination mandates and all the statutes on non-mailable matter.

The brief identifies no constitutional or statutory authority for the President to do this.  None has been identified here today.

On the state lists, again, the President has no authority to direct DHS to undertake actions that it has no statutory authority to carry out.  This all goes back to *Youngstown*.  Executive orders must come either from a constitutional provision or a statutory authority.  We have heard none here today.

Then, there was a suggestion that some of these

cases we rely on are outdated. *LULAC* is from 2025. *NPR* is from 2026. Those both talk about executive orders not being able to destroy themselves through savings clauses. I will also just point out that the USPS provision has no savings clause, Your Honor.

And then, finally, on standing, there's a suggestion that some of these actions that plaintiffs are undertaking might be voluntary, and that was kind of cabined to some sort of abstract educational purpose.

Plaintiffs are doing far more than just educating the public in the abstract. They are working with individual voters every day. They are developing infrastructure to prepare for August 5th, when they will have to help -- when they will have to implement procedures for their clients to obtain the documentation necessary to cure deficiencies.

We know there will be deficiencies. That is not a hypothetical. The McDonald declaration states unequivocally that the federal government has no set of data that can enable it to implement these lists accurately. My friend admitted that the lists would not be perfect. So my clients have to prepare for this eventuality.

It's a mandatory command that these lists be issued, that they contain cure procedures, and it is the core mission of our clients to help voters navigate those

procedures.

They cannot wait until days and weeks before primaries and the general election. As *Newby* said, we do not have to wait for the sword of Damocles to drop. Sixty days before an election is not enough time to cure an inaccurate inclusion on one of these lists.

The Brags declaration makes this very clear in concrete and stark detail that there is no feasible way for him to correct his name-change issues within 60 days. He's tried to correct his information with SSA multiple times and been unsuccessful. That's all laid out in his declaration.

Your Honor, preliminary injunctions are reserved for extraordinary circumstances. And when the President of the United States issues an Executive Order and the federal government is unable to come up with any authority for that order, it is an extraordinary circumstance, and it is harming our clients every single day in the middle of an election season.

With great respect, we urge the Court to enjoin implementation of this order.

**THE COURT:** Thank you, Counsel.

I was going to give you an opportunity. You started. You can close.

**MS. MADDURI:** Thank you, Your Honor.

I just want to underscore a couple of points, and

I will try not to repeat anything my colleagues said.

You just asked the government to identify any argument that USPS could conceivably implement the mandates in this order in a lawful way, and they couldn't give you an answer. All they said is they don't know what it would look like, but they did not say that there is any legal authority for USPS to carry out the mandates in that order or for the President to have issued them.

I just want to clarify, we are not saying that the President can never ask an agency for rulemaking, but he cannot ask for unlawful rulemaking, and that's what this E.O. does.

Counsel for LULAC, I think, very well described the differences in the E.O.s and the executive memorandums that defendants rely on. I just wanted to highlight *Albaugh*, the case that Your Honor referenced.

That involved an Executive Order that set a general policy that agencies should not, to the extent permitted by law, require or prohibit project labor agreements.

And that -- the issue there was that that mandate could be implemented both lawfully and unlawfully. So the savings clause actually had a function there, and there you do assume that they'll do it lawfully. But here, the savings clause can't operate that way because there is no

conceivable way to implement either of the challenged provisions in a lawful way.

*Albaugh* has been repeatedly distinguished on that basis, including in this District and, of course, in *LULAC* last year, where the order contains a clear dictate to take unlawful action.

The one other thing I wanted to highlight about *New York v. Trump* and *Common Cause v. Trump*, that Executive Order arose in the context of a domain where the President and the Commerce Secretary actually enjoy a lot of authority. The case involved apportion in the census, a demain Congress has explicitly assigned broad authority and discretion to the President and the Commerce Secretary.

Here, neither the agencies nor the President have any comparable role in elections. The power to regulate elections has been clearly assigned to the states in Congress. So the illegality of the E.O. exists at the outset at the moment the E.O. was issued.

So it's just completely different, and it's also different in all of the terms that my colleague highlighted.

The last thing I just want to clarify in the Privacy Act claim, because we had a lot of talk about we don't know how it's going to go, we don't know what's going to happen, and that's going to affect its legality.

I just want to clarify that our claim about the

Privacy Act is that disclosing records for use in the computer-matching program is unlawful without a separate legal authority authorizing that matching, and there's no legal authority for doing that matching.

Defendants have completely failed to identify any such authority, and the issuance of a SORN, that can't cure that because SORNs are only for routine uses. So that can't rescue that sort of conduct.

The routine-use exception requires that the use of the record is compatible with the purpose it was originally collected for. Here, none of the records at issue were collected for the purpose of reviewing citizenship and residency for purposes of voting.

So there is just absolutely no way that it can be conceivably implemented lawfully, and none of the procedural sorts of mechanisms that the government might undertake rescue that issue.

THE COURT: Thank you, Counsel.

MS. MADDURI: Thank you.

THE COURT: So thank you-all for the excellent arguments and the excellent briefs.

I don't have much to say other than to say I'm going to take the PI under advisement, or technically, I guess, the PI motions, but I get that all plaintiffs are seeking similar relief.

I guess there are two specific things to say about next steps. The first is that very likely you will hear from me -- I understand the time pressure here -- through a memorandum opinion and order that resolves the preliminary injunctions -- the motions for preliminary injunction. That, I think, is probably the most salient piece of this.

The second is, though, that in the event that before that opinion comes out, that if there is anything even approaching a material change in the factual scenario on the government side, that the government would so notify me.

I get the government's position that can't commit to particular undertakings in the future, and if the case gets dismissed, one has to figure out what to do with it.

But while I have under advisement the PI, I think -- well, put it this way. I expect that the government would be, quote/unquote, conservative in thinking through the kinds of things that it would notify me about, action it takes either as to the USPS part of the E.O. or the list portion.

So with that, thank you-all again for the excellent arguments.

Counsel.

**MS. LANG:** I would just like to make one request, Your Honor, if at all possible.

THE COURT: Okay.

MS. LANG: Which is, the LULAC plaintiffs would request, if at all possible, that there be actually an order with respect to the notification.

THE COURT: No. I thought that through. I understand your point.

MS. LANG: Thank you, Your Honor.

THE COURT: I've landed where I'm going to land. I understand the issue.

The government understands my view, and it would not be good for the government if it took anything other than capacious interpretation of what my expectations are. And I expect the government will comply with that.

So, again, thank you-all for the excellent arguments, the excellent briefs. The matter is under advisement. You will hear from me in an opinion.

I guess, the only thing I would say is if for some unlikely reason I need something additional, that is to say facts or briefing on some other supplemental point, you will hear from me in a Minute Order or whatever, but I am not presently anticipating that.

Okay. Thank you-all.

(Proceedings concluded at 4:23 p.m.)

# C E R T I F I C A T E

I, Lorraine T. Herman, Official Court Reporter, certify that the foregoing is a true and correct transcript of the record of proceedings in the above-entitled matter.

<table>
<tr><td>May 15, 2026</td><td>/s/ Lorraine Herman</td></tr>
<tr><td>DATE</td><td>REPORTED BY</td></tr>
</table>

**COURT REPORTER: [1]** 12/12
**DEPUTY CLERK: [1]** 3/2
**MR. CAPOZZI: [4]** 4/3 86/1 86/4 91/22
**MR. de NEVERS: [4]** 3/18 51/13 51/15 97/23
**MR. PEZZI: [45]** 3/22 55/17 57/22 58/24 59/20 60/14 60/17 61/5 61/12 61/19 63/2 63/13 66/15 67/3 67/6 67/12 67/15 67/24 68/3 68/14 69/14 71/13 72/2 72/11 73/24 74/3 76/7 76/11 76/13 77/9 78/1 79/9 79/11 79/15 80/12 82/5 82/20 83/3 83/18 83/21 84/3 85/11 85/19 85/22 85/25
**MS. LANG: [29]** 3/12 3/17 29/24 35/23 35/25 37/19 38/11 38/16 38/22 39/5 39/8 39/14 42/10 44/17 44/20 44/24 45/15 45/22 45/25 46/2 47/19 50/24 51/12 93/25 94/4 97/22 104/24 105/2 105/7
**MS. MADDURI: [72]** 3/8 5/17 5/23 6/16 6/19 6/22 7/1 7/6 7/10 7/16 7/18 7/23 8/11 8/16 8/22 9/14 9/18 10/9 11/10 11/17 12/13 13/5 13/9 13/12 13/19 14/17 15/3 15/9 15/22 16/2 16/22 17/4 17/10 17/17 18/12 18/15 19/12 20/7 20/9 20/14 20/17 20/20 22/7 22/12 22/15 22/23 23/12 24/17 25/8 25/19 25/24 26/18 27/3 27/8 27/15 28/3 29/3 29/9 29/13 29/18 30/3 30/6 30/11 31/6 31/11 31/15 31/25 33/24 34/10 34/23 100/24 103/19
**THE COURT: [149]**

**/**
**/s [1]** 106/11

**1**
**10 [2]** 19/3 46/12
**10 minutes [1]** 93/22
**10,000 [1]** 75/22
**11 [1]** 52/4
**1100 [1]** 2/9
**1101 [1]** 1/20
**1114 [2]** 1/3 3/3
**120 days [3]** 27/23 78/24 79/6
**120-day [1]** 79/3
**13 [1]** 88/7
**14 [1]** 1/5
**14th [1]** 1/20
**15 [1]** 106/11
**16 [5]** 53/15 53/23 53/24 54/4 54/12
**167 [1]** 86/14
**1700s [1]** 24/18
**1789 [1]** 24/12
**18 [9]** 49/17 53/16 53/19 54/10 64/21 65/3 74/10 86/15 90/12
**18 months [1]** 64/6
**19 [1]** 53/24
**1970 [1]** 93/11
**1:26-1114 [1]** 1/3

**2**
**20 [5]** 53/16 53/19 53/25 54/5 54/9
**200 [1]** 2/14
**20001 [3]** 1/15 2/5 2/22
**20005 [1]** 1/21
**2002 [1]** 62/12
**2018 [2]** 84/11 84/21
**2020 [1]** 84/21
**2025 [1]** 99/1
**2026 [3]** 1/5 99/2 106/11
**2026-1114 [1]** 3/3
**20530 [1]** 2/10
**21 [1]** 54/10
**22 [1]** 54/10
**250 [1]** 1/14
**2700 [1]** 37/3
**29th [2]** 41/19 41/21
**2:10 [1]** 1/6

**3**
**30-day [1]** 69/7
**333 [1]** 2/21
**35-year-old [1]** 77/22

**4**
**40 primary [1]** 52/21
**400 [2]** 1/14 1/20
**45 days [1]** 49/13
**45 minutes [2]** 5/2 5/6
**4:23 p.m [1]** 105/23
**4th [1]** 52/22

**5**
**50 [11]** 16/9 16/10 16/12 18/3 44/21 45/2 45/10 46/16 48/1 48/3 88/23
**5th [1]** 99/13

**6**
**60 days [4]** 49/15 73/22 78/24 100/9
**601 [1]** 2/4
**63101 [1]** 2/14

**8**
**815 [1]** 2/14

**9**
**90 days [1]** 12/15

**A**
**abaldwin [1]** 1/22
**abdicating [1]** 43/7
**abetting [1]** 54/18
**ability [3]** 30/19 43/14 88/16
**able [6]** 28/7 29/21 35/11 41/11 68/11 99/3
**abolished [1]** 86/12
**about [141]**
**above [2]** 74/10 106/5
**above-entitled [1]** 106/5
**absentee [3]** 80/7 82/17 96/2
**absolutely [9]** 20/20 21/5 34/10 44/24 48/17 56/11 79/12 81/23 103/14
**abstract [5]** 73/7 83/7 98/12 99/9 99/11
**Accardi [2]** 1/13 5/20
**accepting [1]** 65/4
**accepts [1]** 44/9
**access [2]** 20/10 21/2
**accomplish [1]** 55/5
**accuracy [1]** 52/6

**accurate [1]** 83/23
**accurately [1]** 99/20
**accusations [1]** 54/20
**accused [2]** 19/14 54/17
**acknowledge [1]** 72/21
**across [4]** 6/9 8/7 45/11 52/13
**act [51]** 6/17 6/19 7/15 7/20 7/24 7/25 8/19 8/24 9/2 9/9 9/11 9/15 9/17 10/4 10/6 10/8 10/10 10/11 11/5 11/15 11/16 16/24 21/10 23/13 24/4 24/14 24/21 25/11 25/14 25/25 26/10 38/6 38/7 51/10 63/1 63/10 68/7 68/13 69/1 69/6 69/19 70/16 71/12 72/15 72/17 76/20 76/21 92/10 92/13 102/22 103/1
**Act's [1]** 26/9
**action [18]** 1/2 23/23 24/4 24/7 24/22 25/16 25/23 26/16 32/10 38/7 56/16 59/6 70/16 72/23 83/5 92/11 102/6 104/19
**actions [5]** 43/21 60/19 87/6 98/20 99/7
**actively [4]** 30/15 33/3 34/14 34/14
**activity [1]** 73/1
**actors [3]** 43/22 62/3 62/4
**acts [2]** 95/19 95/21
**actual [1]** 61/21
**actually [38]** 7/25 11/8 11/11 11/20 11/25 12/8 12/21 13/22 13/23 15/4 18/12 19/16 29/18 29/20 30/12 31/22 31/25 32/22 35/6 40/8 48/8 50/21 51/1 51/3 65/11 69/9 77/6 77/19 77/24 85/1 89/17 94/1 95/6 96/10 96/14 101/23 102/10 105/3
**adage [1]** 94/2
**adamantly [1]** 32/7
**add [2]** 20/9 84/2
**adding [1]** 21/4

**A**

**additional [4]** 20/22 58/13 86/7 105/18

**address [6]** 5/12 34/15 49/20 50/17 73/6 83/6

**addressed [2]** 56/5 63/18

**addressing [2]** 24/21 95/18

**adequate [2]** 25/25 97/20

**administer [1]** 49/1

**administered [1]** 35/2

**administration [3]** 48/22 64/13 80/24

**admitted [1]** 99/21

**adopt [2]** 32/2 32/6

**adoption [1]** 32/5

**adults [1]** 52/3

**advance [1]** 30/12

**advise [2]** 61/8 61/10

**advisement [4]** 85/18 103/23 104/15 105/16

**advising [1]** 59/25

**advocate [2]** 34/16 59/11

**advocating [2]** 59/17 77/6

**affairs [2]** 90/5 90/9

**affect [4]** 29/1 29/7 89/9 102/24

**affected [5]** 17/1 44/16 48/24 49/8 61/4

**affects [1]** 35/9

**affirmative [1]** 92/4

**AFL [1]** 26/5

**AFL-CIO [1]** 26/5

**after [6]** 22/4 22/22 51/6 55/2 55/21 66/4

**afternoon [17]** 3/2 3/8 3/11 3/12 3/16 3/17 3/18 3/21 3/22 4/2 4/3 4/5 5/17 51/13 51/14 55/17 86/1

**again [27]** 4/25 5/17 8/12 9/21 14/8 16/7 19/22 22/3 24/14 32/4 32/12 32/16 45/8 65/6 69/22 70/6 70/13 71/14 75/20 76/11 76/19 77/1 77/15 91/5 98/19 104/21 105/14

**against [13]** 16/15

17/18 34/16 34/17 37/2 59/11 59/17 77/6 80/3 94/9 96/14 96/15 97/16

**age [5]** 14/21 64/21 65/2 74/10 90/12

**agencies [15]** 6/10 6/23 7/5 10/12 23/16 31/20 60/1 60/8 60/18 68/11 70/8 74/16 93/7 101/18 102/14

**agency [12]** 32/4 56/16 56/22 57/10 57/11 57/15 64/25 64/25 72/23 92/21 97/13 101/10

**ago.mo.gov [1]** 2/15

**agree [11]** 10/2 28/2 29/12 42/10 42/16 45/25 46/2 67/22 71/15 79/5 85/21

**agreed [1]** 33/18

**agreement [1]** 70/3

**agreements [2]** 69/20 101/20

**agrees [1]** 64/7

**aided [1]** 2/25

**al [9]** 1/3 1/5 2/8 2/11 2/13 3/3 3/4 3/5 3/25

**Al-Shareffi [2]** 2/8 3/25

**Albaugh [3]** 85/8 101/16 102/3

**Albright [5]** 53/15 53/18 53/24 54/4 54/10

**alike [1]** 93/7

**all [58]** 5/5 5/24 11/18 14/9 18/11 26/6 28/22 30/6 33/6 35/5 36/6 37/23 44/21 45/4 46/16 47/25 48/3 48/4 49/5 50/6 58/10 58/19 60/15 62/17 65/5 70/6 71/1 72/3 72/23 77/3 77/5 78/16 78/18 79/13 80/24 82/24 84/17 85/13 88/11 91/15 92/10 92/11 92/14 95/4 96/7 96/11 98/14 98/21 100/11 101/5 102/20 103/20 103/24 104/21 104/25 105/3 105/14 105/22

**all-powerful [1]** 5/24

**allegation [1]** 91/16

**allegations [3]** 59/22

86/22 91/15

**alleged [5]** 36/19 37/16 39/16 62/16 86/17

**Allen [1]** 89/2

**Allen v. Wright [1]** 89/2

**Alliance [11]** 34/8 34/18 35/8 39/1 59/3 59/9 86/13 86/18 86/21 87/8 90/6

**allow [5]** 8/1 24/4 47/7 52/5 93/22

**allowed [1]** 93/6

**allows [1]** 47/4

**alone [1]** 89/16

**along [2]** 10/25 19/13

**already [22]** 4/24 8/5 17/13 18/15 22/20 22/25 36/20 36/21 37/1 37/10 41/24 43/11 46/6 51/9 53/1 54/6 54/20 55/11 56/4 88/2 90/22 92/8

**already-trodden [1]** 4/24

**also [37]** 3/25 4/5 7/23 13/24 16/23 17/16 18/25 19/1 19/3 19/12 26/7 26/20 26/25 27/8 27/11 33/9 35/10 35/21 40/2 43/20 44/25 45/23 46/12 48/13 52/2 56/1 66/8 69/19 72/25 74/21 77/12 84/9 87/18 88/15 92/17 99/4 102/19

**also -- and [1]** 66/8

**alternative [1]** 34/19

**alternatives [1]** 25/25

**although [3]** 79/17 81/4 94/18

**always [1]** 89/5

**am [7]** 5/17 15/12 16/8 27/13 83/9 93/22 105/20

**amended [2]** 58/3 69/6

**Amendment [3]** 91/7 91/9 91/10

**amendments [1]** 69/15

**American [2]** 40/24 42/21

**Americans [2]** 39/1 90/6

**Americans' [1]** 50/9

**Amnesty [2]** 87/17 91/4

**among [3]** 6/23 7/5 88/13

**amount [5]** 4/15 4/19 49/4 49/23 96/4

**analog [3]** 24/8 24/18 90/3

**analogies [2]** 64/2 64/4

**analogous [2]** 24/21 24/23

**analogy [1]** 87/2

**analysis [5]** 11/7 17/9 40/14 40/19 43/24

**analytics [1]** 11/3

**angle [1]** 27/14

**Anna [2]** 1/19 3/14

**Anna Baldwin [1]** 3/14

**another [8]** 12/9 13/21 22/20 64/25 69/10 70/1 87/24 90/5

**answer [13]** 50/15 58/24 61/17 65/2 69/22 72/12 80/13 81/3 81/14 83/3 83/8 95/9 101/5

**answered [1]** 68/21

**answering [1]** 95/6

**answers [1]** 41/18

**Anthony [2]** 91/6 91/12

**anticipating [1]** 105/21

**any [44]** 6/15 7/9 10/12 12/7 12/8 12/18 14/14 14/14 15/20 18/10 33/19 35/2 37/5 37/5 38/5 47/3 47/17 49/22 50/4 51/6 53/13 56/15 56/17 57/2 57/14 61/25 67/14 73/8 73/8 73/14 73/15 78/15 81/9 85/12 89/22 91/11 91/16 93/19 96/9 100/15 101/2 101/6 102/15 103/5

**anyone [9]** 4/16 6/13 9/13 19/10 29/1 29/8 56/16 57/6 59/25

**anything [17]** 8/15 12/21 12/24 14/24 16/4 33/20 55/12 61/8 62/22 64/16 64/17 75/16 84/1 94/21 101/1 104/8

## A

**anything... [1]** 105/11
**APA [1]** 56/17
**appear [2]** 77/16 78/6
**APPEARANCES [2]**
1/11 2/2
**appeared [1]** 64/4
**appearing [1]** 63/21
**appears [1]** 49/3
**applicable [3]** 9/10
62/8 84/8
**applications [1]** 11/19
**apply [2]** 80/20 81/9
**apportion [1]** 102/11
**appreciate [1]** 55/14
**approaching [1]** 104/9
**appropriate [4]** 14/10
18/21 32/10 41/17
**Approximately [1]**
37/3
**apt [1]** 91/7
**are [199]**
**are -- that [1]** 61/3
**aren't [3]** 31/22 34/7
59/15
**argue [7]** 11/17 20/1
20/12 20/13 20/20 51/8
70/2
**argued [2]** 32/7 36/22
**arguing [1]** 41/22
**argument [25]** 4/6
4/23 5/9 36/25 38/17
45/21 59/1 62/25 63/11
72/1 72/10 75/2 75/2
80/15 80/17 80/21
82/15 83/1 84/19 84/25
85/7 93/5 95/3 96/9
101/3
**arguments [16]** 5/11
70/14 71/15 71/19
79/17 79/18 81/8 81/20
82/15 84/6 86/7 92/2
95/4 103/21 104/22
105/15
**arises [4]** 6/22 7/7 8/2
13/20
**ARNOLD [1]** 2/4
**arnoldporter.com [2]**
2/5 2/6
**arose [1]** 102/9
**around [3]** 23/23 49/11
88/24
**article [17]** 23/24 25/1

25/3 30/9 42/3 56/16
61/20 61/24 63/22
64/23 65/12 65/15
75/12 79/1 81/7 83/22
93/17
**Article II [1]** 93/17
**Article III [15]** 23/24
25/1 25/3 30/9 42/3
56/16 61/20 61/24
63/22 64/23 65/12
65/15 75/12 79/1 81/7
**articles [2]** 50/22
50/24
**articulate [1]** 63/10
**as [75]** 3/21 4/9 4/13
4/19 4/20 7/7 8/24
11/23 13/25 14/4 18/2
18/2 19/21 19/23 26/5
26/6 27/7 29/1 29/11
29/15 31/3 31/9 31/23
32/13 34/22 37/3 37/9
43/16 43/19 43/19
48/10 48/11 48/11 51/2
52/7 54/24 60/6 60/19
60/20 62/4 62/17 62/24
63/5 64/1 64/25 65/5
65/23 66/22 67/1 68/21
71/20 74/9 77/2 77/23
78/14 78/21 80/6 82/1
83/1 83/11 83/11 84/14
85/7 85/7 86/5 86/23
87/19 88/19 92/13
92/25 93/7 94/24 94/24
100/3 104/19
**aside [4]** 38/23 73/25
75/18 76/5
**ask [5]** 24/7 93/16
93/19 101/10 101/11
**asked [9]** 21/12 43/20
57/23 70/8 73/12 82/3
87/12 94/9 101/2
**asking [5]** 36/8 92/19
92/20 92/21 94/9
**asks [1]** 31/21
**aspect [3]** 14/18 14/21
35/2
**asserted [1]** 90/1
**asserting [1]** 50/12
**assigned [3]** 28/6
102/12 102/16
**assist [1]** 75/24
**assistance [1]** 52/15
**assisting [1]** 52/12
**Assoc [1]** 1/20

**assume [19]** 18/1 18/4
18/5 22/13 22/16 31/19
44/6 44/8 45/9 45/10
45/12 45/13 58/15
58/19 66/12 66/24 71/4
79/4 101/24
**assumes [5]** 7/13 31/8
31/13 46/18 62/2
**assuming [7]** 14/9
45/8 70/24 70/24 71/3
71/25 83/22
**assumption [2]** 46/12
82/4
**assumptions [1]** 44/12
**attached [1]** 26/20
**attempting [1]** 6/9
**attested [2]** 26/21
52/13
**attests [1]** 54/15
**Attorney [1]** 2/13
**August [2]** 80/18
99/13
**August 5th [1]** 99/13
**authored [2]** 56/20
84/14
**authority [24]** 28/16
45/18 56/9 56/22 83/2
83/5 84/18 92/7 94/15
94/17 95/1 98/8 98/11
98/17 98/20 98/21
98/23 100/15 101/6
102/11 102/12 103/3
103/4 103/6
**authorization [3]**
51/24 52/8 92/4
**authorize [1]** 9/23
**authorizes [4]** 6/6 6/8
6/10 52/9
**authorizing [1]** 103/3
**automatically [1]** 78/5
**autonomy [1]** 46/21
**available [1]** 25/24
**Ave [2]** 1/14 2/4
**Avenue [1]** 2/21
**average [1]** 40/22
**avoid [1]** 4/23
**aware [1]** 66/14
**away [2]** 52/18 78/22
**AZ [1]** 1/20

## B

**back [12]** 4/12 21/7
23/8 34/3 40/2 48/21
51/8 75/24 93/13 94/16

97/1 98/21
**backing [1]** 78/22
**backstops [1]** 78/10
**backup [1]** 92/9
**Baldwin [2]** 1/19 3/14
**ballot [2]** 35/2 39/24
**ballots [10]** 6/11 21/5
28/6 28/8 28/9 32/25
49/12 51/19 80/7 82/17
**bank [1]** 93/14
**banking [1]** 90/16
**Bankruptcy [1]** 2/21
**bar [1]** 93/1
**bargaining [1]** 90/19
**barrier [2]** 11/25 12/9
**barriers [2]** 12/6 20/9
**barring [1]** 92/20
**base [1]** 61/24
**based [2]** 59/4 62/1
**basically [1]** 89/5
**basis [6]** 51/7 59/25
64/1 66/23 87/19 102/4
**Bates [1]** 26/5
**be [205]**
**bear [1]** 67/18
**because [52]** 8/19
9/16 9/17 9/20 11/6
11/14 11/17 11/20
11/24 12/9 15/20 19/7
19/11 24/1 24/7 25/4
25/8 26/18 30/11 30/16
31/15 32/8 32/20 33/9
33/11 35/11 36/3 37/1
38/19 40/4 41/12 42/3
43/2 43/10 44/14 45/17
49/9 58/14 59/12 60/1
62/18 63/7 63/17 72/13
73/7 81/12 84/4 93/11
95/12 101/25 102/22
103/7
**become [1]** 51/21
**been [30]** 10/22 14/4
23/3 24/22 33/5 35/3
36/15 37/10 38/5 39/14
41/24 43/11 47/14
48/10 50/22 51/1 59/15
60/3 68/22 70/22 82/18
83/25 86/4 91/13 94/8
95/3 98/18 100/11
102/3 102/16
**befall [4]** 29/21 48/14
48/15 48/16
**before [29]** 1/9 8/16
23/1 24/18 28/25 29/7

**B**

**before... [23]** 30/24 33/10 35/22 38/5 38/10 39/13 48/16 49/13 49/15 56/24 60/25 66/19 69/23 73/22 79/2 79/18 79/23 81/16 84/2 85/20 100/2 100/5 104/8
**beginning [2]** 3/7 23/14
**behalf [7]** 3/19 3/23 4/4 5/18 55/18 70/17 86/2
**being [29]** 14/19 19/14 19/24 21/25 28/4 29/11 30/12 30/13 37/3 37/23 38/2 38/18 38/24 39/18 39/19 47/25 55/8 60/5 66/4 70/8 72/22 72/22 72/23 72/25 73/9 74/23 89/11 91/2 99/2
**believe [3]** 32/19 37/7 54/18
**bell [1]** 43/3
**belong [1]** 26/2
**benefit [1]** 35/21
**Bessent [2]** 39/2 90/7
**best [4]** 24/11 72/9 82/15 83/1
**bet [2]** 47/1 47/8
**better [1]** 71/3
**between [11]** 9/4 16/25 20/2 22/3 23/11 23/15 24/2 52/22 71/10 73/2 82/10
**big [1]** 25/11
**biggest [1]** 72/12
**binding [1]** 92/23
**bit [5]** 49/10 57/22 63/16 63/17 64/5
**Black [1]** 51/16
**Bldg [1]** 2/5
**BMV [1]** 2/4
**board [1]** 45/12
**boast [1]** 40/8
**boilerplate [1]** 12/20
**born [1]** 37/12
**Borson [1]** 3/25
**Bost [14]** 40/7 40/10 41/2 41/4 42/11 42/14 42/16 89/4 89/4 89/7 89/8 89/12 89/13 89/18

**both [14]** 4/21 13/1 14/20 22/1 24/18 26/12 33/5 55/7 57/19 62/9 66/5 85/20 99/2 101/22
**boundless [2]** 89/19 89/21
**bracket [1]** 76/19
**Brags [1]** 100/7
**Braidwood [1]** 93/1
**branch [3]** 13/2 13/18 92/5
**breach [2]** 24/19 64/3
**break [2]** 16/25 65/22
**breaking [1]** 43/22
**brief [10]** 20/1 20/13 26/21 52/5 84/19 86/16 88/7 92/2 95/10 98/16
**briefed [2]** 58/8 66/19
**briefing [1]** 105/19
**briefings [1]** 79/18
**briefly [3]** 89/3 91/21 91/22
**briefs [4]** 63/19 84/5 103/21 105/15
**bring [3]** 21/3 24/12 70/13
**bringing [1]** 57/17
**broad [1]** 102/12
**build [1]** 53/7
**bump [1]** 80/3
**bunch [2]** 15/4 43/12
**burden [4]** 21/4 72/3 90/2 93/3
**burdens [1]** 20/23
**business [1]** 34/11
**BVM [1]** 2/5

**C**

**cabined [1]** 99/8
**cabinet [1]** 63/22
**calendar [1]** 78/21
**calendar-related [1]** 78/21
**California [15]** 16/14 16/17 16/19 16/20 16/20 16/23 17/1 17/2 19/22 19/23 19/24 75/21 75/23 76/2 76/4
**California's [1]** 76/1
**call [6]** 38/3 38/3 38/4 62/20 66/7 84/7
**called [3]** 56/11 59/4 70/3
**came [5]** 37/3 50/24

63/17 66/25 98/2
**CAMPAIGN [2]** 1/2 1/20
**campaignlegalcenter. org [2]** 1/21 1/22
**campaigns [1]** 35/15
**can [47]** 4/19 4/22 5/10 11/5 14/24 21/7 22/22 24/1 25/21 26/15 29/13 30/23 33/16 35/14 36/25 38/3 41/21 46/22 47/15 48/16 48/20 57/6 57/18 58/1 58/2 72/25 74/17 75/13 77/15 79/10 80/14 81/10 83/6 85/16 87/21 89/5 89/13 90/24 92/12 94/10 95/2 95/7 95/11 99/19 100/23 101/10 103/14
**can't [26]** 9/11 9/17 9/24 9/25 10/15 11/24 19/21 34/1 34/3 40/20 41/8 41/8 41/19 43/2 43/6 43/18 47/23 61/24 80/17 87/22 87/23 96/3 101/25 103/6 103/7 104/12
**candidate [4]** 40/15 89/3 89/6 89/21
**candidates [6]** 30/7 40/20 41/9 45/6 89/8 89/17
**Candidly [1]** 83/18
**cannot [8]** 9/7 9/23 25/10 35/14 42/24 55/2 100/2 101/11
**canvas [1]** 83/9
**capacious [1]** 105/12
**Capacity [1]** 2/5
**Capozzi [4]** 2/13 4/4 86/2 86/3
**care [1]** 76/2
**careful [1]** 89/7
**CARL [1]** 1/9
**carry [3]** 32/9 98/21 101/7
**case [60]** 3/3 6/5 10/21 10/24 17/12 21/2 23/23 24/8 24/11 24/18 36/3 39/2 40/3 40/8 40/10 41/2 41/6 42/11 43/8 43/9 43/19 46/4 48/7 48/9 48/10 48/12 48/13 48/17 50/14 56/20

57/20 57/21 59/4 59/4 59/7 64/22 65/5 65/8 66/9 66/11 66/21 67/4 67/16 69/10 79/1 80/21 84/6 84/11 84/14 84/23 88/16 89/10 90/7 90/16 92/3 93/1 96/17 101/16 102/11 104/13
**case -- and [1]** 96/17
**cases [13]** 4/8 41/5 41/8 42/17 56/23 65/10 65/11 90/14 96/12 96/12 97/5 97/8 99/1
**casting [1]** 21/5
**categorical [2]** 68/8 69/25
**causal [3]** 16/25 65/23 66/14
**causation [3]** 43/20 43/22 87/20
**cause [16]** 2/3 12/1 24/4 24/7 24/22 25/16 38/7 49/4 51/16 54/14 56/15 70/16 84/14 85/1 92/11 102/8
**causes [1]** 75/12
**causing [1]** 53/10
**CC [1]** 2/4
**census [3]** 84/23 96/17 102/11
**CENTER [3]** 1/20 97/6 97/12
**certain [3]** 27/22 48/17 65/16
**certainly [26]** 4/19 9/19 13/16 40/25 55/23 57/3 59/1 61/5 61/12 61/20 61/25 62/2 63/15 64/6 64/17 65/15 69/2 69/24 70/22 72/11 72/21 77/9 78/1 78/3 92/22 98/2
**certify [1]** 106/4
**cetera [2]** 55/25 73/5
**chain [2]** 65/23 66/14
**challenge [10]** 11/18 15/8 15/19 16/6 57/17 89/6 89/9 91/24 95/11 98/6
**challenged [5]** 57/3 86/23 91/14 91/17 102/1
**challenging [1]** 6/7
**chance [2]** 84/2 95/24

**C**

**change [7]** 16/25 34/24 59/18 66/22 95/8 100/9 104/9
**changed [1]** 89/16
**changing [1]** 58/20
**chaos [1]** 49/4
**characteristics [1]** 27/19
**Charles [1]** 1/13
**check [2]** 16/15 19/5
**checked [1]** 19/9
**checking [1]** 35/6
**chill [11]** 36/12 37/13 37/25 38/23 39/6 39/7 54/7 91/1 91/3 91/7 91/15
**chilled [2]** 38/18 39/11
**chilling [1]** 37/18
**choose [1]** 46/22
**CIO [1]** 26/5
**Circuit [8]** 56/20 57/4 57/4 59/10 62/4 62/10 84/11 84/21
**Circuit's [2]** 85/8 86/14
**circumstance [2]** 50/17 100/16
**circumstances [4]** 59/8 70/4 97/18 100/13
**citation [1]** 20/17
**cite [5]** 84/11 84/13 90/14 96/12 97/5
**cited [2]** 48/7 91/6
**cites [1]** 90/17
**citizen [5]** 65/1 77/22 90/12 90/21 90/23
**citizens [16]** 14/2 19/15 25/13 36/19 36/21 37/4 37/9 37/12 37/16 39/16 39/18 40/24 52/3 74/10 74/14 74/15
**citizenship [17]** 6/9 8/6 9/1 12/16 14/20 32/3 32/6 32/14 35/7 36/16 36/18 37/11 49/15 64/20 81/24 90/11 103/12
**CIV [1]** 2/9
**civic [1]** 55/5
**civil [2]** 1/2 3/3
**claim [8]** 7/25 10/10

17/18 37/16 63/15 70/13 102/22 102/25
**claims [6]** 21/3 24/12 32/18 55/23 91/9 91/10
**Clapper [3]** 87/7 87/17 91/4
**clarification [1]** 81/18
**clarify [5]** 82/5 97/13 101/9 102/21 102/25
**clarity [1]** 50/7
**clause [12]** 9/22 10/16 11/19 31/17 32/11 84/8 84/12 94/23 94/24 99/5 101/23 101/25
**clauses [3]** 9/21 9/22 99/3
**clean [1]** 36/18
**clear [33]** 9/2 10/16 13/25 24/15 25/9 25/11 28/3 28/9 29/4 34/6 47/14 50/2 52/25 56/11 57/11 60/3 60/5 60/17 62/9 63/20 68/5 68/22 77/18 80/19 81/23 82/7 88/13 89/25 92/24 93/9 94/14 100/7 102/5
**clearly [3]** 7/19 84/22 102/16
**client [1]** 61/8
**clients [12]** 29/9 40/23 47/12 52/11 55/9 55/12 61/11 95/23 99/15 99/21 99/25 100/17
**clients' [1]** 34/11
**clock [2]** 93/23 94/2
**close [2]** 42/6 100/23
**co [2]** 27/11 35/17
**co-counsel [1]** 27/11
**co-plaintiffs [1]** 35/17
**Code [1]** 83/9
**cognizable [2]** 20/24 90/2
**colleague [5]** 3/15 36/5 38/8 38/11 102/20
**colleague's [1]** 86/5
**colleagues [3]** 5/19 55/11 101/1
**collected [2]** 103/11 103/12
**collective [1]** 90/19
**collectively [1]** 48/2
**COLUMBIA [1]** 1/1
**combination [1]** 42/12
**come [12]** 3/6 5/7

37/10 51/5 51/6 54/25 80/8 88/3 96/19 96/25 98/22 100/15
**comes [7]** 29/16 36/8 40/11 46/24 72/5 85/14 104/8
**command [5]** 9/24 11/24 12/19 32/1 99/23
**commands [6]** 6/6 9/23 12/22 18/22 18/25 28/9
**comment [1]** 69/7
**comments [6]** 28/21 57/6 57/7 57/8 57/10 86/10
**Commerce [3]** 96/21 102/10 102/13
**commit [2]** 98/1 104/12
**commitment [6]** 66/12 67/5 67/6 67/8 67/9 67/14
**committed [1]** 98/3
**committee [2]** 1/3 30/4
**committees [1]** 30/6
**common [10]** 2/3 12/1 51/16 54/14 61/2 64/4 84/14 85/1 90/3 102/8
**common-law [1]** 90/3
**communicated [1]** 73/21
**comparable [1]** 102/15
**comparison [1]** 43/4
**compatible [1]** 103/10
**compensate [1]** 35/16
**compete [1]** 30/14
**compilation [14]** 7/13 8/18 8/20 14/5 21/12 23/4 23/6 23/6 23/14 38/5 39/12 62/23 71/3 71/21
**compile [18]** 6/8 9/8 9/12 11/1 11/2 11/3 11/8 11/11 12/16 13/2 21/16 22/8 36/16 52/2 63/4 68/12 68/17 92/5
**compiled [23]** 6/14 7/3 7/9 9/16 10/3 10/8 10/22 10/23 14/19 16/8 18/16 21/9 22/5 23/3 23/7 38/3 65/25 66/2 66/5 67/1 71/5 71/6 71/23
**compiles [1]** 63/4

**compiling [4]** 39/15 44/1 71/11 74/16
**complaint [2]** 58/2 58/3
**complete [1]** 47/22
**completely [7]** 45/25 46/2 66/16 71/16 97/16 102/19 103/5
**complicated [1]** 40/11
**complied [4]** 7/21 10/4 10/8 63/7
**comply [1]** 105/13
**complying [2]** 35/6 69/1
**components [2]** 28/18 62/16
**computer [8]** 2/25 8/1 9/4 10/13 69/18 69/20 70/3 103/2
**computer-aided [1]** 2/25
**computer-matching [3]** 69/20 70/3 103/2
**conceded [1]** 45/10
**conceivable [2]** 12/9 102/1
**conceivably [2]** 101/3 103/15
**concern [2]** 43/10 75/7
**concerned [2]** 74/22 75/7
**concerns [8]** 42/5 42/12 43/16 57/1 60/22 75/19 80/4 81/5
**conclude [1]** 89/15
**concluded [1]** 105/23
**concludes [1]** 9/16
**conclusion [3]** 26/7 32/19 70/11
**concrete [8]** 21/18 44/8 66/25 77/7 79/7 79/23 89/1 100/8
**concreteness [2]** 71/11 71/22
**concurrence [1]** 92/7
**conduct [1]** 103/8
**confer [3]** 67/7 85/19 87/23
**confidence [3]** 24/19 42/18 64/3
**confident [1]** 67/18
**confirm [3]** 32/23 77/17 83/12
**confirmed [2]** 74/9

## C

**confirmed... [1]** 74/15
**confirms [1]** 83/21
**confusion [3]** 49/5
49/23 50/8
**Congress [15]** 6/3
8/24 22/25 23/12 24/3
25/14 25/21 25/22
26/18 26/24 93/1 93/11
94/24 102/12 102/17
**CONGRESSIONAL [1]**
1/2
**connection [2]** 7/4
36/9
**consequence [3]** 17/5
17/7 43/25
**consequences [1]**
43/12
**conservative [1]**
104/17
**consider [6]** 13/24
57/10 70/9 88/13 93/17
97/13
**consideration [3]**
80/20 81/16 83/14
**considerations [2]**
57/8 96/7
**considered [1]** 70/9
**considering [1]** 60/18
**consistent [17]** 6/14
9/8 9/10 10/19 13/3
13/8 14/6 23/21 33/17
33/20 62/8 68/13 71/6
71/12 83/23 85/6 92/12
**consistently [2]** 24/20
83/12
**consolidated [1]** 4/8
**Constitution [4]** 2/21
6/4 93/18 94/23
**constitutional [7]**
51/23 52/9 78/10 92/18
93/4 98/16 98/23
**constraint [1]** 68/16
**constraints [2]** 84/10
84/24
**CONT'D [1]** 2/2
**contain [2]** 97/11
99/24
**containing [1]** 10/12
**contains [1]** 102/5
**contemplated [3]**
60/19 68/12 71/24
**contemplates [2]** 66/3

74/1
**contemplates/requires
[1]** 74/1
**contents [2]** 57/14
57/16
**context [12]** 27/5
30/22 35/13 36/9 36/11
37/13 48/18 60/9 63/7
81/9 81/10 102/9
**contingent [1]** 67/13
**contours [1]** 67/9
**contrary [1]** 68/20
**conversation [1]** 42/8
**conversations [2]**
38/8 54/21
**core [6]** 34/11 35/9
40/24 52/21 77/3 99/25
**corollary [1]** 25/1
**correct [8]** 36/5 40/9
53/13 60/16 68/24
100/9 100/10 106/4
**could [38]** 7/9 7/23
10/2 10/5 10/8 10/22
15/3 15/23 16/22 20/12
33/13 35/20 47/10 51/5
51/6 54/22 58/4 61/15
62/25 65/18 67/18
67/24 69/15 71/9 72/21
74/20 76/19 77/21
79/24 82/16 83/10
85/22 87/14 87/25 93/1
96/10 101/3 101/22
**could -- especially [1]**
35/20
**couldn't [6]** 16/19
21/18 21/22 33/23
70/12 101/4
**counsel [20]** 3/6 3/14
3/20 4/2 5/11 5/15
27/11 51/11 55/14
73/12 80/13 84/2 85/24
88/2 93/21 97/21
100/21 101/13 103/18
104/23
**counsel's [1]** 3/24
**counteract [4]** 30/18
52/16 54/6 54/24
**counteracting [1]** 34/5
**counterpart [1]** 38/1
**counties [2]** 37/6
47/18
**counting [1]** 89/9
**country [2]** 5/23 88/24
**county [6]** 46/20 46/21

88/19 88/19 88/22
88/24
**couple [5]** 38/22 44/17
45/15 46/3 100/25
**coupled [1]** 54/7
**course [16]** 4/10 13/21
26/13 27/10 32/16
35/23 39/5 51/2 54/25
56/24 70/13 78/12
78/15 80/17 92/9 102/4
**court [62]** 1/1 2/20 3/9
10/18 20/25 24/6 26/6
32/13 32/19 33/11 34/8
35/20 40/4 40/6 40/10
41/6 41/11 41/14 41/15
41/17 42/1 43/13 47/14
48/6 50/5 51/10 55/11
55/12 61/24 62/4 62/9
65/5 67/20 75/8 84/13
84/21 85/2 85/3 86/6
86/12 86/13 86/24 87/1
87/2 87/8 87/12 87/20
88/1 89/19 89/20 90/5
91/2 91/8 92/1 93/15
93/19 93/20 95/6 97/18
98/10 100/19 106/3
**Court's [5]** 23/21 26/8
84/17 92/25 93/8
**courthouse [2]** 64/5
65/11
**courtroom [1]** 4/15
**courts [13]** 2/21 9/20
24/9 24/20 26/3 27/4
40/14 42/16 56/21 64/1
65/6 65/7 96/13
**covers [1]** 27/22
**Crawford [1]** 20/24
**crazy [3]** 61/10 87/16
87/17
**CRC [1]** 2/20
**create [2]** 9/1 12/4
**created [4]** 41/24
70/22 70/23 75/4
**creating [3]** 28/7 36/13
75/11
**creation [1]** 25/12
**credit [2]** 26/10 97/19
**credited [1]** 86/24
**criminal [2]** 47/6 54/19
**criminal/legal [1]**
54/19
**critical [2]** 30/22 35/13
**crucial [2]** 41/12 50/13
**cry [1]** 89/18

**crystalized [1]** 33/11
**culls [1]** 44/10
**cure [4]** 99/16 99/24
100/5 103/6
**current [2]** 36/17
39/20
**currently [4]** 53/11
53/17 53/20 54/1
**cusp [1]** 80/2
**cut [3]** 50/6 96/14
97/16
**cute [1]** 72/12
**cuts [2]** 83/16 83/18
**cycle [3]** 44/15 52/13
73/5

## D

**D.C [2]** 59/10 62/4
**D.C. [5]** 56/20 57/4
57/4 62/10 85/8
**D.C. Circuit [4]** 56/20
57/4 57/4 62/10
**D.C. Circuit's [1]** 85/8
**damage [2]** 49/1 51/9
**damages [6]** 25/16
25/21 25/23 25/24 26/2
26/16
**Damocles [4]** 48/6
48/8 51/6 100/4
**dangers [1]** 48/3
**Danielle [3]** 1/19 3/13
35/23
**darkest [1]** 61/16
**data [15]** 6/9 7/12 8/6
8/7 8/23 11/3 23/15
23/18 39/15 40/1 60/22
64/13 64/18 69/23
99/19
**database [5]** 9/2 18/17
22/20 25/13 70/1
**databases [6]** 8/8
18/16 18/20 63/5 68/19
69/24
**DATE [1]** 106/11
**dates [1]** 10/6
**day [14]** 34/2 49/16
50/1 51/6 51/6 52/12
52/22 55/21 69/7 79/3
79/6 95/22 99/12
100/17
**days [11]** 12/15 27/23
49/13 49/15 73/22
78/24 78/24 79/6 100/2
100/5 100/9

**D**

**DC [6]** 1/4 1/15 1/21 2/5 2/10 2/22
**DCCC [1]** 1/12
**dcd.uscourts.gov [1]** 2/22
**de [7]** 2/3 3/19 51/15 58/10 76/4 77/5 97/23
**de-registered [2]** 76/4 77/5
**deadline [1]** 49/9
**deadlines [2]** 49/10 74/4
**deal [2]** 75/23 76/25
**decide [14]** 5/5 11/5 15/13 23/7 41/5 41/7 42/17 42/17 66/20 78/16 80/9 95/15 96/23 97/1
**decided [6]** 19/10 41/20 58/9 60/3 68/22 79/8
**decides [3]** 9/7 11/1 15/17
**decision [7]** 14/15 23/22 47/20 85/8 86/14 87/10 93/8
**decisions [5]** 43/13 43/17 68/18 68/23 83/25
**declaration [15]** 53/15 53/15 53/23 53/23 53/24 54/3 54/4 54/9 54/10 54/11 54/13 68/22 99/18 100/7 100/11
**declarations [16]** 26/20 50/21 51/2 51/3 52/14 52/19 52/25 53/9 53/18 58/11 59/2 60/4 83/11 83/13 83/22 83/24
**declarations -- assuming [1]** 83/22
**decline [1]** 51/18
**declined [1]** 96/13
**deep [2]** 40/21 41/1
**deeply [3]** 40/12 40/15 42/23
**defeat [1]** 10/15
**defeated [1]** 65/14
**defective [2]** 19/5 87/3
**defendants [20]** 1/6

2/8 4/4 4/11 4/11 4/12 36/3 41/21 42/20 50/18 51/23 74/19 86/2 86/7 96/9 96/12 97/7 97/8 101/15 103/5
**defendants' [1]** 95/10
**deficiencies [2]** 99/16 99/17
**define [1]** 49/21
**defined [2]** 49/19 91/3
**defining [1]** 65/25
**definitely [2]** 16/22 81/1
**definitively [1]** 16/2
**delay [1]** 97/19
**deliberations [3]** 51/4 60/5 83/24
**deliver [3]** 28/8 32/25 51/18
**demain [1]** 102/12
**demanding [1]** 91/2
**democracy [3]** 50/10 97/7 97/12
**DEMOCRATIC [6]** 1/2 3/10 5/18 5/20 29/24 30/13
**denial [1]** 66/23
**denied [2]** 51/7 68/1
**deny [6]** 66/10 66/20 67/10 86/6 93/20 97/19
**Department [6]** 3/23 3/25 55/18 64/13 96/15 96/20
**depend [2]** 7/10 83/4
**depending [2]** 58/5 81/1
**depends [1]** 57/22
**deprived [1]** 95/18
**described [4]** 12/17 74/9 81/24 101/13
**desks [1]** 49/25
**despite [3]** 32/18 33/2 33/2
**destroy [3]** 11/24 84/12 99/3
**detail [3]** 52/19 63/18 100/8
**detailed [3]** 28/9 52/14 53/9
**details [2]** 22/9 73/8
**determinative [1]** 41/10
**determined [2]** 14/9 51/19

**develop [1]** 34/24
**developed [2]** 21/18 40/7
**developing [3]** 53/11 54/2 99/12
**development [2]** 33/10 98/7
**developments [1]** 67/17
**devoted [1]** 82/14
**DGA [1]** 1/12
**DHS [17]** 2/10 9/7 9/16 11/8 11/14 15/2 15/16 21/19 25/18 33/6 52/2 52/8 68/11 69/9 69/12 70/7 98/20
**DHS's [1]** 53/6
**dicta [1]** 26/6
**dictate [1]** 102/5
**dictates [2]** 7/11 10/14
**dictating [1]** 35/1
**did [9]** 37/12 42/11 46/9 77/10 87/18 94/19 95/12 97/14 101/6
**didn't [11]** 20/16 21/11 43/13 48/14 61/12 67/5 68/6 79/4 90/18 94/21 95/15
**differences [1]** 101/14
**different [24]** 26/2 27/18 28/23 28/24 30/1 31/20 40/5 44/22 58/4 58/12 58/16 58/19 60/10 62/15 63/9 65/19 71/8 87/4 88/2 88/14 91/8 96/19 102/19 102/20
**differently [2]** 44/23 45/11
**differs [1]** 70/5
**difficult [3]** 13/24 43/2 55/5
**direct [7]** 5/11 34/13 57/13 87/1 98/8 98/11 98/20
**directed [1]** 97/13
**direction [3]** 11/6 50/2 50/6
**directionally [1]** 60/10
**directions [2]** 58/4 97/14
**directive [4]** 51/21 51/25 52/10 56/9
**directly [4]** 13/16

52/20 87/3 97/4
**directs [1]** 57/12
**disadvantage [1]** 89/17
**disagrees [2]** 64/8 64/9
**disclose [2]** 13/22 25/10
**disclosed [1]** 9/6
**disclosing [2]** 10/12 103/1
**disclosure [9]** 6/23 9/3 22/24 23/2 23/13 25/9 65/18 69/14 72/14
**disclosure -- right [1]** 23/2
**disclosures [4]** 13/20 26/19 26/22 69/5
**discontinued [1]** 25/6
**discovery [1]** 67/22
**discretion [2]** 96/22 102/13
**discrimination [2]** 10/1 98/14
**discuss [1]** 42/15
**discussed [1]** 56/7
**discussing [1]** 72/17
**discussion [1]** 69/18
**disenfranchised [3]** 20/21 21/1 21/6
**disfavored [1]** 42/6
**dislike [2]** 57/2 70/12
**dismantle [1]** 23/9
**dismiss [5]** 58/6 66/17 66/19 67/25 79/1
**dismissal [3]** 57/23 57/25 66/17
**dismissed [2]** 56/2 104/14
**dispute [1]** 13/2
**dissatisfied [2]** 57/16 58/1
**disseminate [1]** 23/8
**disseminated [3]** 18/3 23/18 23/19
**dissemination [2]** 71/24 72/10
**distinction [1]** 56/14
**distinguished [2]** 93/9 102/3
**district [11]** 1/1 1/1 1/9 2/21 12/2 26/3 65/5 69/10 84/13 85/2 102/4
**districts [1]** 16/10

**D**

**dive [1]** 36/1
**diversion [5]** 35/9 59/3 86/11 86/12 87/11
**divert [3]** 30/17 34/14 53/2
**diverting [2]** 34/14 54/23
**divide [1]** 5/5
**divided [1]** 93/23
**division [1]** 4/23
**dlang [1]** 1/21
**DNC [3]** 1/12 88/7 90/17
**do [86]** 4/21 5/25 7/8 8/12 8/13 8/14 9/11 9/17 10/2 10/5 10/7 11/3 11/7 11/12 12/21 12/24 12/25 13/10 13/15 13/15 14/24 15/14 15/17 16/4 17/3 17/20 17/21 18/12 20/1 20/12 21/5 21/21 21/22 23/20 27/7 27/8 27/22 28/17 29/4 31/23 33/20 34/18 35/5 37/12 38/1 41/13 42/10 45/12 45/19 46/23 49/25 53/5 53/22 56/21 58/12 60/2 60/8 60/10 61/8 63/13 68/24 75/6 75/16 76/16 78/7 78/8 78/13 78/15 79/8 79/10 80/10 82/23 83/10 87/14 88/23 88/25 95/16 96/3 96/3 96/23 97/1 98/17 100/3 101/24 101/24 104/14
**DoC [1]** 2/11
**docket [1]** 85/15
**doctrinal [3]** 59/23 61/17 81/14
**doctrines [1]** 42/3
**document [1]** 70/2
**documentary [3]** 32/2 32/6 32/14
**documentation [1]** 99/15
**does [25]** 7/25 10/6 14/12 14/23 16/7 26/9 28/25 29/1 29/6 44/10 48/11 49/20 50/12 56/15 57/11 57/12 57/15 63/3 64/16 73/16

76/5 78/6 93/12 96/25 101/12
**does -- and [1]** 73/16
**doesn't [19]** 10/5 11/11 11/19 12/21 28/19 29/20 45/3 46/15 48/8 50/15 64/17 73/11 73/13 73/14 77/24 78/15 88/10 89/22 98/10
**doesn't -- it [1]** 73/11
**doing [10]** 8/14 21/16 34/22 37/5 46/9 53/10 58/19 83/4 99/10 103/4
**DoJ [2]** 2/9 2/10
**dollar [2]** 47/1 47/8
**domain [1]** 102/9
**don't [73]** 4/14 4/15 4/23 4/25 5/10 5/14 7/21 10/6 10/23 11/8 11/16 15/17 15/24 16/12 17/2 17/11 17/15 18/10 19/6 20/16 20/21 21/1 23/8 24/17 27/12 28/15 36/3 36/25 37/21 41/13 41/14 42/7 44/18 45/1 50/20 55/10 56/23 58/17 59/24 63/9 63/18 65/4 65/8 70/12 71/19 72/7 72/8 72/11 73/7 74/25 75/25 76/16 77/4 81/2 81/10 81/15 81/23 81/25 82/20 87/16 87/16 89/24 90/23 92/14 92/16 92/16 93/2 95/2 96/9 101/5 102/23 102/23 103/22
**DONALD [3]** 1/5 2/8 3/4
**done [11]** 7/14 29/19 33/21 35/3 36/10 46/6 49/1 51/9 75/16 80/6 88/21
**dos [1]** 48/21
**double [1]** 19/9
**doubt [1]** 12/18
**down [6]** 12/12 46/24 48/25 51/5 94/10 95/14
**downstream [4]** 43/11 75/15 75/21 78/12
**drafted [2]** 49/4 59/2
**Driehaus [1]** 91/6
**drop [1]** 100/4
**dropped [1]** 79/5

**DSCC [2]** 1/12 3/3
**duty [1]** 43/7
**dwell [1]** 89/25

**E**

**E.O [67]** 7/11 8/2 8/5 9/9 10/19 12/8 12/10 12/19 14/24 15/8 15/19 17/1 17/5 17/8 18/22 18/25 19/2 28/4 28/18 28/24 28/25 29/1 29/3 29/7 29/11 29/16 30/16 31/3 31/3 31/16 31/25 32/1 32/9 32/20 33/15 33/17 33/20 34/5 34/17 58/23 59/19 60/9 60/12 60/14 60/15 60/19 61/4 61/15 62/6 65/23 66/3 68/13 68/21 70/7 71/24 73/20 73/25 74/1 74/8 78/21 87/14 92/15 97/12 101/12 102/17 102/18 104/19
**E.O.s [1]** 101/14
**EAC [5]** 32/2 32/4 32/9 32/14 32/15
**each [14]** 4/7 13/8 14/8 14/11 14/11 14/12 16/9 18/3 37/24 45/2 52/20 56/3 73/22 88/11
**earlier [2]** 43/21 85/10
**early [7]** 41/5 41/8 41/11 41/14 42/18 71/2 74/2
**Earth [1]** 48/13
**educate [3]** 34/24 53/12 86/22
**educated [1]** 35/4
**educating [6]** 53/20 58/20 86/19 86/20 86/20 99/10
**education [2]** 2/4 34/12
**educational [1]** 99/9
**effect [8]** 15/21 47/16 47/17 60/5 66/13 67/25 83/2 95/11
**effected [2]** 16/19 89/11
**effects [4]** 29/9 30/19 52/16 95/22
**effectuate [3]** 12/24 33/6 33/8
**effort [3]** 20/2 36/16

62/20
**efforts [3]** 30/18 34/19 53/2
**either [12]** 4/25 5/1 18/23 21/23 45/11 52/10 57/13 60/8 61/21 98/22 102/1 104/19
**election [47]** 14/14 14/17 30/22 35/12 35/13 35/15 41/7 43/1 43/3 43/5 43/16 44/13 44/15 46/21 47/1 47/6 47/8 48/22 48/24 49/13 49/16 49/24 50/1 52/13 52/17 52/23 53/4 54/17 54/18 73/1 73/4 73/21 73/22 74/11 78/22 80/2 80/24 81/5 81/9 81/13 88/24 89/6 95/8 95/22 100/3 100/5 100/18
**election-related [1]** 89/6
**elections [33]** 13/16 14/1 14/22 30/16 34/11 34/25 35/3 36/9 36/10 40/4 40/5 41/2 42/6 42/19 48/18 48/20 49/1 49/6 51/20 52/21 58/15 59/18 60/25 60/25 61/3 73/2 80/11 81/6 81/7 89/23 97/4 102/15 102/16
**elections -- well [1]** 60/25
**electoral [7]** 30/17 40/13 40/16 40/22 41/16 41/23 42/24
**electorate [1]** 40/25
**electors [1]** 94/23
**element [3]** 90/8 90/10 90/23
**ELIAS [1]** 1/14
**elias.law [4]** 1/15 1/16 1/16 1/17
**eligible [6]** 14/20 44/2 47/4 47/5 54/16 77/22
**else [3]** 22/21 55/12 84/1
**elsewhere [1]** 64/5
**Email [2]** 2/10 2/15
**Emails [3]** 1/15 1/21 2/5
**employ [1]** 17/19
**enable [1]** 99/20

# E

**enablement [1]** 52/11
**enacted [2]** 6/2 69/6
**enacts [1]** 87/5
**encourage [1]** 89/20
**end [7]** 5/1 34/1 40/18 61/3 77/21 80/1 88/9
**ends [1]** 79/3
**Energy [1]** 56/20
**enforce [1]** 50/19
**enforced [2]** 48/10 48/11
**enforcement [4]** 39/19 54/8 73/1 96/13
**enforcing [1]** 6/2
**engage [5]** 10/1 11/7 28/16 31/9 92/21
**engaged [3]** 36/15 39/14 40/12
**engaging [1]** 40/24
**enjoin [7]** 21/11 21/20 30/25 33/23 80/9 94/12 100/19
**enjoined [1]** 93/15
**enjoining [1]** 31/3
**enjoins [1]** 5/25
**enjoy [1]** 102/10
**enough [10]** 16/25 17/20 24/4 34/17 60/23 65/15 67/3 93/25 94/4 100/5
**enroll [1]** 28/7
**enrolled [1]** 82/18
**ensure [4]** 20/5 34/21 67/19 77/7
**ensuring [1]** 75/25
**enterprise [1]** 46/25
**entire [1]** 37/1
**entirely [2]** 36/4 76/13
**entirety [1]** 56/2
**entitled [1]** 106/5
**environment [2]** 39/20 39/21
**era [1]** 24/12
**erode [1]** 42/18
**error [2]** 19/4 39/17
**error-prone [1]** 19/4
**errors [1]** 18/20
**Esam [2]** 2/8 3/25
**esam.k.al [1]** 2/11
**esam.k.al-shareffi [1]** 2/11
**especially [5]** 35/20

36/13 62/6 91/9 96/8
**establish [4]** 12/15 16/5 26/11 82/11
**established [1]** 97/17
**et [8]** 1/3 1/5 2/11 3/3 3/4 3/5 55/25 73/5
**et cetera [2]** 55/25 73/5
**evaluate [1]** 33/11
**eve [1]** 80/10
**even [52]** 8/16 8/20 9/16 11/15 13/3 13/6 13/7 14/25 19/13 19/16 21/1 21/2 22/17 22/22 25/4 31/1 31/3 33/4 37/21 39/4 46/6 46/22 46/25 49/19 51/4 54/16 56/23 60/3 63/14 63/20 64/9 65/4 65/4 65/8 65/10 65/14 66/10 67/1 69/4 74/6 74/18 74/19 75/18 76/15 78/10 88/13 89/13 92/16 93/2 93/8 96/9 104/9
**even -- that [1]** 21/1
**event [5]** 39/11 66/13 67/14 91/11 104/7
**eventuality [1]** 99/22
**ever [2]** 78/1 81/12
**every [12]** 10/25 34/2 34/4 34/4 47/9 50/1 52/12 78/5 88/14 97/5 99/12 100/17
**everyone [2]** 28/12 35/20
**everything [2]** 4/17 4/22
**evidence [6]** 26/25 27/3 36/11 53/13 91/11 91/17
**exact [1]** 97/6
**exactly [20]** 7/10 10/9 10/14 18/15 24/23 27/3 28/1 28/4 30/25 33/8 34/23 38/10 38/13 42/19 48/14 58/17 67/9 69/23 72/8 83/4
**examine [1]** 17/14
**examining [1]** 10/19
**example [14]** 9/25 19/21 19/22 36/12 50/18 66/25 69/3 72/13 74/21 74/22 77/21 88/20 95/10 96/16

**examples [2]** 46/5 74/23
**Excel [1]** 11/12
**excellent [5]** 103/20 103/21 104/22 105/14 105/15
**exception [2]** 81/7 103/9
**exchanged [2]** 8/25 9/1
**exchanging [1]** 8/1
**exclusions [1]** 53/14
**Excuse [1]** 12/12
**executive [54]** 2/9 5/24 6/7 6/15 11/15 11/16 13/2 13/17 13/25 14/5 14/10 23/2 27/19 27/24 28/17 38/13 39/21 47/3 48/9 49/3 50/19 51/17 55/21 56/4 56/8 56/12 57/12 58/14 62/10 64/16 73/3 73/13 73/16 78/9 78/15 81/23 81/25 84/8 84/12 92/3 92/5 92/7 94/11 95/12 95/15 96/16 96/18 96/20 98/22 99/2 100/14 101/14 101/17 102/8
**Executor [2]** 93/9 93/9
**exercise [2]** 31/21 48/23
**exercising [1]** 6/3
**exist [2]** 12/4 15/10
**existed [1]** 77/1
**exists [2]** 71/25 102/17
**expect [4]** 57/1 68/6 104/16 105/13
**expectations [1]** 105/12
**expend [1]** 20/2
**expending [3]** 59/5 59/10 59/11
**experiencing [1]** 30/22
**explain [1]** 72/3
**explained [2]** 9/20 11/25
**explaining [1]** 94/22
**explicitly [2]** 68/16 102/12
**extent [9]** 4/22 5/12 9/9 67/18 68/17 70/7 81/4 82/3 101/18
**extra [4]** 20/10 21/4

21/4 58/13
**extraordinary [2]** 100/13 100/16
**extremely [1]** 25/11

# F

**F.4th [1]** 86/14
**face [2]** 31/16 47/24
**faces [1]** 11/25
**facial [1]** 98/6
**facing [2]** 48/3 48/3
**fact [12]** 10/19 15/12 26/21 33/1 41/13 55/3 58/22 60/24 76/25 79/5 90/21 91/12
**facts [5]** 4/18 33/7 46/12 66/22 105/19
**factual [6]** 26/25 33/10 59/23 59/24 98/7 104/9
**failed [1]** 103/5
**fair [11]** 4/21 26/10 27/25 40/17 40/18 40/22 41/1 67/3 80/12 93/25 94/4
**fairly [1]** 89/1
**fall [2]** 48/9 73/23
**falls [1]** 49/9
**falsely [1]** 54/17
**families [2]** 1/20 36/14
**family [1]** 54/21
**far [5]** 75/15 78/12 80/19 89/18 99/10
**fast [2]** 4/25 5/1
**favor [2]** 83/18 96/8
**favorable [1]** 62/14
**fear [2]** 90/25 91/3
**fears [1]** 61/16
**feasibility [11]** 9/22 11/22 11/25 12/2 12/10 12/18 12/20 60/20 68/16 84/9 84/24
**feasible [4]** 9/10 68/17 73/17 100/8
**featured [1]** 84/4
**federal [62]** 2/9 4/11 6/10 6/14 7/5 7/12 8/7 10/12 13/20 16/16 16/21 18/2 19/7 19/11 22/19 23/16 24/3 25/9 32/3 36/15 37/14 38/4 39/13 39/14 39/24 41/17 42/1 44/1 44/9 46/7 46/8 49/19 49/21 51/20 61/9 61/24 62/20

**F**

**federal... [25]** 62/21 62/22 63/11 66/2 73/22 74/16 74/25 75/3 75/8 75/10 75/16 76/17 77/12 77/25 78/8 78/10 81/12 87/14 88/16 91/17 93/5 93/6 93/13 99/19 100/14
**federal-government-only [1]** 62/20
**federalized [1]** 25/13
**feel [1]** 43/6
**felon [1]** 77/21
**few [3]** 27/15 36/7 58/4
**fewer [1]** 73/21
**field [3]** 30/14 41/1 54/19
**fight [1]** 79/21
**figure [3]** 8/3 34/1 104/14
**figured [1]** 83/20
**file [1]** 63/22
**filed [3]** 4/7 55/21 58/2
**filing [1]** 50/23
**filings [4]** 56/18 59/1 74/20 80/23
**final [18]** 27/23 28/1 28/23 29/1 29/12 29/16 41/19 48/16 56/16 57/13 57/14 72/23 78/24 79/13 83/25 87/15 92/16 96/11
**finalize [2]** 57/11 57/15
**finally [3]** 90/25 92/15 99/6
**find [2]** 26/22 36/19
**finding [1]** 27/1
**first [16]** 4/10 11/4 14/3 26/1 55/20 65/24 71/8 72/3 86/9 88/11 91/7 91/9 91/9 91/23 93/14 104/2
**first -- I [1]** 65/24
**five [1]** 5/4
**FL [1]** 2/14
**flagrant [1]** 76/21
**flow [2]** 15/24 44/1
**flows [1]** 48/25
**focus [3]** 5/8 86/8 88/3
**focused [2]** 24/14 36/4
**focusing [1]** 96/12
**folks [5]** 39/17 40/12

40/21 51/3 94/17
**follow [2]** 31/14 94/17
**following [8]** 5/9 27/21 27/22 61/3 80/6 87/14 87/14 87/15
**follows [1]** 4/9
**footnote [3]** 69/11 84/15 85/5
**Footnote 7 [1]** 69/11
**forced [2]** 30/14 52/14
**foreclosed [1]** 34/21
**foregoing [1]** 106/4
**form [2]** 32/3 70/23
**formulated [1]** 18/2
**forward [4]** 3/6 37/10 78/23 96/9
**foundational [1]** 25/13
**founding [3]** 5/23 23/24 24/8
**four [3]** 25/5 25/6 29/25
**four-week [2]** 25/5 25/6
**frame [1]** 40/3
**framework [1]** 94/25
**framing [1]** 23/23
**franchise [1]** 20/11
**frankly [5]** 37/19 43/1 49/3 61/2 66/8
**fraud [1]** 54/18
**free [2]** 15/1 32/15
**Freedman [2]** 2/3 3/20
**frequency [1]** 69/7
**friend [3]** 89/4 91/6 99/20
**friends [4]** 48/13 86/18 88/5 88/20
**full [1]** 60/13
**full-throatedness [1]** 60/13
**fully [7]** 58/8 60/12 60/14 66/19 83/12 83/23 85/6
**function [2]** 12/21 101/23
**Fund [2]** 2/4 2/4
**fundamentally [1]** 12/23
**further [5]** 42/15 77/17 77/18 77/19 98/7
**future [5]** 38/19 73/19 78/14 81/11 104/13

**G**

**galvanize [1]** 34/3
**gave [1]** 47/5
**general [4]** 52/17 52/23 100/3 101/18
**General's [1]** 2/13
**generally [5]** 56/18 64/11 68/12 71/13 95/2
**generate [1]** 68/19
**generated [2]** 64/6 74/5
**genres [1]** 26/3
**get [47]** 8/10 15/11 19/20 19/25 20/12 20/17 24/15 25/21 27/12 28/7 29/21 33/16 34/3 34/19 34/19 36/2 37/21 38/6 41/11 41/14 42/7 42/7 45/3 45/21 48/11 48/16 51/8 58/8 58/9 61/13 61/17 63/6 63/15 65/4 67/13 68/6 68/15 75/25 77/4 77/7 78/25 81/10 82/9 88/6 95/23 103/24 104/12
**getgo [1]** 31/12
**gets [5]** 14/11 29/1 35/2 65/8 104/14
**getting [3]** 36/21 46/7 75/24
**Giddings [3]** 54/11 54/13 54/13
**Ginsburg [1]** 62/13
**gist [1]** 10/10
**give [7]** 27/11 47/21 65/1 84/2 96/21 100/22 101/4
**given [1]** 94/22
**go [19]** 4/12 4/20 11/7 12/23 18/25 19/15 21/7 22/1 27/20 28/13 35/15 50/13 56/3 65/25 66/4 74/1 78/18 86/9 102/23
**goal [1]** 96/24
**goes [6]** 12/2 35/15 45/9 62/6 95/11 98/21
**going [93]** 4/22 5/15 8/5 9/12 10/23 11/1 11/2 11/2 11/3 11/8 14/15 15/18 16/15 17/5 18/11 18/13 18/16 18/17 18/23 19/4 19/10 21/16 21/21 23/15 27/7

27/8 28/1 29/15 30/17 31/23 31/23 33/19 35/10 38/20 39/4 39/22 39/23 39/24 40/9 41/9 43/6 43/15 43/22 44/15 45/3 46/5 46/16 46/16 46/19 46/20 47/5 47/11 48/4 48/11 48/14 48/15 48/15 48/21 49/7 49/10 49/14 49/16 49/24 49/25 50/10 50/18 55/16 58/15 59/13 59/14 59/18 60/2 62/19 76/17 78/2 82/23 86/4 87/21 88/5 88/17 88/18 88/23 93/22 95/23 97/2 97/3 97/9 100/22 102/23 102/23 102/24 103/23 105/8
**Goldilocks [1]** 95/5
**gone [2]** 76/2 79/19
**good [25]** 3/2 3/8 3/11 3/12 3/16 3/17 3/18 3/21 3/22 4/2 4/3 4/5 4/18 4/19 5/17 10/16 19/9 45/13 51/13 51/14 55/17 60/22 64/4 86/1 105/11
**goods [1]** 87/3
**got [2]** 65/7 65/7
**govern [1]** 69/16
**governed [1]** 50/10
**government [91]** 6/14 10/23 12/7 13/20 16/16 21/12 21/15 21/24 22/19 23/16 24/3 25/10 32/7 32/12 36/15 37/15 38/4 38/15 38/20 39/13 39/14 39/24 44/1 44/9 46/7 46/8 49/19 49/21 55/16 60/1 60/4 61/9 62/3 62/4 62/14 62/19 62/20 62/21 62/23 63/3 63/12 64/7 64/8 64/9 64/25 64/25 65/12 65/17 65/21 66/2 66/12 66/24 67/2 67/21 68/25 69/5 69/25 71/18 72/7 73/18 74/25 75/3 75/8 75/10 75/16 75/20 75/21 76/17 77/12 78/8 79/4 80/9 80/14 81/12 83/15 83/19 83/25 85/20 87/4 87/14 98/1

## G

**government... [10]** 99/19 100/15 101/2 103/16 104/10 104/10 104/17 105/10 105/11 105/13

**government -- again [1]** 75/20

**government's [17]** 33/3 57/21 59/6 60/8 62/16 63/6 65/8 68/10 70/4 71/5 71/25 73/18 78/25 79/2 83/13 85/7 104/12

**granting [1]** 27/4

**great [1]** 100/19

**grocery [1]** 95/25

**ground [3]** 4/24 46/12 52/12

**grounds [1]** 79/1

**GROUP [1]** 1/14

**guarantee [3]** 41/21 80/14 81/2

**guess [8]** 22/23 34/18 61/16 82/6 94/2 103/24 104/1 105/17

## H

**had [15]** 21/2 21/3 35/1 36/2 37/10 38/8 43/8 43/11 49/19 54/21 77/12 84/23 91/13 101/23 102/22

**Hakeem [1]** 1/13

**handle [1]** 4/18

**happen [13]** 15/18 15/25 18/11 18/13 18/23 46/16 46/16 72/1 79/2 96/10 97/2 97/3 102/24

**happened [3]** 8/9 22/21 29/7

**happening [7]** 44/14 49/6 49/6 49/11 52/24 80/23 96/4

**happens [7]** 8/20 25/4 34/21 57/23 62/22 66/1 71/3

**happy [4]** 27/15 42/15 56/3 67/7

**hard [4]** 4/25 5/1 73/6 90/11

**harder [3]** 16/4 16/5 77/13

**hardly [1]** 98/1

**harm [57]** 7/6 8/10 15/11 21/8 22/2 22/2 22/12 22/17 22/18 23/10 23/17 23/17 25/2 25/3 25/7 25/8 25/15 25/20 25/22 26/1 26/12 26/12 26/13 26/15 29/20 29/20 29/22 30/1 33/25 34/13 34/15 35/10 35/16 36/8 37/24 38/24 42/23 42/23 45/5 45/24 46/15 48/5 48/19 50/3 51/8 55/7 55/8 56/1 56/16 61/20 63/15 65/16 66/6 68/3 82/9 82/10 96/4

**harmed [5]** 30/8 40/17 44/5 44/7 44/21

**harming [1]** 100/17

**harms [15]** 7/24 15/9 18/6 24/21 30/24 34/5 34/7 44/10 48/19 52/20 53/10 54/22 54/24 54/25 55/1

**has [93]** 7/8 8/12 8/13 8/14 8/24 10/24 11/4 13/10 13/15 13/15 16/5 20/1 22/20 22/21 22/25 23/3 23/6 23/12 24/3 25/14 25/21 25/22 26/6 26/18 26/24 27/23 28/18 32/10 33/5 35/1 36/15 36/20 36/22 39/14 40/1 40/4 41/14 41/19 43/3 43/4 43/9 44/8 44/13 45/18 45/24 47/14 47/14 48/6 48/10 50/25 51/19 52/8 52/14 55/11 56/4 60/3 61/9 62/5 64/24 65/12 65/13 65/25 68/4 68/22 75/16 78/20 79/8 80/13 82/18 85/12 88/1 88/14 89/19 90/8 91/2 91/8 92/7 93/13 93/19 94/8 94/24 95/1 97/6 98/8 98/17 98/19 98/20 99/4 99/19 102/3 102/12 102/16 104/14

**has -- there [1]** 78/20

**hasn't [4]** 10/22 12/7 70/22 77/1

**have [176]**

**have -- there [1]** 29/25

**Havens [3]** 59/4 59/7 59/9

**having [10]** 8/19 16/20 18/7 20/4 34/18 54/6 58/12 77/5 89/8 95/22

**he [5]** 9/25 50/12 54/15 94/22 101/10

**He's [2]** 44/12 100/9

**head [4]** 5/25 33/5 36/12 37/14

**hear [7]** 4/9 67/5 78/3 94/21 104/2 105/16 105/20

**heard [10]** 64/2 64/15 64/22 68/20 69/18 73/1 74/21 75/14 91/1 98/24

**hearing [2]** 1/8 4/6

**hearings [1]** 5/7

**heart [1]** 36/2

**heavily [1]** 84/4

**Heinz [3]** 43/9 43/19 43/24

**held [1]** 38/13

**help [3]** 35/5 99/14 99/25

**help -- when [1]** 99/14

**helping [1]** 54/19

**here [73]** 4/6 5/10 7/21 11/18 11/23 12/6 12/21 12/22 15/4 16/23 17/12 18/10 19/4 24/24 26/14 27/14 28/4 29/19 30/1 30/21 30/23 32/7 32/11 32/12 32/17 32/19 33/9 35/13 35/25 36/10 42/3 43/9 43/16 44/4 45/17 47/16 48/9 48/12 50/17 51/7 51/8 55/9 55/23 56/23 58/7 61/9 62/6 64/19 65/20 69/21 70/8 70/15 74/7 77/15 80/20 80/23 80/23 81/8 84/25 85/7 86/17 87/11 90/24 91/10 91/15 94/19 97/16 98/18 98/24 101/24 102/14 103/11 104/3

**here's [2]** 97/2 97/3

**herman [4]** 2/20 2/22 106/3 106/11

**hesitant [1]** 83/9

**high [1]** 39/17

**highlight [2]** 101/15

102/7

**highlighted [1]** 102/20

**highly [7]** 9/3 23/14 26/19 26/22 46/25 90/9 90/13

**highly-sensitive [1]** 23/14

**him [2]** 6/3 100/9

**Hippocratic [4]** 86/13 86/18 86/21 87/8

**hiring [1]** 90/18

**his [4]** 96/22 100/9 100/10 100/11

**historical [1]** 93/13

**hold [4]** 4/16 22/4 50/5 74/4

**holding [1]** 26/8

**Home [1]** 12/11

**Homeland [1]** 12/14

**Honor [66]** 3/2 3/12 3/18 3/22 4/3 6/20 9/22 20/18 27/16 28/5 34/10 35/23 36/2 37/20 38/22 42/10 44/17 45/15 46/2 51/13 54/11 55/17 56/4 58/5 58/25 59/20 61/12 63/2 63/13 66/15 67/3 67/6 67/12 67/15 67/17 68/4 68/14 71/13 72/11 73/24 74/3 78/16 79/9 79/11 79/15 79/18 79/23 80/12 81/16 81/21 82/20 85/11 85/12 85/25 86/1 93/25 94/6 97/22 97/24 98/1 99/5 100/12 100/24 101/16 104/25 105/7

**Honor's [2]** 81/19 85/15

**HONORABLE [1]** 1/9

**hope [1]** 37/22

**host [1]** 74/17

**House [2]** 33/1 50/25

**House's [1]** 32/23

**how [48]** 5/5 6/18 7/10 10/23 11/1 11/2 11/3 11/8 11/11 12/23 14/14 16/21 17/1 18/15 21/21 22/9 22/17 28/25 29/1 29/6 30/8 36/25 45/2 46/5 47/15 49/21 53/12 54/21 58/17 65/25 66/25 68/11 69/24 73/9 74/20 74/24 75/17

**H**

**how... [11]** 81/13 83/10 86/16 90/11 90/23 94/22 94/25 96/1 96/1 96/1 102/23
**however [2]** 63/4 93/23
**however -- yeah [1]** 93/23
**Humphrey's [2]** 93/8 93/9
**hundreds [1]** 30/16
**hurdles [1]** 20/22
**hurt [2]** 9/13 47/15
**hypothesis [2]** 47/17 77/1
**hypothesize [2]** 17/23 18/3
**hypothesizing [2]** 15/15 16/8
**hypothetical [3]** 70/22 76/13 99/18
**hypothetically [8]** 21/11 45/4 45/4 66/10 66/22 71/4 80/5 80/8

**I**

**I -- and [1]** 33/13
**I'd [2]** 58/24 80/12
**I'll [3]** 5/4 86/5 94/5
**I'm [40]** 3/12 3/13 3/14 3/19 5/19 13/13 15/15 17/17 20/15 22/13 23/1 24/4 24/14 29/13 35/25 39/9 40/8 40/8 42/15 49/7 49/7 56/3 61/9 61/13 66/5 67/6 67/18 67/24 69/21 71/17 73/13 76/24 78/1 79/15 79/16 79/24 85/15 85/22 103/22 105/8
**I've [3]** 23/6 59/9 105/8
**ID [2]** 21/2 21/2
**idea [2]** 47/21 49/14
**identified [7]** 8/24 12/7 18/24 51/23 69/4 82/19 98/18
**identifies [1]** 98/16
**identify [3]** 14/19 101/2 103/5
**identity [1]** 19/15
**ignore [4]** 15/1 15/3 32/15 43/6
**ignored [1]** 43/7

**II [1]** 93/17
**III [17]** 2/13 23/24 25/1 25/3 26/7 30/9 42/3 56/16 61/20 61/24 63/22 64/23 65/12 65/15 75/12 79/1 81/7
**illegal [2]** 12/25 13/2
**illegality [1]** 102/17
**imagine [10]** 4/19 21/9 21/10 22/3 23/5 58/2 58/3 72/21 72/25 74/17
**immediate [1]** 52/19
**immediately [1]** 78/5
**immigration [2]** 43/9 43/13
**imminent [5]** 54/25 61/21 65/16 91/4 91/8
**impact [1]** 40/1
**impairment [1]** 87/2
**impedes [1]** 54/16
**impediments [1]** 53/8
**impending [2]** 9/19 33/25
**imperfect [1]** 77/13
**implausible [2]** 36/23 46/11
**implement [11]** 11/21 13/23 33/4 33/12 51/1 60/2 98/5 99/14 99/20 101/3 102/1
**implementation [6]** 12/7 12/24 41/25 94/13 96/14 100/20
**implemented [8]** 30/13 60/12 61/15 62/7 69/21 92/12 101/22 103/15
**implementing [3]** 60/14 60/15 98/3
**implicated [1]** 69/3
**implies [1]** 32/17
**importance [1]** 81/6
**important [17]** 24/4 36/10 36/11 40/6 41/5 41/7 51/10 56/13 74/6 75/1 81/3 84/16 84/18 84/22 84/25 95/7 95/17
**impose [1]** 55/6
**imposed [1]** 20/10
**impossible [2]** 68/24 95/13
**improbable [1]** 36/23
**improper [1]** 77/11
**inaccurate [1]** 100/6
**inadequate [1]** 18/2

**inappropriate [1]** 17/22
**inappropriately [1]** 18/7
**Inc [2]** 2/4 2/5
**include [4]** 18/21 28/5 28/6 82/24
**included [1]** 37/17
**includes [2]** 18/17 27/21
**including [5]** 9/10 32/8 35/6 91/12 102/4
**inclusion [1]** 100/6
**inclusive [2]** 76/10 77/2
**inconsistent [3]** 7/14 10/18 34/8
**incredibly [3]** 39/17 48/23 95/7
**independence [2]** 28/13 31/21
**independent [6]** 28/12 31/19 32/4 82/24 93/6 93/12
**indicate [1]** 33/7
**indication [1]** 48/25
**indistinguishable [1]** 86/17
**individual [11]** 7/1 7/2 42/23 43/12 44/21 47/22 70/18 75/17 82/18 82/18 99/12
**individuals [3]** 74/9 74/13 74/15
**ineligible [3]** 37/7 47/7 51/19
**inflected [1]** 87/22
**inflicted [3]** 55/8 87/7 87/21
**inflicting [1]** 54/8
**inform [1]** 10/24
**information [50]** 6/23 7/5 8/15 8/24 9/4 10/13 13/17 16/21 18/18 18/22 22/18 22/19 22/21 24/2 25/17 36/17 36/18 37/6 38/20 38/24 39/19 39/25 47/25 48/25 49/20 51/2 62/22 62/25 63/5 64/11 64/12 64/18 64/19 65/16 68/9 68/25 69/5 69/16 70/1 90/11 90/15 90/16 90/16 92/5 92/8 92/9

**inappropriate** 96/21 96/23 97/10 100/10
**informs [1]** 55/22
**infrastructure [5]** 12/5 12/15 53/7 53/12 99/13
**inherent [3]** 14/18 75/19 92/7
**inherently [1]** 14/22
**initiate [1]** 56/13
**Initiative [1]** 1/20
**injunction [16]** 1/8 4/7 23/4 26/17 27/4 41/23 47/14 47/16 55/24 61/25 65/14 86/6 92/23 94/9 96/5 104/5
**injunctions [6]** 26/2 41/15 41/16 42/5 100/12 104/5
**injunctive [3]** 26/1 26/14 70/17
**injure [1]** 7/3
**injured [12]** 6/13 6/24 7/3 19/12 19/20 20/2 20/4 20/21 21/4 21/6 24/2 30/9
**injures [1]** 8/18
**injuries [4]** 15/23 41/3 86/17 90/2
**injury [55]** 6/21 6/22 7/4 8/2 9/5 9/15 9/19 13/10 13/14 13/15 13/16 13/19 13/21 19/17 19/18 20/11 20/24 23/25 24/9 24/16 25/2 35/8 36/1 36/4 36/6 38/7 38/10 40/3 40/11 42/14 42/15 45/17 47/10 47/11 48/12 48/14 50/15 52/24 55/6 58/22 59/22 61/21 61/21 62/16 63/23 75/12 82/10 86/24 87/7 87/21 89/1 91/1 91/4 91/7 97/18
**inquiry [3]** 77/17 77/18 77/19
**insofar [1]** 31/3
**instant [1]** 8/23
**instead [5]** 6/1 41/10 46/8 70/17 75/17
**Institute [1]** 2/5
**instructs [1]** 92/13
**intend [2]** 4/9 4/16
**intended [1]** 14/1

**I**

**intent [1]** 91/16
**interact [2]** 81/13
 81/22
**interest [1]** 8/19
**interested [1]** 67/17
**interfere [1]** 52/20
**interference [2]** 90/4
 90/9
**interim [2]** 22/3 66/6
**internal [3]** 13/17 67/1
 90/17
**International [2]** 87/18
 91/4
**interpretation [2]**
 61/15 105/12
**interpreting [1]** 59/21
**interregnum [1]** 23/10
**intervene [1]** 96/13
**intervened [2]** 17/12
 46/13
**intervening [2]** 16/24
 43/21
**intervenor [2]** 52/4
 74/19
**intervention [1]** 52/5
**intimidates [1]** 54/15
**intra [6]** 38/4 62/21
 62/22 63/11 67/2 69/4
**intra-federal [4]** 38/4
 62/21 62/22 63/11
**intricate [1]** 48/23
**introduce [1]** 3/6
**intrusion [4]** 24/19
 38/12 38/25 64/2
**invalid [1]** 11/18
**invested [2]** 40/16
 42/24
**investigate [1]** 39/17
**investigation [1]** 37/6
**investigations [2]**
 19/14 91/18
**investment [1]** 41/1
**investments [1]** 40/21
**invoke [1]** 83/5
**involved [5]** 40/16
 51/4 62/19 101/17
 102/11
**irreparable [37]** 8/10
 9/5 22/2 22/2 22/18
 23/10 23/17 23/18 25/4
 25/7 25/20 26/12 26/13
 26/14 26/17 26/23

29/20 35/10 38/24
 45/24 46/15 47/11 48/5
 48/19 50/3 51/7 52/20
 55/7 56/1 61/20 63/15
 65/16 66/6 68/3 82/9
 82/10 97/17
**is [425]**
**is -- however [1]** 63/4
**is -- it's [1]** 14/18
**is -- my [1]** 38/11
**is -- put [1]** 38/23
**isn't [12]** 9/16 10/21
 16/24 22/8 33/19 43/21
 45/1 46/23 58/22 59/10
 61/1 97/2
**issuance [1]** 103/6
**issue [27]** 7/24 9/18
 10/10 12/22 15/22
 29/19 30/21 41/22
 45/18 51/24 65/6 69/14
 75/1 82/16 84/23 89/12
 94/15 94/19 94/25 95/1
 95/3 95/8 97/9 101/21
 103/11 103/17 105/9
**issued [6]** 27/23 55/22
 57/5 99/24 101/8
 102/18
**issues [8]** 7/17 33/10
 57/18 57/19 60/20
 79/21 100/9 100/14
**issuing [3]** 31/2 41/15
 42/5
**it [224]**
**it -- which [1]** 71/9
**it -- why [1]** 45/12
**it's [104]** 4/21 8/5
 10/11 10/23 11/1 11/2
 11/2 11/3 12/25 13/12
 13/16 13/24 14/1 14/18
 16/4 16/5 16/9 17/4
 17/10 17/20 18/3 18/19
 19/9 20/3 22/5 22/24
 23/18 25/2 25/3 25/4
 25/9 26/13 26/24 27/25
 28/4 29/4 31/4 32/22
 32/22 35/14 36/22 38/5
 38/10 38/25 39/13 40/6
 40/8 40/11 41/5 41/7
 41/22 41/25 42/12 45/8
 45/12 48/11 48/15
 48/15 49/5 49/11 51/10
 56/16 56/18 57/19 58/8
 58/14 59/13 62/21
 65/15 65/15 67/13

69/22 70/7 71/20 73/6
 74/6 74/13 74/14 74/14
 75/7 75/17 76/2 76/11
 76/13 78/21 78/23
 78/24 80/12 80/19
 82/12 83/6 87/12 87/16
 88/18 90/11 92/10
 94/16 95/17 96/6 97/6
 99/23 102/19 102/19
 102/23
**its [26]** 16/18 16/20
 17/8 21/20 29/3 32/4
 32/16 36/17 36/22 37/1
 41/7 47/24 56/2 56/15
 57/16 60/13 71/6 71/24
 73/20 74/24 77/11 92/8
 95/16 98/9 98/13
 102/24
**itself [18]** 10/15 12/8
 12/19 17/25 23/14
 23/17 30/5 34/17 57/12
 59/7 62/6 63/22 68/21
 70/7 74/8 76/25 77/20
 78/15

**J**

**Jackson [1]** 92/6
**Jacob [2]** 1/12 5/19
**Jeffries [1]** 1/13
**Joey [1]** 3/24
**John [2]** 2/3 3/20
**john.freedman [1]** 2/6
**joined [3]** 3/14 3/19
 5/19
**joke [1]** 94/3
**jshelly [1]** 1/16
**judge [11]** 1/9 26/5
 26/6 32/18 43/13 56/21
 62/13 84/13 84/14 85/2
 90/5
**judgment [7]** 22/25
 23/12 25/14 26/19
 26/24 48/16 95/16
**judicial [7]** 10/20
 56/14 56/19 62/10
 72/24 75/13 81/10
**July [3]** 41/19 41/21
 80/1
**July 29th [1]** 41/19
**jurisdiction [5]** 42/9
 57/24 79/22 81/17
 82/12
**jurisdictional [1]**
 82/15

**jurisdictional-like [1]**
 82/15
**jurisprudence [1]** 40/7
**just [89]** 7/21 8/17
 12/20 12/25 14/2 16/10
 16/11 16/16 17/19
 17/21 17/23 20/16 21/7
 22/16 24/7 24/14 26/2
 30/22 32/5 32/11 32/17
 32/22 33/4 33/25 38/4
 38/21 40/20 40/22
 42/24 45/8 45/10 46/8
 47/21 47/23 56/18 57/4
 58/10 58/18 60/18
 61/13 62/7 62/16 65/20
 66/5 67/1 68/5 71/4
 71/9 72/12 72/16 72/22
 76/14 76/19 81/12 82/5
 82/7 83/6 83/9 84/3
 84/4 84/7 86/10 87/7
 88/5 88/9 88/22 88/25
 89/14 90/11 90/21 92/1
 93/11 94/8 95/1 95/15
 95/17 97/9 97/25 99/4
 99/10 100/25 101/2
 101/9 101/15 102/19
 102/21 102/25 103/14
 104/24
**Justice [5]** 3/23 4/1
 55/18 92/6 96/15
**justiciability [1]** 79/22

**K**

**Katz [1]** 84/14
**Kavanaugh [1]** 56/21
**KAYE [1]** 2/4
**keep [2]** 11/12 64/24
**keeping [1]** 96/8
**Kevin [2]** 1/13 5/20
**kick [1]** 36/24
**kicked [1]** 36/21
**kind [22]** 21/8 23/23
 23/24 24/8 24/9 36/6
 36/9 37/13 37/15 38/12
 40/2 43/11 43/21 45/16
 46/11 48/21 53/12
 68/12 82/19 83/6 89/21
 99/8
**kinds [2]** 92/10 104/18
**kkowalewski [1]** 1/16
**know [72]** 7/21 10/23
 11/8 12/3 13/13 15/17
 16/9 17/2 17/12 18/10
 18/12 18/15 18/19

**K**

**know... [59]** 18/25 19/3 20/3 22/5 22/11 28/4 31/13 36/5 36/21 36/25 38/19 41/10 43/1 43/8 43/25 44/19 45/2 47/19 48/1 48/11 48/14 49/7 49/9 49/14 49/18 49/23 50/15 50/20 57/18 58/17 61/23 66/3 68/15 69/23 70/20 71/5 72/7 72/8 74/13 77/4 79/12 79/16 81/16 82/22 83/8 86/4 86/16 87/4 87/6 88/7 90/12 92/13 92/15 96/18 97/8 99/17 101/5 102/23 102/23
**knowing [1]** 37/14
**knowledge [1]** 47/20
**knows [3]** 28/1 28/12 82/23
**Kollar [2]** 26/7 32/18
**Kollar-Kotelly [2]** 26/7 32/18
**Kotelly [2]** 26/7 32/18
**Kowalewski [2]** 1/13 5/20

**L**

**LA [1]** 2/14
**labor [1]** 101/19
**lack [3]** 40/17 57/24 71/2
**laid [1]** 100/11
**Lali [2]** 3/9 5/17
**Lali Madduri [1]** 3/9
**Lalitha [1]** 1/12
**land [2]** 49/24 105/8
**landed [1]** 105/8
**landmark [1]** 93/8
**Lang [4]** 1/19 3/13 35/23 35/24
**language [7]** 12/20 62/9 69/19 84/9 84/15 84/17 85/5
**last [8]** 32/1 39/15 50/25 64/6 65/6 94/7 102/5 102/21
**late [2]** 41/22 42/1
**later [8]** 35/15 49/10 52/24 71/19 71/21 74/2 96/22 97/1
**Latin [1]** 40/23

**law [30]** 1/14 4/19 6/1 9/10 10/18 10/19 13/8 16/20 16/21 31/14 39/19 41/8 43/9 49/19 50/11 59/4 62/8 64/4 65/5 73/1 75/11 77/20 77/23 78/10 78/10 84/8 88/16 90/3 97/13 101/19
**lawful [24]** 9/24 11/11 14/10 31/5 31/7 31/22 33/12 33/17 40/17 40/18 41/1 45/7 63/7 72/1 72/10 72/19 72/22 73/17 74/17 96/10 98/3 98/5 101/4 102/2
**lawfully [8]** 9/25 9/25 11/21 12/25 22/8 101/22 101/24 103/15
**lawfulness [1]** 79/7
**laws [3]** 88/14 91/17 95/8
**lawsuit [3]** 56/1 64/1 75/9
**lawsuits [2]** 55/20 55/20
**layers [1]** 88/1
**lead [2]** 5/15 55/16
**League [2]** 40/23 69/11
**learned [1]** 23/6
**least [21]** 8/7 10/3 14/9 17/2 19/3 27/13 29/25 45/5 45/13 47/18 55/21 56/25 62/17 62/18 65/22 66/22 68/11 70/20 70/23 78/11 79/25
**leave [2]** 5/5 81/12
**lectern [1]** 80/19
**led [2]** 36/20 43/12
**left [1]** 8/3
**legal [9]** 1/20 7/17 18/9 28/15 54/19 63/7 101/6 103/3 103/4
**legality [7]** 11/23 28/14 57/7 60/19 79/13 84/24 102/24
**less [4]** 46/7 52/18 61/1 77/18
**let [1]** 89/16
**let's [12]** 14/3 16/17 22/3 22/13 22/16 23/5 29/10 38/4 58/18 62/15

71/4 78/18
**letters [1]** 33/19
**level [1]** 88/22
**leverage [1]** 90/19
**light [3]** 31/2 54/20 60/24
**lights [1]** 4/14
**like [52]** 5/5 5/6 5/11 8/17 9/25 20/3 23/15 23/24 24/13 25/22 30/18 32/1 32/5 32/7 32/11 32/12 32/17 35/7 43/6 45/6 58/21 59/2 59/10 61/23 62/13 66/1 66/12 67/23 68/10 68/25 69/16 72/8 72/21 73/9 73/19 74/2 80/18 81/1 81/9 82/15 84/2 85/5 85/15 86/9 88/3 90/15 92/23 93/5 93/12 96/7 101/6 104/24
**likelihood [2]** 72/6 82/11
**likely [9]** 9/19 9/20 15/23 15/25 33/25 80/22 82/12 82/12 104/2
**Likewise [1]** 97/12
**limited [2]** 9/11 89/7
**limiting [1]** 88/16
**limits [1]** 42/4
**line [1]** 95/14
**lineage [1]** 93/13
**list [165]**
**lists [41]** 6/9 14/19 17/13 18/16 18/24 19/5 19/7 19/8 20/22 36/23 37/15 41/24 42/20 42/22 49/9 49/15 49/24 52/7 52/23 53/6 53/14 63/5 68/4 68/17 68/19 75/6 75/11 76/1 81/22 81/24 82/1 88/6 88/12 88/14 88/23 89/11 98/19 99/20 99/21 99/23 100/6
**literally [2]** 18/21 55/21
**litigants [1]** 70/5
**litigate [6]** 57/18 70/20 71/10 71/20 79/7 79/12
**litigated [1]** 65/10
**litigating [1]** 70/21
**litigation [5]** 15/5 64/5

66/17 80/25 85/15
**little [6]** 32/13 49/10 57/22 63/16 63/17 73/6
**LLP [2]** 1/14 2/4
**lmadduri [1]** 1/15
**local [7]** 43/16 46/20 46/21 46/25 47/8 49/24 50/1
**long [4]** 24/22 43/19 54/21 86/4
**look [16]** 16/3 16/14 17/21 17/21 23/24 28/14 41/4 47/2 61/23 67/16 71/17 73/8 80/18 95/9 96/16 101/5
**looked [1]** 62/10
**looking [7]** 15/23 24/9 37/5 39/16 39/24 78/23 88/13
**looks [5]** 28/23 28/24 31/25 72/8 81/1
**looming [1]** 52/24
**lorraine [4]** 2/20 2/22 106/3 106/11
**lose [1]** 71/20
**lost [1]** 65/12
**lot [23]** 32/1 41/20 43/5 46/21 56/8 58/25 59/1 59/3 60/21 68/7 73/1 74/21 75/14 82/14 84/6 88/1 88/18 90/14 90/17 91/1 91/12 102/10 102/22
**lots [4]** 40/21 86/20 86/20 88/15
**Louis [4]** 2/13 2/14 4/3 86/2
**Louis Capozzi [1]** 86/2
**Louis.Capozzi [1]** 2/15
**love [1]** 63/16
**LULAC [14]** 1/19 3/13 26/7 35/25 36/12 37/14 39/2 75/22 76/5 89/4 99/1 101/13 102/4 105/2
**luxury [1]** 53/5

**M**

**maccardi [1]** 1/17
**Madam [1]** 35/20
**Madduri [5]** 1/12 3/9 3/11 5/16 5/18

# M

**made [13]** 22/24 22/25 23/12 25/14 26/18 26/24 50/3 68/18 68/23 83/25 86/7 86/21 92/2
**mail [12]** 28/8 29/2 29/10 29/15 29/18 35/2 39/24 51/19 51/20 51/21 80/7 82/17
**mail-in [2]** 80/7 82/17
**mailable [1]** 98/15
**mailing [1]** 34/22
**maintain [3]** 12/16 74/11 96/6
**maintained [1]** 21/25
**maintenance [1]** 74/24
**major [1]** 67/19
**make [17]** 14/1 21/12 21/23 36/25 41/8 43/17 45/21 52/25 55/4 60/17 63/14 67/7 68/5 74/19 77/3 93/12 104/24
**makes [7]** 9/2 33/9 63/20 68/22 89/25 93/9 100/7
**making [2]** 51/1 76/2
**manage [3]** 74/24 75/17 92/8
**managing [1]** 75/9
**mandate [1]** 101/21
**mandated [2]** 28/4 31/11
**mandates [3]** 98/14 101/3 101/7
**mandatory [2]** 96/6 99/23
**manner [2]** 71/11 96/10
**manufacturer [1]** 87/3
**many [4]** 37/9 46/17 46/20 72/22
**marks [2]** 1/19 43/5
**Massachusetts [13]** 1/14 2/4 14/23 14/25 15/1 15/7 15/16 15/16 15/19 15/20 15/21 16/1 17/8
**massive [1]** 37/15
**master [1]** 9/1
**match [3]** 6/9 8/7 10/14
**matches [1]** 39/25
**matching [14]** 7/7 7/11

8/1 9/4 11/4 42/2 69/18 69/19 69/20 69/25 70/3 103/2 103/3 103/4
**material [2]** 66/13 104/9
**materials [2]** 54/2 54/2
**matter [8]** 7/14 11/11 51/16 57/24 77/23 98/15 105/15 106/5
**matters [1]** 72/16
**Max [2]** 1/13 5/20
**maximum [2]** 49/4 49/23
**may [19]** 1/5 3/8 7/20 7/21 34/16 38/6 44/22 45/7 45/9 45/10 58/9 63/6 67/21 73/16 73/17 80/24 81/11 81/11 106/11
**maybe [15]** 10/4 10/5 22/22 45/3 61/22 64/20 68/5 76/22 78/2 79/16 89/10 89/11 89/14 95/10 97/8
**McDonald [1]** 99/18
**me [28]** 3/24 5/2 7/19 10/24 11/4 12/12 21/13 21/13 24/15 27/17 30/25 31/1 33/15 33/18 37/24 54/15 61/7 65/24 66/19 66/24 71/14 73/11 80/19 104/3 104/11 104/18 105/16 105/20
**mean [42]** 16/12 21/24 24/25 33/24 37/22 44/7 45/8 47/13 59/14 60/7 60/14 60/21 61/12 64/10 65/24 66/21 67/4 68/4 68/5 68/15 69/19 70/14 71/17 72/11 72/20 73/6 74/4 74/13 76/20 76/22 77/9 78/2 78/14 78/20 79/12 80/5 81/14 83/11 84/16 87/6 88/11 93/12
**mean -- I [1]** 37/22
**meaningless [2]** 10/20 12/20
**means [1]** 66/21
**meant [2]** 95/25 96/6
**mechanisms [1]** 103/16
**medical [3]** 64/12

64/18 90/15
**Medicine [4]** 86/13 86/18 86/21 87/9
**meet [2]** 42/14 93/3
**meeting [1]** 33/5
**members [8]** 7/1 7/2 8/18 44/21 48/2 53/21 53/21 54/8
**memorandum [3]** 84/23 85/4 104/4
**memorandums [1]** 101/14
**mentioned [2]** 38/12 85/9
**mere [3]** 32/24 76/7 76/14
**merely [2]** 28/10 77/13
**merits [12]** 6/5 36/4 45/16 45/20 57/19 63/17 68/5 72/7 80/22 84/3 91/20 95/19
**met [1]** 90/2
**mid [1]** 97/4
**mid-term [1]** 97/4
**middle [6]** 27/12 41/23 49/12 52/12 52/17 100/17
**midst [1]** 41/16
**might [27]** 12/5 15/13 15/13 34/17 56/10 60/10 61/23 67/7 67/9 67/22 69/3 70/13 70/23 71/18 72/17 72/20 73/25 75/17 78/9 78/13 79/21 81/13 81/22 82/23 88/25 99/8 103/16
**million [1]** 48/2
**millions [1]** 42/21
**mindful [1]** 27/9
**minute [3]** 34/4 63/16 105/20
**minutes [4]** 5/2 5/4 5/6 93/22
**misframed [1]** 92/3
**misheard [1]** 81/21
**misidentified [1]** 18/23
**mission [5]** 35/9 55/6 67/25 77/3 99/25
**missions [2]** 40/24 52/21
**Missouri [3]** 2/13 2/14 3/5

**mitigate [1]** 30/24
**mixed [1]** 36/14
**mixed-use [1]** 36/14
**mixing [1]** 42/2
**MO [2]** 2/13 2/14
**mobilization [2]** 30/18 34/12
**mobilizing [1]** 53/1
**mode [1]** 41/25
**modify [1]** 52/6
**moment [2]** 76/20 102/18
**Monetary [1]** 25/24
**money [1]** 48/20
**months [5]** 52/18 52/24 61/1 61/24 64/6
**more [26]** 8/9 8/18 16/10 19/9 26/8 29/14 32/13 38/21 40/22 48/19 50/22 54/25 55/5 63/24 63/25 70/14 71/11 71/22 78/3 79/7 81/3 82/6 89/7 89/7 95/17 99/10
**most [7]** 23/24 53/4 75/7 79/17 84/16 84/18 104/6
**mostly [1]** 65/5
**motion [5]** 55/24 58/6 59/19 66/17 66/18
**motions [3]** 4/7 103/24 104/5
**Movant [1]** 3/4
**Movants [1]** 2/13
**move [2]** 49/17 94/5
**moves [1]** 50/25
**moving [1]** 15/12
**Mr. [3]** 54/13 58/10 86/3
**Mr. Capozzi [1]** 86/3
**Mr. de [1]** 58/10
**Mr. Giddings [1]** 54/13
**Ms [1]** 35/24
**Ms. [2]** 3/11 5/16
**Ms. Madduri [2]** 3/11 5/16
**much [15]** 36/3 42/24 51/9 51/11 55/10 55/15 55/22 59/8 63/18 79/6 88/25 89/15 89/25 93/21 103/22
**multiple [2]** 83/16 100/10
**Murray [1]** 56/20

## M

**must [2]** 27/20 98/22
**my [31]** 3/9 3/14 5/13 5/19 19/22 23/5 24/11 29/9 35/17 35/21 36/5 38/11 49/8 52/11 54/16 55/9 55/10 82/4 85/17 86/5 86/18 88/5 88/20 89/4 91/6 99/20 99/21 101/1 102/20 105/10 105/12
**Myers [1]** 93/8
**myself [1]** 40/9

## N

**NAACP [5]** 2/3 3/19 51/15 90/25 97/23
**name [4]** 3/9 35/21 63/21 100/9
**name-change [1]** 100/9
**names [1]** 75/24
**narrower [1]** 59/8
**national [1]** 51/21
**nationwide [2]** 47/16 47/23
**natural [3]** 17/4 17/7 37/12
**natural-born [1]** 37/12
**naturalization [1]** 8/6
**naturalized [3]** 36/21 37/9 39/18
**naturally [1]** 59/19
**nature [2]** 5/2 43/25
**navigate [1]** 99/25
**necessarily [1]** 82/1
**necessary [7]** 5/10 12/16 33/10 53/7 69/17 98/13 99/15
**need [25]** 20/21 21/6 29/21 30/1 33/24 35/4 35/4 35/5 35/5 41/25 42/17 42/17 47/21 50/2 50/7 50/7 53/21 55/25 61/21 63/24 68/6 75/24 92/14 98/10 105/18
**needed [4]** 52/7 77/17 77/18 77/19
**needing [1]** 86/22
**needs [8]** 12/4 14/2 67/6 69/4 78/16 92/4 94/14 98/6
**negotiable [1]** 42/4
**negotiations [1]** 90/20

**neither [1]** 102/14
**never [9]** 13/3 13/6 16/4 35/1 35/2 35/3 35/3 64/22 101/10
**Nevers [5]** 2/3 3/19 51/15 58/10 97/23
**nevertheless [1]** 15/7
**new [18]** 12/1 12/5 40/7 44/6 44/7 44/8 44/14 44/16 45/4 45/5 47/1 54/2 55/4 57/20 58/2 80/8 84/18 102/8
**New York [7]** 12/1 44/6 44/8 44/14 45/4 45/5 47/1
**New York -- I [1]** 44/7
**New York's [1]** 44/16
**Newby [4]** 48/7 55/1 55/4 100/3
**news [3]** 50/22 50/22 50/24
**next [6]** 47/2 49/8 49/16 71/24 96/18 104/2
**NICHOLS [1]** 1/9
**night [1]** 50/25
**nightmare [1]** 50/2
**nine [1]** 52/13
**Ninth [2]** 84/11 84/20
**no [79]** 1/3 6/6 6/7 6/10 9/14 10/7 11/10 11/20 11/25 12/6 12/25 14/2 15/11 15/11 18/21 27/25 29/6 29/10 29/15 29/18 31/6 33/9 33/12 33/16 34/10 35/16 37/22 45/4 45/18 48/19 48/20 48/21 48/21 51/7 51/23 52/8 52/8 55/14 63/13 63/15 64/20 64/21 67/19 68/10 69/25 71/7 72/7 73/21 74/2 76/15 77/16 78/1 81/7 83/25 87/11 90/12 90/12 91/9 91/16 91/17 91/18 92/22 95/3 95/9 97/8 97/10 98/5 98/6 98/8 98/16 98/19 98/20 99/4 99/19 100/8 101/25 103/3 103/14 105/5
**non [8]** 14/2 36/19 37/4 39/16 42/4 74/14 98/14 98/15

**non-citizens [5]** 14/2 36/19 37/4 39/16 74/14
**non-discrimination [1]** 98/14
**non-mailable [1]** 98/15
**non-negotiable [1]** 42/4
**none [5]** 51/1 98/17 98/24 103/11 103/15
**normal [2]** 28/13 70/13
**normally [1]** 96/3
**not [171]**
**not -- it's [1]** 32/22
**nothing [18]** 7/8 8/3 8/9 8/12 8/13 8/14 8/20 13/10 13/15 13/15 15/17 22/21 47/19 57/16 73/3 91/19 91/23 93/7
**notice [6]** 10/5 27/20 31/2 69/7 83/12 83/16
**notices [1]** 69/16
**notification [1]** 105/4
**notify [3]** 11/4 104/10 104/18
**notwithstanding [3]** 77/25 84/20 95/15
**now [62]** 9/18 11/6 15/12 15/15 15/18 15/23 16/8 17/2 20/2 21/16 22/2 22/4 23/2 23/11 24/2 24/2 24/15 26/17 27/23 27/25 30/9 30/15 30/17 30/21 34/2 34/5 34/24 35/11 35/11 38/10 42/19 43/4 50/14 51/10 52/22 52/24 53/11 53/11 53/17 54/1 54/23 58/22 61/1 65/18 71/10 71/19 73/2 74/21 75/10 75/21 76/2 76/13 77/5 78/12 78/18 79/6 79/19 80/2 80/11 83/15 87/12 91/20
**NPR [1]** 99/1
**NPRM [7]** 28/1 28/14 28/18 28/23 60/9 78/24 82/23
**number [1]** 45/13
**numbers [4]** 23/15 64/14 64/15 64/17
**numerous [1]** 48/7
**Nunez [2]** 53/23 54/9

**NW [5]** 1/14 1/20 2/4 2/9 2/21

## O

**obligation [3]** 10/24 18/9 82/24
**obligations [2]** 63/8 71/6
**observed [2]** 26/5 26/7
**obstacles [1]** 55/4
**obtain [2]** 53/12 99/15
**obviously [14]** 4/6 4/11 4/14 5/12 65/18 66/16 73/7 73/12 75/10 78/20 82/8 82/10 83/11 84/6
**occasions [1]** 48/7
**occur [2]** 9/19 9/20
**occurred [1]** 23/7
**occurring [1]** 54/22
**occurs [3]** 7/7 23/6 25/8
**off [11]** 5/15 21/8 36/22 36/24 44/15 50/5 75/23 75/25 78/5 80/17 88/6
**off-cycle [1]** 44/15
**offensive [4]** 26/20 26/22 90/10 90/13
**offer [5]** 36/3 57/6 72/13 81/18 86/10
**offering [1]** 46/9
**Office [2]** 2/9 2/13
**official [4]** 2/20 43/3 47/4 106/3
**officials [12]** 43/2 43/5 43/17 46/20 46/21 47/2 47/6 47/9 48/24 50/1 73/21 88/24
**officials' [1]** 49/24
**oh [3]** 44/3 50/19 82/3
**OK [1]** 2/14
**okay [17]** 15/6 18/14 20/8 20/15 20/19 22/15 24/17 24/25 27/2 27/6 30/3 30/8 38/2 77/16 84/1 105/1 105/22
**old [3]** 59/4 77/22 94/2
**Olive [1]** 2/14
**omitted [1]** 18/24
**once [5]** 22/24 23/18 43/3 48/24 71/10
**one [33]** 10/5 16/12 20/12 21/17 22/8 22/23

## O

**one... [27]** 27/25 29/13 37/22 38/22 40/24 41/20 43/17 44/4 44/6 44/8 47/10 58/25 64/24 70/1 72/12 73/23 81/18 81/19 82/6 84/3 88/2 95/17 97/5 100/6 102/7 104/14 104/24
**one's [1]** 64/20
**ongoing [4]** 52/19 60/5 83/24 97/4
**online [1]** 54/2
**only [12]** 27/6 31/16 54/16 55/25 60/3 62/20 66/20 67/10 73/4 98/13 103/7 105/17
**opaque [1]** 50/21
**open [1]** 32/23
**opening [1]** 5/3
**operate [1]** 101/25
**operates [1]** 11/23
**operations [1]** 53/1
**opinion [11]** 62/12 84/14 84/18 85/1 85/2 85/3 85/6 85/9 104/4 104/8 105/16
**opinions [3]** 64/7 64/9 64/10
**opportunity [5]** 27/12 34/2 71/20 95/18 100/22
**opposite [1]** 50/6
**order [93]** 6/7 6/15 11/15 11/16 12/25 13/25 14/5 14/10 15/24 21/22 23/2 27/19 27/24 28/17 30/9 30/11 31/21 32/2 32/5 32/8 32/9 33/4 33/6 33/8 33/12 38/13 39/21 45/17 45/18 47/3 48/10 49/3 50/19 51/17 52/2 52/14 52/16 53/2 54/15 54/20 55/21 56/4 56/8 56/12 57/12 58/14 60/2 60/2 64/16 68/17 73/3 73/13 73/16 77/20 78/9 78/15 81/24 81/25 82/7 84/8 84/13 90/22 92/12 92/13 92/20 94/11 94/13 94/15 94/20 95/2 95/3 95/12 95/15 96/17

96/18 96/20 96/25 96/25 97/2 97/15 98/3 98/6 100/14 100/16 100/20 101/4 101/7 101/17 102/5 102/9 104/4 105/3 105/20
**ordered [3]** 19/1 32/5 58/5
**orders [9]** 12/11 12/14 53/22 54/3 54/7 62/11 95/8 98/22 99/2
**ordinary [2]** 32/16 53/2
**organization [4]** 48/1 59/5 70/17 76/24
**organizational [2]** 20/3 20/4
**organizations [9]** 44/20 48/2 52/11 53/5 53/10 54/24 55/2 55/5 58/12
**original [2]** 38/13 59/7
**originally [1]** 103/10
**Orion [4]** 2/3 3/18 51/15 97/23
**Orion de [1]** 97/23
**orion.denevers [1]** 2/5
**other [37]** 4/14 7/17 15/21 19/15 20/23 28/20 29/7 30/17 31/20 37/5 39/2 40/21 45/7 45/9 46/18 56/17 56/22 64/5 68/4 70/8 71/18 72/20 78/9 79/1 79/21 80/4 81/9 84/9 85/12 88/21 94/21 96/12 97/5 102/7 103/22 105/11 105/19
**others [1]** 28/19
**otherwise [3]** 58/13 59/14 64/23
**our [37]** 7/1 7/24 8/18 10/10 16/15 19/5 19/8 19/11 21/15 26/20 28/13 29/19 29/20 30/19 31/6 34/11 35/9 35/15 40/23 41/1 47/11 53/9 55/12 58/6 66/16 80/21 84/6 84/25 86/11 86/16 92/2 94/23 95/8 95/23 99/25 100/17 102/25
**ours [1]** 19/9
**out [34]** 8/3 10/5 29/17

31/7 32/9 34/1 34/19 37/3 37/15 41/6 42/20 42/21 44/24 49/12 49/15 50/24 51/6 53/3 62/7 62/15 65/23 66/10 67/19 67/25 79/6 85/16 85/23 95/24 98/21 99/4 100/11 101/7 104/8 104/14
**outcome [6]** 32/8 33/9 41/10 45/13 57/2 96/19
**outcomes [1]** 34/6
**outdated [1]** 99/1
**outset [1]** 102/18
**over [11]** 27/16 35/17 48/2 52/21 64/21 65/2 70/21 75/13 79/22 90/12 90/19
**overbroad [1]** 47/24
**overcome [2]** 20/23 20/23
**overcomes [1]** 12/8
**overcomplicate [1]** 40/14
**overdrive [1]** 52/15
**overhaul [1]** 52/15
**overhauling [1]** 54/1
**overstating [1]** 80/16
**overzealous [1]** 74/23
**own [6]** 32/4 52/6 56/15 93/24 95/16 98/9

## P

**p.m [2]** 1/6 105/23
**Page [3]** 52/4 55/4 88/7
**Page 11 [1]** 52/4
**Page 13 [1]** 88/7
**Page 9 [1]** 55/4
**paper [2]** 82/14 94/10
**papers [1]** 36/22
**Paragraph [6]** 53/15 53/23 53/24 54/4 54/5 54/12
**Paragraph 16 [5]** 53/15 53/23 53/24 54/4 54/12
**Paragraph 20 [1]** 54/5
**Paragraphs [4]** 53/16 53/19 53/24 54/10
**Paragraphs 18 [2]** 53/16 53/19
**Paragraphs 19 [1]** 53/24

**Paragraphs 21 [1]** 54/10
**parallel [1]** 26/9
**part [10]** 15/12 25/11 26/16 31/24 63/25 67/2 75/7 77/2 80/21 104/19
**participation [5]** 37/19 38/18 38/19 39/9 40/25
**particular [5]** 13/14 13/14 73/15 73/15 104/13
**particularly [1]** 54/12
**parties [3]** 6/24 57/18 79/24
**partners [1]** 53/20
**parts [3]** 24/3 28/20 78/21
**party [6]** 3/10 5/18 5/20 16/25 29/24 30/13
**passes [1]** 29/12
**past [3]** 36/16 68/15 91/18
**peers [1]** 37/11
**pending [6]** 10/24 66/9 66/11 66/21 67/16 68/1
**Pennsylvanian [1]** 49/7
**penny [1]** 34/4
**people [24]** 9/6 16/17 28/9 32/25 34/19 38/17 45/5 47/4 47/15 49/17 49/17 49/20 54/23 58/11 58/20 59/14 75/22 75/24 76/3 77/7 77/7 80/7 87/5 91/1
**per [2]** 5/2 78/6
**perfect [3]** 47/20 78/2 99/21
**perfectly [3]** 13/7 31/5 31/7
**perhaps [10]** 18/6 26/15 31/20 58/17 62/15 71/19 71/21 81/20 81/20 95/1
**peril [1]** 93/24
**period [13]** 22/3 22/20 22/22 23/11 24/14 25/5 25/6 34/1 38/2 62/19 66/6 71/2 79/3
**permitted [2]** 24/12 101/19
**permitting [1]** 51/24
**person [6]** 19/7 27/6 77/17 78/5 90/10 90/13

# P

**personal [1]** 10/13
**perspective [3]** 60/8 73/18 80/1
**persuade [1]** 34/2
**persuasion [2]** 30/18 34/13
**PETA [1]** 59/10
**Pezzi [3]** 2/8 3/23 55/18
**PI [15]** 8/10 10/11 23/11 25/3 51/6 66/10 66/20 66/20 66/23 67/11 82/8 93/20 103/23 103/24 104/15
**pick [2]** 16/12 28/19
**piece [6]** 12/19 42/16 43/20 46/18 94/10 104/6
**place [2]** 26/1 52/22
**places [1]** 94/24
**plain [1]** 32/20
**plainly [3]** 47/23 50/17 95/13
**plaintiff [6]** 24/1 44/13 47/22 47/23 72/5 91/13
**plaintiffs [71]** 1/3 1/12 1/19 2/3 3/7 3/10 3/13 3/19 4/10 4/12 5/15 5/18 5/21 24/12 29/24 30/13 35/17 35/25 41/13 44/4 48/15 48/20 51/5 57/6 57/16 58/1 58/18 60/3 60/11 60/20 60/21 61/2 61/5 61/14 63/9 63/10 63/24 67/8 67/23 68/20 70/2 70/12 70/23 70/24 71/7 72/13 74/22 75/6 79/6 81/10 81/17 82/11 84/7 85/5 85/20 87/13 87/17 90/2 90/14 91/24 92/2 92/18 93/22 95/14 97/17 97/19 97/24 99/7 99/10 103/24 105/2
**plaintiffs' [19]** 52/25 55/23 56/25 59/1 59/22 62/24 72/2 73/12 75/15 80/13 80/23 81/4 81/6 81/20 83/12 84/5 86/19 89/17 90/1
**plan [11]** 21/15 21/18 60/12 61/11 66/25 81/5

87/12 87/13 87/18 87/21 87/22
**planning [3]** 30/15 61/3 80/7
**plausible [3]** 44/12 45/12 88/10
**play [3]** 4/18 27/17 52/8
**playing [2]** 30/14 41/1
**please [3]** 3/6 3/8 12/12
**plenary [1]** 5/25
**plenty [1]** 70/19
**point [32]** 5/1 8/3 10/20 11/4 11/20 16/18 24/5 33/14 33/16 33/24 38/9 42/10 43/10 43/20 44/24 49/2 54/12 65/9 71/10 76/5 79/19 79/23 81/18 84/4 84/7 86/13 87/19 92/4 97/25 99/4 105/6 105/19
**points [5]** 36/6 38/22 86/5 97/25 100/25
**policies [1]** 86/23
**policy [6]** 43/12 57/8 77/6 87/5 96/23 101/18
**PORTER [1]** 2/4
**portion [1]** 104/20
**position [8]** 22/11 63/6 71/5 75/1 78/25 82/22 86/11 104/12
**possession [1]** 92/8
**possible [11]** 11/19 17/10 31/4 60/7 60/22 61/14 69/22 78/14 81/11 104/25 105/3
**possibly [1]** 94/25
**post [1]** 73/1
**post-election [1]** 73/1
**postal [28]** 27/13 27/18 27/20 28/11 28/25 31/1 31/8 31/13 31/18 31/20 33/19 33/22 34/22 56/7 56/9 56/12 78/19 79/8 79/19 80/5 82/2 82/16 83/2 83/4 83/10 93/10 98/13 98/13
**potential [2]** 37/4 39/11
**potentially [2]** 65/19 69/15
**power [5]** 5/25 50/12

94/19 94/22 102/15
**powerful [1]** 5/24
**powers [2]** 6/3 52/1
**pre [3]** 59/3 96/13 96/14
**pre-Alliance [1]** 59/3
**pre-enforcement [1]** 96/13
**pre-implementation [1]** 96/14
**precedent [1]** 92/23
**precious [1]** 53/4
**precisely [2]** 46/6 55/8
**preclude [5]** 11/20 21/24 21/24 26/9 31/1
**precluded [1]** 10/18
**predates [1]** 84/17
**preferences [1]** 6/1
**prejudice [2]** 56/2 57/25
**preliminary [11]** 1/8 4/7 27/4 55/24 61/25 65/14 86/6 96/5 100/12 104/4 104/5
**premature [1]** 55/23
**premise [1]** 81/19
**premised [2]** 5/24 64/22
**preordained [1]** 32/8
**prepare [5]** 35/12 61/6 61/14 99/13 99/22
**preparing [3]** 30/15 30/24 49/12
**present [4]** 46/1 66/11 71/19 95/22
**present-day [1]** 95/22
**presentation [1]** 75/15
**presently [5]** 38/18 39/11 58/12 73/19 105/21
**president [34]** 2/9 3/4 6/2 6/8 6/10 9/24 11/7 33/6 45/18 50/12 51/24 92/20 93/2 93/16 94/10 94/10 94/14 94/19 95/1 95/8 95/20 95/21 96/21 96/22 97/1 98/7 98/17 98/19 100/13 101/8 101/10 102/9 102/13 102/14
**President Donald [1]** 3/4
**President's [2]** 56/8 98/11

**presidential [3]** 32/1 84/22 85/4
**pressing [1]** 91/24
**pressure [2]** 46/7 104/3
**presuming [1]** 62/3
**pretty [11]** 4/18 6/5 7/25 10/16 24/15 47/14 68/8 88/12 89/18 91/2 92/22
**prevail [1]** 82/13
**prevent [5]** 12/6 23/4 25/12 26/1 95/6
**previewed [1]** 70/15
**previously [1]** 77/1
**primaries [2]** 49/11 100/3
**primary [5]** 49/8 52/17 52/21 55/6 60/25
**principal [1]** 62/24
**principle [1]** 80/25
**prior [2]** 32/1 85/8
**prioritize [2]** 47/3 47/6
**prioritized [1]** 44/3
**privacy [60]** 6/17 6/19 7/6 7/15 7/20 7/24 7/25 8/19 8/24 9/2 9/9 9/11 9/15 9/17 10/4 10/6 10/8 10/10 10/11 11/5 11/15 11/16 13/12 15/9 15/12 21/7 21/10 23/13 24/4 24/14 24/21 25/10 25/14 25/25 26/9 36/8 38/6 38/7 63/1 63/10 64/22 64/24 68/7 68/13 69/1 69/6 69/19 70/16 71/12 72/15 72/17 76/20 76/21 76/22 89/24 90/1 92/10 92/13 102/22 103/1
**Privacy Act [36]** 6/17 6/19 7/15 7/20 7/24 8/19 9/2 9/9 9/11 9/17 10/8 11/5 11/15 11/16 24/14 24/21 25/14 25/25 38/6 63/1 63/10 68/7 68/13 69/1 69/6 69/19 70/16 71/12 72/15 72/17 76/20 76/21 92/10 92/13 102/22 103/1
**private [8]** 8/23 38/24 64/11 64/18 70/5 90/5 90/9 90/15

## P

**probably [2]** 18/21 104/6
**problem [6]** 11/10 45/1 79/25 87/20 92/18 97/6
**procedural [5]** 7/20 7/23 10/3 69/2 103/15
**procedurally [1]** 57/23
**procedures [3]** 99/14 99/24 100/1
**proceed [2]** 4/9 58/4
**proceedings [4]** 1/8 2/24 105/23 106/5
**process [16]** 19/21 21/5 28/14 31/9 32/5 33/7 37/8 40/13 40/16 40/17 40/18 40/22 41/16 41/24 42/24 69/8
**processing [1]** 35/5
**proclaim [1]** 6/1
**produced [1]** 2/25
**program [2]** 10/13 103/2
**programs [5]** 2/9 9/4 34/2 34/24 52/16
**prohibit [2]** 6/11 101/19
**prohibited [1]** 9/3
**prohibition [1]** 69/25
**prohibitions [2]** 63/8 68/9
**prohibits [1]** 10/11
**project [2]** 39/15 101/19
**promote [1]** 96/23
**prone [1]** 19/4
**pronounced [1]** 40/8
**proof [3]** 32/2 32/6 32/14
**properly [2]** 20/5 76/3
**proposal [1]** 98/2
**propose [3]** 31/23 51/18 98/8
**proposed [15]** 27/21 31/2 53/6 56/6 56/13 56/15 56/22 56/23 56/24 57/5 57/7 57/12 81/11 87/15 92/16
**proposition [2]** 48/8 89/5
**prosecuted [1]** 91/13
**prosecution [5]** 44/3 47/6 91/1 91/3 91/11

**prosecutions [1]** 91/18
**protected [1]** 69/5
**protections [2]** 10/3 52/15
**protects [1]** 41/2
**provably [1]** 76/9
**prove [5]** 19/15 33/25 37/10 41/9 95/14
**provide [2]** 48/20 98/13
**provided [2]** 15/13 45/8
**provides [1]** 21/13
**provision [7]** 11/23 12/9 44/5 52/9 62/13 98/23 99/4
**provision's [1]** 30/19
**provisions [5]** 11/18 56/3 60/15 73/14 102/2
**prudent [5]** 59/25 61/2 61/10 61/22 85/19
**prudential [10]** 42/5 42/8 42/12 42/16 50/4 50/6 50/13 80/1 80/4 96/7
**public [4]** 42/18 53/21 86/23 99/11
**publication [1]** 57/13
**published [1]** 70/4
**pull [2]** 23/8 88/8
**Purcell [5]** 42/11 50/7 80/4 80/15 96/7
**purport [2]** 73/13 73/14
**purport -- I'm [1]** 73/13
**purported [2]** 52/3 93/11
**purports [1]** 26/8
**purpose [7]** 7/9 25/11 25/12 73/10 99/9 103/10 103/12
**purposes [12]** 21/6 25/3 25/3 46/1 49/22 55/7 55/24 56/14 56/17 72/22 82/8 103/13
**put [14]** 8/20 11/12 14/6 22/19 22/20 29/10 38/23 40/2 43/1 73/25 76/5 96/9 96/17 104/16
**put -- their [1]** 22/19
**puts [1]** 59/19

## Q

**qualification [1]** 49/18
**qualifications [1]** 94/23
**qualifier [1]** 12/11
**question [30]** 21/19 22/1 23/5 24/11 29/6 38/23 41/18 43/5 45/20 50/4 50/16 50/16 65/13 66/8 68/3 69/23 71/15 72/18 76/22 77/14 80/12 81/15 82/4 83/3 94/7 94/12 94/18 95/7 95/19 98/10
**questions [21]** 4/20 5/13 21/17 27/16 36/1 37/22 40/3 50/13 55/12 65/19 68/4 70/15 71/8 72/20 73/7 76/20 81/19 83/14 85/12 92/10 93/19
**quibble [2]** 37/22 58/18
**quibbling [1]** 24/5
**quick [1]** 97/25
**quickly [1]** 94/5
**quite [4]** 37/19 43/1 49/3 59/19
**quo [2]** 96/6 96/8
**quotations [1]** 69/11
**quote [4]** 74/9 88/8 88/9 104/17
**quote/unquote [1]** 104/17
**quotes [1]** 84/15

## R

**racial [1]** 10/1
**radical [1]** 92/22
**rail [1]** 28/19
**raise [4]** 42/11 65/19 80/15 84/19
**raised [4]** 71/14 72/20 74/23 81/8
**ran [1]** 37/1
**rate [1]** 39/17
**rather [2]** 62/3 70/21
**re [3]** 48/21 51/8 56/20
**re-argue [1]** 51/8
**re-dos [1]** 48/21
**reach [5]** 32/19 70/11 89/13 89/22 98/10
**reached [1]** 32/18
**reacting [1]** 5/12

**read [6]** 4/17 10/15 32/13 40/7 81/23 84/12
**ready [1]** 27/13
**real [2]** 54/22 54/23
**realize [2]** 21/8 82/14
**really [20]** 5/8 13/24 22/17 34/6 35/13 36/3 36/11 40/6 42/7 43/2 51/10 69/22 69/22 70/12 77/17 80/3 86/16 91/19 92/22 93/7
**really -- certainly [1]** 92/22
**Realty [2]** 59/5 59/7
**reason [8]** 10/17 21/11 37/7 50/5 55/22 75/1 95/17 105/18
**reasonable [5]** 58/14 61/1 61/10 90/10 90/13
**reasons [5]** 41/20 43/17 50/6 72/13 73/17
**rebuttal [3]** 4/13 5/4 93/23
**recall [1]** 20/16
**received [2]** 16/16 19/24
**receives [3]** 14/25 15/2 15/16
**recent [1]** 26/8
**recently [3]** 43/8 69/10 91/13
**recognize [2]** 39/3 58/6
**recognized [6]** 24/20 24/22 26/3 40/10 64/1 91/8
**record [9]** 3/7 18/19 26/25 36/12 66/11 69/16 82/6 103/10 106/5
**recorded [1]** 2/24
**records [11]** 8/2 8/6 8/7 9/6 10/12 18/20 19/5 25/10 37/5 103/1 103/11
**recovered [1]** 35/15
**redress [1]** 43/14
**redressability [2]** 43/10 43/16
**redressable [3]** 19/17 20/11 25/15
**refer [1]** 92/1
**reference [3]** 11/22 60/1 74/19

**R**

**referenced [7]** 9/22 56/18 64/15 77/20 82/1 82/7 101/16
**referencing [1]** 60/21
**reflect [1]** 58/11
**reflexively [1]** 88/8
**regardless [3]** 12/23 13/22 45/19
**regime [1]** 59/14
**register [2]** 90/22 96/1
**registered [13]** 14/15 19/23 19/23 20/6 34/20 59/15 76/3 76/4 77/4 77/4 77/5 77/8 96/1
**registering [2]** 53/3 55/6
**registrar [1]** 51/22
**registration [21]** 13/8 15/20 16/15 16/19 17/9 18/7 19/8 37/1 39/23 42/22 52/6 55/2 73/4 87/25 88/9 88/15 88/17 88/21 89/11 89/14 89/16
**regular [1]** 21/13
**regularity [1]** 62/3
**regularly [2]** 39/18 73/22
**regularly-scheduled [1]** 73/22
**regulate [1]** 102/15
**regulates [1]** 14/1
**regulating [1]** 14/14
**regulation [4]** 14/17 31/5 97/10 97/11
**reject [2]** 32/16 89/21
**rejection [1]** 5/24
**related [6]** 21/17 47/17 78/21 89/6 89/14 89/22
**relates [2]** 29/2 62/17
**relationship [1]** 82/9
**relatively [1]** 69/9
**released [2]** 52/23 53/6
**relevance [1]** 43/9
**relevant [8]** 12/3 67/10 68/11 70/8 72/18 80/25 81/15 94/18
**relief [8]** 26/1 26/14 47/22 47/23 58/5 58/5 70/17 103/25
**relies [1]** 62/13

**rely [4]** 17/8 27/4 99/1 101/15
**remain [4]** 57/16 57/19 67/17 68/1
**remained [1]** 58/1
**remaining [1]** 79/17
**remains [2]** 67/16 85/15
**remedial [1]** 26/9
**remedied [1]** 26/16
**remedies [1]** 26/10
**remedy [7]** 47/21 92/18 92/22 94/7 94/8 94/12 97/20
**remember [2]** 74/6 79/14
**remind [1]** 35/21
**reminding [1]** 42/16
**remove [4]** 19/6 19/10 46/22 88/16
**removed [6]** 18/7 19/16 19/19 37/10 37/23 87/25
**removes [1]** 16/17
**removing [2]** 37/8 88/14
**renders [1]** 12/19
**repaired [1]** 55/2
**reparable [1]** 25/22
**repeat [3]** 86/5 92/14 101/1
**repeatedly [2]** 41/14 102/3
**repetition [1]** 4/23
**reply [2]** 84/5 88/7
**Reported [2]** 2/20 106/11
**Reporter [3]** 2/20 35/21 106/3
**reporting [2]** 26/10 33/4
**represent [4]** 3/9 30/7 44/18 44/20
**representations [1]** 33/3
**representing [1]** 3/13
**reprise [1]** 55/10
**request [4]** 66/16 85/17 104/24 105/3
**requested [2]** 58/6 66/16
**require [4]** 32/14 65/24 73/14 101/19
**required [8]** 10/3 12/5

29/11 29/16 32/2 34/9 70/3 89/15
**requirement [4]** 32/3 47/10 76/15 98/12
**requirements [5]** 7/20 10/7 12/2 42/15 69/2
**requires [15]** 8/2 14/5 28/8 28/17 30/12 31/3 32/20 33/15 34/5 51/17 52/2 60/9 73/20 74/1 103/9
**reread [1]** 94/16
**rescue [2]** 103/8 103/17
**Reserve [3]** 93/5 93/6 93/13
**reserved [2]** 6/3 100/12
**reside [1]** 77/24
**residence [1]** 74/11
**residency [4]** 14/21 18/22 49/18 103/13
**resident [1]** 49/22
**resist [1]** 80/22
**resolve [1]** 50/7
**resolved [1]** 69/15
**resolves [1]** 104/4
**resolving [1]** 50/13
**resource [4]** 53/4 86/11 86/12 87/11
**resources [9]** 30/17 34/15 35/9 53/2 54/23 59/4 59/5 59/11 59/12
**respect [7]** 72/17 77/11 79/19 79/22 93/15 100/19 105/4
**Respectfully [1]** 63/13
**respective [1]** 5/6
**respects [1]** 85/2
**respond [3]** 53/8 59/5 93/4
**responding [1]** 59/16
**response [12]** 5/3 9/14 53/1 53/22 54/3 59/18 59/23 59/23 59/24 86/23 87/5 87/6
**responses [3]** 44/17 45/15 46/3
**responsible [1]** 78/4
**result [7]** 19/21 19/24 31/4 31/9 37/9 59/18 66/1
**results [1]** 35/6
**retailer [1]** 87/4

**Retired [2]** 39/1 90/6
**retool [1]** 53/1
**retraining [1]** 53/17
**retroactive [1]** 25/19
**retroactively [1]** 35/16
**return [2]** 64/13 64/18
**Reverse [1]** 22/6
**reversed [1]** 25/5
**review [9]** 10/20 11/20 56/14 56/19 56/22 62/10 72/24 75/13 81/10
**reviewing [2]** 85/4 103/12
**rife [1]** 18/20
**right [62]** 7/6 7/22 8/22 9/5 9/18 10/9 10/17 11/6 13/1 13/5 13/9 14/13 14/19 15/17 15/23 16/11 19/13 20/25 21/20 22/6 22/17 23/2 23/3 27/25 29/4 30/9 30/15 34/2 35/10 36/1 38/15 40/20 40/23 43/11 43/24 44/16 49/5 49/11 53/11 53/17 54/1 54/23 58/22 61/16 62/12 63/1 64/24 65/7 65/22 67/21 68/2 69/13 71/1 71/17 73/11 78/18 78/23 79/18 80/1 83/15 84/1 94/1
**ripeness [2]** 42/4 55/25
**risk [1]** 48/4
**road [1]** 50/11
**robust [1]** 19/9
**role [3]** 35/1 52/8 102/15
**roll [2]** 41/19 49/11
**rolls [14]** 14/2 30/20 36/18 36/19 36/22 36/24 39/23 44/10 74/24 75/18 78/6 87/25 88/9 89/16
**routine [5]** 69/4 69/6 92/11 103/7 103/9
**routine-use [1]** 103/9
**RPR [1]** 2/20
**rule [51]** 27/23 28/2 28/5 28/6 28/23 29/1 29/12 29/16 30/10 31/7 31/11 32/5 33/18 33/22 33/23 34/17 50/11

**R**

**rule... [34]** 51/18 53/6 56/15 56/23 56/24 57/5 57/7 57/7 57/9 57/11 57/12 57/13 57/14 57/15 59/11 59/12 59/13 59/13 78/24 79/5 79/23 81/11 82/16 83/1 87/15 87/15 89/6 89/22 92/16 92/17 92/25 95/11 98/9 98/12
**rule-adoption [1]** 32/5
**rulemaking [18]** 27/21 31/2 31/4 31/10 31/24 32/16 32/21 33/16 33/17 33/21 56/6 56/13 57/2 78/23 92/21 93/17 101/10 101/11
**rules [9]** 34/22 41/12 50/10 56/22 77/11 79/13 89/9 89/13 96/14
**ruling [2]** 61/25 61/25
**run [1]** 43/15
**runs [2]** 47/13 97/4

**S**

**safeguarding [1]** 50/9
**said [28]** 5/19 24/3 25/21 25/22 26/6 28/5 32/9 32/12 32/15 34/8 37/7 40/13 40/13 41/4 41/15 55/11 62/5 71/9 80/13 80/14 85/15 87/8 87/20 91/23 96/20 100/3 101/1 101/5
**salient [1]** 104/6
**same [9]** 11/23 32/19 34/23 46/6 65/2 82/1 85/4 86/22 97/6
**satisfied [3]** 42/8 64/23 90/24
**satisfy [1]** 92/24
**SAVE [2]** 18/17 37/2
**savings [11]** 9/21 10/16 11/19 31/16 32/10 84/8 84/12 99/3 99/4 101/23 101/25
**saw [1]** 50/23
**say [43]** 4/17 4/21 5/7 9/25 10/22 15/24 16/17 19/8 21/10 21/21 22/23 23/8 25/17 25/18 27/25 28/21 29/13 31/21 38/2 42/21 46/13 47/3 52/4

56/23 62/7 64/16 64/17 68/24 71/7 72/12 85/13 87/22 90/22 92/3 92/6 95/10 96/11 101/6 103/22 103/22 104/1 105/17 105/18
**saying [14]** 4/24 19/4 23/1 24/1 44/2 47/2 48/13 50/18 50/19 59/13 61/9 77/16 93/5 101/9
**says [23]** 9/9 9/9 11/16 16/2 16/14 21/15 24/6 27/19 28/11 32/24 33/8 48/11 56/21 72/6 72/7 73/3 75/22 80/5 80/10 82/16 84/11 88/8 97/2
**SC [1]** 2/14
**scared [1]** 91/2
**scenario [1]** 104/9
**schedule [1]** 67/8
**scheduled [2]** 52/21 73/22
**scheme [1]** 26/9
**SCHOLER [1]** 2/4
**Schumer [6]** 1/13 44/5 44/5 44/11 44/18 45/6
**SD [1]** 2/14
**sea [1]** 34/24
**season [3]** 52/17 80/3 100/18
**seclusion [4]** 24/19 38/12 39/1 64/3
**second [4]** 21/8 86/14 95/24 104/7
**secret [1]** 64/24
**Secretary [5]** 12/11 12/14 37/4 102/10 102/13
**secrets [1]** 90/18
**section [19]** 12/14 12/17 13/3 14/7 27/6 27/7 27/8 27/11 32/13 32/17 43/23 56/7 56/12 81/25 82/19 91/20 91/23 91/25 92/15
**Section 2 [6]** 13/3 32/13 43/23 81/25 91/20 91/23
**Section 3 [7]** 27/7 27/8 27/11 32/17 56/7 82/19 92/15
**Section 4 [1]** 14/7
**sections [1]** 94/13

**Secure [1]** 1/19
**Security [8]** 12/15 18/18 23/15 64/12 64/14 64/15 64/16 90/15
**see [5]** 22/9 30/23 70/12 90/11 90/23
**seek [2]** 47/23 75/13
**seeking [2]** 39/16 103/25
**seem [1]** 88/10
**seems [12]** 5/2 7/19 25/22 27/17 33/15 51/2 61/10 65/24 73/11 83/12 88/12 94/1
**seen [4]** 43/3 43/4 54/17 70/2
**self [3]** 87/7 87/21 87/22
**self-inflected [1]** 87/22
**self-inflicted [2]** 87/7 87/21
**Senator [5]** 44/4 44/5 44/11 44/18 45/6
**send [5]** 37/15 39/23 42/20 49/12 49/15
**sending [5]** 44/2 46/8 75/11 76/18 77/13
**sends [1]** 75/21
**sense [5]** 16/10 30/9 33/9 61/2 67/7
**sensitive [3]** 9/3 23/14 64/11
**sent [5]** 37/6 38/5 47/25 74/5 75/5
**sentences [1]** 47/3
**separate [5]** 7/24 11/13 45/16 50/16 103/2
**separation [1]** 52/1
**September [2]** 52/22 74/2
**September 4th [1]** 52/22
**serious [3]** 25/15 48/3 92/17
**service [28]** 27/14 27/18 27/20 28/11 28/25 31/1 31/8 31/14 31/18 31/20 33/19 33/22 34/22 46/9 56/7 56/9 56/12 78/19 79/8 79/20 80/5 82/2 82/16 83/4 83/10 93/10 98/13

98/14
**Service's [1]** 83/2
**services [1]** 98/13
**set [7]** 4/15 49/5 59/8 62/15 65/23 99/19 101/17
**setting [3]** 75/18 95/5 95/13
**settle [1]** 41/11
**several [3]** 26/3 56/22 65/11
**shadowboxing [2]** 70/21 72/9
**shall [9]** 12/15 27/20 27/22 28/5 28/6 32/6 32/25 62/7 73/3
**share [3]** 65/16 68/25 81/6
**shared [9]** 24/2 25/17 38/9 38/20 38/25 39/13 39/19 63/5 66/4
**shareffi [3]** 2/8 2/11 3/25
**shares [1]** 27/18
**sharing [15]** 7/5 13/17 25/21 38/10 38/14 62/21 62/25 63/11 63/12 64/11 64/17 65/21 68/9 69/16 69/23
**she [1]** 80/14
**sheet [1]** 33/1
**Shelly [2]** 1/12 5/19
**short [3]** 4/13 5/4 75/22
**shorthand [1]** 2/24
**should [24]** 4/17 4/21 5/4 5/8 5/19 8/25 8/25 19/23 32/9 32/13 32/19 41/11 42/22 45/9 48/25 50/5 56/2 76/16 80/6 86/6 96/19 96/21 97/18 101/18
**shouldn't [6]** 16/18 37/24 80/10 80/11 84/12 95/5
**show [7]** 55/25 61/21 63/24 65/15 83/11 90/3 93/1
**shown [1]** 81/17
**side [7]** 5/1 5/3 66/9 86/19 88/21 94/21 104/10
**sides [1]** 4/21
**sight [1]** 37/4

# S

**significantly [1]** 80/16
**similar [3]** 32/10 43/15
103/25
**simple [2]** 7/25 10/11
**simplicity [1]** 16/11
**simply [2]** 41/16 41/25
**since [1]** 17/1
**single [3]** 19/6 78/5
100/17
**sit [1]** 42/19
**sitting [1]** 18/10
**situation [2]** 30/23
32/23
**six [3]** 52/18 61/1
61/24
**six months [3]** 52/18
61/1 61/24
**Sixty [1]** 100/5
**Sixty days [1]** 100/5
**slow [1]** 12/12
**small [3]** 79/21 81/18
84/3
**so [127]**
**Social [7]** 18/18 23/15
64/12 64/14 64/15
64/16 90/15
**software [1]** 12/4
**solely [1]** 95/12
**some [77]** 4/20 5/12
10/3 16/17 17/11 17/23
18/4 18/6 18/8 18/13
20/10 22/22 27/18 28/5
28/10 28/15 28/16
28/18 34/7 35/17 36/1
42/2 43/9 45/3 45/7
46/4 46/11 47/18 47/18
56/4 56/25 60/17 60/20
63/22 64/6 64/7 64/7
65/6 65/7 65/19 68/8
69/2 69/6 69/10 69/18
70/14 70/15 71/10
71/14 71/21 72/16
74/19 75/19 76/19
76/22 78/11 78/20
79/16 79/21 80/22 81/4
81/19 84/9 85/2 85/5
86/7 86/9 86/10 87/6
88/11 92/7 96/21 98/25
99/7 99/9 105/17
105/19
**somehow [1]** 17/20
**someone [10]** 22/18

25/17 37/23 64/21
64/24 65/2 75/12 76/18
77/9 77/24
**something [26]** 5/2
5/3 14/12 15/14 17/22
19/1 21/22 35/14 60/10
63/24 63/25 63/25
67/19 67/23 67/24 68/6
74/2 75/8 75/13 76/16
76/21 77/11 78/8 85/16
85/22 105/18
**sometimes [7]** 5/7
40/11 40/14 64/12
64/13 64/14 70/5
**somewhat [1]** 83/8
**somewhere [1]** 63/22
**soon [2]** 48/11 49/10
**SORN [1]** 103/6
**SORNs [1]** 103/7
**sorry [6]** 7/18 12/13
17/17 29/13 33/2 73/13
**sort [33]** 5/11 8/1 9/1
14/18 20/3 21/20 25/12
27/3 28/10 56/9 57/3
61/22 62/1 62/8 63/14
64/19 67/8 70/16 70/21
71/2 71/8 72/18 73/8
74/6 75/18 77/5 78/22
80/20 83/9 84/7 92/3
99/9 103/8
**sorts [6]** 26/19 28/13
58/20 68/23 70/6
103/16
**sound [1]** 59/2
**sources [1]** 7/12
**speak [2]** 27/12 60/6
**speaking [1]** 35/22
**speaks [1]** 42/14
**specific [9]** 21/18 28/6
29/6 30/2 34/6 55/11
82/19 97/3 104/1
**specifically [3]** 4/16
6/7 8/25
**speculating [2]** 78/13
88/22
**speculation [8]** 57/1
61/22 62/1 62/2 75/19
88/1 88/25 89/15
**spending [1]** 34/4
**spoken [1]** 94/24
**spot [1]** 43/2
**SSA [6]** 2/11 8/6 8/7
25/17 69/9 100/10
**St [2]** 1/20 2/14

**stage [2]** 37/25 80/15
**stale [1]** 49/16
**standard [5]** 25/4 91/3
91/5 91/8 95/14
**standing [43]** 15/7
15/19 16/5 20/3 20/4
21/3 23/21 25/1 29/19
30/1 34/9 40/5 40/7
41/6 42/4 42/11 45/23
55/7 55/25 61/18 61/19
63/10 63/14 63/20
65/13 65/15 66/6 67/18
76/5 76/17 77/10 77/12
86/11 86/12 87/11
87/19 87/23 87/24 89/3
89/8 89/20 89/22 99/6
**standings [1]** 86/10
**stands [1]** 89/5
**stark [2]** 54/12 100/8
**start [8]** 5/14 14/19
35/22 37/8 56/6 63/3
80/7 88/6
**started [1]** 100/23
**starting [1]** 80/3
**state [61]** 3/4 4/4 4/12
4/18 5/25 6/8 6/15 8/14
13/6 14/8 14/11 14/12
14/16 14/23 14/24 15/1
15/3 15/15 16/2 16/7
16/12 17/18 17/19 18/9
27/17 37/4 38/5 43/16
43/22 44/2 44/8 46/23
47/9 47/11 47/12 49/15
49/19 52/4 73/15 73/21
74/12 74/19 76/15
77/10 77/10 77/19
77/23 77/25 78/4 78/9
81/24 82/19 86/2 86/7
88/11 88/14 88/18
88/18 90/7 96/15 98/19
**state -- I [1]** 88/11
**state -- or [1]** 96/15
**state's [6]** 13/8 14/11
14/14 14/15 18/6 93/4
**state-specific [1]**
82/19
**stated [1]** 8/5
**statement [2]** 33/1
92/25
**statements [2]** 32/23
68/8
**states [76]** 1/1 1/9
2/13 3/24 8/14 11/13
13/4 13/22 15/4 15/13

15/13 16/9 16/10 16/12
17/5 17/11 17/12 17/24
17/24 18/4 18/4 19/1
19/3 36/17 36/23 42/21
44/21 44/22 45/2 45/3
45/7 45/9 45/10 45/14
45/19 46/4 46/5 46/9
46/13 46/16 46/17
46/20 46/25 47/9 47/18
48/1 48/3 48/4 49/22
52/3 52/4 55/19 71/25
74/2 74/10 75/5 75/6
75/17 78/3 78/13 84/2
88/3 88/3 88/5 88/8
88/12 88/13 88/16
88/18 88/23 93/14 94/8
98/8 99/18 100/14
102/16
**statewide [1]** 46/19
**status [3]** 64/20 96/6
96/8
**statute [4]** 6/6 6/8 6/10
91/14
**statutes [4]** 6/2 56/17
98/9 98/15
**statutory [7]** 51/24
52/9 83/5 92/4 98/17
98/21 98/23
**stay [3]** 30/19 77/8
96/1
**stayed [1]** 41/15
**Ste [1]** 1/14
**stenotype [1]** 2/24
**step [5]** 10/25 21/4
40/2 71/24 95/5
**Stephen [3]** 2/8 3/23
55/18
**Stephen Pezzi [2]**
3/23 55/18
**stephen.pezzi [1]** 2/10
**stepped [1]** 41/14
**steps [11]** 18/11 20/5
20/10 35/11 61/9 66/13
76/25 77/6 77/7 87/18
104/2
**Sterling [3]** 53/14
53/22 54/3
**still [12]** 21/3 21/3 25/7
26/11 65/20 66/9 66/11
66/21 68/25 70/19
71/14 77/19
**stop [2]** 21/21 57/17
**stopped [2]** 25/6 94/2
**store [1]** 95/25

**S**

**story [2]** 75/14 83/23
**straightforward [2]** 6/5 95/7
**strategies [3]** 90/18 95/5 97/19
**Street [2]** 2/9 2/14
**strong [2]** 61/11 68/8
**stronger [1]** 91/12
**strongest [1]** 61/4
**structure [1]** 94/22
**structured [1]** 5/9
**Students' [1]** 1/20
**stuff [2]** 24/15 82/25
**subject [5]** 19/13 56/19 57/24 72/24 74/12
**submit [1]** 87/10
**subordinates [1]** 9/24
**substantial [1]** 26/12
**success [2]** 72/6 82/11
**successfully [1]** 65/13
**such [7]** 39/18 73/8 74/18 74/20 78/7 83/10 103/6
**sue [7]** 15/8 16/20 16/23 24/2 76/17 77/10 77/12
**sues [1]** 76/6
**sufficient [2]** 8/10 48/4
**sufficiently [1]** 33/11
**suggest [3]** 61/13 88/5 90/7
**suggested [4]** 81/20 82/4 89/4 92/25
**suggesting [2]** 20/16 71/18
**suggestion [8]** 28/10 32/13 32/15 32/24 76/15 80/22 98/25 99/7
**suggests [2]** 37/22 47/20
**Suite [2]** 1/20 2/14
**supervise [1]** 93/16
**supervising [1]** 93/2
**supplemental [2]** 50/23 105/19
**supplying [1]** 87/3
**support [1]** 54/16
**supporters [1]** 34/3
**supporting [1]** 26/25
**supports [2]** 90/7 92/23

**supposed [2]** 38/25 60/18
**Supreme [25]** 20/24 23/21 24/6 26/5 26/8 34/8 40/4 41/6 41/14 47/14 62/4 62/9 84/17 84/21 85/3 86/12 86/24 87/1 87/8 87/20 89/19 91/2 91/8 92/25 93/7
**sure [16]** 14/1 21/13 22/13 58/24 67/10 67/24 69/21 76/3 77/3 78/1 79/15 79/16 79/24 82/20 85/16 85/22
**surely [2]** 6/24 79/2
**surprise [1]** 71/14
**surprises [1]** 67/20
**Susan [2]** 91/6 91/12
**sway [1]** 41/10
**sword [4]** 48/6 48/8 51/5 100/4
**sworn [1]** 10/5
**sympathize [1]** 81/4
**system [3]** 37/2 46/24 54/19
**systems [2]** 36/17 69/15

**T**

**table [4]** 3/14 3/20 3/24 80/18
**tailor [1]** 47/21
**tailored [1]** 47/15
**take [21]** 8/6 20/5 21/19 25/1 27/15 33/23 35/11 36/23 40/2 52/22 55/16 62/16 77/5 78/4 80/11 80/17 83/5 85/17 87/6 102/5 103/23
**taken [3]** 61/9 66/13 75/25
**takes [3]** 44/9 63/4 104/19
**taking [2]** 76/25 77/7
**talk [13]** 14/3 27/10 27/13 41/7 56/8 63/16 86/16 86/19 89/3 90/4 95/24 99/2 102/22
**talked [7]** 40/4 86/22 87/1 88/2 88/21 89/8 90/5
**talking [21]** 13/13 13/14 14/4 23/13 24/23 28/22 29/23 30/4 39/7

39/12 43/19 64/10 64/19 65/20 65/20 68/7 74/7 76/14 76/24 95/23 95/25
**talks [2]** 37/14 90/25
**tangentially [1]** 89/22
**target [1]** 79/7
**targeted [4]** 39/18 54/18 54/22 74/14
**tasked [1]** 6/2
**tax [2]** 64/13 64/18
**teaches [1]** 55/1
**Tech [2]** 97/7 97/13
**technical [3]** 12/2 12/6 13/19
**technically [1]** 103/23
**tell [5]** 36/17 49/21 66/24 75/23 96/1
**telling [2]** 39/22 46/23
**tells [3]** 20/25 21/13 48/18
**ten [1]** 5/4
**ten minutes [1]** 5/4
**tens [1]** 88/23
**term [1]** 97/4
**terms [6]** 14/9 29/4 73/20 78/13 89/24 102/20
**territories [1]** 16/11
**Texas [8]** 36/22 36/25 37/1 46/9 74/22 74/23 75/2 88/20
**text [6]** 32/20 51/17 68/16 68/21 70/7 74/8
**than [18]** 16/10 28/23 28/24 32/13 40/22 48/19 52/18 58/13 62/3 70/21 73/21 74/2 82/6 87/4 89/7 99/10 103/22 105/12
**thank [19]** 35/19 35/22 51/11 51/12 55/14 85/24 85/25 93/21 97/21 97/22 100/21 100/24 103/18 103/19 103/20 104/21 105/7 105/14 105/22
**that [740]**
**that -- and [1]** 33/18
**that -- I [1]** 45/8
**that -- the [1]** 101/21
**that's [97]** 5/10 7/6 7/6 8/22 10/9 10/10 10/14 10/16 10/16 11/17

12/10 12/10 12/22 13/5 13/9 15/18 17/16 22/11 24/3 24/15 24/22 25/2 27/3 30/21 31/11 31/16 33/1 33/17 37/7 38/14 39/2 39/3 40/13 40/18 40/23 41/12 42/19 43/17 44/14 45/18 47/9 47/23 48/4 48/9 48/12 48/13 49/6 49/18 50/12 50/16 51/10 53/14 53/22 54/3 54/9 55/8 55/8 59/18 60/10 61/18 61/19 61/19 71/2 71/3 72/1 75/12 78/16 80/2 81/14 81/25 83/8 84/24 85/13 86/14 86/25 87/4 87/7 87/7 87/20 87/20 87/22 88/25 89/9 89/11 90/10 90/17 92/21 94/2 94/18 95/13 95/17 96/5 96/25 98/6 100/11 101/11 102/24
**that's -- now [1]** 80/2
**their [52]** 6/1 14/20 14/20 14/21 19/7 21/5 22/18 22/19 28/8 36/18 37/11 37/11 38/18 38/19 39/9 39/25 40/24 40/25 43/7 44/10 46/23 50/2 50/10 52/5 52/6 52/7 52/15 52/20 53/1 53/2 53/20 53/20 54/1 54/8 54/8 55/5 57/1 58/20 61/16 61/16 63/10 74/20 74/23 74/24 75/17 75/24 77/3 78/6 88/7 90/2 91/24 99/15
**them [22]** 7/3 18/7 18/13 26/23 29/9 37/8 41/9 41/20 42/17 46/23 48/15 48/16 52/5 52/14 53/11 57/17 62/17 78/8 93/17 96/1 97/16 101/8
**themselves [3]** 9/23 71/19 99/3
**then [51]** 4/10 4/12 4/12 5/7 6/15 9/5 9/13 10/13 11/7 13/21 14/8 14/12 14/12 18/2 18/5 21/15 21/18 25/1 25/20 27/16 27/23 28/21 28/23 33/23 34/21

## T

**then...** [26] 35/10 36/24 39/15 39/16 41/4 45/2 45/9 47/13 50/4 56/21 57/18 59/23 60/25 68/18 71/4 71/10 71/10 71/23 76/21 78/4 80/8 82/10 88/6 96/22 98/25 99/6
**theories** [3] 30/1 86/10 89/20
**theory** [5] 39/10 44/13 64/23 65/14 87/24
**there** [116]
**there's** [28] 11/5 12/3 12/5 12/25 14/1 16/10 26/13 26/25 35/8 41/20 49/14 50/22 50/24 51/7 56/8 59/3 65/11 65/18 71/22 76/16 82/9 88/15 89/14 92/11 92/22 95/3 99/6 103/3
**thereafter** [2] 21/23 66/3
**therefore** [2] 9/12 26/23
**these** [57] 14/19 17/13 18/24 19/13 20/21 26/19 26/22 28/14 28/15 34/1 36/23 37/7 37/15 37/22 41/5 41/24 42/17 43/11 44/2 49/9 49/10 49/15 49/24 52/19 52/23 53/5 53/8 53/10 53/14 53/22 54/3 54/7 54/20 54/22 54/24 54/24 55/1 55/20 55/20 56/18 58/12 60/24 68/17 68/19 70/6 70/9 73/6 81/21 83/14 88/6 93/6 95/4 98/25 99/7 99/20 99/23 100/6
**they** [127]
**they -- as** [1] 77/2
**they'll** [1] 101/24
**they're** [7] 8/5 25/25 46/6 49/14 82/12 95/23 95/24
**they've** [2] 35/2 93/2
**thing** [16] 22/4 22/5 31/16 34/23 46/6 57/3 58/25 78/7 83/6 83/10 84/3 84/16 96/11 102/7

102/21 105/17
**things** [21] 22/7 23/15 27/21 27/22 28/5 28/15 28/16 29/7 31/22 35/7 36/7 70/6 70/19 75/6 80/6 80/16 90/15 94/5 97/14 104/1 104/18
**think** [136]
**think -- I** [1] 78/2
**think -- well** [1] 104/16
**thinking** [1] 104/17
**third** [3] 16/25 28/19 28/20
**this** [180]
**those** [50] 8/7 9/21 9/21 16/11 17/24 18/11 18/20 18/20 18/22 19/4 21/3 22/1 22/9 24/20 28/9 28/9 29/7 30/24 32/18 33/6 34/7 35/11 38/7 39/17 41/2 42/13 42/23 44/12 48/3 48/4 49/22 50/12 52/4 57/10 64/3 64/4 64/10 68/23 70/4 74/4 75/6 75/11 75/19 86/8 86/17 95/21 97/7 97/18 99/2 99/25
**though** [6] 11/15 42/3 51/3 54/16 81/3 104/7
**thought** [3] 84/21 84/22 105/5
**thousands** [2] 48/24 88/24
**threat** [1] 47/2
**threats** [1] 54/7
**three** [5] 4/8 25/5 84/13 85/2 97/25
**three-judge** [2] 84/13 85/2
**threshold** [5] 57/19 70/14 71/15 79/17 79/18
**throatedness** [1] 60/13
**through** [16] 10/15 25/23 28/13 32/10 37/24 56/3 58/10 69/9 71/3 86/9 94/5 94/17 99/3 104/3 104/18 105/5
**Throughout** [1] 95/22
**throw** [1] 78/5
**throwing** [1] 88/6
**thrust** [1] 85/6

**thus** [1] 72/23
**tied** [1] 14/22
**TikTok** [2] 48/9 48/10
**time** [26] 4/15 5/1 9/21 9/21 22/21 22/22 24/23 27/9 29/14 35/18 51/8 53/4 55/15 57/17 59/25 62/19 71/6 71/21 73/2 74/11 79/13 81/1 85/14 86/5 100/5 104/3
**timeline** [4] 49/5 70/24 74/5 97/3
**timers** [1] 4/14
**times** [1] 100/10
**timing** [2] 10/4 71/15
**today** [31] 18/10 19/4 33/4 50/22 50/25 56/5 58/7 60/21 63/17 64/2 64/15 68/6 68/7 75/1 75/15 78/14 78/17 80/19 81/16 83/12 86/18 91/23 94/1 94/16 94/19 95/5 95/25 96/5 98/2 98/18 98/24
**together** [2] 8/20 14/6
**told** [7] 17/13 35/4 40/8 49/25 61/7 78/8 83/23
**too** [10] 11/22 41/22 42/1 42/5 55/10 63/17 88/25 89/15 89/25 94/18
**took** [3] 21/8 87/18 105/11
**tool** [1] 77/15
**top** [3] 46/24 47/1 47/8
**top-down** [1] 46/24
**topics** [2] 27/22 70/10
**tort** [6] 64/2 90/4 90/6 90/8 90/11 90/23
**torts** [2] 24/18 64/4
**totally** [3] 19/25 37/21 63/6
**touch** [1] 16/3
**towards** [1] 50/13
**traceable** [1] 89/1
**tracing** [1] 93/13
**trade** [1] 90/17
**traditionally** [1] 63/25
**train** [1] 87/5
**training** [1] 86/20
**Trans** [4] 23/22 24/6 63/20 89/25
**transcript** [3] 1/8 2/25

106/4
**transcription** [1] 2/25
**transmission** [5] 6/11 8/13 72/19 76/7 76/14
**transmit** [3] 12/16 52/3 82/17
**transmitted** [7] 6/15 13/4 14/11 16/9 29/11 29/15 73/9
**transmitting** [1] 33/19
**Treasury** [1] 64/14
**treat** [1] 45/11
**tried** [3] 87/19 93/3 100/10
**trod** [1] 4/24
**trodden** [1] 4/24
**true** [5] 39/3 45/18 46/19 65/5 106/4
**TRUMP** [9] 1/5 2/8 3/4 12/1 12/1 84/17 96/17 102/8 102/8
**Trump -- the** [1] 96/17
**try** [8] 36/16 39/22 39/23 54/24 62/15 86/5 94/5 101/1
**trying** [8] 38/1 39/10 61/13 65/22 66/5 93/16 93/16 95/8
**turn** [5] 27/16 31/7 35/17 49/17 91/20
**turned** [1] 90/18
**turning** [2] 21/20 53/3
**turnout** [1] 34/12
**turns** [1] 66/10
**two** [12] 22/4 22/7 26/2 42/13 50/24 52/24 58/24 65/6 71/8 80/13 81/21 104/1
**two -- that** [1] 81/21
**two months** [1] 52/24
**TX** [1] 2/14
**type** [1] 86/24
**types** [1] 41/2
**typical** [1] 42/14
**typically** [2] 24/9 69/3

## U

**U.S** [14] 2/10 2/10 2/11 2/21 20/24 31/1 52/3 64/1 65/1 77/22 83/2 83/9 87/8 93/7
**ultimate** [1] 57/2
**ultimately** [6] 19/16 65/12 70/11 75/5 81/8

## U

**ultimately... [1]** 81/14
**ultra [3]** 51/25 95/19 95/21
**unable [1]** 100/15
**unambiguously [1]** 9/23
**uncertainty [1]** 96/4
**unconstrained [1]** 12/10
**uncontested [1]** 18/19
**uncontroversial [1]** 74/18
**undeniable [1]** 47/12
**under [28]** 7/11 7/20 14/24 26/10 33/7 34/18 35/8 47/10 51/18 61/20 61/24 72/14 76/10 77/2 77/19 82/19 83/14 85/18 87/7 87/10 89/1 91/13 92/6 94/25 97/18 103/23 104/15 105/15
**under-inclusive [2]** 76/10 77/2
**underlying [1]** 57/8
**underscore [2]** 36/7 100/25
**understand [13]** 14/4 33/13 39/10 56/25 62/24 66/5 66/18 67/16 89/13 91/24 104/3 105/6 105/9
**understanding [2]** 50/9 89/21
**understands [1]** 105/10
**Understood [1]** 66/15
**undertake [2]** 98/20 103/16
**undertaking [1]** 99/8
**undertakings [1]** 104/13
**undoubtedly [3]** 40/1 46/4 46/17
**unequivocal [5]** 12/9 12/19 29/3 30/11 51/20
**unequivocally [1]** 99/18
**unidentified [1]** 87/24
**uniformity [1]** 46/19
**union [5]** 23/22 24/6 63/20 89/25 90/19
**unique [1]** 35/14

**UNITED [10]** 1/1 1/9 3/24 40/23 47/9 55/19 74/10 93/14 98/8 100/14
**United States [6]** 3/24 55/19 74/10 93/14 98/8 100/14
**universal [1]** 98/14
**unlawful [23]** 11/24 17/16 17/20 17/22 17/25 23/16 25/18 25/21 28/22 30/14 31/9 31/11 32/20 45/11 45/17 63/12 72/3 72/14 72/19 94/13 101/11 102/6 103/2
**unlawfully [4]** 18/1 22/5 23/7 101/22
**unless [6]** 29/11 29/16 68/4 82/18 85/12 93/19
**unlikely [1]** 105/18
**unquote [1]** 104/17
**unreasonable [4]** 60/11 61/8 87/12 87/13
**unring [1]** 43/3
**unrung [1]** 42/25
**unsatisfying [1]** 83/8
**unsavable [1]** 12/23
**unseen [1]** 37/5
**unsuccessful [1]** 100/11
**until [14]** 29/11 29/16 33/20 33/20 34/1 38/9 38/9 41/19 42/8 42/20 53/6 53/6 61/8 100/2
**unusable [1]** 21/23
**unveiled [1]** 53/7
**unwind [1]** 22/22
**unwindable [1]** 22/24
**unwinding [1]** 48/22
**UOCAVA [1]** 49/12
**up [19]** 21/13 21/19 33/23 38/9 46/9 49/5 49/25 61/3 63/17 65/23 66/25 77/21 78/22 80/3 80/11 95/5 95/13 98/2 100/15
**upcoming [4]** 73/2 73/4 74/11 81/5
**update [1]** 85/17
**updates [2]** 21/14 67/23
**upon [7]** 6/22 24/19 25/8 27/4 38/12 38/25

64/3
**urge [1]** 100/19
**us [12]** 5/15 17/13 20/25 28/17 29/21 29/21 29/22 31/21 33/25 35/21 48/19 55/1
**USCIS [2]** 2/10 37/2
**usdoj.gov [2]** 2/10 2/11
**use [32]** 13/22 16/7 17/5 17/11 17/13 17/15 17/24 17/24 18/4 18/17 19/4 19/22 36/14 36/17 42/22 44/16 44/22 45/2 45/7 46/5 46/13 46/22 53/13 69/4 72/9 73/15 88/12 92/11 93/23 103/1 103/9 103/9
**used [15]** 9/6 13/7 18/5 19/24 35/4 45/4 49/1 68/19 72/22 72/23 72/25 73/4 74/1 74/20 87/2
**useful [1]** 77/15
**uses [6]** 13/6 16/21 44/9 69/6 74/18 103/7
**using [2]** 10/13 21/24
**USPS [27]** 2/10 28/6 28/8 32/5 32/24 33/3 33/5 33/12 35/1 51/17 51/21 93/2 93/5 93/12 93/16 95/2 95/12 95/14 97/25 98/3 98/5 98/8 98/11 99/4 101/3 101/7 104/19
**USPS's [2]** 33/2 53/6
**usually [3]** 64/10 69/7 72/5

## V

**v. [7]** 84/18 87/17 89/2 90/7 91/4 102/8 102/8
**v. Amnesty [2]** 87/17 91/4
**v. Bessent [1]** 90/7
**v. New York [1]** 84/18
**v. Trump [2]** 102/8 102/8
**vague [2]** 87/6 91/15
**various [7]** 6/9 7/12 26/21 50/22 63/7 97/14 97/19
**vary [2]** 88/17 88/18
**Venetian [1]** 90/16

**vented [1]** 78/10
**verify [1]** 52/5
**version [5]** 14/8 14/11 61/4 61/11 65/13
**very [46]** 5/3 5/22 5/23 9/2 9/3 13/25 13/25 17/10 24/23 25/9 25/9 25/15 28/3 29/4 29/6 34/13 44/7 44/7 49/10 49/16 50/21 51/11 53/9 55/15 55/22 56/13 60/17 60/20 63/20 70/9 72/16 72/18 75/1 78/12 83/9 83/14 84/21 84/22 87/4 92/17 93/21 94/14 97/3 100/7 101/13 104/2
**very -- to [1]** 44/7
**vet [1]** 42/22
**view [18]** 11/14 13/1 15/7 23/20 25/2 31/6 31/18 57/21 62/17 63/9 65/8 68/10 70/5 74/16 74/23 79/2 83/13 105/10
**views [1]** 81/6
**vindicated [1]** 85/3
**violate [8]** 6/16 6/19 11/15 11/16 38/6 91/16 93/17 98/12
**violated [1]** 16/20
**violates [4]** 21/10 51/25 75/10 98/9
**violation [5]** 11/5 18/8 63/1 64/22 76/21
**violations [2]** 89/24 90/1
**vires [3]** 51/25 95/19 95/21
**voluntary [1]** 99/8
**volunteer [1]** 54/13
**volunteers [4]** 53/18 54/9 54/17 86/19
**vote [13]** 15/21 19/21 20/2 34/19 39/4 47/4 47/7 51/20 59/15 76/4 77/22 90/22 96/2
**voter [47]** 13/8 14/15 15/6 15/18 15/25 16/5 16/15 16/18 16/19 16/22 17/1 17/8 19/8 19/20 19/21 19/22 20/1 20/5 21/2 34/11 34/12 34/12 36/18 37/1 37/23

# V

**voter... [22]** 39/23 40/22 42/22 44/10 52/6 52/11 52/15 55/1 73/4 74/24 75/18 75/25 77/11 78/6 87/25 88/15 88/21 89/10 89/14 89/15 95/24 95/25

**voter-enablement [1]** 52/11

**voters [50]** 14/20 18/6 18/23 19/12 20/10 21/2 26/21 28/7 34/3 34/24 35/3 36/13 36/13 36/20 36/24 37/3 37/8 39/7 39/10 39/11 39/22 40/1 42/21 42/23 43/4 44/3 46/22 47/5 47/7 50/8 51/16 51/19 52/12 53/3 53/12 53/21 54/16 54/19 55/6 69/11 77/4 86/20 87/25 88/6 88/8 88/15 88/17 95/23 99/12 99/25

**voters' [1]** 30/19

**votes [1]** 89/9

**voting [19]** 7/4 7/8 8/13 13/11 13/15 15/11 15/20 19/5 19/7 20/9 24/15 38/18 38/19 39/6 47/17 49/8 49/22 51/21 103/13

**voting-related [1]** 47/17

**vs [4]** 1/4 3/3 39/1 69/12

# W

**wait [13]** 10/21 30/23 34/1 35/14 41/8 41/9 41/9 41/19 42/20 43/15 43/18 100/2 100/4

**wait -- candidates [1]** 41/9

**waiting [4]** 22/9 22/9 42/18 53/5

**walk [1]** 37/24

**walked [1]** 58/10

**want [34]** 4/23 5/8 15/24 16/14 17/13 23/4 27/9 27/10 27/11 27/12 30/25 31/1 36/6 38/3 45/16 46/13 55/10 61/5 61/14 66/7 67/21 68/5

77/3 78/25 86/8 88/13 89/3 89/24 90/18 96/11 100/25 101/9 102/21 102/25

**wanted [6]** 40/2 82/5 82/7 84/4 101/15 102/7

**wanting [1]** 81/5

**wants [1]** 79/8

**warned [1]** 89/19

**warranted [2]** 4/13 26/17

**warrants [2]** 23/11 26/14

**was [56]** 5/24 6/13 12/18 18/8 21/2 21/9 23/8 25/12 27/8 32/4 32/8 32/15 33/4 34/9 36/5 38/1 38/1 38/13 42/11 42/16 43/10 43/25 47/21 55/21 55/22 59/7 62/14 63/6 63/12 63/18 65/22 66/21 67/1 71/6 75/15 76/20 77/11 82/14 84/4 84/22 85/2 85/3 87/1 87/2 87/16 91/12 97/8 97/9 97/10 98/1 98/25 99/8 100/22 101/21 102/18 103/10

**Washington [6]** 1/4 1/15 1/21 2/5 2/10 2/22

**way [63]** 5/9 9/6 9/8 10/25 11/11 11/21 11/23 12/25 13/7 14/6 17/6 17/15 17/20 17/25 18/6 18/21 19/13 21/9 22/8 25/10 25/18 28/20 29/10 31/7 33/7 33/12 34/20 35/16 36/4 37/11 40/5 41/7 44/3 44/8 44/10 45/7 45/8 49/4 57/3 59/22 62/7 62/13 62/18 63/18 73/15 75/11 75/12 81/21 83/13 88/25 89/15 89/16 92/12 96/3 98/4 98/5 100/8 101/4 101/25 102/1 102/2 103/14 104/16

**ways [4]** 58/10 58/25 80/13 83/17

**we [166]**

**we're [24]** 4/6 7/11 15/23 16/15 19/10

21/16 21/21 24/23 31/22 31/23 34/4 39/12 42/2 43/19 44/14 49/12 50/17 58/6 64/10 65/20 65/20 76/14 77/5 77/6

**we've [6]** 16/16 19/9 19/10 66/16 73/1 86/4

**websites [1]** 58/20

**week [4]** 22/4 25/5 25/6 49/8

**weeks [1]** 100/2

**weigh [1]** 96/8

**well [20]** 3/21 5/22 9/9 10/21 24/6 27/7 30/12 60/20 60/25 75/22 80/10 82/22 85/7 86/23 88/19 93/5 94/24 95/10 101/13 104/16

**went [3]** 41/6 69/9 94/16

**were [19]** 24/12 36/8 39/7 60/21 66/10 66/20 67/25 68/1 68/8 68/15 69/17 70/15 72/1 72/16 78/7 96/16 96/17 97/9 103/11

**what [100]** 5/8 9/7 10/14 15/22 15/25 17/11 17/17 19/6 19/8 19/18 22/5 23/10 23/23 24/1 24/21 24/23 28/4 28/11 28/21 29/4 30/12 30/25 33/8 34/8 34/18 34/22 35/5 36/20 36/20 37/18 37/25 38/1 38/10 38/13 39/9 39/10 39/12 40/13 41/4 45/19 48/18 49/25 53/9 53/21 55/1 55/10 56/9 56/11 57/23 58/5 59/19 60/1 60/1 60/9 61/13 61/15 61/23 62/20 63/24 65/19 66/5 66/19 67/9 68/19 68/20 69/23 69/24 70/20 72/8 73/8 73/10 73/25 74/6 76/9 77/10 78/13 80/18 81/1 83/1 83/4 83/5 83/22 84/7 84/20 87/1 87/8 87/13 87/17 88/22 88/23 89/10 94/8 96/23 97/1 97/10 97/14 101/5 101/11 104/14 105/12

**what's [14]** 6/21 21/13 22/12 22/17 24/11 28/1

29/22 71/25 72/9 80/23 82/15 97/2 97/3 102/23

**whatever [14]** 4/24 14/10 18/8 21/11 25/6 28/22 38/3 57/18 66/7 76/1 77/2 79/5 79/7 105/20

**whatnot [1]** 94/18

**when [29]** 7/7 11/1 11/2 13/21 20/9 33/22 36/8 38/24 38/25 40/11 41/19 46/6 46/7 46/19 46/24 47/16 48/14 68/18 68/23 71/21 72/5 73/9 75/4 85/14 90/21 96/8 99/13 99/14 100/13

**where [29]** 7/11 10/3 16/8 20/15 22/21 24/12 26/21 30/23 38/2 39/21 42/19 44/14 45/3 47/25 50/18 58/2 58/3 59/3 62/12 62/19 66/13 85/14 88/3 94/24 96/12 97/8 102/5 102/9 105/8

**whether [27]** 9/18 10/19 11/5 11/12 11/12 12/4 15/18 17/2 18/10 21/19 33/23 39/25 57/19 64/21 64/25 65/2 71/11 72/18 75/5 77/12 80/9 81/17 82/23 92/10 92/11 92/12 97/6

**which [47]** 4/9 10/7 13/25 18/17 18/22 21/17 22/19 26/15 27/19 28/23 34/17 42/11 49/20 51/18 52/4 52/22 55/24 56/4 56/7 57/11 58/11 60/12 60/17 62/8 63/15 64/7 64/8 65/10 65/11 65/24 66/9 68/16 68/20 70/15 71/9 73/23 77/1 77/20 80/25 83/24 84/15 85/9 88/20 90/17 93/13 94/1 105/2

**whichever [1]** 5/14

**while [7]** 10/24 34/16 49/6 49/11 49/12 56/25 104/15

**whims [1]** 50/11

**White [3]** 32/23 33/1 50/25

**W**

**who [38]** 5/25 6/2 6/24 14/15 14/20 15/5 17/11 17/12 19/3 19/23 20/1 21/2 29/22 30/7 32/25 35/1 37/16 37/16 37/23 40/12 40/15 40/21 42/23 47/4 47/15 49/21 51/3 55/16 59/14 69/24 74/10 74/11 74/15 76/6 77/22 77/24 78/6 82/23

**Whoa [1]** 31/21

**whole [2]** 13/25 74/17

**whom [1]** 73/9

**whose [2]** 9/6 25/17

**why [45]** 5/14 10/21 16/19 16/24 21/17 21/22 22/1 22/2 25/20 26/15 26/16 31/19 33/22 39/10 41/4 41/7 41/18 43/17 43/21 44/12 45/9 45/12 45/12 50/5 51/10 55/22 56/1 57/1 58/22 60/11 61/1 63/11 70/12 72/1 72/3 72/6 72/10 75/23 80/11 83/1 86/6 95/4 95/17 96/18 98/6

**wide [1]** 32/23

**wide-open [1]** 32/23

**wife [1]** 54/21

**Wildlife [2]** 97/7 97/9

**will [58]** 4/20 11/14 16/3 16/3 16/4 17/8 17/24 17/24 18/4 20/17 27/16 31/4 31/9 31/14 35/17 36/1 36/23 41/21 42/18 45/2 47/1 47/8 47/8 49/1 51/9 52/5 52/23 54/18 57/5 57/10 57/17 58/19 63/15 65/25 66/1 66/14 67/17 70/9 73/18 74/10 75/9 75/16 77/19 80/18 82/17 85/17 88/8 89/16 91/20 99/3 99/13 99/14 99/17 101/1 104/2 105/13 105/16 105/19

**willing [2]** 67/22 98/1

**within [16]** 12/15 13/20 38/14 38/20 60/4 65/17 65/21 66/2 68/25 83/2 83/14 85/20 88/11

92/5 96/22 100/9

**without [7]** 8/18 30/10 37/5 38/21 56/2 57/25 103/2

**Women [1]** 69/11

**won't [5]** 47/17 49/8 60/8 80/17 88/12

**word [2]** 71/3 72/9

**work [14]** 5/4 10/5 10/6 47/16 50/1 53/3 54/16 58/13 58/20 65/24 67/19 67/25 85/16 85/22

**workers [1]** 54/17

**working [3]** 33/3 58/11 99/11

**world [11]** 10/7 16/8 58/2 58/3 58/15 59/3 60/12 61/23 80/8 80/18 80/24

**worried [1]** 81/13

**worst [4]** 45/13 61/6 61/14 62/2

**would [134]**

**wouldn't [5]** 7/3 17/2 31/19 34/21 71/14

**Wright [1]** 89/2

**write [1]** 94/10

**written [2]** 54/2 59/9

**wrong [5]** 63/21 63/21 65/7 77/2 94/8

**wrongful [1]** 53/13

**wrongly [2]** 18/24 19/14

**Y**

**yeah [7]** 8/22 11/17 13/9 45/22 76/12 80/2 93/23

**year [8]** 3/3 15/21 36/16 39/15 65/6 77/22 95/22 102/5

**yes [35]** 6/16 7/11 7/16 8/11 10/9 15/3 15/9 20/7 20/14 20/20 25/8 29/18 30/6 31/15 39/8 48/9 59/20 63/2 64/20 64/21 66/15 67/12 67/15 68/14 71/13 73/24 74/3 77/9 79/9 79/11 79/14 80/6 85/11 90/12 90/12

**yes/no [2]** 90/12 90/12

**yet [9]** 7/21 10/22 23/3

48/10 66/19 68/22 70/22 72/8 73/8

**York [10]** 12/1 44/6 44/7 44/8 44/14 45/4 45/5 47/1 84/18 102/8

**York's [1]** 44/16

**you [163]**

**you'd [1]** 5/5

**you'll [2]** 78/2 96/18

**you're [11]** 22/16 23/13 29/22 34/18 39/4 39/22 39/23 72/8 89/6 90/21 90/23

**you've [3]** 33/18 42/8 45/10

**you-all [5]** 5/5 103/20 104/21 105/14 105/22

**Youngstown [6]** 45/20 92/6 94/14 94/16 94/25 98/22

**your [103]** 3/2 3/12 3/18 3/22 4/3 6/20 7/2 9/22 11/14 13/1 15/7 15/12 20/1 20/13 20/18 22/11 25/2 27/11 27/16 27/16 28/5 31/18 33/16 34/10 35/21 35/23 36/2 37/20 38/1 38/8 38/17 38/22 38/24 39/10 39/25 41/18 42/10 42/22 43/24 44/2 44/17 45/15 45/24 46/2 51/13 54/11 55/15 55/17 56/4 58/5 58/25 59/20 61/11 61/12 63/2 63/13 63/21 66/9 66/15 67/3 67/6 67/12 67/15 67/17 68/4 68/14 71/13 72/9 72/9 72/11 73/24 74/3 78/16 79/9 79/11 79/15 79/18 79/23 80/12 81/16 81/19 81/21 82/20 82/22 85/11 85/12 85/15 85/25 86/1 90/12 93/24 93/25 94/6 97/22 97/24 98/1 99/5 100/12 100/24 101/16 104/25 105/6 105/7

**Your Honor [56]** 3/2 3/12 3/18 3/22 4/3 9/22 20/18 27/16 28/5 34/10 37/20 38/22 42/10 44/17 45/15 51/13 54/11 55/17 56/4 58/25

59/20 61/12 63/2 63/13 66/15 67/3 67/6 67/12 67/17 68/4 68/14 71/13 73/24 74/3 78/16 79/9 79/11 79/15 79/23 80/12 81/16 81/21 82/20 85/12 85/25 86/1 93/25 94/6 97/22 97/24 98/1 99/5 100/12 100/24 101/16 104/25

**Your Honor's [2]** 81/19 85/15

**yourself [1]** 42/8

**yourselves [1]** 3/7

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

DSCC, *et al.*,

       *Plaintiffs*,

    v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

       *Defendants*.

Civil Action No. 26-cv-01114 (CJN)

---

LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,

       *Plaintiffs*,

    v.

EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,

       *Defendants*.

Civil Action No. 26-cv-01132 (CJN)

---

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,

       *Plaintiffs*,

    v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

       *Defendants*.

Civil Action No. 26-cv-01151 (CJN)

---

1

JA695

## <u>MEMORANDUM OPINION</u>

On March 31, 2026, President Trump issued Executive Order No. 14,399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17,125 (Mar. 31, 2026), which states that it is intended to "prevent[] violations of Federal criminal law and maintain[] public confidence in election outcomes."  Order § 1.  Plaintiffs in these consolidated cases challenge the Executive Order on various grounds and, as relevant here, seek a preliminary injunction directed principally at two provisions.

The first is Section 3(a), which directs the United States Postal Service to issue within 60 days a "notice of proposed rulemaking" that would require mail-in ballots for federal elections to conform to certain design requirements (i.e., unique Intelligent Mail barcode and designated markings) and that would include a process for individuals to be enrolled on a "State-specific Mail-In and Absentee Participation List."  *Id.* § 3(b)(i)–(iv).  The Order also directs that the Postal Service must issue a final rule within 120 days.  *Id.* § 3(d).  But the Postal Service has not yet issued a notice of proposed rulemaking or responded to comments it might receive, let alone adopted a final rule.  Until then, Plaintiffs' claims are not ripe, and they cannot establish that they would suffer harm that is both imminent and irreparable absent preliminary injunctive relief.  As the Court of Appeals has put it, "the issuance of a notice of proposed rulemaking, or other preliminary proceedings undertaken to promote a proposed rule, often will not be ripe for review because the rule may or may not be adopted or enforced."  *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 710 F.2d 842, 846 (D.C. Cir. 1983).

The second provision is Section 2(a), which directs the Secretary of Homeland Security, in coordination with the Commissioner of the Social Security Administration, to compile and transmit to each State a list of individuals in that State who are "confirmed to be United States

2

JA696

citizens[,] who will be above the age of 18 at the time of an upcoming Federal election[,] and who maintain a residence in the subject State." Order § 2(a).  The Order also directs the Secretary of Homeland Security to establish "infrastructure . . . to compile, maintain, and transmit the" Lists, *id.* § 4(c), and to develop procedures that allow individuals to access, and if necessary, update or correct, their personal records ahead of elections, *id.* § 2(a).  But the Order does not mandate any action by a State once a List has been transmitted to it, and in any event, no infrastructure for compilation or transmission of the Lists has been established; no List has been created or transmitted; and no State has taken any action with respect to any List.  *See id.*  In these circumstances, and as discussed below, Plaintiffs have failed to show that they are likely to have Article III standing or that they will suffer imminent and irreparable harm absent an injunction.

The Court recognizes that the Postal Service may ultimately issue a final rule that directly affects Plaintiffs or their members, or that the Government may develop State Citizenship Lists that omit specific individuals due to particularized flaws.  Plaintiffs may, of course, renew their motions if and when those future actions occur.  Until then, however, Plaintiffs cannot show that preliminary injunctive relief is warranted.

For those reasons, discussed in more detail below, Plaintiffs' motions are denied.

**I.    BACKGROUND**

**A.    Factual Background**

On March 31, 2026, President Trump issued Executive Order No. 14,399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17,125 (Mar. 31, 2026).  As noted above, the Order states that it seeks to "prevent[] violations of Federal criminal law and maintain[] public confidence in election outcomes."  Order § 1.

3

JA697

This litigation principally concerns two provisions of the Executive Order. *First*, Section 2(a) directs the Secretary of Homeland Security, in coordination with the Commissioner of the Social Security Administration, to compile a list of individuals in each State who are "confirmed to be United States citizens[,] who will be above the age of 18 at the time of an upcoming Federal election[,] and who maintain a residence in the subject State." *Id.* § 2(a). The Order calls these "State Citizenship List[s]," and provides that, "[t]o the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974," these Lists "shall be derived from Federal citizenship and naturalization records, SSA records, [USCIS Systematic Alien Verification for Entitlements ("SAVE")] data, and other relevant Federal databases." *Id.* The Order directs the Secretary of Homeland Security to establish procedures that allow individuals to access, and if necessary, update or correct, their personal records ahead of elections. *Id.*

Section 2(a) of the Order further states that the "State Citizenship List[s] shall be updated and transmitted to State election officials no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election." *Id.* The Order directs the Secretary of Homeland Security to establish within 90 days the needed "infrastructure . . . to compile, maintain, and transmit the State Citizenship List." *Id.* § 4(c). The Order also requires the implementation of procedures to "enable States to routinely supplement and provide suggested modifications or amendments to the State Citizenship List[s]." *Id.* § 2(a). The Order does not mandate any action by a State once a List has been transmitted to it. At this time, no such Lists have been created, nor has any of the "infrastructure" for compilation or transmission of the Lists been established. *See* ECF 117-2, Decl. of M. Mayhew ("Mayhew Decl.") ¶¶ 5–8; ECF 117-3, Decl. of J.B. MacBride ("MacBride Decl.") ¶¶ 4–6.

4

JA698

*Second*, Section 3 directs the United States Postal Service to initiate a proposed rulemaking to address certain issues concerning absentee and mail-in voting.  Order § 3(b).  In particular, the Order requires the Postal Service to issue within 60 days a "notice of proposed rulemaking" that would include, at a minimum, provisions (1) to require mail-in ballots for federal elections to conform to certain design requirements (i.e., unique Intelligent Mail barcode and designated markings) and (2) to develop a process for individuals to be enrolled on a "State-specific Mail-In and Absentee Participation List."  *Id.* § 3(b)(i)–(iv).[1]  The Order also directs that the Postal Service must issue a final rule within 120 days.  *Id.* § 3(d).  Like Section 2, Section 3 provides that "[t]he preparation and transmission of each State-specific Mail-In and Absentee Participation List shall comply with the Privacy Act and all applicable use agreements."  *Id.* § 3(b)(iv).  And at this time, the Postal Service has not yet issued a notice of proposed rulemaking.  *See* ECF 117-4, Decl. of S. Monteith ¶ 4.[2]

## B.     Procedural History

In the three days following the issuance of the Executive Order, Plaintiffs in these now-consolidated actions filed Complaints challenging it.  *See* ECF 1 ¶¶ 11–23; *League of United Latin American Citizens("LULAC") v. Exec. Off. of the President*, No. 26-cv-1132 (D.D.C. Apr. 2,

---

[1] The "Mail-In and Absentee Participation List" would be distinct from the State Citizenship Lists contemplated by Section 2(a).

[2] Other provisions that Plaintiffs seek to enjoin, but on which they do not focus much attention, are Sections 2(b), 4, and 5.  Section 2(b) directs the Attorney General to "prioritize [ ] investigation[s]" and "prosecution[s] of State and local officials or any others involved in administering Federal elections who issue Federal ballots to individuals not eligible to vote" in those elections.  Order § 2(b).  Section 4 directs the implementation of the Order, tasks the Attorney General with enforcing compliance with federal statutes referenced in the Order, and commands the Secretary of Homeland Security to establish the necessary infrastructure to execute the State Citizenship List Provision.  *Id.* § 4(a)–(c).  And Section 5 charges the Attorney General and executive officials with relevant authority to deter and address noncompliance with federal election laws.  *Id.* § 5.

2026), ECF 1; *NAACP v. Trump*, No. 26-cv-1151 (D.D.C. Apr. 3, 2026), ECF 1 ¶¶ 17–50.[3] Although the Complaints were filed by differently situated plaintiffs (discussed in more detail below) and differ in certain particulars, together they challenge the Executive Order on a number of grounds, including that it is *ultra vires*; violates the separation of powers and the First and Fifth Amendments to the U.S. Constitution; and is inconsistent with the Administrative Procedure Act, the Privacy Act, various statutes relating to the Postal Service, and the Voting Rights Act.  *See, e.g.*, ECF 1 ¶¶ 106–172; *LULAC* ECF 1 ¶¶ 214–327; *NAACP* ECF 1 ¶¶ 214–327.[4]

The following week, Plaintiffs filed motions for preliminary injunction, ECF 29; ECF 34; ECF 37, and subsequently filed memoranda of law in support of their motions, ECF 53 ("LULAC Br."); ECF 54 ("NAACP Br."); ECF 55 ("DSCC Br.").  They argue that the Executive Order exceeds the President's constitutional and statutory authority by directing federal agencies to implement changes to voter registration and mail-ballot processes in conflict with federal law.  *See generally* LULAC Br.; NAACP Br.; DSCC Br.  They further contend that the Order will disrupt established election procedures, causing harm to voters, candidates, and organizations; that those harms are sufficiently imminent to permit pre-implementation or pre-enforcement review; and that they will suffer imminent and irreparable harm without injunctive relief.

---

[3] Citations to the LULAC and NAACP dockets are in the form: *LULAC* ECF No. ## and *NAACP* ECF No. ##.

[4] As a result of consolidation, there are three groups of Plaintiffs in this case:  the DSCC Plaintiffs, the NAACP Plaintiffs, and the LULAC Plaintiffs.  The DSCC Plaintiffs include the Democratic Senatorial Campaign Committee ("DSCC"), Democratic Congressional Campaign Committee, Democratic National Committee, Democratic Governors Association, U.S. Senate Minority Leader Charles E. Schumer, and U.S. House Minority Leader Hakeem S. Jeffries.  The NAACP Plaintiffs include the National Association for the Advancement of Colored People ("NAACP"), Common Cause, the Common Cause Education Fund, Black Voters Matter Fund, and BVM Capacity Building Institute, Inc.  And the LULAC Plaintiffs include the League of United Latin American Citizens, the Secure Families Initiative, and the Arizona Students' Association.

JA700

Thereafter, the Court granted certain States' motion to intervene as defendants, Min. Order of April 30, 2026, and the Parties completed briefing on Plaintiffs' motions. *See* ECF 105 ("States' Br."); ECF 117-1 ("Gov. Br."); ECF 121 ("LULAC Reply Br."); ECF 122 ("DSCC Reply Br."); ECF 123 ("NAACP Reply Br.").  On May 14, 2026, the Court heard oral argument on those motions.

## II.   LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion."  *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).  To obtain that remedy, a plaintiff must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The balance-of-equities and public-interest factors merge where the government is a party "because the government's interest *is* the public interest."  *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).

"[P]laintiffs bear the burden of persuasion on all four preliminary injunction factors." *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014).  Two factors, however, are key to the analysis:  likelihood of success on the merits and irreparable harm. "When a plaintiff has not shown a likelihood of success on the merits, there is no need to consider the remaining factors."  *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 639 F.3d 1078, 1088 (D.C. Cir. 2011).  And "failure to show a likelihood of irreparable harm [is], standing alone, sufficient to defeat the motion."  *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018); *see Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290,

7

JA701

297 (D.C. Cir. 2006) (explaining that "failure to show any irreparable harm" alone is reason enough to deny a preliminary injunction).

### III.    ANALYSIS

### A.    Plaintiffs Have Failed to Show They Are Likely to Succeed on the Merits

To "establish[] a likelihood of success on the merits, [Plaintiffs] must first demonstrate a likelihood of success in establishing jurisdiction." *Make The Rd. N.Y. v. Wolf*, 962 F.3d 612, 623 (D.C. Cir. 2020). As the Court of Appeals has put it, "[t]he affirmative burden of showing a likelihood of success on the merits necessarily includes a likelihood of the court's *reaching* the merits, which in turn depends on a likelihood that plaintiff has standing." *See Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015) (alteration adopted) (citation and internal quotation marks omitted). "In the context of a preliminary injunction motion," courts "require the plaintiff to show a substantial likelihood of standing under the heightened standard for evaluating a motion for summary judgment." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) (citation and internal quotation marks omitted). The Court accordingly begins with whether Plaintiffs have established to the requisite likelihood that the Court has jurisdiction.

### 1.    Plaintiffs Have Not Shown that the Court Likely Has Jurisdiction

To establish Article III standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)). "At the preliminary-injunction stage," a plaintiff "must make a clear showing that

8

JA702

she is likely to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citation and internal quotation marks omitted).

"A concrete injury is direct, real, and palpable—not abstract." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015) (citation and internal quotation marks omitted). "A particularized injury is personal, individual, distinct, and differentiated." *Id.* (citation and internal quotation marks omitted). And "[a]n actual or imminent injury is certainly impending and immediate—not remote, speculative, conjectural or hypothetical." *Id.* (citation and internal quotation marks omitted). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation and internal quotation marks omitted). Thus, the Supreme Court has repeatedly said that "allegations of *possible* future injury" are not sufficient to establish injury in fact. *Id.* (alteration adopted) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). In sum, these requirements "screen[] out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). A related doctrine requires that a case be "ripe," meaning it cannot rely on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation and internal quotation marks omitted).

The causation and redressability requirements "are often 'flip sides of the same coin.'" *All. for Hippocratic Med.*, 602 U.S. at 380 (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008)). If a plaintiff can establish that her "injury likely was caused or likely will be caused by [a] defendant's [action]," *id.* at 382, "enjoining the action or awarding damages for

9

JA703

the action will typically redress [her] injury," *id.* at 381.   At least, that is the case where a government regulation "require[s] or forbid[s] some action by the plaintiff."  *Id.* at 382.  But "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish."  *Lujan*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)).   "That is often because unregulated parties may have more difficulty establishing causation—that is, linking their asserted injuries to the government's regulation (or lack of regulation) of someone else."  *All. for Hippocratic Med.*, 602 U.S. at 382.

When a plaintiff is not the object of the challenged governmental action, causation typically depends "on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well."  *Lujan*, 504 U.S. at 562.  The Supreme Court has made clear, however, that "[t]he causation requirement precludes speculative links— that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs."  *All. for Hippocratic Med.*, 602 U.S. at 383; *see Allen*, 468 U.S. at 757–759; *Clapper*, 568 U.S. at 415 n.5.  Like the injury-in-fact requirement, causation is essential and "screens out plaintiffs who were not injured by the defendant's action."  *All. for Hippocratic Med.*, 602 U.S. at 383.

Different types of plaintiffs may, of course, have Article III standing for different reasons. Organizations, in particular, "may have standing 'to sue on their own behalf for injuries they have sustained.'"  *Id.* at 393 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)). Or they can sue on behalf of their members—provided that the organization can "demonstrate [that] 'its members would otherwise have standing to sue in their own right.'"  *Sierra Club v. EPA*, 926 F.3d 844, 848 (D.C. Cir. 2019) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't. Servs.,*

10

*Inc.*, 528 U.S. 167, 181 (2000)).[5]  That is, an organization must identify at least one member who has suffered an injury in fact.  *See Chamber of Commerce v. EPA*, 642 F.3d 192, 199–200 (D.C. Cir. 2011) (explaining that, to successfully allege associational standing, a plaintiff organization "must specifically identify members who have suffered the requisite harm"); *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) ("[P]laintiff-organizations" must "make specific allegations establishing that at least one identified member had suffered or would suffer harm.").

Finally, "plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek."  *TransUnion*, 594 U.S. at 431.

### a.    Plaintiffs Have Failed To Establish They Presently Have Standing to Challenge Section 2(a).

Plaintiffs seek to preliminarily enjoin the implementation of Section 2(a) of the Executive Order.  Again, that Provision directs the Secretary of Homeland Security—to the extent doing so is "feasible and consistent with applicable law"—to "compile and transmit" to state election officials a List of United States citizens who will be 18 years or older at the time of an upcoming federal election and who maintain a residence in the subject State.  Order § 2(a).  But it "requires nothing from Plaintiffs—no compliance, no changed behavior, nothing at all—because it is not aimed at them but instead tells only the agencies to do something."  *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 79 (D.D.C. 2025) (citation and internal quotation marks omitted).

*Harm to Members as Voters.*  The Plaintiff Organizations nevertheless contend that they have associational standing based on harm to their members' "voting rights."  ECF 53 ("LULAC Br.") at 14–19; ECF 54 ("NAACP Br.") at 37–50; ECF 55 ("DSCC Br.") at 13–16.  They contend

---

[5] An organization must also show that "the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Sierra Club*, 926 F.3d at 848 (internal quotation marks omitted) (quoting *Friends of the Earth, Inc.*, 528 U.S. at 181).

11

that Section 2(a) will make it more difficult, or even impossible, for some of their members to vote because the federal records that will be used to create the State Citizenship Lists are "virtually guaranteed" to contain inaccuracies, LULAC Br. at 14; that those inaccuracies will remain uncorrected (even though the Order directs States to "routinely supplement and provide suggested modifications or amendments to" the List, Order § 2(a)); and that at least certain States will use the Lists to keep otherwise eligible voters from casting ballots.

This "highly attenuated chain of possibilities," however, "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410; *see also Summers*, 555 U.S. at 496. The Government has not yet established the infrastructure to compile the Lists, nor has it determined what information will be used to compile them (or how doing so would be lawful). As a result, it remains speculative whether the State Citizenship Lists, if and when they are initially compiled, will contain inaccuracies.[6] Even if they contain initial inaccuracies, the Executive Order requires the adoption of procedures that will allow individuals to access and, if necessary, update or correct their information in the Lists. *See* Order § 2(a). It thus remains speculative whether that process will be ineffective at resolving all or most inaccuracies. And whether the Lists continue to contain inaccuracies or not, nothing in the Executive Order requires any State to use its List in any way—let alone to prevent otherwise qualified persons from

---

[6] The DSCC Plaintiffs argue that the Executive Order requires the federal government to use databases—namely, the SAVE and SSA databases—that are "incomplete, out-of-date, and riddled with inaccuracies" and it is therefore certain that the Lists will contain errors. DSCC Br. at 4 (citing ECF No. 55-12, Decl. of Dr. Kenneth Mayer, at 1). While it is conceivable these Lists may have some flaws, at least initially, it is impossible to be sure when the agencies have not yet determined what databases they will use or if they can perfect them ahead of use. And even if the Lists as initially compiled contain some flaws, that would mark only the first step in an attenuated chain of speculation. *Cf. Clapper*, 568 U.S. at 412 (explaining that "even if respondents could demonstrate" that their first speculation was true, their injury was still speculative because of others in the chain). In any event, Plaintiffs can renew their motions as to Section 2(a) when more particular and concrete information about the Lists is available.

12

JA706

registering to vote.  Because Plaintiffs "can only speculate as to whether any (asserted)" voter-registration difficulties or disenfranchisement could result from Section 2(a), *Clapper*, 568 U.S. at 413, they cannot show that their threatened injury is "*certainly* impending," *id.* at 409 (internal citation and quotation marks omitted).

Even if Plaintiffs could show that it is likely that their members will imminently be excluded from certain States' voter registration rolls, they cannot demonstrate that that injury is fairly traceable to Section 2(a).  Again, nothing in Section 2(a) (or any other part of the Order) purports to require any State to do anything with the State Citizenship List it is provided, let alone to remove otherwise eligible individuals on State voter registration lists.  Plaintiffs assume that certain States *will* rely on these Lists (and the Court recognizes that some States are more likely to do so than others), but it remains highly speculative *how* they will do so—and if they will do so in a manner consistent with federal and state law.  "[W]here it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs," the causation requirement has not been met.  *All. for Hippocratic Med.*, 602 U.S. at 383.

*Harm to Members' Privacy Rights.*  The Plaintiff Organizations also contend that they have associational standing based on alleged harms to their members' privacy interests.  LULAC Br. at 18; NAACP Br. at 39; DSCC Br. at 15.  They variously contend that Section 2(a)'s disclosure requirements "offend long-standing notions of privacy," DSCC Br. at 15; "intrude[] on [members'] sense of security," LULAC Br. at 18; and compel unauthorized disclosure of sensitive personal information, NAACP Br. at 40.  Plaintiffs argue that their members will be harmed by the transmission of their personal information to the States, *see* DSCC Br. at 15; LULAC Br. at 18, but that injury is currently too speculative.  *See Clapper*, 568 U.S. at 416.  After all, DHS has not yet concluded that doing so is "feasible and consistent with applicable law, including but not

13

limited to the Privacy Act of 1974," Order § 2(a); has not yet created the "infrastructure . . . to compile, maintain, and transmit the State Citizenship List," *id.* § 4(c); and thus has neither compiled the Lists nor begun to transmit them to the States, *see* Mayhew Decl. ¶¶ 5–8; MacBride Decl. ¶¶ 4–6.

Plaintiffs also argue that it would violate the Privacy Act for the federal government to compile a list of individuals who are citizens and over the age of 18, even if no information is ever transmitted to any State—that is, if a purely *intra-federal government* list is created.  But Plaintiffs fail to demonstrate that such action—that is, the sharing of name, age, and residence information between and among government agencies, if already known to the federal government—would cause a harm sufficient to establish Article III standing.  "Article III standing requires a concrete injury even in the context of a statutory violation."  *Spokeo, Inc. v. Robins*, 578 U. S. 330, 341 (2016).  To determine whether a harm is sufficiently concrete, courts "ask[] whether plaintiffs have identified a close historical or common-law analogue for their asserted injury."  *TransUnion*, 594 U.S. at 424.  Here, Plaintiffs have not identified a historical or common-law analogue for the asserted injury their members face—the sharing of non-sensitive personal data (name, citizenship status, and age) between and among different federal agencies.[7]

---

[7] Two of the Plaintiff groups argue that the inter-agency sharing of non-sensitive personal data bears a close relationship to the harm underlying the common-law tort of intrusion upon seclusion. *See* NAACP Br. at 40; DSCC Reply Br. at 16.  That tort makes liable anyone "who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person."  Restatement (Second) of Torts § 652B.  But the inter-agency sharing of non-sensitive personal information (such as one's name, citizenship status, and age) is not the type of "intrusion" that a "reasonable person" would find "highly offensive."  Even if correctly decided, the cases Plaintiffs cite in support of this argument do not hold otherwise.  *See, e.g.*, *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.*, 778 F. Supp. 3d 56, 71–72 (D.D.C. 2025) (finding intrusion upon seclusion to be a sufficient common law analog when unauthorized personnel viewed sensitive personal information held by federal agencies); *All. for Retired Americans v. Bessent*, 770 F. Supp. 3d 79, 102 (D.D.C. 2025) ("Plaintiffs' alleged injury—the *disclosure of their private information*

14

*Organizational Harm.*  The Plaintiff Organizations do not rely solely on injuries to their members.  They also contend that they have organizational standing to challenge Section 2(a) because it interferes with their missions and forces them to divert resources to counteract its effects.  *See, e.g.*, LULAC Br. at 20; DSCC Br. at 18; NAACP Br. at 33.[8]  Plaintiffs contend that, because of Section 2(a), they must redesign their existing educational programs, retrain staff members, distribute new informational materials, monitor List development to see if their members are on the Lists, and assist those who are erroneously omitted.  *See* LULAC Br. at 19–20; DSCC Br. at 18; NAACP Br. at 32–36.

The Supreme Court recently addressed the question of organizational standing in *Alliance for Hippocratic Medicine*.  *See* 602 U.S. at 393–97.  There, the Court explained that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action."  *Id.* at 394.  The Court accordingly held that the organizational plaintiffs lacked standing even though the challenged governmental action had caused them "to conduct their own studies on [a drug] so that the[y] [could] better inform their members and the public

---

*to third parties without a lawful right to access it*—bears a close relationship to the harm essential to an intrusion upon seclusion at common law." (emphasis added)).

[8] Plaintiffs are not always precise when describing the cause of their organizational injuries.  At times, it seems that they are alleging that their injuries will occur in the future once the State Citizenship Lists are created. *See, e.g.*, LULAC Br. at 20 ("[T]he Order will require Plaintiffs to confirm the content of State Citizenship Lists and liaise with federal officials to assist prospective voters whose right to vote is at risk.").  However, in their reply briefs and at oral argument, Plaintiffs argue that they are presently harmed by the Executive Order itself.  *See, e.g.*, NAACP Reply Br. at 13 (Plaintiffs' "claims are ripe because the Order's directives to federal agencies are already injuring them.").  Because any allegations about future State Citizenship Lists have ripeness problems, *see Texas*, 523 U.S. at 300 (explaining that a case cannot depend on "contingent future events that may not occur as anticipated, or indeed may not occur at all" (citation and internal quotation marks omitted)), the Court focuses here on how the Executive Order may currently cause harm to them as organizations.

15

JA709

about [the drug]'s risks" and "to expend considerable time, energy, and resources drafting citizen petitions to [the agency], as well as engaging in public advocacy and public education." *Id.* (citation and internal quotation marks omitted).[9]

The Organizational Plaintiffs' alleged injuries here are similar. They contend that Section 2(a) has caused them to expend time and resources educating the public on the potentially forthcoming State Citizenship Lists, creating new educational materials on the topic, and monitoring the Lists' development. *See, e.g.*, NAACP Br. at 32; DSCC Br. at 18. But those efforts are very similar, if not identical, to "conduct[ing] their own studies . . . so that the[y] can better inform their members and the public," and "expend[ing] considerable time, energy, and resources drafting citizen petitions, as well as engaging in public advocacy and public education." *All. for Hippocratic Med.*, 602 U.S. at 394 (citation and internal quotation marks omitted).

To be sure, the Supreme Court has not completely foreclosed organizational standing. But to establish it, an organization must "suffer[] a concrete injury caused by a defendant's action." *Id.*; *see also id.* at 395 (not overturning *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), because in that case, the defendant's "actions directly affected and interfered with [the organization's] core business activities"). The Organizational Plaintiffs here have failed to demonstrate that the Executive Order has "directly affected and interfered" with their core missions. *Id.* at 395. While it is unrebutted that those Plaintiffs have expended and diverted resources in response to the Executive Order, *see* NAACP Br. at 36 ("BVM is already preparing to assist voters with name-matching issues to ensure that people are still able to vote if they are

---

[9] The Court of Appeals has since recognized that *Alliance for Hippocratic Medicine* casts doubt on "the foundation of [its] organizational injury precedents." *Ctr. for Biological Diversity*, 144 F.4th at 315; *accord Coal. for Humane Immigrant Rts. v. DHS*, 780 F. Supp. 3d 79, 89 n.2 (D.D.C. 2025).

improperly excluded from the lists mentioned in the Order."), the Order itself has not imposed any impediment to their voter registration and education operations.  *Cf. All. for Hippocratic Med.*, 602 U.S. at 395 ("Havens's actions directly affected and interfered with HOME's core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer . . . . FDA's actions relaxing regulation of mifepristone have not imposed any similar impediment to the medical associations' advocacy businesses.").  The Organizational Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending," *Clapper*, 568 U.S. at 416, nor can they allege a sufficient injury in fact when a defendant has not directly impaired their core services, *see All. for Hippocratic Med.*, 602 U.S. at 395.  Of course, those Plaintiffs may eventually suffer harms that are sufficiently concrete to satisfy Article III when additional information about the Lists is developed.  *See supra* at 12–13.  But, at least right now, they have not established that the Court has jurisdiction over their claims.

*Harm to Candidates.*  Finally, the DSCC Plaintiffs argue that political candidates (some of whom are plaintiffs here and others of whom are members of the DSCC)[10] have standing to challenge Section 2(a) because it "unlawfully alters the rules in the elections in which they compete."  DSCC Br. at 10–11 (relying on *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 76–78 (2026)).  But Section 2(a) does not purport to alter the rules of any State election.  In fact, Section 2(a) does not order the States to do anything with the State Citizenship Lists once they are transmitted—much less direct the States to amend their election procedures.  These Plaintiffs thus

---

[10] Two of the DSCC Plaintiffs are candidates themselves:  Chuck Schumer and Hakeem Jeffries.  Because the injury-in-fact analysis is the same for members of Plaintiffs' organizations that are candidates and the two named candidates in the complaint, the Court will only address standing for the Plaintiffs' candidate members.

cannot establish a sufficient causal link between States' future, hypothetical decision to amend their election procedures and the creation and transmission of State Citizenship Lists pursuant to the Executive Order. *Cf. Lujan*, 504 U.S. at 560–61 ("[T]here must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." (cleaned up) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976))).

Alternatively, the DSCC Plaintiffs contend that political candidates have standing based on harm to their electoral prospects. DSCC Br. at 11. They contend that Section 2(a) creates a serious risk that Democratic Party supporters—more so than Republican Party supporters—will be erroneously left off the State Citizenship Lists and therefore face burdens on their ability to vote. *Id.* at 11–13. But this claimed injury again rests "on a highly attenuated chain of possibilities" that fails to "satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410. For Section 2(a) to *cause* (in the Article III sense) Democratic Party candidates' electoral prospects to suffer, something like the following would need to happen: Federal officials must determine that they can lawfully compile and transmit a State Citizenship List to the States; the Secretary of Homeland Security must then compile and transmit Lists containing significant errors to the States; even though the Executive Order expressly requires procedures to correct such errors, those errors would need to remain uncorrected; State election officials must then nevertheless decide to rely on the Lists; and State election officials must then decide to use the erroneous State Citizenship Lists to remove eligible voters from the States' voter rolls (or otherwise make it more difficult for those individuals to vote). "Such speculation upon speculation does not suffice to support Article III standing,"

18

*Endeley v. U.S. Dep't of Def.*, 268 F. Supp. 3d 166, 175 (D.D.C. 2017) (citation and internal quotation marks omitted), especially when it depends on the independent actions of third parties—and especially when (if these events were to transpire in any particular State), affected voters and candidates could challenge those States' decisions under federal and state voting laws.

> **b.** **Plaintiffs Have Failed To Establish They Presently Have Standing to Challenge Section 3(b)**

Returning to Section 3(b) of the Executive Order, recall that it directs the Postal Service to initiate rulemaking procedures for a rule that would address two primary topics.  First, the rule would require that all mail-in ballots be mailed in officially marked envelopes bearing unique barcodes to facilitate tracking.  *See* Order § 3(b)(i).  Second, the rule would establish procedures for individuals to be enrolled on "State-specific Mail-In and Absentee Participation List[s]," which would be used by the Postal Service to determine which mail-in or absentee ballots it "shall not transmit."  *Id.* § 3(b)(iii)–(iv).

Plaintiffs argue that Section 3(b) interferes with their mission-driven work, disenfranchises their voting members, and electorally harms their candidate-members by preventing eligible voters from casting mail-in and absentee ballots.  *See, e.g.*, DSCC Br. at 11–15; LULAC Br. at 21–22; NAACP Br. at 37–38.  But the effects of Section 3(b) are even further removed from any concrete injury in fact than Section 2(a).  Unlike Section 2(a)—which does require the agencies to assess whether they can compile and then transmit to the States certain information—Section 3(b) directs only that the Postal Service initiate and then complete a rulemaking.  Any injury therefore depends on a series of contingencies:  whether the Postal Service issues a notice of proposed rulemaking, what that proposed rule says, what changes occur through notice and comment, whether a final rule issues, and how that final rule affects voters, States, or Plaintiffs.  *Cf. Clapper*, 568 U.S. at 409–410.  Plaintiffs' claims therefore run directly into the bedrock (and commonsense) rule that

19

JA713

even "the issuance of a notice of proposed rulemaking, or other preliminary proceedings undertaken to promote a proposed rule, often will not be ripe for review because the rule may or may not be adopted or enforced." *Ctr. for Auto Safety*, 710 F.2d at 846; *see Bristol-Myers Co. v. FTC*, 424 F.2d 935, 940 (D.C. Cir. 1970) (holding that Bristol-Myers's claim seeking to enjoin the FTC from continuing rulemaking proceedings was "not yet ripe for adjudication" because the "Commission ha[d] merely proposed a rule").  "Because several speculative contingencies must occur before Plaintiffs suffer any concrete harm," they have failed to establish standing to challenge Section 3(b).  *Nat'l Urb. League*, 783 F. Supp. 3d at 81 (citation and internal quotation marks omitted).

Plaintiffs argue that they have standing, regardless of what any final rule may look like, because they have immediately had to "divert resources from planned voter registration activities to assess the Order's impact, retrain staff and volunteers, and reformulate educational materials." NAACP Br. at 43.  "But that argument runs headlong into the Supreme Court's decision in *Clapper*, in which the Court rejected as 'unavailing' the plaintiffs' 'contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm.'"  *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 223 (D.D.C. 2020) (quoting *Clapper*, 568 U.S. at 416).  "[P]laintiffs 'cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.'"  *Food & Water Watch, Inc.*, 808 F.3d at 919 (quoting *Clapper*, 568 U.S. at 416).

Plaintiffs' challenge to Section 3(b) also suffers from a significant causation issue.  Again, to establish Article III standing, an injury must be "fairly traceable to the challenged action." *Clapper*, 568 U.S. at 409 (citation and internal quotation marks omitted).  But here, the primary "source of any injury to the [P]laintiffs is the action that the [Postal Service] *might* take in the

20

JA714

future to" implement Section 3(b), not Section 3(b) itself. *Trump v. New York*, 592 U.S. 125, 133–34 (2020). And because "[a]ny prediction how the Executive Branch might eventually implement" Section 3(b) is "no more than conjecture at this time," *id.* at 131 (citation and internal quotation marks omitted), "Plaintiffs have also failed to show that their challenge to this provision is likely ripe," *Nat'l Urb. League*, 783 F. Supp. 3d at 83.

Ultimately, whether framed as an injury, causation, or ripeness problem, "Article III standing requires more than the possibility of potentially adverse regulation." *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1324–25 (D.C. Cir. 2013). Thus, it is unsurprising that Plaintiffs likely lack standing to challenge Section 3(b). All that provision does is direct the Postal Service to initiate a rulemaking process and consider potential regulatory changes. *Cf. Nat'l Urb. League*, 783 F. Supp. 3d at 81. To be sure, the Postal Service may eventually issue a final rule that directly affects Plaintiffs or their members and that Plaintiffs believe is unlawful. "But *that* is when Plaintiffs would have the requisite 'personal stake'" that supports Article III standing. *Id.* (quoting *All. for Hippocratic Med.*, 602 U.S. at 379). "Until then, Plaintiffs are at most 'concerned bystanders' to internal Executive Branch processes." *Id.* (quoting *All. for Hippocratic Med.*, 602 U.S. at 382); *see also United Presbyterian Church in the USA v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984) (Scalia, J.) (holding that Plaintiffs lacked standing to challenge an Executive Order that "set[] forth no standards governing their conduct"); *cf. Perciasepe*, 714 F.3d at 1324–25 (holding that an intervenor lacked standing to challenge a consent decree that did "not require EPA to promulgate a new, stricter rule" but only "require[d] that EPA conduct a rulemaking and then decide whether to promulgate a new rule").

21

JA715

*****

In sum, Plaintiffs have not shown that they are currently suffering a concrete and imminent injury traceable to Sections 2 or 3 of Executive Order 14,399 and thus have not established a likelihood of Article III standing or that their claims as to those provisions are ripe.[11]

### 2. Plaintiffs Fail to Show That They Are Likely to Succeed on Their *Ultra Vires* Claims

Because Plaintiffs have failed to establish that they likely have standing, they are "*ipso facto* unlikely to succeed" on the merits. *Elec. Priv. Info. Ctr.*, 878 F.3d at 375 n.2. In any event, the Court briefly addresses Plaintiffs' facial challenge to the Executive Order.

Plaintiffs argue that the President has no authority to issue the Executive Order because the executive branch cannot lawfully fulfill its requirements. LULAC Br. at 25, 36; DSCC Br. at 19–23; NAACP Br. at 13. In this sense, Plaintiffs essentially eschew any challenge to future agency action (such as the possible adoption of a final rule by the Postal Service) and direct their challenge at the Order itself. But the Order is not self-executing. It does not itself regulate voter registration or how mail-in or absentee ballots will be transmitted; rather, it directs executive branch officials to take certain actions, subject to the limits of existing laws. That is a key distinction. While the President may not have the authority to change the design of mail-in ballots or remove individuals from states' voter registration lists, he does have the authority to supervise and direct the actions

---

[11] As mentioned above, although they devote little attention to them, certain Plaintiffs challenge additional parts of the Executive Order—namely Sections 2(b), 4, and 5. *See* ECF 34; ECF 37. Plaintiffs have failed to demonstrate that they have standing to challenge Section 4(c), which directs the Secretary of Homeland Security to establish the State Citizenship List infrastructure, because (as explained above) any injury arising from the Lists is, at this stage, too speculative. Plaintiffs likewise have not demonstrated they have standing to challenge the remaining provisions directing the Attorney General to prioritize enforcement of certain federal laws, as "challenges to the Executive Branch's exercise of enforcement discretion" are "not the kind[s] [of suits] redressable by a federal court." *United States v. Texas*, 599 U.S. 670, 677–78 (2023).

of executive branch agencies.  *See* U.S. Const. art. II, § 1, cl. 1 (The "executive Power shall be vested in a President of the United States of America."); *Sierra Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir. 1981) ("The authority of the President to control and supervise executive policymaking is derived from the Constitution."); *Bldg. & Const. Trades Dep't., AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) ("[T]he President's power necessarily encompasses general administrative control of those executing the laws, throughout the Executive Branch of government, of which he is the head." (internal quotation marks omitted) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926))).  And an executive order that operates solely as an internal directive—particularly one expressly conditioned on feasibility and compliance with applicable law—does not, standing alone, exceed Presidential authority or violate the separation of powers.  *See Allbaugh*, 295 F.3d at 33 (holding that the President acted within his constitutional authority in issuing an executive order that was "not selfexecuting" and required compliance with existing laws).

While the Order does require agencies and executive branch officials to take certain actions, it also states in various places that they must do so in a manner consistent with governing statutes and other legal requirements.  *See* Order § 2(a) ("To the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974"); *id.* § 4(c) ("consistent with applicable law, the Privacy Act, and all applicable use agreements"); *id.* § 3(b) ("initiate a proposed rulemaking pursuant to 39 U.S.C. 401 and other applicable authority").  As a result, whether the government's actions under the Order are lawful or unlawful will depend on how those agencies decide to implement the Order, not on the Order itself.  *See Allbaugh*, 295 F.3d at 33 ("The mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that, so far as the present record reveals, is above suspicion in the ordinary course of administration.").

23

JA717

The Court recognizes that the agencies may implement the Order in ways that Plaintiffs will contend are unlawful; for example, the Postal Service may adopt a rule concerning absentee ballots that, Plaintiffs may argue, exceeds the Postal Service's authority or is otherwise inconsistent with federal law. But it is not until such actions are taken that Plaintiffs' claims might be ripe for judicial review. *See, e.g.*, *Bristol-Myers Co.*, 424 F.2d at 940 (Challenging an agency's *proposed* rule was "not yet ripe for adjudication.").

**B.    Irreparable Harm**

To warrant injunctive relief, Plaintiffs must also establish that, absent such relief, they are likely to suffer an imminent and irreparable injury. *See Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1236 (D.C. Cir. 2025) ("[A] movant's failure to show any irreparable harm is grounds for refusing to issue a preliminary injunction, even if the other three factors merit such relief." (cleaned up) (quoting *Chaplaincy*, 454 F.3d at 297)).[12]

The standard for "irreparable" harm is "high." *Chaplaincy*, 454 F.3d at 297. A plaintiff must establish that "the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm" and that the injury is "beyond remediation." *Id.* (alteration adopted) (citation and internal quotation marks omitted). In other words, the "injury must be both certain and great." *Clevinger*, 134 F.4th at 1234 (citation and internal quotation marks omitted). Further, "the movant must show that the alleged harm will *directly result* from the action which the movant seeks to enjoin." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (emphasis added).

---

[12] Where a court determines that plaintiffs fail to show irreparable harm, it need not evaluate the remaining preliminary injunction factors. *See Clevinger*, 134 F.4th at 1236 ("[T]he district court did not err in declining to evaluate the remaining preliminary injunction factors" after finding no irreparable harm.).

JA718

Plaintiffs assert a variety of irreparable injuries:  The DSCC Plaintiffs claim that, without an injunction against the Order's enforcement, they "will suffer irreparable injury in multiple ways: (1) in the form of an illegally structured electoral environment for all Plaintiffs and their candidate members, (2) to the Party's electoral prospects, (3) to Plaintiffs' members' voting rights, (4) to Plaintiffs' core activities and ability to advance their missions, forcing them to revamp their education and turnout programs across the country at the expense of Plaintiffs' persuasion and mobilization programs, and (5) to Plaintiffs' members' privacy interests."  DSCC Br. at 39.  The LULAC Plaintiffs contend that the added difficulties to voter registration, performance of their voter-registration mission, and voting by mail constitute imminent and irreparable harm.  LULAC Br. at 40–44.  And the NAACP Plaintiffs claim that the Order irreparably harms them because it interferes with their primary mission of voter registration, education, and ensuring access to voting by mail.  NAACP Br. at 43–44.

But as discussed above, *see supra* Section I, Plaintiffs have failed to show that they presently have Article III standing.  And "[t]he irreparable-harm standard requires a more significant showing than the injury-in-fact standard."  *Air Transp. Ass'n of Am. v. Export–Import Bank of the U.S.*, 878 F. Supp. 2d 42, 60 (D.D.C. 2012); *see Sibley v. Alexander*, 916 F. Supp. 2d 58, 63 (D.D.C. 2013) (Where plaintiff "has failed to demonstrate an injury in fact sufficient to establish standing, he has also failed to demonstrate irreparable harm warranting a preliminary injunction.").  Because Plaintiffs "have failed to carry their burden with respect to establishing that they have a substantial likelihood of standing based on [their alleged] injur[ies]," they have also failed to show that those injuries are "certain enough and great enough to warrant preliminary injunctive relief."  *Doe v. Off. of Pers. Mgmt.*, No. 25-cv-234, 2025 WL 513268, at *4 (D.D.C. Feb. 17, 2025) (citations and internal quotation marks omitted).  In any event, given that the

Executive Order does not command Plaintiffs to do anything, and that no agency has yet acted pursuant to the Order in a way that could harm Plaintiffs, they have not suffered any harm at present, much less harm that is "certain," "great," and imminent. *Wis. Gas Co.*, 758 F.2d at 674.[13]

## IV.   CONCLUSION

For the foregoing reasons, the Court denies Plaintiffs' Motions for a Preliminary Injunction, ECF 29, ECF 34, ECF 37. The Court will issue an order contemporaneously with this decision.

DATE: May 28, 2026

CARL J. NICHOLS
United States District Judge

---

[13] Although not dispositive, the other two preliminary injunction factors—the balance of equities and the public interest—do not cut substantially in favor of preliminary relief. "When a private party seeks injunctive relief against the government," those factors "generally call for weighing the benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined." *Doe v. Mattis*, 928 F.3d 1, 23 (D.C. Cir. 2019). The government argues that an injunction would impede the President's ability to oversee the Executive Branch, *see* Gov. Br. at 49 (citing U.S. Const. art. II, § 1, cl. 1), while Plaintiffs emphasize the public interest in ensuring compliance with federal law, *see* NAACP Reply Br. at 25; DSCC Reply Br. at 25. Plaintiffs have failed to demonstrate that these factors cut significantly in favor of injunctive relief. *Cf. LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*, No. 25-cv-5197, 2025 WL 1840591, at *2 (D.C. Cir. July 1, 2025) ("The public interest is harmed when an injunction wrongfully insulates the President's Executive Branch appointees from his oversight. Such injunctions sever a key constitutional link between the People and their elected President.").

JA720

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>        *Plaintiffs*,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>        *Defendants*. | Civil Action No. 26-cv-01114 (CJN) |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>        *Plaintiffs*,<br><br>    v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>        *Defendants*. | Civil Action No. 26-cv-01132 (CJN) |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>        *Plaintiffs*,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>        *Defendants*. | Civil Action No. 26-cv-01151 (CJN) |

1

JA721

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Plaintiffs' Motions for a Preliminary Injunction, ECF 29; ECF 34; ECF 37, are **DENIED**.


DATE:  May 28, 2026

CARL J. NICHOLS
United States District Judge

2

JA722

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DSCC, *et al.*,<br><br>　　　　　Plaintiffs,<br>　　v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>　　　　　Defendants. | Case No. 1:26-cv-01114-CJN |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>　　　　　Plaintiffs,<br>　　v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>　　　　　Defendants. | Case No. 1:26-cv-01132-CJN |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>　　　　　Plaintiffs,<br>　　v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>　　　　　Defendants. | Case No. 1:26-cv-01151-CJN |

## **NOTICE**

JA723

Federal Defendants in the above-captioned matters respectfully submit the following notice regarding recent developments in this matter:

A notice of proposed rulemaking by the United States Postal Service has been sent to the Office of the Federal Register and is now available for public inspection ahead of formal publication at: https://www.federalregister.gov/public-inspection/2026-10968/ballot-mail-for-federal-elections.  Formal publication is scheduled to occur on June 2, 2026.[1]

---

[1] Federal Defendants understand that the Court's admonition to notify the Court of "anything even approaching a material change" has now expired with the resolution of Plaintiffs' motions for preliminary injunction.  *See* May 14, 2026 Hrg. Tr. 104:7-11 ("[I]n the event that before that opinion comes out . . . that the government would so notify me."); *id.* at 104:15-18 ("But while I have under advisement the PI . . . I expect that the government would be, quote/unquote, conservative in thinking through the kinds of things that it would notify me about . . .").

Dated: May 29, 2026

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC J. HAMILTON
*Deputy Assistant Attorney General*

JOSEPH E. BORSON
*Assistant Branch Director*

<u>/s/ *Esam K. Al-Shareffi*</u>
STEPHEN M. PEZZI
D.C. Bar. No. 995500
 *Chief Litigation Counsel*
ESAM K. AL-SHAREFFI
D.C. Bar No. 90010174
 *Trial Attorney*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Telephone: (202) 305-8576
E-mail: stephen.pezzi@usdoj.gov

*Counsel for Federal Defendants*

3

JA725

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DSCC, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    Defendants. | Civil Action No. 26-cv-1114 (CJN) |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>    Defendants. | Civil Action No. 26-cv-1132 (CJN) |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>    Defendants. | Civil Action No. 26-cv-1151 (CJN) |

### DEMOCRATIC PARTY PLAINTIFFS' NOTICE OF APPEAL OF ORDER DENYING MOTION FOR PRELIMINARY INJUNCION

JA726

Pursuant to 28 U.S.C. § 1292(a)(1), Plaintiffs DSCC, DCCC, Democratic National Committee, Democratic Governors Association, Charles E. Schumer, and Hakeem S. Jeffries hereby appeal to the United States Court of Appeals for the D.C. Circuit from the Order denying their Motion for a Preliminary Injunction, entered in the above-captioned case on May 28, 2026. ECF No. 144 (Order); ECF No. 143 (Memorandum Opinion).

Dated: June 1, 2026

Respectfully submitted,

*/s/ Lalitha D. Madduri*

**ELIAS LAW GROUP LLP**
Marc E. Elias (DC 442007)
Lalitha D. Madduri (DC 1659412)
Jacob D. Shelly (DC 90010127)
Christina Ford (DC 1655542)
Max Accardi (DC 90021259)
Kevin R. Kowalewski (NY 5946645)*
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4490
eliasm@elias.law
lmadduri@elias.law
jshelly@elias.law
cford@elias.law
maccardi@elias.law
kkowalewski@elias.law

Tyler L. Bishop (DC 90014111)
1700 Seventh Ave., Suite 2100
Seattle, WA 98101
T: (206) 656-0177
tbishop@elias.law

*Admitted *pro hac vice*

*Counsel for Plaintiffs DSCC, DCCC, Democratic National Committee, Democratic Governors Association, Senate Minority Leader Schumer, and House Minority Leader Jeffries*

1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Case No. 1:26-cv-01114-CJN |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, <br><br> Defendants. | Case No. 1:26-cv-01132-CJN |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Case No. 1:26-cv-01151-CJN |

**<u>NOTICE</u>**

JA728

Federal Defendants in the above-captioned matters respectfully submit the following notice regarding recent developments in this matter:

On June 4, 2026, the Department of Homeland Security (DHS) approved a recommendation from the United States Citizenship and Immigration Services (USCIS) regarding implementation of Executive Order 14,399, including the creation of State Citizenship Lists as contemplated in § 2 of Executive Order 14,399.

Specifically, DHS endorses a USCIS proposal for a two-part course of action: The first part is implementation of a SAVE-based State Voter Roll Verification, whereby state election officials can submit their entire voter roll records to the USCIS Systematic Alien Verification for Entitlements program (SAVE) system for verification. The second part is implementation of a registry whereby state election officials would securely access citizenship-related data from USCIS, Social Security Administration, and the Department of State for voter citizenship verification, but where the underlying data would remain in each agency's respective system. Both parts are proposed to be operational by June 30, 2026.

Moreover, DHS contemplates working with the United States Postal Service (USPS) to integrate USPS datasets from Mail-In and Absentee Ballot Participation Lists, once available, and in compliance with applicable law, the Privacy Act, SORNS, PIAs, and interagency agreements, to monitor mail-in and absentee ballot flows, identify anomalies that may suggest voter fraud or misuse, and generate authorized investigative leads.

JA729

Dated: June 5, 2026

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC J. HAMILTON
*Deputy Assistant Attorney General*

JOSEPH E. BORSON
*Assistant Branch Director*

/s/ *Esam K. Al-Shareffi*
STEPHEN M. PEZZI
D.C. Bar. No. 995500
*Chief Litigation Counsel*
ESAM K. AL-SHAREFFI
D.C. Bar No. 90010174
*Trial Attorney*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Telephone: (202) 598-7367
E-mail: esam.k.al-shareffi@usdoj.gov

*Counsel for Federal Defendants*

3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DSCC, *et al.*,<br><br>         Plaintiffs,<br>   v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>         Defendants. | Case No. 1:26-cv-01114-CJN |
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>         Plaintiffs,<br>   v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>         Defendants. | Case No. 1:26-cv-01132-CJN |
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*,<br><br>         Plaintiffs,<br>   v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>         Defendants. | Case No. 1:26-cv-01151-CJN |

**<u>NOTICE</u>**

JA731

Federal Defendants in the above-captioned matters respectfully submit the following notice regarding recent developments in this matter:

Earlier today, Secretary Mullin signed a memorandum pertaining to implementation of Executive Order 14,399. This memorandum rescinds and supersedes the recommendation approved on June 4, 2026, which Defendants noticed in this Court on June 5. The June 8 action more accurately reflects the current policy of the Administration with respect to the implementation of EO 14,399.

Under the new memorandum, Secretary Mullin has approved a technological approach toward implementing the infrastructure contemplated in Executive Order 14,399. Under this approach, USCIS, in coordination with the Social Security Administration and the Department of State, would deliver by June 30, 2026, a mechanism for States to receive secure, state-focused citizenship-related information from each agency. In so doing, USCIS is working to facilitate direct sharing of citizenship list information with the States. The Secretary further approved a phased plan under which citizen-facing portal capabilities would be developed and implemented later in 2026, once sufficient legal, privacy, and technical groundwork has been completed. Finally, the Secretary authorized DHS to continue preliminary conversations with USPS concerning potential data-sharing arrangements, and should USPS finalize its rulemaking process, consider working to advance potential coordination to the extent feasible and consistent with applicable law and privacy protections. Such data-sharing arrangements are not directed by EO 14,399 and would be contingent upon whether USPS issues a final rule; the content of such rule, if any; and any policy and legal determinations as to the desirability and feasibility of any such data-sharing.

Defendants' previous notice stated that the now-rescinded memorandum had as one of its parts the "implementation of a SAVE-based State Voter Roll Verification, whereby state election officials can submit their entire voter roll records to the USCIS Systematic Alien Verification for Entitlements program (SAVE) system for verification."  Executive Order 14,399 does not direct that approach, and the new memorandum no longer includes that discussion.

Dated: June 8, 2026

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC J. HAMILTON
*Deputy Assistant Attorney General*

JOSEPH E. BORSON
*Assistant Branch Director*

/s/ *Esam K. Al-Shareffi*
STEPHEN M. PEZZI
D.C. Bar. No. 995500
*Chief Litigation Counsel*
ESAM K. AL-SHAREFFI
D.C. Bar No. 90010174
*Trial Attorney*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Telephone: (202) 598-7367
E-mail: esam.k.al-shareffi@usdoj.gov

*Counsel for Federal Defendants*

4