**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 26-5193**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

DSCC, *ET AL*.

Plaintiffs-Appellants,

v.

PRESIDENT DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS
PRESIDENT OF THE UNITED STATES, *ET AL*.,

Defendants-Appellees.

On Appeal from the United States District Court
For the District of Columbia
Case No. 1:26-cv-01114
Hon. Carl J. Nichols

**CONSENTED TO BRIEF FOR *AMICUS CURIAE* THE SOCIETY FOR
THE RULE OF LAW IN SUPPORT OF APPELLANTS AND REVERSAL**

NANCY A. TEMPLE
  *Of Counsel*
Katten & Temple, LLP
209 S. LaSalle Street Suite 950
Chicago, IL 60604

RICHARD D. BERNSTEIN
(D.C. Circuit No. 39655)
  Counsel of Record
1875 K Street, NW
Washington, D.C. 20006
(301) 775-2064
Rbernsteinlaw@gmail.com

June 18, 2026

Counsel for *Amicus Curiae* The Society for The Rule of Law

# DISCLOSURE STATEMENT

Pursuant to D.C. Circuit Rule 26.1(a), *Amicus* The Society for the Rule of Law and Democracy, Inc., doing business as The Society for the Rule of Law ("SRL"), has no parent corporation, and there are no publicly held corporations that own more than 10% of its stock.

Dated June 18, 2026

Respectfully Submitted,

*/s/ Richard D. Bernstein*

Richard D. Bernstein
Attorney for *Amicus Curiae*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES PER CIRCUIT RULE 28(a)(1); STATUTES AND REGULATIONS PER CIRCUIT RULE 28(a)(5)**

**A. Parties and *Amici*.**

Except for *amici* Bipartisan Former Governors and State and Local Election Officials, Local Governments, and Election Experts, all parties, intervenors, and *amici* appearing before the district court and in this Court so far, are listed in the Brief of Appellants. *Amicus* The Society for the Rule of Law ("SRL") filed a notice with this Court on June 11, 2026 that it intended to file an *amicus* brief in support of Appellants and reversal, with the consent of the parties.

**B. Rulings Under Review.**

Reference to the ruling under review is in the Brief for Appellants.

**C. Related Cases.**

This case has not previously been before this Court or any other court other than the district court from which the appeal was taken. Reference to the related cases is in the Brief for Appellants.

**D. Statutes and Regulations.**

All applicable statutes and regulations are contained in the Brief for Appellants.

Dated: June 18, 2026        */s/ Richard D. Bernstein*

                                  Richard D. Bernstein (D.C.Cir. No. 39655)
                                  1875 K Street NW, Suite 100

Washington, DC 20006

(301) 775-2064

rbernsteinlaw@gmail.com

Counsel for *Amicus Curiae*

## STATEMENT REGARDING CONSENT TO FILE, AUTHORSHIP AND SEPARATE BRIEFING (CORPORATE DISCLOSURE PREVIOUSLY FILED)

Pursuant to Circuit Rule 29(b), *amicus* SRL filed a Notice to Intent To File *Amicus Brief* in Support of Appellants and Reversal with this Court on June 11, 2026. In their Notice to Intent, *amicus* SRL represented that all parties consented, through their respective counsel, to the filing of this brief. Their Notice to Intent also included the separate Corporate Disclosure Statement required by Circuit Rule 26.1 which Rule 29(b) states must accompany a written representation of consent to participate.

Pursuant to Fed. R. App. P. 29(a)(4)(E), this brief has not been authored, in whole or in part, by counsel to any party in this case. No party or counsel to any party contributed money intended to fund preparation or submission of this brief. No person contributed money that was intended to fund preparation of this brief.

Pursuant to Circuit Rule 29(d), *amicus* certifies that this separate *amicus* brief is necessary and does not believe it duplicates any other brief that may be submitted. This *amicus* brief contains a non-duplicative focus solely on Section 3(b)(i)-(iv) of Executive Order 14399 ("Section 3(b)(i)-(iv)"), the portion that bars delivery of mail containing ballots absent compliance with newly-imposed voting

list and voting system requirements.  Three examples are most pertinent.  First, this brief relies on *A.A.R.P. v. Trump*, 605 U.S. 91 (2025), which held that it was reversible error to reject irreparable harm when at a later time the government might argue that it was too late for a court to order relief.  *Id.* at 93-95, 97.  Here, the government has stated that once the USPS issues a final rule, the government may argue that it is too late for a court to enjoin that rule.  *See* SRL Br. at 2-3. Second, pursuant to precedent and the Help America Vote Act, including 52 U.S.C. §§ 21081(a)-(b),  21083(a)(1)(A), 21084, and 21145(a), it was illegal for the President to order the USPS to issue regulations that impose new or modified requirements concerning voting lists or a voting system, as Section 3(b)(i)-(iv) orders.  *See* SRL Br. at 6-13.  Third, and independently, an alternative reason to rule that Section 3(b)(ii)-(iv) is illegal is that the USPS would require clear statutory authority before the USPS could issue any such regulations.  That is entirely lacking.  *See* SRL Br. at 14-24.

# TABLE OF CONTENTS

Disclosure Statement……………………………………………………….. i

Certificate as to Parties, Rulings, and Related Cases Per Circuit Rule 28(a)(1); Statutes and Regulations Per Circuit Rule 28(a)(5)…………………… ii

Statement Regarding Consent to File, Authorship and Separate Briefing (Corporate Disclosure Previously Filed)…………………………………… iii

Table of Contents…………………………………………………………. v

Table of Authorities………………………………………………………. vii

Glossary…………………………………………………………………….. x

Interest of *Amicus Curiae*…………………………………………………. 1

Introduction and Summary of Argument…………………………………….. 1

Argument…………………………………………………………………….. 2

    I.     Recent Supreme Court Cases Establish Standing, Ripeness, And Irreparable Harm……………………………………………… 2

    II.    Section 3(b)(i)-(iv) Unconstitutionally Orders Incurable Violations Of NVRA and HAVA………………………………………..………… 6

          A.    The Incurable Violations of the NVRA…………………… 8

          B.    The Incurable Violations of HAVA………………………… 10

    III.    In Addition, Section 3(b)(i)-(iv) Unconstitutionally Orders Violations Of 39 U.S.C. § 401(2)………………………………… 13

          A.    The Incurable Violations Of 39 U.S.C. § 401(2)………….... 13

          B.    Further, Clear Statutory Authorization Is Required And Wholly Absent……………………………………….. 15

1. Federalism Principles…………………………….. 15

2. The Major Questions Doctrine…………………….. 17

Conclusion…………………………………………………….. 24

# TABLE OF AUTHORITIES

Page(s)

Cases

*A.A.R.P. v. Trump*,
605 U.S. 91 (2025) ............................................................................2, 3

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
570 U.S. 1 (2013) ...............................................................................16

*Biden v. Nebraska*,
600 U.S. 477 (2023) .......................................................................19, 22

*Bldg. & Const. Trades Dept., AFL-CIO v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002)…………………………………………7

*Bond v. United States*,
572 U.S. 844 (2014) .......................................................................15, 17

*Bost v. Illinois State Board of Elections*,
607 U.S. 71 (2026) ....................................................................3, 4, 5, 6

*Bush v. Gore*,
531 U.S. 1046 (2000) ........................................................................ 4

*Chamber of Commerce of the United States v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996)…………………………………….. 7

*Chiafalo v. Washington*,
591 U.S. 578 (2020) .......................................................................19, 22

*Diamond Alternative Energy, LLC v. EPA*,
606 U.S. 100 (2025)…………………………………………….. 5

*Esteras v. United States*,
606 U.S. 185 (2025)…………………………………………...10, 11

*Gonzales v. Oregon*,
546 U.S. 243 (2006) ...........................................................................18

*Heffernan v. City of Paterson*,
578 U.S. 266 (2016) ...........................................................................24

*Husted v. A. Philip Randolph Institute*,
584 U.S. 756 (2018) ........................................................................ 9

*Kendall v. United States*,
37 U.S. 524 (1837) ........................................................................ 7

*Learning Resources, Inc. v. Trump*,
146 S. Ct. 628 (2026)……………………………………………18, 20, 21

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007) ........................................................................ 4

*National Federation of Independent Business v. OSHA,*
595 U.S. 109 (2022) ................................................................24
*Purcell v. Gonzales*,
549 U.S. 1 (2006) ............................................................2, 3, 7
*Shelby County v. Holder,*
570 U.S. 529 (2013) .............................................................15
*United States v. Classic,*
313 U.S. 299 (1941) .............................................................22
*United States v. Comstock,*
560 U.S. 126 (2010) .............................................................16
*United States v. Gradwell*
243 U.S. 476 (1917) .........................................................16, 17
*United States v. Rahimi,*
602 U.S. 680 (2024) .............................................................20
*United States v. Town of Thornapple, Wisconsin,*
143 F.4th 793 (7th Cir. 2025)……………………………………..12
*West Virginia v. EPA,*
597 U.S. 697 (2022) .....................................................17-19, 21, 22
*Youngstown Sheet & Tube Co. v. Sawyer,*
343 U.S. 579 (1952)…………………………………………………..7

Statutes

1 Stat. 239 (1792) ……………………………………………………. 24
16 Stat. 433 (1871)…………………………………………………… 16
28 Stat. 36 (1894)…………………………………………………….. 16
56 Stat. 753 (1942)…………………………………………………… 24
79 Stat. 437 (1965)…………………………………………………... 17
120 Stat. 577 (2006)………………………………………………… 17
120 Stat. 3198 (2006) ………………………………………………. 15
2 U.S.C. §§ 1-9, 381-96 .........................................................19
3 U.S.C. §§ 1-22 ....................................................................19
18 U.S.C. §3061(b) .................................................................14
18 U.S.C. §§ 241, 611, 1015 ..................................................14
18 U.S.C. §§ 592-611 .............................................................19
28 U.S.C. § 1651(a) ................................................................. 3
39 U.S.C. §401 ................................................................10, 11, 15
39 U.S.C. § 401(2)...........................................2, 11, 13-17, 21, 24
39 U.S.C. § 404(e)(2)...............................................................14
39 U.S.C. §§ 3001-18 ........................................................13, 14

39 U.S.C. §§ 3001(a), 3003(a), and 3014(a)(2) ......................................................13

39 U.S.C. § 3629 .................................................................................................... 9

52 U.S.C. §§ 20506(a)(1), 20507(a) ...................................................................... 9

52 U.S.C. §§ 20507(d), 20984(a)(1)(B)(ii) ........................................................... 9

52 U.S.C. § 20507(a)(4), (c)(1) .............................................................................. 9

52 U.S.C. § 20508(a)(1)-(3) ................................................................................... 9

52 U.S.C. § 20511 ..................................................................................................14

52 U.S.C. § 21081(a) .............................................................................................12

52 U.S.C. § 21081(b)(2)(E) ...................................................................................12

52 U.S.C. § 21082 ..................................................................................................21

52 U.S.C. § 21083(a)(1)(A) ...................................................................................11

52 U.S.C. § 21084 ..................................................................................................10

52 U.S.C. § 21145 ..........................................................................................8, 10, 11

Act of Sept. 16, 1942, ch. 561, § 9, 56 Stat. 753 (1942) .......................................24

Other Authorities

91 Fed. Reg. 32,915-16 (June 2, 2026) .......................................................6, 8, 12

EO 14399 .................................................................... 1, 5, 14, 16, 20, 22, 23

H. R. Rep. No. 107-329 (2001) ..............................................................................11

H.R. 22 (2025) .......................................................................................................19

H.R. 7296 (2026) ...................................................................................................19

H.R. 7300 (2026) ...................................................................................................19

H.R. 8281 (2024) ...................................................................................................19

Merriam-Webster Dictionary…………………………………………………… 9

National Conference of State Legislatures, Challenges to Voter Eligibility, Table 2: Challenge Processes………………………………………………… 23

# GLOSSARY

CSC        Civil Service Commission

DMM       Domestic Mail Manual

EO         Executive Order

HAVA      Help America Vote Act of 2002

NPRM     Notice of Proposed Rulemaking

NVRA      National Vote Registration Act of 1993

UOCAVA  Uniformed and Overseas Citizens Absentee Voting Act

USPS       United States Postal Service

VRA        Voting Rights Act

**INTEREST OF *AMICUS CURIAE***

*Amicus* The Society for the Rule of Law and Democracy, Inc., doing

business as The Society for the Rule of Law ("SRL") is a national non-profit, non-

partisan membership organization of conservative, libertarian, and right-of-center-

lawyers, and others, who are dedicated to defending the legal principles of the rule

of law, separation of powers, and federalism.[1]  SRL has an interest in seeing that

Executive Order ("EO") 14399 does not violate these principles by commanding

the USPS to violate federal statutes.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

This brief focuses on Section 3(b)(i)-(iv) of EO 14399 ("Section 3(b)(i)-

(iv)").  Part I below shows that under recent Supreme Court precedents, there is

already sufficient harm for standing, ripeness, and irreparable harm, particularly as

the appellees have stated that they may later argue that it is too close to the election

to enjoin their illegal rules.  Parts II and III show that Section 3(b)(i)-(iv) exceeds

the President's power because it directs the USPS to violate at least three statutes

in ways that the USPS cannot cure.  Part II shows incurable violations of the

National Voter Registration Act of 1993 ("NVRA") and the Help America Vote

---

[1] *Amicus* states that no counsel for any party authored this brief in whole or in part, and that no entity, aside from *amicus* and its counsel, made any monetary contribution toward the preparation or submission of this brief.  The views of SRL do not necessarily represent the views of all individual members.

Act of 2002 ("HAVA") because those statutes direct that only state officials—

*never* the USPS—have a role in providing or administering any voting list or

modifying a voting system. In addition, Part III shows that 39 U.S.C. § 401(2) also

precludes the USPS from issuing regulations under which it would *ever* do any of

those non-postal functions. Even if that provision were ambiguous—and it is

not—federalism principles and the major questions doctrine each would require

clear statutory authorization, which is conspicuously lacking.

## ARGUMENT

**I.     Recent Supreme Court Cases Establish Standing, Ripeness, And
         Irreparable Harm.**

Under *A.A.R.P. v. Trump*, 605 U.S. 91 (2025), it was reversible error to rule

against standing, ripeness, and irreparable harm until the USPS issues a final rule

because, at a later stage, appellees have stated that they may argue that

under *Purcell v. Gonzales*, 549 U.S. 1 (2006) (*per curiam*), it has become be too

late to enjoin their voting-limiting rule. *A.A.R.P.* reversed the lower courts and

issued an injunction pending appeal. The issue of appellate jurisdiction turned on

whether the putative plaintiff class was "facing an imminent threat of severe,

irreparable harm." 605 U.S. at 94. They were because the government might

argue, if it transferred detainees to El Salvador, that another legal principle

rendered it too late for a federal court to order relief. *See id.* at 95; *see also id.* at

93 (after transfer, "the Government *may* have argued, as it had previously argued

2

[in a different case], that no U.S. court had jurisdiction to order relief") (emphasis added). The possibility that the government might later argue that it was too late defeated the government's arguments in *A.A.R.P.* that now was too soon. "We had the power to issue injunctive relief to prevent irreparable harm to the applicants and to preserve our jurisdiction over the matter. 28 U.S.C. § 1651(a)." *Id.* at 97.

The situation here is indistinguishable. *A.A.R.P.* shows that here relief cannot be denied as too soon now, when it may be too late later. The appellees argue here that it is too soon to enjoin the new illegal rule commanded by Section 3(b)(i)-(iv). But appellees told the district court that, "of course [they] can't and won't take off the table" the argument that after the USPS formally issues the required rule, on July 27, 2026, that *Purcell* would make it too late for a federal court injunction before the 2026 elections. JA 641 (government counsel). *Purcell* makes the election context different from an EO or Notice of Proposed Rulemaking in a non-election context. In a non-election context, the government cannot argue that a prompt challenge to a final rule is too late.

Even if the appellees belatedly made a binding waiver of *Purcell*, the rationale of *Bost v. Illinois State Board of Elections*, 607 U.S. 71 (2026), which the District Court's decision ignored, independently establishes standing, ripeness, and irreparable harm. The heart of *Bost* was that courts should not "channel . . . election disputes" over rules affecting vote-counting towards election day. *Id.* at

3

80. *Bost* relied, 607 U.S. at 80, on the concurrence of Justice Scalia in granting a stay in *Bush v. Gore*, 531 U.S. 1046, 1047 (2000). That concurrence addressed "irreparable harm." *Id.* And the Supreme Court has noted the similarity between the imminence component of standing and ripeness. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n. 8 (2007).

Under *Bost*, candidates are among the plaintiffs who "have an interest in a fair process" and thus "suffer [harm] *when* the process departs from the law." 607 U.S. at 77 (emphasis added). Accordingly, relief should be granted promptly once government officials announce illegal rules that, absent relief, would "govern the counting of votes in [candidates'] elections," including by any "discarding of lawful ones." *Id.* at 78, 82. There is no need to show that under the illegal rule, any potential vote would be rejected. *Id.* at 77, 82. Here, already "the process [has] depart[ed] from the law." *Id.* at 77. Section 3(b)(i)-(iv) has commanded an illegal rule that governs counting votes by unequivocally commanding that the USPS prevent the delivery of many mail-in ballots, thus preventing state officials from performing their constitutionally assigned role to decide whether to count them.

Section 3(b) and 3(b)(iv) require that the USPS rule "*shall* include" that the "USPS *shall provide* each State with a list of individuals (Mail-In and Absentee Participation List) who are *enrolled* with the USPS . . . for mail-in and absentee

4

ballots provided by such state ….”  (Emphases added.)  Most important, Section 3(b)(iii) further mandates that “the USPS *shall not transmit* mail-in or absentee ballots from any individual unless those individuals have been *enrolled* on a State-specific [Mail-In and Absentee Ballot Participation List]” (emphasis added) with the USPS.   This would preclude “the counting of votes.”  *Bost*, 607 U.S. at 82.  Section 3(b)(i) and (iv) also bar transmitting ballots between state officials and voters when envelopes lack a unique bar code.

Nothing in Section 3 of EO 14399 has any ifs or caveats to comply with law.  As the Supreme Court recently held in reversing a no-standing decision: “When as here a government seeks to justify its regulatory actions by, one the one hand, touting the consequences … while, on the other, maintaining that those same regulations are unreviewable because there are no consequences, courts can appropriately be skeptical.”  *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 122 (2025).  The federal courts should not “exhibit a naivete from which ordinary citizens are free,” *id.* (quotations omitted), especially given the President’s asserted control of the USPS under unitary executive principles.

The USPS’s NPRM confirms this control.  The NPRM accordingly limits those who may receive or cast ballots by mail to “individuals [who] have been enrolled with the Postal Service for inclusion on the state’s Mail-In and Absentee Participation  List,” which list “the Postal Service will provide . . . to each state’s

5

chief election official," and the USPS, not state officials, will "evaluate" and "verif[y]" whether a voter is properly "enrolled" with the USPS, and refuse to transmit ballots that are noncompliant. DMM 705.24.4.2-3, 705.24.5.1-3, 91 Fed. Reg. 32,915, 32,917-18 (June 2, 2026). The USPS also won't deliver ballot mail between states and voters without unique barcodes. *Id.*

Delaying injunctive relief encourages every administration, every two years, to announce invalid election rules early enough to induce some states and localities to pre-comply, but delay the last formality of agency promulgation to forestall judicial review. That dangerous precedent would injure separation of powers and federalism, increase costs, disenfranchise voters, and sow confusion and distrust. Fortunately, *Bost* holds that election litigants should be able to obtain relief "when the process departs from the law," 607 U.S. at 77, which already has occurred here. *Infra*, Parts II and III.

## II.     Section 3(b)(i)-(iv) Unconstitutionally Orders Incurable Violations Of NVRA And HAVA.

The District Court erred in ruling that "the government's actions" cannot be "unlawful" until the USPS issues a final rule. JA 717. If that were correct, it would not be unlawful for a President to order the USPS to issue proposed regulations to bar delivery of ballots in rural counties, in which historically a majority vote for Republicans. That is not the law.

Justice Robert Jackson wrote that it is "obvious from the Constitution and

6

elementary American history" that *none* of the President's constitutional powers

"supersede representative government of internal affairs" through statutes.

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 644 (1952) (Jackson, J.,

concurring).  In particular, for nearly two centuries, and consistent with unitary

executive principles, the law has been that a President exceeds his limited

constitutional powers by ordering postal officials, his executive branch

subordinates, to violate federal statutes.  *See Kendall v. United States*, 37 U.S. 524,

610, 612-13 (1837); *see also Chamber of Commerce of the United States v. Reich*,

74 F.3d 1322, 1332 (D.C. Cir. 1996) (per Silberman, J.) (executive order may not

"bypass … statutory limitations on governmental authority").

The District Court misplaced reliance on *Bldg. & Const. Trades Dept.,*

*AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002).  JA 717.  *Allbaugh* actually

supports reversal for two reasons.  First, *Allbaugh* distinguished circumstances

where after the agency would act, there is a "reason to think that the usual

mechanisms for seeking expedited review would be inadequate."  295 F.3d at 33-

34 (quotations omitted).  But that is exactly the case here because of the potential

*Purcell* bar that appellees say they might raise.  JA 641; *supra*, at 3.

Second, *Allbaugh* indicated that review would be available for an

executive order that "is without any valid application."  295 F.3d at 33.  Section

3(b)(i)-(iv) has no valid application because it illegally directs USPS officials to

7

violate federal election and postal statutes that bar, without exception, *any* role for the USPS in providing or administering any voter list or modifying a voting system. The USPS cannot follow Section 3(b)(i)-(iv) *and* cure any of these statutory violations.

To start, the federal government has admitted that it lacks authority for its new ballot-delivery restrictions to apply to "ballots covered under the Uniformed and Overseas Citizens Absentee Voting Act" because "UOCAVA is a separate federal statutory scheme with its own requirements." 91 Fed. Reg. at 32915-16. But UOCAVA is actually part of an integrated "federal statutory scheme with its own requirements" that includes the NVRA and HAVA and that scheme covers all ballots in all federal elections. Indeed, UOCAVA, the NVRA, and HAVA are all chapters of Subtitle II of Title 52 of the U.S. Code, and HAVA integrates both UOCAVA and the NVRA. *See* 52 U.S.C. § 21145(a); *infra*, at 10. Section 3(b)(i)-(iv) illegally commands the USPS to commit incurable violations of the NVRA and HAVA.

**A. The Incurable Violations of the NVRA.**

NVRA and HAVA preclude the USPS from any role concerning any voter list or in modifying any voting system. To start, as the words "enrolled" and "Participation List" in Section 3(b)(i)-(iv) indicate, each USPS Mail-In and Absentee Participation List would be a voting list that the USPS would both

8

provide to states and administer by blocking the counting of potential votes.

Indeed, "enrolled" and "registered" are synonyms. *Enrolled*, Merriam-Webster,

www.merriam-webster.com/dictionary/enrolled (last visited April 10, 2026);

*Registered*, Merriam-Webster, https://www.merriam-

webster.com/dictionary/registered (last visited April 10, 2026). NVRA, HAVA

and the Supreme Court describe voter lists as "voter *rolls*." 52 U.S.C. §§

20507(d), 20984(a)(1)(B)(ii) (emphases added); *Husted v. A. Philip Randolph

Institute*, 584 U.S. 756, 781 (2018) (emphasis added).

But NVRA charges *state* agencies with "the registration of voters in

elections for Federal office" and "the *administration* of voter registration for

elections for federal office." 52 U.S.C. §§ 20506(a)(1), 20507(a) (emphasis

added). In contrast, 52 U.S.C. § 20508(a)(1)-(3) limits the federal authority to

issue regulations under the NVRA to one agency, the Federal Election

Commission, and two subjects – "a mail voter registration application form" and

reports to Congress every two years making recommendations.

As for the USPS, 52 U.S.C. § 20507(a)(4), (c)(1) merely authorizes a state

to use "change-of-address information supplied by the Postal Service" in meeting

the state's obligations to make a "reasonable effort" to remove voters who changed

residence from the state's voter list. The NVRA also enacted 39 U.S.C. § 3629,

which mandates that the USPS make available nonprofit rates to state and local

9

registration officials for the mailings required or authorized by the NVRA.  That's all.

## B. The Incurable Violations of HAVA.

52 U.S.C. § 21084 of HAVA provides that "a *State*" may "establish[] election technology and administration requirements that are more strict than the requirements under this subchapter" provided that the stricter "State requirements" are not inconsistent with the "Federal requirements" of HAVA "or any law described in section 21145 of this title."  (Emphasis added.)  52 U.S.C. § 21145(a) not only lists those federal laws, it also limits any government entity's using other federal statutes that are *not* on that list to impose stricter requirements.  Section 21145(a) specifies that HAVA does not "supersede, restrict, or limit the application of" only "the following laws."  The "following laws" are a series of six specific federal statutes—four voting statutes, including the Voting Rights Act ("VRA"), *UOCAVA*, and the NVRA, and two primarily non-election statutes.  *Id.*

Most important, unlike this series of six specified statutes, Section 21145(a) *omits* 39 § U.S.C. 401 from the series of statutes that Section 21145(a) exempts from HAVA's superseding and restrictions and limits.  Under the "well established canon of statutory interpretation: *expressio unius est exclusio alterius*," *Esteras v. United States*, 606 U.S. 185, 195 (2025), 52 U.S.C. §§ 21084 and 21145(a) prevent the federal executive branch from establishing stricter

10

requirements on HAVA topics by using 39 U.S.C. § 401.  "Indeed, the *expressio unius* canon has particular force here because the" six preserved federal statutes in Section 21145(a) "constitute an 'established series,' such that any 'omission' from that series necessarily 'bespeaks a negative implication.'"  *Esteras*, 606 U.S. at 195 (citation omitted).

In at least two ways, Section 3(b)(i)-(iv)'s ordering USPS to use 39 U.S.C. § 401 to impose stricter election technology and administration requirements violated both HAVA's text and that text's purpose that state and local administration of federal elections "must be preserved" so that it will remain "*impossible* for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome."  H. R. Rep. No. 107-329, pt. 1, at 31-32 (2001) ("HAVA Report") (emphasis added).  First, HAVA directs that the "*single*, . . . official . . .  statewide voter registration list" for each state be "defined, maintained, and administered at the State level."  52 U.S.C. § 21083(a)(1)(A) (emphasis added).  This "computerized list shall serve as *the single system* for storing and managing *the official list* of registered voters throughout the State" and "shall serve as *the official voter registration list* for the conduct of all elections for Federal office in the State."  *Id.* § 21083(a)(1)(A)(i), (viii) (emphasis added).  But Section 3(b)(ii-iv), and consequently the NPRM, illegally use 39 U.S.C. § 401(2) to establish a second voting list for each state, a list of voters eligible to vote by

11

mail. And as the NPRM confirms, a state cannot have mail-in voting unless the "state submitted a list" of those voters through a USPS portal, and "States would provide" the USPS with the "information" for "compiling the [USPS] lists." 91 Fed. Reg. at 32,916. This confirms that Section 3(b)(ii-iv) illegally directed the USPS to violate HAVA by establishing stricter election technology and administration requirements concerning voting lists.

Second, 52 U.S.C. § 21081(a) establishes "requirements" for "[e]ach voting system used in an election for Federal office." The term "voting system" includes "the practices and associated documentation used . . . to make available any materials to the voter (such as notices, instructions, forms, or paper ballots). " 52 U.S.C. § 21081(b)(2)(E). The Seventh Circuit recently agreed with this Administration that every method for "paper balloting" is a "voting system" under HAVA, and that "Congress set forth a broad definition of 'voting system' that captures a wide array of equipment, practices, and documentation used before, during, and after the voting process." *United States v. Town of Thornapple, Wisconsin*, 143 F.4th 793, 798, 799 (7th Cir. 2025).

Certainly, the documentation and practices used for delivering paper ballots to mail-in voters, including the envelopes, constitute a "voting system." Here, the barcoded Outbound Federal Ballot Mail Envelopes under Section 3(b)(i)-(iv) constitute a new and stricter "voting system" because they are documentation used

to make notices, instructions, forms, or paper ballots available to many voters.  So too, the information that states provide through portal that Section 3(b)(i)-(iv) requires and the mandatory barcode on the Outbound Federal Ballot Mail Envelopes constitute a new and stricter "voting system" as they would be practices used to make those materials available to the voter.  Therefore, Section 3(b)(i-iv) illegally directed the USPS to violate HAVA by establishing stricter election technology and administration requirements concerning voting systems.

III.    **In Addition, Section 3(b)(i)-(iv) Unconstitutionally Orders Violations Of 39 U.S.C. § 401(2).**

### A. The Incurable Violations Of 39 U.S.C. § 401(2).

Independently, Section 3(b)(i)-(iv) orders violations of 39 U.S.C. § 401(2), which bars the USPS from adopting regulations that are "inconsistent with this title" or not "necessary in the execution of its functions under this title [or] such other functions as may be assigned to the Postal Service under any provisions of law outside of this title."  First, Section 3(b)(i)-(iv) illegally directs the USPS to issue regulations "inconsistent" with 39 U.S.C. §§ 3001-18, the sections that make certain items "nonmailable."  These Title 39 sections render nonmailable items deposited in violation of 12 *specified* criminal-law sections of other Titles by expressly cross-referencing in 39 U.S.C. §§ 3001(a), 3003(a), and 3014(a)(2) that series of 12 criminal-law sections from other Titles.  Under the *expressio unius* canon, *supra*, at 10-11, violations of criminal-law sections of other Titles that are

13

*omitted* from these Title 39 sections are excluded as a basis for the USPS to block delivery of mail.  Omitted from the nonmailable provisions of 39 U.S.C. §§ 3001-18 is any reference to the four sections from Titles 18 and 52 that Section 1 of EO 14399 cites as the basis for "prohibit[ing] non-citizens from registering to vote or voting."  These four omitted sections are 18 U.S.C. §§ 241, 611, 1015, and 52 U.S.C. § 20511.  Also omitted from 39 U.S.C. §§ 3001-18 are the two additional criminal-law sections cited in the NPRM—52 U.S.C. § 10307 and 18 U.S.C. §3061(b).  These six omissions confirm that Section 3(b)(i)-(iv) of EO 14399 may not direct the USPS to bar delivery of mail-in ballots sent between state officials and voters.

Second, the providing and administering of voting lists and modifying a voting system are each a "nonpostal service" and thus barred by 39 U.S.C. § 404(e)(2).  Providing and administering voter lists is instead historically undertaken by only trained election officials, and modifying a voting system is the exclusive domain of a state or Congress.  *Supra*, at 9, 11.

Third, Section 3(b)(i)-(iv) illegally directs the USPS to violate 39 U.S.C. § 401(2), because no federal statute gives the USPS any "function" with respect to voting lists or modifying a voting system.  Nothing the USPS might do in formulating a final rule could evade these many, complete statutory bars.

14

**B. Further, Clear Statutory Authorization Is Required And Wholly Absent.**

For the reasons in Parts II and III. A, *supra*, this Court can reverse without addressing whether a clear authorization requirement also rejects appellees' argument that 39 U.S.C. §401(2) might authorize the USPS to have a role concerning voter lists or modifying a voting system. But the Court, as an alternative holding, should decide that clear authorization would be required, under each of the federalism principles and the major questions doctrine, before the USPS could do anything like that. As shown in Part III.A, *supra*, nothing in 39 U.S.C. § 401(2) comes remotely close.

### 1. Federalism Principles

39 U.S.C. § 401 codifies legislation enacted under the Postal Clause, *see* Postal Accountability and Enhancement Act, § 504, 120 Stat. 3198, 3235 (2006) (revising 39 U.S.C. § 401 to add the narrowing limitation "not inconsistent with this title"), *not* the Elections Clause. 39 U.S.C. § 401 does not even mention elections, much less voting lists or voting systems. Federalism and Tenth Amendment principles apply to "congressional" and other federal elections. *Shelby County v. Holder,* 570 U.S. 529, 543 (2013). Accordingly, 39 U.S.C. § 401 is interpreted under the standard presumption that, absent a clear statement, a federal statute does not change the usual allocation of authority between the states and the federal government. *See Bond v. United States*, 572 U.S. 844, 857-60 & n.

15

2 (2014).[2]  It is certainly the usual allocation that states, not federal agencies, provide and administer voting lists and modify voting systems.  *See supra*, Part II.A-B.

When Congress has changed that usual allocation, Congress has done so in the clearest and most unmistakable terms.  When Congress twice authorized federal officials to have a role in voting lists or voting systems, Congress used unmistakable, limited language *and* subsequently repealed those authorizations.  In 1871, the Second Enforcement Act gave federal "supervisors of election" in larger cities and towns in House elections authority related to "verify[ing]" and sometimes making voter "lists" and inspecting and scrutinizing "the manner in which voting is done."  16 Stat. 433, 434-35, 438 (1871).  However, in 1894, Congress repealed *all* these statutory provisions.  28 Stat. 36, 36-37 (1894).

There is a second repeal.  In 1965, Sections 6 and 7 of the original VRA,

---

[2] There is an exception to this presumption for "Elections Clause legislation," that is, for statutes enacted "under the Elections Clause." *Arizona v. Inter Tribal Council of Arizona, Inc.,* 570 U.S. 1, 13-15 & n.6 (2013).  But 39 U.S.C. § 401(2) is enacted under the Postal Clause.  Likewise, all the criminal statutes cited by EO 14399 and the NPRM are also enacted under the Necessary and Proper Clause, *see United States v. Comstock,* 560 U.S. 126, 135-36 (2010), not the Elections Clause. In ruling that a federal statute that criminalized defrauding the United States did not apply to a case about a congressional election, *United States v. Gradwell* relied on the practice of Congress that "whenever it has assumed to regulate [congressional] elections it has done so by positive and clear statutes."  243 U.S. 476, 485 (1917).

authorized, in certified jurisdictions, the federal Civil Service Commission (CSC) to appoint examiners to place an eligible voter "on a list of eligible voters" and "transmit" that partial list to state officials. 79 Stat. 437, 440 (1965). Section 9(b) gave the CSC authority to "prescribe[] . . . regulations" concerning the partial "eligibility lists." *Id.* at 441. In 2006, however, Congress *repealed* Sections 6, 7, and 9 of the original VRA. 120 Stat. 577, 580 (2006).

The Supreme Court relied on "the history" of the 1894 repeal to interpret a different, non-election federal statute as lacking the "positive and clear" language necessary to regulate similar federal election topics. *United States v. Gradwell*, 243 U.S. 476, 479-85 (1917). Here, 39 U.S.C. § 401(2) does not come close to the positive and clear language that *Bond* and *Gradwell* hold is necessary. *See* Part III.A, *supra.*

### 2. The Major Questions Doctrine

Independently, the major questions doctrine also requires "clear congressional authorization," *West Virginia v. EPA*, 597 U.S. 697, 723-24 (2022), before any federal agency may be found to have authority concerning voting lists or voting systems. The core of the major questions doctrine is that courts "presume that Congress intends to make major policy decisions itself, not leave these decisions to agencies." *Id.* at 723 (quotations omitted). This reflects "both separation of powers principles and a practical understanding of legislative intent."

17

*Id.* at 723-24. "[A] reasonable interpreter would not expect Congress to pawn . . . a big-time policy call . . . off to another branch." *Learning Resources, Inc. v. Trump,* 146 S. Ct. 628, 641 (2026) (plurality opinion) ("*Learning Resources* Plurality") (cleaned up). The decision as to what is a major question also reflects "constitutional structure and common sense." *Id.* at 639.[3]

Nothing could fit the major questions doctrine better than whether a federal agency has been given federal statutory authority concerning elections. That is because federal elections control who exercises federal legislative and federal executive power. To compare an election issue to *Learning Resources,* Congress has the power to issue tariffs, but federal elections decide who exercises that power and every other legislative and executive power, and therefore how those powers are executed. Indeed, James Madison explained in *Federalist* No. 39 that it was elections that made the federal government under our Constitution "a republic." Madison further explained in *Federalist* No. 51 that "[a] dependence on the

---

[3] The major questions doctrine is *not* limited to economic issues. *West Virginia,* 597 U.S. at 722, cited *Gonzales v. Oregon,* 546 U.S. 243 (2006), as a formative case in the major questions doctrine. *Gonzales* involved assisted suicide. Although assisted suicide is a profound issue, it is not an economic issue. Moreover, the major questions doctrine protects all the legislative powers vested in Congress. As the Elections Clause makes plain, the power over federal elections is a core congressional power. There is no basis to exempt that core power from the major questions doctrine. "There is no major questions exception to the major question doctrine." *Learning Resources* Plurality, 146 S. Ct. at 642.

18

people" through elections "is, no doubt, the primary control on the government." It is through elections that "here, We the People rule." *Chiafalo v. Washington,* 591 U.S. 578, 597 (2020).

The Elections Clause unmistakably vests the power to decide the rules and policies for elections in legislatures – first and foremost state legislatures, subject to alteration by Congress. Congress has not been shy about exercising this power. Not only is there the voluminous Title 52 on federal elections, covering requirements concerning voting lists and voting systems, and many other topics. *See* Part II.A-B, *supra.* There are also extensive provisions for federal elections in Titles 2, 3, and 18. *See, e.g.,* 2 U.S.C. §§ 1-9, 381-96; 3 U.S.C. §§ 1-22; 18 U.S.C. §§ 592-611.

Moreover, Congress has considered expanding federal power concerning voting lists and voting systems. *See* SAVE Act, H.R. 8281, 118th Cong. (2024); SAVE Act, H.R. 22, 119th Cong. (2025); SAVE America Act, H.R. 7296, 119th Cong. (2026); Make Elections Great Again Act, H.R. 7300, 119th Cong. (2026). That Congress has so far not adopted these bills and expanded the federal role in these areas provides further reason to apply the major questions doctrine. *See West Virginia,* 597 U.S. at 731-32; *Biden v. Nebraska*, 600 U.S. 477, 503 & n. 8 (2023).

If the courts ever permitted the shift of the power to make election rules to the federal executive branch, the power would never be retrieved by Congress. As

Justice Gorsuch recently explained, all Presidents have a "desire for more power." *Learning Resources,* 146 S. Ct. at 655 (Gorsuch, J., concurring). Giving power over election rules to legislatures gives opportunity for "deliberation [to] temper[] impulse, and compromise hammers disagreements into workable solutions" that "tend to endure." *Id.* at 672. In contrast, EO 14399 asserts that the President, by himself, can direct the USPS to make and administer voting lists and to modify voting systems. Giving power to "one man"– any President –to make the rules for elections "is no recipe for a republic." *Id.* at 655.[4]

At the heart of election regulation are voting lists and voting systems. They determine who votes and how they vote. That is why Congress has twice enacted – and twice repealed – mechanisms for federal officials to have a role in voting lists and voting systems. *See supra*, at 16-17. Rather, Congress in the NVRA and HAVA has left the providing and administering of voting lists and modifying voting systems to state officials. *See* Part II.A-B, *supra*.

---

[4] History proves that Justice Gorsuch's insight applies to elections. One reason for the Glorious Revolution and the English Bill of Rights of 1689 was that King James II attempted to subvert elections of Parliament by exercising control concerning voting. *See Harper v. Hall*, 866 S.E.3d 393, 434-37 (N.C. 2023) (reviewing history). Both interpretation of our Constitution and the application of the major questions doctrine have relied on the Glorious Revolution and English Bill of Rights. *See e.g., United States v. Rahimi*, 602 U.S. 680, 694 (2024); *Learning Resources*, 146 S. Ct. at 671 (Gorsuch, J., concurring).

39 U.S.C. § 401(2) is the kind of "ancillary provision" or "gap filler" that is not sufficient to satisfy a clear statement or clear authorization rule. *West Virginia*, 597 U.S. at 724; *see also id.* at 723 ("modest words, vague terms, or subtle devices" do not suffice); *id.* at 732 ("a vague statutory grant is not close" to sufficient); *Learning Resources* Plurality, 146 S. Ct. at 642 ("delegations of core congressional powers" do not "lurk[] in ambiguous statutory text") (cleaned up). To the contrary, similar to tariffs, the history in Parts II.A-B and III.B.1, *supra,* shows that when Congress has delegated its power to federalize something concerning voting lists or voting systems, Congress has done so in the most explicit terms and made the delegation subject to express limits. *See Learning Resources* Plurality, 146 S. Ct. at 639 ("When Congress has delegated its tariff powers, it has done so in explicit terms, and subject to strict limits.").

It further supports application of the major questions doctrine where an issue presents a policy choice and "[t]he basic and consequential trade-offs involved in such a choice are ones that Congress would likely have intended for itself." *West Virginia,* 597 U.S. at 730. Whether the USPS should provide or administer voting lists or modify a voting system involves numerous policy choices of the kind that Congress usually makes. Congress has recognized that voting lists and voting systems produce errors, and Congress has required state processes that find and remedy such errors. *See* 52 U.S.C. § 21082 (requiring that voters missing from

21

voter lists have the opportunity to cast provisional ballots). Such errors, when uncaught and unremedied, deprive eligible voters of their long-established constitutional rights to vote for members of Congress, *see United States v. Classic*, 313 U.S. 299, 314-18 (1941), and their rights to cast popular votes in presidential elections in all 50 states and D.C., *see Chiafalo*, 591 U.S. at 584-85. But EO 14399 and consequently the NPRM have no provisions requiring notice to a voter to learn about or fix errors, an administrative opportunity to challenge an omission or mistake, or an opportunity for judicial supervision.

The USPS has no expertise or history concerning voting lists or modifying voting systems. *See West Virginia,* 597 U.S. at 730 (relying on an agency's lack of expertise as support for applying the major questions doctrine); *Biden*, 600 U.S. at 518 (Barrett, J., concurring) ("Another telltale sign that an agency may have transgressed its statutory authority is when it regulates outside its wheelhouse."). Having the USPS check envelopes against voting lists also would slow down the delivery of mail-in ballots to voters, thereby shortening the time given by state legislatures to those voters to consider and make their choices for federal, state, and local offices. This slowdown would be even longer if USPS implemented some process for voters to challenge their omission from the USPS voting lists or the mistaken application of those lists. In contrast, state voting list laws do not interfere with the timely delivery of mail-in ballots because they allow voting list

22

issues to be resolved at the time of registration, or after the timely delivery of mail-in ballots, or both.  *See* National Conference of State Legislatures, *Challenges to Voter Eligibility, Table 2: Challenge Processes* (last updated Feb. 19, 2026), https://www.ncsl.org/elections-and-campaigns/challenges-to-voter-eligibility.

Add to the policy choices involved in EO 14399 the uncompensated costs of the new tasks for the USPS – much less the costs of doing these tasks competently, including recognizing and correcting errors.  Like everyone else, Congress is well aware of the multi-decade funding problems of the USPS.

But the most fundamental policy choice goes to the very structure of our republic.  As the HAVA Report stated, *supra*, at 11, our federalist election structure, designed by the Elections and Electors Clauses, fosters both the reality and appearance of election integrity by decentralizing election rules and their administration.  In our nation's history, it is rare that control of either house of Congress or the Presidency is decided by a single disputed election in one state.  Thus, stealing control would require a conspiracy involving officials in multiple states.  Stealing such control would be easier if any single federal agency, including the USPS, controlled by the President (as EO 14399 asserts that the USPS is), had power concerning the providing and administration of voting lists and modifying voting systems in federal elections *in all 50 states*.

Further, a President's control concerning voting lists or voting systems, via the USPS, could be exercised to expand as well as contract the level of voting. "[I]n the law, what is sauce for the goose is normally sauce for the gander." *Heffernan v. City of Paterson*, 578 U.S. 266, 272 (2016). *Assuming* that Section 3(b)(i)-(iv) were valid, a future President could, for example, order the USPS to provide mail-in voting lists to states based on accepting types of proof of eligibility that a given state does not itself accept. That President would argue that under the Supremacy Clause, the state officials could not thereafter contradict the inclusion of a person on a list of eligible mail-in voters provided by the USPS.

For all these reasons, the major questions doctrine requires clear authorization before interpreting 39 U.S.C. § 401(2) to give the USPS authority concerning voting lists or voting systems. That is sorely lacking here.

Federal statutes have regulated federal elections since at least 1792, *see* 1 Stat. 239 (1792), voting lists since at least 1871, *supra* at 16-17, and voting by mail since at least 1942, Act of Sept. 16, 1942, ch. 561, § 9, 56 Stat. 753, 756 (1942). The elephant of any USPS authority concerning providing or administering voting lists or modifying voting systems would not have been hidden for decades in the mousehole of 39 U.S.C. § 401(2). *See National Federation of Independent Business v. OSHA,* 595 U.S. 109, 119 (2022) (*per curiam*); *id.* at 125 (Gorsuch, J., concurring).

24

## CONCLUSION

The Court should reverse.

/s/ Richard D. Bernstein

Richard D. Bernstein (D.C. Cir. No. 39655)
1875 K Street NW, Suite 100
Washington, DC 20006
(301) 775-2064
rbernsteinlaw@gmail.com

*Of Counsel*
Nancy A. Temple (IL-6205448)
Katten & Temple, LLP
209 S. LaSalle Street, Suite 950
Chicago, IL 60604
312-663-0800
ntemple@kattentemple.com

*Counsel for Amicus The Society*
*For The Rule of Law*

Date: June 18, 2026

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,805 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft 365 in 14 point Times New Roman Font.

By: */s/ Richard D. Bernstein*

Richard D. Bernstein
Attorney for *Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2026, I filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

By: */s/ Richard D. Bernstein*

Richard D. Bernstein
Attorney for *Amicus Curiae*