NOT YET SCHEDULED FOR ORAL ARGUMENT
No. 26-5193

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

DSCC, *et al.*,

*Plaintiffs-Appellants,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

*Defendants-Appellees,*

Appeal from the U.S. District Court for the District of Columbia
(1:26-cv-01114-CJN)

## STATE APPELLEES' BRIEF

**CATHERINE L. HANAWAY**
MISSOURI ATTORNEY GENERAL

Louis J. Capozzi III, 66364
  *Solicitor General*
William J. Seidleck, 63854
  *Principal Deputy Solicitor General*
Graham D. Miller, 66910
  *Deputy Solicitor General*

J. Michael Patton*
  *Deputy Solicitor General*
Benjamin S. Gilberg*
  *Deputy Solicitor General*
815 Olive Street, Ste. #200
St. Louis, Missouri 63101
Tel. (573) 645-9662
Louis.Capozzi@ago.mo.gov

*Counsel for the State of Missouri*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION AND SUMMARY OF ARGUMENT ......................... 1

STATEMENT OF FACTS ................................................................ 6

I.      Factual Background ........................................................ 6

II.     Procedural History ....................................................... 10

LEGAL STANDARD ................................................................... 12

ARGUMENT ............................................................................. 14

I.      Appellants Are Unlikely to Succeed on the Merits. ...................... 14

       A.  Appellants have not alleged a cognizable injury. ................... 14

       B.  Appellants' claims are not ripe. ................................... 45

       C.  Appellants' challenges are doomed on the merits. .................. 51

II.     The balance of the equities forecloses a preliminary injunction. .. 61

Conclusion ............................................................................. 63

CERTIFICATE OF COMPLIANCE ................................................. 67

CERTIFICATE OF SERVICE ........................................................ 68

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner,*
  387 U.S. 136 (1967)................................................................48

*\*Alaska v. U.S. Dep't of Agric.,*
  17 F.4th 1224 (D.C. Cir. 2021) ...................................... 2, 6, 38, 39, 48

*Alexander v. S.C. State Conference of NAACP,*
  602 U.S. 1 (2024) ..................................................................20

*Alexander v. Sandoval,*
  532 U.S. 275 (2001)................................................................52

*All. for Retired Ams. v. Bessent,*
  770 F. Supp. 3d 79 (D.D.C. 2025)....................................................36

*\*Allen v. Wright,*
  468 U.S. 737 (1984)...................................... 3, 14, 17, 21, 41

*Allen-Bradley Loc. No. 1111, United Elec., Radio & Mach. Workers of
  Am. v. Wisconsin Emp. Rels. Bd.,*
  315 U.S. 740 (1942)................................................................62

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.,*
  934 F.3d 649 (D.C. Cir. 2019)....................................................38, 39

*Am. Fed'n of Gov't Emp., AFL-CIO v. Freeman,*
  498 F. Supp. 651 (D.D.C. 1980)....................................................53

*Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan,*
  870 F.2d 723 (D.C. Cir. 1989)....................................................49

*Am. Fed'n of Labor & Congress of Industrial Organizations v.
  Department of Labor,*
  2026 WL 879518 (D.D.C. Mar. 31, 2026) ....................................29, 30

*Am. Petroleum Inst. v. EPA,*
  683 F.3d 382 (D.C. Cir. 2012).....................................................48

*Ambach v. Norwick*,
 441 U.S. 68 (1979) ............................................................................... 28, 29

*\*Bennett v. Spear*,
 520 U.S. 154 (1997) .......................................................... 4, 38, 50, 51

*Bost v. Ill. State Bd. of Elections*,
 607 U.S. 71 (2026) ................................................................................ 3, 34

*California v. Trump*,
 2026 WL 1826490 (D. Mass. June 25, 2026) .................................. 12

*Center of Taxpayer Rights v. Internal Revenue Service*,
 815 F. Supp. 3d 1 (D.D.C. 2025) ....................................................... 31

*Chaplaincy of Full Gospel Churches v. England*,
 454 F.3d 290 (D.C. Cir. 2006) ...................................................... 13, 14

*Church v. Biden*,
 573 F. Supp. 3d 118 (D.D.C. 2021) ............................................ 47, 50

*City & Cnty. of S.F. v. Trump*,
 897 F.3d 1225 (9th Cir. 2018) ........................................................... 46

*\*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013) ......................... 15, 16, 18, 19, 23, 24, 41, 43, 45, 61

*Clinton v. Jones*,
 520 U.S. 681 (1997) ................................................................................ 53

*Common Cause v. Trump*,
 506 F. Supp. 3d 39 (D.D.C. 2020) ..................................... 46, 48, 61, 62

*Common Purpose USA, Inc. v. Obama*,
 227 F. Supp. 3d 21 (D.D.C. 2016) ...................................................... 43

*Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*,
 167 F.4th 605 (2d Cir. 2026) ............................................................... 22

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
 144 F.4th 296 (D.C. Cir. 2025) ......................................................... 3, 22

*Delta Air Lines, Inc. v. Exp.-Imp. Bank of U.S.*,
  85 F. Supp. 3d 250 (D.D.C. 2015)........................................................43

*Dep't of Navy v. Egan*,
  484 U.S. 518 (1988).............................................................................54

*Doe v. Stephens*,
  851 F.2d 1457 (D.C. Cir. 1988)...........................................................52

*\*FDA v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024)........................................... 3, 21, 22, 23, 24, 41, 42

*Fair Fight Action, Inc. v. Raffensperger*,
  413 F. Supp. 3d 1251 (N.D. Ga. 2019)................................................20

*Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*,
  873 F. Supp. 2d 363 (D.D.C. 2012)......................................................50

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015).............................................................13

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992).............................................................................51

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010).............................................................................58

*Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985).............................................................13

*Georgia v. Meadows*,
  88 F.4th 1331 (11th Cir. 2023) ...............................................5, 55, 56

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982).............................................................................42

*Humphrey's Executor v. United States*,
  295 U.S. 602 (1935).............................................................................59

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977).............................................................................36

*In re Al-Nashiri*,
  47 F.4th 820 (D.C. Cir. 2022) .......................................................47

*\*In re Murray Energy Corp.*,
  788 F.3d 330 (D.C. Cir. 2015).....................................................2, 38

*Ind. State Conf. of Nat'l Ass'n for Advancement of Colored People v. Lawson*,
  326 F. Supp. 3d 646 (S.D. Ind. 2018) ...........................................20

*Jeffries v. Volume Servs. Am., Inc.*,
  928 F.3d 1059 (D.C. Cir. 2019).................................................28, 29

*Kamal v. J. Crew Grp., Inc.*,
  918 F.3d 102 (3d Cir. 2019) ...........................................................29

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
  *(LULAC I)*, 780 F. Supp. 3d 135 (D.D.C. 2025) ...........................45, 47

*League of Women Voter v. U.S. Dep't of Homeland Security*,
  2026 WL 1784297 (D.D.C. June 22, 2026) ...................................30, 31

*League of Women Voters of Mass. v. Trump*,
  2026 WL 1755833 (D. Mass. June 18, 2026).....................................62

*LULAC v. Exec. Off. of President*,
  808 F. Supp. 3d 29 (D.D.C. 2025)...............................................51, 52

*Make the Rd. N.Y. v. Wolf*,
  962 F.3d 612 (D.C. Cir. 2020).........................................................14

*Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
  453 U.S. 1 (1981) ...........................................................................52

*Morgan Drexen, Inc. v. CFPB*,
  785 F.3d 684 (D.C. Cir. 2015).........................................................14

*Munaf v. Geren*,
  553 U.S. 674 (2008).........................................................................12

*Myers v. United States*,
  272 U.S. 52 (1926) ....................................................................59, 61

vi

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
538 U.S. 803 (2003).................................................................47

*Nat'l Urb. League v. Trump,*
783 F. Supp. 3d 61 (D.D.C. 2025)........................................16

*New Hampshire v. Maine,*
532 U.S. 742 (2001).................................................................33

*Nixon v. Adm'r of Gen. Servs.,*
433 U.S. 425 (1977).................................................................54

*Ohio Foresty Ass'n, Inc. v. Sierra Club,*
523 U.S. 726 (1998).................................................................50

*People for the Ethical Treatment of Animals (PETA) v.*
*U.S. Dep't of Agric.,*
797 F.3d 1087 (D.C. Cir. 2015)................................23, 24, 35

*Perez v. Mortgage Bankers Ass'n,*
575 U.S. 92 (2015) .................................................................38

*Pileggi v. Washington Newspaper Publishing Company, LLC,*
146 F.4th 1219 (D.C. Cir. 2025) .........................................31

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.,*
489 F.3d 1279 (D.C. Cir. 2007).............................................18

*Sataki v. Broad. Bd. of Governors,*
733 F. Supp. 2d 22 (D.D.C. 2010).......................................12

*Seila Law LLC v. CFPB,*
591 U.S. 197 (2020)....................................................5, 60, 62

*Shays v. FEC,*
414 F.3d 76 (D.C. Cir. 2005)..............................................43

*Simon v. E. Ky. Welfare Rts. Org.,*
426 U.S. 26 (1976) .................................................................17

*Spokeo v. Robins,*
578 U.S. 330 (2016).........................................................27, 44

vii

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ...................................................................... 15

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009).................................................................... 36

*Tex. State LULAC v. Elfant*,
52 F.4th 248 (5th Cir. 2022) ............................................... 26, 40

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)................................................................. 3, 27

*Trump v. New York*,
592 U.S. 125 (2020)......................................... 26, 37, 45, 63

*Trump v. Slaughter*,
146 S. Ct. 18 (2025) ................................................................... 59

*Trump v. United States*,
603 U.S. 593 (2024).................................................................... 55

*U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*,
540 U.S. 736 (2004).................................................................... 60

*United States v. Arthrex, Inc.*,
594 U.S. 1 (2021) ....................................................................... 58

*United States v. Chem. Found.*,
272 U.S. 1 (1926) ....................................................................... 49

*United States v. Texas*,
599 U.S. 670 (2023).................................................................... 35

*Whitmore v. Arkansas*,
495 U.S. 149 (1990)............................................................... 18, 19

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ................................................................. 13, 61

*Wyo. Outdoor Council v. U.S. Forest Serv.*,
165 F.3d 43 (D.C. Cir. 1999)................................................. 49, 50

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952)................................................................54, 55

**Constitution Provisions**

U.S. Const. art. II ................................................................ 7, 53, 57, 59

U.S. Const. art. II, § 1, cl. 1................................................................58

U.S. Const. art. II, § 3 ................................................................55, 58

**Statutes**

5 U.S.C. § 704 ................................................................38

18 U.S.C. § 611 ................................................................ 6, 55, 58

39 U.S.C. § 401 ................................................................ 8, 39, 49

52 U.S.C. § 20508(b)(2)................................................................32, 33

52 U.S.C. § 20511 ................................................................ 6, 7, 55, 58

52 U.S.C. § 21083(a)................................................................56

Mo. Rev. Stat. § 115.155................................................................32

**Regulations**

Ballot Mail for Federal Elections,
  91 Fed. Reg. 32,915 (June 2, 2026) ................................................9, 12, 41

**Other Authorities**

*Breach of Confidence: An Emerging Tort,*
  82 Colum. L. Rev. 1426 (1982) ................................................................29

Restatement (Second) of Torts § 652B (Am. Law Inst. 1977) ................28

## INTRODUCTION AND SUMMARY OF ARGUMENT

Appellants want this Court to issue an advisory opinion condemning Executive Order No. 14399, Ensuring Citizenship Verification and Integrity in Federal Elections ("EO").  Their request is based on rampant speculation about future federal policies that continue to evolve rapidly before they are finalized and put into effect.

Start with Appellants' challenge to Section 2(a), which envisions creating lists of voting-age-eligible citizens in each State.  The Court does not know what the final policy will be—let alone how it will be implemented.  The parties still do not know *which* databases federal agencies will use, whether those databases will be inaccurate, whether and how agencies will comply with the Privacy Act, and whether and how States would use those lists.  JA706.

Speculation also dominates Appellants' challenge to Section 3(b)'s instruction for the U.S. Postal Service (USPS) to engage in rulemaking on potential reforms designed to strengthen the security of mail-in voting.  Since Appellants filed suit and sought preliminary relief, USPS has issued a proposed rule—one which is *quite* different than how Appellants speculated before the District Court.  For example, contrary

to Appellants' complaint and preliminary injunction briefs below, the proposed rule does not apply to primary elections and does not relate to the citizenship lists envisioned by Section 2(a). And even now, all we have is a *proposed rule*—and it is black-letter law that challenges to proposed rules are not ripe. *See In re Murray Energy Corp.*, 788 F.3d 330, 334 (D.C. Cir. 2015). After all, the proposed rule could easily change as a result of rulemaking. Courts do not (as Appellants here ask) "presume that the [the agency] is violating the law by going into that process with its mind made up." *Alaska v. U.S. Dep't of Agric.*, 17 F.4th 1224, 1229 n.5 (D.C. Cir. 2021). Indeed, USPS *must* consider changes in response to comments. Thus, only after USPS finalizes its rule can Appellants challenge it, because only then will they actually know what they are challenging. *See id.* at 1228–29.

Altogether, this Court should not entertain Appellants' premature lawsuit at the expense of foundational justiciability and administrative-law rules. This Court should affirm for several reasons.

*First*, Appellants lack a cognizable Article III injury to support standing. Appellants' hyperbolic claims that voters will be unable to vote (by mail or otherwise) are based on extensive speculation about non-

2

finalized rules and the actions of independent third parties not before the Court. *Cf. Allen v. Wright,* 468 U.S. 737, 757 (1984) (holding that plaintiffs did not have standing where the injury was "highly indirect and 'results from the independent action of some third party not before the court'"). Appellants' alleged resource-diversion injuries are self-inflicted injuries foreclosed by the Supreme Court's decision in *FDA v. Alliance for Hippocratic Medicine.* 602 U.S. 367, 395 (2024); *see also Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 315 (D.C. Cir. 2025) (recognizing that *Alliance for Hippocratic Medicine* casts doubt on "the foundation of our organizational injury precedents"). Additionally, Appellants' claimed privacy injury—the sharing of citizenship and age information within the federal government and with States—is not cognizable because there is no "close historical or common-law analogue for their asserted injury." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). Finally, the Supreme Court's decision in *Bost* does not support candidate standing to challenge Section 2(a) of the EO because it does not change the rules for counting votes in any election. *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 76–77 (2026).

3

*Second*, and relatedly, the ripeness doctrine (both as a matter of Article III standing and prudential considerations) precludes adjudicating Appellants' merits arguments before finalized agency actions exist. Appellants' challenge to Section 2(a)'s envisioned citizenship lists depends on multiple contingencies—including speculation that the Lists will violate the Privacy Act, even though the EO expressly says that the Lists should only be created "to the extent feasible and consistent with applicable law." EO § 2(a). And while Section 3(b) provides a broad outline of what USPS's *proposed* regulation needed to include, the proposed regulation differs considerably from Appellants' predictions in their complaint and briefing below. And just as importantly, the administrative process remains ongoing—there has been no "final" agency action to challenge. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Hence, the Court should decline to review an executive order directing rulemaking when it is unknown what the final rule will provide after the notice-and-comment period.

*Third*, even if Appellants' claims were justifiable, their challenge to Section 2(a) is doomed on the merits because the President has inherent authority to gather and organize information within the Executive

Branch. Even if he did not, all agree he is empowered to act "in relation to another branch's constitutionally authorized act"—*i.e.*, an act of Congress. *Georgia v. Meadows*, 88 F.4th 1331, 1347 (11th Cir. 2023). Because the State Citizenship Lists could be used to help enforce federal statutory prohibitions on non-citizen voting, Section 2(a) of the EO is valid "in relation to" an act of Congress.

*Fourth*, Appellants' challenge to Section 3(b)—which asks for an injunction barring the President from asking USPS to engage in rulemaking—is unlikely to succeed. In maintaining this challenge, and not waiting for a final rule to challenge, Appellants are proposing an extraordinary intrusion on the President's constitutional authority to supervise the executive branch. Appellants point to no statutory authority barring the President from directing USPS to engage in rulemaking. Even if they could, such a statute would be unconstitutional. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020).

*Fifth*, the balance of the equities strongly supports affirming the District Court's denial of injunctive relief. While the federal government has a strong interest in being given a chance to implement executive orders lawfully and the courts have a strong interest in deciding cases

5

based on concrete facts, *see Alaska*, 17 F.4th at 1228–29 & n.5, Appellants' purported "equities" are uncertain injuries based on speculation about future policies. As the District Court acknowledged, Appellants can simply just ask for relief once finalized policies exist. JA697. For these reasons, this Court should affirm.

## ISSUES PRESENTED

1. Whether Appellants have identified a cognizable Article III injury.

2. Whether Appellants' challenges are ripe.

3. Whether the President may manage and distribute citizenship information already in the executive branch's possession.

4. Whether federal courts can enjoin the President from asking an agency to engage in rulemaking, conditioned on compliance with applicable law.

5. Whether Appellants are entitled to a preliminary injunction.

## STATEMENT OF FACTS

### I.   Factual Background

Congress has criminalized providing a fraudulent election ballot and for anyone other than eligible voters to cast ballots. *See* 18 U.S.C. § 611; 52 U.S.C. § 20511. On March 31, 2026, President Trump issued

6

the EO, which recognized the President's "duty under Article II of the Constitution of the United States to enforce Federal law, which includes preventing violations of Federal criminal law and maintaining public confidence in election outcomes." EO § 1. As relevant to this appeal, two sections of the EO are relevant.

First, Section 2(a) of the EO directs federal agencies to create "State Citizenship Lists" and to transmit the Lists to "State election officials," "[t]o the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974." EO § 2(a). The State Citizenship Lists are simply lists of a State's potentially lawful voters—"individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State." *Id.* Under the EO, federal agencies must give States the option "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List" and must allow individuals "to access their individual records as well as to update or correct them in advance of elections." *Id.* As of the date of this filing, it is still unknown which databases federal agencies will use. JA706. It

7

also unknown which States will choose to use State Citizenship Lists, and how States would use the Lists.  JA707.

Second, Section 3 of the EO requires the U.S. Postal Service (USPS) to initiate rulemaking under 39 U.S.C. § 401 and other applicable authority to enhance the security mail-in and absentee ballots.  Section 3(b)(i) provides that "Official Election Mail" shall bear tracking barcodes, which are already ubiquitous for other kinds of mail. Section 3(b)(ii) provides that States "may choose" to provide the USPS "a list of voters eligible to vote" absentee.  Section 3(b)(iii) then provides that the USPS "shall not transmit" absentee ballots from unidentified individuals. Section 3(b)(iv) requires the USPS to create a process by which each State receives "a list of individuals . . . for mail-in or absentee ballots provided by such State, along with unique ballot envelope identifiers."

The EO also provides that the preparation and transmission of these lists "shall comply with the Privacy Act and all applicable use agreements."  EO § 3(b)(iv).  Section 3(b)(v) then directs the creation of "procedures enabling each State to routinely supplement and provide suggested modifications or amendments to the State's Mail-In and Absentee Participation List in advance of any Federal election, consistent

8

with applicable State law." Finally, Section 3(d) provides, "Any final rule pursuant to this section shall be issued no later than 120 days from the date of this order."

There is no final USPS rule as of the date of this filing. On June 2, 2026, USPS published its notice of proposed rulemaking (NPRM) in response to the EO. Ballot Mail for Federal Elections, 91 Fed. Reg. 32,915 (June 2, 2026). Under this proposal, USPS would not send mail ballots to individuals who are not on lists of eligible voters provided by the States. *Id.* at 32,916. Moreover, "states"—not USPS or any agency of the federal government—"would retain full control over who would (or would not) be able to vote by mail in federal elections within each state, as states would control enrollment with the Postal Service for inclusion on the state's Mail-In and Absentee Participation List." *Id.* "The Postal Service would not change the information provided by the state when compiling the lists" but would rather merely "provide technical assistance to states and localities regarding the secure submission of this data." *Id.*

## II.    Procedural History

The plaintiffs in this case challenged the EO almost immediately after it was issued. *See* JA37–100 (filed April 1, 2026); *LULAC v. Executive Office of the President*, No. 26-cv-01132-CJN (Apr. 2, 2026); *NAACP v. Trump*, No. 26-cv-001151-CJN (Apr. 3, 2026). On April 9, 2026, the Court consolidated the three complaints—*DSCC v. Trump*, No. 26-cv-01114-CJN—with *LULAC v. Executive Office of the President*, No. 26-cv-01132-CJN, and *NAACP v. Trump*, No. 26-cv-01151-CJN. All Plaintiffs sought preliminary injunctions.

The District Court denied these motions and issued several holdings in a carefully reasoned opinion. First, the District Court found that Appellants failed to identify any cognizable Article III injury. In particular, the District Court found that (1) Appellants' fears that voters would be unable to vote are far too speculative to confer standing, JA706–07; (2) Appellants' resource-diversion injuries were self-inflicted and thus not cognizable, JA710–11; (3) Appellants' alleged privacy injuries are speculative and not cognizable because they are not analogous to common-law injuries, JA708; and (4) Appellants lack candidate standing

10

to challenge section 2(a) because it does not change the rules governing any election, JA711–12.

Second, the District Court held that Appellants' claims were not ripe. JA696, 709 n.8, 714–15. With regards to Section 2(a), the District Court found that any potential injury would occur only once State Citizenship Lists are distributed to the States, and that Article III does not permit standing based on contingent future events. JA709 n.8. For Section 3(b), the District Court found that the Postal Service has not yet issued a notice of proposed rulemaking or responded to comments it might receive, let alone adopted a final rule; and until then, challenges to it are not ripe. JA696, 713–15.

Third, the District Court held that Appellants were unlikely to succeed on the merits because they lack a cause of action. JA716–17. It specifically found that an "executive order that operates solely as an internal directive—particularly one expressly conditioned on feasibility and compliance with applicable law—does not, standing alone, exceed Presidential authority or violate the separation of powers." JA717. "As a result, whether the government's actions under the Order are lawful or

11

unlawful will depend on how those agencies decide to implement the Order, not on the Order itself." *Id.*

Finally, the District Court found Appellants were not suffering irreparable harm. JA718–20. The District Court acknowledged, however, that Appellants could return and renew their requests for a preliminary injunction once finalized policies existed. JA697.

Two additional lawsuits challenging the EO were filed in the District of Massachusetts—*California v. Trump*, No. 26-cv-11581-IT (Apr. 3, 2026), and *League of Women Voters of Massachusetts v. Trump*, No. 26-cv-11549-IT (Apr. 2, 2026). On June 25, 2026, the court in *California v. Trump* issued an injunction—but only with respect to elections in 2026 and only as applied to the State Plaintiffs in that case. *California v. Trump*, --- F. Supp. 3d ---, 2026 WL 1826490, at *17–18 (D. Mass. June 25, 2026).

## LEGAL STANDARD

"A preliminary injunction is an 'extraordinary and drastic remedy,' it is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citations omitted). This "very high" standard for granting injunctive relief is "very well established." *Sataki v. Broad. Bd. of*

*Governors*, 733 F. Supp. 2d 22, 43–44 (D.D.C. 2010). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Appellants must do more than merely show the possibility of prevailing on the merits; rather they must show "a substantial likelihood of success on the merits." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). Failure to do so is "grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Additionally, "[t]his court has set a high standard for irreparable injury." *Id.* First, the injury "must be both certain and great; it must be actual and not theoretical." *Id.* (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "The moving party must show the injury complained of is of such *imminence* that there is a 'clear and present' need for equitable relief to

13

prevent irreparable harm." *Id.* (citations omitted) (emphasis in original). "Second, the injury must be beyond remediation." *Id.*

## ARGUMENT

### I. Appellants Are Unlikely to Succeed on the Merits.

#### A. *Appellants have not alleged a cognizable injury.*

##### 1. Section 2(a)

The District Court correctly found that Appellants do not have standing to challenge Section 2(a) of the Executive Order and therefore are not entitled to a preliminary injunction. JA705–13. To "establish[] a likelihood of success on the merits, [Plaintiffs] must first demonstrate a likelihood of success in establishing jurisdiction." *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 623 (D.C. Cir. 2020).

To establish Article III standing, Appellants must plausibly allege that they suffered a cognizable injury fairly traceable to Defendants and that the injury is likely to be redressed by a favorable judicial decision. *See Allen v. Wright,* 468 U.S. 737, 751 (1984). Also, because Appellants seek "forward-looking relief," they "must show [they are] suffering an ongoing injury or face[] an immediate threat of injury." *Morgan Drexen, Inc. v. CFPB*, 785 F.3d 684, 689 (D.C. Cir. 2015) (internal quotation omitted). Appellants cannot make these showings.

14

a. Appellants' alleged harms to voters are speculative and not fairly traceable to Section 2(a).

To establish standing, Appellants must prove an "injury in fact"—a harm suffered by the plaintiff that is "concrete" and "actual or imminent, not conjectural or hypothetical." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (internal quotations omitted). The threatened injury must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402, 409–10 (2013). Mere "allegations of a *possible* future injury" or a "reasonable likelihood" of future harm are insufficient. *Id.* at 409–10 (emphasis in original) (cleaned up). The District Court properly concluded that Appellants' challenges to Section 2(a) are not "certainly impending" because their entire case rests on speculation. JA706.

Most glaringly (and fatally), Appellants ignore that any use of the State Citizenship Lists is *optional*:  Nothing in Section 2(a) orders the States to take any action with respect to their voting rules based on the State Citizenship List—a point one Appellant acknowledges in its pleadings. *See* JA61–62 ¶ 62 ("The Order does not explicitly explain the intended use of the State Citizenship List . . . ."). Section 2(a) merely orders the provision of information to States. *See* EO § 2(a) (directing the

15

Secretary of Homeland Security to "take appropriate action to compile and transmit to the chief election official of each State a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State"); *see also Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 79 (D.D.C. 2025) (holding that plaintiffs did not have standing to challenge an executive order mandating a list where the order "require[d] nothing from Plaintiffs—no compliance, no changed behavior, nothing at all—because it is 'not aimed at them' but instead tells only the agencies to do something.").

Still, Appellants claim that they, or their members, will be injured by Section 2(a) on the theory that the State Citizenship Lists will result in disenfranchisement of their voters. *See* Appellant Br. 24, 55–56; *see also* JA41 ¶ 5 ("[T]he Executive Order . . . further threatens to unjustifiably disenfranchise eligible voters across the country."). But as the District Court rightfully concluded, this is extraordinarily speculative, and courts routinely reject standing where plaintiffs theorize about how third parties will respond to government action. *See, e.g.*, *Clapper*, 568 U.S. at 414 n.5 ("Plaintiffs cannot rely on speculation about

16

the unfettered choices made by independent actors not before the courts." (internal quotation omitted)); *Allen*, 468 U.S. at 757 (holding that plaintiffs did not have standing where the injury was "highly indirect and 'results from the independent action of some third party not before the court'" (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 42 (1976))).  And here, Appellants' claimed disenfranchisement injury rests on several impermissible layers of speculation.

The first layer concerns *which* databases the federal government will use to create the State Citizenship Lists.  Appellants claim that "naturalization records, SSA records, SAVE data, *and other relevant Federal databases*," EO § 2(a) (emphasis added), used to create the State Citizenship Lists will contain inaccuracies, Appellant Br. 5.  But as some plaintiffs in this case have admitted, "[t]he Order does not specify what other databases" (beyond SSA and SAVE databases) will "be used to construct the State Citizenship List."  *LULAC v. Executive Office of the President*, No. 26-cv-01132-CJN (Apr. 2, 2026).  That remains true today.  Memorandum from Dep't of Homeland Security on Executive Order 14399 Implementation (June 8, 2026) (ECF 151-1).

17

Now comes the second layer of speculation: Without knowing the sources that federal agencies will use, Appellants posit that the State Citizenship Lists will contain inaccurate data. Appellant Br. 5. At best, Appellants offer a conjectural assertion of an "increased risk" of inaccuracy. *See* JA72 ¶ 96 ("such a list is likely to be incomplete and inaccurate"). That's not enough—not even close. *See Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1297–98 (D.C. Cir. 2007) ("'[I]ncreased risk' is" not by "itself [a] concrete, particularized, and actual injury for standing purposes"—harm must be "actual" or "imminent," not merely "increased." (emphases omitted)). The Supreme Court has "repeatedly reiterated" that "'threatened injury must be certainly impending to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (alterations in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Also, even if the Lists do contain some errors, as the District Court pointed out, JA706, the EO requires adopting procedures that will allow individuals to access and, if necessary, correct their information in the Lists, *see* EO § 2(a). Moreover, States may "routinely supplement and

18

provide suggested modifications or amendments to the State Citizenship List." *Id.* These safeguards against mistakes make it "speculative whether that process will be ineffective at resolving all or most inaccuracies." JA706. Notably, as the EO acknowledges, "An individual's identification on the State Citizenship List does not indicate that the individual has been properly registered to vote in the State." EO § 2(a). "State and Federal laws and State procedures must still be followed for an individual to be registered to vote." *Id.* Appellants' claimed injury thus depends on the assumption that the federal government and States will not collaborate to produce an accurate List. *Cf. Clapper*, 568 U.S. at 409.

Next, and perhaps most glaringly, Appellants must speculate about how States *might* use the Lists. In particular, Appellants brazenly insist there is "no question" States will remove eligible voters from the voter rolls. Appellant Br. 24.

This speculation cannot establish standing. Once again, it is *optional* for States to use the Lists. *See* EO § 2(a). At a minimum, it seems obvious that some States (like California, for example) will *not* use the Lists. JA707. As for States that do choose to use the Lists, they are

19

likely to use them in different ways. Different States have varying laws governing *how* they can maintain their voter registration lists. *See, e.g.*, *Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251, 1290 (N.D. Ga. 2019) (noting differences in voting roll maintenance rules between Ohio and Georgia). Simply put, there are rules—and it is not plausible that States would just uncritically rely on the State Citizenship Lists to remove eligible voters. Such actions could expose States to lawsuits in both state and federal courts. *See, e.g.*, *Ind. State Conf. of Nat'l Ass'n for Advancement of Colored People v. Lawson*, 326 F. Supp. 3d 646, 662 (S.D. Ind. 2018).

Given that reality, States are far more likely to use the State Citizenship Lists as signaling a need for *verification* that a given registered voter is, in fact, a U.S. Citizen and over 18 years old. The Court should decline Appellants' invitation to assume that States will act unlawfully or unreasonably in using the optional tool that Section 2(a) proposes to give them. *Cf. Alexander v. S.C. State Conference of NAACP*, 602 U.S. 1, 6 (2024) (discussing presumption that state legislatures "act[] in good faith").

20

In summary, any potential standing theory to challenge Section 2(a) that depends on voters being removed from the voter rolls relies on rank speculation about the future actions of independent third parties not before the Court. These assumptions are "sufficiently uncertain to break the chain of causation between the plaintiffs' injury and the challenged Government action." *Allen*, 468 U.S. at 759; *see also FDA v. All. for Hippocratic Med. (AHM)*, 602 U.S. 367, 383 (2024) ("The causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs."). Appellants' attenuated theory of injury therefore does not create a case or controversy under Article III.

> b. <u>Appellants' alleged diversion of resources does not confer organizational standing.</u>

Organizational Appellants also complain that the creation and transmission of the State Citizenship Lists will force them to divert resources in response. Appellant Br. 24 ("Plaintiffs must develop programs to ensure their members and other supporters are on the Lists and to attempt to add any who are erroneously omitted. The resources required come at the expense of Plaintiffs' persuasion and voter-

21

mobilization programs."). This allegation does not create Article III standing.

Notably, the Supreme Court rejected resource-diversion standing in *Alliance for Hippocratic Medicine*. *See* 602 U.S. at 394; *see also Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 167 F.4th 605, 618 (2d Cir. 2026) (holding that a "diversion of resources" theory "'does not work to demonstrate standing'" after *AHM* (quoting *AHM*, 602 U.S. at 394)); *Ctr. for Biological Diversity*, 144 F.4th at 315 (recognizing that *AHM* casts doubt on "the foundation of [this Court's] organizational injury precedents"). As the Supreme Court explained, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *AHM*, 602 U.S. at 394. If that were enough, it "would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Id.* at 395.

Accordingly, "Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a

particular government action." *Id.* at 381. This outcome is consistent with the longstanding principle that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. In short, plaintiffs cannot claim standing based on "voluntary expenditure of resources to counteract governmental action that only indirectly affects the plaintiff." *See People for the Ethical Treatment of Animals (PETA) v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1099 (D.C. Cir. 2015) (Millett, J., dubitante).

But that's exactly what Appellants premise standing on here. They point to expenses devoted to helping voters correct erroneous citizenship flags (which have not happened) and educating the public, which allegedly burdens the organizations' other priorities. *See* Appellant Br. 24–25. Appellants' standing allegations are nearly identical to those found insufficient by the Supreme Court in *AHM*—a fact no clever argument can escape. *Compare* 602 U.S. at 394 ("The medical associations . . . claim to have standing . . . based on their incurring costs to oppose FDA's actions. . . . They contend that FDA has 'forced' the associations to 'expend considerable time, energy, and resources' drafting

citizen petitions to FDA, as well as engaging in public advocacy and public education. And all of that has caused the associations to spend 'considerable resources' to the detriment of other spending priorities. But an organization . . . cannot manufacture its own standing in that way." (citations omitted)), *with* Appellant Br. 24–25 (arguing for standing based on work to counteract the supposed effects of the EO).

The District Court correctly saw Appellants' arguments as an attempted run around *AHM*. *See* JA710 ("[Plaintiffs] contend that Section 2(a) has caused them to expend time and resources educating the public on the potentially forthcoming State Citizenship Lists, creating new educational materials on the topic, and monitoring the Lists' development. But those efforts are very similar, if not identical, to 'conduct[ing] their own studies . . . so that the[y] can better inform their members and the public,' and 'expend[ing] considerable time, energy, and resources drafting citizen petitions, as well as engaging in public advocacy and public education.'" (quoting *AHM*, 602 U.S. at 394)). All told, Appellants' resource-diversion theory does not square with Supreme Court precedent—with *AHM* being the tip of the iceberg. *See PETA*, 797 F.3d at 1103 (Millett, J., dubitante) (explaining how *Clapper* "would not

24

have been decided differently if Amnesty International had simply alleged that it had to divert its resources" for a public-education campaign). Hence, the District Court's finding of no standing based on resource diversion must be affirmed.

Even if resource-diversion standing somehow survived *AHM*, Appellants' alleged harms are speculative on their own terms. As discussed above, Appellants postulate that unknown individuals will be improperly excluded from the State Citizenship List. *See, e.g.*, Appellant Br. 24. And even granting for argument's sake that some will be improperly excluded, it is also speculative to assume that the organizational Appellants will identify and assist those few excluded individuals. *See id.* And even if Appellants could identify those mistakenly excluded, it is speculative to assume that neither the "individuals" themselves nor the "States" will "correct" the Citizenship Lists under Section 2(a) before the organizational Appellants insert themselves to provide "assistance." Thus, the organizational Appellants' injury is based on speculation upon speculation—each independently sufficient to rebut standing. Said another way, there are too many

25

"dominoes that would have to fall" to confer organizational standing. *See Tex. State LULAC v. Elfant*, 52 F.4th 248, 257 (5th Cir. 2022).

> c. Appellants' alleged privacy injuries are insufficient for standing.

Appellants also claim that the transmission of the State Citizenship Lists to the States harms their privacy interests, which confers Article III standing. The District Court rightfully rejected this argument. *See* JA707–08.

*First*, like the theory of inaccuracy and disenfranchisement discussed above, the alleged injury resulting from the purported violation of the Privacy Act is textbook speculation. The Department of Homeland Security and the Social Security Administration have not yet taken any final action in response to Section 2(a) of the EO. *See infra*, Part I.B. Section 2(a), in fact, explicitly makes the creation of the lists contingent on "feasib[ility] and consisten[cy] with applicable law, including but not limited to the Privacy Act of 1974." EO § 2(a). In light of the EO's explicit mandate to comply with the Privacy Act, any alleged harm due to a Privacy Act violation is unlikely—and highly speculative at best. *See Trump v. New York*, 592 U.S. 125, 131–32 (2020) (addressing similar situation).

26

*Second*, Appellants offer no precedent suggesting that sharing voter information between different parts of American government constitutes a cognizable injury. In *Spokeo v. Robins*, the Supreme Court held that, in assessing concreteness, courts must consider whether a plaintiff's asserted harm has a "close relationship" to a harm traditionally recognized as providing a basis for a lawsuit in American courts. 578 U.S. 330, 340–41 (2016). "That inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *TransUnion*, 594 U.S. at 424. For standing purposes, "an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law." *Id.* at 426–27.

Appellants argue that the inter-agency sharing of citizenship information within the federal government is analogous to two traditionally recognized injuries: intrusion upon seclusion and breach of confidence. Appellant Br. 17–18. Neither is applicable here. The common-law tort of intrusion upon seclusion imposes liability for anyone "who intentionally intrudes, physically or otherwise, upon the solitude or

27

seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B (Am. Law Inst. 1977). Appellants offer no basis for their suggestion that sharing non-sensitive personal data (such as name, citizenship status, and age) between different governmental agencies is "highly offensive to a reasonable person." And, frankly, the idea that it is unreasonable for the government to compile and share *citizenship* information—in a legal system where citizenship matters for a variety of important governmental functions—borders on the absurd. *See Ambach v. Norwick*, 441 U.S. 68, 75 (1979) ("The Constitution itself refers to the distinction [between citizen and non-citizen] no less than 11 times, indicating that the status of citizenship was meant to have significance in the structure of our government." (citation omitted)).

Appellants' invocation of the common-law breach-of-confidence tort is likewise unavailing. Appellant Br. 18. A common-law breach of confidence "lies where a person offers private information to a third party in confidence and the third party reveals that information." *Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019) (citation omitted). This occurs "when the plaintiff's trust in the breaching party

28

is violated, whether or not the breach has other consequences." *Id.* (citation omitted); *see also Kamal v. J. Crew Grp., Inc.*, 918 F.3d 102, 114 (3d Cir. 2019) ("[A] breach of confidence involves 'the unconsented, unprivileged disclosure to a third party of nonpublic information that the defendant has learned within a confidential relationship.'" (quoting Alan B. Vickery, Note, *Breach of Confidence: An Emerging Tort*, 82 Colum. L. Rev. 1426, 1455 (1982))). But Appellants do not allege that they or their members "entrusted" DHS with nonpublic information or that they are in a confidential relationship with the federal government. And, once again, the notion that individuals could reasonably expect the government not to share their citizenship status within the government is patently unreasonable in a legal system where citizenship-based distinctions exist. *See Ambach*, 441 U.S. at 75.

Appellants' cited cases do not support these theories of injuries. For starters, *American Federation of Labor & Congress of Industrial Organizations v. Department of Labor* (at 18) does not stand for the proposition that the sharing of name, age, and residence information (already known by the federal government) between government agencies causes an injury-in-fact. *See* --- F. Supp. 3d ---, 2026 WL 879518,

29

at \*10 (D.D.C. Mar. 31, 2026).  In that case, the district court held that the disclosure of *sensitive information* belonging to labor union members, namely social security numbers, bank account information, and medical records, constituted an injury recognized by the common law torts of intrusion upon seclusion and breach of confidence.  *See id.*; *see also League of Women Voter v. U.S. Dep't of Homeland Security*, --- F. Supp. 3d ---, 2026 WL 1784297, at \*11 (D.D.C. June 22, 2026) (finding privacy injury for disclosure of sensitive social security information).  By strong contrast, this case does not involve the disclosure of sensitive, private information.  A person's name, citizenship status, and age are all non-sensitive in nature, as the District Court rightly found.  *See* JA708 ("Plaintiffs have not identified a historical or common-law analogue for the asserted injury their members face—the sharing of non-sensitive personal data (name, citizenship status, and age) between and among different federal agencies.").

The same is true of *Center of Taxpayer Rights v. Internal Revenue Service* (at 21), which concerned the disclosure of tax returns and specifically "information that is arguably more sensitive than standard bank account information, including Social Security numbers;

30

information about individuals' income and net worth; bank account information; tax liability; [ ] sensitive information regarding deductions, such as charitable donations, dependents, and medical expenses; [and] whether an individual's tax return has been or is being investigated." 815 F. Supp. 3d 1, 33 (D.D.C. 2025) (alterations in original) (quotations omitted).   Like with *AFL-CIO*, this highly sensitive and personal information is clearly distinct from general name, age, and citizenship status.  *See, e.g.*, *League of Women Voters*, 2026 WL 1784297, at *11 (describing the protections for Social Security Numbers).  *Center of Taxpayer Rights* also concerns a relationship of trust that is not present here, namely between taxpayers submitting tax returns and the IRS where the IRS is obligated to keep taxpayer information confidential.  815 F. Supp. 3d at 36–37.

*Pileggi v. Washington Newspaper Publishing Company, LLC* (at 17, 20) is also inapposite.  That case alleged that Washington Newspaper intruded upon the plaintiff's seclusion by disclosing her private video-viewing history to a third party (Meta) without her knowledge or consent in violation of the Video Privacy Act, which this Court found was offensive to a reasonable person.  *See* 146 F.4th 1219, 1228 (D.C. Cir.

2025) ("It is as if a magazine seller nosed around in someone's mailbox to learn what periodicals to press the owner to buy.").  No parallel exists between that kind of disclosure and the intra-federal government sharing of citizenship information, which is already known across federal and state governments.  The District Court therefore rightfully concluded that Appellants failed to plead a cognizable injury.  *See* JA708.

*Third*, Appellants allege no cognizable privacy injury because, by registering to vote, they (or their members) already disclosed personal information and made representations to the States about their citizenship status and eligibility to vote.  Of course, individuals eligible to vote must register with their State and, in doing so, must generally attest that they are United States citizens and are or will be aged eighteen or older at the time of the next election.  *See, e.g.*, Mo. Rev. Stat. § 115.155; *see also* 52 U.S.C. § 20508(b)(2) ("The mail voter registration form . . . shall include a statement that—(A) specifies each eligibility requirement (including citizenship); [and] (B) contains an attestation that the applicant meets each such requirement . . . .").

The EO does not inhibit these separate voting requirements.  *See* EO § 2(a) ("State and Federal laws and State procedures must still be

32

followed for an individual to be registered to vote."). Section 2(a) seeks only to provide this information to the States so that they may verify their own records. *See id.* It is hard to see how Appellants can complain about citizenship status being shared with the States when voters already must provide that information to States to vote. *See New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (explaining how courts estop parties from "deliberately changing positions according to the exigencies of the moment" (internal quotation marks omitted)).

> d. <u>Political candidates do not have standing to challenge Section 2(a) under *Bost*.</u>

Appellants next claim that they have candidate standing because Section 2(a) supposedly "alter[s] the rules of any State election" and "regulate[s] the election process." Appellant Br. 23–24; *see also* JA711–12. Section 2(a) does neither.

As explained above, because the State Citizenship Lists merely serve as a resource for States to use at their discretion, its creation and transmission do not alter any elections rules or processes. *See* JA711–12 ("Section 2(a) does not order the States to do anything with the State Citizenship Lists once they are transmitted—much less direct the States to amend their election procedures. These Plaintiffs thus cannot

establish a sufficient causal link between States' future, hypothetical decision to amend their election procedures and the creation and transmission of State Citizenship Lists pursuant to the Executive Order.").

The Supreme Court's recent decision in *Bost*—which clarified the law of candidate standing—is thus inapplicable. Appellant Br. 22–23. There, the Supreme Court held a candidate had standing to challenge an Illinois law requiring election officials to count mail-in ballots postmarked by election day, but received up to two weeks later. *Bost*, 607 U.S. at 76–77. Standing existed in *Bost* because that rule affected the counting of votes—which directly affected candidates competing for those votes. *Id.*

Here, by contrast, Section 2(a) does not change the counting or collection of votes. While the Supreme Court held that candidates can challenge election rules regardless of whether they "hurt . . . a candidate's electoral prospects," it made clear it was referring only to rules that "deprive the candidate of a fair process and an accurate result"—"for example, if a State decided to discard a random 10% of cast votes." *Id.* at

34

77.  Because Section 2(a) does not alter any vote-counting rules, it does not deprive candidates of anything.

If this Court credits Appellants' contrary theory—where candidates can challenge any governmental practice that could *conceivably* affect an election—candidate standing would become boundless, rendering barriers to speculative-injury standing toothless.  That makes Appellants' theory implausible.  *See United States v. Texas*, 599 U.S. 670, 681 (2023) (holding that by rejecting the plaintiffs' "expansive" and "novel" standing argument," the Court "abide[d] by and reinforce[d] the proper role of the Federal Judiciary under Article III."); *PETA*, 797 F.3d at 1099 (Millett, J., dubitante) ("[A]n individual's interest in having the law properly enforced against others is not, without more, a cognizable Article III injury."); *see also* JA712 (describing the highly attenuated chain of possibilities required for Section 2(a) to harm Democratic Party candidates' electoral prospects).

    e.  <u>Appellants do not have associational standing to challenge Section 2(a).</u>

Appellants also claim to have associational standing to sue on behalf of their members.  Appellant Br. at 16.  They do not.  An organization only gains standing on behalf of its members upon

establishing that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). As part of the first requirement, Appellants must identify specific members that have suffered or imminently will suffer an injury in fact. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 497–98 (2009); *All. for Retired Ams. v. Bessent*, 770 F. Supp. 3d 79, 99 (D.D.C. 2025).

Appellants, however, point to *zero* specific members who would be likely injured by the State Citizenship Lists—foreclosing associational standing here. *See Summers*, 555 U.S. at 497–98. For that reason, the organizational plaintiffs cannot obtain standing through their members' alleged privacy injuries—in addition to the other reasons provided above. *Supra* Part § I.A.1.a.

2. <u>Section 3(b)</u>

For many of the same reasons as with Section 2(a), Appellants have not pleaded a viable injury-in-fact caused by Section 3(b) of the EO. *First*, standing requires a sufficiently concrete challenged policy to assess the

36

imminence of a threatened injury. *See Trump v. New York*, 592 U.S. at 131–32. No final rule has issued yet—precluding imminent harm. *Cf. id.* Indeed, Appellants admitted that they are uncertain about what a potential USPS rule would institute and that they lack knowledge of "how" the States' own absentee-voter lists "will inform the USPS's Mail-in and Absentee Participation List." JA26 ¶¶ 71, 73; *see also id.* ¶ 73 ("Nor does [the EO] specify the consequences if a State declines to send [its] list [of absentee voters], *as the Order implicitly acknowledges is within a State's authority.*" (emphasis added)).

Contrary to Appellants' claim (at 36), Section 3(b) does not dictate a particular outcome permitting pre-implementation challenges. It rather directs the USPS to *initiate* rulemaking about mail-in and absentee ballots, but the administrative process remains in USPS's hands. *See* EO § 3(b)(iv) (directing "[p]roposed provisions specifying that the USPS shall provide each State with a list of individuals (Mail-In and Absentee Participation List) who are enrolled with the USPS, *pursuant to a process specified in the rulemaking directed by this subsection*" (emphasis added)); *id.* § 3(b)(v) (directing unspecified "procedures enabling each State to routinely supplement and provide suggested

37

modifications or amendments to the State's Mail-In and Absentee Participation List").

It is black-letter law that litigants cannot challenge proposed rules before finalization. *See* 5 U.S.C. § 704; *Bennett*, 520 U.S. at 177–78; *In re Murray Energy Corp.*, 788 F.3d 330, 334 (D.C. Cir. 2015). And for good reasons. With respect to justiciability, a proposed rule can change during the notice-and-comment process—and courts "will not presume that the [agency] is violating the law by going into that process with its mind made up." *Alaska v. U.S. Dep't of Agric.*, 17 F.4th 1224, 1229 n.5 (D.C. Cir. 2021). Hence, this Court has eschewed arguments "that the prospect of a new regulation"—even with ongoing efforts to codify the regulation— make a claim justiciable. *Id.* at 1228.

Here, USPS has committed not to implement any of the proposals from Section 3 before completing notice-and-comment rulemaking. *See* JA 531 ¶ 5. That means USPS will be required to accept and weigh ideas submitted in comments. *Id.* Agencies must consider changes suggested by commenters. *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015); *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 661 (D.C. Cir. 2019). So this Court does not assume that the final rule

will look exactly like Section 3 of the EO. *See Alaska*, 17 F.4th at 1229 n.5.

Moreover, like Section 2(a), Section 3 directs that USPS's action be "pursuant to 39 U.S.C. 401 and other applicable authority," in "compl[iance] with the Privacy Act and all applicable use agreements," and "consistent with applicable State law"—meaning determinations by USPS remain regarding, *inter alia*, how the Mail-In and Absentee Participation Lists will be compiled and how the enrollment process will work. EO § 3(b)(iv)–(v). The only evidence Appellants produced about USPS's rulemaking process regarding the EO was an article reporting a statement that "the Postal Service is examining the executive order, and we are working on a draft of a proposed rule." JA550. This statement provided no detail on what the regulation will look like or how USPS will implement it consistently with applicable law. *See id.*; *see also Am. Bankers Ass'n*, 934 F.3d at 661–62 (contrasting the general presumption that an agency will keep an open mind during rulemaking with a mootness dispute where the government defends a specific policy).

If anything, Appellants' evidence showed that there were too many open questions about the unborn rules—and there still are until

finalization of the rule. Appellants' claim that Section 3 cannot be implemented lawfully is thus mere conjecture.

*Second*, even if Appellants could challenge the non-final rule, their organizational-injury theory suffers from the same speculation as their challenge to Section 2(a). In fact, it is worse, as the District Court aptly explained: "Unlike Section 2(a)—which does require the agencies to assess whether they can compile and then transmit to the States certain information—Section 3(b) directs only that the Postal Service initiate and then complete a rulemaking. Any injury therefore depends on a series of contingencies", including "what changes occur through notice and comment, whether a final rule issues, and how that final rule affects voters, States, or Plaintiffs." JA713. Like Section 2(a), any alleged injury caused by Section 3(b) rests on too many unfallen dominoes. *See Elfant*, 52 F.4th at 257.

To be clear, Appellants' complaint challenges the Executive Order alone, not USPS's proposed rule. JA78 ¶ 114. But even granting Appellants the assumption that the proposed rule as noticed will be the final one (and they could somehow retroactively challenge it without amending their complaint), the NPRM shows that Appellants'

hypothetical fears have not materialized. Specifically, "states"—not USPS or any agency of the federal government—"would retain full control over who would (or would not) be able to vote by mail in federal elections within each state, as states would control enrollment with the Postal Service for inclusion on the state's Mail-In and Absentee Participation List." Ballot Mail for Federal Elections, 91 Fed. Reg. 32,915, 32,916 (June 2, 2026). "The Postal Service would not change the information provided by the state when compiling the lists" but would rather merely "provide technical assistance to states and localities regarding the secure submission of this data." *Id.*

Appellants' theory that Section 3 will restrict eligible voters' access to the mail-in ballot therefore now necessarily assumes that state election officials will take actions that result in their exclusion. The Supreme Court has made clear, however, that "[t]he causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs." *AHM*, 602 U.S. at 383; *see Allen*, 468 U.S. at 757–59; *Clapper*, 568 U.S. at 415 n.5.

41

Shifting from speculation about voter disenfranchisement, Appellants also claim Section 3(b) will impair their "core business activities" by forcing them to divert resources to counteract the proposed policy. Appellant Br. 30–31. Once again, the Supreme Court rejected that sort of resource-diversion injury in *AHM*. 602 U.S. at 394; *see also supra* Part § I.A.1.b.

In response, Appellants rely (at 32) on the Supreme Court's decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). But in *AHM*, the Supreme Court clarified that "*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context." 602 U.S. at 396. Standing existed in *Havens* because the defendant's provision of false information about apartment availability impaired the organization's "ability to provide counseling and referral services for low-and moderate-income homeseekers," *Havens*, 455 U.S. at 379, "not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer," *AHM*, 602 U.S. at 395.

The narrow scenario in *Havens* has no bearing here, as the EO does not directly prevent Appellants from engaging in their core activities, which purportedly consist of voter education and mobilization programs.

42

Appellant Br. 24.  Appellants remain as free as ever to educate voters about mail-in voting.  Their voluntary decisions to expend resources in response to proposed policies they dislike cannot confer standing.  *See Clapper*, 568 U.S. at 416 (rejecting "contention that [plaintiffs] have standing because they incurred certain costs as a reasonable reaction to a risk of harm").

*Finally*, Appellants unpersuasively try to advance a competitive-standing theory to justify their challenge to Section 3.  Appellant Br. 30 n.9.  Specifically, they claim that Democrats are more likely than Republicans to vote by mail, and so the forthcoming USPS regulation will likely put Democrats at a competitive disadvantage.  But once again, this theory of injury rests on far too much speculation to be sufficiently concrete.  *See Shays v. FEC*, 414 F.3d 76, 86 (D.C. Cir. 2005) (recognizing that competitive-injury standing requires a new policy "fundamentally alter[ing] the environment in which rival parties defend their concrete interests"); *Delta Air Lines, Inc. v. Exp.-Imp. Bank of U.S.*, 85 F. Supp. 3d 250, 262 (D.D.C. 2015) ("It remains indispensable, however, that the increase in competition and the corresponding injury are 'imminent' and not merely 'speculative.'"); *Common Purpose USA, Inc. v. Obama*, 227 F.

43

Supp. 3d 21, 26 (D.D.C. 2016) (denying an organization standing because the "alleged injury hinges on the independent choices of third parties not before the Court" (cleaned up)).

As discussed above, it is too speculative to find that *any* voters will be wrongly removed from the States' mail-in ballot lists. *Supra* Part § I.A.1.a. Beyond even that speculation, this theory hinges on the additional assumption that a potential final rule would specifically disadvantage those of a particular political affiliation—pulling Appellants even farther away from Article III's concrete and imminent-injury requirements. *See Spokeo*, 578 U.S. at 339. Also, even positing Appellants' assumptions that Democrats vote by mail more frequently and that the EO will reduce mail-in voting, Appellants make a significant assumption by suggesting that fewer Democratic Party supporters will vote. Appellant Br. 30 n.9. Of course, just because Democrats *prefer* to vote by mail does not mean Democrats *will not* vote in person. Thus, Appellants' theory of competitive standing relies on impermissible speculation.

44

## B. *Appellants' claims are not ripe.*

### 1. Section 2(a)

Whether considered as a matter of Article III standing or prudential ripeness, Appellants lack standing because their alleged harms turn on speculation about future events. *See Clapper*, 568 U.S. at 409–10, 414 n.5. For example, Appellants presume (at 16) that the State Citizenship Lists will violate the Privacy Act, even though the EO directs that the Lists be created "to the extent feasible and consistent with applicable law." EO § 2(a). Notably, Judge Kollar-Kotelly declined to preliminarily enjoin a similar executive order that mandated the creation of citizenship lists based on speculation that the lists would violate the Privacy Act—precisely because the government could create such lists consistent with the Privacy Act. *See League of United Latin Am. Citizens v. Exec. Off. of the President (LULAC I)*, 780 F. Supp. 3d 135, 206 (D.D.C. 2025).

Appellants' extensive speculation about how an eventual regulation will operate dooms their case. The Supreme Court in *Trump v. New York* rejected judicial review of a presidential directive where it included the exact caveat of feasibility and legality. *See* 592 U.S. at 131–32

45

(explaining that where "the President qualified his directive by providing that the Secretary should gather information 'to the extent practicable' and [take action] 'to the extent feasible,'" "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy is 'no more than conjecture' at this time" and the order "may not prove feasible to implement in any manner whatsoever, let alone in a manner substantially likely to harm any of the plaintiffs here"); *see also Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. 2020) (Katsas, J.) (holding presidential memorandum challenge was unripe where the order included qualifiers that any action taken be only "to the extent feasible" and "to the extent practicable").

The "savings clause" cases Appellants cite are also inapposite. *See* Appellant Br. 27–28. In *City & Cnty. of S.F. v. Trump*, the Ninth Circuit held that a challenge to an executive order unambiguously directing that sanctuary jurisdictions not receive federal grants was ripe where Plaintiffs showed a "history of past prosecution or enforcement." 897 F.3d 1225, 1238 (9th Cir. 2018). Here, Appellants alleged no enforcement history. In *LULAC I*, the court afforded little force to an executive order's qualifiers because, in that case, no further factual development was

46

needed because, unlike here, the outcome was certain. *See* 780 F. Supp. 3d at 185. Here, the details of the final policy are far from certain—as the District Court found. JA706.

### 2. Section 3(b)

Even if this Court finds that Appellants have standing, the Court should reject their challenges to Section 3 as prudentially unripe. *See Church v. Biden*, 573 F. Supp. 3d 118, 135 (D.D.C. 2021) ("Even if a case is 'constitutionally ripe'" under Article III standing, "there may still be prudential reasons for refusing to exercise jurisdiction." (citation omitted)). "The ripeness doctrine requires that the federal courts reserve judicial power for resolution of concrete and fully crystalized disputes." *In re Al-Nashiri*, 47 F.4th 820, 826 (D.C. Cir. 2022) (cleaned up). This principle "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807 (2003) (citation omitted).

To determine whether a claim satisfies prudential ripeness, courts consider: (1) the "'fitness of the issues for judicial decision'" and (2) the "extent to which withholding a decision will cause 'hardship to the

47

parties.'" *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).  Assessing whether an issue is "fit[]" for adjudication requires courts to consider whether the issue "is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final."  *Id.* (citation omitted).

Appellants fail to establish the first prong for prudential ripeness because no concrete legal dispute fit for adjudication exists here.  Indeed, while Section 3 provides a broad outline of what the USPS regulation will include, the administrative process remains ongoing.  It would thus be imprudent (at best) to review an executive order directing rulemaking when it is unknown what the final rule will provide after the notice and comment period.  *See Alaska*, 17 F.4th at 1228–29 (finding a challenge nonjusticiable because the court "cannot presume that any such future rulemaking" would lead to the specific effects the challenger feared).

In allowing ongoing administrative proceedings to be completed, courts "respect the Executive Branch's interest in 'crystallizing its policy before that policy is subjected to judicial review.'" *Common Cause*, 506 F. Supp. 3d at 46 (Katsas, J.) (quoting *Am. Petroleum Inst.*, 683 F.3d at 387).

48

Where, as here, "'the possibility that further [administrative] consideration will actually occur before implementation is not theoretical, but real,'" "[j]udicial intervention at this time would inappropriately interfere with ongoing action within the Executive Branch." *Id.* at 45 (first alteration in original) (quoting *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 50 (D.C. Cir. 1999)).

Moreover, the EO's direction that USPS's action be "pursuant to 39 U.S.C. 401 and other applicable authority," in "compl[iance] with the Privacy Act and all applicable use agreements," and "consistent with applicable State law" underscores the intention that said action be conducted lawfully and in accordance with the agency's regular rulemaking procedures set forth by statute. EO § 3(b)(iv)–(v). The "presumption of regularity," which requires courts to presume that public officers have "properly discharged their official duties" absent evidence to the contrary, supports this reading of Section 3. *United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926); *see also Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989).

Appellants likewise fail to show that "delayed judicial review would cause them 'immediate and significant' hardship" to satisfy the second

49

prong for prudential ripeness.  *Church*, 573 F. Supp. 3d at 136 (quoting *Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 873 F. Supp. 2d 363, 371 (D.D.C. 2012)).  As the District Court explained, Appellants remain free to renew their request for a preliminary injunction once a final agency action exists—and once potential real-world harms exist. JA697.

At the same time, prematurely adjudicating USPS's actions in the way Appellants desire "denies the agency an opportunity to . . . apply its expertise" in implementing the EO consistent with its regular rulemaking procedures.  *See Wyo. Outdoor Council*, 165 F.3d at 50 (quoting *Ohio Foresty Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 735 (1998)). All told, proceeding now would defy Congress's well-established expectation that courts will only review actions "mark[ing] the 'consummation' of the agency's decisionmaking process."  *Bennett*, 520 U.S. at 177–78.  For these reasons, Appellants' challenges to Section 3(b) are not ripe for adjudication.

## C. *Appellants' challenges are doomed on the merits.*

### 1. Section 2(a)

#### a. Appellants do not have a cause of action to challenge Section 2(a) under the APA.

Appellants allege that Section 2(a) violates the Privacy Act of 1974. Appellant Br. 46–51. However, the APA does not permit this challenge because there has been no final agency action. *See Bennett*, 520 U.S. at 177–78 (precluding review of "a merely tentative or interlocutory" action). Appellants' claim that the qualified directive in Section 2(a) itself is "final." Appellant Br. 29. Controlling precedent says otherwise.

Importantly, an executive order is not a final agency action because the President is not an "agency" under the APA. *Franklin v. Massachusetts*, 505 U.S. 788, 796–801 (1992); *see also LULAC v. Exec. Off. of President*, 808 F. Supp. 3d 29, 69 (D.D.C. 2025) (explaining that "'the President is not an agency within the meaning of' the APA, the issuance of an executive order is not a final agency action that is reviewable within the APA framework" (quoting *Franklin*, 505 U.S. at 796)). The Court should reject the mistaken attempt by Appellants to challenge an executive order through the APA.

51

Without the APA, Appellants do not have a cause of action under the Privacy Act and, in turn, cannot receive injunctive relief. The Privacy Act itself does not authorize suits for declaratory or injunctive relief, outside of two inapplicable situations, but instead authorizes individual suits for *damages*. *See Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988). The fact that Congress created an alternative statutory process for litigants to vindicate the Privacy Act strongly suggests Appellants cannot maintain this lawsuit under the Privacy Act. *Cf. Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981).

Indeed, Appellants fail to cite a single cause of action—aside from the APA—that allows them to enforce the Privacy Act and, without an applicable cause of action, Appellants lack authority to sue under federal statutes. *See Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001) ("Without [congressional authorization], a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute."); *LULAC*, 808 F. Supp. 3d at 69 (after dismissing Plaintiffs' APA claims against an executive order, holding that Plaintiffs lacked authority to enforce federal law because they possessed "'no express cause of action' under

any federal statute" and equitable relief is "extremely limited" for federal statutory violations (citation omitted)).  Appellants therefore lack a cause of action.

###### b. The President has authority to gather and organize information within the Executive Branch.

Appellants are unlikely to succeed in challenging Section 2(a) because their lawsuit fails to explain how courts can second-guess the President's ability to organize information already within the Executive Branch's possession.  The President has inherent authority to manage information within the Executive Branch's possession—especially when, as here, no statute suggests otherwise.  *See* U.S. Const. art. II.

The Constitution vests the executive power in the President alone, establishing him as "the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity." *Clinton v. Jones*, 520 U.S. 681, 699 n.29 (1997).  This control naturally extends to personnel, resources, and materials throughout the Executive Branch.  *See Am. Fed'n of Gov't Emp., AFL-CIO v. Freeman*, 498 F. Supp. 651, 658 (D.D.C. 1980) ("The President, of course, is the head of the Executive Branch, and in that capacity he has great powers with respect to its management.").  For

example, when the Supreme Court upheld the Presidential Recordings and Materials Preservation Act's rules for collecting and archiving presidential materials, the Court emphasized that the Act did not infringe on separation-of-power principles because "the control over the materials remains in the Executive Branch." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 441 (1977). In so doing, the Supreme Court implicitly recognized the constitutional tradition of presidential control over presidential materials and information. *Cf. Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988) ("[The President's'] authority to classify and control access to information bearing on national security . . . flows primarily from th[e] constitutional investment of power in the President and exists quite apart from any explicit congressional grant.").

State Appellees agree with Appellants that the Supreme Court's framework in *Youngstown Sheet & Tube Co.* is useful. Appellant Br. 28, 41. Appellants, however, misapply that framework. Given the President's inherent authority to supervise and manage the Executive Branch, this case (at best for Appellants) falls in Justice Jackson's second category of presidential power, "[w]hen the President acts in absence of either a congressional grant or denial of authority." *Youngstown Sheet*

54

*& Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). That means he can "rely upon his own independent powers." *Id.* Under *Youngstown* then, Appellants' claim necessarily fails. Appellants are simply mistaken when they suggest that the President needs to point to statutory authority allowing him to compile the State Citizenship Lists. *Compare id.*, *with* Appellant Br. 28.

Even if the President did not have inherent authority to compile citizenship information within the Executive Branch's possession, all agree he is empowered to act "in relation to another branch's constitutionally authorized act"—*i.e.*, an act of Congress. *Georgia v. Meadows*, 88 F.4th 1331, 1347 (11th Cir. 2023). Congress has made it a crime to provide a fraudulent ballot and for anyone other than eligible voters to cast ballots, *see* 18 U.S.C. § 611; 52 U.S.C. § 20511, and the Supreme Court has recognized that "the President's duty to 'take Care that the Laws be faithfully executed' plainly encompasses enforcement of federal election laws passed by Congress," *Trump v. United States*, 603 U.S. 593, 626–27 (2024) (quoting U.S. Const. art. II, § 3). Because the State Citizenship Lists could help enforce federal statutory prohibitions

55

on non-citizen voting, Section 2(a) of the EO is valid "in relation to" an act of Congress. *See Meadows*, 88 F.4th at 1347.

In response, Appellants suggest that Congress has *implicitly* limited the President's ability to make state-level lists of voting-age citizens by giving the States the responsibility of creating voter-registration lists. *See* Appellant Br. 42 (discussing 52 U.S.C. § 21083(a) (HAVA provision requiring the States to create a "computerized statewide voter registration list"), and *id.* § 20507(a) (NVRA provision charging the "administration of voter registration for elections for Federal office" to the States)). But the State Citizenship Lists are not meant to displace state voter-registration lists—a point the EO itself makes clear. EO § 2(a).

Rather, the intent is for States to use this *optional* federal resource to check their own voter-registration lists for non-citizens. *Id.* Appellants never explain how the mere furnishing of the State Citizenship Lists displaces the States' prerogative to maintain their voter registration lists. As the EO itself says, "State and Federal laws and State procedures must still be followed for an individual to be registered to vote," indicating plainly that the Lists do not modify or supplant State

56

election laws. EO § 2(a). Appellants thus wrongly suggest that the mere compiling of information already in the Executive Branch's possession conflicts with Article II and intrudes on congressional and state authority.

## 2. Section 3(b)

Appellants' challenge to section 3(b) is likewise unlikely to succeed on the merits because it asks for an impermissible remedy. In asking this Court to enjoin the President from issuing instructions to a federal agency, Appellants are proposing an extraordinary intrusion on the President's constitutional authority. Indeed, Appellants' complaint challenges not USPS's rule itself (which does not exist), but only the EO— and thus the President's authority to direct rulemaking by agencies within the executive branch. *See* JA79 ¶ 117 ("President Trump's Order intrudes upon Congress's prerogatives by overriding its command that USPS shall be an 'independent establishment . . . .'"). Appellants provide no authority suggesting courts can bar the President from asking a federal agency to engage in rulemaking, conditioned on compliance with applicable law.

57

The Constitution vests the entirety of the executive power in the President. U.S. Const. art. II, § 1, cl. 1. In exercising this power, the President must be able to control and supervise his subordinates to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3; *see Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010). This includes the laws criminalizing provision of a fraudulent ballot and casting ballots by anyone other than eligible voters. *See* 18 U.S.C. § 611; 52 U.S.C. § 20511. Indeed, "the activities of executive officers may take legislative and judicial forms, but they are exercises of—indeed, under our constitutional structure they *must be* exercises of— the executive Power, for which the President is ultimately responsible." *United States v. Arthrex, Inc.*, 594 U.S. 1, 17 (2021) (internal quotation marks and citations omitted). Thus, the "thousands of officers [who] wield executive power" in the federal government "acquire[] [their] legitimacy and accountability to the public through 'a clear and effective chain of command' down from the President." *Id.* at 11 (quoting *Free Enter. Fund*, 561 U.S. at 498).

Given those constitutional rules, Congress cannot bar the President from supervising USPS. *Contra* Appellant Br. 44–46. The Constitution

58

protects the President's ability to "discharge his own constitutional duty of seeing that the laws be faithfully executed." *Myers v. United States*, 272 U.S. 52, 135 (1926). Indeed, in *Myers*, the Supreme Court has already held that Congress cannot interfere with the President's ability to supervise the U.S. Postal Service. *See id.* Article II prevents such intrusions—including restrictions on the President's removal of post-office officials. *See id.* If Congress cannot prevent the President from *firing* postal officials, it follows naturally that Congress cannot prohibit the President from giving directives to postal officials.

Nor does the Supreme Court's decision in *Humphrey's Executor v. United States* save Appellants' claims. 295 U.S. 602 (1935). It bears noting that the Supreme Court has already signaled its intent to overrule *Humphrey's Executor* and stayed an order preventing the removal of an FTC Commissioner. *See Trump v. Slaughter*, 146 S. Ct. 18 (2025). But even if *Humphrey's Executor* is not overruled, the Supreme Court in *Humphrey's* explicitly suggested its rationale did not insulate postal officials from removal—on the rationale that such officials perform "executive functions." 295 U.S. at 627 ("The office of a postmaster is so essentially unlike the office now involved that the decision in the *Myers*

59

Case cannot be accepted as controlling our decision here. A postmaster is an executive officer restricted to the performance of executive functions."); *see also U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 747 (2004) ("Postal Service has many powers more characteristic of Government than of private enterprise, including its state-conferred monopoly on mail delivery, the power of eminent domain, and the power to conclude international postal agreements.").

Nor can Appellants insist USPS must be independent from presidential control by analogizing to "financial institutions like the Second Bank and the Federal Reserve," which "can claim a special historical status" because they "have historically enjoyed some insulation from the President." *Seila Law LLC v. CFPB*, 591 U.S. 197, 222 n.8 (2020). Unlike the Federal Reserve, USPS does not share the same historical lineage of independence. For most of the country's history, the Postmaster General was a member of the President's Cabinet. *See Flamingo Indus.*, 540 U.S. at 740 (providing historical overview).

Article II of the Constitution therefore provides the President with authority to supervise USPS. Neither Congress nor the courts can

60

interfere—including by prohibiting presidential directions to engage in rulemaking. *See Myers*, 272 U.S. at 135.

## II. The balance of the equities forecloses a preliminary injunction.

In order to obtain a preliminary injunction, Appellants must show that the balance of equities clearly favors them. *Winter*, 555 U.S. at 20. They cannot make this showing.

On their side of the balance, Appellants can point only to speculative injuries based on non-final agency actions. *See supra* Part § I.A.1.a. Read charitably, Appellants' strongest equitable claim to harm is their voluntary choice to take prophylactic measures in anticipation of what they predict the government will do. Appellant Br. 24, 52. Such prophylactic measures—based on predictions about future harm—are, of course, insufficient as a matter of law to support standing. *See Clapper*, 568 U.S. at 416. For the same reasons, they deserve little weight in the equitable analysis.

On the other hand, the federal government has a strong interest in getting a chance to implement executive orders lawfully. *See Common Cause*, 506 F. Supp. 3d at 46. Presidents frequently articulate policy objectives, but they rely on agencies to use their expertise to implement

61

policy ideas lawfully.  *See Seila Law*, 591 U.S. at 204.  Giving agencies a chance to lawfully implement policies—rather than reflexively barring presidential directives that do not bind the public—reflects the respect due to the executive branch as a coordinate branch of government.  *See Common Cause*, 506 F. Supp. 3d at 46.

At the same time, the federal courts also have a strong interest in not being forced to adjudicate rushed, speculative cases like this one. Federal courts exist to resolve concrete legal disputes based on specific factual circumstances.  *See Allen-Bradley Loc. No. 1111, United Elec., Radio & Mach. Workers of Am. v. Wisconsin Emp. Rels. Bd.*, 315 U.S. 740, 746 (1942).  But as recognized by two district judges, there are still many unknowns about how the EO will be implemented.  *See* JA713–14; *League of Women Voters of Mass. v. Trump*, --- F. Supp. 3d ---, 2026 WL 1755833, at *5 (D. Mass. June 18, 2026) ("There are clearly many uncertainties as to how the agencies will ultimately implement the EO, including the source and accuracy of DHS' Confirmed Citizen Lists, and what final rule, if any, will be adopted by the USPS.").  Entertaining challenges to non-final, evolving policies—like Appellants demand—only pulls federal

courts away from the foundational principles that constrain and guide judicial power. *See Trump v. New York*, 592 U.S. at 131–32.

A final point bears emphasis. The District Court specifically invited Appellants to renew their motions for a preliminary injunction once final agency actions exist. JA697. Once that happens, Appellants can amend their complaints to remove their various inaccurate predictions about what the final agency actions will look like, *see, e.g.*, JA69 ¶ 85 (alleging that the EO will impact primary elections)—and replace them with accurate allegations about what the federal government is doing. Appellants can then likewise file preliminary injunction briefs that accurately address the policies they are challenging—unlike what Appellants did below. *See, e.g.*, DSCC PI Reply Br. (ECF 122) at 24 (claiming that the federal government, not the States, would create the Mail-In Ballot and Absentee List). That is precisely how litigation is supposed to work—and Appellants offer no real explanation for why that is not good enough for them.

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court in full.

Date: June 29, 2026

Respectfully submitted,

**STEVE MARSHALL**
ALABAMA ATTORNEY GENERAL

**CATHERINE L. HANAWAY**
MISSOURI ATTORNEY GENERAL

*/s/ A. Barrett Bowdre*
A. Barrett Bowdre, 63107
  *Solicitor General*
STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36104
Telephone: (334) 353-8892
Fax: (334) 353-8400
Barrett.Bowdre@AlabamaAG.gov

*/s/ Louis J. Capozzi III*
Louis J. Capozzi III, 66364
  *Solicitor General*
William J. Seidleck, 63854
  *Principal Deputy Solicitor General*
Graham D. Miller, 66910
  *Deputy Solicitor General*
J. Michael Patton*
  *Deputy Solicitor General*
Benjamin S. Gilberg*
  *Deputy Solicitor General*
Missouri Attorney General's Office
815 Olive Street, Suite 200
St. Louis, MO 63101
Tel. (573) 645-9662
Fax (573) 751-0774
Louis.Capozzi@ago.mo.gov
William.Seidleck@ago.mo.gov
Graham.Miller@ago.mo.gov
Michael.Patton@ago.mo.gov
Benjamin.Gilberg@ago.mo.gov

**JAMES UTHMEIER**
FLORIDA ATTORNEY GENERAL

**THEODORE E. ROKITA**
INDIANA ATTORNEY GENERAL

*/s/ David M.S. Dewhirst*
David M.S. Dewhirst,
  66934132(Mont.)
  *Solicitor General*
Jason J. Muehlhoff**
  *Chief Deputy Solicitor General*

/s/ *James A. Barta*
James. A Barta**
  *Solicitor General*
Office of the Indiana Attorney General
302 W. Washington Street

64

Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
david.dewhirst@myfloridalegal.com
jason.muehlhoff@myfloridalegal.com

IGC South, Fifth Floor
Indianapolis, IN 46204-2770
Phone: (317) 232-0709
Fax: (317) 232-7979
James.Barta@atg.in.gov

**KRIS W. KOBACH**
KANSAS ATTORNEY GENERAL

**LIZ MURRILL**
LOUISIANA ATTORNEY GENERAL

*/s/ James R. Rodriguez*
James R. Rodriguez, 67138
 *Assistant Attorney General*
Kansas Office of the Attorney
General
Topeka, Kansas 66612
Phone: (785) 368-8197
jay.rodriguez@ag.ks.gov

*/s/ J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga**
 *Solicitor General*
Louisiana Department of Justice
1885 N. Third St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

**AUSTIN KNUDSEN**
MONTANA ATTORNEY GENERAL

**MICHAEL T. HILGERS**
NEBRASKA ATTORNEY GENERAL

*/s/ Christian B. Corrigan*
Christian B. Corrigan**
 *Solicitor General*
Montana Department of Justice
215 N. Sanders Helena, MT 59601
(406) 444-2707 (o)
Christian.Corrigan@mt.gov

/s/ *Cody S. Barnett*
Cody S. Barnett, 66418
 *Solicitor General*
Nebraska Department of Justice
1445 K Street, Room 2115
Lincoln, Nebraska 68508
Tel.: (402) 471-2683
Fax: (402) 471-3297
cody.barnett@nebraska.gov

65

**GENTER DRUMMOND**
OKLAHOMA ATTORNEY GENERAL

*/s/ Garry M. Gaskins, II*
Garry M. Gaskins, II, 64532
 *Solicitor General*
Office of the Attorney General of
Oklahoma
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

**ALAN WILSON**
SOUTH CAROLINA ATTORNEY
GENERAL

*/s/ Joseph D. Spate*
Joseph D. Spate, 64676
 *Deputy Solicitor General*
1000 Assembly Street
Columbia, South Carolina 29201
Tel. (803) 734-3371
Fax (803) 734-3677
josephspate@scag.gov

**MARTY J. JACKLEY**
SOUTH DAKOTA ATTORNEY GENERAL

/s/ *Grant Flynn*
Grant Flynn**
 *Assistant Attorney General*
South Dakota Office of the Attorney
General
1302 East SD Highway
1889, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Email:
grant.flynn@state.sd.us

**KEN PAXTON**
TEXAS ATTORNEY GENERAL

/s/ *David Bryant*
David Bryant**
 *Senior Special Counsel*
Office of the Attorney General of
Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
david.bryant@oag.texas.gov

\* D.C. Circuit Admission forthcoming
\*\* *Pro hac vice* forthcoming

66

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7) because it contains 12,198 words, excluding the parts of the brief exempted by Rule 32(f) and Circuit Rule 32(e)(1); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word and is set in 14-point Century Schoolbook typeface.

*/s/ Louis J. Capozzi III*

67

## CERTIFICATE OF SERVICE

I hereby certify that, on June 29, 2026, a true and correct copy of the foregoing was filed with the Court's electronic filing system to be served by electronic methods on counsel for all parties entered in the case.

/s/ *Louis J. Capozzi III*

68