[ORAL ARGUMENT NOT SCHEDULED]

No. 26-5193

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

DSCC, et al.,

Plaintiffs-Appellants,

v.

Donald J. Trump, in his official capacity as President of the United States, et al.,

Defendants-Appellees.

On Appeal from the United States District Court
for the District of Columbia

## BRIEF FOR APPELLEES

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

BRAD HINSHELWOOD
LAURA E. MYRON
JENNIFER L. UTRECHT
SAMUEL HOBBS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7228*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.    Parties and Amici

### i. Plaintiffs

Plaintiffs-Appellants are Democratic Senatorial Campaign Committee, Democratic Congressional Campaign Committee; Democratic National Committee; Democratic Governors Association; Senate Minority Leader Charles E. Schumer; and House Minority Leader Hakeem S. Jeffries.

There are additional plaintiffs in the consolidated cases in district court who are not a party to this appeal.  The additional plaintiffs below are League of United Latin American Citizens; Secure Families Initiative; Arizona Students' Association; National Association for the Advancement of Colored People, Common Cause; Common Cause Education Fund; Black Voters Matter Funds, Inc.; and BVM Capacity Building Institute, Inc.

### ii. Defendants

Defendants-Appellees are Donald J. Trump, in his official capacity as President of the United States; Executive Office of the President; United States Department of Justice; United States Postal Service; United States Citizenship and Immigration Services; Social Security Administration; United States Department of Commerce; Todd Blanche, in his official capacity as Acting United States Attorney General; Markwayne Mullin, in his official capacity as Secretary of Homeland Security; Joseph B. Edlow, in his official capacity as Director of the United States Citizenship and Immigration Services; Frank J. Bisignano, in his official capacity as Commissioner of the Social Security Administration; and Howard Lutnick, in his official capacity as Secretary of the Department of Commerce.

The additional defendants named in the consolidated cases below are Amber F. McReynolds, in her official capacity as Chair of the Board of Governors of the United States Postal Service; Board of Governors of the United States Postal Service; Derek Kan, in his official capacity as Vice Chairman of the Board of Governors of the United States Postal

Service; and Ronald A. Stroman, in his official capacity as Members of the Board of Governors of the United States Postal Service.

The Intervenor-Defendants are the States of Missouri, Alabama, Florida, Indiana, Kansas, Louisiana, Montana, Nebraska, Oklahoma, South Carolina, South Dakota, and Texas.

### iii. Amici

Notices of intention to participate as amicus curiae have been filed by Society for the Rule of Law; Bipartisan Former Governors; and Coalition of State and Local Election Officials, Local Governments, and Election Experts.

Amici in the district court also included Wisconsin Democracy Campaign; Expo of Wisconsin, Inc.; Jaleyce Oraedu; Jasmine Oraedu; Aharon Shelef; America's Future; Citizens United; and Freedom for American Immigration Reform.

### B. Rulings Under Review

Plaintiffs-Appellants seek review of the May 28, 2026 memorandum opinion and order denying their motion for a preliminary injunction (Dkt. 143). The rulings were issued by Judge Carl J. Nichols in Case No. 1:26-cv-01114. The district court's opinion is not published

in the federal reporter but is available at 2026 WL 1487833 and is reproduced in the Joint Appendix.

## C.     Related Cases

This case has not previously been before this Court or any other court.  In the district court, this case is consolidated with two other cases: *League of United Latin American Citizens et al. v. Executive Office of the President, et al.*, No. 26-cv-01132-CJN (D.D.C.) and *National Association for the Advancement of Colored People, et al. v. Trump, et al.*, No. 26-cv-01151-CJN (D.D.C.).

Two additional suits challenging the same Executive Order at issue in this lawsuit are pending in the United States District Court for the District of Massachusetts: *League of Women Voters of Massachusetts v. Trump*, No. 26-cv-11549 (D. Mass. Apr. 2, 2026) and *California v. Trump*, No. 26-cv-11581 (D. Mass. Apr. 3, 2026).  There are no other related cases within the meaning of this Court's rules.

*/s/ Laura E. Myron*
LAURA E. MYRON

**TABLE OF CONTENTS**

**Page**

GLOSSARY

INTRODUCTION .................................................................................1

STATEMENT OF JURISDICTION.......................................................3

STATEMENT OF THE ISSUE..............................................................3

PERTINENT STATUTES AND REGULATIONS ..................................3

STATEMENT OF THE CASE ...............................................................3

     A.    Executive Order 14,399 ...................................................3

          i.    State Citizenship Lists. .........................................4

          ii.    Postal Service Rulemaking.....................................7

     B.    Factual and Procedural Background .................................8

SUMMARY OF ARGUMENT...............................................................15

STANDARD OF REVIEW....................................................................19

ARGUMENT ......................................................................................20

I.    The District Court Correctly Held That Plaintiffs Have Not Carried Their Burden to Establish Jurisdiction............................20

     A.    Related Principles of Article III Standing and Ripeness Demonstrate That This Suit Is Premature.........................22

     B.    Plaintiffs' Contrary Arguments Fail .....................................34

II.    The District Court Correctly Determined that Plaintiffs Are Not Likely to Succeed on the Merits of their Facial Challenge to the Executive Order ................................................................61

III. Plaintiffs Have Not Demonstrated an Entitlement to Injunctive Relief ..................................................................64

    A.    Plaintiffs Have Not Demonstrated Irreparable Harm.........64

    B.    The Equities and Public Interest Do Not Favor Injunctive Relief ...................................................................66

CONCLUSION ......................................................................................68

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

**TABLES OF AUTHORITIES**

**Cases:**

*Abbott Labs. v. Gardner,*
387 U.S. 136 (1967) .............................................................. 24

*Alt. Research & Dev. Found. v. Veneman,*
262 F.3d 406 (D.C. Cir. 2001)........................................... 32, 33

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh,*
295 F.3d 28 (D.C. Cir. 2002) ..................................... 18, 38, 39, 63, 64

*Bost v. Illinois State Bd. of Elections,*
607 U.S. 71 (2026) ............................................................. 46

*Center for Auto Safety v. National Highway Traffic Safety Admin.,*
710 F.2d 842 (D.C. Cir. 1983) ........................................... 13

*Centro de Trabajadores Unidos v. Bessent,*
167 F.4th 1218 (D.C. Cir. 2026) ....................................... 20

*Chamber of Commerce v. Reich,*
57 F.3d 1099 (D.C. Cir 1995) ........................................... 42

*Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006) ..................................... 64, 65

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) .......................... 17, 22, 23, 27, 38, 47, 49, 51, 53

*Clevinger v. Advocacy Holdings, Inc.,*
134 F.4th 1230 (D.C. Cir. 2025) ....................................... 64

*Common Cause/Georgia v. Billups,*
554 F.3d 1340 (11th Cir. 2009) ......................................... 43

*Crawford v. Marion Cnty. Election Bd.,*
472 F.3d 949 (7th Cir. 2007) ............................................. 43

*Defenders of Wildlife v. Perciasepe,*
714 F.3d 1317 (D.C. Cir. 2013) ................................. 32, 33, 36

*Devia v. Nuclear Regulatory Comm'n,*
   492 F.3d 421 (D.C. Cir. 2007) ........................................ 31, 61

*Electronic Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,*
   878 F.3d 371 (D.C. Cir. 2017) ............................................ 61

*Fish v. Schwab,*
   957 F.3d 1105 (10th Cir. 2020) .......................................... 43

*Food & Drug Admin. v. All. for Hippocratic Med.,*
   602 U.S. 367 (2024) ................................. 17-18, 23, 33, 50, 52, 53, 54

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982) ..................................................... 53

*League of United Latin Am. Citizens v. Exec. Office of the President,*
   818 F. Supp. 3d 34 (D.D.C. 2026) ....................................... 38

*LeBlanc v. United States Priv. & C.L. Oversight Bd.,*
   2025 WL 1840591 (D.C. Cir. July 1, 2025) .............................. 66

*Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ..................................................... 29

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) .................................................. 22, 23

*Lujan v. National Wildlife Fed'n,*
   497 U.S. 871 (1990).................................................... 31

*Maryland v. King,*
   567 U.S. 1301 (2012) ................................................... 67

*In re Murray Energy Corp.,*
   788 F.3d 330 (D.C. Cir. 2015) ........................................ 45, 55

*Myers v. United States,*
   272 U.S. 52 (1926) ..................................................... 63

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
   538 U.S. 803 (2003) .................................................... 24

*Nat'l Urb. League v. Trump*,
783 F. Supp. 3d 61 (D.D.C. 2025) ........................................ 33

*New York v. Trump*,
485 F. Supp. 3d 422 (S.D.N.Y. 2020) ................................. 28

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
523 U.S. 726 (1998) .......................................................... 31

*People for the Ethical Treatment of Animals v. United States Dep't of Agric.*,
797 F.3d 1087 (D.C. Cir. 2015) ........................................ 54

*Platte River Whooping Crane Critical Habitat Maint. Tr. v. FERC*,
962 F.2d 27 (D.C. Cir. 1992) ........................................... 33

*POET Biorefining, LLC v. Env't Prot. Agency*,
970 F.3d 392 (D.C. Cir. 2020) ......................................... 23

*Reno v. Catholic Soc. Servs., Inc.*,
509 U.S. 43 (1993) ........................................................... 24

*Scahill v. District of Columbia*,
909 F.3d 1177 (D.C. Cir. 2018) ........................................ 58

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) ........................................................ 66

*Sierra Club v. Costle*,
657 F.2d 298 (D.C. Cir. 1981) ......................................... 63

*Sierra Club v. United States Dep't of Transp.*,
125 F.4th 1170 (D.C. Cir. 2025) ................................. 45, 46

*Soundbound Ass'n v. Federal Trade Comm'n*,
888 F.3d 1261 (D.C. Cir. 2018) ........................................ 59

*Texas v. United States*,
523 U.S. 296 (1998) ......................................................... 24

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........................................................ 22

*Trump v. Am. Fed'n of Gov't Emps.*,
  145 S. Ct. 2635 (2025) ................................................................ 31

*Trump v. New York*,
  592 U.S. 125 (2020) .............. 2, 22, 27, 28, 29, 30, 31, 32, 39, 40, 41, 61

*United Presbyterian Church in the USA v. Reagan*,
  738 F.2d 1375 (D.C. Cir. 1984) .......................................... 33

*Venetian Casino Resort, LLC v. EEOC*,
  409 F.3d 359 (D.C. Cir. 2005) ...................................... 56, 57

*Venetian Casino Resort, LLC v. EEOC*,
  530 F.3d 925 (D.C. Cir. 2008).............................................57

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ...................................................... 23, 33

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................ 19

*Wisconsin Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) .......................................... 65

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) .......................................................... 39

**Statutes:**

5 U.S.C. § 553 ...................................................................... 45

5 U.S.C. § 704 ...................................................................... 59

28 U.S.C. § 1292 ................................................................... 3

28 U.S.C. § 1331...................................................................3

28 U.S.C. § 1339 ................................................................... 3

39 U.S.C. § 409 .................................................................... 3

**Rules and Regulations:**

Fed. R. App. P. 4 ............................................................ 3

Fed. R. App. P. 10 .......................................................... 58

60 Fed. Reg. 13,023 (Mar. 8, 1995) ........................................ 42

85 Fed. Reg. 44,679 (July 21, 2020) ................................. 28, 29

86 Fed. Reg. 7,015 (Jan. 20, 2021) ...................................... 32

90 Fed. Reg. 8,237 (Jan. 20, 2025) ...................................... 32

91 Fed. Reg. 17,125 (Mar. 31, 2026) ................................. 1, 3, 4

91 Fed. Reg. 32,915 (June 2, 2026) ................................. 8, 59

**Other:**

U.S. Const. art II, § 1, cl. 1 ...................................... 62-63, 66

U.S. Const. art II, § 3 ..................................................... 66

# GLOSSARY

| | |
|---|---|
| SSA | Social Security Administration |
| SAVE | Department of Homeland Security's Systematic Alien Verification for Entitlements |
| DSCC | Democratic Senatorial Campaign Committee |

# INTRODUCTION

Plaintiffs' opening brief fundamentally mischaracterizes the Executive Order that they challenge. On its face, Executive Order 14,399 is not self-executing, nor does it change the rules of any election. Indeed, as the district court recognized, deliberations within the Executive Branch are ongoing regarding implementation of every major component of the Order—including questions of whether, and to what extent, it is feasible and consistent with applicable law to implement.

For example, Section 3(b) of the Executive Order calls for the United States Postal Service "to initiate a *proposed* rulemaking," but says nothing about the contents of any final rule. *Ensuring Citizenship Verification and Integrity in Federal Elections*, Exec. Order No. 14,399 § 3(b), 91 Fed. Reg. 17,125, 17,126 (Mar. 31, 2026) (emphasis added) (JA103-04). And Section 2(a) contemplates the creation of State Citizenship Lists—lists of individuals that reside in each State who are citizens and who will be of legal age to vote in an upcoming election— but only to the extent "feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974." *Id.* § 2(a) (JA103). At the time of the district court's decision (and as of the time of this

filing), much remains uncertain—even within the Executive Branch—about what those lists (if any) will look like, how they will be compiled, using what data sources, and what (if anything) they will be used for.

Under these circumstances, well-established principles of standing and ripeness require courts to "[l]et[] the Executive Branch's decisionmaking process run its course," *Trump v. New York*, 592 U.S. 125, 134 (2020)—without prejudice to the possibility of exercising judicial review later, if necessary, over any final agency action that causes plaintiffs an actual or imminent injury. The district court thus correctly denied plaintiffs' motion for a preliminary injunction, emphasizing that "[p]laintiffs may, of course, renew their motions if and when" the Postal Service or Department of Homeland Security take action to implement the Executive Order that causes (or will imminently cause) plaintiffs harm. JA697. But on the present record, plaintiffs have not (and cannot) show that they are likely to have Article III standing or that they will suffer imminent and irreparable harm absent an injunction, much less that they are entitled to an injunction that short-circuits the Executive Branch's deliberative processes. The district court's decision should be affirmed.

## STATEMENT OF JURISDICTION

Plaintiffs-Appellants invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1339, and 39 U.S.C. § 409.  Whether the district court had jurisdiction is in dispute.  *See infra* pp. 20-61.

The district court issued an opinion denying plaintiffs' motion for a preliminary injunction on May 28, 2026.  JA721.  Plaintiffs filed a timely notice of appeal on June 1, 2026.  JA727; Fed. R. App. P. 4(a)(1)(B).  This Court has jurisdiction under 28 U.S.C. § 1292(a).

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion when it denied plaintiffs' motion for a preliminary injunction.

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are reproduced in the Brief for Appellants.

## STATEMENT OF THE CASE

### A.    Executive Order 14,399

On March 31, 2026, President Trump Issued Executive Order 14,399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17,125 (Mar. 31, 2026) (JA102-05).  Two aspects of the Order are relevant to this appeal.

###### i. State Citizenship Lists.

First, Section 2(a) of the Order directs "the Secretary of Homeland Security, through the Director of United States Citizenship and Immigration Services in coordination with the Commissioner of the Social Security Administration (SSA)," "[t]o the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974," to take "appropriate action" to "compile and transmit" a list of U.S. citizens "who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State." Exec. Order No. 14,399 § 2(a) (JA103). The Executive Order states that these "State Citizenship Lists" will be derived from Federal citizenship and naturalization records, SSA records, data from the Department of Homeland Security's Systematic Alien Verification for Entitlements (SAVE) system, "and other relevant Federal databases," and that they shall be transmitted to the "chief election official of each State." *Id.* The Executive Order specifically contemplates that the Secretary of Homeland Security will "establish procedures to (i) allow individuals to access their own records to update or correct them in

4

advance of elections; and (ii) enable States to routinely supplement and provide suggested modifications or amendments" to the lists. *Id.*

The Executive Order further directs the Secretary of Homeland Security to "establish the infrastructure necessary to compile, maintain, and transmit" the lists "within 90 days of the date" of the Order, which is June 29, 2026. Exec. Order No. 14,399 § 4(c) (JA105). The Secretary of Homeland Security and the SSA Commissioner are charged with coordinating to implement the State Citizenship Lists. *See id.* § 4(a) (JA104). The Order directs that the SSA Commissioner "provide all necessary citizenship and identity data to the Secretary of Homeland Security in support of this requirement, consistent with applicable law, the Privacy Act, and all applicable use agreements." *Id.* § 4(c) (JA105). The State Citizenship Lists "shall be updated and transmitted to State election officials no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election." *Id.* § 2(a) (JA103).

Critically, the Executive Order does not specify any particular purpose or intended use for the State Citizenship Lists. And, other than mandating their creation and transmission "[t]o the extent feasible

5

and consistent with applicable law," Executive Order 14,399 § 2(a) (JA103), the Order does not require anyone inside or outside of the federal government to do anything with the lists.  At the time of the district court's decision, the Department of Homeland Security had not announced any planned steps to implement the Executive Order.  *See* JA560 (Mayhew Supplemental Decl. ¶ 5) (discussing "ongoing" deliberations "regarding implementation of the Executive Order," "includ[ing] consideration of feasibility and consistency with applicable law . . . as contemplated explicitly by Sections 2(a) and 7(b)"); JA526 (MacBride Decl. ¶ 5) (discussing similar "ongoing" deliberations within SSA).

After the district court's decision, the Department of Homeland Security issued memoranda discussing its ongoing deliberations and proposed plans.  JA728-34.  The operative memorandum, issued on June 8, 2026, states, *inter alia*, that the Department seeks to develop "technological infrastructure" that could be used to share citizenship information with States by June 30, 2026 (the date contemplated by the Executive Order) using information under the control of United States Citizenship and Immigration Services, the Department of State, and

6

SSA, Dkt. 152-1 at 1. The memorandum stresses that "the proposed approach is designed to leverage existing capabilities and legal authorities" and "operate within current privacy and security frameworks." *Id.* at 1. The memorandum further states that discussions remain ongoing regarding, *inter alia*, the extent and manner in which information can be shared consistent with the Privacy Act and other applicable laws. *See id.* at 2-3.

### ii. Postal Service Rulemaking

Second, the Executive Order directs the United States Postal Service "to initiate a proposed rulemaking" with regards to ballot mail for Federal elections and to develop procedures for individuals to be enrolled on "State-specific Mail-In and Absentee Participation List[s]." Exec. Order No. 14,399 § 3 (JA103). As evident from the text of the Order, those lists would be distinct from the State Citizenship Lists contemplated by Section 2(a). The Executive Order directs the Postal Service to begin the proposed rulemaking "within 60 days of" the Order, which was May 30, 2026, with "any final rule" to be issued within 120 days, *i.e.*, by July 29, 2026. *Id.* §§ 3(b), (d) (JA103-04). The Executive Order also identifies proposed provisions for inclusion in the notice of

proposed rulemaking, *id.* §3(b)(i)-(v) (JA104), but does not say anything about whether any or all of those provisions should appear in any final rule promulgated after notice and comment, *see id.* § 3(d) (JA104); *see also* JA531 (Monteith Decl. ¶ 5) ("The Postal Service will not publish a final rule until it has reviewed and considered all comments submitted in response to the proposed rule.").

On June 2, 2026—after the district court's decision here—the Postal Service issued a notice of proposed rulemaking. *See Ballot Mail for Federal Elections*, 91 Fed. Reg. 32,915 (June 2, 2026).

**B. Factual and Procedural Background**

**1.** Plaintiff-Appellants are the Democratic Senatorial Campaign Committee, Democratic Congressional Campaign Committee, Democratic National Committee, Democratic Governors Association, U.S. Senate Minority Leader Charles E. Schumer, and U.S. House Minority Leader Hakeem S. Jeffries (collectively "DSCC Plaintiffs"). On April 1, 2026, the day after Executive Order 14,399 issued, the DSCC Plaintiffs filed this suit in the United States District Court for the District of Columbia challenging Sections 2(a), 3(b), 4(a), and 4(c) of the Executive Order, claiming that it is *ultra vires*, that it exceeds the

Postal Service's statutory authority, and that it violates the separation of powers, the Privacy Act, the Voting Rights Act, and the First and Fifth Amendments to the Constitution.  JA98-99.

The following day, on April 2, 2026, a second group of plaintiffs filed suit challenging Sections 2(a) and 3(b) of the Executive Order raising similar claims.  *See* Complaint, *League of United Latin Am. Citizens v. Executive Off. of the President*, No. 26-cv-1132, Dkt.1 (D.D.C. Apr. 2, 2026).  The following day, April 3, 2026, a third group of plaintiffs filed a similar suit.  *See* Complaint, *National Ass'n for the Advancement of Colored People v. Trump*, No. 26-cv-1151, Dkt. 1 (D.D.C. Apr. 3, 2026).

On April 9, 2026, the three cases were consolidated.[1]  Dkt. 27.  A group of States moved to intervene as defendants.  Dkt. 77.  The district

---

[1] Two additional cases challenging the Executive Order are pending in the United States District Court for the District of Massachusetts: *League of Women Voters of Massachusetts. v. Trump*, No. 26-cv-11549 (D. Mass. Apr. 2, 206), and *California v. Trump*, No. 26-cv-11581 (D. Mass. Apr. 3, 2026).  On June 25, 2026, the district court in *California v. Trump* declared Sections 2 and 3 of the Executive Order to be legally void and enjoined the government from "implementing or giving effect to Sections 2 and 3 of the [Executive Order] with respect to the November 3, 2026 or any earlier federal election in the Plaintiff States."  Memorandum & Order at 34,

*Continued on next page.*

court denied the motion for intervention as of right but granted the alternative request for permissive intervention. *See* Minute Order of April 12, 2026.

One day after the cases were consolidated, plaintiffs collectively filed motions for a preliminary injunction. They filed memoranda of law in support of those motions one week later. Dkts. 53, 54, 55.

**2.** On May 28, 2026, the district court denied all plaintiffs' motions for a preliminary injunction. JA695-720.

At the outset, the court reasoned that plaintiffs have not, at this time, shown that they are currently suffering a concrete and imminent injury traceable to the Executive Order or that their claims are ripe for adjudication. As the court explained, the Executive Order "requires nothing from plaintiffs—no compliance, no changed behavior, nothing at all—because it is not aimed at them but instead tells only the agencies to do something." JA705 (quotation marks omitted). Specifically, Section 2(a) of the Executive Order directs the Secretary of Homeland Security to "compile and transmit" State Citizenship Lists

---

*California v. Trump*, No. 26-cv-11581, Dkt. 191 (D. Mass. June 25, 2026).

"[t]o the extent doing so is 'feasible and consistent with applicable law.'" JA705 (quoting Exec. Order No. 14,399 § 2(a)). And Section 3(b) directs the Postal Service "to initiate . . . proposed rulemaking" for a rule that would establish procedures for individuals to be enrolled on "State-specific Mail-In and Absentee Participation List[s]," which would be used by the Postal Service to determine which mail-in or absentee ballots it "shall not transmit." JA713 (quoting Exec. Order No. 14,399 § 3(b)(iii)-(iv)). Neither directive directly causes plaintiffs harm.

Plaintiffs theorized that Section 2(a) causes their members harm because (i) any future lists would have uncorrected inaccuracies that would make it "more difficult, or even impossible, for some of their members to vote," JA705-06, (ii) Section 2(a) harmed plaintiffs who are political candidates because Section 2(a) alters the rules of the elections in which they compete, JA711-13, and (iii) the creation and transmission of such lists would violate their privacy rights, JA707-08. As the court recognized, however, "Section 2(a) does not purport to alter the rules of any State election." JA711. Instead, it directs that the Secretary create and transmit such lists if the Secretary determines that doing so is feasible and consistent with applicable law. JA705,

11

707-08.  But, the court emphasized repeatedly, "nothing in the Executive Order requires any State to use its List in any way—let alone to prevent otherwise qualified persons from registering to vote."  JA706-07; JA707 ("Again, nothing in Section 2(a) (or any other part of the Order) purports to require any State to do anything with the State Citizenship List it provided, let alone to remove otherwise eligible individuals on State voter registration lists."); JA711 ("In fact, Section 2(a) does not order the States to do anything with the State Citizenship Lists once they are transmitted—much less direct the States to amend their election procedures.").  And the district court further concluded that plaintiffs' concern about inaccuracies or privacy violations are based upon a "highly attenuated chain of possibilities" that are entirely speculative.  JA706 (quotation marks omitted).  The government, the court explained, "has not yet established the infrastructure to compile the Lists," JA706, and it "remains speculative whether the State Citizenship Lists, if and when they are initially compiled, will contain inaccuracies."  JA706.

As for the Postal Service rulemaking, the court held that "the effects of Section 3(b) are even further removed from any concrete

12

injury in fact than Section 2(a)).” JA713. All that portion of the

Executive Order does “is direct the Postal Service to initiate a

rulemaking and consider potential regulatory changes.” JA715.

Plaintiffs' claimed harm thus “run[s] directly into the bedrock (and

commonsense) rule that even 'the issuance of a notice of proposed

rulemaking, or other preliminary proceedings undertaken to promote a

proposed rule, often will not be ripe for review because the rule may or

may not be adopted or enforced.'” JA713-14 (quoting *Center for Auto

Safety v. National Highway Traffic Safety Admin.*, 710 F.2d 842, 846

(D.C. Cir. 1983)). “To be sure, the Postal Service may eventually issue a

final rule that directly affects [p]laintiffs or their members and that

[p]laintiffs believe is unlawful,” but until that happens, plaintiffs are “at

most 'concerned bystanders' to internal Executive Branch processes.”

JA715.

In so holding, the court recognized that the Postal Service may, in

the future, “ultimately issue a final rule that directly affects [p]laintiffs

or their members,” or that the government may “develop State

Citizenship Lists that omit specific individuals due to particularized

flaws.” JA697. The court stated that plaintiffs could “renew their

motions if and when those future actions occur."  JA697.  But on the present record, plaintiffs "have failed to show that they are likely to have Article III standing or that they will suffer imminent or irreparable harm absent an injunction."  JA697, JA719-20.

For similar reasons, the court determined that plaintiffs were not likely to succeed on the merits of their facial challenge to the Executive Order.  Contrary to plaintiffs' characterization, the Executive Order "does not itself regulate voter registration or how mail-in or absentee ballots will be transmitted; rather, it directs executive branch officials to take certain actions, subject to the limits of existing laws."  JA716.  That internal directive—which is "expressly conditioned on feasibility and compliance with applicable law—does not exceed Presidential authority or violate the separation of powers."  JA717.  "As a result, whether the government's actions under the Order are lawful or unlawful will depend on how [the relevant] agencies decide to implement the Order, not on the Order itself."  JA717.  "But it is not until such actions are taken that [p]laintiffs' claims might be ripe for judicial review."  JA718.

Having determined that none of the three groups of plaintiffs had demonstrated a likelihood of success on the merits of any of their claims, the district court denied the motions for a preliminary injunction. JA720. Only one of the three groups of plaintiffs—the DSCC plaintiffs—noticed an appeal, which this Court expedited at the DSCC plaintiffs' request.

## SUMMARY OF ARGUMENT

**I.** The district court correctly held that plaintiffs have not shown that they are likely to have standing to mount a facial challenge to Executive Order 14,399 or that their claims are ripe for review. Contrary to plaintiffs' characterizations, the Order does not purport to regulate Federal elections. Instead, it serves as an intra-Executive Branch directive to federal agencies and subordinate officials to undertake future policymaking action, subject to the constraints of feasibility and applicable laws.

Plaintiffs initiated this litigation just one day after the President signed Executive Order 14,399. As a result, no agency has yet taken any final agency action to implement the Order. Until that occurs, plaintiffs face no actual (or imminent) harm—irreparable or otherwise.

At most, they are concerned bystanders in the Executive Branch's internal deliberative processes. Indeed, plaintiffs' opening brief demonstrates that any injuries that plaintiffs may face are entirely dependent on future steps the Department of Homeland Security, SSA, and the Postal Service take to implement the President's directives. But the Executive Order itself does not demand the result plaintiffs fear; it expressly contemplates that the agencies will—as they do in all policymaking—exercise their relevant expertise and discretion regarding implementing the President's priorities in an appropriate and lawful manner, subject to feasibility constraints.

For example, plaintiffs claim that they are harmed by Section 2(a) of the Executive Order because they believe that the Order will lead the Secretary of Homeland Security to compile and transmit State Citizenship Lists in a manner that violates the Privacy Act and their common-law privacy interests. But the Executive Order itself expressly directs the Secretary to compile and transmit such lists only "[t]o the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974." Exec. Order No. 14,399 § 2(a) (JA103). Likewise, plaintiffs speculate that any lists will contain

16

inaccuracies and this will cause them harm because third parties—State election officials—will use those lists to disqualify otherwise eligible voters. But, as the district court recognized, the Executive Order expressly states that the Department of Homeland Security should create procedures to permit the correction of inaccuracies and does not require or direct States to do anything with these lists (if and when they are created and transmitted). Exec. Order No. 14,399 § 2(a) (JA103).

Because plaintiffs' harms stem from concerns about agency actions that do not yet exist—and that might never exist in the form plaintiffs speculate—plaintiffs' injuries are entirely speculative and not fairly traceable to the Executive Order. Such injuries cannot support standing. Nor can plaintiffs demonstrate organizational standing based on their claims that they have diverted resources to mitigate the harms they perceive may occur depending on how the agencies choose to act in the future. Plaintiffs cannot manufacture standing by spending money to avoid hypothetical harms that themselves are too speculative to support Article III standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013); *Food & Drug Admin. v. All. for Hippocratic Med.*, 602

17

U.S. 367, 394-95 (2024). And in any event, this suit is not ripe.
Plaintiffs cannot obtain an injunction to short-circuit agency
deliberative processes based on their speculative concerns about the
possible contents of future final rules, final agency action, or
policymaking efforts, that have yet to be effectuated.

**II.** The district court also correctly concluded that plaintiffs are
not likely to succeed on the merits of their various arguments that the
President has no lawful authority to issue the Executive Order or that
any future action taken to implement the order would be unlawful.

Plaintiffs' arguments to the contrary largely reiterate their
mistaken view that the Executive Order is self-executing or that it
somehow directly regulates elections, where—as is evident from the
Order's plain text—it is not and does no such thing. By its terms, the
Executive Order states that the agencies tasked with engaging in
policymaking shall implement the Order's directives consistent with
applicable law. Thus, "if the agency is prohibited, by statute or other
law, from implementing the Executive Order, then the Executive Order
itself instructs the agency to follow the law." *Bldg. & Constr. Trades
Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002). There can

thus be no argument that the Order itself is unlawful; ultimately, the question of whether the government acts unlawfully to implement the order will depend on how the Postal Service and Department of Homeland Security "decide to implement the Order, not on the Order itself." JA717.

**III.** Finally, for substantially the same reasons that plaintiffs have not demonstrated standing, the district court correctly determined that they have not (and cannot) demonstrate irreparable harm. Nor have they shown that the remaining equitable factors warrant preliminary injunctive relief.

For each of these reasons, this Court should affirm the district court's denial of plaintiffs' motion for a preliminary injunction.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). To get a preliminary injunction, the movant must show "(1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips

in his favor, and (4) issuing an injunction is in the public interest."

*Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1228 (D.C.

Cir. 2026) (citation and quotation marks omitted). This Court reviews

the district court's decision to issue or deny a preliminary injunction for

abuse of discretion, and any legal conclusions upon which the district

court relied de novo. *Id.*

## ARGUMENT

## I. The District Court Correctly Held That Plaintiffs Have Not Carried Their Burden to Establish Jurisdiction

The district court properly recognized that this litigation—

initiated one day after the President signed Executive Order 14,399—is

legally premature. The Executive Order functions as an internal

directive from the President to subordinate officials and agencies to

engage in future policymaking. Plaintiffs' real concern is not with the

Executive Order itself—which does not require anyone outside the

government to do (or refrain from doing) anything at all—but with

possible harms that may arise depending upon what specific actions the

agencies ultimately decide to take when they implement the President's

directives.

At the time of the district court's decision, the Department of Homeland Security had not developed any infrastructure necessary to compile any State Citizenship Lists contemplated by the Executive Order, nor had the Postal Service issued a Notice of Proposed Rulemaking, much less any final rule regarding the design and handling of mail-in ballot envelopes. *See* JA522-23 (Mayhew Decl. ¶¶ 5-9), JA530 (Monteith Decl. ¶¶ 3-5) (discussing "ongoing" deliberations). As both a practical and doctrinal matter, the government cannot defend—and this Court cannot opine on—the validity of agency actions that do not exist, and the critical parameters of which have not been decided. As the district court acknowledged, if the agencies take action to implement the Executive Order that directly affects plaintiffs or their members, plaintiffs "may, of course, renew their motion[]" for a preliminary injunction. JA697. On the record before the district court, however, plaintiffs cannot demonstrate a concrete injury supporting Article III standing or that this suit is ripe for review.

**A. Related Principles of Article III Standing and Ripeness Demonstrate That This Suit Is Premature**

**1.** The district court's decision correctly applied two "related doctrines of justiciability" that "each originat[e] in the case-or-controversy requirement of Article III": standing and ripeness. *Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam).

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond is purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis omitted) (quoting *Lujan*, 504 U.S. at 564 n.2).

To that end, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in

fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (alteration in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)); *see also Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("[T]he injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon."). In addition, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (citation and quotation marks omitted).

The same principles underlie much of ripeness doctrine. *See POET Biorefining, LLC v. Env't Prot. Agency*, 970 F.3d 392, 403 (D.C. Cir. 2020) ("Constitutional ripeness is subsumed into the Article III requirement of standing, which requires a petitioner to allege *inter alia* an injury-in-fact that is imminent or certainly impending." (citations and quotation marks omitted). "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies,'" and to shield "agencies

from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)). The "ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation and quotation marks omitted). Courts typically consider both "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 301 (quoting *Abbott Labs.*, 387 U.S. at 149).

Whether viewed through the prism of standing or ripeness, plaintiffs have failed to establish any present injury that a court could properly remedy. Executive Order 14,399 is an intra-Executive Branch directive from the President to his subordinates. Of its own force, it does not require anyone outside of the federal government—and

24

certainly not any of the plaintiffs—to do (or refrain from doing) anything. Indeed, although plaintiffs claim that the Executive Order "purports to regulate the election process," Br. 24, they identify no provision of the Executive Order that actually does so.

Certainly, as the district court correctly noted, Section 2(a) does not alter the rules of any State's election processes. *See* JA711. That provision directs the Secretary of Homeland Security—if it is determined to be "feasible and consistent with applicable law"—to "take appropriate action to compile" "a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State" using existing federal records, and to "transmit" that list to the chief election official of each State. Exec. Order No. 14,399 § 2(a) (JA103). As the district court recognized, by its plain terms, the Executive Order contemplates that the Secretary of Homeland Security may determine that the creation or transmission of these lists is not "feasible" or "consistent with applicable law." JA705. Moreover, "Section 2(a) does not order the States to do anything with the State Citizenship Lists once they are transmitted—much less direct the

25

States to amend their election procedures." JA711; *see also* JA707 ("[N]othing in Section 2(a) (or any other part of the Order) purports to require any State to do anything with the State Citizenship List it is provided, let alone to remove otherwise eligible individuals on State voter registration lists.").

Likewise, Section 3(b) does not directly regulate elections. By its terms, that provision simply directs the Postal Service to initiate a rulemaking process regarding the design and handling of mail-in ballot envelopes. Although the Executive Order proposes terms for the proposed rule and sets forth a specific timeline by which the agency should complete the rulemaking process, Exec. Order No. 14,399 § 3(b), (d) (JA104), the content of any final rule is not in any way dictated by the Executive Order. Rather, like all rulemaking, any final rule (if and when it issues) will be developed after the Postal Service solicits and considers public comments.

**2.** Plaintiffs cannot demonstrate that they suffer any particularized injury from ongoing policymaking deliberations within the Executive Branch. Instead, plaintiffs' ultimate concern is with possible "action that the [government] *might* take in the future" to

implement the Executive Order. *Trump v. New York*, 592 U.S. at 133-34.

Those claimed injuries based on possible future agency actions implementing the Executive Order are far "too speculative for Article III purposes." *Clapper*, 568 U.S. at 409. After all, because plaintiffs filed this suit one day after the Order issued, at the time of the district court's decision, it was entirely unknown how the relevant agencies would implement the Order, or on what timeline, or under what parameters, or using what processes. JA522, JA526, JA530 (discussing "ongoing" deliberations). For similar reasons, the fundamental disconnect between plaintiffs' complaint (which challenges the Executive Order itself) and their possible future injuries (which would stem, if at all, from future implementation actions) gives rise to an independently fatal causation problem: The "source of any injury to the plaintiffs is the action that [the Postal Service] *might* take in the future" to implement Section 3(b), not Section 3(b) itself. *Trump v. New York*, 592 U.S. at 133-34 (emphasis in original).

Indeed, plaintiffs' suit here is indistinguishable from the suit the Supreme Court dismissed as premature in *Trump v. New York*. There,

President Trump issued a memorandum during the 2020 decennial census that "announced a policy of excluding 'from the apportionment base aliens who are not in a lawful immigration status.'" *Trump v. New York*, 592 U.S. at 129-30 (quoting Presidential Memorandum, *Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census*, 85 Fed. Reg. 44,679, 44,680 (July 21, 2020)). The directive also called for "implementation 'to the maximum extent feasible and consistent with the discretion delegated to the executive branch.'" *Id.* (quoting 85 Fed. Reg. at 44,680). A group of plaintiffs sued before the memorandum had been implemented, arguing that "the exclusion of aliens on the basis of legal status would contravene the requirement . . . that the President state the 'whole number of persons in each State' for purposes of apportionment" and asserting that "the memorandum was chilling aliens and their families from responding to the census, thereby degrading the quality of census data used to allocate federal funds and forcing some plaintiffs to divert resources to combat the chilling effect." *Id.* at 130 (quoting *New York v. Trump*, 485 F. Supp. 3d 422, 449-53, 477 (S.D.N.Y. 2020)).

The Supreme Court remanded with instructions to dismiss for lack of jurisdiction, holding that the "standing and ripeness inquiries both lead to the conclusion that judicial resolution of this dispute is premature." *Trump v. New York*, 592 U.S. at 134. In so doing, the Court acknowledged that "[t]he President, to be sure, ha[d] made clear his desire to exclude aliens without lawful status from the apportionment base." *Id.* at 133. Even so, "the President qualified his directive by providing that the Secretary should gather information 'to the extent practicable' and that aliens should be excluded 'to the extent feasible.'" *Id.* (quoting 85 Fed. Reg. at 44,680). As a result, "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy [was] 'no more than conjecture' at th[at] time." *Id.* (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983)). For example, the Supreme Court explained that the President's "policy may not prove feasible to implement in any manner whatsoever, let alone in a manner substantially likely to harm any of the plaintiffs here." *Id.* at 132.

Thus, the Court explained "[t]he Government's eventual action will reflect both legal and practical constraints, making any prediction

about future injury just that—a prediction." *Trump v. New York*, 592

U.S. at 131. Exactly the same is true here. Much like the Presidential

Memorandum at issue in *Trump v. New York*, the Executive Order here

also specifies that key provisions shall be implemented only "[t]o the

extent feasible and consistent with applicable law, including but not

limited to the Privacy Act." Exec. Order No. 14,399 § 2(a); *id.* § 4(c)

(providing that the SSA Commissioner "shall provide all necessary

citizenship and identity data to the Secretary of Homeland Security in

support of the requirement [to develop State Citizenship Lists],

consistent with applicable law, the Privacy Act, and all applicable use

agreements"); *id.* § 3(b)(iv) (providing that any "preparation and

transmission of [a] State-specific Mail-In and Absentee Participation

List" under any final rule issued by the Postal Service "shall comply

with the Privacy Act and all applicable use agreements"); *id.* § 7(b)

(providing that the Executive Order as a whole "shall be implemented

consistent with applicable law"). Whether and how those directives are

implemented—and whether and how those directives injure plaintiffs in

any concrete way—can be determined only *after* those directives are

implemented.

Under these circumstances, "[l]etting the Executive Branch's decisionmaking process run its course" would "bring[] 'more manageable proportions' to the scope of the parties' dispute." *Trump v. New York*, 592 U.S. at 134 (quoting *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 891 (1990)); *see also, e.g.*, *Devia v. Nuclear Regulatory Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007) (asking whether "consideration of the issue would benefit from a more concrete setting" (citation and quotation marks omitted)). "And in the meantime the plaintiffs suffer no concrete harm from the challenged policy itself, which does not require them 'to do anything or refrain from doing anything'" at all. *Trump v. New York*, 592 U.S. at 134 (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)); *see also Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635, 2635 (2025) (Sotomayor, J., concurring in the grant of a stay of a preliminary injunction) ("[T]he relevant Executive Order directs agencies to plan reorganizations and reductions in force 'consistent with applicable law,'" and the Supreme Court has "no occasion to consider whether they can and will be carried out

31

consistent with the constraints of law" in a facial challenge to the

Order).[2]

This Court has applied similar principles in related contexts. In

*Defenders of Wildlife v. Perciasepe*, 714 F.3d 1317 (D.C. Cir. 2013), for

example, this Court held that plaintiffs lacked standing to challenge a

consent decree that "require[d] that EPA conduct a rulemaking and

then decide whether to promulgate a new rule" "using a specific

timeline." *Id.* at 1324. This Court explained that nothing in the

consent decree dictated "the content" of any final rule EPA ultimately

issued, and that "Article III standing requires more than the possibility

of potentially adverse regulation." *Id.* at 1324-25. Plaintiffs' rights are

simply "not impaired by the initiation of a rulemaking" or other

policymaking process. *Id.* at 1325 (quoting *Alt. Research & Dev. Found.*

---

[2] Notably, the Supreme Court's decision to order dismissal of *Trump v. New York* on standing and ripeness grounds was vindicated by subsequent events. The Presidential Memorandum at issue there turned out *not* to be "feasible to implement in any manner whatsoever" before the end of President Trump's first term. 592 U.S. at 132. It was later revoked by President Biden, and no further litigation was necessary. Exec. Order No. 13,986, 86 Fed. Reg. 7,015 (Jan. 20, 2021), *revoked by* Exec. Order No. 14,148, 90 Fed. Reg. 8,237 (Jan. 20, 2025). That is one benefit of adherence to the ripeness doctrine—the possibility that the parties' dispute will narrow or resolve itself without the need for judicial involvement.

*v. Veneman*, 262 F.3d 406, 411 (D.C. Cir. 2001) (per curiam)). After all, they will "not be precluded from participating in the rulemaking and, if [the government] decides to issue a final rule," they are "not precluded from challenging that rule." *Id.* (quoting *Alt. Research & Dev. Found.*, 262 F.3d at 411)); *cf. Platte River Whooping Crane Critical Habitat Maint. Tr. v. FERC*, 962 F.2d 27, 35 (D.C. Cir. 1992) ("Allegations of injury based on predictions regarding future legal proceedings are, however, 'too speculative to invoke the jurisdiction of an Art[icle] III Court.'" (alteration in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 157 (1990)).

Applying those settled principles here does not preclude future judicial review. As the district court recognized, the agencies may eventually issue a final rule or otherwise take action "that directly affects [p]laintiffs or their members and that [p]laintiffs believe is unlawful." JA715. At that time, any concretely injured plaintiff "may, of course, renew their motions" for a preliminary injunction." JA697. But "[u]ntil then, plaintiffs are, at most, 'concerned bystanders' to internal Executive Branch processes." JA715 (quoting *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 81 (D.D.C. 2025) (quoting *All. for*

*Hippocratic Med.*, 602 U.S. at 382)); *see also, e.g.*, *United Presbyterian Church in the USA v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984) (Scalia, J.) (holding that plaintiff did not have standing to challenge Executive Order on the theory that it might lead to agencies taking future adverse action against plaintiffs). That is plainly insufficient to establish standing.

### B. Plaintiffs' Contrary Arguments Fail

Plaintiffs' opening brief tries to circumvent these settled principles largely by diversion. Plaintiffs devote much of their brief to arguing that the Executive Order does not mean what it says and eliding the distinction between the Order itself (which plaintiffs have challenged) and future implementing actions (which plaintiffs have not yet challenged). Shorn of these sleights of hand, plaintiffs' other justiciability theories—which rest on claims about the supposed present effect of the Executive Order—collapse. And finally, plaintiffs' references to steps agencies have taken to implement the Order *since* the district court's decision only underscore that the preliminary injunction motion on appeal here was properly rejected as premature. The government has provided the district court with ongoing updates

regarding its implementation of the Executive Order, *see* Dkts. 150, 151, 152, and to the extent plaintiffs believe that any of these developments affect the standing or ripeness analysis, the appropriate vehicle to raise that claim is a renewed motion for a preliminary injunction, as the district court expressly contemplated plaintiffs can and should do, *see* JA697.

**1.** First, plaintiffs erroneously assert that "Section 3(b) conditions transmission of a mail ballot on whether a voter appears on [the Postal Service's] eligible list for receiving one," Br. 33, or "commands [the Postal Service] to interfere with States' mail-voting programs," Br. 37. But those statements appear nowhere in the Executive Order, which instead simply directs the Postal Service "to initiate a proposed rulemaking" setting forth standards for transmitting mail-in or absentee ballots, Exec. Order No. 14,399 § 3(b) (JA103-04); instructs that any ultimate implementation should be "consistent with applicable law," *id.* § 7(b) (JA105); and does not speak to (let alone dictate) voter eligibility. On the contrary, the Order indicates that the proposed rule would give States control over the composition of the Mail-In and Absentee Participation Lists. *See id.* § 3(b)(ii) (JA104) (providing that

35

"a State should . . . indicate whether it intends to submit to the [Postal Service], no fewer than 60 days before the election, a list of voters eligible to vote in a Federal election in such State to whom the State intends to provide a mail-in or absentee ballot to be transmitted via the [Postal Service].").

Critically, although the Order identifies terms to be included in the notice of proposed rulemaking—including terms about the transmission of mail ballots to individuals on each State's specific Mail-In and Absentee Participation List, Exec. Order No. 14,399 § 3(b)(ii-v) (JA104)—the only legal effect that directive has is to mandate that the Postal Service initiate a rulemaking. It does not change the Postal Service's rules. That will not happen until the Postal Service issues a final rule—the contents of which are not dictated by the Executive Order. *Perciasepe*, 714 F.3d at 1324-25 (no injury from "the possibility of potentially adverse regulation" where the content of a final rule is not "dictated" by another source).

Plaintiffs likewise mischaracterize the Executive Order in arguing that Section 2(a) poses an "imminent threat" to their common-law privacy interests, Br. 16, or "unambiguously commands" that the

36

Department of Homeland Security create State Citizenship Lists, Br. 27. By its terms, Section 2(a) does not contemplate the disclosure of any sensitive personal information—only the future, potential disclosure by the federal government to States of whether or not someone is a United States citizen, whether or not they are at least 18 years old by the date of the upcoming election, and whether or not they live in a particular state. Exec. Order No. 14,399 § 2(a) (JA103). And that disclosure will happen only if the Secretary of Homeland Security determines that it is both "feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974" to compile and transmit a list of such individuals using existing federal data. JA707-08 (quoting Exec. Order No. 14,399 § 2(a)); *see also* Exec. Order No. 14,399 §§ 4(c), 7(b) (JA104-05)). The Order thus grants the Department of Homeland Security substantial discretion to determine what will or will not be "feasible and consistent with applicable law," a question that the Department was actively deliberating at the time of the district court's decision, JA707-08; JA522 (Mayhew Decl. ¶ 5); JA526 (MacBride Decl. ¶ 5), and that it continues to deliberate, *see supra* pp. 6-7; JA732; Dkt 152-1 at 2-3. Because deliberations regarding how to comply with the Executive

37

Order in a manner consistent with applicable law remain ongoing, the district court appropriately determined that plaintiffs' concerns about potential future privacy violations are too speculative at this stage. JA707-08; *see also Clapper*, 568 U.S. at 416.

Plaintiffs' repeated overstatements of the effect of the Executive Order appear to stem from their insistence (Br. 27-28) that this Court should improperly disregard the Executive Order's repeated limitations that its directives should be carried out only to the extent "feasible" and "consistent with applicable law." In support of this, plaintiffs assert that Executive Orders "cannot 'destroy themselves through saving clauses' where, as here, their commands *cannot* be lawfully implemented." Br. 27 (quoting *League of United Latin Am. Citizens v. Exec. Office of the President*, 818 F. Supp. 3d 34, 87 (D.D.C. 2026)). But as this Court explained in *Building & Construction Trades Department v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002), when, as here, the President issues an Executive Order that directs his subordinates to proceed "[t]o the extent permitted by law," that directive, by definition, mandates action only if the agency may lawfully implement the Executive Order. 295 F.3d at 33 (alteration in original). "[I]f the agency is prohibited, by

statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Id.* This Court distinguished such an Executive Order from the order directing the seizure of privately owned steel mills that the Supreme Court held unlawful in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952), noting that the *Youngstown* order was "self[-]executing"; it expressly directed the seizure of the mills, without any qualifying language. *Allbaugh*, 295 F.3d at 33 ("Indeed, had President Truman merely instructed the Secretary of Commerce to secure the Government's access to steel '[t]o the extent permitted by law,' *Youngstown* would have been a rather mundane dispute over whether the Secretary had statutory authority to act as he did.").

Here, by contrast, the Executive Order *does* contain limiting language and thus is *not* self-executing. If there is no lawful way to implement the Order, the Order "instructs the agency to follow the law." *Allbaugh*, 295 F.3d at 33. Moreover, *Trump v. New York* explicitly rejects plaintiffs' very reasoning—placing nearly dispositive weight on materially indistinguishable language to order dismissal on the grounds of both standing and ripeness. 592 U.S. at 131

(emphasizing that "the President qualified his directive by providing that the Secretary should gather information 'to the extent practicable' and that aliens should be excluded 'to the extent feasible'").  Plaintiffs' argument that this Court should ignore this language when interpreting the Executive Order cannot be reconciled with this binding precedent.

*Trump v. New York* also disposes of plaintiffs' contentions that this dispute is justiciable now because—in their view—there is no way for the agencies to lawfully implement the Order.  Plaintiffs dedicate a substantial portion of their brief (Br. 17-22, 46-51) to explaining why, in their view, it would violate the Privacy Act for the federal government to even *compile* a list of individuals who are citizens and over the age of 18, even if no information is ever transmitted to any State, and separately contend that there is "no lawful way for the Executive Branch to create and distribute" State Citizenship Lists, Br. 28 (emphasis omitted).  But the plaintiffs in *Trump v. New York* equally asserted that there was no lawful way to carry out the presidential memorandum there, asserting that "the exclusion of aliens on the basis of legal status would contravene" the Constitution's requirement of an

enumeration of the "whole number of persons in each State."  592 U.S. at 130 (citation and quotation marks omitted).  That did not matter: the Court nevertheless ordered the suit dismissed in light of the uncertainties about whether and how the memorandum would be implemented.  *Id.* at 132-34.

Plaintiffs' arguments here suffer from the same fundamental defect.  Again, they raise a facial challenge to an Executive Order that expressly states that any Lists should be compiled only to the extent feasible and consistent with applicable law, specifically including the Privacy Act.  Exec. Order No. 14,399 § 2(a) (JA103).  At the time of the district court's decision, it was not even clear whether or when any State Citizenship List would be created, much less in what form, based on what data, or how they might be used.  JA707-08.  Whatever unlawful disclosure plaintiffs believe may eventually occur, such disclosures are neither "imminent," nor fairly traceable to the Executive Order itself, which expressly conditions the transmission of any information on a future determination that doing so is consistent with the Privacy Act.  JA707-08.

41

For similar reasons, plaintiffs' reliance (Br. 26) on *Chamber of Commerce v. Reich*, 57 F.3d 1099 (D.C. Cir 1995) (per curiam), is entirely misplaced. That case concerned an executive order that authorized the Secretary of Labor to disqualify from certain federal contracts employers who hire permanent replacement workers during a strike. *See id.* at 1100. Notably, the order in question did not contain any language that the directive should be implemented consistent with applicable law. *See* Executive Order 12,954, 60 Fed. Reg. 13,023 (Mar. 8, 1995). This Court held that the plaintiffs' facial challenge to that order was ripe because (i) the Secretary of Labor had already "promulgated final regulations" implementing the order, *Chamber of Commerce*, 57 F.3d at 1100, and (ii) regardless of whether the Secretary took any action to disqualify employers pursuant to those regulations, the existence of the order caused direct harm because it "skew[ed]" the bargaining process by presenting employers with the "difficult choice between surrendering their right to hire permanent replacement and risking the loss of current and future government contracts," *id.* at 1101. Neither circumstance is present here; the agencies have not taken final action to implement the Executive Order, and plaintiffs—

who, unlike the plaintiffs in *Reich*, are not the direct subject of regulation under the Executive Order—have not shown any concrete harm caused by the Order.

**2.** Plaintiffs' other theories of standing and ripeness are downstream of their misconstruction of the Executive Order and fail for largely the same reasons.

First, plaintiffs rely on out-of-circuit decisions for the proposition that voters have "standing to challenge a law that regulates the terms by which they may cast a ballot." Br. 32 (citing *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007); *Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009); *Fish v. Schwab*, 957 F.3d 1105 (10th Cir. 2020)). But even assuming that proposition is correct in some circumstances, it is irrelevant here. The Executive Order does not "regulate[] how" anyone "may cast a ballot." Br. 32. Plaintiffs' brief cites only one provision of the Executive Order in support of their claim that the Order regulates how voters may cast a ballot: the provision that directs the Postal Service to initiate a rulemaking regarding the design and handling of ballot envelopes. *See* Br. 32-33. Thus, what plaintiffs *actually* fear is not an injury inflicted

43

by the Executive Order itself, but that a future Postal Service rule could impair voters' ability to vote by mail.[3]  And if a final rule were to (in plaintiffs' words) "regulate[] the terms by which [voters] may cast a ballot," the question of whether a voter (or plaintiffs) would have standing to challenge that rule is fundamentally distinct from the question before this Court.  No election rules have been altered by the Executive Order itself, and this Court should not exercise judicial review over an imagined version of the Executive Order that goes beyond even the Executive Branch's arguments about the President's legal authority.

Plaintiffs urge (Br. 37) that it is "not a realistic possibility" that a final rule issued by the Postal Service will substantially differ from the terms proposed in the Executive Order or the Notice of Proposed Rulemaking.  But Plaintiffs' predictions about the Postal Service's

---

[3] Earlier in the brief, plaintiffs refer to the Executive Order's statement of purpose (*see* Br. 24), which explains the policy behind requesting the Postal Service to initiate the rulemaking and provides that using "[u]nique ballot envelope identifiers, such as bar codes, enable confirmation that only citizens receive and cast ballots, reducing the risk of fraud and protecting the integrity of Federal elections." Executive Order 14,399 § 1. But that statement of purpose has no legal effect; it serves only to explain the policy behind directing that the Postal Service initiate a rulemaking.

deliberations are just that—predictions.  "In the context of an ongoing rulemaking, an agency's statement about its legal authority to adopt a proposed rule is not the 'consummation' of the agency's decisionmaking process." *In re Murray Energy Corp.*, 788 F.3d 330, 336 (D.C. Cir. 2015) (Kavanaugh, J.).  The Postal Service will go through multiple layers of procedural and substantive decision-making before any final rule is published, including by considering and responding to comments in a manner that is not dictated in any way by the Executive Order—and which may address or obviate some of Plaintiffs' concerns.  *See* JA531 (Monteith Decl. ¶ 5).  This case should not—and cannot—be litigated based on what the Postal Service *might* do.

Plaintiffs complain (Br. 38) that the government "cannot evade judicial review by manufacturing uncertainty about its rule-making process."  But an agency's invocation of the well-established process for informal rulemaking required under the Administrative Procedure Act, *see* 5 U.S.C. § 553, can hardly be characterized as "evad[ing]" judicial review.  And plaintiffs' reliance (Br. 38) on *Sierra Club v. United States Dep't of Transp.*, 125 F.4th 1170 (D.C. Cir. 2025) is entirely misplaced.  That case concerned a final rule that had been temporarily "suspended"

by the agency who issued it pending the outcome of a new rulemaking process to "modify it." *Id.* at 1180. This Court held that the potential issuance of modifications did not make the case unripe because the rule "would go back into effect" "if it is not modified" before the extension expired. *Id.* Critically, of course, *Sierra Club* concerned a *final* rule— one that marked the consummation of the agency's decisionmaking process and that would, when the temporary suspension expired, have the full force and effect of law. The Postal Service's Notice of Proposed Rulemaking does not have that effect.

Second, plaintiffs do not bolster their standing or ripeness arguments through their repeated reliance (Br. 22-24, 30) on *Bost v. Illinois State Bd. of Elections*, 607 U.S. 71 (2026). Plaintiffs cite that decision for the proposition that election candidates "independently have standing . . . to challenge rules governing the election process." Br. 22. But again, as already discussed, *see supra* pp. 25-26, 35-40, this is irrelevant; the Executive Order does not purport to alter the rules of any election.

Plaintiffs urge (Br. 24-25) that Section 2(a) of the Executive Order nevertheless interferes in their ability to compete in a fair election

process because (i) in their view, the federal government is incapable of "accurately identify[ing] citizen-residents of each State," Br. 25, and (ii) at least some States intend to use the State Citizenship Lists compiled by the Department of Homeland Security "to modify their voter rolls," Br. 24. The district court correctly rejected this highly speculative theory, which depends on a "highly attenuated chain of possibilities" that "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410.

At the outset, the assumption that State Citizenship Lists (if and when they are compiled) will contain inaccuracies is speculative. Plaintiffs urge that the Executive Order directs the federal government to refer to databases—namely, the SAVE and SSA databases, among "other relevant federal databases," Exec. Order No. 14,399 § 2(a) (JA103)—that plaintiffs assert are "incomplete, out-of-date, and riddled with inaccurate citizenship data." Br. 5. But at the time of the district court's decision it was not clear the extent to which SAVE or SSA data will feature in the possible future creation of State Citizenship Lists or, if so, how those databases would be used. In the words of the district court, "[w]hile it is conceivable that these Lists may have some flaws, at

47

least initially, it is impossible to be sure when the agencies have not yet determined what databases they will use or if they can perfect them ahead of use." JA706 n.6.

"[E]ven if the Lists as initially compiled contain some flaws, that would mark only the first step in an attenuated chain of speculation." JA706 n.6. The Executive Order expressly "requires the adoption of procedures that will allow individuals to access and, if necessary, update or correct their information in the Lists." JA706; Exec. Order No. 14,399 § 2(a) (JA103). It remains to be seen what procedures the Department will develop to mitigate the risks of inaccurate data, and before any of these decisions about how to develop the infrastructure necessary to compile State Citizenship Lists have been made, it "remains speculative whether that process will be ineffective at resolving all or most inaccuracies." JA706.

In any event, whether the Lists contain inaccuracies or not, "nothing in the Executive Order requires any State to use its List in any way—let alone to prevent otherwise qualified persons from registering to vote." JA706-07. The Executive Order simply directs the Department (to the extent feasible and consistent with applicable law)

to transmit a list of "individuals *confirmed* to be United States citizens" of the relevant age and residency.  Exec. Order No. 14,399 § 2(a) (JA103).  Nothing in the Executive Order suggests that omission from a State Citizenship List by itself confirms *non*-citizenship, or ineligibility to vote under State or federal law.  *Cf. Id.* ("An individual's identification on the State Citizenship List does not indicate that the individual has been properly registered to vote in the State.").

For the State Citizenship Lists to have *any* effect on the election process, recipient States would have to take independent action based on that list.  Plaintiffs' theory that the Executive Order harms their ability to participate in a fair election process thus depends entirely upon an "attenuated chain of inferences" involving the "unfettered choices made by independent actors."  *Clapper*, 568 U.S. at 410 n.5 (quotation marks omitted).  That speculative causal chain cannot satisfy the constitutional requirement that any injury be actual or imminent, rather than conjectural or hypothetical, nor that any injury be fairly traceable to the Executive Order.

Third, plaintiffs' invocation of organizational standing does not change the fact that their alleged harms are too speculative to support

standing nor does it suggest that this case is ripe for review. An organization has standing "to sue on their own behalf for injuries they have sustained" only if they can "satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *All. for Hippocratic Med.*, 602 U.S. at 393-94. "An organization that has not suffered a concrete injury by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394.

Plaintiffs urge that they have organizational standing because they are actively diverting resources toward action they believe will mitigate the harms they fear will occur as a result of future agency actions to implement the Executive Order. Br. 24. But as already established, plaintiffs' concerns are based on mere speculation about how the agencies may choose to implement the Executive Order and potential actions that third parties may take in response—some of which (*e.g.*, the States' potential use of the State Citizenship Lists) are not dictated by the Order's text. That is insufficient to support an Article III injury, and plaintiffs cannot manufacture standing by spending resources to avoid hypothetical harms.

Indeed, plaintiffs' theory of harm based on their expenditure of resources mirrors an injury the Supreme Court found insufficient to establish standing in *Clapper*. There, the plaintiffs challenged a statute establishing procedures to authorize foreign surveillance, asserting that there was an "objectively reasonable likelihood" that they would be subject to surveillance "at some point in the future" based on their extensive contacts with foreign nationals. 568 U.S. at 410. The *Clapper* plaintiffs separately claimed that they had an immediate, ongoing injury because they had incurred certain reasonable costs to avoid that risk. *Id.* at 416. The Supreme Court rejected both theories of harm, holding that the *Clapper* plaintiffs' probabilistic theory of future harm depended entirely—as plaintiffs' theory of harm does here, *see supra* pp. 46-50—on an "attenuated chain of inferences" involving the "unfettered choices made by independent actors not before the court," and was thus insufficient to support standing. *Id.* at 414 & n.5. And the *Clapper* plaintiffs did not salvage their standing theory through arguing that they had incurred costs to avoid that risk of future harm, because plaintiffs may not "manufacture standing by incurring costs in anticipation of non-imminent harm." *Id.* at 402.

The Supreme Court echoed similar concerns in *Alliance for Hippocratic Medicine.* *See* 602 U.S. 367.  That case concerned a challenge by doctors and associations to a decision by the Food & Drug Administration to relax its regulatory requirements for mifepristone, an abortion drug.  *Id.* at 372-73.  The plaintiffs' theory of standing rested on a claim that the relaxed requirements "will cause more pregnant women to suffer complications from mifepristone" and that the doctors would have to divert resources and time from other patients to treat these complications.  *Id.* at 386, 390-91.  The associations also claimed organizational standing, asserting that they had begun to "conduct their own studies on mifepristone" in order to "better inform their members and the public about mifepristone's risks."  *Id.* at 394.  The Supreme Court rejected both theories of standing, concluding that the doctors' concerns about diversion of resources to women suffering from complications from mifepristone "lack[ed] record support and [were] highly speculative," *id.* at 390, and that the organizations "cannot spend [their] way into standing simply by expending money to gather information and advocate against the defendant's action," *id.* at 394.

So too here, even if plaintiffs' fear about future implementation efforts can fairly be described as "nonparanoid" or "not fanciful, irrational, or clearly unreasonable," they have not shown that these harms are imminent or "certainly impending." *Clapper*, 568 U.S. at 416. And they cannot manufacture standing by spending money to prepare for those possible future agency actions. *Id.*; *All. for Hippocratic Med.*, 602 U.S. at 394.

For this reason, plaintiffs' reliance (Br. 32) on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) is misplaced. That case stands for the proposition that an organization has standing to challenge an agency action when it directly interferes with the organization's existing programs or investments in a manner that satisfies Article III's requirements. *See All. For Hippocratic Med.*, 602 U.S. at 395 (describing *Havens* as a case in which the defendant's "actions directly affected and interfered with [the plaintiff's] core business activities"). But as the Supreme Court has since recognized, *Havens* was an "unusual case" where the defendant's actions plainly caused an organization direct harm. *Id.* at 396. There, the defendant—who owned and operated apartment complexes—had provided the plaintiff

53

(who operated a housing counseling service) with false information about apartment availability. *Id.* at 395 (describing *Havens*). "In other words, Haven's actions directly affected and interfered with [the plaintiff's] core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.*; *see also People for the Ethical Treatment of Animals v. United States Dep't of Agric.*, 797 F.3d 1087, 1104 (D.C. Cir. 2015) (Millet, J., dubitante).

Plaintiffs here have not alleged any equivalent direct injury to their core mission. The specific efforts that plaintiffs describe in their opening brief only underscore this point. For example, plaintiffs urge that their "core business activities include ensuring their voters successfully cast their ballots" and that they must redirect funds to "develop new programs to assist voters in ensuring they are 'enrolled' in [the Postal Service's] 'Mail-In and Absentee Participation List.'" Br. 30-31. But there is currently no such list, nor any requirement to compile such a list. The Executive Order requires only that the Postal Service initiate a rulemaking of uncertain scope, for which there is currently only a Notice of Proposed Rulemaking. And although "prudent organizations and individuals may alter their behavior (and thereby

54

incur costs) based on what they think is likely to come in the form of new regulations," "courts have never reviewed *proposed* rules," much less directives that agencies issue a proposed rule (the specific contents of which are undecided). *In re Murray Energy Corp.*, 788 F.3d 330, 335 (D.C. Cir. 2015) (Kavanaugh, J.). After all, "a proposed rule is just a proposal." *Id.* at 334. Plaintiffs' efforts to prepare for a hypothetical, not-yet existent rule cannot supply them with a concrete injury-in-fact.

Similarly, plaintiffs urge that the State Citizenship Lists (if and when they are created) "pose an imminent threat to their core business" because they fear inaccuracies on such lists and therefore must divert resources to "develop programs to ensure their members and other supporters are on the Lists and to attempt to add any who are erroneously omitted." Br. 24. But, as already explained, plaintiffs' concerns about these potential inaccuracies (or about inaccurate Lists' use by States to change voter registrations) is, on the present record, entirely speculative, as it remains to be seen the extent to which the Department of Homeland Security will determine that it is feasible and consistent with applicable law (including the Privacy Act) to share this information with States. Regardless of whether it may be prudent for

plaintiffs to take action based on what they think the agency *may* do, the harm that they fear is not "certainly impending," and plaintiffs' voluntary expenditure of resources to prepare for hypothetical government action does not support standing.

Fourth, plaintiffs do not demonstrate standing or ripeness to raise their Privacy Act claims through reliance (Br. 26) on cases in which this Court has exercised review over facial challenges to agency disclosure policies. Plaintiffs rely, for example, on *Venetian Casino Resort, LLC v. Equal Opportunity Emp't Comm'n*, 409 F.3d 359 (D.C. Cir. 2005) (*Venetian I*), which concerned a policy that permitted the Equal Employment Opportunity Commission "unilaterally to release privileged documents submitted to [the Commission] by a private party without first notifying the party," *id.* at 360. This Court held that the plaintiff's facial challenge to that policy was ripe because the policy had "crystallized"—it represented the culmination of the agency's decisionmaking process. *Id.* at 364-65. In such cases, where the agency "has said nothing to suggest that a procedural or substantive evolution of its disclosure policy is pending or expected," "there is nothing to be gained by deferring" resolution of the question of whether the policy is

consistent with applicable statutes. *Venetian I*, 409 F.3d at 365; *see also Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 929-30 (D.C. Cir. 2008) (*Venetian II*) ("Although the details of the Commission's disclosure policy are still unclear, the record leaves no doubt the Commission has a policy of disclosing confidential information without notice to the submitter.").

The opposite is true here:  No final determination has been made as to whether the Department of Homeland Security can feasibly and consistent with applicable law create State Citizenship Lists.  JA707-08.  The government has provided the district court with ongoing updates regarding the Department's and Postal Service's implementation of the Executive Order, *see* Dkts. 150, 151, 152, and plaintiffs may, of course, renew their motion for a preliminary injunction if and when a policy has crystalized, *see* JA697.  Timing judicial review until after a final agency action will not prevent plaintiffs from effectively challenging the compilation and transmission of State Citizenship Lists.

**3.**  Finally, plaintiffs' discussion of additional steps agencies have taken to implement the Executive Order *after* the district court's

decision are not relevant to *this* appeal. In this interlocutory appeal from the denial of a preliminary injunction, this Court reviews the district court's decision for an abuse of discretion based on the record before the district court. Events occurring after the district court's decision are not part of the record on appeal, *see* Fed. R. App. P. 10(a), and cannot possibly establish that the district court erred in concluding that plaintiffs had not carried their burden to demonstrate a justiciable controversy (or, for that matter, irreparable harm) that was ripe for review at the time of the court's decision, *cf. Scahill v. District of Columbia*, 909 F.3d 1177, 1184 (D.C. Cir. 2018) ("[W]e hold that a plaintiff may cure a standing defect under Article III through an amended pleading alleging facts that arose after filing the original complaint.").

That plaintiffs now rely on such post-decision developments only underscores that their claims were premature to begin with. To the extent plaintiffs believe that any new development affects the district court's analysis, the appropriate vehicle to raise that claim is an amended complaint or a renewed motion for a preliminary injunction,

as the district court expressly contemplated plaintiffs can and should do. *See* JA697.

In any event, none of the further developments represent the culmination of either the Department of Homeland Security or the Postal Service's deliberative processes. Plaintiffs note that, the day after the district court's decision issued, the Postal Service published a Notice of Proposed Rulemaking soliciting comments on its proposed rule implementing the Order. *See* 91 Fed. Reg. 32,915 (June 2, 2026). But that proposed rule is obviously not a final action and is subject to change during the notice-and-comment process. *See Soundbound Ass'n v. Federal Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) ("The [Administrative Procedure Act] limits judicial review to 'final agency action.'" (quoting 5 U.S.C. § 704)).

The Department of Homeland Security has also issued memoranda discussing proposals to implement the Executive Order. JA728-34. The operative memorandum states that the Department seeks to develop the "technological infrastructure" required to share citizenship information with States by June 30, 2026 (the date contemplated by the Executive Order), Dkt. 152-1 at 1, to the extent

that "such access can be provided consistent with applicable law," *id.* at 2.  The memorandum stresses that "the proposed approach is designed to leverage existing capabilities and legal authorities" and "operate within current privacy and security frameworks."  *Id.* at 1.  But although the Department hoped to have this technological capacity by June 30, the memorandum makes clear that the agency continues to deliberate regarding how to appropriately use such technology, including regarding the extent and manner in which that information can be shared consistent with the Privacy Act.  To the extent that plaintiffs believe that the details provided in the memorandum alter the relevant standing (or irreparable harm) analysis, the appropriate place to litigate them is in the district court in the first instance, not through the instant appeal.

***

Whether viewed as a problem of standing or ripeness, this suit is premature.  The Executive Order is the only thing plaintiffs do—or could challenge at this juncture.  The Order is not self-executing and is replete with explicit textual limitations to ensure that it is implemented in a way that is both "feasible" and "consistent with applicable law."

Exec. Order No. 14,399 §§ 2(a), 3(b)(iv), 4(c), 7(b) (JA103-05). If any agency nevertheless takes some final action to implement the Executive Order in a way that plaintiffs believe is unlawful and causes them an actual (or imminent) concrete injury, plaintiffs may sue at that time. But "[a]t present, this case is riddled with contingencies and speculation that impede judicial review." *Trump v. New York*, 592 U.S. at 131. And "[f]ederal courts cannot—and should not—spend their scarce resources on what amounts to shadow boxing." *Devia*, 492 F.3d at 424-25 (quotation marks omitted).

## II. The District Court Correctly Determined that Plaintiffs Are Not Likely to Succeed on the Merits of their Facial Challenge to the Executive Order

Because plaintiffs have failed to show that they likely have standing (or that their claims are ripe), they are "*ipso facto* unlikely to succeed" on the merits. *Electronic Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 375 n.2 (D.C. Cir. 2017). In any event, plaintiffs have not demonstrated that they are likely to succeed on any of their challenges.

As the district court recognized, the core of plaintiffs' challenge is that "the President has no authority to issue the Executive Order,"

because, in their view, "the executive branch cannot lawfully fulfill its requirements." JA716. But, as already discussed at length, "the Order is not self-executing." JA716. "It does not itself regulate voter registration or how mail-in or absentee ballots will be transmitted; rather, it directs executive branch officials to take certain actions, subject to the limitations of existing laws." JA716.

Plaintiffs' arguments to the contrary (Br. 40-51) largely repeat their prior mischaracterizations of the Executive Order that this brief has already addressed at length. For this reason, plaintiffs' assertion that neither the President nor the relevant agencies have any constitutional or statutory authority to create State Citizenship Lists or "create new restrictions for mail voting," Br. 41, is irrelevant. The Executive Order does not mandate that any such actions occur; it operates solely as an internal directive for Executive Branch officials to deliberate regarding future policymaking, with express directives that any actions taken be conditioned on feasibility and compliance with applicable law. Exec. Order No. 14,399 §§ 2(a), 3(b), 4(c), 7(b) (JA103-05). Such a directive, standing alone, cannot exceed Presidential authority or violate the separation of powers. *See* U.S. Const. art II, § 1,

cl. 1; *Allbaugh*, 295 F.3d at 33 ("[T]he President's power necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)); *Sierra Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir. 1981) ("The authority of the President to control and supervise executive policymaking is derived from the Constitution.").

Similarly, plaintiffs' various arguments that any final rule issued by the Postal Service would be unlawful (Br. 45-46) or that any creation or transmission lists of State Citizenship Lists would violate the Privacy Act (Br. 46-51) have no bearing on this case in its current posture and only underscore why plaintiffs' challenge is not ripe.  By its terms, "if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Allbaugh*, 295 F.3d at 33.  Thus, plaintiffs' concerns about the scope of the Postal Service's authority and the precise contours of the Privacy Act's "routine use" exceptions or prohibitions on data matching (Br. 47-51) may be litigated if and when either agency takes final action to implement the Executive Order.

Ultimately, "whether the government's actions under the Order are lawful or unlawful will depend on how" the Postal Service and Department of Homeland Security "decide to implement the Order, not on the Order itself." JA717; *see also Allbaugh*, 295 F.3d at 33 (holding that the President acts within his constitutional authority when he issues executive orders that are "not self[-]executing" and require compliance with existing laws).

## III. Plaintiffs Have Not Demonstrated an Entitlement to Injunctive Relief

### A. Plaintiffs Have Not Demonstrated Irreparable Harm

The district court also correctly concluded that plaintiffs have not demonstrated that they are likely to suffer an imminent and irreparable injury as a result of the Executive Order. *See Clevinger v. Advocacy Holdings, Inc.*, 134 F.4th 1230, 1236 (D.C. Cir. 2025) ("[A] movant's failure to show any irreparable harm is grounds for refusing to issue a preliminary injunction, even if the other three factors merit such relief." (cleaned up) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006))). To establish irreparable harm, a plaintiff must show that "[t]he injury complained of is of such

*imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm" and that the injury is "beyond remediation." *Chaplaincy*, 454 F.3d at 297 (alteration and emphasis in original; quotation marks omitted).  The movant must also "show that the alleged harm will *directly result* from the action which the movant seeks to enjoin."  *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (emphasis added)).

Because plaintiffs have failed to carry their burden to establish standing and ripeness, they also have failed to demonstrate irreparable harm.  "In any event, given that the Executive Order does not command [p]laintiffs to do anything, and that no agency has yet acted pursuant to the Order in a way that could harm [p]laintiffs, they have not suffered any harm at present, much less harm that is 'certain,' 'great,' and imminent."  JA720 (quoting *Wisconsin Gas Co.*, 758 F.2d at 674).

In arguing to the contrary, plaintiffs cite concerns about the "whiplash" allegedly induced by the government's "changing implementation plans" and the need to appropriately structure their businesses in advance of the upcoming mid-term elections.  Br. 52.  But this alleged whiplash reflects the fact that government deliberations

regarding the implementation of the Executive Order remain ongoing. That only underscores that any harm will occur, if at all, from future agency actions the specific contours of which are currently unknown, rather than the Executive Order itself.

## B. The Equities and Public Interest Do Not Favor Injunctive Relief

The district court also appropriately concluded that the other two preliminary injunction factors—the balance of equities and the public interest—"do not cut substantially in favor of preliminary relief." JA720 n.13. Ultimately, plaintiffs request an injunction that would restrain the President from overseeing the Executive Branch. Such an order would harm the public interest, given the Framers' decision to vest all of "[t]he executive Power" in the President and entrust him with the sole constitutional responsibility to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; *id.* § 3; *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020); *LeBlanc v. United States Priv. & C.L. Oversight Bd.*, No. 25-5197, 2025 WL 1840591, at *2 (D.C. Cir. July 1, 2025) (per curiam) ("The public interest is harmed when an injunction wrongfully insulates the President's Executive Branch appointees from his oversight. Such injunctions sever a key

constitutional link between the People and their elected President."); *cf.*

*Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in

chambers) ("[A]ny time a State is enjoined by a court from effectuating

statues enacted by representatives of its people, it suffers a form of

irreparable injury." (alteration in original; quotation marks omitted)).

On the other side of the balance, plaintiffs' interest is slight.  At least at

this time, they merely seek to prevent hypothesized harm based on

speculation about a series of future contingencies that have not yet

come to pass and may never come to pass.

**CONCLUSION**

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney*
    *General*

BRAD HINSHELWOOD
*/s/ Laura E. Myron*
LAURA E. MYRON
JENNIFER L. UTRECHT
SAMUEL HOBBS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7228*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
    *(202) 305-1754*

June 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,995 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Laura E. Myron*
LAURA E. MYRON

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

/s/ Laura E. Myron
LAURA E. MYRON