NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 26-5193

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

DSCC, *ET AL.*,

*Plaintiffs-Appellants*,

v.

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, *ET AL.*,

*Defendants-Appellees*.

On Appeal from the
United States District Court for the District of Columbia
Case No. 1:26-cv-01114
Hon. Carl J. Nichols

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

Tyler L. Bishop
**ELIAS LAW GROUP LLP**
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0177

Marc E. Elias
Lalitha D. Madduri
Jacob D. Shelly
Christina Ford
Max Accardi
Kevin R. Kowalewski
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
Telephone: (202) 948-1135

*Counsel for Plaintiffs-Appellants DSCC, DCCC, Democratic National Committee, Democratic Governors Association, Senate Minority Leader Schumer, and House Minority Leader Jeffries*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

ARGUMENT ..............................................................................................................3

I.  Plaintiffs' claims are justiciable. ......................................................................3

    A.  Plaintiffs' challenges to Section 2(a) are justiciable. ............................3

        1.  Plaintiffs have standing to challenge Section 2(a). .......................3

        2.  Plaintiffs' challenge to Section 2(a) is ripe. .................................8

    B.  Plaintiffs' challenges to Section 3(b) are justiciable. ...........................13

        1.  Plaintiffs have standing to challenge Section 3(b). .....................13

        2.  Plaintiffs' challenge to Section 3(b) is ripe. ...............................16

    C.  Defendants' actions following the district court's order only confirm this case is justiciable. ............................................................20

II.  Plaintiffs are likely to succeed on the merits. ................................................21

    A.  Section 2(a) is unlawful. .......................................................................21

        1.  Section 2(a) is ultra vires. ...........................................................21

        2.  Section 2(a) violates the Privacy Act. .........................................23

    B.  Section 3(b) is unlawful. .......................................................................24

III.  The remaining preliminary injunction factors are present. ...........................26

    A.  Plaintiffs will be irreparably harmed if the E.O. is not enjoined. .......26

    B.  The equities and public interest favor relief. ........................................27

CONCLUSION ........................................................................................................28

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AFG v. OPM*,
786 F.Supp.3d 647 (S.D.N.Y. 2025) ...................................................................27

*Am. Council of Blind of N.Y., Inc. v. City of New York*,
495 F.Supp.3d 211 (S.D.N.Y. 2020) ...................................................................20

*Bennett v. Spear*,
520 U.S. 154 (1997) ...........................................................................................11

*\*Bost v. Ill. State Bd. of Elections*,
607 U.S. 71 (2026) ........................................................... 5, 6, 7, 14, 15, 27

*Building and Construction Trades Department, AFL-CIO v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) ...................................................... 9, 10, 25

*\*California v. Trump*,
No. 1:26-CV-11581, 2026 WL 1826490 (D. Mass. 2026) ...................... 2, 7, 8, 22

*Chamber of Com. of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ...................................................... 22, 25

*Chamber of Com. v. Reich*,
57 F.3d 1099 (D.C. Cir. 1995) ...................................................... 17, 18

*Covad Commc'ns Co. v. Bell Atl. Corp.*,
407 F.3d 1220 (D.C. Cir. 2005) ...................................................................21

*Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*,
815 F.Supp.3d 1 (D.D.C. 2025) ...................................................................4, 27

*Devia v. Nuclear Regul. Comm'n*,
492 F.3d 421 (D.C. Cir. 2007) ...................................................................21

*Doe v. Stephens*,
851 F.2d 1457 (D.C. Cir. 1988) ...................................................................11

*Eagle-Picher Indus., Inc. v. EPA*,
759 F.2d 905 (D.C. Cir. 1985) ...................................................................19

*FAA v. Cooper*,
566 U.S. 284 (2012)......................................................................................11

*FDA v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024)........................................................................................7

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)......................................................................................26

*Gardner v. Henderson*,
No. 2:26-CV-00084, 2026 WL 496448 (D. Utah Feb. 23, 2026) .........................6

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)..................................................................................7, 15

*Hisp. Affs. Project v. Acosta*,
901 F.3d 378 (D.C. Cir. 2018)......................................................................13

*In re Polar Bear Endangered Species Act*
*Listing & Section 4(d) Rule Litig.-MDL No. 1993*,
720 F.3d 354 (D.C. Cir. 2013)......................................................................21

*Ipsen Biopharmaceuticals v. Azar*,
943 F.3d 953 (D.C. Cir. 2019)......................................................................11

*Kaspersky Lab, Inc. v. DHS Sec.*,
909 F.3d 446 (D.C. Cir. 2018)......................................................................24

*Kendall v. U.S. ex rel. Stokes*,
37 U.S. 524 (1838)......................................................................................25

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986)....................................................................................25

*League of Latin Am. Citizens v. Exec. Off. of the President*,
780 F.Supp.3d 135 (D.D.C. 2025)................................................................18

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)..................................................................... 26, 27

*League of Women Voters v. DHS*,
No. 25-3501, 2026 WL 1784297 (D.D.C. June 22, 2026) ..................................8

iii

*Miot v. Trump*,
   No. 26-5050, 2026 WL 659420 (D.C. Cir. Mar. 6, 2026)....................................28

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010)...........................................................................................15

*NAACP v. USPS*,
   No. 20-CV-2295, 2026 WL 1893762 (D.D.C. July 1, 2026) ..........................2, 18

*NRSC v. FEC*,
   No. 24-621, 2026 WL 1868932 (U.S. June 30, 2026)..........................................5

*NTEU v. Vought*,
   149 F.4th 762 (D.C. Cir. 2025).........................................................................20

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
   461 U.S. 190 (1983)...........................................................................................17

*Pileggi v. Washington Newspaper Publ'g Co.*,
   146 F.4th 1219 (D.C. Cir. 2025)..........................................................................5

*\*Regional Rail Reorganization Act Cases*,
   419 U.S. 102 (1974).................................................................................... 16, 21

*Rhode Island v. Trump*,
   810 F.Supp.3d 283 (D.R.I. 2025) ......................................................................22

*Sierra Club v. Costle*,
   657 F.2d 298 (D.C. Cir. 1981)...........................................................................25

*\*Sierra Club v. U.S. Dep't of Transp.*,
   125 F.4th 1170 (D.C. Cir. 2025)...................................................... 4, 17, 20, 21

*Soucie v. David*,
   448 F.2d 1067 (D.C. Cir. 1971).........................................................................26

*Stanley v. Brown Cnty. Election Bd.*,
   No. 1:25-CV-01482, 2026 WL 215825 (S.D. Ind. Jan. 27, 2026) ......................6

*Tenn. NAACP v. Lee*,
   139 F.4th 557 (6th Cir. 2025) ...........................................................................15

iv

*Teva Pharms. USA, Inc. v. Sebelius*,
  595 F.3d 1303 (D.C. Cir. 2010).................................................................13

*Trump v. New York*,
  592 U.S. 125 (2020)............................................................... 9, 10, 19

*Venetian Casino Resort, L.L.C., v. E.E.O.C.*,
  530 F.3d 925 (D.C. Cir. 2008)................................................. 12, 13

*Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*,
  857 F.2d 55 (2d Cir. 1988) .................................................... 2, 17, 18

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001)..............................................................................11

*Wildlife v. Perciasepe*,
  714 F.3d 1317 (D.C. Cir. 2013).........................................................19

## STATUTES

44 U.S.C. § 1507 ...................................................................................21

## REGULATIONS

Ballot Mail for Federal Elections,
  91 Fed. Reg. 32915 (proposed June 2, 2026) ....................................16

## OTHER AUTHORITIES

Hearing Before the Comm. on Homeland Sec. & Govt'l Affairs,
  119th Cong. (2026),
  https://www.hsgac.senate.gov/hearings/reforming-the-u-s-postal-services-
  broken-business-model/ ......................................................................24

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| Br. | Appellants' Opening Brief |
| Defs. Resp. | Defendants' Response Brief |
| DHS | Department of Homeland Security |
| E.O. | Executive Order |
| JA | Joint Appendix |
| NPRM | Notice of Proposed Rulemaking |
| SAVE | Systematic Alien Verification for Entitlements |
| SSA | Social Security Administration |
| SSN | Social Security Number |
| State Resp. | Intervenor States' Response Brief |
| USCIS | U.S. Citizenship and Immigration Services |
| USPS | U.S. Postal Service |

**INTRODUCTION**

Neither Defendants nor Intervenors succeed in rehabilitating the lower court's opinion, which merely postpones judicial review of an E.O. that no one seriously defends as lawful. Section 2(a) requires Defendants to (i) share sensitive personal information from SAVE and SSA databases (ii) across agencies to compile Citizen-Resident Lists that (iii) will be accessed by States to prune their voter rolls. None of this is speculative, and the response briefs fail to rebut Plaintiffs' demonstration of the illegal interplay of these elements. They ignore Plaintiffs' explanation that the data-sharing will *necessarily* include private social security, driver's license, or passport numbers. They ignore case law confirming that privacy rights are violated when sensitive information is shared *between government agencies*. And they ignore Intervenors' *own representations* about their intent to use the Lists for voter roll maintenance. The conclusion is unavoidable: privacy violations from the Lists' *creation* and electoral disruption from the Lists' *use* represent independent, imminent injuries that are ripe for relief.

The responses also fail to rebut Plaintiffs' challenge to Section 3(b). That section requires USPS to engage in rulemaking to stymie voters' ability to send and receive mail ballots if they are not "enrolled" with USPS. USPS has proposed precisely such a rule, defeating any speculation that the agency might defy the E.O.'s edict. As multiple courts have now confirmed, controversies over that provision are

1

presently ripe because it is "already having a 'real impact on present-day affairs,'" causing "hardship" to affected parties. *NAACP v. USPS*, No. 20-CV-2295, 2026 WL 1893762, at *4-5 (D.D.C. July 1, 2026) (quoting *Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council* ("*Volvo*"), 857 F.2d 55, 64 (2d Cir. 1988)) (holding NPRM violates settlement agreement); *California v. Trump*, No. 1:26-CV-11581, 2026 WL 1826490, at *1 (D. Mass. June 25, 2026) (enjoining Sections 2 and 3 of E.O. as to 23 states). And for all of Defendants' efforts to import APA principles as a defense, Plaintiffs' Section 3(b) challenge does not sound in the APA—the equitable causes of action seek relief from a fundamentally lawless command that purports to require USPS to act far outside its statutory mandate. Because that command currently injures Plaintiffs by destabilizing the electoral playing field during a high-stakes election season, relief is necessary now.

The merits and other preliminary injunction factors remain beyond dispute—Defendants again omit any explanation of how the E.O. could be lawfully implemented. It is also undisputed that the harms Plaintiffs identify are irreparable, and Defendants fail to identify any countervailing injuries they will suffer if they are cabined to their constitutional powers.

2

# ARGUMENT

## I.    Plaintiffs' claims are justiciable.

### A.    Plaintiffs' challenges to Section 2(a) are justiciable.

#### 1.    Plaintiffs have standing to challenge Section 2(a).

Plaintiffs have standing to challenge (i) the imminent and illegal disclosure of their members' data under the Privacy Act, (ii) the E.O.'s illegal command to insert the federal government into the elections process, and (iii) the E.O.'s effect on Plaintiffs' core voter-mobilization activity. Contrary to Defendants' arguments, that standing is not contingent on which additional databases will be used to compile the Citizen-Resident Lists, whether those Lists will have errors, or how States will use the Lists. *Contra* Defs. Resp. 36-41, 46-61.[1] The flawed quality of the Citizen-Resident Lists and how they are used may affect the *degree* of harm but will not impact *whether* harm occurs.

**a.    Privacy harm.** Defendants do not contest that the Privacy Act prohibits sharing of records both *among* federal agencies and *outside* federal agencies (as the district court failed to recognize, *see* Br. 19). And Defendants do not contest that courts routinely find harms arising from inter-agency sharing of data sufficient to establish injury-in-fact. *See* Br. 17-19.

---

[1] This brief cites Defendants' Appellee Brief as "Defs. Resp.," the Intervenors' Appellee Brief as "State Resp.," and Plaintiffs' Opening Brief as "Br."

Defendants argue that the E.O. requires compliance with the Privacy Act, Defs. Resp. 41—but they do not even try to articulate how they could do so. Defendants also suggest Plaintiffs' privacy harms are not "imminent," *id.*, but Defendants already confirmed their "current policy" to "compile, maintain, and transmit State Citizenship Lists" "on or around" June 30. Docs. 150, 151-1 at 1-2. If the government had abandoned those plans, it surely would have said so in its June 29 brief. *See Sierra Club v. U.S. Dep't of Transp.*, 125 F.4th 1170, 1180 (D.C. Cir. 2025) (holding case ripe where agency "continues to defend the Rule" "[r]ather than disclaiming any intent to implement [it] or conced[e] its invalidity"). Indeed, as recently as July 1, Defendants confirmed they "continu[e] [to] work on the portal to provide state election officials with citizenship verification information from the USCIS, SSA, and DOS databases." *California*, No. 1:26-cv-11581, Doc. 195 at 23 (D. Mass. July 1, 2026).

Intervenors contest whether Plaintiffs' privacy harms are analogous to common law torts by misrepresenting the record and ignoring binding precedent. Intervenors wrongly suggest that the only data at issue is a voter's name, age, and citizenship status. *See* State Resp. 28. But it remains uncontested that it is not *possible* for DHS to "verify" citizenship status without matching a name, date of birth, *and* either an SSN, driver's license number, or passport number, *see* Br. 21-22—data that D.C. common law recognizes as highly sensitive, *see Ctr. for*

*Taxpayer Rts. v. Internal Revenue Serv. ("CTR")*, 815 F.Supp.3d 1, 34 (D.D.C. 2025). Intervenors also suggest these disclosures are not "highly offensive." State Resp. 28. But as this Court has recognized, the level of offense "goes to the degree of harm, not the injury's recognition at common law, and so does not affect the concreteness of the [Article III] injury." *Pileggi v. Washington Newspaper Publ'g Co.*, 146 F.4th 1219, 1229 (D.C. Cir. 2025). Intervenors also fail to acknowledge unrebutted declarations establishing that Plaintiffs' members are highly offended by the intrusions at issue. *See* Br. 18.

**b.    *Bost* standing.** Plaintiffs also have standing to challenge rules governing election processes that "depart[] from the law" and thereby deprive candidates of a fair contest. *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 77 (2026); *see also NRSC v. FEC*, No. 24-621, 2026 WL 1868932, at *7, 14 (U.S. June 30, 2026) (describing "unique," "intertwined relationship of parties and their candidates"). Because standing under *Bost* exists whether the challenged procedures "help, hurt, or have no effect on a candidate's electoral prospects," *Bost*, 607 U.S. at 77, this basis for standing again does not depend on any errors in the Citizen-Resident Lists or how States use them.

Like the district court, Intervenors read *Bost* far too narrowly; *Bost*'s reasoning extends beyond the mere counting of votes to reach candidates' interest in a fair election process overall. *See* Br. 22-23. Indeed, multiple courts have already

held that *Bost*'s logic necessarily applies to other parts of the elections process. *See, e.g.*, *Gardner v. Henderson*, No. 2:26-CV-00084, 2026 WL 496448, at *5 (D. Utah Feb. 23, 2026) (three-judge court); *Stanley v. Brown Cnty. Election Bd.*, No. 1:25-CV-01482, 2026 WL 215825, at *5 (S.D. Ind. Jan. 27, 2026). Intervenors also argue applying *Bost* here would allow candidates to challenge a policy even without evidence that the policy would "conceivably affect an election" result, State Resp. 35, but that exact argument failed to garner a majority in *Bost*, *see* 607 U.S. at 79. The *Bost* majority made clear that candidates have standing to challenge election rules because they possess a particularized interest in the rules governing the integrity of their elections, one that does not require them to show a "substantial risk that a rule will cause them to lose the election, prevent them from achieving a legally significant vote threshold, or damage their reputation or finances." *Id*.

Defendants' suggestion that *Bost* does not apply because the E.O. does not regulate the elections process, Defs. Resp. 46, strains credulity. The E.O.'s title is "Ensuring Citizenship Verification and Integrity in Federal Elections." Its stated purpose is to ensure "only citizens receive and cast ballots." E.O. § 1. And to the extent that Defendants have defended the E.O. on the merits *at all*, they have done so under the President's alleged authority to "enforce federal statutory prohibitions on non-citizen voting." State Resp. 55-56.

    **c.**    **Organizational harm.** The E.O. forces Plaintiffs to develop programs

6

to confirm whether their member voters appear on the Citizen-Resident Lists, giving them organizational standing. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982) (holding organization that "had to devote significant resources to identify and counteract" defendant's practices had standing); *California*, 2026 WL 1826490, at *8 (challenge to the present E.O. was justiciable where the E.O.'s commands "required [plaintiffs] to respond given the practical nature of an election cycle").

Intervenors respond by repeatedly invoking *FDA v. Alliance for Hippocratic Medicine* ("*AHM*"), 602 U.S. 367 (2024), and unreasonably characterizing Plaintiffs' work as "identical" to that of mere issue advocacy organizations. State Resp. 24. But Plaintiffs do not hold a mere "general legal, moral, ideological, or policy objection" to the E.O. *Contra* State Resp. 22-23 (quoting *AHM*, 602 U.S. at 381). Plaintiffs are the Democratic national party committees, governors association, and leaders responsible for mobilizing their voters to win elections. Plaintiffs' objection to the E.O. is that it interferes with their ability to execute election-programming and requires Plaintiffs to counteract the threat of the Citizen-Resident Lists. For the same reason, Plaintiffs are not "bystanders" who are unaffected by "internal Executive Branch processes." *Contra* Defs. Resp. 33 (citing *AMH*, 602 U.S. at 382). Indeed, *Bost* rejected this argument, explaining that "[c]andidates, in short, are not 'mere bystanders' in their own elections." 607 U.S. at 78.

To the extent that this Court believes Plaintiffs will suffer organizational harm

7

only if the Citizen-Resident Lists are inaccurate, the unrebutted record shows that they will be. Intervenors argue it is "unknown" which databases will be used to construct the Lists, State Resp. 7-8, but no Defendant disputes the E.O. *requires* the Lists to be constructed from SAVE and SSA data, *see* E.O. § 2(a), databases that courts have concluded *certainly* cause errors in citizenship findings—and have *already* harmed many voters, *see League of Women Voters v. DHS*, No. 25-3501, 2026 WL 1784297, at *12, *14-15 (D.D.C. June 22, 2026); *California*, 2026 WL 1826490, at *13 (noting "the federal agencies charged with compiling Confirmed Citizen Lists lack the ability to create complete and accurate lists of the U.S. citizens residing in every State"). Even Defendants' counsel admitted to the district court these Lists would not be "perfect" and that "a responsible state would not take that list and then immediately or automatically" remove voters on that basis. JA639. These inevitable errors are not confined to citizenship; the record shows, and Defendants do not contest, that the federal government lacks data necessary to determine residency for voting purposes. *See* Br. 5 (citing unrebutted expert analysis); *see also California*, 2026 WL 1826490, at *13. Yet Intervenor States have already confirmed their intent to use such Lists, *see* Br. 5 (citing Doc. 77-1 at 10-12), an admission they now ignore.

### 2.  Plaintiffs' challenge to Section 2(a) is ripe.

Defendants agree that Article III ripeness is subsumed by the standing inquiry,

Defs. Resp. 24, and their remaining prudential and statutory ripeness arguments fail.

> **a.**     **Savings clause.** Defendants argue that *Trump v. New York*, 592 U.S. 125 (2020), and *Building and Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002), require this Court to postpone review of Plaintiffs' constitutional challenges because the E.O. purports to instruct the agencies to act "consistent" with applicable law. *See* Defs. Resp. 30-31, 36-41. But neither case holds that a savings clause alone insulates presidential directives from review; unlike here, the savings clauses in those cases had meaning because there were ways to carry out the directives lawfully.

The only "order" in *Trump v. New York* was an instruction to the Commerce Secretary to "gather information" so the President could later set policy for the census count that he oversees. 592 U.S. at 130-31. That case presented no claims that the conduct the directive ordered—gathering information—*itself* violated federal law. In contrast, the E.O. here imposes concrete, unlawful mandates on federal agencies: Those agencies "shall" compile the Citizen-Resident Lists, which "shall" be transmitted to States at least 60 days "before each regularly scheduled Federal election," E.O. § 2(a), actions Plaintiffs *do* contend violate federal law, *see infra*, Argument § II.A. And even Defendants conceded Plaintiffs "can seek judicial review" if Defendants cause injury and "violate[] the law on the way to creating or sending" the Lists. JA636.

9

*Trump* also turned on facts that made the case inappropriate for judicial review. In *Trump*, the Court found that the President's preferred policy might not be technically "feasible" to implement, so the case could become moot. 592 U.S. at 130, 132-33. Here, however, the E.O. itself orders DHS to build infrastructure to make implementation feasible (setting aside accuracy), E.O. § 4(c), which it has done, and the relevant agencies have *already* authorized the data-sharing necessary to create the Citizen Resident Lists as the E.O. directs. *See* JA731-33; Doc. 151-1 at 1-2. Unlike in *Trump*, the issues here are thus sufficiently crystalized for judicial review.

In *Allbaugh*, it was possible for agency officials to lawfully implement the President's directive—and as that Court noted, the basis for withholding review is *absent* where, as here, the order is void of "any valid application." 295 F.3d at 33; Br. 28 (discussing *Allbaugh*). As *Allbaugh* recognized, the President "may properly supervise and guide [his subordinates'] construction of the statutes under which they act," 295 F.3d at 32 (citation omitted). Here, no statute permits Defendants to create and share the Citizen-Resident Lists.

**b. Final agency action.** Plaintiffs' distinct APA claims challenge consummated agency action to implement the E.O. in violation of federal law, notwithstanding the E.O.'s purported instruction to follow it. Br. 29, 41 n.12, 46-

10

51.[2] Indeed, Defendants appear to concede these claims can proceed if final action is shown, arguing only that no reviewable actions "exist." Defs. Resp. 17, 56-57. But Defendants merely press theories—*i.e.*, that the challenged actions are not in the archetypal "final" "form," or might be subject to change later, State Resp. 51—that have been repeatedly rejected by this Court and the Supreme Court.

"Action" for purposes of the APA encompasses "comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). Action is final if it is (1) "the consummation of the agency's decision-making process" (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation modified). This "pragmatic inquiry" takes place against the APA's presumption of reviewability. *Ipsen Biopharmaceuticals v. Azar*, 943 F.3d 953, 956 (D.C. Cir. 2019).

At the district court, Plaintiffs introduced unrebutted evidence showing Defendants decided to share SAVE, SSA, and State Department data among and between federal agencies in a manner that is unlawful under the Privacy Act. Doc.

---

[2] Intervenors' argument that Plaintiffs cannot challenge the E.O. *itself* under the APA is irrelevant, State Resp. 51, as Plaintiffs did not do so, Compl. ¶¶ 140-53 (naming agency defendants), JA86-92. To the extent Intervenors are attempting to argue APA review is unavailable to remedy violations of the Privacy Act, *see* State Resp. 52, the argument is foreclosed, *see Doe v. Stephens*, 851 F.2d 1457, 1467 (D.C. Cir. 1988); *FAA v. Cooper*, 566 U.S. 284, 295 (2012).

55 at 31-35 (discussing JA108-531); Doc. 122 (discussing JA532-45); *see also* JA546-59. This included evidence that DHS, USPS, and DOJ employees were coordinating to implement the E.O., agency documents showing Defendants understood data-sharing mandates of executive orders as mandatory, and staffing increases and budget requests consistent with a decision to proceed. JA249-331; JA468-561. Defendants offered no response to this evidence, instead submitting declarations that mused about irrelevant technological "details" but did not deny that a decision to share sensitive data among agencies had occurred. Doc. 122 at 8. Secretary Mullin later approved a memorandum implementing the E.O. that further memorialized a policy of disclosing data between agencies and with States to implement Section 2(a), plainly confirming final action. JA731; Doc. 151-1.

This Court has held that a decision to disclose records protected by federal privacy law among federal agencies "is surely a consummation of the agency's decisionmaking process, and one by which the submitter's rights and the agency's obligations have been determined." *Venetian Casino Resort, L.L.C., v. E.E.O.C.* ("*Venetian II*"), 530 F.3d 925, 931 (D.C. Cir. 2008) (citation modified). Defendants attempt to distinguish that case by suggesting no "final determination" has been made about whether the creation of the Lists is lawful. Defs. Resp. 57. But whether Defendants are still pondering the legality of their actions is irrelevant under the APA; what matters is that Defendants decided to disclose the records in question.

12

*Venetian II*, 530 F.3d at 928-31; *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 386 & n.4 (D.C. Cir. 2018) (Millett, J.) (similar).

Likely recognizing that Secretary Mullin's approval of the June 8 memorandum confirms final agency action, Defendants argue the Court should not consider anything that happened after the district court's decision. But the June 8 memo only *confirms* what the record already showed "exists." *Hisp. Affs. Project*, 901 F.3d at 386 & n.4 (citing *Venetian II*, 530 F.3d at 928-31); *see* JA108-549. Moreover, courts are not limited to the timing or scope of an agency record on the agency's own terms when assessing finality—especially in cases like this one, where Defendants deny the existence of a reviewable policy. *See Hisp. Affs. Project*, 901 F.3d at 386 & n.4; *Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1307-12 (D.C. Cir. 2010).

**B.    Plaintiffs' challenges to Section 3(b) are justiciable.**

**1.  Plaintiffs have standing to challenge Section 3(b).**

As with Section 2(a), Plaintiffs have multiple independently sufficient bases for standing to challenge Section 3(b). *See* Br. 29-33. Like the district court, Defendants address these bases for standing only briefly, focusing on supposed implementation contingencies that do not negate the harm that Section 3(b) causes today.

13

a.    ***Bost* standing.** Section 3(b) orders USPS to change the rules under which Plaintiffs and their members will compete in upcoming elections. That on its own imposes an Article III injury: candidates and political organizations have an interest in a fair election process; illegal departures from that process inflict a concrete injury. *Bost*, 607 U.S. at 79. Defendants do not advance any specific arguments against applying *Bost* to Section 3(b), which, as explained, is not limited to vote-counting rules. *See supra*, Argument § I.A.1.

b.    **Organizational harm.** Section 3(b) also disrupts Plaintiffs' core business activities. Plaintiffs must finalize their vote-by-mail programs well in advance of ballot distribution in early September. Br. 7-8. By threatening a tectonic shift in rules for mail-voting, Section 3(b) forces Plaintiffs to adapt these programs and investments. That is true regardless of the nuances of any rule USPS promulgates.

Here, again, Defendants attempt to minimize Plaintiffs' role to "concerned bystanders," Defs. Resp. 33, but that reductive label that does not accurately reflect the E.O.'s impact on Plaintiffs and their ability to plan for and execute imminent elections. *See* JA124; JA138; JA141; JA153; JA168; JA170. Nor must the E.O. "directly prevent Appellants from engaging in their core activities" for them to have organizational standing, as Intervenors allege without citation. State Resp. 42. It is

14

sufficient if the E.O. "perceptibly impair[s]" Plaintiffs' ability to conduct its election activities, *Havens*, 455 U.S. at 379, which the E.O. has already done, *see* Br. 30-32.

Defendants wrongly suggest that Plaintiffs cannot be injured by Section 3(b) because it does not "require anyone outside of the federal government … to do (or refrain from doing) anything." Defs. Resp. 24-26; *see* State Resp. 41-43. That argument misses the point: Section 3(b) inflicts a concrete harm on Plaintiffs, regardless of whom it regulates. *See Tenn. NAACP v. Lee*, 139 F.4th 557, 565 (6th Cir. 2025) ("[O]rganizations [may] have standing to challenge a government action that does not regulate them if the action causes them to suffer economic harms[.]"). In *Bost*, the challenged rule did not directly regulate the plaintiff candidate—it instructed state election officials on how to count ballots. 607 U.S. at 74. The candidate nevertheless had standing. *Id*. at 82. Similarly, in *Monsanto Co. v. Geertson Seed Farms*, the Supreme Court held that farmers of a non-modified crop had standing to challenge a proposal governing the *modified* version of the crop—a regulation to which their activities were not subject—because the de-regulation would require them to "take [] measures to minimize the likelihood of potential contamination." 561 U.S. 139, 153-55 (2010). The Supreme Court has thus repeatedly recognized that unregulated parties have standing to challenge rules that inflict a concrete harm on their activities, as the E.O. does to Plaintiffs.

15

**c.**    **Voter harm.** Voters have standing to challenge conditions on their right to vote. *See* Br. 32-33 (citing cases). Both Section 3(b) and USPS's proposed rule state that USPS should refuse to transmit mail ballots for voters who are not "enrolled" with the agency. E.O. § 3(b); Ballot Mail for Federal Elections, 91 Fed. Reg. 32915 (proposed June 2, 2026) (to be codified at 39 CFR pt. 111). That is a condition on voting—full stop—and courts routinely recognize voters have standing to challenge such policies even if voters can ultimately overcome them. *See* Br. 32-33 (citing cases). Defendants frame States' ability to "enroll" voters as evidence voters will not be affected, but the fact that a voter's access to their mail ballot is conditioned on their "enroll[ment]" with USPS is sufficient to give Plaintiffs' members standing to sue. *See* Br. 32-33 (citing cases).

### 2.    Plaintiffs' challenge to Section 3(b) is ripe.

Defendants do not seriously dispute that Section 3(b) harms Plaintiffs. Instead, they assert that Section 3(b) should escape judicial review based on the theory that a plaintiff can never challenge an order to engage in rulemaking before the resulting rule becomes final.

That theory is wrong. "One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 143 (1974) (citation omitted). Thus, a proposed rule that has a "present [] effect" on the plaintiff

16

gives rise to a justiciable controversy, even if that rule has not yet been finalized, implemented, or enforced. *See Volvo*, 857 F.2d at 64 (holding antitrust challenge to proposed rule in professional tennis was ripe, before rule's implementation, where rule had a "present anti-competitive effect"). Just last year, this Court entertained a challenge to an agency regulation that was not only "suspended" at the time of the decision, but that was the subject of a "new rulemaking process" that could have resulted in an entirely different rule. *See Sierra Club*, 125 F.4th at 1180. The "suspended" rule still gave rise to a ripe controversy, this Court reasoned, because the agency "continue[d] to defend the [r]ule" and the rule's existence created a risk of harm. *Id*. at 1181-82.[3]

So too here. The 2026 election season is well underway. To force Plaintiffs "to proceed" into the election "without knowing whether [Section 3(b)] is valid would impose a palpable and considerable hardship." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201-02 (1983); *see also Chamber of Com. v. Reich*, 57 F.3d 1099, 1100 (D.C. Cir. 1995) (holding a challenge to an E.O. stating a general policy gave rise to a justiciable controversy *before* it had

---

[3] Defendants try to distinguish *Sierra Club* by arguing that it concerned a "final rule" that had been suspended, whereas this case concerns a proposed rulemaking. Defs. Resp. 45-46. But they do not explain why that distinction matters. In *Sierra Club*, as here, the challenged rule was not presently in effect—indeed, the agency had initiated a process "to modify it"—but the Court still found the case ripe due to its ongoing and future effects. 125 F.4th at 1180.

been applied to any plaintiff because the "mere existence of the Order alter[ed] the balance of bargaining power" in a detrimental way). Defendants contend that the agency in *Reich* had "promulgated final regulations," Defs. Resp. 42, but the Court's justiciability analysis focused on the present *effects* of the order on the plaintiffs, not the order's regulatory status, 57 F.3d at 1101-02.

Indeed, in another case concerning whether USPS's proposed rule violates a previously entered consent decree, a district court found that the proposed rule gave rise to a ripe dispute because it is "already having a 'real impact on present day affairs,'" causing "hardship" to the affected parties. *NAACP v. USPS*, 2026 WL 1893762, at *4-5 (quoting *Volvo*, 857 F.2d at 64). The E.O. inflicts a similar hardship on Plaintiffs, ripening the dispute. *Supra*, Argument § I.B.1.

None of Defendants' arguments rebut this commonsense conclusion. They contend the case is unripe simply because USPS has not yet taken final agency action. Defs. Resp. 31-33, 36. But the final agency action requirement (and Defendants' cases applying it) concern challenges to agency action, typically under the APA. Here, Plaintiffs do not mount an APA challenge against USPS or challenge its proposed rule. Instead, Plaintiffs challenge Section 3(b) itself, contending—as litigants routinely do in pre-implementation challenges to executive orders—that it inflicts a concrete and imminent injury and that there is no way to lawfully effectuate its commands. Br. 35-36; *League of Latin Am. Citizens v. Exec. Off. of the President*,

18

780 F.Supp.3d 135, 175 (D.D.C. 2025) (enjoining E.O. not yet implemented).

Nor are there prudential reasons to delay adjudication: whether Section 3(b)'s commands are lawful is a "purely legal question." *Eagle-Picher Indus., Inc. v. EPA*, 759 F.2d 905, 915 (D.C. Cir. 1985). The Court has all it needs to rule on Section 3(b)'s lawfulness *now* because it requires USPS to take actions that are unlawful on their face. This case is thus unlike the pre-implementation challenges Defendants cite; in those cases, the content of the challenged rulemaking was completely unspecified. *See Trump*, 592 U.S. at 133-34 (holding challenge was unripe when asserted injury was dependent on undefined action that an executive officer "*might* take in the future*"); *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1324 (D.C. Cir. 2013) (challenge to consent decree requiring rulemaking was unripe when "the content of [the rulemaking was] not in any way dictated by the consent decree").

Finally, Defendants argue Plaintiffs' challenge to Section 3(b) is unripe because the E.O. says it should be carried out "only to the extent 'feasible' and 'consistent with applicable law,'" Defs. Resp. 38, but Section 3(b) contains no such savings clause. Section 3(b) mentions only that USPS "shall comply with the Privacy Act and all applicable use agreements," *see* E.O. § 3(b)(iv), but because Plaintiffs do not currently challenge Section 3(b) under the Privacy Act, this provision is irrelevant. Defendants also briefly allude to Section 7 of the E.O., which states generally that the E.O. will be "implemented consistent with applicable law," but

19

that generic clause is not a get-out-of-jail-free card because Defendants remain unable to identify possible lawful implementation of Section 3(b).

### C. Defendants' actions following the district court's order only confirm this case is justiciable.

Just last year, this Court highlighted the risk that "a savvy agency could perpetually dodge review" by creating uncertainty about the status of its regulations. *Sierra Club*, 125 F.4th at 1180 (citation omitted). That appears to be Defendants' plan here. On May 29—the day after the district court denied Plaintiffs' preliminary-injunction motion—USPS announced its NPRM implementing Section 3(b). JA723-24. On June 18—the day after Plaintiffs filed their opening brief—Defendants filed a memorandum that had been approved on June 8, detailing how DHS plans to implement Section 2(a). Doc. Nos. 151, 151-1. The "suspicious timing" of these developments "suggests a litigation-driven motivation," rather than genuine uncertainty about whether and how to implement the E.O. *Am. Council of Blind of N.Y., Inc. v. City of New York*, 495 F.Supp.3d 211, 248 (S.D.N.Y. 2020) (rejecting similar efforts to evade review); *see also NTEU v. Vought*, 149 F.4th 762, 804-20 (D.C. Cir. 2025) (Pillard, J., dissenting) (explaining that an agency cannot "evade judicial review" by "keep[ing] its [] plans non-public until they are *fait accompli*"), *vacated upon reh'g en banc*, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025).

Defendants argue the Court must turn a blind eye to these developments because they occurred after district court's preliminary injunction order Defs. Resp.

58-60. But "because 'ripeness is peculiarly a question of timing, it is the situation now … that must govern.'" *In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.-MDL No. 1993*, 720 F.3d 354, 359 (D.C. Cir. 2013) (quoting *Regional Rail Reorganization Act Cases*, 419 U.S. at 140). Accordingly, this Court has routinely considered new developments in evaluating justiciability, including in cases Defendants cite. *E.g.*, *Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421, 423 (D.C. Cir. 2007). Plus, the developments here—which consist of an NPRM published in the Federal Register and district court filings—are subject to judicial notice. *See* 44 U.S.C. § 1507; *Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005).

Regardless, however, the Court does not *need* to consider these developments to decide the case—the E.O. is unlawful on its face in a way that inflicts a concrete injury. *Supra*, Argument § I.A-B. And Defendants "continue[] to defend" and implement the E.O. "[r]ather than disclaiming any intent to implement [it] or conceding its invalidity." *Sierra Club*, 125 F.4th at 1180. These actions confirm this case presents a ripe, justiciable controversy.

## II.     Plaintiffs are likely to succeed on the merits.

### A.     Section 2(a) is unlawful.

#### 1.     Section 2(a) is ultra vires.

Defendants all but ignore Plaintiffs' argument that Section 2(a) is *ultra vires*.

There is simply no constitutional or statutory authority authorizing the President to order the creation of Citizen-Resident Lists or for DHS to comply. Br. 40-42; *see also California*, 2026 WL 1826490, at *14 (holding "the creation of the Confirmed Citizen Lists is ultra vires" because the executive "lacks any authority to compile voter lists for each State").

Defendants suggest the "Executive Order does not mandate" executive officers "to create State Citizenship Lists," Defs. Resp. 62, but Section 2(a)'s text does exactly that: it says DHS "*shall* take appropriate action to compile and transmit" the Lists. E.O. § 2(a); Doc. 151-1 (acknowledging the Order is mandatory). Intervenors, in turn, argue Plaintiffs lack a cause of action to challenge Section 2(a) under the APA. State Resp. 51-53. But this incorrect assertion is irrelevant to Plaintiffs' *ultra vires* claim, which can be asserted as a free-standing constitutional claim under this Court's authority to conduct "non-statutory judicial review" of unlawful executive-branch actions. *Chamber of Com. of U.S. v. Reich,* 74 F.3d 1322, 1328 (D.C. Cir. 1996).[4]

---

[4] The "Take Care" Clause and distantly related criminal statutes also do not aggrandize agency authority. *Contra* State Resp. 55; *cf. Rhode Island v. Trump*, 810 F.Supp.3d 283, 308-09 (D.R.I. 2025) (concluding E.O. likely *violated* the "Take Care" Clause). Not even the President presses this theory.

22

### 2.    Section 2(a) violates the Privacy Act.

As in the district court, Defendants offer nothing on the merits of Plaintiffs' Privacy Act claims and merely repeat unpersuasive justiciability objections.

While Defendants make much of "ongoing deliberations" about the "extent and manner in which that information can be shared" *with States* consistent with the Privacy Act, Defs. Resp. 21, 59-60 (citing Doc. 151-1), DHS has confirmed data will be shared *among federal agencies* pursuant to Section 2(a) (and later with States). *See* Doc. 151-1. But it remains undisputed that the Privacy Act expressly limits *inter-agency* disclosures *within* the federal government. *See* Br. 20-21, 46-50. And far from rebutting Plaintiffs' claim that Section 2(a) violates the Privacy Act's separate data-matching provisions, *see* Br. 49-50, Defendants again concede they are building Citizen-Resident lists across agencies through unlawful data matching. *See* Defs. Resp. 6; *id.* 20 (acknowledging the E.O. *requires* officials in federal agencies to act); Doc. 151-1 at 1 (confirming agencies will build the lists).

Intervenors briefly argue that the President possesses inherent "authority to gather and organize information within the Executive Branch," which authorizes him to disclose protected information at his pleasure, at least among federal agencies. State Resp. 53. Even if that were true for certain policy memoranda, it remains undisputed that the Privacy Act sharply restricts the inter-agency transfer of individual data, and Intervenors properly stop well short of challenging the Privacy

23

Act's constitutionality. In any event, the E.O. requires the disclosure of Citizen-Resident Lists—and the protected information within them—to States. Br. 19. Such external disclosures are distinct from the internal "management" of executive branch materials.

### B.     Section 3(b) is unlawful.

Defendants continue to forgo defending Section 3(b) on the merits.[5] They explain neither how USPS can regulate federal elections without congressional authorization, nor how USPS can interfere with state mail-ballot programs consistent with bedrock principles of federalism, nor how USPS can make or enforce the regulation Section 3(b) commands without exceeding or violating its statutory prerogatives. *See* Br. 44-46. Instead, Defendants claim that even if USPS cannot lawfully implement Section 3(b), the *issuance* of Section 3(b) is merely an "internal directive" that falls within the President's authority to "supervise executive policymaking." Defs. Resp. 62-63 (quotation omitted). But Defendants cite cases that confirm the President's supervisory authority "is not without limits"—he may "provide guidance and supervision" only in the course of "execution of the laws

---

[5] Postmaster General Steiner was recently asked "under what legal authority can the Postal Service regulate who and how people can vote by mail," and failed to muster any substantive response. Hearing Before the Comm. on Homeland Sec. & Gov't'l Affairs, 119th Cong. (2026), at 40:25-42:01, https://www.hsgac.senate.gov/hearings/reforming-the-u-s-postal-services-broken-business-model/. The court may take judicial notice of congressional hearings. *Kaspersky Lab, Inc. v. DHS Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018).

24

enacted by Congress." *Allbaugh*, 295 F.3d at 32; *see also Sierra Club v. Costle*, 657 F.2d 298, 406 n.524 (D.C. Cir. 1981) (recognizing the President "may properly supervise and guide [some executive officers'] construction of the statutes under which they act"). Section 3(b), however, directs USPS to take action that exceeds not just its statutory mandate, but the power of the executive as a whole—action that it "literally has no power" to perform, *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). That is why this Court has routinely held that judicial review is proper to prevent executive officers from implementing unlawful presidential directives. *E.g.*, *Chamber of Com.*, 74 F.3d at 1328; *Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 610 (1838) (holding judicial review was available against the President ordering the Postmaster General to violate the law).

This reasoning also disposes of Intervenors' confused argument that courts cannot intrude upon the President's relationship with USPS. *See* State Resp. 57-59. The doctrinal basis for Intervenors' argument is unclear—they spend much of their brief arguing about whether USPS is an independent agency and whether *Congress* can "prohibit the President from giving directives to postal officials," *see id.*, issues not material to Plaintiffs' claims.[6] Plaintiffs' argument is *not* that the E.O. is

---

[6] Intervenors suggest that, "[i]f Congress cannot prevent the President from *firing* postal officials, it follows naturally that Congress cannot prohibit the President from giving directives to postal officials." State Resp. 59. But it does not follow at all; even if an employer can terminate an employee at will, the employer cannot lawfully

unlawful simply because the President instructed USPS to do something. Rather, the

E.O. is unlawful because the President instructed USPS *to do something illegal*. *See*

Br. 36-37. And when the President instructs an agency to do something illegal,

"courts have the power to compel subordinate executive officials to disobey" the

instruction. *Soucie v. David*, 448 F.2d 1067, 1072 n.12 (D.C. Cir. 1971); *Franklin v.*

*Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring) ("Review of the

legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin

the officers who attempt to enforce the President's directive[.]"). That is the relief

Plaintiffs seek: an order confirming Section 3(b) is unlawful and relieving executive

branch officials of their obligation to comply.

## III.     The remaining preliminary injunction factors are present.

### A.     Plaintiffs will be irreparably harmed if the E.O. is not enjoined.

Defendants repeat the district court's error by insisting Plaintiffs must show

irreparable harm is "certain." JA718; Defs. Resp. 65. That is not the law. *League of*

*Women Voters of U.S. v. Newby*, 838 F.3d 1, 8-9 (D.C. Cir. 2016). In any event,

Plaintiffs' injuries *are* certain, as discussed above, and they are a direct result of the

E.O.

In asking Plaintiffs to wait for "Damocles' sword" to fall, *Newby*, 838 F.3d at

---

instruct the employee to do something illegal. A restaurant manager, for instance,
can fire a waiter, but cannot order the waiter to rob a bank.

8, Defendants fail to articulate how a court can later remedy the harm to Plaintiffs. An injunction cannot turn back time; even if a court grants relief close to the election, the time and resources spent battling on an unfair playing field are lost. Just as an unexpected extension of a 100-meter dash to 105 meters deprives all runners of a fair chance to compete, *see Bost*, 607 U.S. at 79, a mid-race change *back* to 100 meters cannot reverse the harm already suffered. Once Plaintiffs have expended resources adjusting to the E.O., a belated injunction would require retooling *yet again*, and any resuscitated plans to mobilize and persuade voters will inevitably be less effective than if they had continued apace. And of course, after an election is over, "there can be no do over and no redress." *Newby*, 838 F.3d at 9 (citation omitted).

There can also be no redress for Plaintiffs' imminent privacy injuries from unlawful data disclosures, and Defendants do not argue otherwise. *See* Br. 56; *CTR*, 815 F.Supp.3d at 61-68 (recognizing irreparable harm from forthcoming government misuse of improperly disclosed information); *see also AFG v. OPM*, 786 F.Supp.3d 647, 693-94 (S.D.N.Y. 2025) (holding public dissemination is not required to establish irreparable harm in a prospective Privacy Act claim).

## B. The equities and public interest favor relief.

On the equities, one side of the scale is empty. Defendants have failed to "name a single concrete harm" they would suffer from an order "maintaining the

27

status quo" that the President has no role in regulating elections. *See Miot v. Trump*, No. 26-5050, 2026 WL 659420, at *2 (D.C. Cir. Mar. 6, 2026) (citation omitted); Br. 55. On the other side, immediate relief is necessary to protect Plaintiffs—including their millions of members—from mass privacy breaches and a sweeping, unlawful transformation of the electoral process weeks before voting begins.

## CONCLUSION

This Court should reverse.

Dated: July 6, 2026

**ELIAS LAW GROUP LLP**

By: /s/ *Lalitha D. Madduri*

Marc E. Elias
Lalitha D. Madduri
Jacob D. Shelly
Christina Ford
Max Accardi
Kevin R. Kowalewski
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
Telephone: (202) 948-1135
eliasm@elias.law
lmadduri@elias.law
jshelly@elias.law
cford@elias.law
maccardi@elias.law
kkowalewski@elias.law

Tyler Bishop
**ELIAS LAW GROUP LLP**
1700 Seventh Ave. Suite 2100

Seattle, WA 98101
Telephone: (206) 656-0177
tbishop@elias.law

29

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7) because it contains 6,494 words, excluding the parts of the brief exempted by Rule 32(f) and Circuit Rule 32(e)(1); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word and is set in 14-point Times New Roman typeface.

Dated: July 6, 2026                    /s/ *Lalitha D. Madduri*

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2026, I filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Lalitha D. Madduri*